# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK, et al.,

     Plaintiffs,

        v.

ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.

     Defendants.

Case No. 1:25-Civ-00196

## PLAINTIFF STATES'
## MOTION FOR A PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................... iii

PRELIMINARY STATEMENT............................................................................................... 1

BACKGROUND ....................................................................................................................... 3

I.    The Department of Health and Human Services Delivers Life-Saving Services to the American People. ............................................................................................................ 3

II.    The March 27 Directive and Initiation of HHS's Dismantling........................................... 4

III.   Since the March 27 Directive, Plaintiffs Have Lost Access to Crucial Services, Public Health Data, Technical Assistance, and Other Important Work from HHS....................... 6

    A.    CDC Laboratory Services and the National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention ..................................................................... 6

    B.    CDC's Division of Reproductive Health ........................................................ 9

    C.    CDC's National Institute for Occupational Safety and Health ..................... 12

    D.    CDC's Office on Smoking and Health, and FDA's Center for Tobacco Products........ 17

    E.    Head Start (within Office of Head Start and HHS Regional Offices) .......................... 18

    F.    Federal Poverty Guidelines (within Office of the Assistant Secretary for Planning and Evaluation) ................................................................................ 20

ARGUMENT ........................................................................................................................... 21

I.    Plaintiffs Are Likely to Succeed on the Merits. .............................................................. 22

    A.    The March 27 Directive Is Subject to Review Under the APA. ................... 22

    B.    The March 27 Directive Is Arbitrary and Capricious. ................................. 23

    C.    The March 27 Directive Is Contrary to Law.................................................. 28

    D.    The March 27 Directive Is Unconstitutional. ............................................... 35

    E.    The March 27 Directive is *Ultra Vires*........................................................ 37

II.    Plaintiffs Face Irreparable Harm Absent Injunctive Relief............................................. 38

    A.    Harms from the Directive's Application to CDC Laboratory Services and CDC's National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention............. 39

    B.    Harms from the Directive's Application to CDC's Division of Reproductive Health.. 40

    C.    Harms from the Directive's Application to the CDC's National Institute for Occupational Safety and Health ...................................................................... 42

    D.    Harms from the Directive's Application to CDC's Office on Smoking and Health, and FDA's Center for Tobacco Products.............................................................. 46

E.     Harms from the Directive's Application to Head Start (within Office of Head Start and HHS Regional Offices)................................................................................... 47

F.     Harms from the Directive's Application to Federal Poverty Guidelines (within Office of the Assistant Secretary for Planning and Evaluation) ................................................. 48

G.     Harms from the Directive's Application to the CDC's National Center for Environmental Health ......................................................................................................... 49

H.     Harms from the Directive's Application to the National Center for Birth Defects and Disabilities......................................................................................................... 51

III.   The Balance of the Equities and the Public Interest Favor a Preliminary Injunction....... 52

IV.    Defendants Cannot Avoid the Merits by Relying on Jurisdictional Arguments. .............. 54

V.     The Court Should Not Require a Bond. ........................................................................ 55

CONCLUSION............................................................................................................ 56

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aids Vaccine Advocacy Coalition v. U.S. Dep't of State*,
No. 25-cv-00402, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ........................................... 36-37

*Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*,
522 U.S. 359 (1998).................................................................................................24

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) .............................................................................24

*Animal Welfare Inst. v. Martin*,
588 F. Supp. 2d 70 (D. Me. 2008) ........................................................................38

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015).................................................................................................37

*Bennett v. Spear*,
520 U.S. 154 (1997).................................................................................................22

*New York v. Trump*,
No. 25-cv-39, 2025 WL 715621 (D.R.I. Mar. 6, 2025).....................................23, 25

*City & Cnty. of San Francisco. v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ...........................................................................28, 35

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020)...................................................................................28

*Clinton v. City of New York*,
524 U.S. 417 (1998).................................................................................................36

*Colorado v. U.S. Dep't of Health & Hum. Servs.*,
No. 25-cv-121, 2025 WL 1017775 (D.R.I. Apr. 5, 2025) ......................................52

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019).................................................................................................27

*Doe v. Trump*,
No. 25-cv-10139, 2025 WL 485070 (D. Mass. Feb. 13, 2025)..............................53

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) ................................................................................................55

*F.C.C. v. NextWave Pers. Commc'ns Inc.,*
    537 U.S. 293 (2003) ............................................................................................28

*Fed. Commc'ns Comm'n v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ............................................................................................23

*Francisco Sanchez v. Esso Standard Oil. Co.,*
    572 F.3d 1 (1st Cir. 2009) ..................................................................................53

*In re Aiken Cnty.,*
    725 F.3d 255 (D.C. Cir. 2013) ............................................................... 28, 36-37

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.,*
    925 F.2d 6 (1st Cir. 1991) ..................................................................................55

*K-Mart Corp. v. Oriental Plaza, Inc.,*
    875 F.2d 907 (1st Cir. 1989) ..............................................................................38

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ...............................................................................54

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................54

*Maine v. United States Dep't of Agriculture,*
    No. 25-cv-00131, 2025 WL 1088946 (D. Me. Apr. 11, 2025) .............................55

*Michigan v. E.P.A.,*
    576 U.S. 743 (2015) ............................................................................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .........................................................................................23, 25

*Myers v. United States,*
    272 U.S. 52 (1926) ........................................................................................35, 37

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,*
    No. 25-cv-239, 2025 WL 368852 (D.D.C. Feb. 3, 2025) ................................24, 55

*Nat'l Fed. of Indep. Bus. v. OSHA,*
    595 U.S. 109 (2022) ............................................................................................37

*Nat'l Treasury Employees Union v. Trump*,
    No. 25-cv-0935, 2025 WL 1218044 (D.D.C. Apr. 28, 2025)..................................................53

*Nat'l Treasury Emps. Union v. Vought*,
    No. 25-cv-0381, 2025 WL 942772 (D.D.C. Mar. 28, 2025) ........................................... 23-24

*Nken v. Holder*,
    556 U.S. 418 (2009)..................................................................................................21, 52

*P.J.E.S. v. Wolf*,
    502 F. Supp. 3d 492 (D.D.C. 2020) ......................................................................................55

*Rhode Island v. Trump*,
    No. 25-cv-128, 2025 WL 1303868 (D.R.I. May 6, 2025) ............................................ *passim*

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996)....................................................................................................38

*Seila L. LLC v. CFPB*,
    591 U.S. 197 (2020)................................................................................................................35

*Trump v. United States*,
    603 U.S. 593 (2024)................................................................................................................35

*U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
    121 F.4th 339 (1st Cir. 2024)................................................................................................21

*Washington v. Trump*,
    No. 25-cv-00244, 2025 WL 659057 (W.D. Wash. Feb. 28, 2025).........................................53

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...................................................................................................................38

*Woonasquatucket River Watershed Counc. v. U.S. Dep't of Agric.*,
    No. 25-cv-97, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) .....................................................52

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)................................................................................................................35

## Constitutions

U.S. Const.
    art. I, § 1 ................................................................................................................................35
    art. I, § 9 ................................................................................................................................36

**Federal Statutes**

2 U.S.C.
    § 683 ................................................................................................................ 36

5 U.S.C.
    § 704 ................................................................................................................ 22
    § 706(2)(A) ................................................................................ 22-23, 28, 35
    § 7103 .............................................................................................................. 55
    § 7123 .............................................................................................................. 55
    § 7703 .............................................................................................................. 55

15 U.S.C.
    § 1341 ........................................................................................................ 17, 33

21 U.S.C.
    § 387d ............................................................................................................. 31
    § 387f .............................................................................................................. 18

29 U.S.C.
    § 651 ................................................................................................................ 12
    § 669 ....................................................................................................... 13, 29-30
    § 669a .............................................................................................................. 29
    § 670 ................................................................................................ 13-14, 29-30
    § 671 ....................................................................................................... 13, 29-30

30 U.S.C.
    § 843 ........................................................................................................ 15, 29
    § 951 ................................................................................................................ 30

42 U.S.C.
    § 242c ............................................................................................................. 32
    § 247b-3 .......................................................................................................... 30
    § 247b-4 .......................................................................................................... 33
    § 247b-4a ........................................................................................................ 33
    § 247b-12 ........................................................................................... 10, 12, 32
    § 247b-13 ........................................................................................................ 33
    § 254c-21 ........................................................................................................ 12
    § 280e-5 .......................................................................................................... 30
    § 300ee-4 ........................................................................................................ 31
    § 9801 ............................................................................................................. 18
    § 9835 ............................................................................................................. 34
    § 9843 ............................................................................................................. 34
    § 9844 ............................................................................................................. 34
    § 9902 ........................................................................................................ 20, 35

Fiscal Year 2025 by the Full-Year Continuing Appropriations and Extension Act, 2025, Pub. L. No. 119-4 (Mar. 15, 2025) ........................................................................32

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47 (Mar. 23, 2024) .......... 30, 32-34

Pandemic and All-Hazards Preparedness Act, Pub. L. 109-417 (Dec. 19, 2006) ........................12

**State Statutes**

RCW 51.32.185 ....................................................................................................................16

**Federal Regulations**

29 C.F.R.
    § 1960.35.........................................................................................................................30

42 C.F.R.
    § 84.10.............................................................................................................................15

**Rules**

Fed R. Civ. P. 65(c) ............................................................................................................55

**Miscellaneous Authorities**

Appropriations Committee, 118th Cong., Rep. on Dep't of Labor, Health & Human Servs., & Educ., and Related Agencies Appropriations Bill 2025, 70-71 (Comm. Print 2025) ...............................................................................................................31

Congressional Research Service, Labor, Health and Human Services, and Education: FY2024 Appropriation, available at https://www.congress.gov/crs-product/R47936 ............36

David Bradley, et al.,Cong. Rsch. Serv. R47936, Labor, Health, and Human Services, and Education: FY2024 Appropriations (2024), https://www.congress.gov/crs-product/R47936.......................................................................................................................36

## PRELIMINARY STATEMENT

The Department of Health and Human Services (HHS, or the Department) is required by law to promote the health and well-being of all Americans by regulating and advancing medicine, public health, and social services. For more than a century, Congress has enacted statutes governing HHS that created public health programs and responsibilities that the Department must implement and has allocated trillions of dollars of funding for HHS to do so—thereby improving Americans' health and ensuring that the most vulnerable people in our country are fed, clothed, sheltered, and cared for. Generations of public servants, including the more than 82,000 scientists, doctors, social workers, and administrators employed by the Department, have devoted themselves to this mission. Untold numbers of Americans have enjoyed the benefits of this work and lived longer, fuller, and more stable lives as a result.

HHS Secretary Robert F. Kennedy, Jr. ignored these laws and the public health progress they have enabled when, on March 27, he issued a 650-word press release announcing the Defendants' plan to terminate 10,000 HHS employees and shutter dozens of agencies as part of Secretary Kennedy's directive to "Make America Healthy Again" (the "March 27 Directive"). Termination notices were sent on April 1 placing staff on administrative leave, with formal terminations set to begin occurring on June 2 (absent court intervention). That directive followed a series of public statements of contempt for the Department, its employees, and the statutory and constitutional constraints on the Executive branch.

The March 27 Directive reflects a rapidly unfolding effort to disable, diminish, or effectively eliminate the dozens of sub-agencies that compose the Department, in direct violation of the Constitution and the express will of Congress. Defendants claim that the Directive's implementation makes the Department more "responsive and efficient." But in reality, the

Directive has already incapacitated critical and often statutorily required services that the States and their citizens rely on, while the planned reduction in force would save less than one percent of the Department's budget. In fact, the cuts are designed to degrade disfavored HHS sub-agencies, such as those that address HIV/AIDS, workers' safety, and programs for those living in poverty.

Plaintiff States file this Motion for a Preliminary Injunction to prevent the imminent, irreparable damage resulting from the unlawful Directive's implementation as to certain agencies and programs within HHS. Specifically, Plaintiff States seek to enjoin the mass terminations and restructurings resulting from the March 27 Directive at (1) the Centers for Disease Control and Prevention, (2) the Center for Tobacco Products, (3) the Office of Head Start and Head Start employees in Regional Offices, and (4) the Office of the Assistant Secretary for Planning and Evaluation. Although the entire restructuring plan as described in the March 27 Directive is unlawful, the mass terminations and restructurings at these agencies and programs have caused and will continue to cause particularly severe harms to Plaintiff States, by depriving them of the resources and expertise they need to combat infectious diseases, reduce smoking related deaths, and ensure that children and families have access to crucial means-tested programs, including Head Start.

The Court should grant the preliminary injunction. First, Plaintiffs are likely to prevail on their claims that Defendants' actions challenged here violate the Administrative Procedure Act, congressional mandates, and the Constitution. Second, Plaintiffs have suffered and will continue to suffer irreparable harm stemming directly from the portions of the Directive they seek to have preliminarily enjoined, in the form of lost data, technical assistance, laboratory capacity, guidance, and support for critically important state public health programs. These harms are particularly imminent and acute given the June 2 deadline for formal staff terminations. Third, the devastating

public health and welfare consequences of Defendants' actions overwhelmingly militate in favor of preliminary injunctive relief. This Court should therefore grant the States' Motion for a Preliminary Injunction to prevent the unlawful evisceration of many portions of HHS while this litigation proceeds.

## **BACKGROUND**

### I.     The Department of Health and Human Services Delivers Life-Saving Services to the American People.

The Department of Health and Human Services (the Department or HHS) is an agency of the federal government with a broad and impactful portfolio of programs. The Department spent $2.5 trillion in Fiscal Year 2024 alone on federal health programs and a wide variety of services, including medical and public health research, and social services promoting health and safety. Ex. 17 to the Declaration of Andres Ivan Navedo.[1] The Department's activities reflect Congress's interest in protecting and improving the general welfare of people living in the United States.

Congress has passed scores of laws for HHS to enforce, and each year, it appropriates billions of dollars in funding for the agency to fulfill its statutory obligations. In a given year, HHS employees inspect the factories that process the country's food supply; collect national data on threats to public health, including substance use and overdose and maternal morbidity and mortality; and operate cutting-edge laboratories that track disease outbreaks in real time by testing samples for hepatitis, complex sexually transmitted infections, and emerging respiratory viruses. HHS employees also administer grants to States to fund programs to support early childhood education, heating and cooling assistance to low-income households, tobacco prevention and cessation efforts, and many more projects that help keep Americans healthy.

---

[1] Citations herein to "Ex. ___" are to the Declaration of Andres Ivan Navedo, unless otherwise indicated.

