# EXHIBIT 35

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK, et al.

    Plaintiffs,

    v.

ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

    Defendants.

Case No. 1:25-cv-00196

## DECLARATION OF MARGARET LELAND

I, Margaret Leland, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am over the age of eighteen, and am otherwise competent to testify. I am familiar with the information in the statements set forth below either through personal knowledge, in consultation with the staff at Washington's Department of Labor & Industries (L&I) staff, or from documents that have been provided to and reviewed by me.

2. I am the Policy Director at L&I working in the Government Affairs and Policy Division under the Director's Office. I have worked L&I for 15 years. I have worked with the L&I Government Affairs and Policy Division since July 2013, initially as a Senior Policy Advisor and currently as the Policy Director. Prior to those positions, I held roles in Division of Occupational Safety and Health (DOSH) within L&I, including as the Legislative and Laboratory Programs Manager from June 2011 to July 2013 and as the Special Assistant to the Deputy Assistant Director who heads the division. Prior to joining L&I, I was an Assistant Attorney General providing legal support to L&I, including litigation and advice.

3. I have J.D. from Seattle University School of Law, an M.S.P.H. in Industrial Hygiene from the Graduate School of Public Health from San Diego State University, and B.S. in Environmental Policy and Assessment at Western Washington. Prior to entering public service, I worked as an Occupational Health Specialist, Industrial Hygienist/Technician, and as a Safety Administrator for several companies as well as a for a local public health department.

4. L&I's is a diverse state agency dedicated to the safety, health, and protection of Washington's 3.3 million workers along with the public and is one of the largest providers of workers' compensation coverage in the country. Our mission is to "Keep Washington Safe and Working". Our key responsibilities administration of workplace safety and health laws and administration of Washington's workers' compensation system.

5. Washington L&I's Division of Occupational Safety and Health (DOSH) administers chapter 49.17 RCW, the Washington Industrial Safety and Health Act (WISHA). DOSH ensures employers meet safety and health standards via workplace inspections, on-site consultations. DOSH also develops and enforce rules that protect workers from hazardous job conditions, thus decreasing the risk and occurrence of occupational injuries and illnesses. L&I is one of 22 OSHA-approved State Plan by the Occupational Safety and Health Administration (OSHA) pursuant to 29 U.S.C. § 667 with jurisdiction over most private sector employers and all state and local government workers

6. L&I's Division of Industrial Insurance administers the state's workers compensation insurance system according to Title 51 RCW, Washington Industrial Insurance Act. In this capacity, L&I is the workers' compensation insurer for more than 99% of Washington's 200,000 employers, providing medical and limited wage replacement coverage to workers who suffer job related injuries and illness. In the event of an injury or illness leading to a workers'

permanent total disability, L&I workers' compensation provides a lifetime pension benefit, or in the event of a worker's death a lifetime benefit to their survivors. Under Washington's Industrial Insurance Act, employers must obtain workers' compensation coverage from L&I unless certified by L&I to be self-insured. Both employers and employees pay premiums to L&I, with on average, employers paying 75% of the premium and employees paying 25% through payroll deductions.

7. It is my understanding and belief that as a result of the massive reduction in force across HHS, over 90% of the staff of the National Institute for Occupational Safety and Health ("NIOSH"), housed within the Centers for Disease Control and Prevention ("CDC"), have been placed on administrative leave and will be permanently terminated on or after either June 1, 2025, or July 2, 2025.

8. As authorized under the federal Occupational Safety and Health (OSH) Act pursuant to 29 U.S.C. § 671, NIOSH is the only US federal agency mandated to conduct research and making recommendations for the prevention of work-related injury and illness. NIOSH conducts research, disseminates information and supports education in the field of occupational safety and health. NIOSH achieves their mission through a combination of intramural (research conducted by NIOSH with its own employees) and extramural programs (research conducted outside NIOSH by researchers and institutions funded by NIOSH). It is my understanding that terminations include those program staff in the NIOSH Office of Extramural Program and as such all NIOSH Extramural Research programs and grants will not be continued.

