UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>        Plaintiffs,<br><br>   v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES, et al.,<br><br>        Defendants. | Civil Action No. 1:25-cv-00196 |

**<u>MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

**INTRODUCTION**

The Executive Branch has broad discretion to manage its personnel and order its priorities. Yet Plaintiffs—a group of states—argue otherwise in seeking to preliminarily enjoin restructuring and reduction-in-force (RIF) plans issued by the Secretary of the Department of Health and Human Services (HHS or the Department). Plaintiffs assert that the restructuring and RIFs have resulted and will result in a violation of the Department's statutory duties. But their arguments amount to the proposition that they, rather than the Executive, should get to dictate how Department prerogatives and day-to-day operations are carried out. In and of itself, that is an extraordinary proposition. But Plaintiffs go further: they seek a sprawling preliminary injunction that would revoke the RIFs for hundreds of employees and require the Department to engage in the discretionary work Plaintiffs prefer. This Court should reject that invitation for multiple reasons.

First, Plaintiffs lack standing to challenge the restructuring and RIFs. Fundamentally, their theory about the RIFs is just wrong: the Department has made clear that it intends to continue carrying out its statutory duties. So Plaintiffs have not been and will not be injured by a statutory violation. And the categories of injuries they assert are speculative, attenuated, non-cognizable, or all of the above. Part of this is because the restructuring and RIFs are part of an ongoing transition, and it is too soon for Plaintiffs to determine whether they might ever suffer many of the harms they allege. For related reasons, a court could not redress many of Plaintiffs' claimed injuries.

Second, Plaintiffs have brought the wrong claims under the wrong statute. Plaintiffs claim that the restructuring and RIFs violate the Administrative Procedure Act (APA). But their claims revolve around federal employment actions, and such claims can be litigated only through the statutory scheme specifically provided by Congress for the purpose. Even if the APA were a potential vehicle, the plans for restructuring and RIFs would not be actionable under the statute because they do not constitute final agency action. Rather, they are only steps in an ongoing

transition that does not affect Plaintiffs' legal rights. And Plaintiffs' claims are really directed at agency actions unlawfully withheld, which requires Plaintiffs to surmount a higher standard they have not met.

Third, Plaintiffs' claims fail on the merits. The statutes establish the Department and some of its divisions, and they set broad guidelines for activities the Department must conduct. The Department has stated that it intends to continue carrying out its statutory functions. Just because it is not doing so in the way or at the pace Plaintiffs would prefer does not mean it is violating applicable law. Nor was the decision to better align the Department with its core statutory duties, and consolidate duplicative and overlapping functions, arbitrary and capricious.

Finally, the remaining preliminary injunction factors likewise counsel against relief. Plaintiffs' speculative injuries cannot establish irreparable harm. And Plaintiffs' weeks-long delay in seeking a preliminary injunction underscores that they are not and will not be irreparably harmed. On the other hand, the harm to the Executive Branch in having Plaintiffs dictate its workforce and responsibilities would be immense. The public has an interest in the President's being able to carry out polices on which he won an election, including via appropriate organizational efforts by the Secretary of HHS. Plaintiffs should not be allowed to usurp that role. The Court should deny Plaintiffs' request for a preliminary injunction.

## STATEMENT CONCERNING HEARING

Under LR Cv 7(c), Defendants note that this matter has already been set for a hearing on Tuesday, May 20, 2025, at 3:00 p.m.

## BACKGROUND

### I.    The U.S. Department of Health and Human Services

The U.S. Department of Health and Human Services is the federal agency charged with enhancing the health and well-being of Americans, including by fostering advances in the sciences

underlying medicine, public health, and social services. *See* 42 U.S.C. §§ 3501 *et seq.* The Department currently consists of twenty-eight distinct staff and operating divisions.

One of these operating divisions is the Centers for Disease Control and Prevention (CDC), which itself consists of several components. Relevant here, the National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention (NCHHSTP) is a CDC component that seeks to reduce incidence of infection, morbidity, and mortality in connection with these infectious diseases. The Division of Reproductive Health (DRH) focuses on issues related to reproductive, maternal, and infant health. The National Center on Birth Defects and Developmental Disabilities (NCBDDD) works to advance the health and well-being of individuals with birth defects and developmental disabilities and their families. The National Institute for Occupational Safety and Health (NIOSH) conducts research, provides services, and makes recommendations for the prevention of work-related injury and illness. The National Center for Environmental Health (NCEH) plans, directs, and coordinates programs to protect Americans from environmental hazards. Finally, the Office on Smoking and Health (OSH) works to protect the public's health from the harmful effects of tobacco use by seeking to reduce tobacco-related health disparities, death, and disease.

Another relevant HHS operating division is in the Food and Drug Administration (FDA): the Center for Tobacco Products (CTP). Among other activities, CTP sets performance standards, reviews premarket applications for new and modified-risk tobacco products, requires new warning labels, and establishes and enforces advertising and promotion restrictions. Also relevant here, the Administration for Children and Families (ACF) contains the Office of Head Start (OHS), which administers the federal discretionary grant program that promotes school readiness in low-income children up to age five. Finally, the Office of the Assistant Secretary for Planning and Evaluation

(ASPE) contains the Division of Data and Technical Analysis, which updates the Federal Poverty Guidelines on an annual basis.

## II.    **Factual Background**

### A.    **Executive Order 14210**

On February 11, 2025, President Trump issued Executive Order 14210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative" (Workforce Executive Order). Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025). As relevant here, subpart c of Section 3—titled "Reductions in Force"—directs "Agency Heads [to] promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id.* § 3(c). Further, it directs that "[a]ll offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website." *Id.* Finally, it directs that "[t]his subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement." *Id.*

The Workforce Executive Order further provides that, within 30 days of its issuance (*i.e.*, by March 13, 2025), "Agency Heads shall submit to" OMB and OPM "a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities." *Id.* § 3(e). That report "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated." *Id.* The Executive Order also allows agency heads to "exempt from

- 4 -

this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities." *Id*. § 4(b). And it provides that it "shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id*. § 5(b).

### B.     February 26, 2025, Workforce Memorandum

On February 26, 2025, OPM and OMB jointly issued a memorandum (Workforce Memorandum) to agencies providing guidance for complying with the Workforce Executive Order. Office of Personnel Management, *Memorandum re: Guidance on Agency RIF and Reorganization Plans Requested by* Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative, https://www.opm.gov/policy-data-oversight/ latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf.     The Workforce Memorandum noted that the Workforce Executive Order required agencies to submit reports by March 13 and that the Workforce Memorandum provides "guidance on these Agency RIF and Reorganization Plans ('ARRP'), along with the instruction that such plans be submitted to OMB and OPM." *Id.* at 1. Pursuant to this guidance, ARRPs were to seek to achieve five principles: (1) "Better service for the American people"; (2) "Increased productivity"; (3) "A significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required"; (4) "A reduced real property footprint"; and (5) "Reduced budget topline." *Id.* at 1-2. "Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily required functions." *Id.* at 2.

The Workforce Memorandum also identifies, in broad terms, "principles" agencies should consider in undertaking reorganization and reduction actions. Specifically, agencies should:

> seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient service delivery; and maximally reduce the use of outside consultants and contractors.

*Id.* at 2. In addition, the Workforce Memorandum directs agencies to "review their statutory authority and ensure that their plans and actions are consistent with such authority." *Id.*

The Workforce Memorandum states that agencies should submit ARRPs in two phases: Phase 1 ARRPs, to be submitted by March 13, 2025, which "shall focus on initial agency cuts and reductions," *id.* at 3; and Phase 2 ARRPs, to be submitted by April 14, 2025, which "shall outline a positive vision for more productive, efficient agency operations going forward," *id.* at 4.

