# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK, et al.,

       Plaintiffs,

       v.

ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

       Defendants.

Case No. 1:25-Civ-00196

## PLAINTIFF STATES' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... ii

I. In the Ten Days Since Plaintiffs Filed Their Motion, Courts Have Issued Decisions Enjoining HHS's Hasty and Ill-Considered Decision-Making .......................................... 2

II. Meanwhile, Defendants Revoked some RIFs at NIOSH and Testified to Congress. ......... 3

III. Defendants' Jurisdictional Arguments are Meritless. .......................................................... 5

    A. The Unrebutted Record Shows that the March 27 Directive Has Caused and Will Continue to Cause Concrete, Particularized Harm to Plaintiff States. ...................... 5

    B. Plaintiffs' Claims Need Not Be Channeled Through an Administrative Process ........ 9

    C. Plaintiffs' Claims Need Not Be Adjudicated in the Court of Federal Claims ............ 11

IV. Plaintiffs Are Likely to Succeed on the Merits of their APA Claims ................................ 12

    A. The March 27 Directive Is a Discrete and Final Agency Action ............................... 12

    B. Defendants' Actions Are Not Committed to Agency Discretion ................................ 13

    C. The Unrebutted Factual Record Demonstrates that the March 27 Directive Was Arbitrary and Capricious .......................................................................................... 15

    D. The March 27 Directive Violates the APA Because It Contravenes Numerous Statutes. ................................................................................................................... 16

V. Plaintiffs Are Likely to Succeed on the Merits of their Constitutional and *Ultra Vires* Claims .............................................................................................................................. 20

VI. The Unrebutted Factual Record Shows that Plaintiffs are Experiencing Irreparable Harm ........................................................................................................................................ 21

VII. The Balance of Equities and Public Interest Factors Heavily Favor Issuing Preliminary Relief. ............................................................................................................................... 22

VIII. Defendants' Remaining Arguments Lack Merit ............................................................. 23

    A. There Is No Basis to Narrow Plaintiffs' Requested Injunction. ................................ 23

    B. The Court Should Not Require a Bond. .................................................................... 24

    C. The Court Should Not Issue a Stay. ......................................................................... 24

# TABLE OF AUTHORITIES

**Cases**                                                                                  **Page(s)**

*Abbott Labs v. Gardner*,
    387 U.S. 136 (1967)................................................................................................13

*Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*,
    522 U.S. 359 (1998)................................................................................................20

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
    929 F.3d 748 (D.C. Cir. 2019)..............................................................................16

*Am. Fed'n of Gov't Emps. v. Trump*,
    No. 25-CV-03698, 2025 WL 1358477 (N.D. Cal. May 9, 2025)................................... passim

*Amrhein v. eClinical Works, LLC*,
    954 F.3d 328 (1st Cir. 2020)..................................................................................12

*Animal Welfare Inst. v. Martin*,
    588 F. Supp. 2d 70 (D. Me. 2008) .........................................................................27

*Block v. Community Nutrition Institute*,
    467 U.S. 340, 347 (1984).......................................................................................16

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988)...............................................................................................17

*Cal. Cmtys. Against Toxics v. EPA*,
    934 F.3d 627 (D.C. Cir. 2019)...............................................................................18

*Califano v. Yamasaki*,
    442 U.S. 682 (1979)...............................................................................................29

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ...............................................................................25

*Colorado v. Kennedy*,
    No. 1:25-CV-00121 (D.R.I. May 16, 2025) ................................................... passim

*Colorado v. U.S. Dep't of Health & Hum. Servs.*,
    No. 25-cv-00121, 2025 WL 1017775 (D.R.I. Apr. 5, 2025) ..................................28

*Dalton v. Specter*,
    511 U.S. 462 (1994)...............................................................................................25

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)......................................................................................19

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    591 U.S. 1 (2020)..........................................................................................21

*Department of Education v. California*,
    145 S. Ct. 966 (2025)...................................................................................17

*Doe v. Trump*,
    No. 25-cv-10139-LTS, 2025 WL 485070 (D. Mass. Feb. 13, 2025)....................29

*Dreher v. Experian Info. Sols., Inc.*,
    856 F.3d 337 (4th Cir. 2017) .......................................................................12

*Drs. for Am. v. Off. of Pers. Mgmt.*,
    No. 25-322 (JDB), 2025 WL 452707 (D.D.C. Feb. 11, 2025) .............................14

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)......................................................................................18

*Gonzalez v. Cuccinelli*,
    985 F.3d 357 (4th Cir. 2021) .......................................................................15

*Heckler v. Chaney*,
    470 U.S. 821 (1985)......................................................................................28

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013) ......................................................................25

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)..............................................................................26-27

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)......................................................................................11

*Lujan v. National Wildlife Federation*,
    497 U.S. 871, 891 (1990)..............................................................................17

*Mahoney v. Donovan*,
    721 F.3d 633 (D.C. Cir. 2013) ......................................................................16

*Maine Forest Prods. Council v. Cormier*,
    586 F. Supp. 3d 22 (D. Me. 2022) ...............................................................28

*Maine v. U.S. Dep't of Agric.*,
   No. 1:25-CV-00131. 2025 WL 1088946 (D. Me. Apr. 11, 2025) .............................. 16, 29-30

*Markland v. Off. of Pers. Mgmt.*,
   140 F.3d 1031 (Fed. Cir. 1998)..................................................................................20

*Maryland v. U.S. Dep't of Agric.*,
   No. JKB-25-0748, 2025 WL 973159 (D. Md. Apr. 1, 2025) ...............................11, 18

*Massachusetts v. Kennedy*,
   2025 WL 1371785 (D. Mass. May 12, 2025) ..................................................16, 18

*Massachusetts v. Nat'l Insts. of Health*,
   No. 25-cv-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025) ...............................19

*McKenna v. Dep't of Interior*,
   996 F.2d 1235 (Fed. Cir. 1993)..................................................................................19

*Michigan v. E.P.A.*,
   576 U.S. 743 (2015)....................................................................................................21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)......................................................................................................21

*Murthy v. Missouri*,
   603 U.S. 43 (2024)......................................................................................................10

*NAACP v. Sec'y of Hous. and Urb. Dev.*,
   817 F.2d 149 (1st Cir. 1987)......................................................................................20

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
   763 F. Supp. 3d 36 (D. D.C. 2025) ....................................................................20, 30

*Nat'l Treasury Emps Union v. Trump*,
   No. 25-cv-0935, 2025 WL 1218044 (D.D.C. Apr. 28, 2025)...................................29

*Nat'l Treasury Emps. Union v. Vought*,
   No. CV 25-0381, 2025 WL 942772 (D.D.C. Mar. 28, 2025)...................................18

*New York v. Trump*,
   133 F.4th 51 (1st Cir. 2025).......................................................................................17

*New York v. Trump*,
   No. 1:25-CV-39, 2025 WL 1098966 (D.R.I. Apr. 14, 2025) ...................................17

iv

*New York v. Trump*,
No. 25-CV-39-JJM-PAS, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ..........................18, 20, 25

*New York v. Trump*,
No. 25-cv-39-JJMS-PAS, 2025 WL 357368 (D.R.I. Jan. 31, 2025) ......................................29

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) .........................................................................................16

*Pacito v. Trump*,
No. 25-cv-255, 2025 WL 1077401 (W.D. Wash. Apr. 9, 2025) ...........................................17

*Rhode Island v Trump*,
No. 1:25-cv-128-JJM-LDA, 2025 WL 1303868 (D.R.I. May 6, 2025) ........................ passim

*Roe v. Department of Defense*,
947 F.3d 207, 228 (4th Cir. 2020), *as amended* (Jan. 14, 2020) ...................................... 27-28

*Roth v. United States*,
952 F.2d 611 (1st Cir. 1991) ............................................................................................16

