UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF NEW YORK, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES, et al., <br><br> Defendants. | Civil Action No. 1:25-cv-00196 |

**DEFENDANTS' STATUS REPORT REGARDING
PRELIMINARY INJUNCTION COMPLIANCE**

As directed by the Court in its order of July 1, 2025, granting plaintiffs' motion for a preliminary injunction (Order), Defendants respectfully submit this notice of compliance with the Order, which includes as an attachment the compliance directive Defendants issued pursuant to the Order.

On May 9, 2025, the district court in *American Federation of Government Employees, et al. v. Trump, et al.*, 3:25-cv-3698 (N.D. Cal.) (*AFGE 2*), issued a Temporary Restraining Order (TRO) prohibiting the U.S. Department of Health and Human Services (HHS) and multiple other federal agencies from further implementing their Agency Reduction in Force (RIF) and Reorganization Plans (ARRPs). *AFGE 2*, Order Granting TRO and Compelling Certain Discovery Production, ECF No. 85, at 40-41. Pursuant to that TRO, HHS was enjoined from, *inter alia*, separating employees pursuant to existing RIF notices, issuing additional RIF notices, and further placing employees on administrative leave. *Id.* On May 22, 2025, the district court in *AFGE 2* issued a preliminary injunction order that was substantially similar to the previously issued TRO.

*See AFGE 2*, Order Granting Prelim. Inj., ECF No. 124, at 47-48. Since issuance of these orders in *AFGE 2*, HHS has worked diligently to comply with them including, for example, by staying further action on RIF notices that otherwise would have become effective on June 2, 2025, and by halting implementation of any plans to restructure certain HHS components.

On July 1, 2025, this Court issued an Order granting Plaintiffs' motion for preliminary injunction. *See* Mem. & Order, ECF No. 73. Defendants have been complying with the terms of the Court's July 1, 2025, Order and will continue to work diligently to remain in compliance. The Order prohibits implementation of the agency's planned restructuring and RIFs announced in HHS's March 27, 2025, press release as to the "sub-agencies and programs that are the subject of [plaintiffs'] motion for preliminary injunction." *See id.* at 56. Like the *AFGE 2* preliminary injunction order, the Court's order prohibits execution of existing RIF notices, issuance of additional RIF notices, and placement of additional employees on administrative leave. *Id.* This Court's Order, however, is narrower than the *AFGE 2* preliminary injunction order, in that it applies only to programs within (1) the Centers for Disease Control and Prevention; (2) the Food and Drug Administration's Center for Tobacco Products; (3) the Administration for Children and Families' Office of Head Start and regional offices; and (4) the Assistant Secretary for Planning and Evaluation.

Because HHS as a whole has been complying with the *AFGE 2* preliminary injunction order since May, the HHS components subject to this Court's Order were already complying with the terms of this Court's Order at the time of its issuance, and they have continued to do so. The injunction in *AFGE 2* was stayed by the U.S. Supreme Court this week. *Trump v. Am. Fed'n of Gov't Emps.*, --- S. Ct. ---, 2025 WL 1873449 (July 8, 2025). To guide compliance after the *AFGE 2* stay, on July 10, 2025, HHS's Office of General Counsel circulated to the four components

impacted by this Court's Order and to additional staff involved in the HHS restructuring and RIFs

a compliance directive containing specific guidance. A copy of the directive is attached hereto.

Dated: July 11, 2025

<div style="margin-left: 40%;">

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

CHRISTOPHER R. HALL
Assistant Branch Director
Civil Division, Federal Programs Branch

/s/ *Elizabeth Hedges*
ELIZABETH HEDGES
Counsel to the Assistant Attorney General
Civil Division
950 Pennsylvania Ave NW
Washington, DC 20530
Telephone: (202) 616-0929
Email: Elizabeth.T.Hedges@usdoj.gov

*Counsel for Defendants*

</div>

**Preliminary Injunction Compliance Instructions:**
*New York v. Kennedy*, No. 1:25-cv-196 (D.R.I.)

July 10, 2025

As we previously advised, a group of nineteen states and the District of Columbia have challenged the HHS announcement on March 27, 2025, of a planned restructuring and Reduction-in-Force (RIF). *New York, et al. v. Kennedy, et al.*, 1:25cv196 (D.R.I.).

On July 1, 2025, the District Court in this case issued a preliminary injunction prohibiting HHS "and all other named defendants" from taking any action "to implement or enforce the planned RIFs" or restructuring as to the agency divisions and programs that were the subject of the plaintiffs' motion for preliminary injunction. A copy of the order is attached.

The preliminary injunction order details that prohibited actions for the HHS components covered by the order include but are not limited to:

- "any further execution of any existing RIF notices (including final separation for any employees previously notified of impending termination)";
- "issuance of any further RIF notices"; and
- "placement of additional employees on administrative leave."

This preliminary injunction order does not apply across the entirety of HHS. Instead, the preliminary injunction order applies to the following agency components:

- Centers for Disease Control and Prevention (CDC)

- Food and Drug Administration (FDA):
  - Center for Tobacco Products (CTP)

- Administration for Children and Families (ACF):
  - Office of Head Start (OHS), including regional offices

- Assistant Secretary for Planning and Evaluation (ASPE)

This preliminary injunction provides substantially the same relief (although only as to the referenced components) as the preliminary injunction previously issued in *American Federation of Government Employees, et al. v. Trump, et al.*, 3:25cv3698 (N.D. Cal.) (*AFGE 2*), with which all HHS divisions have been complying. **Although the *AFGE 2* preliminary injunction order was stayed by the Supreme Court on July 8, 2025, the preliminary injunction order in this case, *New York v. Kennedy*, remains in effect as to the narrower set of agency components referenced above.** The referenced agency components must continue their compliance with the terms of the July 1st injunction in *New York v. Kennedy*.

Please reach out to ███████████████████████ in the Office of the General Counsel if you have any questions about the scope or requirements of this preliminary injunction.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF NEW YORK; STATE OF WASHINGTON; STATE OF RHODE ISLAND; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; THE PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WISCONSIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; SUSAN MONAREZ, in her official capacity as ACTING DIRECTOR, FIRST ASSISTANT TO THE DIRECTOR, PRINCIPAL DEPUTY DIRECTOR OF THE CENTERS FOR DISEASE CONTROL AND PREVENTION; CENTERS FOR DISEASE CONTROL AND PREVENTION; MARTIN A. MAKARY in his official capacity as COMMISSIONER OF THE U.S. FOOD AND DRUG ADMINISTRATION; U.S. FOOD AND DRUG ADMINISTRATION; ANDREW | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

C.A. No. 25-cv-196-MRD-PAS

GRADISON, in his official capacity as )
ACTING SECRETARY )
OF THE ADMINISTRATION FOR )
CHILDREN AND FAMILIES; )
ADMINISTRATION FOR CHILDREN )
AND FAMILIES; MARY LAZARE in )
her official capacity as PRINCIPAL )
DEPUTY ADMINISTRATOR OF THE )
ADMINISTRATION FOR )
COMMUNITY LIVING; ARTHUR )
KLEINSCHMIDT, in his official )
capacity as PRINCIPAL DEPUTY )
ASSISTANT SECRETARY OF THE )
SUBSTANCE ABUSE AND MENTAL )
HEALTH SERVICES )
ADMINISTRATION; SUBSTANCE )
ABUSE AND MENTAL HEALTH )
SERVICES ADMINISTRATION, )
                                       )
        Defendants.                    )
                                       )

## MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.

Yet another group of plaintiffs seek relief from a federal court to halt sweeping changes to a federal agency's operations which they claim disregard congressionally mandated programs to the detriment and peril of all who live in the United States. The subject at the heart of this controversy is the March 27, 2025 announcement from the Department of Health and Human Services ("HHS" or "the Agency") that HHS would: substantially cut the number of employees who work for its various sub-

agencies,[1] reorganize its sub-agencies by closing some and consolidating others, reduce the number of regional offices around the country by half, and create a new division called the Administration for a Healthy America.  The stated end goal is to Make America Healthy Again.   Nineteen states and the District of Columbia challenge HHS's implementation of its plans as a violation of the Administrative Procedure Act and the U.S. Constitution and asks this Court for a preliminary injunction to halt the implementation of these changes.  Before reaching the requisite preliminary injunction factors, the Court must resolve the threshold jurisdictional challenges that the Agency raised in response to the plaintiffs' motion.   This hodgepodge of challenges will be familiar to those who are tracking the dozens of cases around the country similarly challenging the Trump administration's efforts to reduce and reorganize the federal government.

For the reasons stated below, this Court will grant the relief the States have requested.  To briefly summarize, the Court concludes that the States have standing to bring these causes of action, *see infra* Part III(A), the claims were not subject to channeling pursuant to the Civil Service Reform Act ("CSRA"), *see infra* Part III(B), the States were not required pursuant to the Tucker Act to bring their claims in the Court of Federal Claims, *see infra* Part III(C), and HHS's announcement on March 27 represented final agency action such that the Court can review the alleged

---

[1] The Court uses "sub-agency" and "sub-agencies" to refer to all the entities that fall within HHS's organizational structure, including but not limited to departments, offices, divisions, programs, etc.

violations of the Administrative Procedure Act, *see infra* Part III(D)(1)(a)(i). With respect to the merits, the Court concludes the States have shown a likelihood of success on their claims that the HHS's action was both arbitrary and capricious as well as contrary to law. *See infra* Part III(D)(1)(b)(ii)-(iii). The Court declines to address the constitutional claims at this point. The Court also concludes that the States have sufficiently shown irreparable harm, *see infra* Part III(D)(2), and that the balance of the equities and the public interest weigh in their favor, *see infra* Part III(D)(3).

## I.     BACKGROUND

### A. Separation of Powers

To properly set the scene for this case, the Court begins with a brief reminder about the bedrock doctrine of separation of powers that governs the relationship between the Unites States' three co-equal branches of government. This nation's enduring founding document, the Constitution, categorically establishes the basic structure of government, the scope and purview of each of the three co-equal branches, and manifests a system in which each branch may serve as a check on and balance to the other two branches. This deliberate separation of powers is "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 227 (2020). As relevant here, the Constitution bestowed on Congress the power to create laws, U.S. Const. art. I, § 1, on the President the duty to "take [c]are that the [l]aws be faithfully executed," U.S. Const. art. II, § 3, and on the judiciary the responsibility for interpreting the laws

when a dispute over the meaning and application is properly brought to its bench, *see* U.S. Const. art. III, § 2; *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923). The founders carefully constructed this democratic system to prevent the concentration of power in one part of the government. *See New York v. Trump*, 769 F. Supp. 3d 119, 128 (D.R.I. 2025) (citing *Marbury v. Madison*, 5 U.S. 137, 177-78 (1803); *Mellon*, 262 U.S. at 488; *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring)). With these basic constitutional and jurisprudential nuts and bolts in place, the Court moves on to the matter at hand.