## II.    The March 27 Directive and Initiation of HHS's Dismantling

In early 2025, Robert F. Kennedy, Jr. was confirmed to be President Trump's HHS Secretary. On March 27, 2025, HHS announced multiple structural changes. Ex. 1 (March 27 Directive); Ex. 2 (March 27 Directive Fact Sheet). First, it would terminate 10,000 employees, which, in addition to earlier reductions in force (RIFs) and departures, would result in the Department losing a total of 20,000 full-time employees. Ex. 1 (March 27 Directive) at 1. But that was not all. According to the announcement, HHS would collapse twenty-eight divisions into fifteen and, in the process, create three new agencies including the Administration for a Healthy America. *Id.* at 1–2. Furthermore, HHS would close half of its regional offices. *Id.* at 2. For many HHS employees, the news of their termination came with no advance notice, so that they could not plan for a smooth transition of services and work. But even if they had had sufficient notice to plan for continuity, many entire divisions were wiped out, meaning that there were no staff left who could take over their responsibilities. *See, e.g.*, Ex. 46 (Doe 1 Decl.) ¶¶ 5, 20–27; Ex. 47 (Doe 2 Decl.) ¶¶ 14–16.

Secretary Kennedy admitted that it was "always the plan" for the terminations to be overbroad. Ex. 4 (CBS News, *RFK Jr. says 20% of health agency layoffs could be mistakes*). He has said that he ordered the March 27 Directive despite advanced knowledge that there were "mistakes" and that "[p]ersonnel that should not have been cut, were cut." *Id.* In a later interview, he agreed that he could have gone "line-by-line" to ensure he was terminating employees whose jobs were not necessary, but that such a careful approach "took too long" and he would "lose political momentum." Navedo Decl. ¶ 4.

On April 1, notices went out that placed staff on immediate administrative leave and notified them that they would be permanently terminated as of June 2, 2025. Ex. 46 (Doe 1 Decl.) ¶¶ 20–21; Ex. 47 (Doe 2 Decl.) ¶¶ 9–11. For many HHS employees, the news of their termination

4

came with no advance notice, so workers were locked out of their emails, laptops, and offices and they could not plan for a smooth transition of services and work. Ex. 64 (Bloomberg.com, *RFK Jr. Ousts Top Officials in Bid to Overhaul U.S. Health Agency*, at 5).

Of the 10,000 termination notices, approximately one-quarter (2,400) went to employees at the Centers for Disease Control and Prevention (CDC). Ex. 2 (March 27 Directive Fact Sheet) at 2. Within CDC, about a thousand termination notices were directed to one subagency, the National Institute of Occupational Safety and Health (NIOSH), which would result in the termination of more than ninety percent of its workforce. Ex. 47 (Doe 2 Decl.) ¶¶ 9–16; Ex. 34 (Miller Decl. - WA) ¶ 8. CDC's National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention had to shut down its laboratories and lost other staff as well. Ex. 20 (Peruski Decl. - NY) ¶¶ 22–23. CDC's Division of Reproductive Health (DRH) lost most of its staff—including the entire team that managed the Pregnancy Risk Assessment Monitoring System (PRAMS), which surveyed pregnant people and babies to improve health outcomes. Ex. 18 (Mother Jones, *Inside the "Vital" Office for Reproductive Health Gutted by Mass HHS Firings*). CDC's Office on Smoking and Health (OSH), which protects Americans from the dangers of tobacco products by spotting trends in tobacco use and preventing it at the national and state levels, lost all or almost all of its staff. Ex. 63 (Statnews, *Why CDC cuts are being called 'the greatest gift to tobacco industry in the last half-century'*). In addition to these debilitating terminations, NIOSH (a CDC subagency), was absorbed into the new Administration for a Healthy America, adding more unknowns and restructuring work to any employees who actually remain at the agencies. Ex. 2 (March 27 Directive Fact Sheet) at 2.

Beyond CDC, the March 27 Directive also terminated staff at FDA's Center for Tobacco Products (CTP), which plays a complementary role to CDC in tobacco regulation and response.

Ex. 65 (Politico, *The FDA fired its tobacco enforcers. Now it wants them back.*). Likewise, Defendants terminated scores of staff members at the Administration for Children and Families, which runs, among other things, Head Start, a federally funded program that provides comprehensive services to low-income children and families primarily focusing on early learning, health, and family support. Ex. 19 (Associated Press, *Mass layoffs rattle Head Start leaders already on edge over funding problems*); Ex. 39 (Marton Decl. - NY) ¶¶ 16–17. Additionally, two-thirds of the staff under the Assistant Secretary for Planning and Evaluation (ASPE), including every person on the team responsible for updating the federal poverty guidelines, were terminated. Ex. 12 (KFF Health News, *Trump HHS Eliminates Office That Sets Poverty Levels Tied to Benefits for at Least 80 Million People*).

### III. Since the March 27 Directive, Plaintiffs Have Lost Access to Crucial Services, Public Health Data, Technical Assistance, and Other Important Work from HHS.

The mass termination of 10,000 HHS employees, including 2,400 CDC employees, pursuant to the March 27 Directive had the foreseeable and intended effect of interrupting the core work of the Department. Literally overnight, there was no one to answer the phones or otherwise respond to inquiries from stakeholders and grant recipients (including state agencies), or the general public. Factories went into shutdown mode, studies were abandoned, trainings were cancelled, site visits were postponed, and partnerships were suspended.

The devastating effects of these terminations and reorganizations were felt outside HHS immediately in many ways. Here are six examples.

### A. CDC Laboratory Services and the National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention

Prior to April 1, Plaintiff States relied upon CDC's infectious diseases laboratories and the National Center for HIV, Viral Hepatitis, STD and Tuberculosis Prevention (NCHHSTP) for an array of services, including: (1) diagnostic testing for rare and complex diseases (Ex. 20 (Peruski

Decl. - NY) ¶¶ 13–20; Ex. 21 (Underwood Decl. - MN) ¶ 11; Ex. 22 (Hovan Decl. - DE) ¶ 7); (2) susceptibility and antibacterial resistance testing for infectious diseases (Ex. 23 (Gallagher Decl. - RI) ¶¶ 9–11; Ex. 21 (Underwood Decl. - MN) ¶ 11; Ex. 20 (Peruski Decl. - NY) ¶¶ 13, 15); (3) developing new diagnostic tools for STIs to address rising cases of reportable STIs (Ex. 25 (Rosenberg Decl. - NY) ¶ 13); (4) disease outbreak surveillance (Ex. 21 (Underwood Decl, - MN) ¶ 16); (5) trainings for public health professionals involved in contact tracing and case investigations for STIs (*id.* ¶ 22); (6) on-the-ground support for outbreak response (Ex. 24 (Larkin Decl. - RI) ¶ 11); (7) coordinated national guidance for HIV surveillance and prevention, a crucial task given the CDC's estimate that 1.2 million people in the United States are living with HIV (Ex. 25 (Rosenburg Decl. - NY) ¶ 15; Ex. 61 (May 21, 2024 CDC Publishes New HIV Surveillance Reports); (8) the HIV Medical Monitoring Project, which provides "nationally representative estimates related to behaviors, clinical outcomes, quality of care for people living with HIV and is conducted in 23 project areas around the United States," and helps Plaintiff States "monitor trends, identify unmet healthcare needs, and assess access to ancillary care, and supportive services" (Ex. 25 (Rosenburg Decl. - NY) ¶ 16); and (9) embedded field assignees who advise state agencies on congenital syphilis and other STIs (see, *e.g.*, Ex. 51 (Cunico Decl. - AZ) ¶ 14); Ex. 26 (Brown Decl. – NJ) ¶ 40. In Rhode Island, the State Department of Health "relied on CDC for its technical assistance in preventing and controlling HIV/AIDS, viral hepatitis, STIs, and tuberculosis," including a recent "multi-drug resistant case of tuberculosis." Ex. 24 (Larkin Decl - RI) ¶ 11. New York and other Plaintiff States relied upon CDC's "highly sophisticated tools including bioinformatic genetic analysis programs used for hepatitis outbreak investigations that are not available in any other laboratory." S*ee* Ex. 20 (Peruski Decl. - NY) ¶ 13.

Since the March 27 Directive's implementation, many of the laboratories that Plaintiff States relied upon have been shuttered, and Plaintiff States no longer have access to the services and expertise that they require to address infectious diseases in their States. Beginning April 1, Plaintiff States learned that CDC "would be eliminating much, if not all, of its reference and confirmatory testing for STIs." Ex. 20 (Peruski Decl. - NY) ¶ 23; *see also* Ex. 21 (Underwood Decl. – MN) at Ex. D. And while State Public Health Laboratories have tried to close the gaps created by the shuttered laboratories, some gaps cannot be filled. For instance, with regards to viral hepatitis:

> The elimination of the CDC's Hepatitis laboratories is especially concerning because DVH has developed and maintained a proprietary Global Hepatitis Outbreak and Surveillance Technology (GHOST) system to characterize viral genotypes and transmission links among cases with hepatitis C virus (HCV) infection in outbreak settings. The Wadsworth Center [in New York] does not have access to the GHOST system and cannot replace the CDC's unique capability to track HCV infections in real time without committing significant, additional resources.

Ex. 20 (Peruski Decl. - NY) ¶ 24; *see also* Ex. 21(Underwood Decl. - MN) ¶ 16 ("In the meantime, Minnesota and other states are left without a national surveillance system for Hepatitis A, which means some national outbreaks may go undetected.").

The result is that State Public Health Laboratories are being asked to fill the gaps, and they must divert resources away from other important work to try to do so and likely cannot ultimately fill all of the gaps. For instance, CDC has begun "redirecting testing requests" for "H. influenzae and Neisseria meningitidis" to Minnesota's State Public Health Laboratory, which will cause delays in getting results and will mean that outbreaks may go undetected for longer, because of the lack of national surveillance systems. Ex. 21 (Underwood Decl. – MN) ¶¶ 18–19. In Rhode Island, the elimination "of the CDC's STD Prevention Laboratory Branch directly impacts the ability of [Rhode Island State Health Laboratories] and [division of Emergency Preparedness Infectious

Disease] to identify and track resistant gonorrhea cases in Rhode Island," at a time of "regional emergence of highly resistant gonorrhea." Ex. 23 (Gallagher Decl. - RI) ¶ 14. States are scrambling to find alternate laboratories for testing and are often having to pay more and locate alternative sources of funding. *Id.* ¶ 18; *see also* Ex. 22 Hovan Decl. - DE) ¶ 17 ("The changes to CDC Infectious Diseases Laboratory testing . . . have forced Delaware Public Health Laboratory to rely on alternative labs for testing, which may contribute to an increase in costs, delayed testing, and/or reporting of public health disease for investigation.").

Plaintiff States have also lost access to technical assistance and resources they relied upon for preventing transmission of STIs, including HIV and hepatitis. In New Jersey, the Department of Health has lost access to guidance and data about HIV pre-exposure prophylaxis medication. Ex. 26 (Brown Decl. - NJ) ¶ 28–29. New York relied upon the Medical Monitoring Project, which was run out of the NCHHSTP, to guide the assignment of resources and to overcome barriers to access to care. Ex. 25 (Rosenberg Decl. - NY) ¶¶ 16, 29–35. Several States received notifications that their grants supporting STD/HIV Disease Intervention Training Centers would be terminated because the March 27 Directive meant that the Division of STD Prevention (located within the NCHHSTP) "is no longer able to provide programmatic technical assistance or project monitoring as required by law." *Id.* ¶ 40; *see also* Ex. 60 (Kato Decl. – HI) ¶ 20.

### B. CDC's Division of Reproductive Health

The Division of Reproductive Health (DRH) operated within CDC until the March 27 Directive caused all employees of two of its three branches to be placed on administrative leave on April 1, including the fifteen-person team responsible for the Pregnancy Risk Assessment Monitoring System, (PRAMS). *See* Ex. 6 (Rolling Stone, *How Trump's CDC Purge Will Affect Reproductive Health: 'Women Will Die'*). Prior to April 1, DRH had worked to reduce the risk and

9

improve the health of women and infants by studying maternal mortality, improving quality of care for pregnant and birthing people and newborns, and collecting quality data.

Among other programs, DRH administered the Pregnancy Risk Assessment Monitoring System (PRAMS). *See* 42 U.S.C. § 247b-12(a)(2)(B). PRAMS is a joint surveillance project that collects data nationwide on individuals' experiences during pregnancy, delivery, and postpartum. Ex. 27 (Eilers Decl. - WA) ¶ 4; Ex. 25 (Rosenberg Decl. - NY) ¶ 9. PRAMS is carried out through cooperative agreements between CDC and participating public and private health organizations, including state departments of health. Ex. 7 (NY PRAMS Notice of Award), 1; Ex. 28 (Biggs Decl. - OR) ¶ 9; *see* Ex. 30 (Blessing (PRAMS) Decl. - DE) ¶ 12; Ex. 50 (Standridge Decl. - WI) ¶ 10; Ex. 51 (Cunico Decl. - AZ) ¶ 8. The program is designed to identify groups of women and infants at high risk for health problems, to monitor changes in health status, and to measure progress towards goals in improving the health of mothers and infants. Ex. 26 (Brown Decl. - NJ) ¶ 8.

DRH collected survey data from PRAMS partners through the PRAMS Integrated Data Collection System. Ex. 29 (Epstein Decl. - IL) ¶ 6; Ex. 25 (Rosenberg Decl. - NY) ¶ 10; Ex. 50 (Standridge Decl. - WI) ¶ 5; *see* Ex. 7 (NY PRAMS Notice of Award), 5 (noting CDC staff will "[p]rovide CDC-provided software system for use in data collection procedures and monitoring of PRAMS operational data"); Ex. 8 (OR PRAMS Notice of Award), 5 (same). CDC experts are responsible for maintaining the data provided by PRAMS partners through the PRAMS Integrated Data Collection System; for extracting, cleaning, and weighting the raw data submitted by PRAMS partners; and for providing the final national data to participants. Ex. 25 (Rosenberg Decl. - NY) ¶ 10; Ex. 27 (Eilers Decl. - WA) ¶ 5. Plaintiff States use PRAMS data for program planning, policy development, and overall decision-making regarding maternal and infant health. Ex. 24 (Larkin Decl. - RI) ¶ 9. For example, Rhode Island and Washington's departments of health relied in part

on PRAMS data that showed barriers to health care access during the postpartum period in deciding to extend Medicaid coverage for new parents to one year postpartum. *Id.* ¶ 9; Ex. 27 (Eilers Decl. - WA) ¶ 4. Similarly, New Jersey relied on PRAMS data to identify Black women as a high-risk maternal population, and, as a result, the state health commissioner appropriated $4.7 million per year in grant funding to community-based organizations to address Black maternal health. Ex. 26 (Brown Decl. - NJ) ¶¶ 8–11. But the PRAMS Integrated Data Collection System is now offline indefinitely and no new data is being collected. Ex. 25 (Rosenberg Decl. - NY) ¶ 24; Ex. 28 (Biggs Decl. - OR) ¶ 20; Ex. 26 (Brown Decl. - NJ) ¶ 18.