9. Losing NIOSH, both the intermural and extramural programs. would be devastating for L&I, and for Washington. Broadly, L&I relies on NIOSH for research on the recognition and control of workplace physical, biological, chemical and psychosocial hazards which will reduce the burden of occupational injury and illness and promote worker well-being. In fiscal year 2023,

$2.6 billion was paid for workers' compensation benefits to workers in Washington State. Indirect costs of occupational injuries and illnesses are estimated to up to 4 times the direct costs and include loss of productivity, administrative costs, overtime, training of replacement workers, and administrative costs, presenteeism, decrease in quality of life, and household and community effects.

**Losing NIOSH Hinders Development of Washington Workplace Safety Regulations**

10. The elimination of NIOSH will directly impact the development and effectiveness of workplace safety and health regulations in Washington, many of which directly depend on NIOSH findings and actions.

11. Washington's DOSH, a state OSHA plan, has authority to adopt workplace safety and health regulations pursuant to WISHA, that exceed the requirements of federal workplace regulations. Regulatory development relies on research to determine hazardous levels of exposure, health effects of that exposure, and adequacy of control measures for the exposure. WISHA, similar to OSHA, mandates L&I to set health and safety standard to control conditions in the workplace concerning toxic materials and harmful physical agents that "most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity." (RCW 49.17.050(4) and 29 U.SC § 655(5)). NIOSH, directly and by grant, is the largest producer of occupational safety and health research in the United States.

12. For example, NIOSH's Criteria for a Recommended Standard: Occupational Exposure to Heat and Hot Environments,[1] informed the updated of Washington's 'Outdoor Heat

---

[1] NIOSH [2016]. NIOSH criteria for a recommended standard: occupational exposure to heat and hot environments. By Jacklitsch B, Williams WJ, Musolin K, Coca A, Kim J-H, Turner N. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication 2016-106.

Exposure' regulation[2] adopted in 2023. Absent research, workplace safety regulations may lead to incomplete, ineffective rules. Ineffective rules likely impose an unnecessary burden on employers while not having the benefit of worker protection and diminished worker injuries and illness.

13. The Washington State Legislature explicitly recognized the value of NIOSH's expertise and guidance in producing recommended workplace standards and enacted RCW 49.17.465 in 2011 requiring L&I adopt rules for exposures to hazardous drugs, such as chemotherapeutic agents, in healthcare that are consistent with NIOSH's 2004 alert on preventing occupational exposures to antineoplastic and other hazardous drugs in health care settings as updated in 2010. The Washington State Legislature defined "hazardous drugs," in part, as any hazardous drug identified by NIOSH.[3] NIOSH has published and updates a lists of hazardous drugs in 2004, 2010, 2012, and 2014, As described in the "NIOSH List of Antineoplastic and Other Drugs in Healthcare Settings, 2016" document, part of NIOSH's effort to identify hazardous drugs includes an initial review by an internal committee of all new FDA drug approvals and new warnings on existing drugs for a two-year period, followed by review of an expert panel consisting of peer reviewers and stakeholder review followed by notice in the Federal Register requesting public comment.[4]

14. The elimination of NIOSH diminishes the information available to establish safe workplaces in Washington. Washington L&I DOSH relies on NIOSH to provide authoritative information for employers, workers and state worker safety and health agencies.

---

[2] Washington Administrative Code 296-62-095
[3] RCW 49.17.460(2)
[4] NIOSH [2016]. NIOSH list of antineoplastic and other hazardous drugs in healthcare settings, 2016. By Connor TH, MacKenzie BA, DeBord DG, Trout DB, O'Callaghan JP. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication Number 2016-161 (Supersedes 2014-138).