Phase 1 ARRPs were to provide, among other things: a list of agency subcomponents or offices that provide direct services to citizens, any statutes that establish the agency or subcomponents thereof, any agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations, "[w]hether the agency or any of its subcomponents should be eliminated or consolidated; and which specific subcomponents or functions, if any, should be expanded to deliver on the President's priorities[,]" "[a] list by job position of all positions categorized as essential for purposes of exclusion from largescale RIFs," "[t]he agency's suggested plan for congressional engagement to gather input and agreement on major restructuring efforts and the movement of fundings between accounts," and the agency's timetable for implementation of each part of the Phase 1 ARRP. *Id.*

Phase 2 ARRPs were to provide, among other things:

- Confirmation that the agency has reviewed all its personnel data and plans to ensure that employees are grouped based on like duties and functions to the maximum extent possible;

- "The competitive areas for subsequent large-scale RIFs";

- All reductions (of FTE positions and otherwise);

- The agency's plan to ensure new career appointment hires are in highest-need areas;

- An explanation of how the ARRP will improve services for Americans and advance the President's priorities;

- "For agencies that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care), the agency's certification that implementation of the ARRPs will have a positive effect on the delivery of such services" (a certification that "should include a written explanation from the Agency Head");

- Plans to improve efficiency and reduce costs through improved technology;

- "Any changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking"; as well as the agency's timetable and plan for implementing the ARRP.

*Id.* at 5-6. The Workforce Memorandum also delineates timing: it states that Phase 2 Plans should be planned for implementation by September 30, 2025. *Id.* at 4. With respect to RIFs, the Workforce Memorandum states that, before a RIF is implemented and an employee separated from service, there must be a formal RIF notice period of 60 days (or 30 days if the agency obtains an OPM waiver), in which affected employees are issued formal RIF notices, as well as provided appeal rights, career transition assistance, and priority placement options. *Id.* at 7.

C.    **The Department's Implementation of Executive Order 14210 and the Workforce Memorandum**

In accordance with the Workforce Executive Order and the Workforce Memorandum, the Department has submitted its Phase I and Phase II ARRPs. Those ARRPs are in the process of review and refinement but have not yet been finalized for public release and implementation. On March 27, 2025, as a step along the ARRP process, Secretary Robert F. Kennedy, Jr. of the Department of Health and Human Services publicly announced the planned reorganization of certain components of the Department. *See* ECF No. 44-1. The Secretary's announcement does not contemplate the elimination of any statutorily mandated HHS programs or divisions. Instead, the focus of the planned reorganization and consolidation is the reduction of wasteful spending, increased efficiency, and increased responsiveness to the needs of the American people.

Specifically, regarding the restructuring of programs and divisions, the Department plans to consolidate its existing 28 divisions; centralize shared services including information technology, external affairs, human resources, and procurement; create a new Administration for a Healthy America to coordinate chronic care and disease prevention programs and harmonize health resources to low-income Americans more efficiently; appoint a new Assistant Secretary for Enforcement to combat waste, fraud, and abuse in federal health programs; and consolidate ten regional offices into five. *Id.* at 1-2. The goal of the consolidation and streamlining of agency functions is to reduce redundancy and allow the Department to perform its core functions more efficiently. As the announcement explained, the Department intends to accomplish its goals "without impacting critical services." *Id.* at 1.

As the Department and its Operating Divisions have continued to develop their ARRPs, they are also working to ensure that statutorily mandated programs continue to function. For example, certain employees at CTP were sent RIF notices and placed on administrative leave on

- 8 -

April 1. Despite RIFs at CTP, critical CTP functions like tobacco compliance checks are continuing. *See* FDA, *Tobacco Compliance Check Outcomes*, https://timp-ccid.fda.gov/ (last updated Apr. 30, 2025) (demonstrating that compliance checks have continued to occur from January through April 2025). CTP review of pre-market tobacco applications also continues. *See* FDA, *Tobacco Products Marketing Orders*, https://www.fda.gov/tobacco-products/market-and-distribute-tobacco-product/tobacco-products-marketing-orders#Marketing%20Denial    (last updated May 13, 2025) (demonstrating continued review of applications and issuance of decisions from January through mid-May 2025). Similarly, employees from the Division of Data and Technical Analysis within ASPE were subject to the RIFs. Yet the annual requirement for the Department to revise the Federal Poverty Guidelines—a function that had been managed by this ASPE division—has already been completed for this year, *see* 90 Fed. Reg. 5917 (Jan. 17, 2025), allowing ample time for this function to be consolidated with other functions before the next annual revision is due in January 2026.

As the ARRP process continues, the Department and its Operating Divisions have in other instances determined that employees who had initially received RIF notices should be returned to work. For example, the Department determined that the RIF notices of more than three hundred NIOSH employees should be rescinded and those employees returned to work. Decl. of John J. Howard ¶ 3, Ex. 1. The impacted employees were provided notice on May 13, 2025, that they would not be affected by the upcoming RIFs. *Id.*

The restoration of these NIOSH employees will aid in restoring functionality to the Coal Miner Health Surveillance Program, the Fire Fighter Fatality Investigation and Prevention Program, the National Firefighter Registry for Cancer, and the Health Hazard Evaluation Program. *See id.* ¶ 6. Restoration of employees at the National Personal Protective Technology Laboratory

will aid in restoring functionality to the NIOSH certification program for respirators and personal protective equipment and will resume the processing of applications for new respiratory equipment. *Id.* ¶ 7.

As this overview indicates, the Department's ARRPs are in the process of review and refinement and are not final. The Department's operating divisions have worked diligently toward completing their ARRPs, as required by the Workforce Executive Order and the Workforce Memorandum, with the goal of implementation by the September 30, 2025, deadline. One recent development may affect the timeline: "further implementation" of the ARRPs was recently enjoined for 14 days—through May 23, 2025—via a temporary restraining order (TRO) in *American Federation of Government Employees v. Trump*, --- F. Supp. 3d ---, 2025 WL 1358477, at \*23-24 (N.D. Cal. May 9, 2025), *appeal filed*, No. 25-3030 (9th Cir.).[1] If and when the injunction in that case is lifted or narrowed, the Department plans to resume its development, finalization, and implementation of ARRPs, while ensuring that statutorily mandated programs continue to function.

## III.    **Procedural Background**

On May 5, 2025, Plaintiffs filed this lawsuit against the Secretary, the Department, and several Department agencies and agency heads (together, Defendants). ECF No. 1. Plaintiffs' complaint alleges five claims under the U.S. Constitution and the federal Administrative Procedure Act (APA). On May 9, Plaintiffs filed a motion for a preliminary injunction, ECF No. 44, asking the Court to enjoin the planned restructuring and RIFs announced in the March 27 press release as to four components: CDC, CTP, OHS and Head Start regional offices, and ASPE. The effect of

---

[1] The district court in that case did not "rule[] on whether" the challengers were "likely to succeed on their APA claims regarding individual agency ARRPs." 2025 WL 1358477, at \*23. The court is considering whether to enter a preliminary injunction upon expiration of the TRO. *See id.*

such an injunction would be to freeze the ARRP in its tracks as to these agencies.

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). "Federal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1992) (citation omitted). To obtain such "extraordinary" relief, Plaintiffs must show (1) a likelihood of success on the merits, (2) that they will likely suffer irreparable harm "in the absence of preliminary relief," (3) "that the balance of equities tips in [their] favor," and (4) that an injunction would serve the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Though each factor is important," *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012), the "first two factors are the most critical," *Respect Me. PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010). And the third and fourth factors of the analysis "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

**I.    <u>Plaintiffs Are Not Likely to Prevail on the Merits of Their Claims.</u>**

**A.    Plaintiffs Lack Article III Standing.**

"At the preliminary injunction stage," Plaintiffs "must make a 'clear showing' that" they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation omitted). Standing is a "bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). It requires that a plaintiff "possess a personal stake" in the outcome, which "helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Standing doctrine thus "serves to

protect the 'autonomy' of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *Id.* at 379–80 (citation omitted).

Under any theory of standing, "the irreducible constitutional minimum" requires that (1) the plaintiff have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (*Lujan*) (cleaned up). "Injury in fact" requires "an invasion of a legally protected interest." *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (citation omitted). If the plaintiff relies on a "risk of future harm" to a legally protected interest, that future harm must be "certainly impending," or there must be a "substantial risk" that it "will occur." *Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*, 120 F.4th 904, 910 (1st Cir. 2024) (*NAGE*) (citation omitted). And "when (as here) a plaintiff challenges the government's unlawful regulation (or lack of regulation) of *someone else*, standing is not precluded, but it is ordinarily substantially more difficult to establish." *All. for Hippocratic Med.*, 602 U.S. at 382 (citation and quotation marks omitted).