*Sierra Club v. Trump*,
963 F.3d 874 (9th Cir. 2020) ...........................................................................................26

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200, 207 (1994) ................................................................................................15

*Trump v. Am. Fed'n of Gov't Emps.*,
No 24A1106 (May 16, 2025) ..............................................................................................9

*United States v. Fausto*,
484 U.S. 439 (1988) .......................................................................................................16

*United States v. Texas*,
599 U.S. 670 (2023) ................................................................................................... 14-15

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
586 U.S. 9 (2018) ..........................................................................................................19

*Wiley v. Kennedy*,
No. 2:25-CV-00227, 2025 WL 1384768 (S.D. W. Va. May 13, 2025).......................... passim

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..........................................................................................................27

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
No. 25-cv-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ........................................ 28-29

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........................................................................................................26

**Federal Statutes**

5 U.S.C.
    § 705 ...........................................................................................................................29
    § 706(1) ..................................................................................................................15, 20
    § 706(2) .......................................................................................................................20

21 U.S.C.
    § 387a(e) .....................................................................................................................23

29 U.S.C.
    §§ 669(a), 671(c)(2) ...................................................................................................22
    § 671(b) .......................................................................................................................22
    § 671(h)(3) ..................................................................................................................22

30 U.S.C.
    §§ 937(b), 951(a)–(b) .................................................................................................22

42 U.S.C.
    § 247b-3 ......................................................................................................................23
    § 247b-4a(1–2) ...........................................................................................................23
    § 247b-4a(d)(1) ..........................................................................................................22
    § 247b-12, 13 .............................................................................................................14
    § 247b-12(a)(1)–(a)(2) ...............................................................................................24
    § 300ee-4 ....................................................................................................................24
    § 9902(2) ....................................................................................................................24

## PRELIMINARY STATEMENT

Plaintiffs seek a Preliminary Injunction to prevent the imminent harm that will occur in just two weeks, when the reductions in force (RIFs) issued as part of the March 27 Directive go into effect on June 2. Specifically, Plaintiff States seek a preliminary injunction narrowly tailored to four units within HHS as to which the evidence demonstrates that the March 27 Directive will cause irreparable injury to Plaintiffs unless enjoined: (1) the Centers for Disease Control and Prevention; (2) the Center for Tobacco Products within the Food & Drug Administration; (3) the Office of Head Start within the Administration for Children and Families and all employees of regional offices who work on Head Start matters; and (4) the Office of the Assistant Secretary for Planning and Evaluation, which is responsible for calculating the federal poverty guidelines.[1]

Although Defendants oppose Plaintiffs' motion for a preliminary injunction, they support their position with no evidence except a declaration relating only to recent developments at one sub-agency of CDC. They devote the bulk of their brief to attempts to avoid arguing the merits, but Defendants' scattershot attacks on this Court's jurisdiction and other threshold matters do not alter the fact that the key elements the Court needs to find are essentially undisputed.

*First*, Defendants do not dispute that within days of the March 27 Directive, ten thousand RIF notices described in the Directive were sent and staff were placed on administrative leave until the RIFs ultimately become effective on June 2.

*Second*, Defendants do not, on the main, dispute that many of HHS's key services have stopped, as detailed in Plaintiffs' extensive evidence. Defendants point to two news articles, *see*

---

[1] Plaintiff States reserve the right to move at a later date for preliminary injunctive relief as to the Directive's implementation as to other agencies or programs within HHS.

Opp'n 9, regarding the effect of the Directive at FDA's Center for Tobacco Products, but otherwise do not appear to dispute that the Directive has had the devastating effect on HHS's programs that the States' ample record demonstrates.

*Third*, the States have a detailed, specific record showing that they are harmed in a myriad of ways from the Directive, including the loss of HHS's critical public health services, resources, data, guidance, policies, and expertise.

*Fourth*, Defendants have failed to point to any reasoning supporting the March 27 Directive, which further confirms that the Directive was arbitrary and capricious.

Because of the brazen unlawfulness of Defendants' actions and imminent harm to Plaintiffs, the Court should order a preliminary injunction.

## I. In the Ten Days Since Plaintiffs Filed Their Motion, Courts Have Issued Decisions Enjoining HHS's Hasty and Ill-Considered Decision-Making

Since Plaintiff States filed their motion, courts across the country have issued relevant decisions enjoining Defendants' unlawful actions.

In West Virginia, a coal mine worker who has been diagnosed with black lung disease sued Secretary Kennedy and HHS on behalf of a putative class of workers, asserting, *inter alia*, that HHS's RIFs at the National Institute for Occupational Safety and Health (NIOSH), particularly with respect to the Coal Workers Health Surveillance Program, violated the APA. On May 13, the court issued a preliminary injunction rescinding the RIFs in NIOSH's Respiratory Health Division to "facilitate the full restoration of" that division. *Wiley v. Kennedy*, No. 2:25-CV-00227, 2025 WL 1384768, at *13 (S.D. W. Va. May 13, 2025). The court noted that because the agency "does such specialized work," after the RIFs, "there is no one else, within HHS or any other agency, that does similar work" and "HHS cannot simply add [these] duties to epidemiologists with other

specialties." *Id.* at *10. As a result, the court concluded, "HHS and NIOSH are no longer fulfilling [their] obligations" under the Mine Act." *Id.*

Here in Rhode Island, States sued Secretary Kennedy and HHS to challenge the termination of $11 billion of public health grants appropriated by Congress. On May 16, the court issued a preliminary injunction prohibiting the grant terminations. Ex. 76, *Colorado v. Kennedy*, No. 1:25-CV-00121, slip op. (D.R.I. May 16, 2025) (McElroy, J.). While this case challenges the March 27 Directive rather than grant terminations, much of the court's reasoning applies equally to the March 27 Directive, including the Court's finding of irreparable harm to Plaintiff States in the form of "protecting public health, the elimination of healthcare services, and impact on public health infrastructure." *Id.* at *48.

In California, a group of unions, non-profit organizations, and local governments sued federal agencies, including HHS, asserting, *inter alia*, that the agencies' reductions in force (RIFs) and reorganization plans violate the APA. On May 9, the court issued a temporary restraining order pausing large-scale RIFs, including at HHS. *Am. Fed'n of Gov't Emps. v. Trump*, No. 25-CV-03698, 2025 WL 1358477, at *25 (N.D. Cal. May 9, 2025). The court based its decision, in part, on many of the same key facts at issue here. *See id.* at *2 (citing HHS cuts to NIOSH and Head Start).[2]

## II.    Meanwhile, Defendants Revoked some RIFs at NIOSH and Testified to Congress.

On May 13, 2025, the same day the court in West Virginia issued its preliminary injunction restoring NIOSH's Respiratory Health Division, *see supra* Section I, the head of NIOSH, Dr. John

---

[2] To date, no appeal has been docketed for the West Virginia or Rhode Island decisions. In California, a preliminary injunction hearing is set for May 22, *id.* at *25; the temporary restraining order is set to expire on May 23, *id.*; briefing on the government's motion to the Ninth Circuit to stay the TRO is in progress and, meanwhile, the government has filed an application to the Supreme Court for an immediate administrative stay, *Trump v. Am. Fed'n of Gov't Emps.*, No 24A1106 (May 16, 2025).