### B. Executive Action

The current head of the executive branch has articulated several priorities as part of his policy objectives; one being shrinking the size of many executive agencies. *See* "Commencing the Reduction of the Federal Bureaucracy," The White House, Feb. 19, 2025, https://perma.cc/UME8-5A9K. Federal courts around the country have been asked via motions for injunctive relief to make constitutional gut checks of the Trump administration's actions in furtherance of this objective. Throughout this bevy of litigation, the division of power between the executive branch and legislative branch with respect to the structure and function of executive agencies has been much discussed. As one district court currently adjudicating a challenge to the reductions-in-force ("RIF(s)") and planned reorganizations in several federal agencies summarized, part of Congress' legislative power is to establish offices and determine each office's function and jurisdiction. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-cv-3698-SI, 2025 WL 1482511, at *16 (N.D. Ca. May 22, 2025) (citing

*Myers v. United States*, 272 U.S. 52, 129 (1926); *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010)). "Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). "While 'the President may create, reorganize, or abolish an office that *he* established,' the Constitution does not authorize him 'to enact, to amend, or to repeal statutes.'" *Am. Fed'n of Gov't Emps.,* 2025 WL 1482511, at *16 (quoting *Clinton*, 524 U.S. at 438). Indeed, "the President may broadly restructure federal agencies only when authorized by Congress." *Id.* at *17; *see also id.* at *18 ("The simple proposition that the President may not, *without Congress*, fundamentally reorganize the federal agencies is not controversial: constitutional commentators and politicians across party lines agree." (citation omitted)).

**C. HHS**

The structure and purview of the agency we know as HHS has evolved since its initial inception. As summarized by the plaintiffs, in 1939, Congress promulgated legislation which redistributed the functions of existing agencies and newly created agencies so that health, education, and social insurance would be governed by a newly titled "Federal Security Agency." Compl. ¶ 44 (ECF No. 1). In 1953, Congress created a cabinet-level Department of Health, Education, and Welfare. *Id.* ¶ 45. Later, Congress removed education from this department and, in 1979, created a standalone Department of Education. The remaining agency was renamed the Department of Health and Human Services. *Id.* ¶ 46. At the end of 2024, HHS employed

6

approximately 82,000 people and was responsible for twenty-six percent of all federal spending. *Id.* ¶¶ 48-49.

On March 27, 2025, HHS published a communication titled "HHS Announces Transformation to Make America Healthy Again" (the "March 27 Communiqué"). *Id.* ¶ 67, Ex. 1. According to this document, and in lockstep with President Trump's Executive Order 14210 ("Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative"), HHS planned to implement a RIF of 10,000 full-time employees, "streamline the functions" of HHS by consolidating 28 divisions down to 15 divisions, collapsing 10 regional offices into 5 regional offices, and creating a new division called Administration for a Healthy America ("AHA"). *Id.* ¶ 67, Ex. 1. On April 1, HHS sent notices to 10,000 employees, informing them that HHS had placed them on administrative leave and that their terminations would become final on June 2, 2025. *Id.* ¶¶ 85-86. These employees were immediately locked out of their email accounts and no longer had access to HHS-issued laptops, offices, and buildings. *Id.* ¶ 88.

HHS Secretary Robert F. Kennedy, Jr. initially declined an invitation to appear before the U.S. Senate Committee on Health, Education, Labor, and Pensions ("HELP Committee") to discuss the HHS reorganization, but opted instead to speak to the media. *Id.* ¶¶ 89-91. Secretary Kennedy told reporters that he and other administration officials knowingly took an approach to the HHS restructuring that would generate mistakes. *Id.* ¶ 90. From the outset, Kennedy expected 20% of the cut employees would need to be reinstated, with the Centers for Disease Control and

Prevention ("CDC")'s Lead Poisoning Prevention and Surveillance Branch being an example of the foreseeable mistakes known within a couple of days of the March 27 Communiqué. *Id.* In an interview with CBS News on April 9, 2025, Secretary Kennedy explained that undertaking a close examination of employees' job responsibilities before issuing the termination notices "takes too long" and would result in the loss of the opportunity to capitalize on "political momentum." *Id.* ¶ 91. On May 14, Senator Kennedy made his first appearance before the Senate's HELP Committee and testified that he and his colleagues "had to act quickly so that we could do something for the American people that is lasting." Brachfeld Decl. ¶ 5 (ECF No. 55). "[I]t was more important to do decisive action quickly." *Id.* Even though he and his colleagues "understood that there would be some mistakes made," they "would go back and reverse them when they were made." *Id.* For example, HHS revoked 300 RIF notices sent to employees of one sub-agency, the National Institute for Occupational Safety and Health ("NIOSH"). Howard Decl. ¶ 3 (ECF No. 53). More recently, HHS rescinded RIF notices for 467 employees across the CDC's Office of the Director, National Center for Environmental Health, National Center for HIV, Viral Hepatitis, STD, and TB Prevention, and Global Health Center. Patterson Decl. ¶ 4 (ECF No. 70-1).

### D. Pending Federal Cases in Other Jurisdictions

Relatedly, federal district courts have partially adjudicated at least two cases arising from HHS's reorganization actions. In the Southern District of West Virginia, a coal mine electrician with decades of experience in the coal mines and a recent

diagnosis of the dreaded black lung sued Secretary Kennedy and HHS on behalf of himself and others similarly situated to challenge the shuttering of NIOSH's Coal Workers Health Surveillance Program through the RIF announced on March 27 and implemented on April 1. *Wiley v. Kennedy*, C.A. 2:25-cv-227, 2025 WL 1384768, at *1-2 (S.D.W.V. May 13, 2025). On Tuesday, May 13, that court granted a preliminary injunction ordering that "the RIFs in the NIOSH Respiratory Health Division be enjoined and, therefore, rescinded to facilitate the full restoration of the NIOSH Respiratory Health Division" and that further efforts to reorganize may not include any "pause, stoppage or gap in the protections and services mandated by Congress in the [Federal Mine Safety and Health Act of 1977] and the attendant regulations for the health and safety of miners." *Id.* at *13.

Approximately 2,500 miles west of West Virginia, a group of unions, nonprofits, and a local government sought relief in the Northern District of California from twenty-two agencies (including HHS). *Am. Fed'n of Gov't Emps.,* 2025 WL 1482511, at *3. These plaintiffs challenged the Agency RIF and Reorganization Plans ("ARRPs") submitted to the Office of Management and Budget and the Office of Personnel Management pursuant to Executive Order 14210 and a related memo, which had been partially implemented in those agencies. *Id.* On Thursday, May 22, that court preliminarily enjoined the agency defendants in that case (including, as directly relevant to this case, HHS) from, among other things, "execut[ing] any existing RIF notices (including final separation of employees)" or "implement[ing]" any ARRPs. *Id.* at *27. The order also commanded the agency defendants to "rescind

9

any RIFs issued pursuant to Executive Order 14210 and . . . transfer any federal employees who were moved into administrative leave status to effectuate Executive Order 14210 back to the status they held prior to being placed on such leave" but stayed this part of the injunction order "for the duration of any appeal of th[e] injunctive order." *Id.* at *28. The agency defendants have indeed filed an appeal with the Ninth Circuit Court of Appeals, which recently denied defendants motion to stay the injunction pending appeal. *See Am. Fed'n of Gov't Emps. v. Trump*, No. 25-3293, --- F. Supp. 3d ---, 2025 WL 1541714, at *2 (9th Cir. May 30, 2025). The federal agencies have sought the same emergency relief at the U.S. Supreme Court, which is currently pending. *See* S. Ct. Dkt. 24A1174.

### E. This Case

Shifting focus to the immediate cause of action in this Court, the States filed this case on May 5, 2025 against HHS, its Director, and several principal administrators of various HHS sub-agencies. The States allege that HHS's mass terminations and agency reorganization are unlawful in five ways: (1) a Violation of the Separation of Powers Doctrine because these actions usurp legislative authority, U.S. Const. art. I, § 1, art. II, § 3; (2) a Violation of the Appropriations clause, U.S. Const. art. I, § 9, cl. 7; (3) the Defendants' conduct is ultra vires because it is "outside the scope of statutory authority conferred on the Executive" (title caps omitted); (4) a Violation of the Administrative Procedures Act as contrary to law, 5 U.S.C. § 706(2)(B)-(C); and (5) a Violation of the Administrative Procedure Act as arbitrary and capricious, 5 U.S.C. § 706(2)(A). Compl. at 87-96.

The States filed a Motion for Preliminary Injunction on May 9, asking this Court to enjoin the terminations and agency restructuring as announced in the March 27 Communiqué at, specifically, the CDC, the FDA's Center for Tobacco Products ("CTP"), the Office of Head Start and Head Start employees in Regional Offices, and the Office of the Assistant Secretary for Planning and Evaluation ("ASPE"). Pl.'s Mot. For Prelim. Inj. (ECF No. 43 at 2, 6-21). HHS, in opposition, raises several jurisdictional issues, Mem. in Opp'n (ECF No. 52), to which the States replied, Reply Br. (ECF No. 54). The Court held a hearing on May 20 and took the motion under advisement.

## II.    STANDARD

"A request for a preliminary injunction . . . may be granted only if 'the district court finds that . . . four . . . factors . . . weigh in favor of granting the request.'" *Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022) (quoting *Comcast of Me./N.H., Inc. v. Mills*, 988 F.3d 607, 611 (1st Cir. 2021)). The factors are: "(1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest." *Id.* (quoting *Comcast of Me./N.H., Inc.*, 988 F.3d at 611). "[T]hese four elements are not of equal prominence in the preliminary injunction calculus. The most important is whether the movant has demonstrated a likelihood of success on the merits," a factor that the Circuit makes clear is indispensable to "the preliminary injunction inquiry." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020) (citing *Ryan v. ICE*, 974 F.3d 9, 18-19 (1st Cir. 2020)). To meet this

11

factor, "plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueno de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting *Respect Maine PAC v. McKee,* 622 F.3d 13, 15 (1st Cir. 2010)). That said, the court "need not conclusively determine the merits of the underlying claims." *Akebia Therapeutics*, 976 F.3d at 93 (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)). The court's "decisions 'are to be understood as statements of probable outcomes' only." *Id.* (quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)). In addition, when the government is the opposing party, the third and fourth factors merge and are considered together. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## III.    DISCUSSION

Before the Court dives into the States' likelihood of success on the merits, it must address the three jurisdictional arguments HHS raises. HHS argues that the States lack Article III standing (ECF No. 52 at 12-22), that the Civil Service Reform Act ("CSRA") and the Federal Service Labor-Management Relations Statute ("FSL-MRS") require the States to channel their claims to the Merit Systems Protection Board ("MSPB") and/or the Federal Labor Relations Authority ("FLRA") (ECF No. 52 at 22-26), and that the Tucker Act requires the case to be filed in the Court of Federal Claims (ECF No. 52 at 20-21). The Court addresses each argument in turn.