DRH also provided PRAMS partners with funding and substantial programmatic involvement including: technical assistance for epidemiology, data collection and editing, and implementation of survey supplements; maintenance of approvals for research involving human subjects; statistical guidance; and organizing workshops and trainings. Ex. 7 (NY PRAMS Notice of Award), 5–6; Ex. 28 (Biggs Decl. - OR) ¶¶ 9, 19–21. PRAMS cooperative agreements specify that a federal project officer or other staff member will provide "day-to-day" support for the project. Ex. 7 (NY PRAMS Notice of Award), 6. But DRH's support for PRAMS halted after April 1, leading to the cessation of PRAMS activities by CDC. In fact, on April 30, CDC informed Plaintiff States' agencies that it could "no longer provide the scientific, technical, and information technology assistance resources as described in the Notice of Funding Opportunity" for PRAMS. Ex. 25 (Rosenberg Decl. - NY) ¶ 24; Ex. 24 (Larkin Decl. - RI) ¶ 15; Ex. 27 (Eilers Decl. - WA) ¶ 6; Ex. 29 (Epstein Decl.  IL) ¶ 16; Ex. 50 (Standridge Decl. - WI) ¶ 10; Ex. 28 (Biggs Decl. - OR) ¶ 27.

DRH also ran the Pregnancy Mortality Surveillance System, which supported public and private agencies and organizations managing Maternal Mortality Review Committees (MMRCs).

42 U.S.C. §§ 247b-12(d), 254c-21(a)(2). MMRCs are multidisciplinary committees formed at the state or local level that perform comprehensive reviews of deaths among women during and within a year of the end of a pregnancy. 42 U.S.C. § 247b-12(d); Ex. 30 (Blessing Decl. (PRAMS) - DE) ¶ 8. MMRC data is critical to providing a deeper understanding of the circumstances surrounding each maternal death, and to guiding evidence-based coordination of health care and other services to prevent future deaths. *Id.* ¶ 8. After April 1, DRH's support for MMRCs disappeared, including specific technical guidance that DRH had previously made available to MMRCs. *See* Ex. 24 (Larkin Decl. - RI) ¶¶ 8, 13–14.

In addition, DRH also ran a Field Support Branch to provide guidance on the needs of pregnant and postpartum people and infants in emergencies. *See* Pandemic and All-Hazards Preparedness Act, Pub. L. 109-417. And it studied assisted reproductive technology, including by collecting data from clinics offering in vitro fertilization. *See* Pub. L. 102-493. But after April 1, there is no one left within DRH to staff these congressionally mandated activities.

### C. CDC's National Institute for Occupational Safety and Health

The National Institute for Occupational Safety and Health (NIOSH) sits within CDC and was created by Congress to address and prevent work-related injury and illness across all types of workplaces, including mines, fire departments, oil and gas wells, construction sites, small businesses, and hospitals. Ex. 47 (Doe 2 Decl.) ¶ 4.

NIOSH is the only federal agency statutorily mandated and authorized to conduct workplace health and safety research. 29 U.S.C. § 651 *et seq.* NIOSH is required, *inter alia,* to: conduct or fund "research, experiments, and demonstrations relating to occupational safety and health"; "produce . . . criteria identifying toxic substances," including setting "exposure levels that are safe for various periods of employment"; and "publish . . . at least annually a list of all known toxic substances by generic family or other useful grouping, and the concentrations at which such

toxicity is known to occur"; disseminate information about occupational safety to employers and employees; conduct education programs about occupational safety; and contract with State personnel to provide compliance assistance for employers. 29 U.S.C. §§ 669(a)(1)-(3), 669(a)(6), 669(d), 670, 671(c)(2). Additionally, Congress has required that there be "permanently established" within NIOSH an Office of Mine Safety and Health, which is "responsible for research, development, and testing of new technologies and equipment designed to enhance mine safety and health." 29 U.S.C. § 671(h). Most NIOSH employees are based in research laboratories and offices in Cincinnati, Ohio; Morgantown, West Virginia; Pittsburgh, Pennsylvania; Spokane, Washington; Washington, D.C.; Atlanta, Georgia; and Denver, Colorado. Ex. 47 (Doe 2 Decl.) ¶ 5.

NIOSH has been gutted by the March 27 Directive. Nearly all (over 90%) of NIOSH's highly-trained employees received either Notices of RIF or Notices of Intent to RIF. Ex. 47 (Doe 2 Decl.) ¶¶ 8-14. NIOSH employees confirmed via an annotated organizational chart that the Institute's programs would be largely demolished:



*Id.* ¶ 14.

The work of NIOSH can be divided into Extramural Programs, and Intramural Programs. Both of these functions are mandated, directly or impliedly, by statute. Most, if not all, of these programs will be eliminated as a result of the March 27 Directive.

***Extramural Programs***: Extramural research programs operate at non-federal facilities and interface with private and public partners. For instance, before the March 27 Directive, NIOSH funded eighteen Education and Research Centers, which NIOSH described as playing a key role in fulfilling its statutory directive to conduct either directly or with grants, "education programs to provide an adequate supply of qualified personnel to carry out the purposes" of the Occupational Safety and Health Act. 29 U.S.C. § 670(a); Ex. 31 (Simpson Decl. - WA) ¶ 4.

One such Education and Research Center is the Northwest Center for Occupational Health and Safety at the University of Washington, a center fully-funded by NIOSH, though their funding runs out this June 30, 2025. Ex. 31 (Simpson Decl. - WA) ¶¶ 11-20. Following the March 27 Directive, NIOSH has lost the personnel necessary to process the Northwest Center's non-competitive renewal application, as well as their request for a no-cost extension. *Id.* After months of the Northwest Center pleading with their program official at NIOSH for any kind of response, on May 2, 2025, they eventually received an answer from a CDC Grant Specialist: "***at the present time there is a pause on all NIOSH activities***." Ex. 31 (Simpson Decl. - WA) ¶ 18, Ex. 2 (emphasis added). A phone call to the NIOSH program official (who informed the Northwest Center he was not allowed to communicate via email because of HHS' communications embargo) confirmed that the CDC had no plans to take any action on renewal applications for Education and Research Centers —seemingly content to let them wither and end. *Id.* ¶ 17. Several other Plaintiff State Education and Research Centers, as well as those in state surveillance programs, report similar

silence from HHS on their NIOSH extramural grants. *See, e.g.,* Ex. 32 (Bonauto Decl. - WA) ¶¶ 14-16; Ex. 33 (Tan Decl. - NJ) ¶ 7.

*Intramural Programs*: NIOSH's own internal programs have also been largely gutted— even those explicitly mandated by statute. After the reductions in force, NIOSH's facilities in Spokane and Pittsburgh, including its mining research and surveillance capabilities, would become functionally obsolete, their specialized equipment rendered essentially inoperable. Ex. 47 (Doe 2 Decl.) ¶¶ 9-16; Ex. .34 (Miller Decl.) ¶¶ 14-19. The Coal Miner Health Surveillance Program, a statutorily mandated program (30 U.S.C. § 843) that tracks black lung and permits no-cost transfer to lower dust settings, exists in name only, and has stopped providing medical screenings and accepting new requests. Ex. 35 (Leland Decl. - WA) ¶¶ 30-31.

The same is true for several other congressionally mandated programs, such as the National Firefighter Registry for Cancer and the Fire Fighter Fatality Investigation and Prevention Program, which have both stopped accepting new submissions or producing new work product "due to the reductions in force across NIOSH." Ex. 35 (Leland Decl. - WA) ¶¶ 32-35. The National Personal Protective Technology Laboratory (NPPTL) in Pittsburgh, PA, which is required to vet and approve personal protective equipment, including N95 respirators and self-contained breathing apparatus (SCBA) machines used by firefighters, lost all or nearly all its employees, and has confirmed on its website that it will not take any new respirator approval applications "due to the reduction in force across NIOSH." *Id*. ¶¶ 19-23. The NPPTL, by law, is the only facility authorized to perform this certification, leaving certification applicants nowhere else to turn. 42 C.F.R. § 84.10(c). And NIOSH's congressionally mandated Health Hazard Evaluation program, which investigates workplaces upon request and publishes findings and evidence-based recommendation

for workplace safety, similarly announced it could no longer operate "due to the reduction in force across NIOSH." Ex. 35 (Leland Decl. - WA) ¶¶ 24-29.

Recently, following media coverage of the layoffs, HHS briefly restored "some" NIOSH workers for some specific NIOSH programs in mining and firefighting—but only on a "temporary" basis until their official separation dates in June or July. Ex. 47 (Doe 2 Decl.) ¶ 12. And despite HHS promising that NIOSH's functions would be subsumed into the new Administration for a Healthy America, no transition plan has been enacted, nor have current NIOSH employees received any instruction for transitioning their programs to anyone else at HHS. *Id.* ¶ 16. After the RIFs, NIOSH, by nearly all accounts, will functionally cease to exist as the occupational safety apparatus Congress created and required. *Id.; E*x. 34 (Miller Decl. - WA) ¶¶ 6-8; Ex. 33 (Tan Decl. - NJ) ¶ 6; Ex. 35 (Leland Decl. - WA) ¶¶ 7-8; Ex. 36 (Berg Decl. - CA) ¶ 11.

***State Reliance on NIOSH Standards***: Additionally, Plaintiff States rely heavily on NIOSH for developing their own workplace safety rules. Ex. 36 (Berg Decl – CA). ¶ 21. Plaintiff States like Washington and California explicitly incorporate into its laws and regulations NIOSH publications, recommendations, and findings in setting rules for wildland fire smoke, nanomaterials, perfluoroalkyl and polyfluoroalkyl substances, toxic dust exposure, infectious disease exposure, excessive noise exposure, and hazardous drug exposure. Ex. 35 (Leland Decl – WA). ¶¶ 10-17, 42-43; Ex. 36 (Berg Decl. - CA) ¶¶ 29-31. Certain state laws depend on updated research findings and standards from NIOSH to determine what specific health conditions can be presumed for purposes of workers compensation—like cancer for firefighters. *See* RCW 51.32.185 (Washington statute on presumption of occupational disease for firefighters); Ex. 35 (Leland Decl – WA). ¶¶ 34-35. Certain state workplace safety regulations require NIOSH-approved respiratory equipment for certain dangerous jobs conditions—certification that can only come (under 42 CFR

Part 84) from the NPPTL, which has now been rendered inoperable by the Secretary's Directive. Ex. 35 (Leland Decl. - WA) ¶¶ 19-23; Ex. 36 (Berg Decl. - CA) ¶¶ 15-18. Additionally, Plaintiff States depend on NIOSH not only to certify that respiratory equipment meets standards, but also to guard against counterfeit or shoddy equipment that gives workers only the illusion of protection from harmful airborne particulate matter and diseases. Ex. 36 (Berg. Decl. - CA) ¶¶ 15-16.

### D. CDC's Office on Smoking and Health, and FDA's Center for Tobacco Products

HHS must, by law, operate two subagencies that regulate the tobacco industry and protect Americans from the health risks of tobacco products: The Office on Smoking and Health (OSH) within the CDC, and the Center for Tobacco Products (CTP) within FDA.

The Office on Smoking and Health (OSH) prevents and reduces smoking—the leading cause of preventable disease, disability, and death in the United States—by collecting, studying, and sharing information on tobacco use and its effects on health, all work that is mandated by Congress. Ex. 37 (Davis Decl. - NY) ¶ 7. This work is required by statute, as the Secretary must "conduct and support research on the effect of cigarette smoking on human health and develop materials for informing the public of such effect." 15 U.S.C. § 1341(a)(1). But OSH was effectively shuttered through terminations. Ex. 59 (Hertel Decl. - MI) ¶ 37. There is now no one at OSH to collect, manage, and publish data and guidance, including the National Youth Tobacco Survey, Best Practices for Comprehensive Tobacco Control Program Guide. Ex. 25 (Rosenberg Decl. - NY) ¶ 25; Ex. 37 (Davis Decl. - NY) ¶¶ 9, 11, 12, 14; Ex. 21 (Underwood Decl. - MN) ¶ 8; Ex. 51 (Cunico Decl. - AZ) ¶ 12; Ex. 59 (Hertel Decl. - MI) ¶¶ 41, 48.

Additionally, the Center for Tobacco Products (CTP) within FDA implements, among other things, the Family Smoking Prevention and Tobacco Control Act, Pub. L. 111-31, and oversees the manufacture, marketing, distribution, and sale of tobacco products and to protect the public from the harmful effects of tobacco product use. The CTP is responsible for conducting compliance

checks to ensure tobacco products are not sold to minors. 21 U.S.C. § 387f. In the past, Plaintiff states have relied on these compliance checks to protect minors from illegally purchasing tobacco products. Ex. 56 (Sanchez Decl. - NM) ¶ 20; Ex. 59 (Hertel Decl. - MI) ¶ 58; Ex. 37 (Davis Decl. - NY) ¶ 34. Yet CTP has paused compliance checks and review of premarket applications. Ex. 59 (Hertel Decl. - MI) ¶ 46 (" . . . HHS terminated the staff at the CTP, effectively shuttering it.").

### E.  Head Start (within Office of Head Start and HHS Regional Offices)

Head Start provides vital services at no cost to eligible families with young children, including early childhood education and services that support early learning and development, health, and family well-being. Ex. 10 (February 5, 2025 Head Start Approach). Eligible families include those with low-incomes, children in foster care, or children living in temporary housing. Head Start programs include the Early Head Start-Child Care Partnership (Early Head Start) for infants, toddlers, and expectant families. Some Plaintiff States participate in Early Head Start as grantees and mix state and federal funds to provide services. Ex. 38 (Propheter Decl. - CA) ¶¶ 10, 13.

The Office of Head Start sits within the Administration of Children and Families (ACF) and manages the Head Start program, which was created by statute. 42 U.S.C. § 9801. For day-to-day operations, Head Start grantees including Plaintiff States relied on grant managers, program specialists, fiscal specialists, and other staff in the HHS's Regional Offices. Ex. 39 (Marton Decl. - NY) ¶ 9; Ex. 38 (Propheter Decl. - CA) ¶¶ 18–22; Ex. 40 (Pascale Decl. - CT) ¶¶ 10, 14–15. Head Start programs regularly operate on razor-thin margins and only have reserves to survive from one week to a maximum of two months without federal funding. Ex. 39 (Marton Decl. - NY) ¶ 21.

ACF lost about 500 staff members, or thirty-eight percent of its total headcount, in the April 1 terminations. It lost all staff in the regional offices in Boston (Region 1), New York City (Region

2), Chicago (Region 5), San Francisco (Region 9), and Seattle (Region 10). Ex. 40 (Pascale Decl. - CT) ¶¶ 17–18; Ex. 1.