15. For example. hazardous and harmful exposures to workplace chemicals can occur below the regulatory standards adopted by OSHA and WISHA. NIOSH publishes Recommended Exposure Limits (NIOSH RELs). NIOSH RELs provide exposure limits to hazardous substances in the workplace to protect workers from any harm. NIOSH RELs are developed through a comprehensive data review. NIOSH RELs are published in the NIOSH Pocket Guide to Chemical Hazards. In the absence of OSHA regulations for specific chemicals, NIOSH RELS can be helpful to employers to provide guidance on safe exposure levels. The personnel and resource demands to develop a comprehensive set of RELs are not available in state labor or health agencies. Some L&I safety and health rules explicitly reference the NIOSH Pocket Guide as a means of determining whether a legally-actionable workplace safety condition exists. WAC 296-842-19005 (relying on NIOSH Pocket Guide to Chemical Hazards to determine whether immediately dangerous to life or health conditions exist).

16. NIOSH publishes the NIOSH Manual of Analytical Methods (NMAM). NMAM is a collection of sampling and analytical methods for workplace exposure monitoring. It includes methods for workplace air, surfaces, and blood and urine. NIOSH and its partners have developed or adapted the methods included in the NMAM. NIOSH evaluates the methods according to established protocols and performance criteria. NIOSH recommends using the best method available for making each measurement. L&I DOSH inspectors and consultants take samples of chemicals, dusts or other hazardous matter during worksite compliance inspections or consultations. The samples are collected according to sampling protocols based on corresponding NIOSH developed protocols. The samples are sent to DOSH's lab in Tumwater, Washington. The DOSH lab analyzes these samples according to analytical method developed by NIOSH to determine if hazardous chemicals or materials are present and, if so, the amount to which

employees may have been exposed. If analytic samples exceed regulatory thresholds, control measures may be instituted and in the context of an enforcement inspection, the employer may be given a citation and a monetary penalty. NMAM thus provides standardized, authoritative methods for the collection and analysis of these samples across the United States, including Washington.

17. The loss of NIOSH means the inability to update NMAM, inability to test and develop analytic methods with greater sensitivity to lower levels of exposures and develop new analytic methods for emerging exposures and hazards. NMAM will become obsolete. The number of methods developed and in need of updating far exceeds the capacity of one state or even multiple states and as such the loss of NIOSH, the loss of NMAM, will create confusion, with the application of inconsistent methods across states.

**Losing NIOSH Facilities and Programs Makes Washington's Workplaces Less Safe**

18. In addition to the regulatory effect of losing access to NIOSH, there are several NIOSH-run programs that significantly affect Washingtonians and their workplace safety. All of the programs below now appear to be halted and may be forever lost if the reductions in force go into full effect.

19. ***Respiratory Equipment Certification***: NIOSH's National Personal Protective Technology Laboratory in Pittsburgh, PA, which is required to vet and approve personal protective equipment, including N95 respirators, lost all or nearly all their employees. No other federal facility may issue these approvals.[5] Nor can any state facility. Unfortunately, NIOSH's website

---

[5] Ian Karbal, *Federal cuts threaten to close Pennsylvania lab that certifies N95s and other respirators in June*, Pennsylvania Capital-Star (April 17, 2024) https://penncapital-star.com/health-care/federal-cuts-threaten-to-close-pennsylvania-lab-that-certifies-n95s-and-other-respirators-in-june/.

confirms reports of the respirator approval program's demise, noting "[d]ue to the reduction in force across NIOSH, no new respirator approval applications can be accepted."[6]









---

[6]*NIOSH, Personal Protective equipment*, https://www.cdc.gov/niosh/ppe/index.html (last accessed April 28, 2025); *NIOSH, Respirator Approval Program,* https://www.cdc.gov/niosh/rap/index.html (last accessed April 28, 2025).

20. The loss of the NPPTL, and thus NIOSH's approval program for respirators and PPE, will profoundly impact the safety of Washington's workers and the work of L&I DOSH. NIOSH NPPTL is responsible for the testing and certification of respiratory protective equipment in the United States.