Plaintiffs appear to assert three theories of injury. First, they allege that they are not receiving information previously provided by divisions or units within the Department. *E.g.*, Pl. States' Mot. for Prelim. Inj., ECF No. 43 ("PI Br.") at 9, 16, 20-21, 40-42, 44-48, 50-51. Second, they allege that certain services they previously received from the Department are not being provided, and they are seeking other providers of such services. *E.g.*, *id.* at 8-9, 11-12, 14-19, 25, 31-32, 34, 39-48, 50-51. These two categories of alleged injury overlap substantially, as in many cases the services on which Plaintiffs allegedly rely consist largely of providing information. Under either an informational theory or a more tangible services-related theory, however, Plaintiffs

lack standing. Plaintiffs' third theory of harm concerns allegedly canceled or soon-expiring grants or delays in funding for state programs. *E.g.*, *id.* at 9, 14, 32, 43. That theory, too, fails because it suffers from a fatal redressability problem. Moreover, only a handful of Plaintiffs appear to rely on such allegations in their motion; at a bare minimum, they cannot serve as a basis for other Plaintiffs' standing or for preliminary relief as to those other Plaintiffs.

## 1. Plaintiffs Lack Cognizable Informational Injury.

First, Plaintiffs have not suffered a cognizable informational injury or causation. To establish informational injury under Article III, Plaintiffs must show (1) that they "lack access to information to which [they are] legally entitled" and (2) "that the denial of that information creates a 'real' harm with an adverse effect." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)); *see also Amrhein v. eClinical Works, LLC*, 954 F.3d 328, 332-33 (1st Cir. 2020). Even if a statute requires the provision of information, "a bare procedural violation" is not enough to give Plaintiffs standing. *Spokeo*, 578 U.S. at 341. They must still show "a concrete injury" caused by lack of access to the information. *Id.* Here, that means Plaintiffs must show that alleged informational deficiencies resulting from the ARRPs caused real-life "consequences." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (holding that "an asserted informational injury that causes no adverse effects cannot satisfy Article III" (cleaned up) (citation omitted)).

To a significant extent, Plaintiffs' allegations do not make it past the first element of informational standing. In many instances, they show no current or imminent deprivation of information to which they are legally entitled. Take, for example, the federal poverty guidelines. *See* PI Br. at 20. As Plaintiffs note, the Secretary is required to revise "the poverty line" annually. 42 U.S.C. § 9902(2). Although Plaintiffs cite an ASPE webpage stating that it is "not being updated

*currently*," PI Br. at 21 (quoting ECF No. 44-16) (emphasis added), updating the webpage is not required at any given time as long as the statute's annual deadline is met. In fact, it has already been met for this year, *see* 90 Fed. Reg. 5917 (Jan. 17, 2025), and the authorizing statute does not require that the revision be done by any particular office, *see* 42 U.S.C. § 9902(2). Plaintiffs also allege injury based on some allegedly unavailable information that is not required to be provided by a particular division or on a particular timeline. For example, Plaintiffs allege that their "efforts to track and prevent" certain threats to health will be impeded because "NIOSH's regularly updated Pocket Guide to Chemical Hazards and Recommended Exposure Limits" is not currently being updated. PI Br. at 44. But the applicable statute requires the Secretary to update a list of toxic substances only "as needed but at least annually." 29 U.S.C. § 669(a)(3), (6). And Plaintiffs do not specify a time since the March 27 press release that the Pocket Guide "needed" to be updated and was not. So Plaintiffs have no legally cognizable harm. *See Dreher*, 856 F.3d at 345.

In some instances, Plaintiffs identify information (or services) that statutes do, in fact, require the Department to collect or provide and that they allege is not presently being provided. The collection of certain pregnancy- and maternal-risk-related data (referred to as PRAMS data) under 42 U.S.C. § 247b-12, 13, arguably falls in this category. As an initial matter, Plaintiffs do not show that this information is being intentionally withheld or indefinitely suspended, and it is not clear that it has been allegedly unavailable long enough to violate any statutory requirement. Given the Workforce Executive Order's direction to implement ARRPs consistent with applicable law and the Department's stated intention to proceed "without impacting critical services," the reasonable interpretation is a temporary lapse in providing the information rather than a refusal to provide statutorily mandated services. ECF No. 44-1 at 1. Setting that aside, some required information may be delayed or not provided at this time. But there are still two problems with

these assertions of standing.

First, Plaintiffs have not shown any concrete and particularized harm based on lack of access to the information. Lack of access without more is not enough. So when Plaintiffs allege that "no new data" for the Pregnancy Risk Assessment Monitoring System (PRAMS) "is being collected" by CDC, PI Br. at 11, their injury appears to be that they may no longer be able to run their own pregnancy-health programs in their preferred manner. They are not unable to function; they allegedly have to divert "resources" to fill data gaps. PI Br. at 41. And diversion of resources alone is not an Article III injury. *See infra* Section I.A.2. If taken to its apparent conclusion, Plaintiffs' informational-harm theory would require that the Department never be allowed to provide less or different information than it did at the moment before implementation of the ARRPs began. But courts may not micromanage the "internal affairs" of the executive branch that way. *Sampson v. Murray*, 415 U.S. 61, 83–84 (1974).

Second, even if Plaintiffs could show concrete harm from a lack of access to information, they do not show that the services they use would resume to their liking if the restructuring were reversed or if additional employees were reinstated. After all, the Department still has discretion to hire and fire employees. The absence of redressability defeats standing. *See Lujan*, 504 U.S. at 560-61. So Plaintiffs' informational-injury theory fails for this reason as well.

2. <u>Plaintiffs Lack Cognizable Injury Based on Services Allegedly Not Provided.</u>

Next, Plaintiffs have not suffered cognizable injury based on non-provision of services. Plaintiffs allege that the Department is not providing services that they have historically benefited from, and they allege that they will incur (or are incurring) expenses to find alternative sources of such services. *E.g.*, PI Br. at 40. But that theory is inconsistent with Supreme Court precedent. In *United States v. Texas*, states challenged a federal immigration policy that would "impose[] costs

on the States." 599 U.S. at 674. The states claimed the government's immigration-enforcement decisions would force them to "supply social services such as healthcare and education" to additional persons. *Id.* The Supreme Court held the states lacked standing, explaining that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id.* at 680 n.3. "[I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id.* And the states' "indirect effects" standing theory was too "attenuated" to amount to a constitutionally sufficient injury. *Id.*; *see also, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (rejecting contention that any federal policy that "imposes peripheral costs on a State creates a cognizable Article III injury"); *cf. All. for Hippocratic Med.*, 602 U.S. at 395 (rejecting the theory that "standing exists when an organization diverts its resources in response to a defendant's actions").

Similarly, here, the states assert that the ARRPs have inflicted or may inflict downstream harms on the states' budgets and resources. They allege, for example, that they "are investing time, money, and other resources in changes to their state programs due to the closure and reduction of CDC's laboratory resources." PI Br. at 40. Plaintiffs' motion also relies on predictions of what "may" or is "likely" to happen to their budgets or programs. *E.g.*, *id.* at 8-9, 41. For example, they argue that without complete PRAMS data for 2024, they will not be able to "shape current policy priorities." *Id.* at 41. Similarly, they argue that without Maternal Mortality Review Committees (MMRC) resources, "life-saving insights will be lost." *Id.* at 42. But they cite no proof that these alleged harms will materialize. Such remote and speculative harms are not cognizable injuries-in-fact. *See Texas*, 599 U.S. at 674, 680 n.3. Were the rule otherwise, states could claim standing to second-guess nearly any federal personnel decision—whether that be hirings, firings, or relocations—on the theory that the decision has a downstream effect on state resources. The theory

- 16 -

could reach far beyond federal personnel decisions, too, to the litany of federal policies that "frequently generate indirect effects on state revenues or state spending." *Id.* at 680 n.3; *see Arizona*, 40 F.4th at 386 (rejecting a peripheral-costs theory as "boundless" and "a bridge much too far").