Howard, sent a NIOSH-wide email that contained most of the same content as his declaration that the government submitted in this case, ECF No. 52-1. The email explained that some NIOSH staff in specific programs who had previously received RIF notices had subsequently received additional notices explaining that their RIF had been rescinded. Ex. 68 (Suppl. John Doe 2 Decl.) ¶ 3.[3] According to Dr. Howard, these restorations affected "selected units" representing approximately thirty-eight percent of NIOSH's terminated staff.[4] *Id.* ¶ 4. These restorations did not include the Mining Safety Programs or Research Divisions in NIOSH's Spokane or Pittsburgh offices, or Spokane's Western States Division, among many others. *Id.* ¶¶ 5-9. Dr. Howard recognized that more NIOSH employees needed to be restored, noting in his email that "I am hopeful that we can continue to make the case reinstating everyone at NIOSH." *Id.* ¶ 3. Omitted from Defendants' brief and Dr. Howard's declaration is that some of the restorations at NIOSH were required by and happened on the same day as the West Virginia court's injunction. Further, according to an internal CDC email received by media outlets, the CDC plans a one-to-one "substitution" for all restored NIOSH employees—that is, terminate one additional employee for every employee restored—to "maintain the integrity and legality of the RIF." Ex. 77 (Government Executive, *CDC to cut one employee for each it is recalling from layoffs*).

---

[3] Citations herein to Ex. 1 through Ex. 65 are exhibits to the May 9, 2025 Declaration of Andres Ivan Navedo, ECF No. 44. Additionally, Plaintiffs are submitting eight declarations executed since the original preliminary injunction motion to supplement the factual record with respect to the impacts of the March 27 Directive; six of these are from current or former HHS staff speaking to the impact of the March 27 Directive on their programs' functions. These, as well as a few additional exhibits, are numbered Exhibits 66 to 77 and are attached to the May 19, 2025 declaration of Molly Brachfeld.

[4] These programs were: the NIOSH Office of the Director; the Respiratory Health Division; the Division of Safety Research; the National Personal Protective Technology Laboratory; the Division of Compensation Analysis and Support; and part of the Division of Field Studies and Surveillance. These programs largely correspond to the five NIOSH programs identified by Plaintiff States in their Preliminary Injunction Motion, that each contained disclaimers on their website that they had stopped "due to the reduction in force across NIOSH." Ex. 35 (Leland Decl. - WA) ¶¶ 19, 25, 30, 33.

On May 14, while testifying before Congress, Secretary Kennedy addressed the RIFs and restructurings at issue in this lawsuit. Under questioning, Secretary Kennedy admitted that he decided to commence the "decisive action" of the HHS restructuring "quickly" instead of a "surgical[]" approach focused on individual employees, knowing he would make "mistakes," as a way to avoid "inertia." Brachfeld Decl. ¶ 5. Secretary Kennedy admitted to a number of "mistakes," including the termination of the World Trade Center Health Program, and testified that he was unaware that his RIFs had shut down the National Firefighter Registry for Cancer. *Id.* ¶ 6. When pressed about why these programs were cut in the first place, Secretary Kennedy responded: "[i]t was part of the overall budget cuts. Our agency was asked to make very, very serious budget cuts that were going to be painful." *Id.* And when pressed by Senator Murkowski as to why funding from HHS was not being received by grantees, he admitted it "could" be due to the RIFs. *Id.*

## III. Defendants' Jurisdictional Arguments are Meritless.

### A. The Unrebutted Record Shows that the March 27 Directive Has Caused and Will Continue to Cause Concrete, Particularized Harm to Plaintiff States.

Plaintiff States have made a "clear showing" that they are "likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (internal quotes and citation omitted). They have suffered "concrete and particularized" injuries that are "actual [and] imminent"; "fairly traceable" to Defendants' challenged behavior; and "likely" to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up).

Contrary to Defendants' arguments, the voluminous and unrebutted record demonstrates dozens of examples of concrete harms that the March Directive 27 has already caused and will continue to cause to the Plaintiff States absent preliminary injunctive relief. These harms are not, as Defendants suggest, based on a highly attenuated chain of possibilities; they are happening right now. *See Rhode Island v Trump*, No. 1:25-cv-128-JJM-LDA, 2025 WL 1303868, at *5 (D.R.I.

May 6, 2025); *Maryland v. U.S. Dep't of Agric.*, No. JKB-25-0748, 2025 WL 973159, at *12 (D. Md. Apr. 1, 2025). Those harms include:

- Plaintiff States have been harmed by the discontinuance of key public health services, including CDC laboratories and other resources, that ensure the health and safety of state residents.[5]

- Plaintiff States have been harmed by the loss of the gold standard scientific data collected, analyzed, and distributed[6] by HHS.[7]

- Plaintiff States have been harmed because HHS has ceased providing policies and guidance on which the States rely. After the RIFs, HHS does not have the capacity to design, distribute, and implement these policies and guidance.[8]

---

[5] *See, e.g.*, Ex. 71 (Jane Doe 5 Decl.) ¶ 9 (noting that the now-shuttered STD Laboratory within CDC provided unique technical assistance and guidance to state and local public health labs); Ex. 23 (Gallagher Decl. - RI) ¶¶ 17–20 (explaining that, without the CDC's laboratories, Rhode Island must seek commercial testing for samples of drug-resistant gonorrhea and viral hepatitis); Ex. 21 (Underwood Decl. - MN) ¶ 16 (Plaintiff States are left without a surveillance system for hepatitis A after the elimination of CDC's Viral Hepatitis Lab); Ex. 74 (Sloss Decl. - CA) ¶¶ 20–22 (estimating that, without Office of Smoking and Health support, California's tobacco and nicotine quitline capacity will shrink by ten percent).

[6] Defendants characterize this harm as "informational injury" to Plaintiff States. Opp'n 13. To the extent that the characterization is accurate, Plaintiff States have met their burden under Article III to show (1) that they "lack access to information to which [they are] legally entitled"—the data formerly collected and reported to them by various agencies within HHS—and (2) "that the denial of that information creates a 'real' harm with an adverse effect." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)); *see also Amrhein v. eClinical Works, LLC*, 954 F.3d 328, 332–33 (1st Cir. 2020). Moreover, these "informational injuries" indeed would be redressable through the relief sought by Plaintiff States, *contra* Opp'n 15; if the Court vacates the March 27 Directive, and employees are reinstated, the activities currently on pause could reasonably be expected to resume.

[7] *See, e.g.*, Ex. 25 (Rosenberg Decl. - NY) ¶ 24, Ex. 69 (Jane Doe 3 Decl.) ¶¶ 11(a), 17 (noting that CDC has taken all Pregnancy Risk Assessment Monitoring System (PRAMS) data offline and no employees remain to maintain the system, analyze birth year 2024 data, or collect birth year 2025 data from the states); Ex. 57 (Chawla Decl. - NY) ¶¶ 11–15 (explaining that delays or inaccuracies in Federal Poverty Guidelines will result in erroneous benefit eligibility determinations, and necessitate additional system work by state agencies).

[8] *See, e.g.*, Ex. 59 (Hertel Decl. - MI) ¶ 33 (noting the National Center for Environmental Health has ceased sending regular notices about newly identified food and consumer products contaminated with lead).

- Plaintiff States have been harmed by the loss of access to agency experts who were RIFed. HHS experts provided crucial training and technical assistance to Plaintiff States before April 1.[9] They served as points of contact capable of providing specific guidance and instruction to the States, but Plaintiff States have been unable to reach their former points of contact to obtain answers without which state agencies may be unable to avail themselves of agency services, and inquiries to generic program email inboxes have gone unanswered.[10] The lack of clarity that would normally be provided by agency experts has forced the States to scramble to make future plans without input from their federal partners, putting substantial strain on state resources.[11]

- Plaintiff States have been harmed by delays and interruptions in funding because HHS is no longer collecting, reviewing, and processing grant applications and disbursing allocated funds to the States.[12]

Defendants' arguments in response are meritless. Defendants wrongly contend that Plaintiff States' harms are speculative because the Department's reorganization is ongoing. Opp'n

---

[9] *See, e.g.*, Ex. 38 (Propheter Decl. - CA) ¶ 31, Ex. 39 (Marton Decl. - NY) ¶ 16 (noting Plaintiff States have lost training, technical assistance, monitoring site visits, and other support for Head Start programs previously performed by Office of Head Start staff); Ex. 25 (Rosenberg Decl. - NY) ¶ 23, Ex. 27 (Eilers Decl. - WA) ¶ 14 (explaining Plaintiff States have been left without guidance for how to proceed in Early Hearing Detection and Intervention Programs, which places increased strain on their ability to screen for hearing and provide services to infants).