A.    **Standing**

HHS argues that the States lack standing to bring this suit because they lack cognizable injuries related to their alleged informational and tangible service injuries. ECF No. 52 at 13-20. They also argue that there is a redressability problem with respect to the harms related to grants or delays in funding for state programs. *Id.* at 14, 20-22. For the reasons described below, the Court rejects HHS's arguments and concludes that the States have established Article III standing.

Preliminarily, it is important to note that the Court need not examine standing for each State since they are collectively seeking the same injunctive relief. *See Carey v. Population Srvs., Intern.*, 431 U.S. 678, 682 (1977) (finding that one plaintiff "ha[d] the requisite standing and therefore hav[ing] no occasion to decide the standing of the other [plaintiffs]."); *Project B.A.S.I.C. v. O'Rourke*, 907 F.2d 1242, 1244 (1st Cir. 1990) (finding that one plaintiff had standing so the court did "not consider whether [other plaintiffs] ha[d] standing as well."); *Am. Fed. of Gov't Emps. v. Trump*, No. 25-cv-3698, 2025 WL 1358477, at *7 (N.D. Cal. May 9, 2025) ("*AFGE*") (stating that "[a]s a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing")

To establish standing to sue, the States must show an injury that is traceable to HHS's conduct and prove that the injury is redressable by this Court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The injury suffered must be "concrete and particularized," and "actual or imminent," not "conjectural or hypothetical." *Id.* (internal citations omitted). "At the preliminary injunction stage … [the States]

must make a 'clear showing' that [they are] 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008)). When "risk of future harm" is asserted, as it is here, the harm "must be sufficiently imminent and substantial." *Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*, 120 F.4th 904, 910 (1st Cir. 2024) (quoting *Roe v. Healey*, 78 F.4th 11, 20 (1st Cir. 2023)). "This standard is satisfied if the threatened injury is certainly impending, or there is a substantial risk that harm will occur." *Id.* (internal quotations and citation omitted).

When the question requires the Court to decide "whether an action taken by one of the other two branches of Federal Government was unconstitutional" then the standing inquiry is "especially rigorous." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)). That is certainly the case here.

The States assert myriad injuries that they claim are either already occurring or present a risk of future harm based on the RIFs that were scheduled to take effect on June 2, 2025. (ECF No. 43 at 14-29; ECF No. 54 at 13-14). Before analyzing whether the asserted harms are concrete and particularized, actual and imminent, and sufficiently imminent and substantial, the Court finds it worthwhile to layout examples of the States' uncontroverted injuries as to each agency/program for which injunctive relief is sought.

14

*Centers for Disease Control ("CDC")*

The States describe a symbiotic relationship between themselves and the CDC. They rely on the CDC's infectious disease laboratories for "an array of services, including: (1) diagnostic testing for rare and complex diseases, (2) susceptibility to an antibacterial resistance testing for infectious diseases, (3) developing new diagnostic tools for [sexually transmitted infections] to address rising cases of reportable STIs . . . , (6) on-the-ground support for outbreak response . . . ," and surveillance, training, and coordinated national guidance on a number of important public health issues. ECF Nos. 43 at 14-15; 44-20 at ¶¶ 13-20; 44-21 at ¶¶ 11, 22; 44-22 at ¶ 7; 44-23 at ¶¶ 9-11; 44-24 at ¶ 11; 44-25 at ¶¶ 13, 15.   Since the March 27 Communiqué, these "public health services, including CDC laboratories and other resources" have been discontinued, imperiling the health and safety of state residents.  ECF No. 54 at 13. The States "have tried to close the gaps created by the shuttered laboratories," but "some gaps cannot be filled."  ECF No. 43 at 16.

The March 27 Communiqué also affected the Division of Reproductive Health ("DRH") which operates within the CDC.  One program that was severely impacted by the Communiqué is the Pregnancy Risk Monitoring System ("PRAMS") which saw its fifteen-person team put on administrative leave.  *Id.* at 17.  PRAMS, as part of a larger effort towards "Safe Motherhood,"[2] "is a joint surveillance project that collects

---

[2] The Safe Motherhood program is governed by 42 U.S.C. § 247b-12(a)(1), which provides "[th]e purposes of this subsection are to establish or continue a Federal initiative to support State and tribal maternal mortality review committees, to improve data collection and reporting around maternal mortality, and to develop or support surveillance systems at the local, State, and national level to better

data nationwide on individuals' experiences during pregnancy, delivery, and postpartum." *Id.* at 18; ECF Nos. 44-25 at ¶ 9; 44-27 at ¶ 4.  DRH collected survey data from PRAMS partners and CDC experts were responsible for maintaining, extracting, cleaning, and weighting the data submitted.  ECF Nos. 43 at 18; 44-25 at ¶ 10; 44-27 at ¶ 5; 44-29 at ¶ 6; 44-50 at ¶ 5.  The States rely on this data for "program planning, policy development, and overall decision-making regarding maternal and infant health."  ECF Nos. 43 at 18; 44-24 at ¶ 9.  However, since the release of the March 27 Communiqué, "the PRAMS Integrated Data Collection System is now offline indefinitely and no new data is being collected."  ECF Nos. 43 at 19; 44-25 at ¶ 24; 44-26 at ¶ 18; 44-28 at ¶ 20.

The CDC also houses the NIOSH, which was created "to address and prevent work-related injury and illness across all types of workplaces, including mines, fire departments, oil and gas wells, construction sites, small businesses, and hospitals." *See* 29 U.S.C. § 651 et seq.; ECF Nos. 43 at 20; 44-47 at ¶ 4.  It is worth noting the sole declaration HHS submitted in support of its opposition to the motion for preliminary injunction was from NIOSH's director, "who oversee[s] all of NIOSH's activities."  ECF No. 53 at ¶ 1.  The States allege 90% of NIOSH's employees "received either Notices of RIF or Notice of Intent to RIF," including its director, the declarant Dr. John J. Howard.  ECF Nos. 1 at ¶ 136; 43 at 21.  Dr. Howard's declaration states that more than three hundred RIF notices have been revoked, but that is still less

_____

understand the burden of maternal complications and mortality and to decrease the disparities among populations at risk of death and severe complications from pregnancy."

than half of the "[a]pproximately 873 NIOSH employees…[who] received termination notices" which were slated to take effect on June 2, 2025 or July 2, 2025.  ECF Nos.1 at ¶ 136; 53 at ¶¶ 2-3. This large and quick reduction of staff, the States argue, will continue to exacerbate the issues and interruptions to NIOSH's many programs.  *See* ECF No. 43 at 22-25 (providing, as an example, "the Northwest Center for Occupational Health and Safety at the University of Washington" being told by a CDC grant specialist on May 2, 2025 that "at the present there is a pause on all NIOSH activities").

*Center for Tobacco Products ("CTP")*

The States also describe injuries flowing from the March 27 Communiqué's impact to CTP.  This agency is statutorily obligated "to inform the public of any dangers to human health presented by cigarette smoking."  15 U.S.C. § 1341. Specifically, the States allege that CTP stopped performing compliance checks to ensure tobacco products are not sold to minors, a function on which the States relied. ECF No. 43 at 25-26.  The Director of the Michigan Department of Health and Human Services ("MDHHS"), for example, asserts that "[t]he functional elimination of these two subagencies will lessen MDHHS's ability to protect its citizens, especially its youth, from the dangers of smoking and tobacco products."  ECF No. 44-59 at ¶¶ 1, 48.

17

*Office of Head Start ("OHS")*[3]

The States also argue the March 27 Communiqué impacted OHS to the point that its grantees "were thrown into 'chaos.'"  ECF No. 43 at 27 (quoting ECF No. 44-39 ¶ 25).  Services that the States once utilized, such as technical assistance, site visits, and grant oversight activities, have disappeared.  ECF No. 44-38 at ¶ 29.  The States argue that they faced delays in receiving notifications of funding, that OHS provided little to no information about regional realignments and have left critical questions unanswered.  ECF No. 43 at 27.  States were also not provided any advanced notice that the entire Division of State Systems, which state agencies and their child welfare systems rely on, would be subject to the RIF.  *Id.*

*Office of the Assistant Secretary for Planning and Education ("ASPE")*[4]

Last, the States assert that the March 27 Communiqué has impacted ASPE which is charged with updating the federal poverty guidelines each year.  *Id.* at 28.  The ASPE webpage currently displays the message "[d]ue to current HHS restructuring, the information provided on aspe.hhs.gov is not being updated currently." **https://perma.cc/VZ6B-MFA3.**  The States further highlighted that the entire team responsible for updating the federal poverty guidelines was placed on

---

[3] 42 U.S.C. § 9837.

[4] 42 U.S.C. § 9902(2).

leave after RIF notices issued which could impact the guideline calculations moving forward.[5] ECF No. 43 at 27-28.

With these examples of the States alleged injuries laid out, the Court will turn to the standing elements.

HHS categorizes these harms, as well as those described in the other declarations submitted by the States, as informational injuries, tangible-service related injuries, and grant related injuries. ECF No. 52 at 13-14. The Court agrees that some of the injuries suffered by the States can be classified as informational injuries, which the Supreme Court has said can be concrete informational injury, so long as plaintiffs have a legal right to the information and can show "downstream consequences." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 441-42 (2021). In *TransUnion*, the Supreme Court declined to find standing based on plaintiff's informational injuries – incorrect information on a credit report that was never sent out – because they failed to identify "downstream consequences from failing to receive the information." *Id.* at 441. It reasoned that "[a]n asserted information injury that causes no adverse effects cannot satisfy Article III." *Id.* at 442 (internal quotation omitted). Compare this with *Fed. Election Comm'n v. Akins*, where the Supreme Court found an informational injury sufficient to confer standing. 524 U.S. 11, 12 (1998). There, a group of voters sued the Federal Election Commission ("FEC") for

---

[5] Importantly, the Court notes that the 2025 federal poverty guidelines have been updated and are available on the ASPE webpage. https://perma.cc/J2FS-NMUE. HHS amplifies this point by arguing that the guidelines have been updated for 2025 and "updating the webpage is not required at any given time as long as the statute's annual deadline [*see* 42 U.S.C. § 9902(2)] is met." ECF No. 52 at 14-15.

not providing information they believed they were entitled to under a federal law.  *Id.* at 24-25.

Here, the States have identified statutes that require the Secretary of HHS and the HHS sub-agencies under his control to make information available to the public and to the States.  This is similar to the situation in *Akins* where the Supreme Court found that a group had standing to sue the FEC based on a federal statute. *See* id.   Take, for example, PRAMS data which the States say is "offline."  ECF No. 54 at 13 n.7.  PRAMS was "carried out through cooperative agreements between CDC and participating public and private health organizations, including state departments of health," but the States claim that "no employees remain to maintain the system, analyze birth year 2024 data, or collect birth year 2025 data from the states."  ECF No. 43 at 18; ECF No. 54 at 13 n.7.  The Defendants acknowledge that the required PRAMS information has been "delayed or not provided at this time," but argue that this lapse does not amount to a "refusal to provide statutorily mandated [information]."  ECF No. 52 at 15.  The Court is not persuaded by this argument because not only is the data not being collected and analyzed, but the CDC has removed all historical data from 1988-2023, so it cannot currently be used by policymakers and researchers.  ECF No. 55-4 at ¶ 17.  This lack of information has clear "downstream consequences" for the States.  *TransUnion*, 594 U.S. at 441-42.  The Court concludes, therefore, that these informational injuries are concrete and particularized for purposes of Article III standing.