Without sufficient ACF staff members to manage Head Start programs, Plaintiff States and other Head Start grantees were thrown into "chaos." Ex. 39 (Marton Decl. - NY) ¶ 25. Without warning, grantees lost their critical points of contact at regional offices. Ex. 39 (Marton Decl. - NY) ¶¶ 17, 25; Ex. 38 (Propheter Decl. - CA) ¶¶ 20, 21. In Region 9, for example, Head Start staff "have not provided technical assistance, have not conducted site visits, and have not been available to respond to grant questions or to provide other grant oversight activities." Ex. 38 (Propheter Decl. - CA) ¶ 29; see also id. ¶ 31 ("HHS Head Start staff are no longer available to offer training, technical assistance, monitoring, site visits, and other support to Head Start programs."). In a failed effort to answer questions, grantees across the country were told to email their questions to an unassigned inbox or use a correspondence feature within the Head Start Enterprise System. But in using either method, grantees received limited or no response. Ex. 38 (Propheter Decl. - CA) ¶ 26; Ex. 40 (Pascale Decl. - CT) ¶ 18; Ex. 39 (Marton Decl. - NY) ¶ 17. Weeks after the terminations, grantees were invited to a webinar to address the "regional realignment," but the information was unhelpful, no questions were taken (or permitted), and the webinar was ended in less than ten minutes. Ex. 40 (Pascale Decl. - CT) ¶ 12; Ex. 38 (Propheter Decl. - CA) ¶ 27. Grantees and Plaintiff States still have questions that are critical, technical, and, yet unanswered. Ex. 40 (Pascale Decl. - CT) ¶ 13 (questions regarding a "carry-over" request application for $65,564; Ex. 39 (Marton Decl. - NY) ¶ 20 (questions regarding recent amendments to the HHS grants Policy Statement regarding DEI initiatives). Additionally, Plaintiff States have faced delays in receiving notifications of funding since the March 27 Directive, so that they have learned about the amount of funding provided mere days before  it is scheduled to commence, Ex. 40 (Pascale Decl. - CT) ¶

16; Ex. 39 (Marton Decl. - NY) ¶ 13 & fn. 1 ("Approximately 20 Head Start programs expecting a Notice of Award for refunding starting in April or May received no updates on the status of their applications.").

Further, ACF's Division of State Systems supports state agencies in developing, operating, and assessing child welfare systems by responding to questions, proving technical assistance, and serving as the primary contact. Ex. 5 (June 30, 2024 ACF Division of State Systems); Ex. 58 (Verma Decl. - WA) ¶ 3. The entire Division of State Systems team received RIFs on April 1, 2025. Ex. 58 (Verma Decl.- WA) ¶ 4. States such as Washington, which rely on the Division of State Systems to develop and operate their child welfare information systems, were not provided any advanced notice about the RIFs. *See id.* (email from Washington's Division of State Systems analyst stating that "the DDS federal team is Riffed as of today. Sorry for a very short notice, I am not sure what [is] next for us.")

## F. Federal Poverty Guidelines (within Office of the Assistant Secretary for Planning and Evaluation)

HHS's Office of the Assistant Secretary for Planning and Evaluation (ASPE) is responsible for updating the federal poverty guidelines each year. Ex. 11 (ASPE FAQ). Doing so is required by statute, 42 U.S.C. § 9902(2) ("[HHS] Secretary *shall* revise annually . . . the poverty line." (emphasis added)). The federal poverty guidelines are used to calculate eligibility for more than thirty types of federal benefits. Ex. 11 (ASPE FAQ). Plaintiff States rely on the federal poverty guidelines not only for administration of federal benefits within and administered by their States, but also for state-specific benefits and other state programs that use the federal poverty guidelines as the basis for eligibility. Ex. 41 (Rodgers Decl. - AZ) ¶ 9; Ex. 42 (Hadler Decl. - CT) ¶¶ 11-12; Ex. 43 (Schieffert Decl. - DE) ¶ 8; Ex. 44 (Adelman Decl. - NJ) ¶ 9; Ex. 45 (Montgomery Decl. - WA) ¶¶ 8-9. For example, in New Jersey, NJ FamilyCare, a health insurance program with both

state and federally funded components, serves 1.85 million people and updates its eligibility requirements each year based on updates to the federal poverty guidelines. Ex. 44 (Adelman Decl. - NJ) ¶¶ 11-12. And in Washington, the federal poverty guidelines are used in child support calculations to determine the minimum net income for child-support-paying parents. Ex. 45 (Montgomery Decl. - WA) ¶ 13.

The March 27 Directive proposed to move the entire ASPE to the new "Administration for a Healthy America." March 27 Directive. But the Division of Data and Technical Analysis within ASPE, the entire team responsible for updating the federal poverty guidelines, was placed on administrative leave and issued RIFs per the March 27 Directive. Ex. 12 (KFF Health News, *Trump HHS Eliminates Office That Sets Poverty Levels Tied to Benefits for at Least 80 Million People*). The ASPE website for the Guidelines is "not being updated currently" "[d]ue to current HHS restructuring." Ex. 16 (May 5, 2025 ASPE Webpage).

## ARGUMENT

Plaintiff States have satisfied each of the elements for issuance of a preliminary injunction. Under that standard, "[t]he district court must consider the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest." *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (cleaned up). The final two factors—the balance of hardships and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Although the entire restructuring plan as announced in the March 27 Directive is unlawful, Plaintiff States move only for an order at this stage preliminarily enjoining the Directive's mass

terminations and restructuring at four agencies or units under the Department: (1) the Centers for Disease Control and Prevention; (2) the Center for Tobacco Products (located within the Food & Drug Administration); (3) the Office of Head Start within the Administration for Children and Families and all employees of Regional offices who work on Head Start matters; and (4) Office of the Assistant Secretary for Planning and Evaluation, which is responsible for calculating the federal poverty guidelines.[2]

## I.      Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on the merits for several, independent reasons. *First*, the March 27 Directive is a final agency action that violates the APA because it is arbitrary and capricious and contrary to law. *See*, 5 U.S.C. § 706(2)(A). *Second*, the March 27 Directive is unconstitutional because it violates the Separation of Powers and the Appropriations Clause. *Third*, the March 27 Directive is *ultra vires*. No constitutional or statutory authority allows the Secretary to take actions that effectively incapacitate or transfer the Department's core statutory functions.

### A.  The March 27 Directive Is Subject to Review Under the APA.

The March 27 Directive is a "final agency action" subject to review under the APA, 5 U.S.C. § 704, because it: (1) "mark[ed] the consummation" of agency decision-making and (2) determined "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

Recognizing the concrete consequences that flow from agency directives ordering mass layoffs and restructurings, numerous courts have concluded that such directives constitute final agency action. *Rhode Island v. Trump*, No. 25-cv-128, 2025 WL 1303868, at *8 (D.R.I. May 6,

---

[2] Plaintiff States reserve the right to move at a later date for preliminary injunctive relief as to the Directive's implementation as to other agencies or programs within HHS.

2025); *Maryland v. U.S. Dep't of Agric.*, — F. Supp. 3d —, 2025 WL 973159, at \*14 (D. Md. Apr. 1, 2025); *Nat'l Treasury Emps. Union v. Vought*, No. 25-cv-0381, 2025 WL 942772, at \*10 (D.D.C. Mar. 28, 2025) *c.f. New York v. Trump*, No. 25-cv-39, 2025 WL 715621, at \*8 (D.R.I. Mar. 6, 2025).[3]

The Court should reach the same conclusion as to the March 27 Directive. The March 27 Directive marked the consummation of Defendants' decision making. The Directive "announced a dramatic restructuring" of HHS; ordered "a reduction in workforce of about 10,000 full-time employees"; and "reduced" regional offices "from 10 to 5." Ex. 1 (March 27 Directive). Nothing about these determinations in the Directive is "tentative or interlocutory." *Rhode Island*, 2025 WL 1303868, at \*9 (quotation marks omitted). The March 27 Directive also had immediate, concrete legal consequences. Following the Directive, as detailed in *supra* 6-21, the Agency's critical work ground to a halt with grave consequences for Plaintiff States.

### B. The March 27 Directive Is Arbitrary and Capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary and capricious. 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n of U.S.*, *Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "[C]onclusory statements will not do; an agency's

---

[3] The procedural history to date of these recent cases is summarized here and omitted elsewhere in the brief. In *Maryland*, the Fourth Circuit stayed the preliminary injunction pending appeal and a petition for rehearing *en banc* of that stay order remains pending. *See* 2025 WL 1073657, at \*1 (4th Cir. Apr. 9, 2025). In *Nat'l Treasury Emps. Union*, the D.C. Circuit stayed in part the preliminary injunction pending appeal. No. 25-5091 (D.C. Cir. April 11, 2025). In *New York*, the District Court issued a preliminary injunction; the defendants have appealed that decision and sought a stay pending appeal, which the First Circuit denied, concluding that Defendants-Appellants had failed to show that they were likely to succeed on the merits of their arguments. 133 F.4th 51 (1st Cir. 2025).

statement must be one of *reasoning*." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (emphasis in original) (internal quotation marks omitted).

Defendants did not engage in the required "logical and rational" decision-making process in issuing and carrying out the Directive, including as to the agencies and programs at issue in this preliminary injunction motion. *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998). Indeed, Secretary Kennedy admitted that Defendants did not perform a careful review of employees' job responsibilities before issuing the RIFs because doing so would "take[] too long and you lose political momentum." Navedo Decl. ¶ 4. He also said that it "was always the plan" that 20% of the layoffs would be mistakes. Ex. 4 (CBS News, *RFK Jr. says 20% of health agency layoffs could be mistakes*). In other words, Defendants could have taken the time to consider and determine which teams to restructure and which jobs to eliminate on a case-by-case basis based on specific circumstances and rationales—but they simply chose not to do so. Instead, Defendants made massive changes by issuing RIF notices to 10,000 workers who performed thousands of different jobs across hundreds of offices based solely on speed and political expediency. Defendants' approach here—acting quickly *en masse* without any individualized analysis—is exactly what courts reviewing similar agency actions have found to be arbitrary and capricious. *See Nat'l Treasury Emps. Union*, 2025 WL 942772, at *40 (finding mass RIFs likely to be arbitrary and capricious when "there was little or no analysis undertaken before the employees were ordered to put their pencils down"); *cf. Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025) ("Rather than taking a measured approach . . . Defendants cut the fuel supply to a vast, complicated, nationwide machine—seemingly without any consideration for the consequences of that decision.").

Because Defendants did not engage in any rational decision-making process, they "failed to consider" many "important aspect[s] of" the March 27 Directive. *State Farm*, 463 U.S. at 43. To start, they failed to consider that the sudden reorganization and elimination of a large portion of HHS's workforce would cause immediate and significant disruption to agency operations and functions, including statutorily required functions detailed below in Section I.A.c. *See Rhode Island*, 2025 WL 1303868, at *10 (finding arbitrary and capricious where "Defendants have not shown that any analysis was conducted to determine which components and functions . . . are statutorily required, and which are not") (internal quotation marks omitted). The chaos that has arisen in the wake of the March 27 Directive as described *supra* 6-21, underscores that such consideration was a crucial aspect of decision-making that Defendants failed to consider. *See New York*, 2025 WL 715621, at *12 (considering "the catastrophic consequences that flowed" as evidence that the agency failed to meaningfully consider the important aspects of the problem, in violation of the APA).

Defendants also failed to consider several other important aspects of the March 27 Directive. The APA requires agencies to "pay[] attention to the advantages *and* the disadvantages" of their decisions. *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015) (emphasis in original). There is no indication that Defendants considered the many long-term harms of the March 27 Directive or balanced those harms with the purported benefits of the Directive. For example: Defendants did not consider the indirect costs associated with their purported cost-cutting measures, *see infra* 27. As just one example, the shuttering of the viral hepatitis laboratory means that States will need to come up with alternative ways to replicate that laboratory's "highly sophisticated" system for tracking hepatitis C virus infections. Ex. 20 (Peruski Decl. – NY) ¶¶ 13-20.  There is also no indication that the Department considered the reliance interests for Plaintiffs States. *Regents*, 591

U.S. at 30 ("When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.") (cleaned up). Plaintiff States rely on many of Defendants' programs and services, such as testing for communicable diseases, data on infant health outcomes, and standards for occupational health. *See supra* 6-21. Failure to consider these interests renders the March 27 Directive arbitrary and capricious.

The March 27 Directive is also arbitrary and capricious because Defendants' purported justifications for the Directive are conclusory and unsupported by any evidence. Defendants cannot rely on buzzwords to evade review of their decision-making: agencies must explain their reasoning not only to be "accountable to the public," but also so that their actions are "subject to review by the courts." *Regents*, 591 U.S. at 16; *see also Rhode Island*, 2025 WL 1303868, at *11 (finding agency action arbitrary and capricious where "'rational connections' are absent, as [agencies'] justifications for eliminating programs . . . and implementing large-scale employee RIFs have been couched in mere conclusory statements").

Here, the Directive's stated goals were to "streamline the functions of the Department," "mak[e] the agency more responsive and efficient," save taxpayers money, and "implement the new HHS priority of ending America's epidemic of chronic illness by focusing on safe, wholesome food, clean water, and the elimination of environmental toxins." Ex. 1 (March 27 Directive). But there is nothing that connects Defendants' sweeping actions to these wholly conclusory statements. Defendants do not explain, for example, how the March 27 Directive will make HHS more "responsive." Nor do they cite anything to suggest that mass layoffs will make the agency more "efficient." As to the cost savings, the March 27 Directive asserts taxpayer savings of $1.8 billion without any support at all, let alone the detailed analysis that would adequately support a claim of

savings of such magnitude. *See id.* And as to the purported new agency priority to "end[] America's epidemic of chronic illness," the March 27 Directive makes no connection between the wholesale cuts and reorganization and improving Americans' health and well-being (nor could it). *See id.*

To the contrary, it is clear that Defendants' stated (albeit conclusory) goals are merely a pretext for their true goal of vastly diminishing HHS and, as relevant here, disabling or eliminating the agencies and programs subject to the current preliminary injunction motion. Ex. 13 (NPR, *With Trump coming into power, the NIH is in the crosshairs*); Ex. 14 (Newsweek, *What RFK Jr. Has Said About What He'll Do If Named Trump Health Czar*). Agencies must "offer genuine justifications for important decisions" and cannot rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Commerce v. New York*, 588 U.S. 752, 784–85 (2019). Here, while the Directive purports to "implement the new HHS priority of ending America's epidemic of chronic illness by focusing on safe, wholesome food, clean water, and the elimination of environmental toxins," it does the opposite. The Directive cut staff so that the Department's chronic illness, food, water, and environmental toxin-related programs, such as the Childhood Lead Poisoning Prevention Program, can no longer operate. *Infra* 49-50. Likewise, while the Directive says it will save taxpayer funds via staffing cuts, the changes it makes will have significant and unaccounted for indirect costs to public health. *See*, *e.g.*, Ex. 28 (Biggs Decl. – OR) ¶ 29 ("Each of the above-described programs affecting Oregonians from birth to old age will be less effective due to fewer resources and loss of expertise. The harms these programs seek to prevent include infectious diseases, maternal and infant mortality, tobacco addiction, and lead toxicity in children. Loss of capacity to test for infectious and foodborne disease, reduce contamination in air and water, evaluate risks and harms of chronic and acute conditions, and respond to health crises will lead to increased injury, illness,

and premature, preventable death for Oregonians."); Ex.35 (Leland Decl. – WA) ¶ 9 (losing NIOSH greatly decreases workplace safety and increases States' workers compensation costs).