21. For certification of respirators, NIOSH conducts comprehensive testing of respirators to ensure they meet established safety and performance standards before granting approval. The NIOSH approval process is codified under 42 C.F.R. § 84. They perform ongoing audits and testing of approved respirators to ensure continued compliance with standards. They participate in creating and updating standards for respiratory protection equipment. They conduct research to improve respiratory protection technology and standards. They provide information and resources about proper respirator selection, use, and maintenance. The NIOSH approval number on certified respirators indicates the product has passed these tests and meet the required protection standards. Since the NIOSH NPPTL certification process is comprehensive and rigorous, the workforce can be assured that a NIOSH certified respirator will perform to standard.

22. During the COVID-19 pandemic and the scarcity of N-95 respirators, counterfeit respirators and respirators that misrepresented approval were introduced to the market. Loss of NPPTL creates a real risk of faulty respirators appearing on the market, especially if there is scarcity of NIOSH certified respirators. Further, innovation in developing novel methods for production of respirators, developing new types of respirators, e.g. for wildland firefighters, cannot gain NIOSH approvals.

23. Additionally, all L&I DOSH rules that require employers ensure workers wear respirators to protect workers from hazardous airborne exposures, such as firefighters and healthcare workers, mandate the use of NIOSH certified respirators and respirator filters. *See, e.g.*,

WAC 296-305-04001 (requiring firefighters' self-contained breathing apparatus to be NIOSH certified); WAC 296-842-11005 (relying on NIOSH certification for respirator selection for workplaces; noting "[i]f a respirator is not certified by NIOSH, you have no guarantee that it meets minimum design and performance standards for workplace use"); WAC 296-842-13005 Table 6 (requiring air-purifying respirators with filters certified to be at 95% efficient as certified by NIOSH for exposures to particulates). The requirement to use NIOSH certified respirators and filters is consistent with OSHA's requirement for respirator usage and all state plans must have a similar provision to be at least as effective as OSHA. The loss of the NPPTL means that list of existing approved respirators becomes static but also removes the important oversight over existing respirator certifications as NIOSH will no longer be able to conduct audits and revoke approval for cause outlined in 42 C.F.R. § 84.34. For example, in December 2024, NIOSH revoked six approvals for a respirator manufacturer on the basis that they failed to maintain their quality management system.[7] Absent this critical safeguard, there is risk of harmful exposure despite efforts by L&I, employers, and workers to ensure workers are wearing appropriate NIOSH certified respirators and filters.

24.     **_Health Hazard Evaluation Program_**: NIOSH's Health Hazard Evaluation (HHE) program was created by Section 20(a)(6) of the Occupational Safety and Health Act of 1970, and Sections 301 and 501 of the Federal Mine Safety and Health Act of 1977. 29 U.S.C. § 669(a)(6); 30 U.S.C. § 951(a)(11). As part of its implementing regulations, NIOSH must conduct investigations upon request of possible safety and health hazards and conduct inspections resulting from employee or committee reports of unsafe of unhealthful working conditions. 29 C.F.R. §

---

[7] *NIOSH CA 2024-1089, NIOSH Respiratory Device Information CAN Revocation of Six Aegle PPE 1 LLC Approvals*, CDC (Dec. 2024) https://www.cdc.gov/niosh/media/pdfs/2025/03/CA-2024-1089-P.pdf.

1960.35(a). NIOSH is also required to provide a hazard evaluation program for all federal agencies. 29 C.F.R. § 1960.35(b).

25. According to NIOSH's website, "[d]ue to the reduction in force across NIOSH, no new health hazard evaluation requests can be accepted."[8]



26. The elimination of the NIOSH Health Hazard Evaluation (HHE) program undermines the ability to detect new workplace hazards and characterize harmful exposures. Among HHE's many purposes, HHE's evaluate workplaces where workers have an illness with an unknown cause, and evaluate exposures to a novel new or previously unrecognized hazard. HHE's serve the purpose of an objective, science-based exploration of the risks posed by workplace exposures on human health. HHE's can be requested by employers, unions, and workers. They are performed at public and private sector employers. Employers nor workers are charged for a NIOSH HHE. Washington has had more than 40 HHEs from 1973 through 2025.