Even to the extent the Plaintiffs assert a more direct (and less downstream) interest in the receiving Department services, they have not shown that the Department is failing to provide statutorily required services. For example, no indication exists that the Head Start monitoring required under 42 U.S.C. § 9836a(c) is not being completed as required. Although Plaintiffs allege that regional-office closures mean that the Department is "unable to perform the functions upon which" they "rely," PI Br. at 47, not enough time has passed for there to have been a monitoring disruption. The statute requires standard reviews every three years and six- or 12-month reviews for deficient or newly designated agencies. 42 U.S.C. § 9836a(c)(1)(A)–(C). Because far less time than any of those intervals has passed, whether required monitoring will in fact be disrupted is speculation.  And "site visits," PI Br. at 19, are not statutorily required. The same analysis applies to STD testing services. Although Plaintiffs allege reliance on those services, PI Br. at 6-8, the services about which Plaintiffs complain are not specifically required by statute.

Especially given the Department's intent to streamline "without impacting critical services," there is no basis for assuming that disruption of statutorily mandated programs will occur in the reorganized Department. ECF No. 44-1 at 1. As to services like the specific STD testing upon which Plaintiffs claim to rely, they do not show their alleged injuries are caused by a statutory violation rather than an exercise of proper discretion. *See Gonzalez v. Cuccinelli*, 985 F.3d 357, 366 (4th Cir. 2021) (finding lack of jurisdiction to consider challenge to failure to adjudicate visas because statute did not mandate it and the agency had discretion). Thus, they fail

- 17 -

to establish an invasion of a legally protected interest.

Plaintiffs have also failed to identify any "case or historical practice" offering precedent for the notion that courts can micromanage federal personnel policies to produce particular downstream effects. *Texas*, 599 U.S. at 677. On their theory of harm, any plaintiff purportedly aggrieved by deficient government services might even seek to compel terminations of underperforming employees and then compel the government to hire better workers in their place. *See* 5 U.S.C. § 706(1) (authorizing a court to "compel agency action unlawfully withheld or unreasonably delayed"). Or a plaintiff might seek to require that the Executive Branch put in place an ARRP with different goals and directives. "[I]interpos[ing] the federal courts as virtually continuing monitors of the wisdom and soundness of . . . administration," however, is "contrary to the more modest role Article III envisions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006) (cleaned up); *see also Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985). In short, an injury based on services not being provided in the way Plaintiffs prefer is not one "traditionally thought to be capable of resolution through the judicial process." *Texas*, 599 U.S. at 676 (citation omitted).

At minimum, a handful of particularized allegations of some delay or disruption in a government service cannot justify sweeping relief reinstating hundreds of employees across an entire Department or freezing in place an entire restructuring effort. *Cf. All. for Hippocratic Med.*, 602 U.S. at 402 (Thomas, J., concurring) (reasoning that "no party should be permitted to obtain an injunction in favor of nonparties"). Were the Court to find that Plaintiffs are entitled to particular information or services that they did not receive within a required timeframe, they would at most have standing to seek provision of such information or services—not an order requiring the Department to provide it in a particular fashion or with particular staff. Courts may not grant relief for supposed injuries that goes far beyond redressing the injury itself. *See Gill v. Whitford*, 585

U.S. 48, 73 (2018).

3. Plaintiffs Cannot Establish Standing Based on Alleged Lapses in State-Program Funding.

A subset of Plaintiffs allege that grants for existing state programs have been or will shortly be terminated. PI Br. at 9 (alleging that "[s]everal States received notifications that their grants supporting STD/HIV Disease Intervention Training Centers would be terminated"); *id.* at 32 (alleging that "the CDC had to cancel agreements with Plaintiff States to fund STD/HIV Disease Intervention Training Centers"). Others fear that funding will run out or expected grants will not be supplied in the future. *Id.* at 14 (Washington alleging that funding for one of its occupational-health centers "runs out this June" and that a NIOSH official "confirmed that the CDC had no plans to take any action on renewal applications for" ERCs); *id.* at 43 (Washington and California alleging that ERCs in their states "face imminent closure when many of their grants run out"); ECF No. 44-24 ¶ 12 (Rhode Island alleging that "grant support" for several programs is "threatened due to the sudden elimination of staff within the CDC"); ECF No. 44-26 ¶ 20 (New Jersey alleging that it had "expected to receive a one-year extension" of a grant for a tobacco "Quitline and Quit Centers," but "was advised" in April "that instead it was going to receive a six-month 'no cost extension'"). Plaintiffs cannot establish standing based on those alleged harms.

Start with grants that have allegedly been terminated. The first hurdle is that any Plaintiff alleging harm based on the non-payment of grant funds the Department committed to provide is in the wrong court. The proper remedy would be to seek damages in the Court of Federal Claims. In *Department of Education v. California*, 604 U.S. ---, 145 S. Ct. 966, 968 (2025) (per curiam), the Supreme Court stayed a district court's order that (in relevant part) "require[d] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." The Court held that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual

obligation to pay money.'" *Id.* (citation omitted). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(145 1)). That reasoning would apply squarely to any alleged breach of a specific funding agreement. And it would require such a claim to be dismissed here. *See* 5 U.S.C. § 704 (providing for review under the APA only where "there is no other adequate remedy in a court").

Even if this Court had jurisdiction to consider grant-termination claims, and even if some Plaintiffs experienced losses of relied-upon funding, they have not shown how their requested relief would redress that injury. If planned funding was already canceled, freezing the restructuring in place or halting the RIFs would not automatically lead to restoration. To the contrary, Plaintiffs ordinarily submit applications for grants, which must then be reviewed and approved. Plaintiffs have not shown that enjoining any part of the Department's ARRPs would result in Plaintiffs' becoming entitled to grant funding. Without redressability, Plaintiffs cannot establish standing. *Lujan*, 504 U.S. at 560-61.

Moreover, only some Plaintiffs allege having lost funding. The others may not piggyback on those allegations to establish their own standing. *See Gill*, 585 U.S. at 73 ("[c]aution[ing] . . . that standing is not dispensed in gross: [a] plaintiff's remedy must be tailored to redress the plaintiff's *particular* injury" (emphasis added) (citation and internal quotation marks omitted)). Thus, even if the Court finds that the loss of funding is a redressable injury for standing purposes, it should not find such injury for Plaintiffs who do not allege such loss.

Finally, alleged injuries based on *anticipated* losses of funding are too speculative to support standing. Alleging that funding loss is "threatened" by the ARRPs or that funding may not be renewed after a grant runs out evinces little more than an apprehension about the future. *See*

- 20 -

*NAGE*, 120 F.4th at 910 (finding plaintiff lacked standing to seek injunctive relief "because its anticipated future harms" were "far too speculative"). Especially given the Department's focus on avoiding disruption of critical services, the risk that a future grant termination will actually materialize is not imminent.

### B.    The CSRA Precludes District-Court Jurisdiction Over Plaintiffs' Claims.

Even if Plaintiffs have Article III standing, this Court lacks jurisdiction to adjudicate plaintiffs' challenges to the employment decisions of federal agencies. Although district courts have jurisdiction over civil actions arising under federal law, *see* 28 U.S.C. § 1331, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019) (*AFGE*). As detailed below, Congress has precluded jurisdiction for the claims brought by Plaintiffs challenging the Department's RIFs and restructuring.

The Civil Service Reform Act ("CSRA") and the Federal Service Labor-Management Relations Statute (FSL-MRS), which is set forth in the CSRA, together provide a comprehensive "scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes brought by unions representing those employees. *Id.* at 752 (regarding FSL-MRS); *see Roth v. United States*, 952 F.2d 611, 615 (1st Cir. 1991) (stating that "Congress intended [the CSRA] to provide an exclusive procedure for challenging federal personnel decisions" (citation omitted)); *Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (similar). In passing the CSRA, Congress made the Merit Systems Protection Board (MSPB)[2] and

---

[2] Congress established the MSPB to, among other things, hear employee appeals of final adverse actions as set out in 5 U.S.C. § 7512. *See* 5 U.S.C. § 1204(a)(1). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id.* §§ 1204(a)(2), 7701(g). Employees may appeal adverse MSPB decisions to the Federal Circuit. *See id.* § 7703(b)(1)(A); *see also* 28 U.S.C. § 1295(a)(9).