[10] *See, e.g.*, Ex. 48 (Gagne-Holmes - ME) ¶ 20 (stating Childhood Lead Prevention Program staff did not respond to a recent inquiry from the Maine state health authority regarding potentially faulty blood collection tubes); Ex. 39 (Marton Decl. - NY) ¶¶ 16–17, Ex. 38 (Propheter Decl. - CA) ¶¶ 26, 31 (explaining that Head Start grantees cannot reach their former points of contact in the regional offices).

[11] *See, e.g.*, Ex. 34 (Miller Decl. - WA) ¶ 33, Ex. 35 (Leland Decl. - WA) ¶ 43, Ex. 52 (Cummings Decl. - CA) ¶¶ 10–14 (noting Washington State relied on NIOSH expert input in setting state workplace safety standards and preparing for emerging safety concerns, such as the upcoming wildfire season).

[12] *See, e.g.*, Ex. 31 (Simpson Decl. - WA) ¶ 18, Ex. 2 to Simpson Decl. (explaining Plaintiff States' Education and Research Centers will close next month because they cannot obtain NIOSH non-competitive grant renewals that they would have received in the normal course before the RIFs at NIOSH); Ex. 21 (Underwood Decl. - MN) ¶ 7 (noting the Office of Smoking and Health "returned" Minnesota's continuation application for the National and State Tobacco Control Program award for the stated reason that, because of "organizational changes at HHS/CDC," the grant manager could grant only a temporary no-cost extension).

27–28. "This argument invites the Court to speculate that perhaps HHS will someday reinstitute some version of the services" it used to offer. *Wiley*, 2025 WL 1384768, at *10. But Defendants have offered "no testimony or plan offered explaining how they will resume." *Id.*; *see also Abbott Labs v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

Defendants' contention that States' "informational deficiencies resulting from the [March 27 Directive] caused [no] real-life 'consequences'" is false. *See* Opp'n 13. The record establishes many current and imminent deprivations of information to which Plaintiff States are legally entitled. That the agencies can no longer collect, analyze, maintain, and deliver such information to the States constitutes a harm that is both concrete and particularized. *See Drs. for Am. v. Off. of Pers. Mgmt.*, No. 25-322 (JDB), 2025 WL 452707 (D.D.C. Feb. 11, 2025). For example, the discontinuance of the Pregnancy Risk Assessment and Monitoring System (PRAMS) program—which is required by 42 U.S.C. § 247b-12, 13—is concrete, particularized, and already causing current harm, *contra* Opp'n 14–15. Plaintiff States cannot access historical data from 1988–2023, have not received national weighted data for 2024, and cannot reasonably expect to receive 2025 data because it is not being collected. Ex. 69 (Jane Doe 3 Decl.) ¶ 17. Beyond forcing Plaintiff States to divert "resources" to fill data gaps, Opp'n 15, the lack of PRAMS data and programmatic support from CDC is interrupting Plaintiff States' public health activities in response to the crisis of maternal mortality and morbidity *right now*. *See* Ex. 26 (Brown Decl. - NJ) ¶ 8; Ex. 24 (Larkin Decl. - RI) ¶ 9.

Defendants also incorrectly argue that Plaintiff States assert harms in the form of lost state-program funding and "non-payment of grant funds." Opp'n 19. The funding loss to Plaintiff States is caused by the March 27 Directive not because the Directive directly cut funding to States, but

because the Directive resulted in funding processes collapsing due to lack of staff. This is not speculation; in less than two months since the termination notices were sent, the Department has failed to administer a growing number of its grants. *See, e.g.*, Pls.' Mem. 34 (at the Early Hearing Intervention and Direction team, all but one member was laid off and as a result the review of future grant applications was put on hold); *see also id.* at 42–43, 50.

Lastly, the harm to Plaintiff States caused by the cessation of vital, statutorily mandated services is not precluded by *United States v. Texas*, 599 U.S. 670 (2023), as defendants suggest, Opp'n 15–16. That case presented the question whether a state has standing to demand that the federal government make arrests and bring prosecutions under its immigration enforcement authority. *Texas*, 599 U.S. at 674. Here, rather than foregoing discretionary action, HHS has acted in such a way that stymies the will of Congress and harms Plaintiff States by causing the denial of statutorily mandated services on which the States rely, with "meaningful standards" to "assess[] the propriety of [the Department's action] in this area." *Id.* at 679. Moreover, the injuries to Plaintiff States go far beyond potential "downstream harms on the states' budgets and resources." Opp'n 16; *see infra* Section VI.[13]

### B. Plaintiffs' Claims Need Not Be Channeled Through an Administrative Process.

Defendants maintain that Plaintiff States, who are not employees or labor unions and who are not raising claims sounding in employment law, must raise their claims in administrative fora designed for employees or labor unions. Opp'n 21–22. That argument, grounded on the Civil

---

[13] Defendants fare no better with *Gonzalez v. Cuccinelli*, 985 F.3d 357 (4th Cir. 2021), which they cite for the proposition that Plaintiff States do not have standing based on harms caused by disruptions to "discretion[ary]" services. Opp'n 17. *Gonzalez* did not address standing or injury-in-fact, and dealt only with when a Court may compel agency action that has been "unlawfully withheld or unreasonably delayed" under Section 706(1) of the APA. *Gonzalez*, 985 F.3d at 365–66 (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2024)). Plaintiff States are not seeking relief under that subsection of the APA. *See infra* Section IV.B.

Service Reform Act (CSRA) is wrong, and has been correctly rejected on similar facts. *See Rhode Island*, 2025 WL 1303868, at *7–8. More specifically, neither of the relevant factors articulated in *Thunder Basin Coal Co. v. Reich* applies here: there is no "fairly discernible" Congressional intent to channel States' claims, nor is there any indication that Congress intended to "preclude judicial review." 510 U.S. 200, 207 (1994). Defendants admit that CSRA has no applicable explicit provision, instead relying on an argument that the statute "*implicitly* precludes" such review. Opp'n 24 (emphasis added). And were the CSRA to apply here, Plaintiff States would be denied a forum, as the administrative bodies do not have jurisdiction over the States' claims. *See id.* 23; *Rhode Island*, 2025 WL 1303868, at *7.

Defendants cite many irrelevant cases brought by employees and unions that do not address the issues here. *See Roth v. United States*, 952 F.2d 611, 615 (1st Cir. 1991) (cited Opp'n 21) (addressing federal preemption of an employee's claims); *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019) (cited Opp'n 21) (describing "exclusive procedures" for "federal employees and their bargaining representatives"); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 448–49 (D.C. Cir. 2009) (cited Opp'n 23) ("*Federal employees* may not circumvent the CSRA . . . .") (emphasis added); *Mahoney v. Donovan*, 721 F.3d 633, 635–36 (D.C. Cir. 2013) (cited Opp'n 23) (addressing scope of "personnel action" under CSRA). Defendants further suggest that Plaintiff States are trying to "step into the shoes of" federal employees, Opp'n 22, but Plaintiffs are raising claims based on *their own* concrete harms. *See supra* Section III.A. Similarly, *Block v. Community Nutrition Institute*, cannot carry the weight Defendants place on it, *see* Opp'n 24–25, because in that case, the Supreme Court considered preclusion of "the *same* [legal] challenge," advanced by a different party. 467 U.S. 340, 347 (1984) (emphasis added); *see*

*also United States v. Fausto*, 484 U.S. 439, 448 (1988) (interpreting the CSRA and *Block* to limit *employees*' rights to district court judicial review).