The Court is also persuaded that the States have alleged other concrete and particularized harm. These injuries are referred to by HHS as a "more tangible services-related theory" of injury. ECF No. 52 at 13. For example, the Director of Northwest Center for Occupational Health and Safety ("NWCOHS") discusses how the CDC has been unable to process a no-cost grant extension for the organization and that his attempts to contact someone at the CDC led to a grant specialist informing NWCOHS that "at the present time there is a pause on all NIOSH activities." ECF No. 44-31 at ¶¶ 15-20. This unprocessed grant extension has already led to disruptions at NWCOHS, including cancelled grant renewal meetings, inability "to provide funded offers of admission for trainees," and a decrease in the number of occupational medicine residents admitted for 2025-2026. *Id.* ¶ 21. Further, the States relied on CDC labs for infectious disease and STD/STI confirmatory testing, which is no longer being conducted, requiring the States to now rely on a single lab in New York. ECF No. 44-20 at ¶¶ 29-31. This has "strained the [lab's] resources." *Id.* ¶ 31. These types of monetary and "tangible-service" harms are undoubtedly concrete and particular. *See Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 372 (1st Cir. 2023) (affirming the principle on monetary harms outlined in *TransUnion that* "[i]f a defendant has caused ... monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III" (citing *TransUnion LLC*, 594 U.S. at 425)). Again, this is just one of the many harms described by the States and for purposes of this analysis at this stage, the Court finds the States have satisfied the concrete injury-in-fact requirement of standing.

The next part of the standing inquiry is whether the States' injuries are actual and imminent and, because "risk of future harm" is asserted, the Court will simultaneously determine if those harms are "sufficiently imminent and substantial." *Yellen*, 120 F.4th at 910. "This standard is satisfied if the threatened injury is certainly impending, or there is a substantial risk that harm will occur." *Id.* (internal quotations and citation omitted). The States' declarations describe the current harms individual programs and offices have been facing since the RIFs issued and staff was placed on leave at the beginning of April. For example, one declarant who was employed by DRH stated that "[t]he April 1 RIFs have had an especially damaging effect on DRH surveillance systems. By eliminating the Women's Health and Fertility Branch, long-standing activities ceased that are vital … PRAMS data for 2025 births is not being collected … and historical data from 1988-2023 are on longer available from CDC." ECF No. 55-4 at ¶ 17. The declarations also make a "clear showing" of "sufficiently imminent and substantial" risk of future harm based on the June 2 and July 2 RIFs. *Murthy*, 603 U.S. at 58; *Yellen*, 120 F.4th at 910. Certainly, if the States have been experiencing harm since the RIFs went out in April, it is reasonably foreseeable that the harm will continue, and likely worsen, once the RIFs take effect, staff are laid off, and more services are discontinued, whether temporarily or permanently. The Court is satisfied that the States' alleged injuries are actual and imminent.

In addition to injury, the States must establish traceability and redressability to establish Article III standing. The unrebutted evidence the States submitted in

support of their motion for preliminary injunction clearly establishes that the States began experiencing harm almost immediately after the publication of the March 27 Communiqué and the subsequent RIF notices issued to HHS employees. The Court is satisfied that the alleged injuries are traceable to HHS's conduct. With respect to redressability, HHS mainly argues that any redressability should be limited and not far reaching, not that the issuance of an injunction would fail to redress the States' asserted harms.[6]  ECF No. 52 at 19. For purposes of standing, the Court finds that the States' injuries could be redressed by this Court and is satisfied that the States have standing to bring this cause of action.

## B.   CSRA

Moving on, the Defendants' next jurisdictional argument is that the Court "lacks jurisdiction to adjudicate plaintiffs' challenges to the employment decisions of federal agencies."  ECF No. 52 at 22. They suggest that the CSRA and FSL-MRS require the States' claims to be channeled through administrative forums. *Id.* The Court is required to analyze the *Thunder Basin* factors to determine if the States' claims "are of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994). To that end, this Court must analyze (1) whether the claims are "wholly collateral to a

---

[6] The Defendants argue that the States would "at most have standing to seek provision of such information or services—not an order requiring the Department to provide it in a particular fashion or with particular staff."  ECF No. 52 at 19. However, the Defendants have not provided the Court with any indication about how HHS plans to carry on providing services and information to the States during the restructuring mentioned in the March 27 Communiqué.

statute's review provisions," (2) whether the issues are "outside the agency's expertise," and (3) whether a "finding of preclusion could foreclose all meaningful judicial review." *Id.* "When the answer to all three questions is yes, 'we presume that Congress does not intend to limit jurisdiction'" to administrative, rather than judicial, fora. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023) (quoting *Free Enter. Fund*, 561 U.S. at 489). To examine this argument, the Court looks to the First Circuit's brief discussion of the issue in *Somerville Pub. Schools v. McMahon*, 139 F.4th 63, 71-72 (1st Cir. 2025), as well as the Ninth Circuit's reasoning and conclusion in *Am. Fed'n of Gov't Emps.*, 2025 WL 1541714, at *3-5 (both cases denying motions to stay the grant of preliminary injunctive relief), and concludes that the States were not required to channel their claims through an administrative forum.

Beginning with whether the States' claims are "wholly collateral to [the CSRA's] review provisions," the Court finds that the APA and constitutional claims the States alleged in this case fall outside the CSRA's provisions. *See Thunder Basin Coal Co.,* 510 U.S. at 212-13. In addition, the claims are clearly outside the purview of the MSPB, which "reviews claims by federal employees arising out of specific adverse actions taken against them by their employer," and FLRA, which "reviews 'issues relating to the duty to bargain in good faith' and unfair labor practices." *Am. Fed'n of Gov't Emps.*, 2025 WL 1541714, at *3 (citing 5 U.S.C. §§ 7105(a)(2), 7117, 7118). The Defendants argue that the "[States] cannot step into the shoes of those employees and assert claims against the Department that the employees cannot themselves assert in federal district court," ECF No. 52 at 23, but that is not the case

24

here and represents an incorrect reading of the asserted claims.  In rejecting the channeling argument, the First Circuit noted it was "loath at this juncture of the proceedings to" agree with the federal government in finding "that Congress intended to bar every challenge to an unlawful effort by the Executive to shut down a statutorily created agency by summarily firing its employees en masse[.]" *Somerville Pub. Schools*, 139 F.4th at 71.  The harms suffered by the States relate to the sudden cessation of critical services and information sharing, not to any specific employee or their employment situation.  Indeed, these two are intertwined because the reason the States have suffered the harm is the March 27 Communiqué and subsequent RIF of nearly 10,000 workers.  Importantly, the States' claims do not pertain specifically to those workers' employment relationships or unfair labor practices. The States' claims are, therefore, "wholly collateral to [the CSRA's] review provisions." *Thunder Basin Coal Co.,* 510 U.S. at 212.

With respect to whether the issues are "outside the agencies expertise" (*Thunder Basin* factor #2), the Ninth Circuit's explanation on why the MSPB and FLRA lack the relevant expertise and jurisdiction to decide the claims is instructive. That court turned to *Carr*, where the Supreme Court noted that "agency adjudications are generally ill suited to address structural constitutional challenges." *Carr v. Saul*, 593 U.S. 83, 92 (2021).  The States' APA and constitutional challenges are more "structural constitutional challenges" than challenges to the decisions stemming from the employment relationship.  *Id.*  HHS also relies on the Supreme Court's decision in *Elgin* to seemingly argue that the States' claims are intertwined

with areas of agency expertise.  ECF No. 52 at 23-24; *Elgin v. Dept. of Treasury*, 567 U.S. 1 (2012).  *Elgin* involved plaintiffs who sued in district court after they were discharged for failing to register for Selective Service.  *Elgin*, 567 U.S. at 7-8.  The employees challenged the constitutionality of the law that was relied on to fire them, and the Supreme Court found the CSRA precluded district court jurisdiction because "[i]n sum … they are covered employees challenging a covered adverse employment action."  *Id.* at 21.  The focus of this case is on the March 27 Communiqué's effect on HHS's ability to perform the duties it was Congressionally created to carry out. It is not on why or how employees were fired, or within MSPB or FLRA's areas of expertise.  The States' APA and constitutional challenges, here, are "ill suited" for an "agency adjudication."  *See Carr*, 593 U.S. at 92.

Lastly, the Court must consider whether channeling the States' claims "could foreclose all meaningful judicial review."  *Thunder Basin Coal Co.,* 510 U.S. at 212-13.  Channeling the claims would be meaningless when "entire offices and functions are being eliminated from federal agencies."  *Am. Fed'n of Gov't Emps.*, 2025 WL 1541714, at *5.  To reiterate, the States' challenge to the March 27 Communiqué was brought because critical services and information were impacted by the RIFs.  This Court sees little to no value in requiring employees to bring individual claims about their employment status to MSPB or FLRA while the States continue experiencing harm to critical services.  In this scenario, "[e]ven successful Plaintiffs 'would return to an empty agency with no infrastructure to support a resumption of their work.'"  *Id.* (quoting *Am. Fed'n of Gov't Emps.*, 2025 WL 1482511, at *14).  Channeling the

States' claims to administrative fora would indeed "foreclose all meaningful judicial review." *Thunder Basin Coal Co.,* 510 U.S. at 212-13.

To try and convince this Court otherwise, the Defendants cite to cases that they argue support channeling the APA and constitutional claims to administrative agencies, but as suggested by the States, those cases are easily distinguishable. *See e.g., Roth v. United States*, 952 F.2d 611, 614-15 (1st Cir. 1991) (finding that the CSRA preempted former Federal Aviation Administration employee's state law claim that her former supervisor made slanderous utterances that concerned former employee's job performance); *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 761 (D.C. Cir. 2019) (explaining "that the unions' claims fall within the exclusive statutory scheme, which the unions may not bypass by filing suit in the district court."). Those claims arose directly from the employee-employer relationship, which is different than this case. The Defendants also fail to address the recent, and more factually similar, cases where courts have rejected the Defendants' channeling argument. *See Somerville Pub. Schools v. McMahon*, No. CV 25-10601-MJJ, --- F. Supp. 3d ---, 2025 WL 1463009, at *19 (D. Mass. May 22, 2025) (finding the CSRA inapplicable when "the magnitude and the proportion of the mass terminations accounting for 50% of the Department's workforce has effectively incapacitated the department");[7] *Widakuswara v. Lake*, No. 25-cv-1015, --- F. Supp. 3d ---, 2025 WL

---

[7] Even though this case was initially briefed and argued before the district court's and First Circuit's decisions in *Somerville Pub. Schools*, the Court notes that HHS has not filed a notice of supplemental authority or supplemental brief attempting to distinguish this case from *Somerville Pub. Schools*. Meanwhile the

1166400, at *10-11 (D.D.C. April 22, 2025) (channeling not required when USAGM

staff were laid off and it caused the agency to "reach[] the breaking point[.]"); *Am.