### C. The March 27 Directive Is Contrary to Law.

Plaintiff States are also likely to succeed on the merits of their claim that the March 27 Directive is contrary to law. *See* 5 U.S.C. § 706(2)(A); *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (contrary to law means "*any* law, and not merely those laws that the agency itself is charged with administering") (emphasis in original). The mass terminations and reorganization of the Department under the Directive make it functionally impossible for the Department to comply with its obligations under numerous federal statutes. In addition, under the Directive, the Department is also refusing to spend appropriated funds, in violation of the appropriations statute and the Impoundment Control Act. *See Rhode Island*, 2025 WL 1303868, at *13.

Whether Defendants maintain that the Department should or should not have a different mission, size, or scope is irrelevant to their obligations to comply with Congress's statutory mandates. *See In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections."); *accord City & Cnty. of San Francisco. v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018); *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013))). This is so whether the statute in question is one that prescribes mandatory statutory duties or an appropriations statute that directs the agency to spend funds in a prescribed manner. *Rhode Island*, 2025 WL 1303868, at *13–14.

Simply put, Defendants do not have the statutory authority to select which acts of Congress they wish to comply with—but that is exactly what the March 27 Directive functionally does:

*First*, Congress created the CDC's National Institute of Occupational Safety and Health (NIOSH) with specific directives to conduct occupational safety research; establish a supply (either directly or through grants) of well-qualified occupational health specialists; research occupational safety; and make recommendations for the understanding and prevention of work-related injury and illness. 29 U.S.C. §§ 669(a), 669(d), 669a, 670(a), 671(c)(2). Scientific research is not an optional function of NIOSH—it is the core reason Congress created it. *Id.* §§ 651(b)(5), 671. But after the Directive's reductions in force, these core functions of NIOSH will be functionally eliminated. Ex. 47 (Doe 2. Decl.) ¶ 14. Further, Congress mandated the existence of NIOSH as its own department within HHS, which is jeopardized by the March 27 Directive's reorganization of NIOSH into the new Administration for a Healthy America *See* 29 U.S.C. § 671 ("National Institute for Occupational Safety and Health); *see also id*. § 671(b) ("There is hereby established in the Department of Health and Human Services a National Institute for Occupational Safety and Health.").

Moreover, several programs within NIOSH have their own independent statutory authorization and responsibilities. For example, in separate statutes, Congress required that there be "permanently established" within NIOSH an Office of Mine Safety and Health, which is "responsible for research, development, and testing of new technologies and equipment designed to enhance mine safety and health." 29 U.S.C. § 671(h). This directive is carried out in NIOSH's Spokane and Pittsburgh locations, which will both be rendered functionally inoperable following the reductions in force. Ex. 47 (Doe 2 Decl.) ¶ 15; Ex. 34 (Miller Decl. – WA) ¶ 14. Similarly, the Coal Mine Health and Safety Act of 1969 directs HHS to receive medical submissions from coal miners, provide the miners with results, and provide them with notices of their rights (including rights to transfer to lower dust positions). 30 U.S.C. § 843. NIOSH accomplishes this via the Coal

Miner Health Surveillance Program, which is currently not accepting any submissions "[d]ue to the reduction in force across NIOSH." Ex. 35 (Leland Decl. – WA) ¶ 30. NIOSH's Health Hazard Evaluation Program is mandated by both Section 20(a)(6) of the Occupational Safety and Health Act of 1970, and Sections 301 and 501 of the Federal Mine Safety and Health Act of 1977. 29 U.S.C. § 669(a)(6); 30 U.S.C. § 951(a)(11). These statutes, and NIOSH's own regulations, require NIOSH to conduct investigations upon request (from employers or federal agencies) of possible safety and health hazards and conduct inspections resulting from employee or committee reports of unsafe of unhealthful working conditions. *Id.*; 29 C.F.R. § 1960.35. This program, too, has now been shut down. Ex. 35 (Leland Decl. – WA) ¶ 25. Certain firefighter programs, like the National Firefighter Registry for Cancer, are also mandated by statute—specifically, the Registry is mandated by the Firefighter Cancer Registry Act of 2018, which was signed by then-President Trump in July 2018 (42 U.S.C. § 280e-5). This program has similarly announced that it will no longer fulfill its mission "due to the reduction in force across NIOSH." Ex. 35 (Leland Decl. – WA) ¶ 32–34.

In all, Congress appropriated $362,800,000 to NIOSH to carry out work required under the Public Health Service Act, the Federal Mine Safety and Health Act, the Mine Improvement and New Emergency Response Act, and the Occupational Safety and Health Act in Fiscal Year 2024. Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D, tit. II, 138 Stat. 654 (Mar. 23, 2024). But NIOSH is not able to carry out these funded programs due to reduction of nearly its entire staff via the March 27 Directive.

*Second*, Congress requires the CDC's National Center for Environmental Health (NCEH) to work on the prevention of lead poisoning and asthma control. 42 U.S.C. § 247b-3; *id.* § 247b-10. Congress appropriated $191,850,000 for the work of the CDC's National Center for

Environmental Health. Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D, tit. II, 138 Stat. 653 (Mar. 23, 2024). Of this, $34,000,000 was earmarked for the Environmental and Health Outcome Tracking Network; $51,000,000 was earmarked for addressing childhood lead poisoning; and $5,000,000 was earmarked for the lead exposure registry. Appropriations Committee, 118th Cong., Rep. on Dep'ts of Labor, Health & Human Servs., & Educ., and Related Agencies Appropriations Bill 2025, 70-71 (Comm. Print 2025).[4] But nearly the entire staff of the NCEH's Division of Environmental Health Science and Practice was laid off, meaning that they can no longer provide support to State health departments on matters ranging from lead exposure to the aftermath of wildfires. Ex. 46 (Doe 1 Decl.) ¶¶ 20–27. Plaintiff States have relied upon NCEH's unparalleled expertise to manage complex public health threats stemming from environmental risks, including the aftermaths of wildfires. Ex. 60 (Kato Decl. - HI) ¶ 21.

*Third*, Congress has required that the FDA establish a Center for Tobacco Products (CTP), which is responsible for enforcement of the Family Smoking Prevention and Tobacco Control Act. 21 U.S.C. § 387a, *et seq.*  As detailed at *supra* 17–18, the CTP has paused performance of its duties and cannot undertake the work it is required by law to do. *See* 21 U.S.C. §§ 387d (requiring regular submission of data about health impact of smoking to Secretary of HHS), 387f-1 (requiring development of an enforcement plan), 387j (requiring CTP to conduct premarket review of new tobacco products).

*Fourth,* Congress has mandated that the CDC undertake a range of programs targeted to the prevention of HIV/AIDS, including providing technical assistance (42 U.S.C. § 300ee-4); administering grants to States (*id.* § 300ee-11, *et seq.*); and implementing public awareness

---

[4] A copy of the report is available at:
https://docs.house.gov/meetings/AP/AP00/20240710/117503/HMKP-118-AP00-20240710-SD002.pdf.

campaigns (*id.* § 300ee-31, *et seq.*). And the CDC is generally required to "implement . . . investigation, detection, identification, prevention, or control of diseases or conditions to preserve and improve public health domestically and globally." 42 U.S.C. § 242c(b)(1). To ensure that the CDC fulfills these statutory obligations and undertakes other similar work, Congress has, among other things, appropriated over a billion dollars to the CDC for the National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention (NCHHSTP) in Fiscal Year 2024.[5] *See* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D, tit. II, 138 Stat. 653 (Mar. 23, 2024).

But as detailed at *supra* 6-9, as a result of the Directive, both the CDC laboratory that is used to detect, diagnose, and analyze complex STIs and the CDC viral hepatitis laboratory were shuttered. Additionally, layoffs have meant that the CDC had to cancel agreements with Plaintiff States to fund STD/HIV Disease Intervention Training Centers, because the Department laid off the staff who had provided the legally required "programmatic technical assistance or project monitoring." As a result, CDC is not spending appropriated funds and has stopped performing certain statutorily required work to prevent HIV/AIDs and STDs.

*Fifth*, Congress has mandated that the CDC's National Center for Chronic Disease Prevention and Health Promotion, which oversees the Division of Reproductive Health (DRH)

> continue a Federal initiative to support State and tribal maternal mortality review committees, to improve data collection and reporting around maternal mortality, and to develop or support surveillance systems at the local, State, and national level to better understand the burden of maternal complications and mortality and to decrease the disparities among populations at risk of death and severe complications from pregnancy.

---

[5] Fiscal Year 2024 amounts were carried over to Fiscal Year 2025 by the Full-Year Continuing Appropriations and Extension Act, 2025, Pub. L. No. 119-4 § 1101(a)(8).

42 U.S.C. § 247b-12(a)(1); *see also id.* § 254c-21(a)(2) (requiring the Secretary to award grants for the purpose of collaborating with state Maternal Mortality Review Committees (MMRCs)). And, relatedly, Congress has required that CDC "collect, analyze, and make available data on prenatal smoking and alcohol and other substance abuse and misuse." 42 U.S.C. § 247b-13(a)(1). Congress also requires the CDC's National Center for Chronic Disease Prevention and Health Promotion, which oversees CDC's Office on Smoking and Health (OSH), to undertake specific categories of smoking research, education, and data analysis. 15 U.S.C. § 1341. Given the breadth of this undertaking, Congress appropriated $1,192,647,000 to the CDC's NCCDPH in Fiscal Year 2024. Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D, tit. II, 138 Stat. 653 (Mar. 23, 2024). Of that, $246,500,000 is earmarked for the Center's work on tobacco control and prevention, and $110,500,000 was earmarked for the Center's Safe Motherhood and Infant Health work. Appropriations Committee, 118th Cong., Rep. on Dep'ts of Labor, Health & Human Servs., & Educ., and Related Agencies Appropriations Bill 2025, 62-63 (Comm. Print 2025).

But, as detailed *supra* 9-12, 17-18, the Office on Smoking and Health and the Division of Reproductive Health were both hit hard by the Directive's employee terminations. They are now unable to undertake the PRAMS study, support Maternal Mortality Review Committees (MMRCs), support State tobacco control efforts, and manage tobacco product ingredient submissions.

*Sixth*, the CDC's National Center on Birth Defects and Developmental Disabilities is a creation of statute, and its work is mandatory. 42 U.S.C. § 247b-4. Congress mandates that the National Center on Birth Defects and Developmental Disabilities "make awards of grants or cooperative agreements to provide technical assistance to State agencies to complement an intramural program and to conduct applied research related to newborn and infant hearing

screening, evaluation and intervention programs and systems." 42 U.S.C. § 247b-4a(d)(1). Congress appropriated $206,060,000 to the National Center on Birth Defects and Developmental Disabilities in Fiscal Year 2024. Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D, tit. II, 138 Stat. 653 (Mar. 23, 2024). Of that, $10,760,000 was earmarked for Early Hearing Intervention and Direction. Appropriations Committee, 118th Cong., Rep. on Dep'ts of Labor, Health & Human Servs., & Educ., and Related Agencies Appropriations Bill 2025, 67 (Comm. Print 2025). Yet, all but one member of the Early Hearing Intervention and Direction team was laid off, and as a result, "the typical functions of project officers, health/data scientists and evaluation scientists are not occurring" and the review of future grant applications was "on hold." Ex. 27 (Eilers Decl. – WA) (Ex. 2 thereto).

*Seventh*, the Head Start Act has a range of requirements for HHS staff, from "carry[ing] out a continuing program of research, demonstration, and evaluation activities," 42 U.S.C. § 9844(a)(1), to "technical assistance and training" to Head Start programs. 42 U.S.C. § 9843(a)(1). Congress appropriated $12,271,820,000 in Fiscal Year 2024 to the Administration for Children and Families for making payments under the Head Start Act. Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D, tit. II, 138 Stat. 666 (Mar. 23, 2024). Each year, the Secretary is required to "reserve for each fiscal year an amount that is not less than 2.5 percent and not more than 3 percent . . . to fund training and technical assistance activities." 42 U.S.C. § 9835(a)(2)(C)(i). As detailed *supra* 18-20, the employees who were laid off from the Head Start division were engaged in providing training and technical assistance activities. And while the Fiscal Year 2024 appropriations do allow Secretary Kennedy to reduce the amount reserved for training and technical assistance under 42 U.S.C. § 9835(a)(2)(C)(i), he may only do so if he transfers the funds to fulfill another specific purpose listed in the statute, which he has not done here. Further

Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D, tit. II, 138 Stat. 666 (Mar. 23, 2024).

*Eighth*, Congress requires that HHS annually revise the federal poverty guidelines. 42 U.S.C. § 9902(2). As detailed *supra* 20-21, the March 27 Directive has meant that the Office of Assistant Secretary for Planning and Evaluation's public information and resources, including those related to the federal poverty guidelines, are "not being updated currently."

In sum, the March 27 Directive's layoffs and reorganization are incompatible with the numerous statutes that require HHS to undertake specific activities, activities for which Congress appropriated money by statute, and are thus contrary to law. And in each of these instances, the March 27 Directive required HHS to engage in conduct that was irreconcilable with the overlay of statutes that mandate the Department to undertake specific duties and the annual appropriations statutes passed by Congress. These actions are thus "not in accordance with law" and must be "set aside." 5 U.S.C. § 706(2)(A).

### D. The March 27 Directive Is Unconstitutional.

Plaintiff States are also entitled to a preliminary injunction because the March 27 Directive violates the Separation of Powers and the Appropriations Clause of the U.S. Constitution. The separation of powers doctrine is a central tenet of our Constitution and is "evident from the Constitution's vesting of certain powers in certain bodies." *Seila L. LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see Trump v. United States*, 603 U.S. 593, 637–638 (2024). Article I of the Constitution allows only Congress to make law. U.S. Const. art. I, § 1. Thus, only Congress may create and define federal agencies. *See Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices" and "the determination of their functions and jurisdiction"). The Constitution also "exclusively grants the power of the purse to Congress, not the President." *San Francisco*, 897 F.3d at 1231 (citing U.S. Const. art. I, § 9, cl. 7).