27. A 2021 HHE of the Washington State's State Toxicological Laboratory evaluated concerns regarding potential exposures to illicit drugs, including methamphetamine, among

---

[8] *NIOSH, Health Hazard Evaluations (HHEs),* CDC (July 22, 2024) https://www.cdc.gov/niosh/hhe/default.html.

workers at the lab.[9] Detectable levels of methamphetamine, cocaine, fentanyl, and heroin were found on surfaces but levels were not significant to trigger mandated cleanup and workers did not report symptoms. Observations regarding improved use of PPE were made.

28. Another example is the 2004 HHE conducted following a confidential request from employees working at the Hanford Tank Farm and a subsequent request from the United States Department of Energy to evaluate the potential for exposures and health effects of vapors emitted from hazardous waste storage tanks at the Hanford Site in Richland, Washington.[10]

29. While Washington directly benefits from the HHE's performed in Washington, the national compilation of HHE helps Washington for rulemaking and to assist employers in providing a safe workplace, for example identifying ergonomic risks in warehousing, exposures to lead in bullet recycling, and evaluations of silica exposures in various workplace settings. No other local, state, or federal program has the level of expertise in hazard identification, exposure assessment, symptom surveys, medical testing and engineering controls for a diverse and complex exposure issues as the NIOSH HHE program. Absence of the HHE program can lead to an increased burden of unnecessary workplace illnesses, employee and employer anxiety and stress regarding unknown hazards, failure to intervene early to identify harmful effects of exposures throughout an industry and loss of the knowledge gained from worksite evaluations in the real world.

---

[9] NIOSH [2023]. Evaluation of occupational exposures to illicit drugs in forensic laboratories. By Li JF, Shi D, Neu DT, Chiu S, Charles M. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, Health Hazard Evaluation Report 2021-0115-3388, https://www.cdc.gov/niosh/hhe/reports/pdfs/2021-0115-3388.pdf.

[10] NIOSH [2004]. Health hazard evaluation report: CH2M Hill Hanford Group, Inc. and United States Department of Energy, Office of River Protection, Richland, WA. By Boudreau Y, Cardarelli J, Burr G. Cincinnati, OH: U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, NIOSH HETA Report No. 2004–0145–2941, https://www.cdc.gov/niosh/hhe/reports/pdfs/2004-0145-2941.pdf.

30.     ***Coal Miner Programs***: NIOSH's Coal Workers Health Surveillance Program (CWHSP) provides black lung screenings to coal miners at no cost to miners. Its existence is mandated by Coal Mine Health and Safety Act of 1969, later amended by the federal Mine Safety and Health Act of 1977. 30 U.S.C. § 843. But because of the destruction of NIOSH, this program has stopped operating, according to NIOSH's website:



31.     While there are currently no active coal mines in Washington, coal mining did occur in Washington prior to 2007, thus there are likely workers alive in Washington still eligible for services under the CWHSP. Moreover, if coal mining is expanded in Washington as a result of federal administrative priorities, the number of otherwise-eligible Washington miners will undoubtedly grow—but the program will not exist by then.

32.     ***Firefighter Programs***: NIOSH also operates a number of firefighter-specific programs, such as the Fire Fighter Fatality Investigation and Prevention Program (FFFIPP), which takes submissions and conducts investigations of select career and volunteer firefighter medical and traumatic injury line-of-duty deaths, and the National Firefighter Registry for Cancer, which

collects history and occupational information that can be used to determine the incidence of cancer among firefighters.[11]

33.     Despite recent media reports that "some" of the laid-off NIOSH workers in these programs would be brought back on a "temporary" basis, on a practical level these firefighter-focused programs have ceased all activity. Both programs have been effectively halted, their websites updated that they will not be accepting new submissions "[d]ue to the reduction in force across NIOSH."[12]



---

[11] This Registry is mandated by the Firefighter Cancer Registry Act of 2018, which was signed by then-President Trump on July 9, 2018, 2 U.S.C. § 280e-5.