Federal Labor Relations Authority (FLRA)[3] the exclusive means for federal employees, labor unions, and other interested parties to raise challenges to final, non-discrimination-related, adverse employment actions.[4] *See United States v. Fausto*, 484 U.S. 439, 455 (1988). CSRA channeling is required even when such disputes involve constitutional claims. *See Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10–15 (2012) (citation omitted); *see also AFGE*, 929 F.3d at 752; *Nat'l Ass'n of Agric. Emps. v. Trump,* 462 F. Supp. 3d 572, 586 (D. Md. 2020) (adopting the reasoning of *AFGE*).

CSRA's channeling provisions preclude this Court's review of Plaintiffs' claims. Everything about those claims, and the remedies Plaintiffs seek, derives from the relationship between the federal government and its employees, to which Plaintiffs and their members are strangers. Plaintiffs cannot step into the shoes of those employees and assert claims against the Department that the employees cannot themselves assert in federal district court but instead must pursue before the FLRA or the MSPB.

In *AFGE*, the D.C. Circuit applied the "two-step framework set forth in" *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), to conclude that the union plaintiffs in that case could not challenge in district court three executive orders related to federal employment. *AFGE*, 929 F.3d at 754. Under that framework, district courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of appeals is "(i) fairly discernible in the statutory scheme,

---

[3] The FLRA was established by Congress as part of the FSM-LRS to "conduct hearings and resolve complaints of unfair labor practices," *see* 5 U.S.C. § 7105(a)(2)(G). Direct review of the FLRA's decisions on unfair labor practice and negotiability issues is available in the courts of appeals. *See id*. § 7123(a). FLRA regulations are set out at 5 C.F.R. pt. 2420. Among other things, the regulations allow persons or organizations who show that the outcome of the proceeding is likely to directly affect their rights or duties to intervene. *See* 5 C.F.R. § 2423.22.

[4] As argued *infra* in Section I.C, the RIFs at issue in this case do not constitute "final agency action" in the sense required for APA review. However, if the Court disagrees on that point, the argument in this section provides an independent alternative basis for denying Plaintiffs' motion as to the RIFs at minimum.

and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *See id.* at 755 (citations omitted).

The Supreme Court repeatedly has held that the CSRA provides the exclusive means of redressing employment disputes involving federal employees. *See Elgin*, 567 U.S. at 10-15; *Fausto*, 484 U.S. at 455. In other words, Congress intended to make the FSL-MRS and CSRA the exclusive scheme, and they satisfy the first step of the two-step *Thunder Basin* framework. As to covered actions, beyond restricting judicial review of covered constitutional claims, the CSRA prevents district courts from deciding the merits of APA claims challenging an agency's "'systemwide' . . . policy interpreting a statute," its "implementation of such a policy in a particular case," *Nyunt v. Chairman, Broad Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quoting *Fornaro*, 416 F.3d at 67-69), or its decision to engage in "'a *type* of personnel action' the [CSRA] does not cover," *Mahoney v. Donovan*, 721 F.3d 633, 635-36 (D.C. Cir. 2013) (citation omitted); *but see Axon Ent., Inc. v. FTC*, 598 U.S. 175 (2023).

That Plaintiffs have framed their alleged injuries partly in constitutional terms does not allow them to sidestep CSRA's mandatory channeling regime. *Cf. Maryland v. USDA*, No. 25-1248 (4th Cir.) (April 9, 2025) ECF No. 42 (holding that "[t]he Government is likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims"). Were Plaintiffs' theory correct, downstream users of government services could always go directly to court to raise challenges to agency reductions in force notwithstanding Congress's determination that the employees must themselves first pursue relief administratively. Courts have repeatedly rejected these sorts of end runs. In *Elgin*, the Supreme Court held that even if a federal employee was raising constitutional claims, the CSRA imposes an "implied preclusion of district court jurisdiction." 567 U.S. at 12. Similarly, in *AFGE*, numerous federal unions asserted broad

constitutional and statutory challenges to a set of three Executive Orders. *See* 929 F.3d at 752. The D.C. Circuit held that the FLRA provided the exclusive avenue through which unions could bring their claims. *See id.* at 754–61 (citing *Thunder Basin*, 510 U.S. at 212–16); *Nat'l Ass'n of Agric. Emps.*, 462 F. Supp. 3d at 586 (adopting the reasoning of *AFGE v. Trump*); *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 636–39 (D.C. Cir. 2013); *Nat'l Treasury Emps. Union v. Trump*, --- F. Supp. 3d ----, 2025 WL 561080, at *7 (D.D.C. Feb. 20, 2025) (upholding channeling requirement and denying request for emergency relief).

Indeed, it would be odd if strangers to the federal-employment relationship—such as Plaintiffs here—could raise claims in this Court that the affected federal employees cannot themselves raise. It would upend the entire reticulated process Congress set out in the exclusive statutory schemes of the CSRA and other employment statutes. The "exclusion" of Plaintiffs "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [Plaintiffs] from seeking review" under other provisions. *Fausto*, 484 U.S. at 455. When a comprehensive scheme of the sort at issue here permits review at the behest of some types of plaintiffs but not others, it implicitly precludes review by plaintiffs who are not authorized to bring claims.

For example, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984), considered a statute that permitted dairy handlers to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else. *See id.* at 346 (citing 7 U.S.C. § 608c). When a group of dairy consumers sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding," and that "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process."

*Id.* at 347. Hence, the "structure of this Act indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* And the "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other holding would facilitate circumvention of the comprehensive statutory scheme. *See id.* at 348.

The principles described in *Block* fully apply to the CSRA. *See Fausto*, 484 U.S. at 448 (applying *Block* to conclude that certain employees who lack CSRA appeal rights "should not be able to demand judicial review for the type of personnel action covered by that chapter"). Because Congress intentionally foreclosed judicial review for parties other than those specifically authorized to seek relief, Plaintiffs, who are not employees of the Department, cannot challenge the Department's employment actions here. Because "district courts do not have concurrent jurisdiction over matters within the exclusive purview of the FLRA," this Court should reject Plaintiffs' effort to disrupt Congress's review scheme and to seek premature, improper review before this Court. *Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*, 367 F.3d 932, 935 (D.C. Cir. 2004) (citing *Karahalios v. Nat'l Fed'n of Fed. Employees,* 489 U.S. 527, 533 (1989)).

### C.    Plaintiffs' Claims Do Not Qualify for APA Review Because They Do Not Seek Judicial Review of a Discrete, Final Agency Action.

As a threshold matter, Plaintiffs do not identify an agency action that the Department has taken that could specifically be redressed by a federal court. Plaintiffs must plead "an identifiable action or event" and "direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (*Nat'l Wildlife Fed'n*). That final agency action must be "circumscribed [and] discrete." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (*SUWA*). The APA does not provide for "general judicial review of [an agency's] day-to-day operations." *Nat'l Wildlife Fed'n*, 497 U.S. at 899. On the contrary, it contains "a

- 25 -

prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (cleaned up); *see also SUWA*, 542 U.S. at 64. "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (*Kempthorne*) (citation omitted). The avoidance of such "generalized" review reflects separation-of-powers concerns and the courts' recognition that unlike "circumscribed, discrete agency actions," a plan can represent "the sum of many individual actions, including some yet to be taken." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006) (citation omitted). "[P]lans themselves are generally unreviewable"; instead, "it is only [the] specific actions implementing the plans that are subject to judicial scrutiny." *Id.* at 20-21.

Plaintiffs' requested injunction presents exactly the type of wholesale challenge that the APA forbids. They do not seek judicial review of a discrete agency action. Rather, they seek comprehensive judicial review of a planned restructuring outlined by a press release, and their requested preliminary relief would freeze that eventual restructuring in its tracks as to CDC, CTP, OHS and its regional offices, and ASPE. PI Br. at 22. Instead of presenting the court with a "narrow question to resolve," *Kempthorne*, 455 F.3d at 307, Plaintiffs challenge how the Department plans to go about streamlining operations and consolidating redundant units and functions. Addressing this type of claim would require the Court to supervise the Department's activities and determine how it should accomplish each statutorily-mandated function going forward—an even more extreme kind of supervisory claim than the one rejected in *National Wildlife Federation*. *See* 497 U.S. at 892-93. Such a claim would completely circumvent the purpose of the APA's discrete

agency action requirement, which is to "protect agencies from undue judicial interference with their lawful discretion and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *SUWA*, 542 U.S. at 66-67.