### C. Plaintiffs' Claims Need Not Be Adjudicated in the Court of Federal Claims

Defendants suggest that any "alleged breach of a specific funding agreement" falls within the ambit of the Tucker Act so that "any Plaintiff alleging harm based on the non-payment of grant funds" must "seek damages in the Court of Federal Claims." Opp'n 19–20. But that argument misreads the Tucker Act, and in any event, Plaintiffs make no such claim here. The Court should reject it, just as reviewing courts have routinely done. *Accord Rhode Island*, 2025 WL 1303868, at *6; *Maine v. U.S. Dep't of Agric.*, No. 1:25-CV-00131, 2025 WL 1088946, at *19 n.8 (D. Me. Apr. 11, 2025) (similar); *Massachusetts v. Kennedy*, 2025 WL 1371785, at *6–9 (D. Mass. May 12, 2025) (similar); Ex. 76, *Colorado v. Kennedy*, at *15-23 (similar).

Defendants' invocation of the Supreme Court's per curiam opinion in *Department of Education v. California*, 145 S. Ct. 966 (2025), is doubly flawed. First, Plaintiffs seek relief in the form of an order enjoining portions of the March 27 Directive which, as opposed to an order to require specific performance or compensation under any contract, falls outside the ambit of the Tucker Act. *See, e.g.*, *Pacito v. Trump*, No. 25-cv-255, 2025 WL 1077401, at *3 (W.D. Wash. Apr. 9, 2025). Second, the logic of the *Department of Education* stay decision does not extend to cases such as this in which "the terms and conditions of each individual grant that the States receive from the Agency Defendants are not at issue." *New York v. Trump*, No. 1:25-CV-39, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025). Rather, Plaintiff States' claims here fall squarely within the holding of *Bowen v. Massachusetts*, 487 U.S. 879 (1988), that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Dep't of Educ.*, 145 S. Ct. at 968 (quoting *Bowen*, 487 U.S. at 910). These are "precisely the type of claims that belong in district court." Ex. 76, *Colorado v. Kennedy*, at *18.

## IV. Plaintiffs Are Likely to Succeed on the Merits of their APA Claims.

### A. The March 27 Directive Is a Discrete and Final Agency Action.

Defendants' argument that the March 27 Directive is not a "discrete agency action," and rather a broad programmatic attack that would "require the Court to supervise the Department's activities," is wrong as this case bears no resemblance to *Lujan v. National Wildlife Federation*. Opp'n 25–27. As the First Circuit explained, that case involved "a variety of programmatic deficiencies that [the plaintiff] claimed were unlawful for varied reasons," and "the broad programmatic attack . . . was an attempt to seek wholesale programmatic improvements." *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (quotations omitted)). Plaintiffs here do not challenge varied deficiencies; to the contrary, Plaintiffs challenge a single, discrete action—the March 27 Directive (and seek preliminary injunctive relief as to an even more limited subset of that Directive)—which is similar to actions recent courts have found to be discrete. *See Rhode Island*, 2025 WL 1303868, at *8; *Maryland*, 2025 WL 973159, at *14; *Nat'l Treasury Emps. Union v. Vought*, No. CV 25-0381, 2025 WL 942772, at *10 (D.D.C. Mar. 28, 2025); *c.f. New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *8 (D.R.I. Mar. 6, 2025). Nor does the broad scope of the March 27 Directive render Plaintiffs' lawsuit "programmatic, even if it is large." *Massachusetts*, 2025 WL 1371785 at *10.

Defendants fare no better with their unsupported assertion that the March 27 Directive is not "final" agency action. Opp'n 27–29. While Defendants attempt to characterize the March 27 Directive as a mere "press release," Opp'n 27, it is the effect of the Directive that matters. *See Wiley v. Kennedy*, 2025 WL 1384768, at *10 ("Shutting down programs without conducting rulemaking or otherwise engaging in a process that results in an official written statement announcing the shutdown is no less final."). Defendants do not offer any facts to contradict the voluminous record evidence offered by Plaintiffs that the Directive resulted in thousands of

employees with specialized knowledge and expertise being placed on administrative leave, and that on June 2, most of these workers will be officially separated from the government, permanently depriving the States of the benefits of their work. That is consistent with Secretary Kennedy's recent testimony, where he described the March 27 Directive as "*decisive* action *quickly* that could eliminate the metastasizing of [HHS], which was growing, and growing, growing as our health declined." Brachfeld Decl. ¶ 5 (emphasis added). No one could reasonably find that the March 27 Directive was "all bark and no bite," *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019) (cited Opp'n 27), because the Directive plainly had a massive and "direct effect on day-to-day business" of HHS, *see Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (cited Opp'n 27).

Defendants next suggest (without evidence) that their actions are "ongoing and evolving." Opp'n 27; *see also id.* at 27–28 ("developing," "remain subject to changes," "still being planned"). But whether Defendants take hypothetical future actions to further dismantle HHS is irrelevant to whether the actions that they have already taken are final and thus subject to APA review. Plaintiffs can challenge final agency actions that have already happened—if that were not so, the government could always evade APA review by suggesting that it may take additional future action.

### B. Defendants' Actions Are Not Committed to Agency Discretion.

The Defendants' attempt to recast the March 27 Directive as "programmatic decisions . . . committed to agency discretion," Opp'n 33–34, fails to overcome the APA's "basic presumption of judicial review." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22–23 (2018) (citation omitted). The exception for decisions committed to agency discretion must be read "quite narrowly" and is confined only to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 23. Requiring Defendants here to "articulate[] a satisfactory

13

explanation for [their] decision," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), is simply demanding compliance with a "fundamental requirement of administrative law" that "an agency set forth its reasons for decision." *Massachusetts v. Nat'l Insts. of Health*, No. 25-cv-10338, 2025 WL 702163, at *16 (D. Mass. Mar. 5, 2025). The Court certainly has a "meaningful standard against which to judge the" Agency's action: decades of applicable precedent for arbitrary and capricious review. *Cf. Weyerhaeuser*, 586 U.S. at 23; *see* Ex. 76, *Colorado v. Kennedy*, at *27. ("There are applicable constitutional, statutory, and regulatory standards that cabin HHS' discretion as an agency."). The cases cited by Defendants show that there is not, as Defendants suggest, *see* Opp'n 33-34, any rule that RIFs are unreviewable by Courts. *See McKenna v. Dep't of Interior*, 996 F.2d 1235 (Fed. Cir. 1993) (table) (cited Opp'n 33) (considering the strength of the agency's record evidence to determine the propriety of its decision); *Markland v. Off. of Pers. Mgmt.*, 140 F.3d 1031, 1033 (Fed. Cir. 1998) (cited Opp'n 34) (same).

Defendants' attempt to obtain a more deferential "mandamus-like" standard of review by mischaracterizing Plaintiffs' APA claims is also unavailing. *See* Opp'n 29–32. Defendants' argument rests on the incorrect assertion that Plaintiffs seek relief under 5 U.S.C. § 706(1), which permits courts to "compel agency action unlawfully withheld or unreasonably delayed." But Plaintiffs' APA claims are brought under 5 U.S.C. § 706(2), *see* Compl., ECF No. 1 ¶¶ 333, 341, 344–58, which authorizes courts to "hold unlawful and set aside agency action." The Complaint does not seek to compel an agency action withheld or delayed. Rather, it seeks vacatur of the March 27 Directive and an injunction preventing Defendants from implementing it. *Id.* at 96–97. The fact that agencies have stopped acting is a consequence of the March 27 Directive, but it is not the agency *inaction* that the Plaintiffs seek to remedy. *See NAACP v. Sec'y of Hous. and Urb.*

*Dev.*, 817 F.2d 149, 160 (1st Cir. 1987) (the "purpose of § 706(2)(A) is to provide for judicial review of agency action and inaction that falls outside its statutory powers").