Fed'n of Gov't Emps., AFL-CIO v. United States Office of Personnel Mgmt.*, 771 F.

Supp. 3d 1127, 1136 (N.D. Ca. 2025) (originally finding no jurisdiction over the

plaintiffs' claims due to the CSRA, but finding that channeling not required after the

issue was fully briefed).

      In all, the States' claims are properly before this Court and were not subject to

CSRA channeling.

## C.    Tucker Act

      The last jurisdictional argument the Defendants raise is that the Tucker Act

compels these claims to be in the Court of Federal Claims.  This argument is

unavailing and misconstrues the States' arguments.  The States' claims do not relate

to a breach of "any express or implied contract with the United States" which would

require the claims to be heard in the Court of Federal Claims.  28 U.S.C. § 1491(a)(1).

Further, the Defendants' reliance on *Dept. of Ed. v. California*, 604 U.S. ---, 145 S. Ct.

966, 968 (2025) (per curiam), in which the Supreme Court stayed an injunction and

held that the Tucker Act would likely apply to a lawsuit related to grant terminations,

is misplaced because the States' request is not that "the Government [] pay out past-

due grant obligations and to continue paying obligations as they accrue."  This case

is not about grant contracts, it is about HHS's inability to perform congressionally

---

States filed notices of supplemental authority (ECF Nos. 59 and 68) when both the
district court and First Circuit opinions were issued.

mandated tasks during its restructuring, some of which relate to grant administration. *See, e.g.,* ECF No. 44-24 at ¶ 15 ("An email was sent to CDC Grants Management Office . . . and a response was returned indicating that grant staff were also on leave."); ECF No. 44-27 at ¶ 13 (discussing how "all but one member of the Early Hearing Intervention and Direction team was laid off, and as a result…the review of future grant applications was on hold").

The States suggest that their claims are more aligned with the principles outlined in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), because the States are seeking an order setting aside unlawful agency action, not an order to require specific performance or compensation under any contract. In *Bowen*, the Supreme Court examined whether "a federal district court ha[d] jurisdiction to review a final order of the Secretary of [HHS] refusing to reimburse a State for a category of expenditures under its Medicaid program." *Id.* at 882. In declining to apply the Tucker Act, the Supreme Court analyzed the plain language of the APA and stated "two reasons why the plain language of this amendment does not foreclose judicial review of the actions brought by the States challenging the Secretary's disallowance decision." *Id.* at 893. First, the States sought declaratory and injunctive relief, "and more importantly, even the monetary aspects of the relief that the State sought are not 'money damages' as that term is used in the law." *Id.* The Court went on to say, "[i]t seems perfectly clear that, as the reviewing court, the District Court had the authority to hold unlawful and set aside agency action that it found to be not in accordance with law." *Id.* at 911 (internal quotations omitted).

29

The Court agrees and finds persuasive the States' argument that "[t]he funding loss to Plaintiff States is caused by the March 27 [Communiqué] not because the [Communiqué] directly cut funding to the States, but because the [Communiqué] resulted in funding collapsing due to lack of staff."  ECF No. 54 at 15-16.  The facts here fit squarely into the reasoning in *Bowen*.  Accordingly, the States' claims are not of such a type that would require the States to seek relief in the Court of Federal Claims.  Simply put, the Tucker Act plays no role here.

### D.    Preliminary Injunction Factors

Now that the Court has determined it has jurisdiction, the Court can turn to the preliminary injunction factors.

### 1.    *Likelihood of Success on the Merits*

The most important consideration before this Court when determining a request for a preliminary injunction is whether the States have shown a substantial likelihood of success on the merits.  *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020) (noting that the "movant's likelihood of success on the merits weighs most heavily in the preliminary injunction calculus"); *see also New Commc'n Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (holding that likelihood of success on the merits is the "sine qua non" of the four-part preliminary injunction inquiry).  To meet this burden, plaintiffs "must show more than mere possibility of success—rather, they must establish a strong likelihood that they will ultimately prevail."  *Fortuño*, 699 F.3d at 10 (cleaned up).  However, a "court's conclusions as to the merits of the issues presented on preliminary injunction are to

be understood as statements of probable outcomes." *Narragansett Indian Tribe*, 934 F.2d at 6. Thus, at the preliminary injunction phase, this Court "need not conclusively determine the merits of the underlying claim." *Ross-Simons of Warwick*, 102 F.3d at 16.

As previewed above, the States have argued that the March 27 Communiqué violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), "because it is arbitrary and capricious and contrary to law." ECF No. 43 at 30 (citing 5 U.S.C. § 706(2)(A)); *see also* ECF No. 1 ¶¶ 333, 342, 356, 357. The States also allege that the Communiqué is at odds with the Separation of Powers and the Appropriations Clause, rendering it unconstitutional. *Id.* And finally, the States insist that the Communiqué is *ultra vires* because the Secretary operated without any constitutional or statutory authority to "effectively incapacitate or transfer the Department's core statutory functions." *Id.* So long as this Court finds one of the above counts as likely to succeed, it may grant a preliminary injunction. *See, e.g.*, *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157, at *10 (D.R.I. Apr. 15, 2025) (stating plaintiffs need only show likelihood of success on the merits on one claim); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 597959, at *15 n.12 (D.D.C. Feb. 25, 2025) (same); *Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 215 (D. Mass. 2023) (same). The Court will first turn its attention to whether the States have demonstrated a likelihood of success on the merits of its APA claims.

### a. *Administrative Procedure Act Claims*

The APA enables judicial review of the "procedure and substance" of final agency decisions alleged to violate federal law for which "there is no other adequate remedy in a court." *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 19 (1st Cir. 2020) (citing 5 U.S.C. § 551 et seq. and 5 U.S.C. § 706(2)); 5 U.S.C. § 704). The reviewing court may hold unlawful and set aside final agency action that is found to be arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706(2).

### i. *Final Agency Action*

The Court must establish that the March 27 Communiqué may properly be classified as final agency action, making it subject to this Court's jurisdiction pursuant to the APA. As a preliminary matter, the Court must determine that a party is targeting "its attack against some particular 'agency action' that causes it harm[,]" and is not "seeking wholesale improvement of an administrative program by court decree, rather than in the offices of the agency or the halls of Congress, where programmatic improvements are normally made." *Lujan*, 497 U.S. at 891. Agency action is an expansive term, which practically covers nearly "every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 478 (2001) (citation omitted). By definition, agency action can take many forms, including a rule,[8] order, sanction, or the equivalent thereof. 5 U.S.C. § 551(13). The

---

[8] The United States Code defines "rule" as the "whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization,

examination of whether an agency's action may be considered "final" hinges on two criteria. First, the action must "[mark] the 'consummation' of the agency's decision making process," meaning the agency has "rendered its last word on the matter." *Bennett v. Spear*, 520 U.S. 154, 177 (1997) (citing *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)); *Harrison v. PPG Indus. Inc.*, 446 U.S. 578, 586 (1980). Second, the agency action must determine rights or obligations or create legal consequences. *Bennett*, 520 U.S. at 178. The Supreme Court frequently "[interprets] the finality element in a pragmatic way." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).

### Programmatic Improvements or Particular Agency Action

The Defendants attack the States' claims by asserting that judicial review in this case under the APA is improper because the States are making a programmatic challenge instead of challenging a single, discrete action. ECF No. 52 at 27. The Defendants claim the States are seeking "comprehensive judicial review of a planned restructuring outlined by a press release, and their requested preliminary relief would freeze that eventual restructuring in its tracks as to CDC, CTP, OHS and its regional offices, and ASPE." *Id.* Invoking *Lujan*, 497 U.S. at 899, they argue that the States are asking this Court to operate outside the bounds of the APA and perform a "general judicial review of [the agency's] day-to-day operations." *Id.* at 26. In their

---

procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing." 5 U.S.C. § 551.

defense, the States contend that HHS's reference to *Lujan* is misplaced. Unlike *Lujan*, which involved a "variety of programmatic deficiencies" and an "attempt to seek wholesale programmatic improvements," the States say, in this case only the Communiqué is being challenged as a single, discrete action, for which they are seeking limited relief for a subset of that action. ECF No. 54 at 19 (quoting *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025)).

This Court is not persuaded by the Defendants' argument that the States are launching a programmatic challenge because the States are indeed challenging the discrete March 27 Communiqué. It is this action that ushered in sweeping terminations and administrative leaves that essentially eviscerated many of the public health programs on which the States rely. Contrary to the Defendants' assertions, the record does not indicate that the States are seeking "wholesale improvement" of a program, as was sought in *Lujan*. *See* 497 U.S. at 890-891. Remarkably, the Defendants fail to explain why a communication that foists mass terminations and is implemented to effectively discontinue sub-agencies would not constitute a "discrete" agency action.

*Consummation of Agency's Decision Making*

Moving to the first prong of the *Bennett* analysis, *see* 520 U.S. at 177, the States posit that the March 27 Communiqué is final agency action because it marked the consummation of the Agency's decision making. ECF No. 43 at 31. They observe that the Defendants began enforcing the tenets of the Communiqué within days of its publication, issuing notices of termination and administrative leave to thousands of

HHS employees, which left many without access to their emails, laptops and offices. *Id.* at 13. They further note that Secretary Kennedy himself referred to the Communiqué as "decisive action" in Congressional hearings in May of this year. ECF No. 54 at 20. In rebuttal, the Defendants highlight that the March 27 Communiqué is titled "Press Release" and that no court has considered a press release final agency action, insisting that the Communiqué is tentative. ECF No. 52 at 29. Accordingly, HHS asserts that the decision-making process is "ongoing and evolving," observing specifically that the Communiqué itself states that the Agency "will continue to look for further ways to streamline its operations and agencies." *Id.* at 28-29. The States reply that potential future actions by HHS does not foreclose APA review of actions already taken. ECF No. 54 at 20.

The Court is satisfied that the March 27 Communiqué meets the pragmatic and flexible finality standard for purposes of judicial review under the APA. *See Bennett*, 520 U.S. at 177. The Communiqué amounted to an announcement, not a suggestion, of the Defendants' plans to implement an absolute reorganization. The RIF notices further underscored HHS's intentions to fulfill the plans announced in the Communiqué. Such an immediate and sweeping termination of critical staff and the closure of divisions and offices surely marks the culmination of the Agency's decision to implement the Communiqué. The mere fact that additional cuts may also be implemented does not prevent this Court from reviewing the actions already taken. The Defendants do not proclaim an intention to reverse all the mass

35

terminations in the absence of judicial intervention, nor do they suggest they will reinstate closed programs or offices or resuscitate transferred programs.