35

Under the structure of the Constitution, "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). Consequently, the Executive has no power "to enact, to amend, or to repeal statutes," *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). And "settled, bedrock principles of constitutional law" require the Executive to expend the funds that Congress duly authorizes and appropriates. *Aiken Cnty.*, 725 F.3d at 259 (Kavanaugh, J.). This foundational separation of powers principle is reflected in the Appropriations Clause, which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. And it has been codified in the Impoundment Control Act, which provides that all funds appropriated by Congress "shall be made available for obligation" unless Congress itself has rescinded the appropriation, 2 U.S.C. § 683(b), and that "[n]o officer or employee of the United States may defer any budget authority" except in exceedingly narrow circumstances, *id.* § 684(b); *see also Aiken Cnty.,* 725 F.3d at 261 n.1 ("even the President does not have unilateral authority to refuse to spend the funds").

Congress has, as detailed *supra* 28-35 passed an overlay of statutes that require the Department to undertake important, lifesaving work, from preventing HIV/AIDS to providing technical assistance to Head Start Programs. Furthermore, in Fiscal Year 2024, Congress appropriated $103.7 billion to HHS (not including mandatory entitlement spending, which is not a part of the annual appropriations process).[6]

---

[6] David Bradley, et al.,Cong. Rsch. Serv. R47936, Labor, Health, and Human Services, and Education: FY2024 Appropriations (2024), https://www.congress.gov/crs-product/R47936.
Congressional Research Service, Labor, Health and Human Services, and Education: FY2024 Appropriation, available at https://www.congress.gov/crs-product/R47936.

In the March 27 Directive, HHS announced that the layoffs and reorganizations "will save taxpayers $1.8 billion per year." ECF No. 1-1 at 2. But it is Congress who must make the decision whether to cut programs for taxpayer savings. *Aids Vaccine Advocacy Coalition v. U.S. Dep't of State*, No. 25-cv-00402, 2025 WL 752378 at *17 (D.D.C. Mar. 10, 2025). And Congress *has* spoken here, by imposing mandatory duties on HHS and appropriating funds for the Department to carry out those duties. It is not for the executive to refuse to spend appropriated funds or to refuse to undertake mandatory work for which Congress has appropriated funds. *Aiken Cnty.*, 725 F.3d at 261 n.1. Defendants' actions usurp Congress's power of the purse by disregarding congressional appropriations and disregard mandatory statutory duties. *Aids Vaccine Advocacy Coalition*, 2025 WL 752378 at *17; *Rhode Island*, 2025 WL 1303868 at *12.

### E. The March 27 Directive is *Ultra Vires*.

Defendants' actions in instituting the March 27 Directive are *ultra vires* of their authority and should be enjoined. "[T]he right of action for an *ultra vires* claim flows from the federal courts' equity jurisdiction." *Maryland*, 2025 WL 800216, at *11 n.4. For centuries, federal courts have maintained the authority to "grant injunctive relief against . . . violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The Court should exercise that authority here and enjoin Defendants' actions.

Administrative agencies "are creatures of statute." *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). "Congress under its legislative power is given the establishment of offices [and] the determination of their functions and jurisdiction." *Myers*, 272 U.S. at 129. No constitutional or statutory authority allows the President or the head of an agency to take actions that incapacitate core statutory functions of an agency that Congress created. As detailed *supra* 35-36, the Executive cannot repeal statutes and must spend funds that Congress appropriated. But the March 27 Directive is designed to incapacitate many functions of HHS, in excess of the executive

authority, and in direct contravention of the statutory mandates and appropriations provided by Congress. Because the March 27 Directive exceeds the Executive's lawful authority, Defendants have acted *ultra vires*.

## II.    Plaintiffs Face Irreparable Harm Absent Injunctive Relief.

The Court should enter a preliminary injunction because Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). A movant need not "demonstrate definitive harm." *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 101 (D. Me. 2008). Rather, a showing that "irreparable injury is *likely*" will suffice. *Winter*, 555 U.S. at 22 (emphasis in original). Injuries of many types are irreparable, and district courts "have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (citations omitted).

Earlier this week, Judge McConnell in the District of Rhode Island found that impacts stemming from the Administration's "attempts to dismantle congressionally sanctioned agencies and ignor[ance of] congressionally appropriated funds" relating to the Institute of Museum and Library Services, Minority Business and Development Agency, and Federal Mediation and Conciliation Service demonstrated irreparable and continuing harm. *Rhode Island*, 2025 WL 1303868, at **1, 15-17. The Court acknowledged "myriad" harms justifying injunctive relief, including but not limited to halts and delays to state services and programs, state layoffs and hiring freezes, information loss, payment denials, lost access to federal resources, training cancelations,

38

and loss of federal services and assistance. *Id.* at **15-17 . Here, the Plaintiff States have suffered, and continue to suffer, equivalent irreparable harms from the HHS dismantling.

### A. Harms from the Directive's Application to CDC Laboratory Services and CDC's National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention

The shuttering of CDC's infectious diseases laboratories and layoffs at the National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention (NCHHSTP) are already irreparably harming Plaintiff States and will continue to do so absent preliminary injunctive relief. In Rhode Island, for example, the State Department of Health has had to turn to commercial laboratories to test for extended drug resistance in gonorrhea and viral hepatitis, at a higher price. Ex. 23 (Gallagher Decl. - RI) ¶ 18. And because the commercial laboratories do not have the same nationwide mandate as CDC, this "will significantly hamper the ability to compare results across States," which is especially important "in the Northeast Region where there is often interstate mobility and clusters and outbreaks frequently involve multiple jurisdictions." *Id.*; *see also* Ex. 22 (Hovan Decl. - DE) ¶¶ 17–18; Ex. 59 (Hertel Decl. - MI) ¶ 10. In New Jersey, a CDC employee who assisted the State Department of Health in contract tracing and field follow-up for patients with syphilis was laid off; NCHHSTP has been delayed in its communications with the New Jersey Department of Health about pending grant applications (leading to chaos and confusion); and the New Jersey Department of Health can no longer "depend[] on resistance patterns to understand what treatments are working to stop the spread of gonorrhea," making it very possible that "gonorrhea could now spread without warning." Ex. 26 (Brown Decl. - NJ) ¶¶ 37–43. Like New Jersey, Arizona lost a "NCHHSTP field assignee, who had supported epidemiological STI efforts statewide," which "reduced . . . our ability to complete critical cross matches and identify parents and babies with syphilis that need to be treated." Ex. 51 (Cunico Decl. - AZ) ¶¶ 43–44. New York has been harmed by the lack of access to the NCHHSTP's computer program for tracking and

investigating outbreaks of the hepatitis C virus. Ex. 25 (Rosenberg Decl. - NY) ¶ 27. New York has been harmed because the NCHHSTP provided data systems and technical support that New York that were "critical to New York's HIV response.". *Id.* ¶ 28. And as other States and local governments seek new labs for testing, New York's Wadsworth Center has sought to fill the gaps created by the closure of CDC laboratories, but that has "strain[ed] its already-limited resources allocated for the benefit of New Yorkers." Ex. 20 (Peruski Decl. - NY) ¶ 35. A Michigan state agency has twice contacted CDC to schedule an inspection of renovated lab space, with no response. Ex. 59 (Hertel Decl. - MI) ¶ 16.

These harms to Plaintiff States are irreparable, in that Plaintiff States are investing time, money, and other resources in changes to their state programs due to the closure and reduction of CDC's laboratory resources—and Plaintiff States cannot be recompensed for the time, money, and resources that they are needing to devote. The loss of CDC's technical expertise is likewise irreparable. Moreover, the chaos caused by the Directive's changes places a significant administrative burden on state officials. And, of course, a viral outbreak as a result of these actions caused by reduced capacity at CDC's laboratories would irreparably harm Plaintiff States by requiring tremendous time and resources to address, and risk serious harm to their residents' public health.

### B. Harms from the Directive's Application to CDC's Division of Reproductive Health

Plaintiff States have already suffered and will continue to suffer harm directly stemming from the loss of CDC support for the Pregnancy Risk Assessment Monitoring System (PRAMS) program, including the PRAMS Integrated Data Collection System—the CDC database housing the PRAMS data—going offline. For example, Plaintiff States can no longer access PRAMS data; have not received weighted 2024 birth year data from CDC; were forced to abruptly end the 2024

birth year data collection early (for example, resulting in an over twenty percent reduction in the New York State sample for 2024); have lost "the scientific, technical, and information technology assistance resources" provided by CDC; and will need to delay or not engage in collection of future data sets because the PRAMS data collection for birth year 2025 was set to begin in April 2025. Ex. 25 (Rosenberg Decl. - NY) ¶ 24; Ex. 24 (Larkin Decl. - RI) ¶ 15; Ex. 28 (Biggs Decl. - OR) ¶¶ 19–21; Ex. 26 (Brown Decl. - NJ) ¶ 17; Ex. 27 (Eilers Decl. - WA) ¶ 5; Ex. 29 (Epstein Decl. - IL) ¶ 13; Ex. 50 (Standridge Decl. - WI) ¶ 11; Ex. 51 (Cunico Decl. - AZ) ¶¶ 26–33; Ex. 59 (Hertel Decl. - MI) ¶ 29. Michigan has already incurred "significant resources and expense" because it has "has been forced to develop its own in-house data management system" to replace the terminated PRAMS data collection activities. Ex. 59 (Hertel Decl. - MI) ¶ 30.

Plaintiff States are further irreparably harmed as a result of the cessation of the PRAMS program because they no longer have the ability to monitor health outcomes and goals without creating their own pregnancy outcome monitoring systems, which would take at least a year to accomplish, would cost prohibitive, and would be incapable of replicating PRAMS' weighted national dataset in any event. Ex. 27 (Eilers Decl. - WA) ¶¶ 5–6; Ex. 29 (Epstein Decl. - IL) ¶¶ 17–19. For example, without PRAMS data, New York will likely be unable to meet state reporting requirements and track progress on key maternal and infant health objectives outlined in the State Title V State Action Plan, the New York State Title V Dashboard, the New York State Maternal and Child Health Dashboard, and the New York State Prevention Agenda. Ex. 25 (Rosenberg Decl. - NY) ¶ 24. Likewise, New Jersey will no longer be able to use PRAMS data to identify policy and program priorities, as it has in the past. Ex. 26 (Brown Decl. - NJ) ¶ 18. These harms are irreparable, as Plaintiff States do not have access to the data to shape current policy priorities. *Id.* Further, even if PRAMS data collection resumes later, Plaintiff States will be forced to limit the

amount of time for collection, resulting in less data collected and/or additional work for state agencies charged with collecting multiple sample batches at once, putting more strain on staff and increasing operations costs. Ex. 25 (Rosenberg Decl. - NY) ¶ 24.

In addition, Plaintiff States have been harmed by CDC's loss of support for Maternal Mortality Review Committees (MMRCs). Ex. 24 (Larkin Decl. - RI) ¶ 8. Specifically, States no longer have access to online resources relied upon by MMRCs that were removed by CDC, including the Community Vital Signs report, which specifies the protocols for identifying maternal deaths within a given jurisdiction, and SharePoint webpages offering guidance. *Id.* ¶ 14. For example, Rhode Island was forced to cancel its most recent MMRC meeting because these kinds of CDC guidance documents were unavailable. *Id.* In Oregon, on March 31, 2025, CDC terminated a CDC Maternal and Child Health Senior Epidemiologist embedded in the state health agency who was a key participant in Oregon's MMRC. Ex. 28 (Biggs Decl. - OR) ¶ 18; *see also* Ex. 62 (Juthani Decl. - CT) ¶ 21 (similar in Connecticut). Further, Plaintiff States have been harmed because, without Division of Reproductive Health staff in place, they have been unable to coordinate with federal colleagues to respond to pressing reporting concerns, approve budget redirections, or issue "needs assessment" guidance. Ex. 24 (Larkin Decl. - RI) ¶ 14. These harms are irreparable: MMRCs have shown that two out of every three pregnancy-related deaths are preventable, but without program support, maternal deaths will go uninvestigated and life-saving insights will be lost. Ex. 30 (Blessing Decl. (PRAMS) - DE) ¶ 8.

### C. Harms from the Directive's Application to the CDC's National Institute for Occupational Safety and Health

The gutting of NIOSH irreparably harms Plaintiff States on multiple levels. *First*, several Plaintiff State agencies and programs directly depend on NIOSH funding and participation, but have been harmed because the loss of the vast majority of NIOSH personnel has led to a "pause

on all NIOSH activities," including the processing of non-competitive grant renewals, and no-cost grant extensions. *See* Ex. 31 (Simpson Decl. - WA) ¶ 18; *see also* Ex. 2 to Simpson Decl. As a result, Education and Research Centers in Plaintiff States such as California and Washington, which train the next generation of occupational health specialists in these States and offer region-specific research and occupational health partnerships, face imminent closure when many of their grants run out, which will require them to terminate their faculty and staff, and eliminate their incoming classes. *Id.* ¶¶ 11-30; Ex. 52 (Cummings Decl. - CA) ¶¶ 42-45. With some Education and Research Centers losing funding in June, like Washington's Northwest Center for Occupational Health and Safety, these harms are being felt right now, their closure imminent. *Id.* ¶¶ 19-21. This will cause long-term harm to Plaintiff States' public health by leading to a shortage of trained professionals, less evidence-based care of injured workers, prolonged disability, and more worker injuries. *Id.* ¶¶ 20-23, 26-35; Ex. 35 (Leland Decl. - WA) ¶¶ 38-41. States like California would lose their only occupational health professional degree programs at a time where there is an insufficient number of these specialists to meet the needs of a growing workforce. Ex. 36 (Berg Decl. - CA) ¶ 20; Ex. 52 (Cummings Decl. - CA) ¶¶ 42-44.

Moreover, many Plaintiff States would be harmed because they would no longer be able to operate occupational surveillance efforts that are directly dependent on NIOSH, such as programs for occupational injuries, lead exposure, fatality reviews in high-risk industries, and respiratory diseases. This would harm Plaintiff States and their residents by necessitating additional state employee layoffs, reducing Plaintiff States' visibility of emerging workplace safety risks, and exposing workplaces to dangers known and unknown. Ex 32 (Bonauto Decl. - WA) ¶¶ 13-22; Ex. 36 (Berg Decl. - CA) ¶ 23; Ex. 33 (Tan Decl. - NJ) ¶¶ 8, 12; Ex. 52 (Cummings Decl. - CA) ¶¶ 8, 15-24.