[12] *NIOSH Firefighting, About the FFFIPP* https://www.cdc.gov/niosh/firefighters/fffipp/about.html; *NIOSH Firefighting, National Firefighter Registry (NFR) for Cancer*, CDC (Oct. 7, 2024) https://www.cdc.gov/niosh/firefighters/registry/index.html.



34. The loss of the NIOSH firefighting programs lessens our scientific knowledge of the causes of work-related injuries and diseases, such as cancer and mental health disorders, associated with firefighting. Aside from making our firefighters less safe, this directly impacts Washington law. For instance, Washington, like many states, presume that specific health conditions are occupational diseases for purposes of workers compensation. This includes RCW 51.32.185, which establishes this presumption for firefighters. Current occupational disease presumptions for firefighters include for respiratory disease, heart problems, specific cancers, specific infectious diseases and post-traumatic stress disorder. This list of disease presumptions are informed by the data provided by NIOSH's Center for Firefighter Safety, Health, and Well-being,[13] which includes the National Firefighter Registry for Cancer, and the National Firefighter Fatality Investigation and Prevention Program

35. As the expectation of the Washington Legislature is to have evidence-based recommendations for modification of Washington's occupational disease presumption law, NIOSH

---

[13] *NIOSH, Center for Firefighter Safety, Health and Well-being*, CDC (Oct. 23, 2024) https://www.cdc.gov/niosh/centers/firefighter-safety-and-health.html

demise suggests fewer, if any conditions, will be added to the Washington occupational disease presumption law.

36.     ***Extramural Programs***: NIOSH also directly funds, through grants, several organizations at the University of Washington, including the Northwest Center for Occupational Health and Safety (NWCOHS), an Educational Research Center (ERC), and the Pacific Northwest Center for Agricultural Safety and Health (PNASH), a Center for Agricultural Safety. Both are wholly supported by NIOSH grants—both would be shuttered in NIOSH no longer exists.

37.     NIOSH is mandated to provide an adequate supply of qualified personnel to carry out the purposes of the OSH Act (29 U.S.C. § 670(a)) and NIOSH funded ERCs are the means to comply with this mandate. Losing these centers would be devastating not just for the faculty and students at the University of Washington, but also for Washington, its local communities, and the safety of its workers.

38.     Ending funding for the NWCOHS ERC, and the other 17 ERCs across the nation, jeopardizes the supply of trained occupational safety and health professionals. ERC trainees, include occupational medicine physicians, occupational nurses, industrial hygienists and occupational safety specialists, the professions that can identify hazards in the workplace and establish causal links between the workers illness and workplace exposures. Workers compensation in Washington relies on occupational medicine physicians and nurses among other medical providers to initiate claims, provide evidence based treatment for injured workers, evaluate their disabilities, and promote return to work.

39.     Shuttering NIOSH ERCs diminishes the supply of these well-trained professionals, likely leading to less evidence-based care of injured workers, prolonged disability and diminished return to work. NIOSH ERC trained industrial hygienists evaluate workplaces for chemical

exposures, build controls that may include ventilation, substitution of hazardous chemicals with less hazardous chemicals, and implementing respiratory protection programs. Less trained industrial hygienists lead to more chemically related illnesses and less compliance among the employer community with workplace health and safety regulations. ERC safety professionals can evaluate for safety hazards, develop training programs for recognition of safety hazards, install controls, like lock out tag out, to diminish worker risk for severe injuries. Less ERC trained safety professionals means more worker injuries.

40. Similarly, the PNASH, along with 10 other Agriculture Safety and Health Centers in the US, researches and promotes best safety and health practices for workers in farming forestry and fishing, the occupational group with the highest fatal work injury rates in the country—in 2023, 24.4 workers per 100,000 FTE were killed on the job compared to the overall national average of 3.5 deaths per 100,000 FTE for all other occupations.