Even assuming Plaintiffs have identified discrete agency actions—which they have not—they have not shown that these programmatic actions are final. "Final agency action" has two components. First, the action must "mark the 'consummation' of the agency's decisionmaking process[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). It may not be a "preliminary, procedural, or intermediate agency action." 5 U.S.C. § 704. Second, the action must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (citation omitted). With respect to this second criterion, the "core question" is whether the agency action "will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992); *see also Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (noting that the action being challenged must be "the definitive statement of the agency's position" and must have a "direct and immediate" effect on the complaining parties). This requirement means that documents with "no independent legal authority" are not reviewable. *Cal. Cmtys. Against Toxins v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019).

Plaintiffs argue that the restructuring outlined in the March 27 press release qualifies as "final action" because its announcements about restructuring and RIFs are not "tentative or interlocutory" and "had immediate, concrete legal consequences." PI Br. at 23. But *Bennett*'s test is not satisfied because by the terms of the press release, the agency's "decisionmaking process" is ongoing and evolving. For example, the Release describes "specific contents of the restructuring plan that have been announced *so far*." ECF No. 44-1 at 2 (emphasis added). And the accompanying Fact Sheet notes that while "[n]o additional cuts are currently planned" beyond

- 27 -

those described in the sheet, the Department "will continue to look for further ways to streamline its operations and agencies." ECF No. 44-2 at 2. These statements underline the developing nature of the agency's actions. An unfolding reorganization plan that remains subject to changes based on circumstances is quintessentially non-final.

The actions taken so far reflect a decision by Department leadership that agency functions need to be streamlined and reorganized. And the Department has begun taking steps to address that need. Those steps are "preliminary" in nature and "not directly reviewable." *See* 5 U.S.C. § 704. They "may be . . . step[s], which if erroneous will mature into a prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make the individual programmatic actions themselves the "consummation of the administrative process" of reevaluating the agency's priorities to reorganize the Department. *Id*. at 113. Moreover, the March 27 press release and the restructuring do not "directly affect" Plaintiffs. *See Franklin*, 505 U.S. at 797. True, Plaintiffs allege dealing with some effects of the RIFs. But those are downstream effects. Plaintiffs are undisputedly not the subjects of the restructuring, and to the extent the March 27 press release could be construed to "directly affect" anyone, Plaintiffs do not have standing to assert their interests.

The restructuring plan is not final agency action for another reason. Plaintiffs identify the press release as the source of a "Directive" and also rely on the associated fact sheet. Those documents, however, have "no direct and appreciable legal consequences." *Cal. Cmtys.*, 934 F.3d at 638; *cf. Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 189 (D.C. Cir. 2006) ("[W]e have never found a press release of the kind at issue here to constitute 'final agency action' under the APA"). Instead, they describe aspects of what the Department "will" do going forward. ECF No. 44-1. No one "action" is encompassed by the press release because the restructuring is still being planned,

refined, and ultimately will be implemented. *Cf. Cal. Cmtys.*, 934 F.3d at 637–38 (holding that memorandum announcing agency's final interpretation of law was not final for APA purposes, even though it "unequivocally declare[d]" the agency's "definitive" position and "forecast[]" "in no uncertain terms" how the agency would proceed).

Plaintiffs' only citations in support of their "final action" theory are to injunctions recently issued against the government in other cases. PI Br. at 22-23. Those cases do not warrant the same relief here. The government is already appealing three of those rulings, and as Plaintiffs acknowledge, one of the injunctions has been stayed and another stayed in part. Their persuasive force is thus limited at best. Most importantly, Plaintiffs cite no binding authority to support their argument that a preliminary and evolving restructuring plan is "final action." It is not.

To the extent the Court determines that the RIF phase of the ARRPs—or any part of them—does constitute final agency action, it should deny a preliminary injunction on standing grounds or CSRA preclusion grounds and for the reasons addressed below.

### D. Plaintiffs' APA Claims Fail on the Merits.

1. Plaintiffs Seek to Compel Agency Action But Cannot Meet the Mandamus-Like Standard.

A significant aspect of Plaintiffs' allegations is that the restructuring and RIFs violate the law because they will cause (or have caused) the Department to cease performing functions mandated by statute. *See, e.g.*, PI Br. at 14 (arguing that NIOSH functions that "are mandated, directly or impliedly, by statute . . . will be eliminated"), 17 (arguing that OSH's collection of tobacco-use information is "required by statute"), 20. Such allegations are governed by the APA's provision permitting courts to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). Plaintiffs cannot succeed under § 706(1)'s mandamus-like standard.

"The only agency action that can be compelled under the APA is action legally *required*." *SUWA*, 542 U.S. at 63. In 5 U.S.C. § 706(1), "the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through" writs like mandamus, a remedy "normally limited to enforcement of a specific, unequivocal command, the ordering of a precise, definite act … about which [an official] had no discretion whatever." *Id.* (alterations in original) (citations and quotation marks omitted). Thus, "Section 706(1) permits judicial review of agency inaction, but only within strict limits," mirroring "the common law writ of mandamus." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016). Those strict limits mean that a plaintiff challenging "federal agency *inaction*" must show that the agency "failed to take a *discrete* agency action that it is *required to take.*" *Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97, 99 (1st Cir. 2012) (quoting *SUWA*, 542 U.S. at 64); *see In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (holding that § 706(1) relief "starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act." (quoting *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000))).

Several significant hurdles limit the availability of § 706(1) relief. Reflecting the traditional limitations on mandatory injunctions issued to co-equal branches, "[i]n the case of agency inaction" the Court "not only must satisfy [itself] that there indeed exists such a duty, but that the agency has 'unreasonably delayed' the contemplated action." *Bluewater Network*, 234 F.3d at 1315 (quoting 5 U.S.C. § 706(1)). Even once there has been an "unreasonable delay" in fulfilling the required statutory duty, this Court evaluates "whether the agency's delay is so egregious as to warrant mandamus." *Core Commc'ns, Inc.*, 531 F.3d at 855 (quoting *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984) (*TRAC*)). The *TRAC* standard for determining

whether an agency's delay is sufficiently egregious "is very deferential to administrative agencies." *Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Env't Prot.*, 163 F.3d 74, 82 n.9 (1st Cir. 1998) (*AAMA*); *see also Towns of Wellesley, Concord & Norwood v. FERC*, 829 F.2d 275, 277 (1st Cir. 1987) (applying the *TRAC* standard). And even where performance of a required duty is delayed sufficiently to satisfy that deferential standard, courts must still be careful not to "enmesh[]" the judiciary "in the minutiae of agency administration." *Cobell v. Norton*, 240 F.3d 1081, 1108-09 (D.C. Cir. 2001) (*Cobell*) (citation omitted). If a court does find a violation after applying the proper deference, *see AAMA*, 163 F.3d at 82 n.9, "[i]t is proper . . . to allow the government the opportunity to cure" that violation, *Cobell*, 240 F.3d at 1108-09 (citation omitted).

Rather than recognize that § 706(1) applies to their request for preliminary relief insofar as it depends on alleged statutory mandates, Plaintiffs argue that their challenge is to final agency action under 5 U.S.C. § 706(2)(A). *See* PI Br. at 22. That is incorrect. As in *SUWA*, there was no "agency action" that Plaintiffs could challenge here. *See SUWA*, 542 U.S. at 64; *supra* Section I.C.

And even to the extent that Plaintiffs may have identified any discrete and statutorily required action that the Department is withholding, any relief would have to accord with the remedial principles applicable under § 706(1). Yet Plaintiffs do not identify any "specific, unequivocal command" to which the Department is subject such that the Court could "order[] . . . a precise, definite act." *SUWA*, 542 U.S. at 63 (citations omitted). They describe no "transparent violations of a clear duty to act," let alone one that has been withheld so long as to be "unreasonably delayed." *Bluewater Network*, 234 F.3d at 1315. Indeed, in several instances where Plaintiffs purport to identify required departmental activities, the Department is not subject to a ministerial duty and enjoys discretion in how to act. For example, the CDC's STD and HIV Programs, which do help carry out statutory functions, are not specifically mandated by statute. *See* PI Br. at 39-40

(alleging a loss of access to resources from these programs). And even statutorily prescribed activities such as the funding of training and education programs like ERCs, which has historically been conducted by NIOSH, is not required to be conducted in a particular manner. Instead, the Secretary has discretion to "conduct, directly or by grants or contracts," such programs. 29 U.S.C. § 670(a). Finally, issuing a preliminary injunction now would not "allow the government the opportunity to cure" any statutory violation the Court may find. *Cobell*, 240 F.3d at 1108-09 (citations omitted). In sum, this case is a poor candidate for the mandamus-style relief afforded by § 706(1). And because § 706(1) is the most logical avenue for Plaintiffs' theory of harm, the Court should deny their motion.