### C. The Unrebutted Factual Record Demonstrates that the March 27 Directive Was Arbitrary and Capricious

The undisputed evidence in the record shows that the March 27 directive was arbitrary and capricious, in that it was not the result of the "logical and rational" decision-making process. *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998); *see also Rhode Island*, 2025 WL 1303868, at *10; *New York*, 2025 WL 715621, at *11–12; *cf. Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 55-56 (D.D.C. 2025).

Defendants offer virtually no response to Plaintiffs' argument. Their brief does not describe any reasoning that Defendants purportedly undertook in issuing the March 27 Directive—let alone offer any evidence of such reasoning. Defendants claim that Plaintiffs "overlook the cost-saving value of actions like consolidating redundant departments," Opp'n 33, but Defendants do not specify what those cost savings are, have provided no evidence that they actually considered them, and have offered no indication that they considered countervailing financial costs and other harms.

Defendants have no rejoinder to Secretary Kennedy's own admissions that the Agency did not perform a careful review of employees' job responsibilities because doing so would "take[] too long and you lose political momentum," Navedo Decl., ECF No. 44 ¶ 4; that it was always the plan that "there [we]re going to be mistakes," *id.*; that it was "more important to do decisive action quickly" than to avoid those mistakes, Brachfeld Decl. ¶ 5; and that many of the consequences of the Directive were mistakes, including the termination of the World Trade Center Health Program, *id.* ¶ 6. Nor do Defendants counter Plaintiffs' evidence showing that Defendants failed to consider many "important aspect[s] of" the March 27 Directive before issuing it. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, (1983). There is nothing to show they

considered the chaos that would arise in the wake of the Directive or that they considered the reliance interests of anyone, including Plaintiff States, in violation of the APA. *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015); *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020).

### D. The March 27 Directive Violates the APA Because It Contravenes Numerous Statutes.

Defendants' broad claim that Plaintiffs have not identified any "statutory obligations" affected by the Directive is meritless. Opp'n 34–35. Plaintiffs have identified numerous ways in which Defendants have violated the APA by contravening statutory mandates and Defendants have not meaningfully responded to these arguments with anything more than conclusory assertions. By way of addressing a few:

**NIOSH's Occupational Safety Research**: Despite the Secretary's recent purported May 13, 2025, reinstatements of some employees, NIOSH's research laboratories and divisions remain largely shuttered and unable to fulfill its statutory responsibilities as an occupational health research institute. NIOSH was created by Congress as its own occupational research arm within HHS. *See* 29 U.S.C. § 671(b). None of the reinstatements covered NIOSH's occupational research programs, which are mandated by the Occupational Safety and Health Act. *See* 29 U.S.C. §§ 669(a), 671(c)(2) (directing NIOSH to conduct occupational safety and health research). This core area of NIOSH is not functioning. Ex. 68 (Suppl. John Doe 2 Decl.) ¶ 9.

Similarly, NIOSH's mine safety research divisions, which are run out of Spokane and Pittsburgh, have been eliminated. *Id.* ¶ 8; *see also Am. Fed'n of Gov't Emps.*, 2025 WL 1358477, at *25 (221 of 222 workers in NIOSH Pittsburgh's mining research division will be terminated). With their unique and immobile technology and employees' expertise, these are the only research laboratories able to fulfill NIOSH's statutory directive under the Mine Improvement and New

Emergency Response Act of 2006, which directed NIOSH to promote "research, development, and testing of new technologies and equipment designed to enhance mine safety and health." 29 U.S.C. § 671(h)(3); *see also* 30 U.S.C. §§ 937(b), 951(a)–(b) (requiring NIOSH to conduct research on mine worker health and mine safety). There has been no effort to transition these duties anywhere else, leaving Plaintiff States in the dark. Ex. 68 (Suppl. John Doe 2 Decl.) ¶ 9.

**CDC's National Center on Birth Defects and Developmental Disabilities**: In the Children's Health Act of 2000, Pub. L. No. 106-310, Congress mandated HHS to, among other tasks, "make awards of grants or cooperative agreements to provide technical assistance to State agencies to complement an intramural program and to conduct applied research related to newborn and infant hearing screening, evaluation and intervention programs and systems." 42 U.S.C. § 247b-4a(d)(1). It established the program within CDC and made its programs mandatory. 42 U.S.C. § 247b-4a(a)(1–2). But the Directive has eliminated the entire Early Hearing Detection and Intervention team at the CDC's National Center on Birth Defects and Developmental Disabilities; Plaintiff States' grantees are now being told future grant applications are "on hold," and the "the typical functions of project officers, health/data scientists and evaluation scientists are not occurring." Ex. 27 (Eilers Decl. - WA) ¶ 13.

**FDA's Center for Tobacco Products**: In passing the Family Smoking Prevention and Tobacco Control Act, 21 U.S.C. § 387a, *et seq*., Congress granted broad authority and direction to the FDA to regulate tobacco products, and specifically established within the FDA the Center for Tobacco Products (CTP), which was responsible for implementation of the Act. Pls.' Mem. 17-18; 21 U.S.C. § 387a(e) ("The Center shall be responsible for the implementation of this subchapter and related matters assigned by the Commissioner"). After the Directive was implemented, the Center for Tobacco Products had no employees in the office responsible for tracking tobacco user

fees (which entirely funded the Center for Tobacco Products), supporting contract acquisitions and monitoring payroll. Ex. 73 (John Doe 7 Decl.) ¶¶ 7, 23. Furthermore, the RIFs eliminated entire teams responsible for health communication and education projects, including "The Real Cost" campaign, a national tobacco prevention advertising campaign, leaving that work abandoned. *Id.* ¶ 24.

**Lead Poisoning Programs**: In passing the Lead Contamination Control Act of 1988, Congress directed HHS and CDC to work on the prevention of lead poisoning and asthma control through data collection, surveillance, publication, collaborative efforts, education, and technology assessment. 42 U.S.C. § 247b-3; *id.* § 247b-10. The CDC accomplished this through the National Center for Environmental Health (NCEH), but nearly everybody at NCEH doing this statutory work was laid off, meaning nobody is left to carry out these congressionally-mandated functions Ex. 46 (Doe 1 Decl.) ¶¶ 20–27; Pls.' Mem. 31, 49–51.

**Reproductive and Maternal Health Programs**: Congress ordered HHS to "continue a federal initiative to support State and tribal maternal mortality review committees," and "to improve data collection and reporting around maternal mortality," which the CDC accomplished through its PRAMS data collection efforts and support for state MMRCs. 42 U.S.C. § 247b-12(a)(1)–(a)(2). But Defendants gutted the entire PRAMS team, and have undermined support for Plaintiff States' MMRCs, destroying the programmatic framework Congress mandated. Pls.' Mem. 9–12, 40–42.

**HIV and STD Prevention Program**: Beginning in 1988, Congress directed HHS to undertake a range of programs targeted to the prevention of HIV/AIDS, including providing technical assistance, 42 U.S.C. § 300ee-4; administering grants to States, *id.* § 300ee-11, *et seq.*; and implementing public awareness campaigns, *id.* § 300ee-31, *et seq.* Until now, this work was

conducted only by CDC's National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention—work that has since halted as a result of the March 27 Directive. Pls.' Mem. 6–9, 31–32.