### Legal Consequences

Regarding the second prong (that the agency action must determine rights or obligations or create legal consequences, *Bennett*, 520 U.S. at 177), the States maintain that the format of the Communiqué is irrelevant. Press release or not, they argue that the direct, immediate and negative legal consequences resulting from the Communiqué are without question. After its issuance, the States assert that the Agency's "critical work ground to a halt," ECF No. 43 at 31, as a result of the RIFs issued to 10,000 employees swiftly following the Communiqué's publication. Conversely, the Defendants maintain that the States have not experienced any "direct and appreciable legal consequences." ECF No. 52 at 29 (quoting *Cal. Cmtys, Against Toxins v. EPA*, 934 F.3d 627, 638 (D.C. Cir. 2019)).

The States have demonstrated to this Court that clear legal consequences resulted from the issuance of the Communiqué. The States are unable to access previously available funds, guidance, research, screenings, compliance oversight, data, and, importantly, the expertise and guidance on which they have long relied. HHS's decision to dismiss employees and shut down entire programs and offices further demonstrate self-evident legal consequences. For example, in the case of NIOSH, the Agency issued RIFs or Intent-to-RIF letters to nearly 90% of the sub-agency's employees. As a result, NIOSH occupational research programs and mine safety research programs have been effectively discontinued. Such an

announcement, along with the swift actions taken by the Defendants to execute the plans of the Communiqué clearly marked the "consummation of the agency's decision making process" which triggered legal consequences.

Overall, the Court concludes that the March 27 Communiqué constitutes final agency action. As such, this Court is satisfied that the States are challenging a single, discrete action and not seeking programmatic change, that the decision-making process regarding that action is complete, and that the result of that action has already and will continue to directly affect the States. Next, the Court will engage in the APA analysis for setting aside final agency action that is arbitrary and capricious or contrary to law.

## ii.  Arbitrary and Capricious

Final agency action may be set aside by the reviewing court as arbitrary and capricious if the "administrative record reveals that 'the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.'" *Atieh v. Riordan*, 727 F.3d 73, 75-76 (1st Cir. 2013) (quoting *Associated Fisheries v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In essence, an agency must precede its action with an assessment of relevant data and be prepared to explain the basis of such action with a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citing *Burlington Truck Lines, Inc.*

*v. United States*, 371 U.S. 156, 168 (1962)).  The "reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *DOC v. New York*, 588 U.S. 752, 785 (2019).  A "court may not substitute its own policy judgement for that of the agency," but instead, must ensure that the "agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *but see California v. United States Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025) (noting that judicial review of agency is action is "narrow in scope").

The States argue that the March 27 Communiqué is arbitrary and capricious because it was issued without a rational basis and its justification rested on conclusory statements and unsupported evidence.  ECF No. 43 at 31-36.  The Defendants, they argue, did not engage in a "logical and rational" decision-making process in issuing and carrying out the Communiqué.  *Id.* at 32 (quoting *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998)).  As a result, the States assert, the Defendants neglected to consider that "the sudden reorganization and elimination of a large portion of HHS's workforce would cause immediate and significant disruption to agency operations and functions," including those that are statutorily mandated.  *Id.* at 33.  In addition, contrary to the requirements of the APA, the States assert, the Defendants did not assess the pros and cons of its actions, including the "indirect costs associated with their purported cost-cutting measures." *Id.*  As examples, the States point to the closure of the viral hepatitis laboratory which will burden States to devise "alternative ways to replicate that laboratory's highly

sophisticated system for tracking Hepatitis C virus infections," as well as to the States' reliance "on many of Defendant's programs and services, such as testing for communicable diseases, data on health outcomes, and standards for occupational health." *Id.* at 33-34. Finally, the States stress that the Defendants have not explained or demonstrated any nexus between the restructuring announced in the Communiqué and meeting the Agency's goals of increased efficiency and "ending America's epidemic of chronic illness, by focusing on safe, wholesome food, clean water, and the elimination of environmental toxins." *Id.* at 34-35. The States carefully note Secretary Kennedy's clear admission that a careful review of employee's job responsibilities before issuing RIFs did not take place because doing so would "take too long" and would sacrifice "political momentum." *Id.* at 12, 32; ECF No. 54 at 22.

The Defendants counter that the Communiqué is indeed based on a "cost-benefit analysis," arguing that the States "overlook the cost-saving value of actions like consolidating redundant departments." ECF No. 52 at 34. They emphasize that HHS has "broad discretion to choose how to marshal its limited resources and personnel to carry out its delegated responsibilities," including implementing RIFs and restructuring the sub-agencies. *Id.* (quoting *Scarborough Citizens Protecting Res. v. United States Fish & Wildlife Serv.*, 674 F.3d 97, 100 (1st Cir. 2012)). If the Court disagrees, the Defendants suggest the "proper course" would be to "remand to the [Department] for additional . . . explanation." *Id.* at 35 (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

When looking to HHS's explanation for its action, the Court must look to "the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015). Review of the lone declaration provided by the Defendants, the March 27 Communiqué, and the various testimonies of Secretary Kennedy has not revealed a reasoned explanation for the agency action by the Defendants. Instead of undertaking an intentional and thoughtful process for weighing the benefits and drawbacks of implementing the sweeping policy change, the Defendants hastily restructured the sub-agencies and issued RIF notices. The Defendants have failed to demonstrate how the workforce terminations and restructurings made the sub-agencies more efficient, saved taxpayer dollars, or aligned with HHS's priority of "ending America's epidemic of chronic illness, by focusing on safe, wholesome food, clean water, and the elimination of environmental toxins." ECF No. 44-1 at 3. In fact, the record is completely devoid of any evidence that the Defendants have performed any research on the repercussions of issuing and executing the plans announced in the Communiqué. Without a modicum of evidence to the contrary, the record shows that the Defendants did not consider the "substantial harms and reliance interests" of the States and the devastating consequences that would be felt by the populations served by these critical public health programs. *See New York v. McMahon*, 2025 WL 1463009, at *60 (citing *Michigan v. E.P.A.*, 576 U.S. at 753). The States and their local agencies that rely on these programs had no reason to suspect that they would be abruptly wiped clean of all personnel and rendered unable to fulfill their statutorily mandated functions. Unable to perceive any rational basis for the

Agency's actions, the Court concludes that HHS's actions in implementing the March

27 Communiqué were both arbitrary and capricious.

The Defendant's suggestion that this Court remand the agency action to HHS

for a comprehensive explanation is without merit.  A reviewing court has discretion

to take any steps it deems necessary to prevent irreparable injury before a final

judgment is reached.  *See* 5 U.S.C. § 705 ("To prevent irreparable injury, the

reviewing court . . . may issue all necessary and appropriate process to postpone the

effective date of an agency action or to preserve status or rights pending conclusion

of the review proceedings.").  Because this Court finds that it is also likely that

Defendants acted contrary to law (see discussion below), remand for further

explanation is not appropriate in this case.  *See McMahon*, 2025 WL 1463009, at *28;

*see also Florida Power & Light Co.*, 470 U.S. at 744 (holding that remand is the

"proper course, except in rare circumstances" when the agency's actions are held

arbitrary and capricious for an inadequate explanation).  Thus, the States have

established a likelihood of success on demonstrating that the Defendants

unreasonably exercised their discretion, in violation of the APA.

### iii.  Contrary to Law

#### 1.  Congressionally Mandated Functions

The Court now shifts to the States' APA-based claim that HHS acted contrary

to law.  The APA instructs a reviewing court to "hold unlawful and set aside" agency

actions that are contrary to any law, "not merely those laws that the agency itself is

charged with administering."  5 U.S.C. § 706(2)(A); *FCC v. NextWave Pers. Commc'ns*

*Inc.*, 537 U.S. 293, 300 (2003). "An agency may not confer power upon itself," but instead must operate within the bounds "authoritatively prescribed by Congress." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).

The "statutory scheme governing federal appropriations are at the forefront of the States' contrary to law claims against the Agency Defendants." *New York*, 769 F. Supp. 3d at 137-38. The States allege that the "mass terminations and reorganization of the Department [of HHS] under the [Communiqué] make it functionally impossible for the Department [of HHS] to comply with its obligations under numerous federal statutes." ECF No. 43 at 36. They present numerous instances in which the Communiqué conflicts with statutory mandates of HHS's sub-agencies. The States claim as follows.

### *NIOSH's Occupational Safety Research*[9]

Several Congressional statutes command the work of NIOSH. The Occupational Safety and Health Act, 29 U.S.C. §§ 669(a), 671(c)(2), mandates NIOSH to conduct occupational safety and health research and the Mine Improvement and the New Emergency Response Act of 2006, 29 U.S.C. § 671(h)(3), directs NIOSH to promote "research, development, and testing of new technologies and equipment designed to enhance mine safety and health." *See also* 30 U.S.C. §§ 937(b), 951(a)-(b) (requiring NIOSH to conduct research on mine worker health and mine safety); ECF

---

[9] RIFs issued to NIOSH employees were later rescinded by the Agency and will be considered further below.

No. 54 at 23.   The States allege that, as a result of the Communiqué, NIOSH's occupational research programs remain largely shuttered.  *Id.*  They claim NIOSH's mine safety research divisions that operate out of Spokane and Pittsburgh have been eliminated as there are no employees to conduct such research.  *Id.*

### *CDC National Center on Birth Defects and Developmental Disabilities*

The Children's Health Act of 2000, 42 U.S.C. §§ 247b-4a(a)(1-2), (d)(1), mandates this Center to "make awards of grants or cooperative agreements to provide technical assistance to State agencies to complement an intramural program and to conduct applied research related to newborn and infant hearing screening, evaluation and intervention programs and systems."  ECF No. 54 at 24.  The States allege that the Communiqué precipitated the elimination of the entire Early Hearing Detection and Intervention team at this Center.  *Id.*  Grantees of the States are now being told that future grant applications are "on hold" and the "typical functions of project officers, health data scientists and evaluation scientists are not occurring."  *Id.*

### *FDA's Center for Tobacco Products*

The Family Smoking Prevention and Tobacco Control Act, 21 U.S.C. § 387(a), *et seq.*, established the CTP as a vehicle for the FDA to regulate tobacco products.  As a result of the Communiqué and its ensuing terminations and restructurings, no employees remain to support contract acquisitions and monitor payroll in the office responsible for tracking tobacco user fees, the main funding stream for the CTP.  ECF No. 54 at 24.  The States also claim the RIFs eliminated entire teams responsible for health communication and education projects, including "The Real Cost" campaign,

43

a national tobacco prevention advertising campaign, leaving that work abandoned. *Id.* at 25.