*Second*, Plaintiff States will be harmed by NIOSH's failure to update publications, recommendations, and findings on scientific areas upon which their own state standards and residents' safety rely. For instance, Plaintiff States' efforts to keep workers safe in especially vulnerable workplaces with increased respiratory danger—like mining, shipyards, firefighting, and factory settings—will be severely hampered by the destruction of the NIOSH certification program for respirators and PPE, essentially depriving Plaintiff States of the ability to require quality certified respiratory equipment. Ex. 33 (Tan Decl. - NJ) ¶ 11; Ex. 35 (Leland Decl. - WA) ¶¶ 20-24; Ex. 52 (Cummings Decl. - CA) ¶¶ 25-29. And ongoing applications for new respiratory equipment—such as respirators specifically designed for protecting wildland firefighters from toxic smoke—will not be processed, the benefits of new technology denied to those most vulnerable toxic particulate matter, like firefighters and agricultural workers. Ex. 35 (Leland Decl. - WA) ¶¶ 20-24; Ex. 36 (Berg Decl. - CA) ¶¶ 15-18.

*Third*, because NIOSH research and publications (such as NIOSH's regularly updated Pocket Guide to Chemical Hazards and Recommended Exposure Limits) will no longer be updated to reflect the newest scientific research, Plaintiff States' own efforts to track and prevent dangers like exposure to extreme heat or hazardous materials will be harmed. Ex. 35 (Leland Decl. - WA) ¶¶ 13-18; Ex. 33 (Tan Decl. - NJ) ¶ 8; Ex. 52 (Cummings Decl. - CA) ¶¶ 10-14. State agencies that regularly received (like state toxicology laboratories) or relied on the findings of NIOSH Health Hazard Evaluations for implementing rules for specific industries (especially airborne particles like silica dust, smoke, and toxic particulates from food flavoring) will now be left flying blind, as they simply lack the resources or regulatory backing to conduct their own Health Hazard Evaluations. Ex. 36 (Berg Decl. - CA) ¶ 19; Ex. 33 (Tan Decl. - NJ) ¶¶ 13-14; Ex. 35 (Leland Decl. - WA) ¶¶ 24-29; Ex. 52 (Cummings Decl. - CA) ¶¶ 33-37. Plaintiff States and their occupational

44

safety programs that rely on NIOSH-maintained data registries and compilations to better inform their own actions in critical sectors like firefighter fatalities will be similarly harmed. Ex. 33 (Tan Decl. - NJ) ¶¶ 9-10; Ex. 32 (Bonauto Decl. - WA) ¶¶ 21-22. Additionally, losing NIOSH's expertise, research data, and evidence-based recommendations will lead to greater morbidity and mortality for Plaintiff States' workers. Ex. 36 (Berg Decl. - CA) ¶ 32; Ex. 28 Biggs Decl. (OR) ¶ 11. Workers in mining, commercial fishing, oil and gas extraction, shipyards, hydroelectric dams, construction, and wildland firefighting, especially those in Washington and other western states, will all be fundamentally more unsafe after the shuttering of NIOSH's facilities in Spokane and elsewhere. Ex. 34 (Miller Decl. - WA) ¶¶ 14-32. Crucially for the upcoming fire season, Plaintiff States were depending on NIOSH finalizing its draft publication on wildfire smoke when developing their own set of plans and recommendations—but that NIOSH publication will now never be finalized. Ex. 34 (Miller Decl. - WA) ¶ 33; Ex. 35 (Leland Decl. - WA) ¶ 43.

*Finally*, Plaintiff States will be harmed by the loss of the technical expertise of NIOSH's staff, on whom Plaintiff States rely for administration of NIOSH's functions; the availability of trained project officials to obtain funding; the certification of qualified engineers and medical personnel for respiratory equipment and program eligibility; and the reliability of NIOSH's decades of institutional expertise in affording their research finding with the heavy burden of keeping their constituents safe. Ex. 33 (Tan Decl. - NJ) ¶¶ 6-7, 10-16; Ex. 34 (Miller Decl. - WA) ¶¶ 3-5, 7-8, 15, 18-20, 33; Ex. 31 (Simpson Decl. - WA) ¶¶ 9-30; Ex. 35 (Leland Decl. - WA) ¶¶ 42-43; Ex. 52 (Cummings Decl. - CA) ¶¶ 30-32.

Much of the mining research equipment at the NIOSH facility in Spokane, for instance, is large, immobile, and requires a year or more of training to operate—without trained and qualified personnel, that equipment is essentially inoperable. Ex. 34 (Miller Decl. - WA) ¶¶ 15-20. There

are scant few people in the world with the credentials, experience, and technical expertise that can fill the specific research and programmatic functions of NIOSH. Ex. 47 (Doe 2 Decl.) ¶¶ 13-16. These employees, once lost, cannot be easily or adequately replaced. Ex. 34 (Miller Decl. - WA) ¶ 7.

Harms to Plaintiff States from the March 27 Directive's effect on NIOSH are irreparable. Ultimately, if the reductions in force across NIOSH (and NIOSH's restructuring into the Administration for a Healthy America) are not halted, Plaintiff States lose the primary and vast engine driving evidence-based workplace safety recommendations, which cannot be easily undone. Ex. 32 (Bonauto Decl. – WA) ¶ 9. The specialized research addressing unique threats in Plaintiff States' vital industries—from agriculture to aerospace, maritime to forestry—would vanish and the personnel and technical expertise upon which this research relies could not be quickly replaced. *Id.*

### D. Harms from the Directive's Application to CDC's Office on Smoking and Health, and FDA's Center for Tobacco Products

Since the March 27 terminations, Plaintiff States have lost their ability to access tobacco use data and guidance, including the National Youth Tobacco Survey and Best Practices for Comprehensive Tobacco Control Program Guide. Ex. 37 (Davis Decl. - NY) ¶ 28; Ex. 21 (Underwood Decl. - NY) ¶ 8; Ex. 26 (Brown Decl. - NJ) ¶ 19. They have lost their access to the Office on Smoking and Health's services that coordinated tobacco control effort, including the State Tobacco Activities Tracking and Evaluation System. Ex. 37 (Davis Decl. - NY) ¶ 11, 12; Ex. 26 (Brown Decl. - NJ) ¶ 19; Ex. 53 (Blessing Decl. - DE) ¶ 9. Plaintiff States' tobacco control agencies have also lost their access to the national quitline, Ex. 26 (Brown Decl. - NJ) ¶ 20; Ex. 21 (Underwood Decl. – MN) ¶ 7; Ex. 37 (Davis Decl. - NY) ¶ 30, which has proven effective and encouraged millions of interested people to quit tobacco use. Ex. 37 (Davis Decl.- NY) ¶ 16

(Exhibits B and C). Plaintiff States have also lost access to educational campaigns, such as the Tips from Former Smokers campaign and publications, run in part by the Office on Smoking and Health. Ex. 26 (Brown Decl. - NJ) ¶¶ 20, 21; Ex. 24 (Larkin Decl. - RI) ¶ 17; Ex. 37 (Davis Decl. - NY) ¶ 29; Ex. 24 (Larkin Decl. - RI) ¶¶ 16-17 ("Since April 1, 2025, Rhode Island has experienced harm relating to CDC and FDA's role in tobacco prevention and control in our state."). These harms are irreparable, as even a temporary loss in State resources to combat tobacco has real, long-term consequences for the public health of Plaintiff States' residents, with corresponding administrative and financial burdens on State public health departments.

### E.  Harms from the Directive's Application to Head Start (within Office of Head Start and HHS Regional Offices)

Plaintiff States have been harmed by terminations in Head Start staff that have left the agency unable to perform the functions upon which grantees, including Plaintiff States, rely. "HHS Head Start staff are no longer available to offer training, technical assistance, monitoring site visits, and other support to Head Start programs." Ex. 38 (Propheter Decl. - CA) ¶ 31; Ex. 39 (Marton Decl. - NY) ¶ 16 (With the closure of the Region 2 Office of Head Start, grantees had no designated staff to help them with "training and technical assistance questions, receiving/filing of required reports (e.g., of child injuries or accidents), providing updates on the status of grant applications or pending requests for payments, or answering questions on compliance arising with the rapidly changing federal landscape."). In addition to the loss of services, pervasive delays and panic in funding have left grantees, which includes Plaintiff States, unsure if and when their funds will arrive. Ex. 38 (Propheter Decl. - CA) ¶¶ 13, 35–37; Ex. 39 (Marton Decl. - NY) ¶¶ 18, 21, 23, 24.

This chaos, the product of the March 27 Directive's implementation at the Office of Head Start, has created indirect costs on the Plaintiff States who pick up the administrative slack. Ex. 39 (Marton Decl. - NY) ¶ 25. Since April 1, state agencies have shouldered the administrative burden

of responding to grantees questions, often, with no answers of their own. Ex. 39 (Marton Decl. - NY) ¶ 18; Ex. 40 (Pascale Decl. - CT) ¶ 13. In Connecticut, an office of one person has dedicated significant time and resources to "attending in-person, onsite Head Start meetings, events, press conferences and preparing *ad hoc* Head Start reports and Fact Sheets" to manage grantees to replace work that had previously been performed by the HHS Office of Head Start. Ex. 40 (Pascale Decl. - CT) ¶ 13; *see also* Ex. 38 (Propheter Decl. - CA) ¶ 34 (Head Start programs who cannot get their questions answered by the Office of Head Start "are now contacting [California Department of Education] frequently, placing a burden on [its] staff and resources and diverting resources away from other key state programs."); Ex. 49 (Chatterjee Decl. - OR) ¶ 22 (Oregon Department of Early Learning and Care is not staffed or funded to provide support for the federal program). The March 27 Directive has also made it harder for grantees to fill staff positions due to funding uncertainty increasing costs on programs. Ex. 39 (Marton Decl. - NY) ¶ 22. These harms are irreparable: the lack of communication with and technical assistance from HHS Head Start staff has already impacted Plaintiff States and caused significant administrative burden and confusion that cannot be later undone.

### F. Harms from the Directive's Application to Federal Poverty Guidelines (within Office of the Assistant Secretary for Planning and Evaluation)

Already, Plaintiff States have seen the effects of the March 27 Directive's dismantling of the division within HHS that updates the Federal Poverty Guidelines, for example, that the detailed information on the Office of the Assistant Secretary for Planning and Evaluation (ASPE) website about the Guidelines is no longer being updated "[d]ue to current HHS restructuring." Ex. 16 (May 5, 2025 ASPE Webpage). Additionally, with the expertise and capacity of that division completely eliminated, there is a substantial likelihood that there will be errors or delay in calculating the Guidelines for the upcoming year. That would be catastrophic for Plaintiff States. Any delays or

inaccuracy in guidelines would have a devastating impact on millions of Plaintiff States' neediest residents, who would face the prospect of being rendered ineligible for crucial subsistence benefits. Ex. 42 (Hadler Decl. - CT) ¶ 15; Ex. 43 (Schieffert Decl. - DE) ¶ 12; Ex. 44 (Adelman Decl. - NJ) ¶¶ 18-20; Ex. 45 (Montgomery Decl. - WA) ¶¶ 12, 14; Ex. 57 (Chawla Decl. - NY) ¶¶ 13-15. These delays would cause harm directly to Plaintiff States by creating widespread uncertainty for Plaintiff States' officials and benefits recipients regarding eligibility for both state and federal benefits; placing a burden on Plaintiff States' officials, who would have to expend resources fielding questions regarding the applicable guidelines and/or calculating their own replacement guidelines; and increasing the administrative burden that would arise on Plaintiff States if different States were to use different applicable guidelines levels and result in inconsistently or incorrectly administered benefits. Ex. 41 (Rodgers Decl. - AZ) ¶ 11; Ex. 42 (Hadler Decl. - CT) ¶ 14; Ex. 43 (Schieffert Decl. - DE) ¶ 10; Ex. 44 (Adelman Decl. - NJ) ¶ 20; Ex. 45 (Montgomery Decl. - WA) ¶ 11. These delays will result in Plaintiff States having "to expend resources to address disruption and uncertainty." Ex. 57 (Chawla Decl. - NY) ¶ 13. In New York, delays would bring extraordinary complications, because the "[y]early system changes based upon the annually revised Federal Poverty Guidelines require significant production time and are built into New York State's production schedule one year in advance." Ex. 57 (Chawla Decl. - NY) ¶ 15. This harm is irreparable: neither the short-term administrative chaos nor the widespread loss of subsistence benefit eligibility could be corrected through belated guidelines updates.

### G. Harms from the Directive's Application to the CDC's National Center for Environmental Health

Plaintiffs have already suffered and will continue suffer harm from the loss of the Lead Poisoning Prevention and Surveillance Branch within the CDC's National Center for Environmental Health (NCEH), including the congressionally mandated Childhood Lead

Poisoning Prevention Program. In New York, the Department of Health relied upon "long-standing monthly technical assistance calls," but "[a]t this time, CDC is not providing further technical assistance to New York State." Ex. 25 (Rosenberg Decl. – NY) ¶ 36; *see also* Ex. 28 (Biggs Decl. – OR) ¶ 22; Ex. 51 (Cunico Decl. – AZ) ¶¶ 45–49. In Maine, State health authorities have sought guidance from CDC on falsely elevated blood lead levels associated with a specific brand of capillary blood collection tubes, but have received no response. Ex. 48 (Gagne-Holmes – ME) ¶ 20. Maine would previously have relied on CDC for assistance in developing a communications strategy and agency response. *Id*. CDC used to send regular notices about newly identified food and consumer products containing lead, which informed public health officials about lead hazards of concern to the public, but those notices have stopped. Ex. 59 (Hertel Decl. – MI) ¶ 33.

The harm to Plaintiff States extends beyond harming their ability to respond to lead poisoning. The Rhode Island Department of Health receives four grants from NCEH. Ex. 24 (Larkin Decl. – RI) ¶ 12. But since April 1, "grant managers and project officers are no longer available to answer questions or process requests," and the State has "yet to receive guidance on four grants." *Id.* ¶ 20. Additionally, the layoffs of Asthma Control Program staff "has caused chaos in Rhode Island, as there is no guidance on budgetary or programmatic-related questions, issues, or assistance with the required non-competitive funding application which provides funding for the next project period starting September 1, 2025." *Id.* ¶ 19.

In Arizona, the Department of Health Services relied upon NCEH "to develop and implement heat and health mitigation programs and strategies." Ex. 51 (Cunico Decl. – AZ) ¶ 19. The State "benefit[ed] from NCEH's technical expertise," including "reviewing and updating essential school health toolkits," "a "Heat and Health Tracker" that allowed the State to "monitor near-real-team and historical trends in heat-related emergency department visits and

hospitalizations." *Id.* ¶¶ 21, 23. After April 1, Arizona cannot rely upon NCEH staff and the Heat and Health Tracker "is no longer being maintained or updated with new data." *Id.* ¶¶ 51-53. The result is that Arizona is limited in its "ability to monitor and respond to heat-related risks across the state." *Id.* ¶ 54.