41. PNASH researches how to most effectively educate these vulnerable workers on safety and health topics. For example, among many education and training programs, PNASH developed Heat Education and Awareness Tools (HEAT) in collaboration with agricultural workers, tested comprehension, and evaluated the effectiveness of the health prevention efforts—and they were effective. These tools supplemented L&I's adoption of an occupational heat exposure standard in initially adopted in 2008 and updated in 2023. Simply, PNASH assists agricultural, forestry, and fishing workers decrease harmful exposures and avoid injury. Loss of PNASH will result in more injuries to this vulnerable working population and less access to social insurance programs.

**Eliminating NIOSH's Research and Investigative Arm Hurts Washington Workers**

42. Even beyond Washington direct reliance on NIOSH for setting its workplace safety regulations, and on NIOSH facilities (or NIOSH-funded facilities) for industry-specific workplace safety, the loss of NIOSH also means the loss of some of the world's most highly trained occupational safety and health experts. NIOSH staff are highly trained, many with advanced degrees and expertise in various occupational health and safety disciplines, such as industrial hygiene, occupational medicine, occupational health nursing, occupational safety, occupational epidemiology, and ergonomics. These expert staff positions are not easily filled or nor is the expertise easily transferred. Their thought leadership, experience and accumulated knowledge is available to Washington L&I programs, including DOSH, workers compensation, and Washington's small safety research program.

43. The termination of access to these individuals impairs future research endeavors, creating inefficiencies and the loss of many practical lessons of what does and doesn't work in occupational safety and health. While currently available, the likely loss of NIOSH's website (and its updates), loss of access to landmark studies, research reports, research articles, hazard reviews, safety recommendations, and facts sheets. With the loss of NIOSH, we lose decades of experience in reducing the harms in the workplace, such as control workplace noise exposure,[14] and evaluations of the risk for work-related musculoskeletal disorders,[15] among many other occupational safety and health hazards. With loss of NIOSH, we lose its global leadership in

---

[14] *NIOSH Noise and Hearing Loss, Understand Noise Exposure*, CDC (Feb. 16, 2024) https://www.cdc.gov/niosh/noise/prevent/understand.html#:~:text=The%20NIOSH%20recommended%20exposure%20limit,a%20hearing%20loss%20prevention%20program.

[15] The NIOSH Yellow Book is a summary of the epidemiologic evidence for workplace risks for work-related musculoskeletal disorders (https://www.cdc.gov/niosh/docs/97-141/default.html). NIOSH developed and updated the NIOSH Lifting Equation—a common exposure assessment tool for evaluation work risk for back disorders; (https://www.cdc.gov/niosh/ergonomics/about/RNLE.html).

ongoing study of emerging hazards, such as nanomaterials,[16] wildland fire smoke,[17] and perfluoroalkyl and polyfluoroalkyl substances (PFAS).[18] Research builds upon itself, the loss NIOSH's history stymies innovation and future research. This loss of knowledge is likely irreplaceable.

44. Overall, the loss of NIOSH would have the effect of making Washington workplaces less safe, increase the burden on the workers' compensation system, impair the quality of life of Washington workers and their families, and impose other societal costs to Washington's communities

45. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

                                                  /s/ Margaret Leland
                                                  Margaret Leland
                                                  Policy Director/Executive Policy Manager
                                                  Washington Department of Labor & Industries

Date: May 8, 2025

---

[16] NIOSH has a Nanotechnology Research Center (https://www.cdc.gov/niosh/centers/nanotechnology.html)

[17] NIOSH's Wildfire Smoke on their webpage (https://www.cdc.gov/niosh/centers/nanotechnology.html). More importantly, NIOSH published a Request for Information in the Federal Register—'Draft Hazard Review: Wildland Fire Smoke Exposure Among Farmworkers and Other Outdoor Worker' (https://www.cdc.gov/niosh/docket/review/docket352a/default.html). This RFI and review is in process and would be lost with the demise of NIOSH.

[18] NIOSH started studying Per- and Polyfluoroalkyl substances more than 20 years ago. These cancer-causing agents are ubiquitous in the environment and many workplaces—(https://www.cdc.gov/niosh/pfas/about/index.html)