        2.      <u>Plaintiffs are Unlikely to Succeed on their Arbitrary and Capricious Claim.</u>

Plaintiffs present various arguments in support of their APA arbitrary and capricious claim. Specifically, Plaintiffs assert that the Defendants "did not engage in the required 'logical and rational' decision-making process," that they "did not perform a careful review of employees' job responsibilities," that they did not take enough time in preparing the ARRPs, that they issued RIF notices "solely on speed and political expediency," and that they "'failed to consider' many 'important aspect[s] of'" their plan, such as "indirect costs" and "reliance interests." PI Br. at 24-25 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). These are, in essence, different ways of alleging the same thing: Plaintiffs claim that Defendants' actions are arbitrary and capricious because they failed to adequately analyze the Department's problems before addressing them.

But Plaintiffs' dissatisfaction with the degree of analysis does not support their APA claim. "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also Littlefield v. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023),

*cert. denied*, 144 S. Ct. 1117 (2024). "As the Supreme Court has 'repeated time and again, an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities.'" *Scarborough Citizens*, 674 F.3d at 101 (quoting *Massachusetts v. EPA,* 549 U.S. 497, 527 (2007)). Thus, the Court must review only to ensure "that the agency has acted within a zone of reasonableness[.]" *Prometheus*, 592 U.S. at 423; *cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.").

The Defendants' actions satisfy this deferential review. Although Plaintiffs assert that the ARRPs do not bear a connection to the Department's goals as described in the press release, they overlook the cost-saving value of actions like consolidating redundant departments. And they overstate the alleged harms that may follow finalization of the ARRPs—harms that, as discussed earlier, are largely speculative.

Plaintiffs may disagree with the Department's cost-benefit analysis, but they are not entitled to judicial relief "dictating to the agency the methods[] [and] procedures" it uses to complete its statutory obligations. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 545 (1978) (citation omitted). "The decision to undertake a reorganization necessitating a [RIF] is within the discretion of the agency," *McKenna v. Dep't of Interior*, 996 F.2d 1235 (Fed. Cir. 1993) (table). And any other programmatic decisions regarding the Department's handling of its statutorily required duties or responsibilities are likewise committed to agency discretion. *Nat'l Wildlife Fed'n*, 497 U.S. at 891; *SUWA*, 542 U.S. at 62. To override these principles and enjoin agency leadership from exercising control over their own staffing and organizational issues would be an extraordinary violation of the separation of powers.

In particular, RIFs are exactly the type of action that is "committed to agency discretion by law." *See* 5 U.S.C. § 701(a)(2); *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998) (stating that "[w]e accord an agency wide discretion in conducting a reduction-in-force" (cleaned up)). Staffing decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191-92 (citation omitted). After all, the point of the Department's actions is to improve efficiency, which allows the Department to "meet its statutory responsibilities in what [the new administration] sees as the most effective or desirable way." *Id.* at 192. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Heckler*, 470 U.S. at 831-32. Moreover, Plaintiffs point to no statute limiting the agency's inherent discretion to reduce headcount.

Even if this Court were to conclude that the Department's analysis was insufficient to justify actions taken so far under the ARRPs, such a conclusion would not justify a preliminary injunction. Rather, "the proper course" would be "to remand to the [Department] for additional . . . explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). If the Court finds the Department's reasoning arbitrary or capricious in any way, it should take that course.

3.   Plaintiffs are Unlikely to Succeed on their Claims that the RIFs and Restructuring are Contrary to Law and Exceed Defendants' Statutory Authority.

Plaintiffs are unlikely to prevail on their claims that the RIFs and restructuring are "not in accordance with law" and "in excess of statutory . . . authority."  5 U.S.C. § 706(2). Plaintiffs first argue that the Department's plans "make it functionally impossible for the Department to comply with its" statutory obligations. PI Br. at 28. But that is simply incorrect. Plaintiffs have not identified statutory obligations with which the Department is unable or unwilling to comply. To

- 34 -

reiterate, the ARRPs are in progress. They are currently subject to a temporary injunction, but if and when that injunction is lifted, the Department will be able to continue developing and implementing them. Meanwhile, some of Plaintiffs' complaints about alleged reduction of statutorily required services, *see* PI Br. at 29, are already being resolved by the recalling of over three hundred NIOSH employees. That some regional offices are being closed does not prevent the Department from providing services. And some of Plaintiffs' other allegations center on functions that are not, in fact, required by statute, such as Head Start site visits.

Plaintiffs also argue that the planned restructuring violates the law because the Executive Branch must spend appropriated funds. *Id.* at 28. Again, however, this anticipated problem does not meet the high bar required to justify a preliminary injunction. The Department has not said it will not spend appropriated funds on statutorily mandated programs, and saving taxpayer money by consolidating functions and reducing personnel redundancy is not inherently inconsistent with spending appropriated funds. The several weeks that have elapsed since the March 27 press release are not, in the context of this case, enough time to diagnose a failure to spend prescribed money. The Department was continuing to refine and implement the ARRPs until the California district court temporarily enjoined them. And the Workforce Executive Order requires that the ARRPs be implemented consistent with applicable law. That services may be provided by a different division or unit after the reorganization does not mean that they will cease being provided.

### E.    Plaintiffs' Constitutional and *Ultra Vires* Claims Fail on the Merits.

Plaintiffs' remaining theories as to why an injunction should issue are also incorrect. They assert three theories: violation of the separation of powers, violation of the Appropriations Clause, and that Defendants' actions are *ultra vires*. PI Br. at 35-37. According to Plaintiffs, Defendants' actions violate mandatory duties and disregard the appropriation of funds to carry out those duties.

As previously addressed, however, Plaintiffs have failed to show that Defendants are actually violating (or will imminently violate) a specific statutory requirement. Plaintiffs' separation-of-powers theory therefore fails.

In a similar vein, Defendants have not refused to spend appropriated money. Plaintiffs cite, for example, the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460, 654. To take just one relevant portion of that Act: it simply states that it is appropriating $362,800,000 to NIOSH "[f]or carrying out" statutory obligations. *Id.* It provides no limitations or instructions on how or when the funds should be spent. That Congress often chooses to appropriate funds without attempting to control the manner of their use underlines a key point: absent explicit statutory direction, funding decisions are generally committed to the agency's discretion by law. *See* 5 U.S.C. § 701(a)(2). The appropriations bills provide no standards "against which to judge the agency's exercise of discretion" in making the many choices the agency must make concerning how to spend those funds. *See Heckler*, 470 U.S. at 830. The agency thus has unreviewable discretion to make choices on how the appropriations are spent. *Lincoln*, 508 U.S. at 192 ("the allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."). The Department's decisions about how best to spend appropriated funds "requires 'a complicated balancing of a number of factors which are peculiarly within its expertise,'" and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831–32).

Plaintiffs cannot avoid these problems by repackaging their APA claims as *ultra vires* claims. "[S]uits for specific relief against officers of the sovereign" allegedly acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity. *Larson v.*

*Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689, 693 (1949) (footnote omitted). The exception to sovereign immunity is based on the principle that such *ultra vires* action by a federal officer "is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Id.* at 690. Here, Plaintiffs set forth no *ultra vires* claim that is conceptually distinct from their APA claims. Indeed, Plaintiffs' *ultra vires* argument centers on the contention that "the Executive cannot repeal statutes and must spend funds that Congress appropriated." PI Br. at 37. This claim is largely duplicative of the APA claims alleging violations of statutory requirements. Thus, this claim fails for the same reasons as do the APA claims.