**Federal Poverty Guidelines**: For decades, Congress has specifically directed HHS to annually revise the Federal Poverty Guidelines. 42 U.S.C. § 9902(2). As of the date of this Reply, the sub-agency responsible, HHS's Office of Assistant Secretary for Planning and Evaluation (ASPE), has disclaimed the program, noting that "[d]ue to the current HHS restructuring," the "information" on its website (including the Federal Poverty Guidelines page) is "not being updated currently." Ex. 16 (May 5, 2025 ASPE Webpage).

Accordingly, aside from reportedly partial restoration of a few statutorily required NIOSH programs in the past week, the unrebutted record show these congressionally mandated programs will be destroyed as a result of Defendants' Directive.

Similarly, Defendants do not dispute that the Executive Branch is obligated to spend money appropriated by Congress. *See, e.g.*, *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018); *New York*, 2025 WL 715621, at *1. And the unrebutted record shows that Congress has appropriated billions of dollars that Defendants will be unable to spend due to the March 27 Directive, including over $190 million to CDC's National Center for Environmental Health, over $50 million dedicated to addressing childhood lead poisoning, Pls.' Mem. 30–31, and nearly $1.2 billion to the CDC center that oversees the Office on Smoking and Health and the Division of Reproductive Health, but both of those offices were hit hard by the Directive, *id.* at 9–12, 17–18, 32–33. And although Defendants restored *some* NIOSH programs, others for which Congress had already allocated hundreds of millions of dollars, remain gutted. Defendants' actions are thus in violation of the APA because

they violate the appropriations statute. *See Rhode Island*, 2025 WL 1303868, at *13. They are, on multiple levels, contrary to law, and must be set aside.

## V. Plaintiffs Are Likely to Succeed on the Merits of their Constitutional and *Ultra Vires* Claims

Defendants likewise offer no meaningful response to Plaintiff States' arguments that the March 27 Directive violates the Constitution's separation of powers principles and Appropriations Clause, and is *ultra vires*.

Defendants cite *Dalton v. Specter*, 511 U.S. 462 (1994), as support for their argument that Plaintiffs are "bootstrap[ping]" constitutional claims to "garden-variety" agency action, *see* Opp'n 37, but "*Dalton* suggests that some actions in excess of statutory authority may be constitutional violations, while others may not." *Sierra Club v. Trump*, 963 F.3d 874, 889 (9th Cir. 2020) (*vacated and remanded as moot sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021)). As one court reviewing mass RIFs recently explained, "[t]he facts of *Dalton* could not be more different from the scenario here," since *Dalton* "challenged Presidential action taken pursuant to statutory authority that Congress delegated to the President," whereas Plaintiff States's claims here are about Defendants "acting without *any* authority, constitutional or statutory." *Am. Fed'n of Gov't Emps.*, 2025 WL 1358477, at *18; *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

Defendants wrongly rely on *Lincoln v. Vigil*, 508 U.S. 182 (1993) to argue they have "unreviewable discretion to make choices on how the [challenged] appropriations are spent." Opp'n 36. Unlike in *Lincoln*, where "Congress never expressly appropriated funds for" the program whose cancellation was challenged, 508 U.S. at 186, here Congress *has* appropriated funds for the subagencies and centers that the March 27 Directive effectively ended. *See supra* Section IV.D; Pls.' Mem. 37–43 (listing statutory responsibilities and Congressional appropriations for the fulfillment of those responsibilities). Defendants not only fail to explain how they will

spend congressionally appropriated funds after having fired 10,000 people, but also claim that the March 27 Directive would save $1.8 billion. Ex. 1 at 2.

Defendants contend that they are permitted to broadly restructure and dismantle programs that Congress has required, and appropriated funds to support, because those appropriations "provide[] no limitations or instructions on how or when the funds should be spent." Opp'n 36. But the appropriations are explicitly tied to the statutory functions that Congress also directed Defendants to perform. Because the March 27 Directive renders ineffective the Congressional plan to delegate specific duties to HHS, where funds are appropriated for that purpose, it violates separation of powers principles, the Appropriations Clause, is *ultra vires* and unconstitutional. *See Lincoln*, 508 U.S. at 193 ("Of course, an agency is not free to simply disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes . . . ."); *see also Am. Fed'n of Gov't Emps. v. Trump* 2025 WL 1358477, at *17-18 ("[S]weeping reorganization of the federal bureaucracy requires the active participation of Congress.").

## VI.    The Unrebutted Factual Record Shows that Plaintiffs are Experiencing Irreparable Harm

A movant need not "demonstrate definitive harm" to support issuance of a preliminary injunction, *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 101 (D. Me. 2008); a showing that "irreparable injury is *likely*" will suffice, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). In any event, Plaintiffs have far exceeded this threshold, as they have submitted numerous declarations attesting with specificity that the March 27 Directive has already caused irreparable harm to Plaintiffs including the loss of public health services, resources, data, guidance, policies, and expertise and will continue to do so without court intervention, as detailed *supra* Section III.A.

Aside from conclusory assertions to the contrary, Defendants have not presented any facts to contradict this ample record that shows Plaintiff States have been and will continue to be harmed. Nor are Defendants' legal authorities to the contrary. For example, in *Roe v. Department of Defense*, cited Opp'n 38, the Court found that there *was* irreparable harm even with only an asserted reputational injury, noting that the Supreme Court had "rejected" a stricter standard and only "require[es] plaintiffs to 'demonstrate that irreparable injury is *likely* in the absence of an injunction.'" 947 F.3d 207, 228 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (quoting *Winter*, 555 U.S. at 22).[14]

## VII. The Balance of Equities and Public Interest Factors Heavily Favor Issuing Preliminary Relief.

Plaintiffs have a strong interest in critical public health and safety infrastructure, warranting an injunction. *See Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-cv-00097, 2025 WL 1116157, at *23 (D.R.I. Apr. 15, 2025); *Colorado v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-00121, 2025 WL 1017775, at *5 (D.R.I. Apr. 5, 2025); *Maine Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 64 (D. Me. 2022), *aff'd*, 51 F.4th 1 (1st Cir. 2022). Defendants argue that "the American people have entrusted [the Executive Branch] with the power to direct the activities of executive departments," and that "any sort" of relief would be against the public's interest in seeing that power carried out effectively. Opp'n 39. But courts regularly find that the balance of harms favors issuing injunctive relief where there is a substantial likelihood that the agency acted unlawfully. *Rhode Island*, 2025 WL 1303868, at *17.

---

[14] Defendants' argument that Plaintiffs waited too long after the March 27 Directive to file their injunction, Opp'n 38, fails. First, there naturally was some time between when the Directive went into effect and when the States were able to assess the magnitude of its impacts. Second, the harms will become permanent on June 2 when the RIFs go into effect absent swift Court intervention.

Defendants cannot overcome these critical public interests by invoking the President and Secretary's interest in setting their own priorities for HHS, and their reliance on *Heckler v. Chaney*, 470 U.S. 821 (1985), is misplaced, as that case did not address the public interest or the balance of equities. Defendants also contend that requested relief is "impracticable in the extreme, if not impossible" because Defendants would have to "reverse steps already taken." Opp'n 40. This description is implausible: it is belied by the record which shows that Defendants have successfully recalled hundreds of employees from administrative leave in recent weeks, including after the West Virginia court order, *Wiley*, 2025 WL 1384768, at *13, Opp'n 9; it omits the fact that most employees subject to the RIFs will have those RIFs finalized on June 2, Opp'n 8–9, 39, *see* Howard Decl. ¶ 2, ECF No. 52-1; and it contradicts Defendants' own contention that the challenged Directive is "not final," Opp'n 10.