<div align="center">*Lead Poisoning Programs*[10]</div>

The States assert that the Lead Contamination Control Act of 1988, 42 U.S.C. §§ 247b-3, 10, directed HHS and the CDC to work on the prevention of lead poisoning and asthma control through the National Center for Environmental Health's ("NCEH") data collection, surveillance, publication, collaborative efforts, education, and technology assessment. *Id.* Since the Communiqué, the States allege that nearly everyone at NCEH supporting the statutory work has been laid off and no one remains to carry out the congressionally mandated functions. *Id.*

<div align="center">*Reproductive and Maternal Health Programs*</div>

Congress has mandated HHS to "continue a federal initiative to support State and tribal maternal mortality review committees," and "to improve data collection and reporting around maternal mortality." 42 U.S.C. § 247b-12(a)(1)-(a)(2). The States allege the Communiqué generated the demolition of the PRAMS team, which completed data collection efforts and provided support for state programs. ECF No. 54 at 25.

---

[10] The Agency rescinded RIFs issued to some NCEH employees on June 16, 2025. According to the agency, the reinstated employees in NCEH's Lead Poisoning Prevention and Surveillance Branch will "assist in restoring functionality to the Childhood Lead Poisoning Prevention Program" in the areas of program services, epidemiology and surveillance, and guidance and recommendations. ECF No. 70-1 at 4.

<div align="center">44</div>

*HIV and STD Prevention Program*[11]

The States also claim that 42 U.S.C. §§ 300ee-4; ee-11; ee-31 direct HHS to undertake a range of programs targeting the prevention of HIV/AIDS, including providing technical assistance, administering grants to States, and implementing public awareness campaigns. They lament that since the Communiqué issued, all work previously conducted by CDC's National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention has been halted. *Id.* at 25-26.

*Federal Poverty Guidelines*

HHS has been directed to annually revise the Federal Poverty Guidelines. 42 U.S.C. § 9902(2). The States contend that the guidelines' information on the ASPE website is not currently being updated. *Id.* at 26.

\*\*\*

In response to these allegations, the Defendants aver that HHS is still willing and able to comply with all its statutory obligations. ECF No. 52 at 35-36. To signal such intentions, they note that over three hundred RIFs have been recalled for NIOSH employees. *Id.* at 36. In addition, they assert that the closure of "some

---

[11] On June 16, 2025, the Agency rescinded RIFs issued to some employees of the National Center for HIV, Viral Hepatitis, STD, and TB Prevention ("NCHHSTP"). According to the Defendants, employees subject to the RIF recissions issued from the NCHHSTP Laboratory Branch and STD Laboratory Reference and Research Branch will assist in restoring the functionality of the Viral Hepatitis Laboratory, which supports outbreak investigations. Employees in the Behavioral and Clinical Surveillance Branch will restore the HIV Medical Monitoring Project, which provides information on the quality of life for people living with HIV. And finally, those recalled employees of the Disease Intervention and Response Branch will assist in restoring support for state health departments in investigating and responding to outbreaks of sexually transmitted infections. ECF No. 70-1 at 4-5.

45

regional offices" does not automatically "prevent the [Agency] from providing services." *Id.* at 36. Furthermore, the Defendants argue, the States allege statutory violations either where no obligations exist, as in the case of Head Start, or where HHS has already fulfilled its obligations, noting that the annual revision of the Federal Poverty Guidelines has already been completed for 2025. *Id.* at 10, 36.

The States dismiss the notion that the reinstatements of some NIOSH employees ameliorate the harm caused by HHS's action. They argue that "despite the Secretary's recent purported May 13, 2025, reinstatements of some employees, NIOSH's research laboratories and divisions remain shuttered" leaving the department "unable to fulfill its statutory responsibilities as an occupational health research institute." ECF No. 54 at 23. They remark that the ASPE has announced on its website that the "'information' on its website (including the Federal Poverty Guidelines page) is 'not being updated currently'" and express concern regarding the integrity of future calculations. *Id.* at 26.

Here, the Court finds that the Communiqué contravenes congressional directives and statutory law. The States have presented copious clear examples in which Congress has appropriated funds to the federal programs and outlined how those funds are to be used.[12] The Defendants, on the other hand, have yet to proffer

---

[12] The Court recognizes the Defendants' position that the Congressional statutes governing Head Start make site visits discretionary and so the failure to perform site visits is not necessarily in contravention to the law governing management of the programs. As for the allegation that HHS has violated its obligation to update the Federal Poverty Guidelines, the Court acknowledges some data has been updated but is troubled by the inactivity of the ASPE website in light of the requirements of 42 U.S.C. § 9902(2) to perform ongoing comprehensive

any evidence demonstrating that the planned terminations would not decimate the Congressionally created sub-agencies or inhibit them from fulfilling their mandates. The catastrophic effects documented by the States illuminate that reality. In the Court's view, the States have substantiated that HHS is already unable to fulfill many of its statutory functions in light of the Communiqué. Given that the Communiqué is for all intent and purpose dismantling critical, statutorily mandated functions of the Agency, this Court finds that it is contrary to law.

### 2. *Congressionally Mandated Appropriations*

The parties further dispute whether the Communiqué telegraphs HHS's decision not to spend congressionally appropriated funds. The States assert that the Defendants "usurp[ed] Congress' power of the purse by disregarding congressional appropriations" when it announced layoffs and reorganization which would "save taxpayers $1.8 billion per year," as "it is Congress who must make the decision whether to cut programs for taxpayer savings." ECF No. 43 at 45 (citing *AIDS Vaccine Advocacy Coalition v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 147-48 (D.D.C. 2025). The Defendants protest that HHS has not refused to "spend appropriated funds on statutorily mandated programs, and [that] saving taxpayer money by consolidating functions and reducing personnel redundancy is not inherently inconsistent with spending appropriated funds." ECF No. 52 at 36. They contend

---

calculations, including an analysis of the Census Bureau poverty thresholds with the relevant percentage change in the Consumer Price Index for All Urban Consumers, consideration of inflation rate, and rounding and standardizing adjustments. https://perma.cc/LV38-9VEE; *see also* Federal Register Vol. 87, No. 14, Friday, January 21, 2022, https://perma.cc/6VCU-W734.

that the States' claims are premature, as not "enough time [has elapsed] to diagnose a failure to spend prescribed money." *Id.* Ultimately, they rely on *Lincoln v. Vigil*, 508 U.S. 182 (1993) (in which the Supreme Court held the decision to discontinue the Indian Children's Program by the Indian Health Service agency was 'committed to agency discretion by law' pursuant to the APA because it pertained to the allocation of funds from a lump-sum appropriation and was within the permissible statutory objectives), to argue that HHS has "unreviewable discretion to make choices on how the appropriations are spent." *Id.* at 184. ECF No. 52 at 37 (citing *Lincoln*, 508 U.S. at 192). But according to the States, "the unrebutted record shows that Congress has appropriated billions of dollars that Defendants will be unable to spend, [due to the Communiqué], including over $190 million to CDC's National Center for Environmental Health, over $50 million dedicated to addressing childhood lead poisoning, and nearly $1.2 billion to the CDC center that oversees the Office on Smoking and Health and the Division of Reproductive Health." ECF No. 54 at 26. The States contrast *Lincoln*, noting that here, unlike in *Lincoln*, "Congress has [expressly] appropriated funds for the subagencies and centers that the March 27 [Communiqué] effectively ended." *Id.* at 27.

Defendants have not persuaded this Court that the Secretary's authority is "so broad that [he] can unilaterally dismantle a department by firing nearly the entire staff, or that [his] discretion permits [him] to make a 'shell' department*." McMahon*, 2025 WL 1463009, at *28. Plaintiffs have the better argument here. *Lincoln* held that "an agency is not free simply to disregard statutory responsibilities: Congress

may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Lincoln*, 508 U.S. at 193 (labeling an action unreviewable because Congress granted the agency discretion for how to spend the lump sum). In the case at hand, Congress directed HHS to maintain specific initiatives with the support of the Congressional appropriations pursuant to the applicable statutes. HHS cannot decide for itself whether it has exceeded its statutory authority because there are Congressional statutes in place to serve as guardrails to the Agency's actions. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92, 97-98 (1st Cir. 2025) *opinion stayed on other grounds*, (explaining that "applicable regulations cabin the [agency's] discretion as to when it can terminate existing grants" which provide the Court with a meaningful framework to judge the agency's action). The Defendants' efforts to portray the Communiqué and its whiplash as a matter of agency discretion despite the snub of Congressional mandates is without merit. An examination of the relevant statutes supports the conclusion that Congress never meant to confer HHS the power to self-destruct. *See W. Virginia v. EPA*, 597 U.S. 697, 721 (2022) (holding that "[w]here the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented – whether Congress in fact meant to confer the power the agency has asserted"). The Defendants here have failed to submit any evidence that HHS can meet its Congressional orders without applying the federal appropriations and employing the essential staff and experts who run its programs.

Consequently, this Court concludes that the Defendants usurped Congressional power to manage the public health appropriations at stake and that the States are likely to succeed on their "contrary to law" claims. [13]  The Court need not go further and decided the Plaintiffs' additional claims.  *See Vaquería Tres Monjitas, Inc. v. Pagan*, 748 F.3d 21, 26 (1st Cir. 2014) (noting that "federal courts are not to reach constitutional issues where alternative grounds for resolution are available" (quoting *Am. Civil Liberties Union v. U.S. Conference of Cath. Bishops*, 705 F.3d 44, 52 (1st Cir. 2013))).  The Court now turns to whether the Plaintiffs satisfy the other requirements for injunctive relief.

### 2. *Irreparable Harm*

The next step in the injunction inquiry is whether the States are "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20. To guide this analysis, the Court looks to whether the States have suffered "a substantial injury that is not accurately measurable or adequately compensable by money damages."  *Ross-Simons of Warwick, Inc.*, 102 F.3d at 19.  The States must show that "irreparable injury is *likely,*" *Winter*, 555 U.S. at 22, and it "must be grounded on something more than conjecture, surmise, or a party's unsubstantiated

---

[13] The Defendants attempt to characterize the States' request for relief as actually a claim pursuant to 5 U.S.C. § 706(1).  But the States claims are clearly alleged under § 706(2).  The States do not seek to compel agency action withheld or delayed, pursuant to 5 U.S.C. § 706(1).  As Plaintiffs eloquently state, "the fact that agencies have stopped acting is a consequence of the March 27 [Communiqué], but it is not the agency inaction that the Plaintiffs seek to remedy."  ECF No. 54 at 21.

fears of what the future may have in store," *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

The Court already determined that the States have a concrete injury to establish Article III standing but will now explain why those injuries constitute irreparable harm for the purposes of the preliminary injunction analysis. Two very recent decisions guide this Court's discussion. In a similar case involving RIFs issued to Department of Education employees, the First Circuit recently denied the federal government's motion to stay the district court's decision to grant a preliminary injunction, preventing the federal government from moving forward with RIFs. *Somerville Pub. Schools*, 139 F.4th at 76. The Court agreed that the District Court record "sufficed to support the plaintiffs' contention that the disabling of the Department's statutorily assigned functions caused by the challenged actions would jeopardize their ability to proceed with their programs." *Id.* at 75. This harm was more compelling and irreparable than the government's asserted harm of "not be[ing] able to recoup those expenditures." *Id.*

Prior to the First Circuit issuing its opinion affirming the denial of a stay in *Somerville Pub. Schools*, a colleague in this Court issued an injunction where the States "presented a plethora of declarations illustrating . . . myriad . . . harms arising from the undoing of [the agency]." *Rhode Island v. Trump*, No. 1:25-cv-128, 2025 WL 1303868, at *15 (D.R.I. May 6, 2025). The harms in that case included the loss of data, delays in funding leading to a hiring freeze and stopping services, loss of mediation services to resolve public sector labor disputes, delays in services and

programs, loss of access to federal resources, and loss of federal services and assistance.  *Id.* at *15-17.  The Court found "the implementation of the [Executive Order] at [the agencies] ha[d] disrupted numerous critical state" resources and programs.  *Id.* at *17.