These harms cannot be adequately addressed at a later date via monetary relief because they involve emergent health situations that need to be immediately addressed in order to limit cascading harms.

### H. Harms from the Directive's Application to the National Center for Birth Defects and Disabilities

Plaintiff States have suffered harm and will continue suffer harm from the cuts to the National Center for Birth Defects and Developmental Disabilities. Plaintiff States rely upon the Center for technical assistance and other support in their Early Hearing Detection and Intervention programs, which aim to increase "the proportion of newborns who are screened for hearing loss by no later than age one month, have audiologic evaluation by age three months, and are enrolled in appropriate intervention services no later than age six months." Ex. 25 (Rosenberg Decl. – NY) ¶ 7. The CDC also helped States "identify trends and areas for improvement," as in Washington, a CDC analysis recently helped the State identify that "young maternal age" was "a possible contributing factor to children not receiving screening, diagnostic, and early intervention service." Ex. 27 (Eilers Decl. – WA) ¶ 10. However, in April, States received emails notifying them that "all but one team member is on administrative lead as a result of the federal reduction in force" and that the services provided by the Early Hearing Detection and Intervention team "are not occurring." Ex. 27 (Eilers Decl. – WA), Exhibit 2 thereto. The result: State "Early Hearing Detection and Intervention staff have been left without guidance or direction on how to proceed." Ex. 25 (Rosenberg Decl. – NY) ¶ 23. In Washington, the lack of CDC support "will place growing

strain" on the State's ability to screen for hearing and provide services to infants. Ex. 27 (Eilers Decl. – WA) ¶ 14.

### III. The Balance of the Equities and the Public Interest Favor a Preliminary Injunction.

The equites and the public interest tip sharply in favor of Plaintiff States.

These factors merge "when the government is the opposing party." *Nken*, 556 U.S. at 435. "When weighing these factors, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief paying particular regard for the public consequences that would result from granting the emergency relief sought." *Rhode Island*, 2025 WL 1303868, at *17 (quoting *Winter*, 555 at 24) (cleaned up).

The destruction of critical public safety infrastructure and vital government functions that will occur in the absence of an injunction, *supra* 38-51, shows that granting emergency relief here is equitable and in the public interest. *See Woonasquatucket River Watershed Counc. v. U.S. Dep't of Agric.*, No. 25-cv-97, 2025 WL 1116157, at *23 (D.R.I. Apr. 15, 2025) (placement of "critical climate, housing, and infrastructure projects in serious jeopardy" supported finding that balance of equities favored relief). In particular, public health impacts of administrative actions bear strongly on the public interest analysis. *See Colorado v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-121, 2025 WL 1017775, at *5 (D.R.I. Apr. 5, 2025) ("The public interest further favors a TRO because, absent one, there is a substantial risk that the States and their citizens will face a significant disruption in integral, expansive, and important public health programs."). And here, where the cuts have meant that the Department is failing at its most basic public health efforts, the public interest strongly favors emergency relief. *See, e.g.*, Ex. 59 (Hertel Decl. – MI) ¶ 19 ("As a result [of the March 27 Directive], the CDC has failed to provide timely response[s] to inquiries

of urgent nature, reduced or eliminated national calls, and can no longer effectively serve as a national coordinator of infectious diseases efforts.").

Moreover, Plaintiff States seek to preserve the status quo as it existed before the unlawful March 27, 2025, Directive—to preserve the agency structure that Congress intended, with the various mandatory HHS programs in properly-staffed and working order, weighing in favor of granting the requested relief. *See Francisco Sanchez v. Esso Standard Oil. Co.*, 572 F.3d 1, 19 (1st Cir. 2009) ("[T]he purpose of a preliminary injunction is to preserve the status quo."); *Nat'l Educ. Ass'n*, 2025 WL 1188160, at *30 (holding that "defendants stand to suffer little harm if a preliminary injunction is granted" where "a preliminary injunction would merely maintain the status quo").

Plaintiffs anticipate that Defendants will argue they will be injured by an injunction because it will limit their ability to exercise discretion to implement the Trump Administration's priorities. *See*, *e.g.*, *Rhode Island*, 2025 WL 1303868, at *17. But court after court has rejected similar weak appeals from the Trump Administration. *See*, *e.g.*, *id.* (rejecting argument "that granting the injunctive relief the States request would effectively disable several federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities" (quoting record) (internal quotation marks omitted)); *Doe v. Trump*, No. 25-cv-10139, 2025 WL 485070, at *14 (D. Mass.  Feb. 13, 2025) (enjoining executive order overturning birthright citizenship and rejecting argument based in "manag[ing] the immigration system" (internal quotation marks omitted)); *Washington v. Trump*, No. 25-cv-00244, 2025 WL 659057, at *27 (W.D. Wash. Feb. 28, 2025) (rejecting argument that "an injunction should not issue because the relief Plaintiffs request would effectively disable the President and federal agencies from effectuating the President's agenda" (internal quotation marks omitted)); *Nat'l Treasury*

*Employees Union v. Trump*, No. 25-cv-0935, 2025 WL 1218044, at *20 (D.D.C. Apr. 28, 2025) (rejecting argument that injunction would prevent the President from "effectively operat[ing] agencies relevant to national security without the constraints of collective bargaining" (internal quotation marks omitted)).

"There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The balance of the equities and the public interest tip decisively in favor of an injunction here.

### IV.    Defendants Cannot Avoid the Merits by Relying on Jurisdictional Arguments.

Plaintiff States have standing: they have suffered "concrete and particularized" injuries that are "actual [and] imminent"; "fairly traceable" to Defendants' challenged behavior; and "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up). These harms "are already unfolding . . . in light [of] the significant reduction in personnel available and competent to administer these agencies' . . . services and the elimination of certain programs that served the States." *Rhode Island*, 2025 WL 1303868, at *5. The evidence shows that Plaintiff States have already suffered actual concrete harms in dozens of ways affecting a myriad of Plaintiff States' programs and millions of their residents. *See supra* 38-51.

Additionally, the "breakneck" nature of Defendants' actions means that it is a "virtual certainty that all Plaintiff States will soon incur" additional injuries, which provides a second, independent basis for standing under the "imminent injury" prong. *See Maryland*, 2025 WL 973159, at *12. Absent the Court's intervention, the RIFs will begin to go into effect on June 2, 2025, leading to many specific harms to Plaintiff States, *see supra* 38-51. And, the existing and imminent harm to Plaintiff States is exactly what makes their claims ripe for adjudication. *See Rhode Island*, 2025 WL 1303868, at *5.

54

All these injuries are directly traceable to Defendants' March 27 Directive and are redressable by the Court. For these same reasons, courts considering similar cases have likewise found state plaintiffs to have standing. *See Maryland*, 2025 WL 973159, at *8 ("[I]t would be naïve . . . for the Court to conclude that . . . [Plaintiff States] have not suffered and will not soon suffer at least one injury sufficient for standing. After all, tens of thousands of . . . employees work for the federal government throughout the country.").[7]

## V.     The Court Should Not Require a Bond.

Under Fed R. Civ. P. 65(c), a Court may order, in connection with a preliminary injunction, a bond in the amount "the court considers proper." "[T]here is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond." *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991); *accord P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) ("[T]he Rule vests broad discretion in the district court to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all." (cleaned up)). Plaintiffs request that the Court exercise its discretion to waive the requirement to post a bond, as courts have done in similar cases brought against federal agencies to vindicate the public interest. *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19; *Rhode Island*, 2025 WL 1303868, at *17–18. To the extent a bond is required, Plaintiffs request that the bond be nominal,

---

[7] Nor does the Civil Service Reform Act, 5 U.S.C. § 7101 *et. seq.*, bar Plaintiffs' claims from being adjudicated here, as "Congress' intent to preclude district court jurisdiction" for claims by States is nowhere to be found in the CRSA statutory scheme. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 9–10 (2012). CRSA channels *only* claims by employees, unions, and employers to administrative tribunals (the Merit Systems Protection Board and the Federal Labor Relations Authority). *See* 5 U.S.C. §§ 7103(a)(1)-(2), 7123, 7703. If Plaintiffs' States claims could not be heard in district court, the States would be deprived of any judicial review at all. *See Rhode Island*, 2025 WL 1303868, at *7 ("The Court does not observe any jurisdiction bar within the CSRA's statutory scheme that would apply to the States [and] . . . a finding of CSRA preclusion would foreclose all meaningful judicial review over the States' claims.").

consistent with the practice in this Circuit. *See Maine v. United States Dep't of Agriculture*, No. 25-cv-00131, 2025 WL 1088946, at *29–30 (D. Me. Apr. 11, 2025) (collecting cases); *cf. Nat'l Council of Nonprofits*, 2025 WL 597959, at *19 ("In a case where the government is alleged to have unlawfully withheld trillions of dollars . . . it would defy logic . . . to hold Plaintiffs hostage for the resulting harm.").

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the March 27 Directive and its implementation be preliminarily enjoined.

Dated: May 9, 2025                                        Respectfully submitted,

**NICHOLAS W. BROWN**                       **LETITIA JAMES**
Attorney General of Washington            Attorney General for the State of New York

By: */s/ Spencer W. Coates*                    By: */s/ Molly Thomas-Jensen*
Spencer W. Coates
Kelsey E. Endres                                      Molly Thomas-Jensen
*Assistant Attorneys General*                 Jessica Ranucci
Cynthia Alexander                                   *Special Counsel*
William McGinty                                      Rabia Muqaddam
*Deputy Solicitors General*                     *Special Counsel for Federal Initiatives*
800 Fifth Avenue, Suite 2000                 Andres Ivan Navedo
Seattle, WA 98104-3188                         Molly Brachfeld
(206) 464-7744                                       *Assistant Attorneys General*
spencer.coates@atg.wa.gov                    28 Liberty St.
kelsey.endres@atg.wa.gov                      New York, NY 10005
cynthia.alexander@atg.wa.gov              (929) 638-0447
william.mcginty@atg.wa.gov                 rabia.muqaddam@ag.ny.gov
                                                             molly.thomas-jensen@ag.ny.gov
*Counsel for the State of Washington*      jessica.ranucci@ag.ny.gov
                                                             ivan.navedo@ag.ny.gov
                                                             molly.brachfeld@ag.ny.gov

                                                             *Counsel for the State of New York*

**PETER F. NERONHA**                         **KRISTIN K. MAYES**
Attorney General for the State of Rhode    Attorney General for the State of Arizona
Island
                                                             By: */s/ Alexa Salas*

/s/ Sarah Rice
Kathryn M. Sabatini (RI Bar No. 8486)
Chief, Civil Division
Sarah Rice (RI Bar No. 10588)
Deputy Chief, Public Protection Bureau
Chandana Pandurangi (RI Bar No. 10922)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
ksabatini@riag.ri.gov
srice@riag.ri.gov
cpandurangi@riag.ri.gov

*Counsel for the State of Rhode Island*

Alexa Salas
*Assistant Attorney General*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Alexa.Salas@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**ROB BONTA**
Attorney General for the State of California

By: /s/ Crystal Adams
Crystal Adams
*Deputy Attorney General*
Michael L. Newman
Neli Palma
*Senior Assistant Attorneys General*
Kathleen Boergers
Virginia Corrigan
Srividya Panchalam
*Supervising Deputy Attorneys General*
Jesse Basbaum
Jeanelly Orozco Alcala
*Deputy Attorneys General*
1515 Clay Street
Oakland, CA 94612-1499
(510) 879-3428
Crystal.Adams@doj.ca.gov
Michael.Newman@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Virginia.Corrigan@doj.ca.gov
Srividya.Panchalam@doj.ca.gov
Jesse.Basbaum@doj.ca.gov
Jeanelly.OrozcoAlcala@doj.ca.gov

*Counsel for the State of California*

**PHILIP J. WEISER**
Attorney General of Colorado

By: /s/ Tanya E. Wheeler
Tanya E. Wheeler
*Associate Chief Deputy Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
tanja.wheeler@coag.gov

*Counsel for the State of Colorado*

57

**WILLIAM TONG**
Attorney General of the State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

*Counsel for the State of Connecticut*


**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Andrew C. Mendrala*
Andrew C. Mendrala
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.mendrala@dc.gov

*Counsel for the District of Columbia*


**KWAME RAOUL**
Attorney General of the State of Illinois

By: */s/ Caitlyn G. McEllis*
Caitlyn G. McEllis
Senior Policy Counsel
Katharine P. Roberts
Assistant Attorney General
Office of the Illinois Attorney General
115 S. Lasalle Street
Chicago, IL 60603
312-814-3000

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*


**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*


**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Margaret Machaiek*
Margaret Machaiek
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
August, ME 04333-0006
Tel.: 207-626-8800
Fax: 207-287-3145
margaret.machaiek@maine.gov

58

Caitlyn.McEllis@ilag.gov

*Counsel for the State of Illinois*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Michael Drezner*
Michael Drezner
*Senior Assistant Attorney General*
Federal Accountability Unit
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6959
mdrezner@oag.state.md.us

*Counsel for the State of Maryland*

**KEITH ELLISON**
Attorney General for the State of
Minnesota

By: */s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Astrid Carrete_____*
Astrid Carrete
Impact Litigation Counsel
New Mexico Department of Justice
P.O. Drawer 1508

*Counsel for the State of Maine*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
Danny Haidar
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
HaidarD1@michigan.gov

*Counsel for the People of the State of Michigan*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

By: */s/ Justine M. Longa_____*

Justine M. Longa
Jessica L. Palmer
*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-4527
Justine.Longa@law.njoag.gov
Jessica.Palmer@law.njoag.gov

*Counsel for the State of New Jersey*

**DAN RAYFIELD**
Attorney General of the State of Oregon

By: */s/ Elleanor H. Chin*
Elleanor H. Chin
*Senior Assistant Attorney General*
100 Market Street
Portland, OR 97201

Santa Fe, NM 87504-1508
(505) 490-4060
acarrete@nmdoj.gov

*Counsel for the State of New Mexico*

**CHARITY R. CLARK**
Attorney General for the State of Vermont


By: */s/ Ryan P. Kane*
Ryan P. Kane
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

*Counsel for the State of Vermont*

Tel (971) 673-1880
Fax (971) 673-5000
elleanor.chin@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSHUA L. KAUL**
Attorney General of Wisconsin


By: */s/ Charlotte Gibson*
Charlotte Gibson
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218  (phone)
(608) 294-2907 (Fax)
Charlie.Gibson@wisdoj.gov

*Counsel for the State of Wisconsin*