Moreover, to the extent Plaintiffs' *ultra vires* claim depends on constitutional separation-of-powers principles, it is barred because the nature of such a claim is purely statutory. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Dalton v. Specter*, 511 U.S. 462, 473-74 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. at 472. The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the executive officers rely on an unconstitutional statute. *Id.* at 473 & n.5. Neither of those situations applies here.

Plaintiffs' alleged separation-of-powers claims hinge entirely on whether Defendants acted in accordance with statutory obligations and appropriations law. PI Br. at 37-38. But the Supreme Court rejected similar arguments in *Dalton*. And if Plaintiffs' argument were accepted, then every garden-variety action by a federal agency alleged to be in violation of a statutory provision could be used to bootstrap a claim based on the constitutional separation of powers, impermissibly end-running *Dalton*. Plaintiffs are unlikely to succeed on their *ultra vires* claim.

## II.  **Plaintiffs Will Not Face Irreparable Harm Absent a Preliminary Injunction.**

To show injury sufficient to qualify for a preliminary injunction, a plaintiff must show irreparable harm, which is satisfied only by a showing of "a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat*, 102 F.3d 12, 19 (1st Cir. 1996).  In addition, harm is irreparable only when it "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (citation omitted). "[I]rreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Only "actual and imminent" harm suffices. *Direx Israel*, 952 F.2d at 812 (citation omitted); *see also Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004) ("A preliminary injunction should not issue except to prevent a real threat of harm.") Plaintiffs have not shown any such harm.

As described above, *supra* Section I.A.1-2, two categories of Plaintiffs' alleged injuries are not sufficiently concrete or imminent to establish standing. That means they are also insufficient for irreparable harm. Even to the extent Plaintiffs suffer an arguable injury to a legally protected interest in the lack of services or information previously provided by the Department, that does not establish a need for preliminary relief: "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough." *Roe v. Dep't of Def.*, 947 F.3d 207, 228 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (citation omitted).

The third category of alleged harms (alleged grant terminations), even if sufficient for the injury prong of standing, is readily measurable in monetary terms and compensable upon final judgment. (And as addressed above, *supra* Section I.A.3, any claim for a particular sum of money

belongs in the Court of Federal Claims rather than this Court.) Thus, preliminary relief is not necessary to safeguard Plaintiffs' interests. Even if Plaintiffs could plausibly argue that they need immediate relief to forestall near-certain harms, the relief they request—completely halting a planned reorganization and RIFs as to four agencies—sweeps far beyond what might arguably be necessary to protect their interests.

Plaintiffs' argument for irreparable harm is also diminished here by the length of time since Plaintiffs and its members learned of the planned restructuring. The press release was publicly issued on March 27, and RIFs occurred on April 1. Decl. of John J. Howard ¶ 2, Ex. 1. But Plaintiffs waited well over a month to seek injunctive relief. That delay further undermines their claims that they are suffering irreparable harm.

## III.    **The Equities and Public Interest Weigh Against Relief.**

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. These factors tilt decisively against granting a preliminary injunction here. Granting a preliminary injunction would disrupt the Department's efforts to comply with the Workforce Executive Order and Workforce Memorandum. Both of those documents are duly promulgated directives of the Executive Branch, which the American people have entrusted with the power to direct the activities of executive departments. The public has an interest in seeing that power carried out effectively. It also has an interest in permitting the Secretary to decisively implement policy priorities for the Department. Entering any sort of preliminary relief would displace and frustrate the Secretary's decision about how to best address issues. *See Heckler*, 470 U.S. at 831–32. And as discussed above, Plaintiffs will not suffer any irreparable harm from the denial of their request for preliminary relief. Their side of the

equities scale is far outweighed by the Defendants' here.

Plaintiffs argue that Defendants will not be harmed by an injunction against an unlawful practice and that the public interest favors carrying out statutory functions. PI Br. at 53-54. But, as explained, the Defendants intend to continue performing their statutory duties. And the relief Plaintiffs seek goes beyond merely ensuring statutory functions are carried out. Agencies are permitted to weigh "many variables involved in the proper ordering of [agency] priorities" without judicial overview of their discretionary decisions. *Heckler*, 470 U.S. at 831-32. Yet Plaintiffs' requested relief would hamstring the Department and force it to operate as if a new administration was never elected. Not only would this deprive Defendants of flexibility on how to execute their broad statutory mandates; it would also compel work that is otherwise discretionary and may not be consistent with administration priorities.

Although Plaintiffs allege that their requested injunction would "preserve the status quo as it existed before" the press release, PI Br. at 53, such relief would be impracticable in the extreme, if not impossible to execute. What Plaintiffs want is for the Court to order the Department to reverse steps already taken and return four of its agencies to a state of the world that is now close to two months in the past. The Court should decline Plaintiffs' request to order such relief, as it would impose an extraordinary burden on the Department. It also goes far beyond the relief even arguably appropriate to address Plaintiffs' alleged harms, as further discussed in the next section.

Recently, the Supreme Court stayed an injunction similar to that Plaintiffs seek here. *OPM v. Am. Fed'n of Gov't Emps.*, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025). For good reason. Such an injunction intrudes on Article II and creates impractical barriers to the management of the Department. The "well-established rule [is] that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs." *Sampson*, 415 U.S. at 83–84. Dictating

the personnel and organizational decisions of an agency contravenes that fundamental principle. It also makes no practical sense: Plaintiffs have not shown that every employee subject to the RIFs is necessary for the Department to carry out statutory duties.

In sum, Plaintiffs' proposed relief would inflict severe constitutional harms on the Executive branch and run contrary to the public interest. It would frustrate the public interest in having the Executive Branch effectuate the President's policy priorities—including by reducing the federal government's operational footprint—through lawful direction. The equities and the public interest disfavor such sweeping and intrusive relief. That is doubly true given Plaintiffs' delay in moving for that relief. The third and fourth factors weigh decisively against Plaintiffs.

## IV.    Any Preliminary Injunction Should Be Limited.

For the reasons explained above, Plaintiffs are not entitled to a preliminary injunction. But if the Court concludes otherwise, the relief granted "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). The expansive relief that Plaintiffs seek flouts these well-established principles and should be significantly narrowed, if awarded at all.

Any preliminary injunction should do no more than necessary to alleviate the irreparable harm to any specific Plaintiff that the Court finds to have established such harm. Extending relief that is broader either in substance or scope (for example, wholesale reinstatement of staffing at, or reversal of already-commenced reorganization of, Department agencies) would violate the foundational Article III principle that judicial remedies "must be tailored to redress the plaintiff's particular injury." *Gill*, 585 U.S. at 73. A federal court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Id.* at 66 (citation omitted). Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable

practice." *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Mem.) (Gorsuch, J., concurring). As addressed at length, *supra* Section I.A, the majority of Plaintiffs' alleged harms stem from what they perceive as deprivations of information and services. Rather than attempt to shape Plaintiffs' sprawling request into practical relief, the Court should—if it orders any remedy—order only relief sufficient to address any information or services to which it determines Plaintiffs have established an entitlement.

## V.    <u>Any Preliminary Injunction Should Be Accompanied by Security and Be Stayed.</u>

Any preliminary injunction should also require Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of the injunction. The bond amount should take into account that the relief requested by Plaintiffs will hinder Defendants' ability to conduct the reorganization of the Department in a manner consistent with the President's policies.

Plaintiffs assert that the Court has discretion not to require a bond. In the appropriate case, setting the bond's amount at zero may be fitting. But this is not that case. Plaintiffs want to stop a Department-wide reorganization—a quintessentially discretionary undertaking—in its tracks so that they do not have to spend more of their own resources providing services to their constituents. For a request of that magnitude, they should have skin in the game. Even if the Court orders more limited relief—which Defendants reiterate would be more appropriate than what Plaintiffs ask for—a bond is still appropriate because there is a significant likelihood that the Defendants will be found to "have been wrongfully enjoined." *See* Fed. R. Civ. P. 65(c).

Finally, to the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending any appeal, or at a minimum that such relief be administratively stayed for a period of seven days to allow Defendants to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

Dated: May 16, 2025

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ELIZABETH HEDGES
Counsel to the Assistant Attorney General
Civil Division

/s/ *Christopher R. Hall*
CHRISTOPHER R. HALL
Assistant Branch Director
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 514-4778
Email: Christopher.Hall@usdoj.gov

*Counsel for Defendants*