Defendants also cite the financial cost of an injunction—but to maintain the status quo at the Department the Government "merely" would have to spend money "Congress has appropriated." *Maine*, 2025 WL 1088946, at *29; *see also New York v. Trump*, No. 25-cv-39-JJMS-PAS, 2025 WL 357368, at *4 (D.R.I. Jan. 31, 2025); *Doe v. Trump*, No. 25-cv-10139-LTS, 2025 WL 485070, at *14 (D. Mass. Feb. 13, 2025); *Woonasquatucket River Watershed Council*, 2025 WL 1116157, at *23; *Nat'l Treasury Emps Union v. Trump*, No. 25-cv-0935, 2025 WL 1218044, at *20 (D.D.C. Apr. 28, 2025). The balance of equities and public interest therefore weigh heavily in favor of granting preliminary injunctive relief.

## VIII. Defendants' Remaining Arguments Lack Merit

### A. There Is No Basis to Narrow Plaintiffs' Requested Injunction.

Defendants state that Plaintiffs' requested injunction should be "significantly narrowed," but do not identify *how* the requested injunction should be narrowed or what part they deem too broad. *See* Opp'n 41–42. In any event, Plaintiffs are entitled to "complete relief" for their harms.

*Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The source of Plaintiffs' injuries is the March 27 Directive, and Defendants do not identify any administrable means by which they could reverse their actions only in part.[15]

### B. The Court Should Not Require a Bond.

Defendants have not suggested what bond they would like the Court to order, nor have they identified a single expense they would incur from an injunction. *See* Opp'n 42. Instead, they argue that Plaintiffs "should have skin in the game," a suggestion that ignores the extensive evidence of harm in the record. *Id.* The Court should exercise its discretion to forego a bond here, like all three of the courts recently issuing injunctions against HHS, described *supra* in Section I, did. *Am. Fed'n of Gov't Emps.*, 2025 WL 1358477, at *24 (finding "significant public interest" and noting that "the government [will] incur costs if the RIFs are implemented hastily and unlawfully") (citation omitted); *Wiley*, 2025 WL 1384768, at *13 (noting "absence of any meaningful harm to the Defendants related to this injunction"); Ex. 76, *Colorado v. Kennedy*, at *58 (noting that "it would defy logic . . . to hold the States hostage for [HHS's] harm") (quotation omitted). To the extent a bond is required, Plaintiffs request that the bond be nominal. *See Nat'l Council of Nonprofits*, 2025 WL 597959, at *19; *Maine*, 2025 WL 1088946, at *29–30 (collecting cases showing practice in this Circuit of ordering nominal bonds).

### C. The Court Should Not Issue a Stay.

Upon issuing an injunction, the Court should not preemptively stay its own order, as Defendants suggest without any reasoning or citation to authority, Opp'n 43. Given the specific,

---

[15] Defendants incorrectly contend that the Court should "remand" to the Department rather than vacate the March 27 Directive. Opp'n 34. The preliminary injunctive relief Plaintiffs seek is an interim measure until the parties litigate the merits to a final judgment. *See, e.g.*, 5 U.S.C. § 705. The Court can address the propriety of vacatur or remand at the merits stage; such potential final relief does not affect a court's ability to grant provisional relief.

concrete, documented harms to Plaintiff States arising from Defendants' actions, a stay would be inappropriate.

***

For the foregoing reasons, Plaintiffs respectfully request that their Motion be granted.

Dated: May 19, 2025                    Respectfully submitted,

**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ Spencer W. Coates*
Spencer W. Coates
Kelsey E. Endres
*Assistant Attorneys General*
Cynthia Alexander
William McGinty
*Deputy Solicitors General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
spencer.coates@atg.wa.gov
kelsey.endres@atg.wa.gov
cynthia.alexander@atg.wa.gov
william.mcginty@atg.wa.gov

*Counsel for the State of Washington*


**PETER F. NERONHA**
Attorney General for the State of Rhode
Island

*/s/ Sarah Rice*
Kathryn M. Sabatini (RI Bar No. 8486)
Chief, Civil Division
Sarah Rice (RI Bar No. 10588)
Deputy Chief, Public Protection Bureau
Chandana Pandurangi (RI Bar No. 10922)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
ksabatini@riag.ri.gov
srice@riag.ri.gov
cpandurangi@riag.ri.gov

*Counsel for the State of Rhode Island*


**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Molly Thomas-Jensen*
Molly Thomas-Jensen
Jessica Ranucci
*Special Counsel*
Rabia Muqaddam
*Special Counsel for Federal Initiatives*
Andres Ivan Navedo
Molly Brachfeld
*Assistant Attorneys General*
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
molly.thomas-jensen@ag.ny.gov
jessica.ranucci@ag.ny.gov
ivan.navedo@ag.ny.gov
molly.brachfeld@ag.ny.gov

*Counsel for the State of New York*


**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Alexa Salas*
Alexa Salas
*Assistant Attorney General*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Alexa.Salas@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**ROB BONTA**
Attorney General for the State of California

By: /s/ Crystal Adams
Crystal Adams
*Deputy Attorney General*
Michael L. Newman
Neli Palma
*Senior Assistant Attorneys General*
Kathleen Boergers
Virginia Corrigan
Srividya Panchalam
*Supervising Deputy Attorneys General*
Jesse Basbaum
Jeanelly Orozco Alcala
*Deputy Attorneys General*
1515 Clay Street
Oakland, CA 94612-1499
(510) 879-3428
Crystal.Adams@doj.ca.gov
Michael.Newman@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Virginia.Corrigan@doj.ca.gov
Srividya.Panchalam@doj.ca.gov
Jesse.Basbaum@doj.ca.gov
Jeanelly.OrozcoAlcala@doj.ca.gov

*Counsel for the State of California*

**PHILIP J. WEISER**
Attorney General of Colorado

By: /s/ Tanya E. Wheeler
Tanya E. Wheeler
*Associate Chief Deputy Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
tanja.wheeler@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General of the State of Connecticut

By: /s/ Michael K. Skold
Michael K. Skold
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: /s/ Vanessa L. Kassab
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of
Columbia

By: */s/ Andrew C. Mendrala___*
Andrew C. Mendrala
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.mendrala@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
Attorney General of the State of Illinois

By: */s/ Caitlyn G. McEllis*
Caitlyn G. McEllis
Senior Policy Counsel
Katharine P. Roberts
Assistant Attorney General
Office of the Illinois Attorney General
115 S. Lasalle Street
Chicago, IL 60603
312-814-3000
Caitlyn.McEllis@ilag.gov

*Counsel for the State of Illinois*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Michael Drezner*
Michael Drezner
*Senior Assistant Attorney General*
Federal Accountability Unit
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6959
mdrezner@oag.state.md.us

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Margaret Machaiek*
Margaret Machaiek
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
August, ME 04333-0006
Tel.: 207-626-8800
Fax: 207-287-3145
margaret.machaiek@maine.gov

*Counsel for the State of Maine*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
Danny Haidar
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
HaidarD1@michigan.gov

*Counsel for the State of Maryland*

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Astrid Carrete_____*
Astrid Carrete
Impact Litigation Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
acarrete@nmdoj.gov

*Counsel for the State of New Mexico*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

*Counsel for the People of the State of Michigan*

**MATTHEW J. PLATKIN**
  Attorney General of New Jersey

By: */s/ Justine M. Longa_____*

Justine M. Longa
Jessica L. Palmer
  *Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-4527
Justine.Longa@law.njoag.gov
Jessica.Palmer@law.njoag.gov

*Counsel for the State of New Jersey*

**DAN RAYFIELD**
Attorney General of the State of Oregon

 By: /s/ *Elleanor H. Chin*
Elleanor H. Chin
*Senior Assistant Attorney General*
100 Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
elleanor.chin@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Charlotte Gibson*
Charlotte Gibson
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218  (phone)
(608) 294-2907 (Fax)

*Counsel for the State of Vermont*

Charlie.Gibson@wisdoj.gov

*Counsel for the State of Wisconsin*