Here, the States go into detail about the substantial harm that they are facing from the Communiqué's application to CDC lab services, DRH, NIOSH, OSH/CTP, OHS, federal poverty guidelines, NCEH, and the National Center for Birth Defects and Disabilities.  *See generally* ECF No. 43 at 46-60.  The Defendants argue that the States will not face irreparable harm because the injuries "are not sufficiently concrete or imminent to establish," that the injury "is readily measurable in monetary terms and compensable by final judgment," and the fact that the States waited "over a month to seek injunctive relief."[14]  ECF No. 52 at 39-40.

Following *Somerville Pub. Schools* and *Rhode Island*, this Court finds the March 27 Communiqué and RIF of nearly 10,000 HHS employees has launched several HHS programs into a rapid freefall away from their statutory obligations, thereby irreparably harming the States.

 The Court also rejects Defendants' assertions that the States' injuries "are not sufficiently concrete or imminent to establish," and that the injury "is readily

_____

[14] The Court can dismiss the delay in filing argument right off the bat.  The Communiqué was issued on March 27, the RIFs occurred on April 1, ECF 52-1 at ¶ 2, and the States filed this case on May 5, 2025.  It was completely reasonable for the States to wait until the harms, described in the nearly 70 declarations, were realized.  The Court disagrees with the Defendants' statement that "the delay further undermines their claims that they are suffering irreparable harm."  ECF No. 52 at 40.

measurable in monetary terms and compensable by final judgment." *Id.* at 39-40.  At the CDC, for example, laboratories have shuttered which has resulted in States seeking out commercial labs for testing.  ECF No. 44-23 at ¶ 18.  This in and of itself is not the problem.  The problem is that these commercial labs do not have the same mandates as CDC which will impact the States' ability to compare and track results, potentially leading to outbreaks involving multiple jurisdictions.  *Id.*; ECF No. 44-22 at ¶¶ 17-18; ECF No. 44-59 at ¶ 10.  The shuttering of labs has also hampered New York's Wadsworth Center which has tried to fill the gaps but is feeling the strain on its resources.  ECF No. 44-20 at ¶ 35.  The States "are investing time, money and other resources in changes to their state programs due to the closure and reduction of CDC's laboratory resources."  ECF No. 43 at 48.

DRH has also experienced irreparable harm related to the loss of CDC support for the PRAMS program.  PRAMS historical data is offline, states have not received weighted 2024 birth year data from CDC, and 2024 birth year data collection ended early.  States no longer have access to "scientific, technical, and information technology assistance resources" provided by CDC, ECF No. 44-25 at ¶ 24, and lack clear guidance on data collection for birth year 2025.  ECF No. 44-25 at ¶ 24; ECF No. 44-24 at ¶ 15; ECF No. 44-28 at ¶¶ 19-21; ECF No. 44-26 at ¶ 17; ECF No. 44-27 at ¶ 5; ECF No. 44-29 at ¶¶ 12-13; ECF No. 44-50 at ¶ 11; ECF No. 44-51 at ¶¶ 26-33; ECF No. 44-59 at ¶ 29. Without the PRAMS data and CDC expertise, the States "no longer have the ability to monitor health outcomes and goals without creating their own pregnancy outcome monitoring systems, which would take at least a year

to accomplish, would be cost prohibitive, and would be incapable of replicating PRAMS' weighted national dataset in any event." ECF No. 43 at 49; ECF No. 44-27 at ¶¶ 5-6; ECF No. 44-29 at ¶¶ 17-19.

The Communiqué has also irreparably harmed NIOSH, which has lost a majority of its staff, leading to a "pause on all NIOSH activities." ECF No. 44-31 at ¶ 18, Ex. 2. Education and research centers face imminent closure, like "Washington's Northwest Center for Occupational Health and Safety," which loses its funding in June. *Id.* at ¶¶ 11-30; *see also* ECF No 44-52 at ¶¶ 42-45 (describing the effect RIFs have had on Education and Research Centers throughout California).

These harms, all of which are undisputed by HHS, are concrete examples of the many irreparable harms the States are currently, and will continue, to experience because of the March 27 Communiqué. Critical public health services have been interrupted, databases taken offline, status of grants thrown into chaos, technical assistance services gone, and training and consultation services curtailed. These are not unsubstantiated fears. *See Winter*, 555 U.S. at 22. Further, none of these harms can be compensated by money damages. *Ross-Simons of Warwick*, 102 F.3d at 19. The Court finds that the States have established irreparable harm stemming from the Communiqué.

### 3. Balance of the Equities & Public Interest

The last two factors for the Court to consider, balance of the equities and public interest, merge because the Government is the opposing party. *Nken*, 556 U.S. at 435; *Mills*, 16 F.4th at 37. These factors require the Court to "balance the competing

claims of injury and must consider the effect on each party of the granting or withholding of the requested relief . . . pay[ing] particular regard for the public consequences" resulting from granting the relief sought. *Winter*, 555 U.S. at 24.

HHS argues that "[g]ranting a preliminary injunction would disrupt the Department's efforts to comply with the Workforce Executive Order and Workforce Memorandum" – both directives from the executive branch. ECF No. 52 at 40. They go on to say that the States' "requested relief would hamstring the Department and force it to operate as if a new administration was never elected." *Id.* at 41. However, this Court Order and the harm suffered by the States have nothing to do with the new administration's priorities, but rather focuses on HHS failing to carry out its congressionally mandated duties and obligations. HHS has failed to produce a shred of evidence that services to States and access to critical information would continue uninterrupted, that the harms are minimal or not irreparable, or that it is authorized to act absent Congressional action. Compare that absence of evidence to the over seventy declarations submitted by the States which assert many harms to various State public health agencies and programs. When balancing the equities and the public interest, this Court has no trouble finding that both factors weigh heavily in favor of maintaining the status quo and issuing a preliminary injunction. *See Woonasquatucket*, 2025 WL 1116157, at *23-24.

## IV. Scope of Remedy and Order

The States are asking this Court "to enjoin the mass terminations and restructurings resulting from the March 27" Communiqué at the CDC, the FDA's

CTP, the Head Start Offices, and the Office of the ASPE.  ECF No. 43 at 10.  The

agency asks the Court to limit any injunctive relief to "address any information or

services to which it determines [the States] have established an entitlement," which

is to say, the agency asks the Court to do its job.  ECF No. 52 at 41-42.

 After careful consideration of the States' Motion for a Preliminary Injunction,

and for the reasons discussed in this Memorandum, the Court hereby orders that:

1. The States' Motion for a Preliminary Injunction (ECF No. 43) is GRANTED;

2. HHS and all other named defendants are ENJOINED from taking any actions to
implement or enforce the planned RIFs or sub-agency restructuring announced in the
March 27 Communiqué or set in motion after the Communiqué's release with respect
to the specific sub-agencies and programs that are the subject of the instant motion
for preliminary injunction, until further order of this Court.  The actions enjoined by
this order include but are not limited to:

(a) any further execution of any existing RIF notices (including final separation for
any employees previously notified of impending termination);

(b) issuance of any further RIF notices; and

(c) placement of additional employees on administrative leave.

3. This Order shall apply to the maximum extent provided for by Federal Rule of Civil
Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706.

4. The Defendants shall file a status report on or before July 11, 2025 at 5:00pm EST,
apprising the Court of the status of their compliance with this Order and providing a
copy of all directives that Defendants provided pursuant to this Order.

5. The parties shall file a notice with the Court on or before July 11, 2025, addressing
the way in which (if at all) *Trump v. CASA, Inc.*, Nos. 24A884, 24A885, 24A886, --- S.
Ct. ---, 2025 WL 1773631 (June 27, 2025), impacts the scope of this Order.

## V.  Bond

 Rule 65(c) of the Federal Rules of Civil Procedure contemplates that the party

moving for a preliminary injunction "gives security in an amount that the court

considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The States request that the Court waive security in this case, pointing out that the courts have long recognized this provision as a discretionary call for the district court to make.  ECF No. 43 at 55-56.  HHS does not dispute the court's discretion on this point but asserts that, because the States are attempting to halt a discretionary agency undertaking in order to avoid devoting more state resources to "providing services to their constituents," "they should have skin in the game."  ECF No. 52 at 42.  The Defendants suggest the bond be "commensurate with the scope of the injunction" and "take into account that the relief requested by [the States] will hinder" the agency's ability to reorganize pursuant to the President's policies."  *Id.*  In the Court's opinion, the States and their constituents have plenty on the line in this litigation.  The Court imposes a nominal bond of $100.

## VI.  Stay

The Defendants are requesting that the Court stay the injunctive relief pending any appeal they may file.  ECF No. 52 at 43.  The States assert that a stay would be inappropriate in this case given "the specific, concrete, documented harms" to them. ECF No. 54 at 24.  HHS's request is, as the States point out, premature.  However, because HHS is already enjoined, as of the entering of this Order, from moving forward with its reorganization plans, including finalizing the employee terminations, *see Am. Fed'n of Gov't Emps.*, 2025 WL 1482511, at *27, the Court will preemptively deny the agency's request for a stay.

IV.    CONCLUSION

Circling back to the separation of powers principles covered earlier in this decision, the Executive Branch is vested with the power and is imbued with the responsibility to faithfully execute the laws which govern the governance structure of our country.  The Executive Branch does not have the authority to order, organize, or implement wholesale changes to the structure and function of the agencies created by Congress.  As Judge Smith in this district court recently warned when presented with the declining depth of civics education in public schools, "we may choose to survive as a country by respecting our Constitution, the laws and norms of political and civic behavior, *and* by educating our children on civics, the rule of law, and what it really means to be an American, and what America means.  Or, we may ignore these things at our and their peril."  *A.C. v. Raimondo*, 494 F. Supp. 3d 170, 181 (D.R.I. 2020), *aff'd sub nom. A.C. by Waithe v. McKee*, 23 F.4th 37 (1st Cir. 2022).


IT IS SO ORDERED.

Melissa R. DuBose
United States District Judge


July 1, 2025

58