UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK, et al.,

       Plaintiffs,

   v.

ROBERT F. KENNEDY, JR., in his official
capacity as SECRETARY OF THE U.S.
DEPARTMENT OF HEALTH & HUMAN
SERVICES, et al.,

       Defendants.

Civil Action No. 1:25-cv-00196

**<u>DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS........................................................................................................ i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 3

    I.     The U.S. Department of Health and Human Services ............................................ 3

    II.    Factual Background ............................................................................................... 5

    III.   Procedural Background.......................................................................................... 10

LEGAL STANDARD.......................................................................................................... 10

ARGUMENT ...................................................................................................................... 11

    I.     This Court Lacks Jurisdiction. ............................................................................. 11

         A.     The CSRA Precludes District-Court Jurisdiction Over Plaintiffs' Claims. ........................................................................................................ 11

         B.     Plaintiffs Lack Article III Standing........................................................... 15

         C.     Plaintiffs' Claims Are Not Reviewable Under the APA Because They Do Not Seek Judicial Review of a Discrete, Final Agency Action. ............... 31

    II.    The Complaint Does Not State a Claim for Violation of the APA...................... 35

         A.     Plaintiffs Seek to Compel Agency Action But Cannot Meet the Mandamus-Like Standard. ...................................................................... 35

         B.     Plaintiffs Fail to State an Arbitrary and Capricious Claim. ..................... 38

         C.     Plaintiffs Fail to State a Claim that the RIFs and Restructuring are Contrary to Law and Exceed Defendants' Statutory Authority............... 41

    III.   Plaintiffs' Constitutional and Ultra Vires Claims Fail on the Merits. ................. 44

CONCLUSION.................................................................................................................... 48

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alabama-Coushatta Tribe of Tex. v. United States*,
   757 F.3d 484 (5th Cir. 2014) ..................................................................................... 32

*A.M. Capen's Co. v. Am. Trading & Prod. Corp.*,
   202 F.3d 469 (1st Cir. 2000)....................................................................................... 17

*Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Env't Prot.*,
   163 F.3d 74 (1st Cir. 1998).......................................................................................... 37

*Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*,
   367 F.3d 932 (D.C. Cir. 2004) .................................................................................... 13

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
   929 F.3d 748 (D.C. Cir. 2019) ........................................................................ 11, 12, 13

*American Fed'n of Gov't Emps. v. Trump*,
   139 F.4th 1020 (9th Cir. 2025) ........................................................................... 14, 31

*Amrhein v. eClinical Works, LLC*,
   954 F.3d 328 (1st Cir. 2020)....................................................................................... 17

*Anglers Conservation Network v. Pritzker*,
   809 F.3d 664 (D.C. Cir. 2016) .................................................................................... 36

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ...................................................................................... 23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................................................... 11

*Axon Ent., Inc. v. FTC*,
   598 U.S. 175 (2023)...................................................................................................... 13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................... 11, 27

*Bennett v. Spear*,
   520 U.S. 154 (1997)...................................................................................................... 33

*Block v. Cmty. Nutrition Inst.*,

    467 U.S. 340 (1984) ................................................................................. 14, 41

*Cal. Cmtys. Against Toxins v. EPA*,

    934 F.3d 627 (D.C. Cir. 2019) ................................................................. 34, 35

*Carney v. Adams*,

    592 U.S. 53 (2020) ......................................................................................... 17

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,

    333 U.S. 103 (1948) ....................................................................................... 34

*Cincinnati Soap Co. v. United States*,

    301 U.S. 308 (1937) ....................................................................................... 45

*City of New Haven v. United States*,

    809 F.2d 900 (D.C. Cir. 1987) ....................................................................... 47

*Cobell v. Kempthorne*,

    455 F.3d 301 (D.C. Cir. 2006) ....................................................................... 32

*Cobell v. Norton*,

    240 F.3d 1081 (D.C. Cir. 2001) ............................................................... 37, 38

*CFPB v. Community Fin. Servs. Ass'n of Am., Ltd.*,

    601 U.S. 416 (2024) ................................................................................. 45, 46

*DaimlerChrysler Corp. v. Cuno*,

    547 U.S. 332 (2006) ....................................................................................... 25

*Dalton v. Specter*,

    511 U.S. 462 (1994) ....................................................................................... 44

*Dantzler, Inc. v. Empresas Berríos Inventory and Operations, Inc.*,

    958 F.3d 38 (1st Cir. 2020) ...................................................................... 10, 16

*Department of Education v. California*,

    145 S. Ct. 966 (2025) ..................................................................................... 26

*Dreher v. Experian Info. Sols., Inc.*,

    856 F.3d 337 (4th Cir. 2017) ......................................................................... 17

*Elgin v. Dep't of the Treasury*,

    567 U.S. 1 (2012) ............................................................................... 12, 13, 14

*FCC v. Prometheus Radio Project,*

   592 U.S. 414 (2021) ................................................................................ 39

*FDA v. All. for Hippocratic Med.,*

   602 U.S. 367 (2024) .................................................................... 16, 28, 30

*Franklin v. Massachusetts,*

   505 U.S. 788 (1992) .......................................................................... 33, 35

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*

   460 F.3d 13 (D.C. Cir. 2006) ............................................................ 32, 33

*Gill v. Whitford,*

   585 U.S. 48 (2018) ................................................................................ 25

*Glob. Health Council v. Trump,*

   2025 WL 2326021, at *9–11 (D.C. Cir. Aug. 13, 2025) ................. 41, 42, 44, 45, 48

*Gonzalez v. United States,*

   284 F.3d 281 (1st Cir. 2002) ............................................................ 11, 21

*Graham v. Ashcroft,*

   358 F.3d 931 (D.C. Cir. 2004) ................................................................ 11

*Harper v. Werfel,*

   118 F.4th 100 (1st Cir. 2024) .................................................................. 34

*Heckler v. Chaney,*

   470 U.S. 821 (1985) .............................................................................. 40

*Hells Canyon Pres. Council v. U.S. Forest Serv.,*

   593 F.3d 923 (9th Cir. 2010) .................................................................. 36

*In re Bluewater Network,*

   234 F.3d 1305 (D.C. Cir. 2000) ...................................................... 36, 37, 38

*In re Core Commc'ns, Inc.,*

   531 F.3d 849 (D.C. Cir. 2008) ............................................................ 36, 37

*Karahalios v. Nat'l Fed'n of Fed. Emps.,*

   489 U.S. 527 (1989) .............................................................................. 13

*Kerin v. Titeflex Corp.,*

   770 F.3d 978 (1st Cir. 2014) .................................................................. 23

*Lincoln v. Vigil*,

    508 U.S. 182 (1993) ............................................................................... 39, 40

*Littlefield v. Dep't of the Interior*,

    85 F.4th 635 (1st Cir. 2023) ........................................................................ 39

*Lujan v. Defs. of Wildlife*,

    504 U.S. 555 (1992) ....................................................................... 16, 20, 27

*Lujan v. Nat'l Wildlife Fed'n*,

    497 U.S. 871 (1990) ..................................................................... 31, 32, 40

*Mahoney v. Donovan*,

    721 F.3d 633 (D.C. Cir. 2013) ..................................................................... 13

*Markland v. OPM*,

    140 F.3d 1031 (Fed. Cir. 1998) ............................................................... 20, 40

*Maryland v. USDA*,

    2025 WL 1073657 (4th Cir. April 9, 2025) ................................................... 13

*Massachusetts v. EPA*,

    549 U.S. 497 (2007) .................................................................................. 39

*McKenna v. Dep't of Interior*,

    996 F.2d 1235 (Fed. Cir. 1993) ................................................................... 40

*McMahon v. New York*,

    145 S. Ct. 2643 (2025) .......................................................................... 1, 14

*Murthy v. Missouri*,

    603 U.S. 43 (2024) ............................................................................. 16, 27

*Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*,

    120 F.4th 904 (1st Cir. 2024) ..................................................... 16, 24, 26, 30

*Nat'l Treasury Emps. Union v. Vought*,

    2025 WL 2326021 (D.C. Cir. Aug. 13, 2025) ....................................... 33, 38, 45

*Norton v. S. Utah Wilderness All.*,

    542 U.S. 55 (2004) ............................................................. 31, 32, 36, 37, 40

*Nyunt v. Chairman, Broad Bd. of*,

    *Govs.*, 589 F.3d 445 (D.C. Cir. 2009) ........................................................... 12

*Puerto Rico v. United States*,

    490 F.3d 50 (1st Cir. 2007) ............................................................................... 31

*Raines v. Byrd*,

    521 U.S. 811 (1997) .......................................................................................... 16

*Roth v. United States*,

    952 F.2d 611 (1st Cir. 1991) ............................................................................. 11

*Sampson v. Murray*,

    415 U.S. 61 (1974) ............................................................................................ 40

*Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*,

    674 F.3d 97 (1st Cir. 2012) ......................................................................... 36, 39

*Sheldon v. Vilsack*,

    538 F. App'x 644 (6th Cir. 2013) ..................................................................... 36

*Sig Sauer, Inc. v. Brandon*,

    826 F.3d 598 (1st Cir. 2016) ............................................................................. 33

*Somerville Public Schools v. McMahon*,

    139 F.4th 63 (1st Cir. 2025) ........................................................................ 14, 15

*Spokeo, Inc. v. Robins*,

    578 U.S. 330 (2016) .......................................................................................... 17

*Steel Co. v. Citizens for a Better Env't*,

    523 U.S. 83 (1998) ............................................................................................ 10

*Telecomms. Research & Action Ctr. v. FCC*,

    750 F.2d 70 (D.C. Cir. 1984) ........................................................................... 37

*Thunder Basin Coal Co. v. Reich*,

    510 U.S. 200 (1994) .................................................................................... 12, 13

*Towns of Wellesley, Concord & Norwood v. FERC*,

    829 F.2d 275 (1st Cir. 1987) ............................................................................. 37

*Train v. City of New York*,

    420 U.S. 35 (1975) ............................................................................................ 43

*TransUnion LLC v. Ramirez*,

    594 U.S. 413 (2021) .................................................................................... 17, 27

*Trudeau v. Fed. Trade Comm'n*,
  456 F.3d 178 (D.C. Cir. 2006) ................................................................ 35

*Trump v. Am. Fed'n of Gov't Emps.*,
  145 S. Ct. 2635 (2025) ................................................................ 1, 14, 15

*Trump v. Boyle*,
  145 S. Ct. 2653 (2025) ................................................................ 15

*Trump v. CASA, Inc.*,
  145 S. Ct. 2540 (2025) ................................................................ 15

*Tyler v. Hennepin Cnty.*,
  598 U.S. 631 (2023) ................................................................ 16

*United States v. Fausto*,
  484 U.S. 439 (1988) ................................................................ 12, 14

*United States v. Texas*,
  599 U.S. 670 (2023) ................................................................ 15, 22, 23, 25

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978) ................................................................ 40

*Wilson v. Genzyme Corp.*,
  93 F.4th 33 (1st Cir. 2024) ................................................................ 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ................................................................ 44

**Statutes**

2 U.S.C. § 683(a) ................................................................ 42

2 U.S.C. § 684(a) ................................................................ 42

2 U.S.C. § 687 ................................................................ 42

5 U.S.C. § 701(a)(2) ................................................................ 40

5 U.S.C. § 704 ................................................................ 31, 33, 34

5 U.S.C. § 706(1) ................................................................ 36, 37

5 U.S.C. § 706(2) ................................................................ 41

28 U.S.C. § 1491(a) ................................................................ 26

29 U.S.C. § 670(a) ................................................................ 38

42 U.S.C. § 242c(b)(7)................................................................................. 19

42 U.S.C. § 242c(c)(1)................................................................................. 18

42 U.S.C. §§ 3501 ....................................................................................... 3

42 U.S.C. § 8623(1)(A)............................................................................... 29

42 U.S.C. § 9836a(c)(1) .............................................................................. 24

42 U.S.C. § 9902(2) .............................................................................. 18, 19

Pub. L. No. 118-47, 138 Stat. 460 ............................................................. 42

## Constitutional Provisions

Pa. Const. of 1776, § 20……………………………………………….46

S.C. Const. of 1778, art. XVI………………………………………….46

U.S. Const. Art I, § 9, cl. 7......................................................................... 45

## Other Authorities

4 Cong. Rec. 5628 (1876) .......................................................................... 46

90 Fed. Reg. 5917 (Jan. 17, 2025) ....................................................... 9, 18

9/11 World Trade Center Health Program, https://perma.cc/6ARL-6LLD.............. ……………9

Appropriation—Contracts, 21 Op. Att'y Gen. 414 (1896) ....................... 47

Art Kleinschmidt, *Release of the 2024 National Survey on Drug Use and Health: Leveraging the Latest Substance Use and Mental Health Data to Make America Healthy Again*, https://www.samhsa.gov/blog/release-2024-nsduh-leveraging-latest-substance-use-mental-health-data-make-america-healthy-again (Jul. 28, 2025)……… ................................. …….18

Articles of Confederation of 1781, art. IX, para. 5………………………..………………46

Bill of Rights Act 1689, 1 W. & M. 2 ............................................................................... 46

CDC, *About the FFFIPP*, https://perma.cc/6FWG-GJSU………................................ …9, 21

CDC, *Coal Workers' Health Surveillance Program*, https://perma.cc/4AU7-DY6K............. 9, 21

CDC, *Measures of Success*, https://perma.cc/G3FG-96DT ....................................... 18

CDC, *National Firefighter Registry (NFR) for Cancer*, https://perma.cc/6434-J8Z6............. 9, 21

CDC, *Request a NIOSH Health Hazard Evaluation*, https://perma.cc/5P7B-ZUP8 ............... 9, 21

CDC, *Respirator Approval Program*, https://perma.cc/2K6Z-E27D ...................... 9, 21

*Department of Homeland Sec.—Border Barrier Const. & Obligations*, B-335747,
2024 WL 1740422 (Comp. Gen. Apr. 22, 2024) ...................................................... 43

FDA, Approval Letter – NUVAXOVID (May 16, 2025) ........................................... 28

FDA, *Public Health Education Campaigns*,
https://www.fda.gov/tobacco-products/public-health-education/public-health-education-
campaigns…… ....................................................................................................... .……39

FDA, *Results from the Annual National Youth Tobacco Survey*,
https://www.fda.gov/tobacco-products/youth-and-tobacco/results-annual-national-youth-
tobacco-survey-nyts…………………………………………………………………...………39

FDA, *Tobacco Compliance Check Outcomes*, https://timp-ccid.fda.gov/................................8, 21

FDA, *Tobacco Products Marketing Orders*,
https:// https://www.fda.gov/tobacco-products/market-and-distribute-tobacco-product/tobacco-
products-marketing-orders.................................................................. .......8, 21

GAO, *Role as an Audit Institution*, https://www.gao.gov/about/what-gao-does/audit-role... ... ...43

H.R. Rep. No. 81-1797 (1950)..................................................................................... 47

Implementing the President's 'Department of Government Efficiency' Workforce Optimization
Initiative" (Workforce Executive Order). Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11,
2025) ................................................................................................... 5, 6, 7, 8

*James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept.
15, 1981) ................................................................................................... 43

Office of Minority Health, https://minorityhealth.hhs.gov/ ....................................... 29

OPM, *Memorandum re: Guidance on Agency RIF and Reorganization Plans Requested by
Implementing the President's "Department of Government Efficiency" Workforce
Optimization Initiative* ................................................................................ 6, 7

Nile Stanton, *History and Practice of Executive Impoundment of Appropriated Funds*,
53 Neb. L. Rev. 1 (1974) ...................................................................................... 47

Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted
Schools, 1 Op. O.L.C. Supp. 303 (1969) ................................................................ 43

PTTC, *Recent News*, https://perma.cc/Q5FG-ZP7A................................................ 22

SAMHSA, *988 Day*, https://www.samhsa.gov/mental-health/988/newsroom/988-day ………...22

SAMHSA, *Key Substance Abuse and Mental Health Indicators in the United States: Results from the 2024 National Survey on Drug Use and Health*, https://perma.cc/M5CT-HR8C (July 2025) .................................................................................................................. 18

SAMHSA, *HHS Announces $100M in Pilot Funding Opportunity to Eliminate Hepatitis C*, https://www.samhsa.gov/newsroom/press-announcements/20250728/hhs-100m-hepatitis-c-elimination-funding-opportunity (July 28, 2025) ...................................................... 28

SAMHSA, *"Talk. They Hear You." Underage Drinking Campaign*, https://www.samhsa.gov/substance-use/prevention/talk-they-hear-you.................................. 22

SPARS, *New CSAT SOR/TOR Program Instrument Resources and Trainings Now Available on SPARS!*, https://perma.cc/43U8-26XQ (May 9, 2025) ............................................. 22

Strategic Prevention Technical Assistance Ctr., *Events*, https://www.samhsa.gov/technical-assistance/sptac/events ..................................... 22

Thomas Jefferson, *Third Annual Message to Congress* (Oct. 17, 1803)...................................... 46

## INTRODUCTION

The Executive Branch has broad discretion to manage its personnel and order its priorities. Yet in this case, a group of states argue otherwise and seek to enjoin and set aside restructuring and reduction-in-force (RIF) plans currently in progress at the Department of Health and Human Services (HHS or the Department). Plaintiffs theorize throughout their complaint that the restructuring and RIFs have resulted and will result in a violation of the Department's statutory duties. Setting aside that the Department is not violating any of its duties, Plaintiffs' arguments amount to the extraordinary proposition that they, rather than the Executive, should get to dictate how the Department orders its prerogatives and conducts its day-to-day operations. At an early stage of this case, the Court granted a preliminary injunction based in large part on reasoning from preliminary-injunction decisions by other courts. The Supreme Court's recent stays of two of those decisions cast serious doubt on their reasoning and counsel in favor of this Court reconsidering its previous reasoning. *See Trump v. Am. Fed'n of Gov't Emps.*, 606 U.S. __, 145 S. Ct. 2635 (2025) (mem.) (*AFGE 2*); *McMahon v. New York*, 606 U.S. __, 145 S. Ct. 2643 (2025). This Court now should dismiss Plaintiffs' complaint for the reasons advanced here.

Plaintiffs' claims fail on numerous threshold grounds. First, Plaintiffs have brought the wrong claims under the wrong statute. Their claims revolve around federal employment actions, and such claims can be litigated only through the statutory scheme specifically provided by Congress for this purpose. Second, Plaintiffs lack standing to challenge the restructuring and RIFs. Fundamentally, their theory about the RIFs is just wrong: the Department has made clear that it intends to continue carrying out its statutory duties. As a result, the categories of injuries Plaintiffs assert are speculative, attenuated, and non-cognizable, primarily because the restructuring and RIFs are part of an ongoing transition, and it is too soon for Plaintiffs to determine whether they might ever suffer any of the harms they allege. Plaintiffs have not been and will not be injured by

alleged statutory violations. At the very least, Plaintiffs have failed to state any particularized injury as to multiple agencies within the Department, and those agencies should be dismissed because Plaintiffs have not established standing for claims against them. Third, even if the Administrative Procedure Act were a proper vehicle for review—and it is not—the plans for restructuring and RIFs would not be actionable under the statute because they do not constitute discrete, final agency actions. They are only steps in an ongoing (and, for now, partially enjoined) transition that does not affect Plaintiffs' legal rights. Furthermore, the focus of Plaintiffs' allegations is that the RIFs and restructuring will cause (or have caused) the Department to cease performing functions mandated by statute. Thus, Plaintiffs' claims are claims of agency action unlawfully withheld—a type of claim that requires Plaintiffs to surmount a heightened standard that their allegations do not meet.

Setting aside these threshold and jurisdictional defects, Plaintiffs' claims fail on the merits. The Department has stated that the restructured agency will continue carrying out its statutory functions. Just because it is not doing so in the way Plaintiffs prefer does not mean it is violating applicable law. Nor was the decision to better align the Department with its core statutory duties, and consolidate duplicative and overlapping functions, arbitrary and capricious. As for Plaintiffs' *ultra vires* and constitutional claims, binding Supreme Court precedent prohibits Plaintiffs from bringing them as freestanding claims, a proposition with which the D.C. Circuit agreed in a decision released this week. And precedent, history, and tradition foreclose Plaintiffs' implied theory that the Executive must spend all funds allocated by Congress. Moreover, all of Plaintiffs' constitutional claims fail for the same reason as their APA claims.

The Court should dismiss Plaintiffs' complaint.

## STATEMENT CONCERNING HEARING

Under LR Cv 7(c), Defendants defer to the Court regarding the necessity for a hearing on

this motion and the length of that hearing.

## BACKGROUND

### I. <u>The U.S. Department of Health and Human Services</u>

The U.S. Department of Health and Human Services is the federal agency charged with enhancing the health and well-being of Americans, including by fostering advances in the sciences underlying medicine, public health, and social services. *See* 42 U.S.C. §§ 3501 *et seq.* The Department currently consists of 28 distinct staff and operating divisions.

One of these operating divisions is the Centers for Disease Control and Prevention (CDC), which itself consists of several components. Relevant here, the National Center for HIV, Viral Hepatitis, STD, and TB Prevention (NCHHSTP) is a CDC component that seeks to reduce incidence of infection, morbidity, and mortality in connection with certain infectious diseases. The National Center for Chronic Disease Prevention and Health Promotion is a CDC center that includes, among other divisions, the Division of Reproductive Health (DRH), which focuses on issues related to reproductive, maternal, and infant health, and the Office on Smoking and Health (OSH), which works to protect the public's health from the harmful effects of tobacco use by seeking to reduce tobacco-related health disparities, death, and disease. The National Center on Birth Defects and Developmental Disabilities (NCBDDD) works to advance the health and well-being of individuals with birth defects and developmental disabilities and their families. The National Institute for Occupational Safety and Health (NIOSH) conducts research, provides services, and makes recommendations for the prevention of work-related injury and illness. The National Center for Environmental Health (NCEH) plans, directs, and coordinates programs to protect Americans from environmental hazards. Finally, the National Center for Injury Prevention and Control (NCIPC) conducts research, tracks trends, raises awareness, and implements prevention programs to prevent injury, overdose, suicide, and violence.

Another relevant HHS operating division is the Food and Drug Administration (FDA). That division in turn consists of several components. As relevant here, the Center for Biologics Evaluation and Research (CBER) protects and advances public health by ensuring that biological products are safe and effective. The Center for Drug Evaluation and Research (CDER) makes recommendations to update drug labeling and regulates the drug development process, including how new drugs get approved for marketing. The Human Food Program (HFP) oversees all activities related to food safety and nutrition, including efforts to prevent foodborne illness and ensure that food chemicals are safe for consumption. The Center for Veterinary Medicine (CVM) ensures that animal drugs are safe and that food made from animals receiving veterinary care is safe for human consumption. Lastly, among other responsibilities, the Center for Tobacco Products (CTP) sets performance standards, reviews premarket applications for new and modified-risk tobacco products, requires new warning labels, and establishes and enforces advertising and promotion restrictions.

The Administration for Children and Families (ACF) is another HHS operating division, and it contains the Office of Head Start (OHS), the agency which administers the Head Start federal discretionary grant program that promotes school readiness for low-income children up to age five. ACF also includes the Office of Community Services, which administers the Low Income Home Energy Assistance Program (LIHEAP) that provides grants to reduce costs associated with home energy bills.

Another HHS operating division called the Administration for Community Living (ACL) works to maximize the independence, well-being, and health of older adults and people with disabilities, along with their caregivers and families. The Substance Abuse and Mental Health Services Administration (SAMHSA) is an operating division that leads efforts to promote mental

health, prevent substance misuse, and provide treatments to foster recovery and support from mental and substance use disorders.

Finally, HHS staff divisions include the Office of the Assistant Secretary for Planning and Evaluation (ASPE) and the Office of the Assistant Secretary for Health (OASH). Within ASPE is the Division of Data and Technical Analysis, which updates the Federal Poverty Guidelines on an annual basis. Within OASH is the Office of Infectious Disease and HIV/AIDS Policy (OIDP), which provides leadership among federal agencies and stakeholders to reduce the burden of infectious diseases.

## II. **Factual Background**

### A.    **Executive Order 14210**

On February 11, 2025, President Trump issued Executive Order 14210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative" (Workforce Executive Order). Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025). One subpart, titled "Reductions in Force," directs "Agency Heads [to] promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id.* § 3(c). Further, it directs that "[a]ll offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in

appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website." *Id*.

The Workforce Executive Order further provides that agency heads submit to OMB and OPM within 30 days of its issuance (*i.e.*, by March 13, 2025) a report identifying "any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities." *Id.* § 3(e). That report "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated." *Id.* The Executive Order also allows agency heads to "exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities." *Id*. § 4(b). And it provides that it "shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id*. § 5(b).

### B.    February 26, 2025, Workforce Memorandum

On February 26, 2025, OPM and OMB jointly issued a memorandum (Workforce Memorandum) providing guidance for complying with the Workforce Executive Order. *See* OPM, *Memorandum re: Guidance on Agency RIF and Reorganization Plans Requested by* Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative, https://perma.cc/Q9NH-RV8Y. Pursuant to this guidance, "agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily required functions." *Id.* at 2.

The Workforce Memorandum also identifies certain "principles" agencies should consider in undertaking reorganization and reduction actions. Specifically, agencies should:

> seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient

service delivery; and maximally reduce the use of outside consultants and contractors.

*Id.* at 2. In addition, the Workforce Memorandum directs agencies to "review their statutory authority and ensure that their plans and actions are consistent with such authority." *Id.*

The Workforce Memorandum states that agencies should submit ARRPs in two phases: Phase 1 ARRPs, to be submitted by March 13, 2025, "shall focus on initial agency cuts and reductions." *Id.* at 3. Phase 1 ARRPs were to provide, among other things, a list of agency subcomponents or offices that provide direct services to citizens, any statutes that establish those agency or subcomponents, any agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations, "[a] list by job position of all positions categorized as essential for purposes of exclusion from largescale RIFs," and the agency's timetable for implementation of each part of the Phase 1 ARRP. *Id.*

Phase 2 ARRPs were to be submitted by April 14, 2025, and were to "outline a positive vision for more productive, efficient agency operations going forward." *Id.* at 4. Agencies were to provide, among other things, confirmation that the agency has reviewed all its personnel data and plans to ensure that employees are grouped based on like duties and functions to the maximum extent possible; all reductions (of full-time-employee (FTE) positions and otherwise); an explanation of how the ARRP will improve services for Americans and advance the President's priorities; and, for agencies providing direct services to citizens, the agency's certification that implementation of the ARRPs will have a positive effect on the delivery of such services" (a certification that "should include a written explanation from the Agency Head." *Id.* at 5–6. The Workforce Memorandum also delineates timing: it states that Phase 2 Plans should be planned for implementation by September 30, 2025. *Id.* at 4.

C.     **The Department's Implementation of Executive Order 14210 and the Workforce Memorandum**

As a step along the ARRP process, Secretary Robert F. Kennedy, Jr. publicly announced on March 27, 2025, the planned reorganization of certain components of the Department. *See* ECF No. 44-1. The Secretary's announcement does not contemplate the elimination of any statutorily mandated HHS programs or divisions. Instead, the focus is reduction of wasteful spending, increased efficiency, and increased responsiveness to the needs of the American people.

Specifically, the announcement stated that the Department planned to consolidate its existing 28 divisions; centralize shared services including information technology, external affairs, human resources, and procurement; create a new Administration for a Healthy America to coordinate chronic care and disease prevention programs and harmonize health resources to low-income Americans more efficiently; appoint a new Assistant Secretary for Enforcement to combat waste, fraud, and abuse in federal health programs; and consolidate ten regional offices into five. *Id.* at 1–2. The goal of the consolidation and streamlining of agency functions is to reduce redundancy and allow the Department to perform its core functions more efficiently. As the announcement explained, the Department intends to accomplish its goals "without impacting critical services." *Id.* at 1.

As the Department and its operating divisions have continued to plan this restructuring, they are also working to ensure that statutorily mandated programs continue to function. For example, critical CTP functions like tobacco compliance checks and review of pre-market tobacco applications are continuing. *See* FDA, *Tobacco Compliance Check Outcomes*, https://timp-ccid.fda.gov/ (last visited Aug. 15, 2025) (demonstrating that compliance checks have continued to occur from January through July 2025); *see* FDA, *Tobacco Products Marketing Orders*, https:// https://www.fda.gov/tobacco-products/market-and-distribute-tobacco-product/tobacco-products-

- 8 -

marketing-orders (last visited Aug. 15, 2025) (demonstrating continued review of applications and issuance of decisions from January through mid-July 2025). NIOSH is also continuing to operate the Coal Miner Health Surveillance Program, the Health Hazard Evaluations, the Fire Fighter Fatality Investigation and Prevention Program, the National Firefighter Registry for Cancer, the World Trade Center Health Program, and the National Personal Protective Technology Laboratory, all of which are operational. Their websites do not reflect any notice or alert indicating their services are unavailable.[1] Similarly, employees from the Division of Data and Technical Analysis within ASPE were subject to the RIFs, but the annual requirement for the Department to revise the Federal Poverty Guidelines—a function that had been managed by this ASPE division— has already been completed for this year, *see* 90 Fed. Reg. 5917 (Jan. 17, 2025), allowing ample time for this function to be consolidated with other functions before the next annual revision is due in January 2026.

HHS and its operating divisions have in some cases determined that employees who had initially received RIF notices should be returned to work. For example, on May 13, 2025, the Department provided notice to more than 300 NIOSH employees that they would not be affected by the upcoming RIFs and should return to work. Decl. of John J. Howard ¶ 3, ECF No. 52-1. More recently, the Department determined that RIF notices for 467 CDC employees should be rescinded. *See* Decl. of Sara Patterson ¶ 3, ECF No. 70-1; Decl. of Sara Patterson ¶ 4, ECF No. 82-1. Those employees would be returned to a host of CDC components, including NCEH and

---

[1] *See* CDC, *Coal Workers' Health Surveillance Program*, https://perma.cc/4AU7-DY6K (last visited Aug. 14, 2025); CDC, *Request a NIOSH Health Hazard Evaluation*, https://perma.cc/5P7B-ZUP8 (last visited Aug. 14, 2025); CDC, *About the FFFIPP*, https://perma.cc/6FWG-GJSU (last visited Aug. 14, 2025); CDC, *National Firefighter Registry (NFR) for Cancer*, https://perma.cc/6434-J8Z6 (last visited Aug. 14, 2025); 9/11 World Trade Center Health Program, https://perma.cc/6ARL-6LLD (last visited Aug. 14, 2025), CDC, *Respirator Approval Program*, https://perma.cc/2K6Z-E27D (last visited Aug. 14, 2025).

NCHHSTP, *id.* ¶ 4, and would restore support for NCEH's agreements for lead poisoning, asthma, and environmental public health tracking, as well as NCHHSTP's research and lab testing activities. *Id.* ¶¶ 8–10. At the same time, the Department is ensuring that statutorily mandated programs will continue, as required by the Workforce Executive Order and Workforce Memorandum.

### III. Procedural Background

On May 5, 2025, Plaintiffs filed this lawsuit against the Secretary, the Department, and several Department agencies and agency heads (together, Defendants). *See* ECF No. 1. Plaintiffs' complaint alleges five claims under the U.S. Constitution and the APA. On May 9, Plaintiffs filed a motion for a preliminary injunction, asking the Court to enjoin the planned restructuring and RIFs announced in the March 27 press release as to four components: CDC, CTP, OHS and Head Start regional offices, and ASPE. *See* ECF No. 44. On July 1, 2025, the Court entered a preliminary injunction enjoining Defendants from "taking any actions to implement or enforce" the restructuring as to HHS components at issue in Plaintiffs' motion. ECF No. 73 at 56. On August 12, 2025, the Court clarified that the preliminary injunction applies only to particular subcomponents: CTP, OHS and OHS regional staff, NCHHSTP, DRH, NIOSH, OSH, NCEH, NCBDDD, and ASPE's Division of Data and Technical Analysis. ECF No. 89. Defendants have appealed the preliminary injunction. *See New York v. Kennedy*, No. 25-1780 (1st Cir.).

### LEGAL STANDARD

Defendants move to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Under Rule 12(b)(1), Plaintiffs bear the burden to establish subject matter jurisdiction, and the Court must determine whether it has jurisdiction before addressing the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95, 104 (1998). Standing is "a prerequisite to" a court's subject matter jurisdiction. *Dantzler, Inc. v. Empresas Berríos Inventory and*

*Operations, Inc.*, 958 F.3d 38, 46 (1st Cir. 2020) (quotation marks omitted). When adjudicating a

12(b)(1) motion, courts may consider material from outside the pleadings. *See Gonzalez v. United*

*States*, 284 F.3d 281, 288 (1st Cir. 2002). As for Rule 12(b)(6), a court should grant a motion to

dismiss under that rule if the complaint does not contain "enough facts to state a claim to relief

that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

## ARGUMENT

### I. This Court Lacks Jurisdiction.

#### A. The CSRA Precludes District-Court Jurisdiction Over Plaintiffs' Claims.

The entire Complaint should be dismissed because the Court lacks jurisdiction to

adjudicate Plaintiffs' challenges to the employment decisions of federal agencies. The Civil

Service Reform Act (CSRA) and the Federal Service Labor-Management Relations Statute (FSL-

MRS) together provide a comprehensive "scheme of administrative and judicial review" for

resolving both disputes between employees and their federal employers and disputes brought by

unions representing those employees. *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748,

752 (D.C. Cir. 2019) (*AFGE*) (regarding FSL-MRS); *see also Roth v. United States*, 952 F.2d 611,

615 (1st Cir. 1991) (stating that "Congress intended [the CSRA] to provide an exclusive procedure

for challenging federal personnel decisions" (citation omitted)); *Graham v. Ashcroft*, 358 F.3d 931,

933 (D.C. Cir. 2004) (similar). In the CSRA, Congress made the Merit Systems Protection Board

(MSPB) and Federal Labor Relations Authority (FLRA) the exclusive fora in which federal

employees, labor unions, and other interested parties may raise challenges to final, non-

discrimination-related, adverse employment actions.[2] *See United States v. Fausto*, 484 U.S. 439, 455 (1988). CSRA channeling is required even when such disputes involve constitutional claims. *See Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10–15 (2012) (citation omitted); *see also, e.g.*, *AFGE*, 929 F.3d at 752.

The D.C. Circuit's decision in *AFGE* provides a roadmap for analysis here. In that case, the court applied the "two-step framework set forth in" *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), to conclude that the union plaintiffs could not challenge in district court three executive orders related to federal employment. *AFGE*, 929 F.3d at 754. Under that framework, district courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of appeals is "(i) fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *See id.* at 755 (citations omitted).

The framework is satisfied here. As to the first step, the Supreme Court has held repeatedly that the CSRA provides the exclusive means of redressing employment disputes involving federal employees. *See Elgin*, 567 U.S. at 10–15; *Fausto*, 484 U.S. at 455. In other words, Congress intended to make the FSL-MRS and CSRA the exclusive review scheme.

As to the second step, beyond restricting judicial review of covered constitutional claims, the CSRA prevents district courts from deciding the merits of APA claims challenging an agency's "systemwide . . . policy interpreting a statute," its "implementation of such a policy in a particular case," *Nyunt v. Chairman, Broad Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quotation

---

[2] As argued *infra* at pages 31–35, the RIFs and restructuring at issue in this case do not constitute "final agency action" in the sense required for APA review. However, if the Court disagrees on that point, the argument in this section provides an independent alternative basis for dismissing the case as to the RIFs at minimum.

marks omitted), or its decision to engage in "a *type* of personnel action the [CSRA] does not cover," *Mahoney v. Donovan*, 721 F.3d 633, 635–36 (D.C. Cir. 2013) (citation and quotation marks omitted); *but see Axon Ent., Inc. v. FTC*, 598 U.S. 175 (2023).

That Plaintiffs have framed their alleged injuries partly in constitutional terms does not allow them to sidestep CSRA's mandatory channeling regime. *Cf. Maryland v. USDA*, 2025 WL 1073657, at *1 (4th Cir. April 9, 2025). Were it otherwise, downstream users of government services could always go directly to court to raise challenges to agency reductions in force despite Congress's determination that the employees themselves must first pursue relief administratively. Courts have repeatedly rejected these sorts of end runs. In *Elgin*, the Supreme Court held that even if a federal employee was raising constitutional claims, the CSRA imposes an "implied preclusion of district court jurisdiction." 567 U.S. at 12. Similarly, in *AFGE*, numerous federal unions asserted broad constitutional and statutory challenges to a set of three Executive Orders. *See* 929 F.3d at 752. The D.C. Circuit held that the FLRA provided the exclusive avenue through which unions could bring their claims. *See id*. at 754–61 (citing *Thunder Basin*, 510 U.S. at 212–16). In short, because "district courts do not have concurrent jurisdiction over matters within the exclusive purview of the FLRA," this Court should reject Plaintiffs' effort to disrupt Congress's review scheme and to seek premature, improper review before this Court. *Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*, 367 F.3d 932, 935 (D.C. Cir. 2004) (citing *Karahalios v. Nat'l Fed'n of Fed. Emps.*, 489 U.S. 527, 533 (1989)).

This limitation is not only doctrinally mandated; it also makes common sense because Plaintiffs are not members of the class benefited by Congress's comprehensive statutory structure. It would be odd if strangers to the federal-employment relationship—such as Plaintiffs here— could raise claims in this Court that the affected federal employees cannot themselves raise. The

"exclusion" of Plaintiffs "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [Plaintiffs] from seeking review" under other provisions. *Fausto*, 484 U.S. at 455. When a comprehensive scheme of the sort at issue here permits review at the behest of some types of plaintiffs but not others, it implicitly precludes review by plaintiffs who are not authorized to bring claims. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347–48 (1984); *see Fausto*, 484 U.S. at 448 (applying *Block* to conclude that certain employees who lacked CSRA appeal rights "should not be able to demand judicial review for the type of personnel action covered by that chapter"). Congress intentionally foreclosed judicial review for parties other than those specifically authorized to seek relief; therefore, Plaintiffs, who are not employees of the Department, cannot challenge the Department's employment actions.

Defendants acknowledge that this Court previously held that Plaintiffs' claims are not subject to CSRA channeling. *See* ECF No. 73 at 23–28. But subsequent guidance from the Supreme Court counsels for revisiting that determination. This Court relied on "the Ninth Circuit's reasoning and conclusion" in *American Federation of Government Employees v. Trump*, 139 F.4th 1020 (9th Cir. 2025), to hold that the CSRA does not preclude jurisdiction. *See id.* at 24–26. The Supreme Court has since stayed that injunction. *See AFGE 2*, 145 S. Ct. at 2635. This Court also "look[ed] to" the First Circuit's reasoning in *Somerville Public Schools v. McMahon*, 139 F.4th 63 (1st Cir. 2025), while analyzing Defendants' CSRA channeling argument here. *See* ECF No. 73 at 24. The Supreme Court subsequently stayed the First Circuit's injunction pending appeal. *See McMahon*, 145 S. Ct. at 2643; *see generally* Defendants' Motion to Vacate, ECF No. 78.

Such decisions "on the interim legal status of" Executive activities are entitled to great weight: they "will often constitute a form of precedent (*de jure* or *de facto*) that provides guidance throughout the United States during the years-long interim period until a final decision on the

merits." *Trump v. CASA, Inc.*, 606 U.S. __, 145 S. Ct. 2540, 2570 (2025) (Kavanaugh, J., concurring); *see also Trump v. Boyle*, 606 U.S. __, 145 S. Ct. 2653, 2654 (2025) ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases."). The *McMahon* and *AFGE 2* stays provide particularly weighty guidance here. Like this case, *McMahon* addressed a RIF at a Cabinet agency; the plaintiffs there alleged, as Plaintiffs do here, that the RIF "made it effectively impossible for the Department to carry out its statutorily mandated functions." *Somerville*, 139 F.4th at 69 (quotation marks omitted). Moreover, as here, many of the *McMahon* plaintiffs are states. As for *AFGE 2*, although the Court did not opine on the legality of any specific ARRP, *see* 145 S. Ct. at 2635, its reasoning and result indicate that the Supreme Court likely would side with the Government on core issues relating to the scope of Executive authority to reorganize Executive agencies. *See AFGE 2*, 145 S. Ct. at 2635 (granting stay "[b]ecause the Government is likely to succeed on its argument that the Executive Order and Memorandum are lawful"). These recent stay orders cast doubt on this Court's reliance on the lower courts' decisions in those cases.

In sum, CSRA's channeling provisions preclude this Court's review of Plaintiffs' claims. Everything about those claims, and the remedies Plaintiffs seek, derives from the relationship between the federal government and its employees, to which Plaintiffs and their members are strangers. Plaintiffs cannot step into the shoes of those employees and assert claims against the Department that the employees cannot themselves assert in federal district court but instead must pursue before the FLRA or the MSPB.

## B.    Plaintiffs Lack Article III Standing.

Standing is a "bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). It requires that a plaintiff "possess a personal stake" in the outcome, which "helps

ensure that courts decide litigants' legal rights in specific cases, as Article III requires." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Standing doctrine thus "serves to protect the 'autonomy' of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *Id.* at 379–80 (citation omitted). Standing is not "dispensed in gross," *Wilson v. Genzyme Corp.*, 93 F.4th 33, 40 (1st Cir. 2024) (quotation marks omitted), meaning that "for every defendant, there must be at least one plaintiff with standing," *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). A plaintiff must plead facts "on the face of [its] complaint" that support standing. *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 637 (2023). And, at the pleading stage, standing is determined based on the allegations in the complaint. *See Dantzler*, 958 F.3d at 47. "Conclusory assertions or unfounded speculation will not suffice." *Id.*

Under any theory of standing, "the irreducible constitutional minimum" requires that (1) the plaintiff has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). "Injury in fact" requires "an invasion of a legally protected interest." *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (citation omitted). If the plaintiff relies on a "risk of future harm" to a legally protected interest, that future harm must be "certainly impending," or there must be a "substantial risk" that it "will occur." *Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*, 120 F.4th 904, 910 (1st Cir. 2024) (*NAGE*) (citation omitted). And "when (as here) a plaintiff challenges the government's unlawful regulation (or lack of regulation) of *someone else*, standing is not precluded, but it is ordinarily substantially more difficult to establish." *All. for Hippocratic Med.*, 602 U.S. at 382 (emphasis in original) (citation and quotation marks omitted).

This Court's previous conclusion that Plaintiffs had standing at the preliminary-injunction stage was a statement "of [a] probable outcome[]" and does not conclusively determine standing for the rest of the case. *A.M. Capen's Co. v. Am. Trading & Prod. Corp.*, 202 F.3d 469, 473 (1st Cir. 2000) (quotation marks omitted). Moreover, Plaintiffs must assert standing as to "each defendant," and multiple Defendants here were not implicated by the preliminary-injunction motion. *Carney v. Adams*, 592 U.S. 53, 61 (2020). Regardless of its determination as to the other Defendants, the Court must address standing afresh with respect to these Defendants.

Plaintiffs appear to assert three theories of injury resulting from (1) not receiving information previously provided by the Department; (2) not receiving services previously provided by the Department; and (3) canceled or soon-expiring grants. All of these theories fail. Moreover, as to some of the programs about which they complain, Plaintiffs fail to allege a personal stake in the litigation, defeating standing for claims regarding those programs.

1. Plaintiffs Lack Cognizable Informational Injury.

First, Plaintiffs have not suffered a cognizable informational injury or causation. To establish informational injury under Article III, Plaintiffs must show that (1) they "lack access to information to which [they are] legally entitled" and (2) "the denial of that information creates a 'real' harm with an adverse effect." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)); *see also Amrhein v. eClinical Works, LLC*, 954 F.3d 328, 332–33 (1st Cir. 2020). Even if a statute requires the provision of information, "a bare procedural violation" is not enough to give Plaintiffs standing. *Spokeo*, 578 U.S. at 341. They must still show "a concrete injury" caused by lack of access to the information. *Id.* Here, that means Plaintiffs must show that alleged informational deficiencies resulting from the Department's restructuring caused real-life "consequences." *TransUnion LLC v. Ramirez*, 594

U.S. 413, 442 (2021) (holding that "an asserted informational injury that causes no adverse effects cannot satisfy Article III" (quotation marks omitted)).

Many of Plaintiffs' allegations fail the first element of informational standing because they do not allege any current or imminent deprivation of information to which they are legally entitled. For example, Plaintiffs claim that the CDC must "update the required Strategic Plan" in light of the recent ARRPs and post that Plan to the agency's website. Compl. ¶ 116. Yet the law requires the Secretary to update the Plan every four years, not any time the agency's priorities change. *See* 42 U.S.C. § 242c(c)(1). And the current Plan is on the website, contrary to Plaintiffs' allegation. *Compare* CDC, *Measures of Success*, https://perma.cc/G3FG-96DT (updated Feb. 6, 2024), *with* Compl. ¶ 116. Similarly, Plaintiffs allege that the law requires SAMHSA to publish data collected through the National Survey on Drug Use and Health (NSDUH) and that SAMHSA has ceased collecting that data. *See* Compl. ¶¶ 280, 292. Contrary to that allegation, SAMHSA has since published the 2024 NSDUH data on its website. *See* SAMHSA, *Key Substance Abuse and Mental Health Indicators in the United States: Results from the 2024 National Survey on Drug Use and Health*, https://perma.cc/M5CT-HR8C (July 2025). This "represents the earliest release of the annual NSDUH report." Art Kleinschmidt, *Release of the 2024 National Survey on Drug Use and Health: Leveraging the Latest Substance Use and Mental Health Data to Make America Healthy Again*, https://www.samhsa.gov/blog/release-2024-nsduh-leveraging-latest-substance-use-mental-health-data-make-america-healthy-again (Jul. 28, 2025).

Similar issues plague Plaintiffs' allegations about the poverty guidelines, which Plaintiffs worry will be "inaccurate or out-of-date" due to the restructuring. Compl. ¶ 300. But the Secretary is required to revise "the poverty line" annually. 42 U.S.C. § 9902(2). That deadline has already been met for this year, *see* 90 Fed. Reg. 5917 (Jan. 17, 2025), and the authorizing statute does not

require that the revision be done by any particular office, *see* 42 U.S.C. § 9902(2). Plaintiffs thus have all the information regarding poverty guidelines that the law requires the Secretary to publish. For these allegations, Plaintiffs have failed to allege any deprivation of legally required information.

In other allegations, Plaintiffs do not identify information that is legally required. For example, Plaintiffs allege that the CDC will stop communicating information to them as required by law, *see* 42 U.S.C. § 242c(b)(7), simply because the CDC communications team allegedly lost its leaders and employees, *see* Compl. ¶ 117. The CDC must "communicate" with public and private entities, including through annual meetings, but the statute does not require any other specific mode of communication or that it be conducted by particular staff inside the CDC. 42 U.S.C. § 242c(b)(7). Plaintiffs also say that CDC "partnered with the Consumer Product Safety Commission" (CPSC) to collect and publish data as part of the National Electronic Injury Surveillance System. Compl. ¶ 226. Plaintiffs allege that any future data collection as part of the study "will be significantly limited." *Id.* Plaintiffs not only never specify how they rely on this particular dataset, but they provide no basis to suggest that the CDC is required by statute to collaborate with the CPSC to collect and publish that data.

In some instances, Plaintiffs identify information that statutes do, in fact, require the Department to collect or provide and that allegedly is not being provided. The collection of certain pregnancy- and maternal-risk-related data (referred to as PRAMS data) under 42 U.S.C. § 247b-12, arguably falls in this category, as does the collection of data by OSH under 15 U.S.C. § 1341. As an initial matter, Plaintiffs do not show that this information is being intentionally withheld or indefinitely suspended, and Plaintiffs do not allege that this information has been unavailable long enough to violate any statutory requirement. Given the Workforce Executive

Order's direction to implement ARRPs consistent with applicable law and the Department's stated intention to proceed "without impacting critical services," the reasonable interpretation is a temporary lapse in providing the information rather than a refusal to undergo statutorily mandated collections and publications. ECF No. 44-1 at 1. But even to the extent that Plaintiffs plausibly allege that required information is delayed or not provided at this time, these assertions of standing still have two flaws.

First, Plaintiffs have not shown any concrete and particularized harm based on lack of access to the information. Lack of access without more is not enough. For PRAMS, Plaintiffs' apparent injury is that they might not operate in their preferred manner without the CDC's "knowledge of key maternal and infant health indicators." Compl. ¶ 177. Plaintiffs' only specific example is of Connecticut using PRAMS data "to collaborate with community and state organizations and provide insights" regarding the Medicaid population. *Id.* ¶ 176. Connecticut can still collaborate and provide insights without access to completely updated PRAMs data. States can also still "evaluate their work and monitor progress in tobacco use prevention" despite a temporary pause in reports from OSH. *Id.* ¶ 167.

Second, even if Plaintiffs could show concrete harm from a lack of access to information, they do not show that the services they use would resume to their liking if restructuring efforts were reversed or if particular employees were reinstated. After all, the Department still has discretion to hire and fire employees. *See Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998) (specific to RIFs, agencies are entitled to "wide discretion"). The absence of redressability defeats standing. *See Lujan*, 504 U.S. at 560–61.

2. Plaintiffs Lack Cognizable Injury Based on Services Allegedly Not Provided.

Next, Plaintiffs have not suffered cognizable injury based on non-provision of services for

multiple reasons.

Most fundamentally, Plaintiffs incorrectly allege that certain services are not being provided when they are still being provided. Take, for example, Plaintiffs' allegations regarding NIOSH. Contrary to those allegations, the Coal Miner Health Surveillance Program, the Health Hazard Evaluations, the Fire Fighter Fatality Investigation and Prevention Program, the National Firefighter Registry for Cancer, the World Trade Center Health Program, and the National Personal Protective Technology Laboratory are all operational. Their websites do not reflect any notice or alert indicating their services are unavailable to the public.[3] *Contra* Compl. ¶¶ 140–44. The NIOSH director of that agency has already sworn to this Court that employees whose RIF notices were rescinded would "aid in restoring functionality" to these programs. *See* ECF No. 52-1 ¶¶ 5–6); *see also Gonzalez*, 284 F.3d at 288 (court may consider material outside the pleadings on a 12(b)(1) motion). And despite Plaintiffs' allegation that CTP "cannot continue to operate," Compl. ¶ 248, it has continued to conduct compliance checks as required by 21 U.S.C. § 387f, *see* FDA, *Tobacco Compliance Check Outcomes*, https://timp-ccid.fda.gov/ (last visited Aug. 15, 2025) (demonstrating that compliance checks have continued to occur). CTP review of pre-market tobacco applications also continues as required by 21 U.S.C. § 387j. *See* FDA, *Tobacco Products Marketing Orders*, https://www.fda.gov/tobacco-products/market-and-distribute-tobacco-product/tobacco-products-marketing-orders (last visited Aug. 15, 2025) (demonstrating continued review of applications and issuance of decisions from January through July 2025).

---

[3] *See* CDC, *Coal Workers' Health Surveillance Program*, https://perma.cc/4AU7-DY6K (last visited Aug. 14, 2025); CDC, *Request a NIOSH Health Hazard Evaluation*, https://perma.cc/5P7B-ZUP8 (last updated Jun. 2, 2025); CDC, *About the FFFIPP*, https://perma.cc/6FWG-GJSU (last visited Aug. 14, 2025); CDC, *National Firefighter Registry (NFR) for Cancer*, https://perma.cc/6434-J8Z6 (last visited Aug. 14, 2025); 9/11 World Trade Center Health Program, https://perma.cc/6ARL-6LLD (last visited Aug. 14, 2025), CDC, *Respirator Approval Program*, https://perma.cc/2K6Z-E27D (last visited Aug. 14, 2025).

Plaintiffs' allegations about SAMHSA similarly allege nonexistent lapses in service. The 988 Lifeline remains fully operational, as does the "Talk. They Hear You" campaign.[4] *Contra* Compl. ¶¶ 290, 294. And although Plaintiffs assert that they "have lost the benefit" of assistance from the State/Tribal Opioid Response programs, the Strategic Prevention Technical Assistance Center, and the Prevention Technology Transfer Center Network, *see id.* ¶ 294, the websites for those programs make clear they are still in operation.[5]

Otherwise, Plaintiffs allege that the Department is not providing services that they have historically benefited from, and they allege that they will incur (or are incurring) expenses to find alternative sources of such services. *See, e.g.*, Compl. ¶¶ 145 (alleging potential future difficulty sourcing respirators due to restructuring); 146 ("States will need to curtail their own activities or divert funding" to "fill the gap"); 149 (monitoring previously performed by NIOSH "will now be borne fully by states"). But that theory is inconsistent with Supreme Court precedent. In *United States v. Texas*, states challenged a federal immigration policy that would "impose[] costs on the States." 599 U.S. at 674. The states claimed the government's immigration-enforcement decisions would force them to "supply social services such as healthcare and education" to additional persons. *Id.* The Supreme Court held that the states lacked standing, explaining that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an

---

[4] *See* SAMHSA, *988 Day*, https://www.samhsa.gov/mental-health/988/newsroom/988-day (last visited Aug. 15, 2025); SAMHSA, *"Talk. They Hear You." Underage Drinking Campaign*, https://www.samhsa.gov/substance-use/prevention/talk-they-hear-you (last visited Aug. 15, 2025).

[5] *See* SPARS, *New CSAT SOR/TOR Program Instrument Resources and Trainings Now Available on SPARS!*, https://perma.cc/43U8-26XQ (May 9, 2025); Strategic Prevention Technical Assistance Ctr., *Events*, https://www.samhsa.gov/technical-assistance/sptac/events (last visited Aug. 15, 2025) (stating that SPTAC is "currently updating our events page"); PTTC, *Recent News*, https://perma.cc/Q5FG-ZP7A (most recent publication on August 1, 2025).

executive agency or officer." *Id.* at 680 n.3. "[I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id.* And the states' "indirect effects" standing theory was too "attenuated" to amount to a constitutionally sufficient injury. *Id.*; *see also, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (rejecting contention that any federal policy that "imposes peripheral costs on a State creates a cognizable Article III injury").

Similarly, here, Plaintiffs assert that the RIFs and restructuring have inflicted or may inflict downstream harms on the states' budgets and resources. They allege, for example, that they "will need to curtail their own activities or divert funding from other necessary programs to fill the gap" caused by the loss of workers at NIOSH and must "fully" bear the monitoring costs previously expended by NIOSH. Compl. ¶¶ 146, 149. Elsewhere, Plaintiffs allege that they will need to take on "the high cost of producing new ads" regarding smoking education, *id.* ¶ 184, and the "inspection and licensure burden" for Head Start-affiliated centers at some point in the future, *id.* ¶ 261. Such remote and speculative harms are not cognizable injuries-in-fact. *See Texas*, 599 U.S. at 674, 680 n.3; *Kerin v. Titeflex Corp.*, 770 F.3d 978, 982–83 (1st Cir. 2014). Were the rule otherwise, states could claim standing to second-guess nearly any federal personnel decision— whether that be hirings, firings, or relocations—on the theory that the decision has a downstream effect on state resources. *See Arizona*, 40 F.4th at 386 (rejecting a peripheral-costs theory as "boundless" and "a bridge much too far"). The theory could reach far beyond federal personnel decisions, too, to the litany of federal policies that "frequently generate indirect effects on state revenues or state spending." *Id.*

Indeed, Plaintiffs often support their allegations with speculation that if HHS stops providing certain services as a result of its restructuring, certain harms will result. These predicted

- 23 -

harms include difficulties recruiting foster parents without Head Start programs, *see* Compl. ¶ 260, and fears that it will be more difficult to "apply for [ACL] grants and receive funds in a timely manner," *id.* ¶ 277. *See also id.* ¶ 308 (Plaintiffs "fear the abrupt closure of half of the regional offices will cause disruption" in "the disbursement of obligated funds" and delays or suspensions of services). These allegations evince little more than an apprehension about the future. *See NAGE*, 120 F.4th at 910 (finding plaintiff lacked standing to seek injunctive relief "because its anticipated future harms" were "far too speculative"). Especially given the Department's focus on avoiding disruption of critical services, the risk that any of them will actually materialize is not imminent.

Even to the extent that Plaintiffs assert a more direct (and less downstream) interest in receiving Department services, they have not shown that the Department is failing to provide statutorily required services. For example, no indication exists that the Head Start monitoring required under 42 U.S.C. § 9836a(c) is not being completed as required. *Contra* Compl. ¶ 262. And although Plaintiffs allege that regional-office closures will cause the Department not to perform certain review services, *id.* ¶ 261, not enough time has passed for there to have been a monitoring disruption. The statute requires standard reviews every three years and six- or 12-month reviews for deficient or newly designated agencies. 42 U.S.C. § 9836a(c)(1)(A)-(C). Because far less time than any of those intervals has passed, whether required monitoring will in fact be disrupted is speculation. And "site visits" are not statutorily required. Compl. ¶ 262; *accord* ECF No. 73 at 46 n.12 (Court acknowledging that site visits are not required). Especially given the Department's intent to streamline "without impacting critical services," there is no basis for assuming that disruption of statutorily mandated programs will occur in the reorganized Department. ECF No. 44-1 at 1.

Ultimately, Plaintiffs have failed to identify any "case or historical practice" offering

precedent for the notion that courts can micromanage federal personnel policies to produce particular downstream effects. *Texas*, 599 U.S. at 677. On their theory of harm, any plaintiff purportedly aggrieved by deficient government services might even seek to compel terminations of underperforming employees and then compel the government to hire better workers in their place. Or a plaintiff might seek to require that the Executive Branch put in place a restructuring plan with different goals and directives. The Supreme Court has declined to recognize standing for such a theory of injury because doing so would "interpose the federal courts as virtually continuing monitors of the wisdom and soundness of . . . administration, contrary to the more modest role Article III envisions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006) (cleaned up). In short, an injury based on services not being provided in the way Plaintiffs prefer is not one "traditionally thought to be capable of resolution through the judicial process." *See Texas*, 599 U.S. at 676 (citation omitted).

At minimum, a handful of particularized allegations of some delay or disruption in a government service cannot justify sweeping relief freezing in place an entire restructuring effort. If Plaintiffs adequately alleged that they are entitled to particular information or services that they did not receive within a required timeframe, they would at most have standing to seek provision of such information or services—not an order requiring the Department to provide it in a particular fashion or with particular staff. Courts may not grant relief for a supposed injury that goes far beyond redressing the injury itself. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018).

3. Plaintiffs Cannot Establish Standing Based on Alleged Lapses in State-Program Funding.

Plaintiffs allege in some places that grants or funding for existing state programs will be terminated or that their continued availability is in question. *See* Compl. ¶ 196 (alleging that New York "received the April 10 notice that funding would be terminated," meaning New York "will

lose $300,000 in [NCHHSTP] grant funding."). Other allegations fear that funding will run out or expected grants will not be supplied in the future. *See id.* ¶¶ 186 (alleging that Plaintiffs "stand to lose approximately $16 million in funding for their state quitlines" due to changes at OSH); 293 (alleging that Plaintiffs "have no means of submitting inquiries or confirming the approval or distribution of [SAMHSA] grants"). Plaintiffs cannot establish standing based on those alleged harms.

Alleged injuries based on *threatened* losses of funding—which appear to be the majority, if not the entirety, of Plaintiffs' grant-related claims—are too speculative to support standing. *See NAGE*, 120 F.4th at 910 (finding plaintiff lacked standing to seek injunctive relief "because its anticipated future harms" were "far too speculative"). Thus, this Court should not consider those claims on the merits.

Defendants do not read Plaintiffs' allegation about New York receiving notice of future termination of a NCHHSTP grant as having alleged that the grant was actually terminated. *See* Compl. ¶ 196. But even if Plaintiffs are alleging an actual termination there or elsewhere in the Complaint, any such claim is in the wrong court and should be brought instead in the Court of Federal Claims. In *Department of Education v. California*, 145 S. Ct. 966, 968 (2025) (per curiam), the Supreme Court stayed a district court's order requiring the Government to pay "past-due grant obligations and to continue paying obligations as they accrue." Because the claims asserted were based on "'express or implied contract[s]' with the United States," the APA's "limited waiver of immunity" did not apply, and the Tucker Act granted jurisdiction to the Court of Federal Claims. *Id.* (quoting 28 U.S.C. § 1491(a)). That reasoning applies squarely to any allegation here of a breach of a specific funding agreement.

Moreover, even if this Court had jurisdiction over such a claim, freezing the restructuring

in place or halting the RIFs would not necessarily lead to restoration of previously canceled funding. Plaintiffs thus fail to show that their requested relief would redress any injury based on an allegedly terminated grant. Therefore, Plaintiffs lack standing for such a claim. *See Lujan*, 504 U.S. at 560–61.

    4.  <u>For Some Agencies, Plaintiffs Have Not Stated Any Particularized Injury.</u>

Defendants have proffered multiple reasons above for why Plaintiffs' theories of injury are insufficient. In addition, certain allegations as to certain agencies simply fail to explain or state Plaintiffs' "personal stake" in actions taken by those agencies. *TransUnion*, 594 U.S. at 423. For many programs, Plaintiffs merely describe the RIFs and claim that certain agency functions might not occur as a result, but Plaintiffs do not allege any alleged injury to them from the purported lapses. Plaintiffs therefore lack standing as to those agencies. *See Murthy*, 603 U.S. at 61 ("[F]or *every* defendant, there must be at least one plaintiff with standing." (emphasis added)). Alternatively, and for the same reasons, Plaintiffs' allegations as to these agencies are insufficiently detailed to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Court thus may also dismiss these allegations under Rule 12(b)(6).

***FDA.*** Consider, for example, the allegations regarding FDA. At no point do Plaintiffs allege that they rely on any activities conducted by CBER, CDER, HFP, or CVM. Their assertion that the restructuring at those agencies "will cripple the Administration's ability to perform its statutory mandate," Compl. ¶ 245, is not only an unsubstantiated prediction, but also a "generalized grievance" that cannot support standing, *Lujan*, 504 U.S. at 575. The most Plaintiffs say is that FDA suspended a planned exercise "that was to be coordinated with a network of veterinary testing labs around the country." Compl. ¶ 246. Plaintiffs have not alleged that the exercise was required by statute, that it involved labs run by Plaintiffs, or how the suspension affected services on which Plaintiffs rely. Similarly, Plaintiffs allege that FDA missed a deadline

for approval of a vaccine in April. *See id.* ¶ 245. But they do not explain how the allegedly missed deadline impacts *them*. And even assuming that the alleged deadline is statutorily mandated (and Plaintiffs never allege that it is), Plaintiffs have no standing to sue "based only on an asserted right to have the Government act in accordance with the law." *All. for Hippocratic Med.*, 602 U.S. at 381 (quotation marks omitted).[6] As to FDA, then, Plaintiffs do not state any particularized injury about most FDA components. And, as to the one component about which Plaintiffs' allegations are more particularized—CTP—the functions at issue are still occurring. CTP continues to engage in statutorily mandated compliance checks and reviews of PMTA applications. *See supra* at 8–9. Thus, Plaintiffs have failed to state a particularized injury, and their allegations are insufficiently detailed to state a claim. FDA and Commissioner Makary should be dismissed as Defendants.

**SAMHSA.** Similarly, Plaintiffs have not stated an injury as to SAMHSA. Plaintiffs allege that SAMHSA has not provided NSDUH data or operated the 988 Lifeline, the State/Tribal Opioid Response program, the Strategic Prevention Technical Assistance Center, the Prevention Technology Transfer Network, or the "Talk. They Hear You" campaign, with threadbare allegations as to how these alleged lapses have impacted Plaintiffs. *See* Compl. ¶¶ 292, 294. Further, as noted already, those services are still in operation, and NSDUH data has been published. *See supra* at 18, 22. As for Plaintiffs' allegation that they cannot submit inquiries regarding grants due to staff terminations, *id.* ¶ 293, no specific Plaintiff alleges any such harm as to a particular grant, and SAMHSA continues to operate grant programs, *see, e.g.*, SAMHSA, *HHS Announces*

---

[6] What's more, FDA has now approved the vaccine in question. *See* FDA, Approval Letter – NUVAXOVID (May 16, 2025), available at https://www.fda.gov/vaccines-blood-biologics/vaccines/nuvaxovid. This fact underscores fundamental problems with this lawsuit: it consists of complaints about the manner and speed with which HHS is performing its duties and an improper request for judicial oversight of the day-to-day operations of an Executive agency. As this example demonstrates, HHS continues to perform its functions, perhaps just not on the timeline of Plaintiffs' choosing.

*$100M in Pilot Funding Opportunity to Eliminate Hepatitis C*, https://www.samhsa.gov/newsroom/press-announcements/20250728/hhs-100m-hepatitis-c-elimination-funding-opportunity (July 28, 2025). Lastly, Plaintiffs note as an aside that the Department closed the Office of Minority Health. Compl. ¶ 288. That office remains open. *See* Office of Minority Health, https://minorityhealth.hhs.gov/ (last visited Aug. 15, 2025). And Plaintiffs yet again fail to allege how any alleged closure affected them. Because Plaintiffs have not pled a cognizable injury based on SAMHSA's actual activities and their allegations are insufficiently detailed, SAMHSA and Assistant Secretary Kleinschmidt should be dismissed as Defendants.

*ACF.* Plaintiffs' allegations about Head Start fail for the reasons given above. Not enough time has passed for Plaintiffs to claim a disruption of Head Start monitoring services, site visits are not statutorily required, and there is no indication that required review processes will miss their statutory deadlines. *See supra* at 24. The allegations about LIHEAP fail as well. Compl. ¶¶ 264–65. Plaintiffs say that the restructuring will cause "delays and disruptions" to future projects, *id.* ¶ 265, because, as part of the current restructuring, "no one was left behind capable of operating the formula to distribute funds remaining on the Fiscal Year 2025 contracts," *id.* ¶ 264. These allegations are entirely speculative. Pursuant to statute, the Secretary "shall…allot to each State" a specified amount to assist low-income households with energy costs. 42 U.S.C. § 8623(1)(A). But the statute does not require a specific distribution date or timeline for LIHEAP funds. And Plaintiffs admit that the Department distributed LIHEAP funds to them on April 30—after the RIF. *See* Compl. ¶ 264. That distributions happened "later than usual" does not mean the Department failed to meet its mandate or will fail to do so in the future. *Id.* Plaintiffs' allegations to the contrary are pure speculation, making the alleged injury insufficiently imminent to state a cognizable legal

injury and the allegations insufficiently detailed to state a claim. *See NAGE*, 120 F.4th at 910. In sum, ACF and Acting Assistant Secretary Gradison should be dismissed.

   ***ACL.*** Plaintiffs' allegations about ACL are entirely speculative. Plaintiffs "anticipate that it will become more difficult to apply for grants and receive funds in a timely manner," Compl. ¶ 277, and suggest that ACL will have difficulty answering questions about a forthcoming regulatory change. That is the extent of their allegations. Plaintiffs provide no detail whatsoever to support these highly speculative, non-specific claims of injury. ACL and Deputy Administrator Lazare should be dismissed both for lack of standing and failure to state a claim.

   ***Administrative Offices.*** Plaintiffs assert two injuries related to the alleged closure of certain administrative offices: "inaccurate and out-of-date poverty guidelines," Compl. ¶ 300, and "a disastrous effect on OIDP and its effort to end the HIV/AIDS epidemic," *id.* ¶ 302. The first injury is not an actual injury. Defendants have already explained that the Department has not failed to meet any statutory mandates or deadlines as to the federal poverty guidelines. *See supra* at 18–19. Because Plaintiffs allege no injury to a legally protected interest, their allegations about ASPE must be dismissed accordingly. Compl. ¶¶ 299–300. Plaintiffs also mention changes to OIDP and alleged effects on the EHE program, but Plaintiffs never assert how those changes affect them. *See* Compl. ¶¶ 298, 301. To allege that the cuts will "end the consistent progress made by EHE"—as Plaintiffs do, *id.* ¶ 302—is a "general legal, moral, ideological, or policy objection" that cannot confer standing, *All. for Hippocratic Med.*, 602 U.S. at 381. Plaintiffs thus have not asserted any injury connected to the poverty guidelines or OIDP, and they therefore lack standing for any allegations related to the alleged closure of administrative offices. Compl. ¶¶ 295–302. Their allegations are also insufficiently detailed to state a claim.

C.   **Plaintiffs' Claims Are Not Reviewable Under the APA Because They Do Not Seek Judicial Review of a Discrete, Final Agency Action.**[7]

Beyond the channeling and standing issues, Plaintiffs' APA claims fail at the threshold because they do not identify a discrete, final agency action that this Court can review. Again, Defendants acknowledge this Court's previous conclusion to the contrary. *See* ECF No. 73 at 32–37. But as with the CSRA arguments above, the Supreme Court's recent stay decisions undermine the reasoning on which this Court relied. For example, the lower court in *AFGE 2*—in a decision the Supreme Court has now stayed—ruled that the challenged AARPs were final agency actions. *See Am. Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1038–39 (9th Cir. 2025). This Court should revisit its similar conclusion in this case.

Plaintiffs must plead "an identifiable action or event" and "direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (*Nat'l Wildlife Fed'n*). That final agency action must be "circumscribed [and] discrete." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (*SUWA*). The APA does not provide for "general judicial review of [an agency's] day-to-day operations." *Nat'l Wildlife Fed'n*, 497 U.S. at 899. On the contrary, it contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree."

---

[7] "The issue of whether there was final agency action implicates the jurisdiction of the federal courts, and such final action is normally a prerequisite to judicial review." *Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007). Whether the issue is analyzed as a jurisdictional issue—as Defendants believe is appropriate—or as a Rule 12(b)(6) defect in Plaintiffs' attempt to state a claim, the Court should dismiss for lack of final agency action because such action is a baseline requirement for APA reviewability. *See Puerto Rico*, 490 F.3d at 70 (noting that "the question of whether there has been final agency action is one that implicates statutory, rather than constitutional, jurisdiction"); *see generally* 5 U.S.C. § 704 (providing that "final agency action for which there is no other adequate remedy in a court are subject to judicial review").

*Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (cleaned up); *see also SUWA*, 542 U.S. at 64. "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). The avoidance of such "generalized" review reflects separation-of-powers concerns and the courts' recognition that, unlike "circumscribed, discrete agency actions," a plan can represent "the sum of many individual actions, including some yet to be taken." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006) (citation omitted). "[P]lans themselves are generally unreviewable"; instead, "it is only [the] specific actions implementing the plans that are subject to judicial scrutiny." *Id.* at 20–21.

**1.** Plaintiffs' claims do not challenge a "discrete" action; instead, they present exactly the type of wholesale challenge that the APA forbids. They seek comprehensive judicial review of a planned restructuring that will affect roughly half of the Department's 28 divisions. Far from presenting the Court with a "narrow question to resolve," *Kempthorne*, 455 F.3d at 307, Plaintiffs prematurely challenge how they think the Department plans to go about a wholesale streamlining of operations and consolidation of various units and functions. Addressing this type of claim would require the Court to supervise the Department's activities and determine how it should accomplish each statutorily-mandated function going forward—an even more extreme kind of supervisory claim than the one rejected by the Supreme Court in *National Wildlife Federation. See* 497 U.S. at 892–93. Such a claim would circumvent the purpose of the APA's discrete agency action requirement, which is to "protect agencies from undue judicial interference with their lawful discretion and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *SUWA*, 542 U.S. at 66–67. It is not the "task of the

judiciary, rather than the Executive Branch, to determine what resources an agency needs to perform its broad statutory functions." *Nat'l Treasury Emps. Union v. Vought*, No. 25-5091, slip op. at 42–43 (D.C. Cir. Aug. 15, 2025) (*Vought*).

In its preliminary-injunction order, this Court opined that Defendants have not explained "why a communication that foists mass terminations and is implemented to effectively discontinue sub-agencies would not constitute a discrete action." ECF No. 73 at 34. The answer is that the March 27 press release was a general statement of overarching principles that has been and will continue to be implemented as a series of "many individual actions." *Fund for Animals*, 460 F.3d at 20; *see also Vought*, slip op. at 31 (APA claim challenging "a constellation" of individual actions did not challenge a discrete action). The number of actions needed to implement the planned restructuring likely numbers in the thousands. Plaintiffs' challenge is far too broad. They challenge a restructuring that affects much of the Department and how the Department conducts a significant number of its statutory responsibilities. Such an attack is the opposite of "discrete." It is a programmatic challenge foreclosed by the APA.

**2.** Even assuming Plaintiffs have identified discrete agency actions—which they have not—they have not shown that these programmatic actions are final. "Final agency action" has two components. First, the action must "mark the consummation of the agency's decisionmaking process[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted). It may not be a "preliminary, procedural, or intermediate agency action." 5 U.S.C. § 704. Second, the action must "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (citation and quotation marks omitted). With respect to this second criterion, the "core question" is whether the agency action "will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992); *see also Sig Sauer, Inc.*

*v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (noting that the action being challenged must be "the definitive statement of the agency's position" and must have a "direct and immediate" effect on the complaining parties). This requirement means that documents with "no independent legal authority" are not reviewable. *Cal. Cmtys. Against Toxins v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019).

Plaintiffs allege that the planned restructuring outlined in the March 27 press release meets the *Bennett* test. Compl. ¶ 340. But *Bennett*'s test is not satisfied based on the press release's own terms, which clarify that the agency's "decisionmaking process" is ongoing and evolving. For example, the press release describes "specific contents of the restructuring plan that have been announced *so far*." ECF No. 44-1 at 2 (emphasis added). And the accompanying Fact Sheet notes that while "[n]o additional cuts are currently planned" beyond those described in the sheet, the Department "will continue to look for further ways to streamline its operations and agencies." ECF No. 44-2 at 2. These statements underline the developing nature of the agency's actions.

The Department's steps to begin to address what it sees as a necessary restructuring are "preliminary" in nature and "not directly reviewable" under the APA. *See* 5 U.S.C. § 704. They "may be . . . step[s], which if erroneous will mature into a prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make the planned individual actions themselves the "consummation of the administrative process." *Id*. at 113. In addition, premature judicial intervention by this Court will deny the Department "an opportunity to correct its own mistakes and to apply its expertise." *Harper v. Werfel*, 118 F.4th 100, 117 (1st Cir. 2024) (quotation marks omitted). Indeed, since the press release, the Department has reversed some of the RIFs, as noted above. The Department has responded to facts on the ground in a way

that courts are not able to quickly accomplish and that litigation-driving judicial management would impede.

The restructuring plan is not final agency action for two additional reasons. First, the March 27 press release and the planned restructuring do not "directly affect" Plaintiffs, who are not the subject of the reorganization contemplated by the press release. *See Franklin*, 505 U.S. at 797. Although Plaintiffs allege that they must confront effects of the RIFs and restructuring, all of the alleged effects are downstream effects. Second, the press release that Plaintiffs paint as the source of a "Directive," Compl. ¶ 340, has "no direct and appreciable legal consequences," *Cal. Cmtys.*, 934 F.3d at 638; *cf. Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 189 (D.C. Cir. 2006) ("[W]e have never found a press release of the kind at issue here to constitute 'final agency action' under the APA"). Instead, it describes aspects of what the Department "will" do going forward (to the extent not enjoined). ECF No. 44-1. No one "action" is encompassed by the press release because the restructuring is still being planned. *Cf. Cal. Cmtys.*, 934 F.3d at 637–38 (memorandum announcing agency's final interpretation of law was not final for APA purposes, even though it "unequivocally declare[d]" the agency's "definitive" position and "forecast[]" "in no uncertain terms" how the agency would proceed).

## II. <u>The Complaint Does Not State a Claim for Violation of the APA.</u>

### A. **Plaintiffs Seek to Compel Agency Action But Cannot Meet the Mandamus-Like Standard.**

A significant aspect of Plaintiffs' allegations is that the restructuring and RIFs violate the law because they will cause (or have caused) the Department to cease performing functions mandated by statute. *See, e.g.*, Compl. ¶¶ 145 (alleging that RIFs have deprived Plaintiffs "of resources guaranteed to them under statute"), 223 (alleging that RIFs at NCIPC are illegal because they allegedly affect work "required by statute"). Such allegations are governed by the APA's

provision permitting courts to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1).[8]
Plaintiffs cannot succeed under § 706(1)'s mandamus-like standard.

"The only agency action that can be compelled under the APA is action legally *required*."
*SUWA*, 542 U.S. at 63 (emphasis in original). In 5 U.S.C. § 706(1), "the APA carried forward the
traditional practice prior to its passage, when judicial review was achieved through" writs like
mandamus, a remedy "normally limited to enforcement of a specific, unequivocal command, the
ordering of a precise, definite act . . . about which [an official] had no discretion whatever." *Id.*
(alterations in original) (citations and quotation marks omitted). Thus, "Section 706(1) permits
judicial review of agency inaction, but only within strict limits," mirroring "the common law writ
of mandamus." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016).
Those strict limits mean that a plaintiff challenging "federal agency *inaction*" must show that the
agency "failed to take a *discrete* agency action that it is *required to take.*" *Scarborough Citizens
Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97, 99 (1st Cir. 2012) (quoting *SUWA*, 542
U.S. at 64); *see In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (holding that
§ 706(1) relief "starts from the premise that issuance of the writ is an extraordinary remedy,
reserved only for the most transparent violations of a clear duty to act." (quoting *In re Bluewater
Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000))).

---

[8] This Court previously held that Plaintiffs' claims are brought under § 706(2), but that is incorrect
based on their allegations. *See* ECF No. 73 at 50 n.13. Plaintiffs based their challenge on
allegations that the Department allegedly no longer takes actions or provides services that are
legally required. In such a scenario—where an agency allegedly does not do what a statute
requires, "§ 706(1) is the appropriate provision." *Sheldon v. Vilsack*, 538 F. App'x 644, 649 n.3
(6th Cir. 2013); *accord Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 933 (9th
Cir. 2010) (recognizing that a claim based on the Forest Service not following a statutory command
would be cognizable under § 706(1)).

Several significant hurdles limit the availability of § 706(1) relief. Reflecting the traditional limitations on mandatory injunctions issued to co-equal branches, "[i]n the case of agency inaction" the Court "not only must satisfy [itself] that there indeed exists such a duty, but that the agency has 'unreasonably delayed' the contemplated action." *Bluewater Network*, 234 F.3d at 1315 (quoting 5 U.S.C. § 706(1)). Even once there has been an "unreasonable delay" in fulfilling the required statutory duty, this Court evaluates "whether the agency's delay is so egregious as to warrant mandamus." *Core Commc'ns, Inc.*, 531 F.3d at 855 (quoting *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984) (*TRAC*)). The *TRAC* standard for determining whether an agency's delay is sufficiently egregious "is very deferential to administrative agencies." *Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Env't Prot.*, 163 F.3d 74, 82 n.9 (1st Cir. 1998) (*AAMA*); *see also Towns of Wellesley, Concord & Norwood v. FERC*, 829 F.2d 275, 277 (1st Cir. 1987) (applying the *TRAC* standard). And even where performance of a required duty is delayed sufficiently to satisfy that deferential standard, courts must still be careful not to "enmesh[]" the judiciary "in the minutiae of agency administration." *Cobell v. Norton*, 240 F.3d 1081, 1108–09 (D.C. Cir. 2001) (citation omitted). If a court does find a violation after applying the proper deference, *see AAMA*, 163 F.3d at 82 n.9, "[i]t is proper . . . to allow the government the opportunity to cure" that violation, *Cobell*, 240 F.3d at 1108–09 (citation omitted).

And even to the extent that Plaintiffs may have identified any discrete and statutorily required action that the Department is withholding, any relief would have to accord with the remedial principles applicable under § 706(1). Yet Plaintiffs do not identify any "specific, unequivocal command" to which the Department is subject such that the Court could "order[] . . . a precise, definite act." *SUWA*, 542 U.S. at 63 (citations omitted). They describe no "transparent violations of a clear duty to act," let alone one that has been withheld so long as to be "unreasonably

- 37 -

delayed." *Bluewater Network*, 234 F.3d at 1315. Indeed, several instances where Plaintiffs purport to identify required departmental activities do not involve a ministerial duty, and the Department enjoys discretion in how to act. For example, the CDC's STD and HIV Programs, which do help carry out statutory functions, are not specifically mandated by statute. *See* Compl. ¶¶ 191–96 (alleging a loss of access to resources from these programs). And even statutorily prescribed activities such as the funding of training and education programs like ERCs, which has historically been conducted by NIOSH, is not required to be conducted in a particular manner. *See* Compl. ¶ 123. Instead, the Secretary has discretion to "conduct, directly or by grants or contracts," such programs. 29 U.S.C. § 670(a).

Finally, issuing a permanent injunction would not "allow the government the opportunity to cure" any statutory violation the Court may find. *Cobell*, 240 F.3d at 1108–09 (citations omitted); *cf. Vought*, slip op. at 34 (recognizing that immediate judicial review is inappropriate when an agency has shown willingness to change course). In sum, this case is a poor candidate for the mandamus-style relief afforded by § 706(1). And because § 706(1) is the most logical avenue for Plaintiffs' theory of harm, the Court should dismiss their complaint.

### B.      Plaintiffs Fail to State an Arbitrary and Capricious Claim.

Even if analyzed under Section 706(2), Plaintiffs' claims fail. Plaintiffs present various arguments in support of their APA arbitrary and capricious claim. Specifically, they assert that the Defendants "provided no reasoned basis or explanation" for their restructuring plans, "failed to consider the consequences of their actions," and failed to consider "important reliance interests." Compl. ¶¶ 351, 352, 355. These are, in essence, different ways of alleging the same thing: that Defendants' actions are arbitrary and capricious because they failed to adequately analyze the Department's problems before addressing them.

But Plaintiffs' dissatisfaction with the degree of analysis does not support their APA claim.

"Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also Littlefield v. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 1117 (2024). "As the Supreme Court has 'repeated time and again, an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities.'" *Scarborough Citizens*, 674 F.3d at 101 (quoting *Massachusetts v. EPA,* 549 U.S. 497, 527 (2007)). Thus, the Court must review only to ensure "that the agency has acted within a zone of reasonableness[.]" *Prometheus*, 592 U.S. at 423; *cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way").

Defendants' actions satisfy this deferential review. Although Plaintiffs assert that the Department's various actions do not bear a connection to its goals as described in the press release, they overlook the cost-saving value of actions like consolidating components that have overlapping responsibilities. For example, Plaintiffs highlight OSH's role in the National Youth Tobacco Survey and in educational campaigns regarding the effects of smoking. *See* Compl. ¶¶ 167–68. But FDA has joint responsibility for the National Youth Tobacco Survey and also maintains smoking education campaigns.[9] Plaintiffs also overstate the alleged harms that may follow finalization of the restructuring process—harms that, as discussed earlier, are largely speculative.

---

[9] FDA, *Results from the Annual National Youth Tobacco Survey*, https://www.fda.gov/tobacco-products/youth-and-tobacco/results-annual-national-youth-tobacco-survey-nyts (last visited Aug. 15, 2025); FDA, *Public Health Education Campaigns*, https://www.fda.gov/tobacco-products/public-health-education/public-health-education-campaigns (last visited Aug. 15, 2025).

Plaintiffs may disagree with the Department's cost-benefit analysis, but they are not entitled to judicial relief "dictating to the agency the methods[] [and] procedures" it uses to complete its statutory obligations. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 545 (1978) (citation omitted). "The decision to undertake a reorganization necessitating a [RIF] is within the discretion of the agency," *McKenna v. Dep't of Interior*, 996 F.2d 1235 (Fed. Cir. 1993) (table). And any other programmatic decisions regarding the Department's handling of its statutorily required duties or responsibilities are likewise committed to agency discretion. *See Nat'l Wildlife Fed'n*, 497 U.S. at 891; *SUWA*, 542 U.S. at 62. To override these principles and enjoin agency leadership from exercising control over their own staffing and organizational issues would be an extraordinary violation of the separation of powers.

In particular, RIFs are exactly the type of action that is "committed to agency discretion by law." *See* 5 U.S.C. § 701(a)(2); *Markland*, 140 F.3d at 1033 (stating that "[w]e accord an agency wide discretion in conducting a reduction-in-force" (cleaned up)). Staffing decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191–92 (citation omitted). After all, the point of the Department's actions is to improve efficiency, which allows the Department to "meet its statutory responsibilities in what [the new administration] sees as the most effective or desirable way." *Id.* at 192. As the Supreme Court has held, "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and "the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs," *Sampson v. Murray*, 415 U.S. 61, 83 (1974). Moreover, Plaintiffs point to no statute limiting the agency's inherent discretion to reduce headcount.

C.   **Plaintiffs Fail to State a Claim that the RIFs and Restructuring are Contrary to Law and Exceed Defendants' Statutory Authority.**

Plaintiffs fail to state a claim that the RIFs and restructuring are "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2). Plaintiffs' allegation is that the Department's plans will "dismantle statutorily mandated functions." Compl. ¶ 339; *see, e.g., id.* ¶¶ 5 ("Abandoning the Department's core functions was not an unintended side effect[.]"), ¶ 114 (CDC will be "unable to meet the agency's statutory mandates"); ¶ 245 (stating, without support, that FDA terminations "will cripple the Administration's ability to perform its statutory mandate"). That is incorrect. Plaintiffs have not identified statutory obligations with which the Department is unable or unwilling to comply. To reiterate, HHS's restructuring is in progress. Certain components of that restructuring are currently subject to this Court's injunction, but if and when that injunction is lifted, the Department will be able to continue developing and implementing them.

Plaintiffs also argue that the planned restructuring violates the law because the Executive Branch cannot "refuse to spend money Congress has appropriated for HHS and its various functions." Compl. ¶ 337. As an initial matter, the Department has not said that it will not spend appropriated funds on statutorily mandated programs. And saving taxpayer money by consolidating functions and reducing personnel redundancy is not inherently inconsistent with spending appropriated funds.

Moreover, Plaintiffs cannot use the APA to enforce appropriations bills. The APA provides a cause of action to persons aggrieved by agency action but "withdraws that cause of action to the extent the relevant statute precludes judicial review." *Block*, 467 U.S. at 345. As the D.C. Circuit held this week, the Impoundment Control Act (ICA) provides the exclusive means to challenge presidential impoundment of appropriated funds. *See Glob. Health Council v. Trump*, __ F.4th __, 2025 WL 2326021, at *9–11 (D.C. Cir. Aug. 13, 2025) (analyzing this issue and concluding that

plaintiffs had "no cause of action to undergird their APA contrary-to-law claim"). The ICA directs the President to notify Congress when he proposes to defer or rescind appropriated funds, *see* 2 U.S.C. §§ 683(a), 684(a), which allows Congress to determine whether to respond given the particular circumstances of a specific proposal. And to the extent that the ICA contemplates litigation to enforce any obligation to spend appropriated funds, it provides for suits brought by the Comptroller General, an official within the Legislative Branch. 2 U.S.C. § 687. The statute does not contemplate enforcement at the behest of other parties, such as states. "[I]t does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits at any time and without notice to the Congress of the alleged violation." *Glob. Health Council*, 2025 WL 2326021, at *10. The ICA thus forecloses Plaintiffs from bringing an APA contrary-to-law claim to enforce appropriations bills. *Id.* at *11.

Even if Plaintiffs could bring such a claim, the most recent appropriations bills do not provide the necessary statutory commands. *See* Compl. ¶¶ 103, 119, 172, 188, 201, 213, 222, 240, 265, 273, 298 (citing amount of appropriations for FY 2024). In many instances, the appropriations statute simply provides that Congress is appropriating large undifferentiated sums for various activities such as to "carry out" specified provisions of the various public health acts. For example, the Further Consolidated Appropriations Act of 2024 simply states that it is appropriating $362,800,000 to NIOSH "[f]or carrying out" statutory obligations. Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460, 654. The same verbiage appears in the appropriation of funds regarding birth defects, environmental health, and STI prevention, all programs that are the subject of Plaintiffs' complaint here. *See id.*, 138 Stat. at 653–54. These statements do not affirmatively and unequivocally command expenditure of specific funds on a specific timetable for specific recipients. Thus, taken on their own, many of the appropriations provisions governing agencies in

this action simply "permit[] but do[] not require the Executive Branch to spend funds." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 309 (1969); *see also Train v. City of New York*, 420 U.S. 35, 43–44 (1975) (similarly recognizing that an appropriations provision may permit, but not require, expenditure "of the entire amounts authorized").

Even if the bills did require expenditures, not enough time has elapsed since the March 27 press release for Plaintiffs to claim that Defendants have violated that command. The Department continues to refine and implement its restructuring plans, and the Workforce Executive Order requires that agencies' restructuring be implemented consistent with applicable law. That services may be provided by a different division or unit after the reorganization does not mean that they will cease being provided. In fact, temporary pauses and ultimate failures to obligate are commonplace and accepted by the Legislative Branch. The Government Accountability Office has approved of agencies "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385, at *4 (Comp. Gen. Sept. 15, 1981). And in a decision requested by Congress, GAO has further explained that agencies will often have "small remaining unobligated balances," which are "consistent with sound administrative funds control practices." *Department of Homeland Sec.—Border Barrier Const. & Obligations*, B-335747, 2024 WL 1740422, at *1 n.8 (Comp. Gen. Apr. 22, 2024). The GAO is the "supreme audit institution of the United States" and is part of the branch that appropriates money. GAO, *Role as an Audit Institution*, https://www.gao.gov/about/what-gao-does/audit-role (last visited Aug. 14, 2025). If that entity agrees that temporary pauses are acceptable even after appropriations occur, Plaintiffs cannot assert that the same pauses are somehow contrary to

appropriations bills.

### III. Plaintiffs' Constitutional and Ultra Vires Claims Fail on the Merits.

Plaintiffs' other theories in their complaint similarly fail. In Count I, Plaintiffs bring an *ultra vires* claim asserting that Defendants have usurped legislative authority. Compl. at 88. Count II similarly asserts that Defendants have infringed on congressional power, except this time by violating the Appropriations Clause. *Id.* ¶¶ 319–24. And Count III is another *ultra vires* claim alleging that Defendants have exceeded the scope of their statutory authority. *Id.* ¶¶ 325–30. Each of these claims fails.

As an initial matter, Plaintiffs cannot bring freestanding constitutional claims that are actually statutory in nature. As the Supreme Court explained in *Dalton v. Specter*, 511 U.S. 462 (1994), not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. Rather, the Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases); *see also Glob. Health Council*, 2025 WL 2326021, at \*8 (noting the same distinction in *Dalton*). The Constitution is implicated, for example, if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" that can be asserted through a direct cause of action. *Id.* at 473.

Here, Plaintiffs' asserted constitutional claims are really "statutory" claims because they claim that Defendants exceeded their statutory authority. *Id.* at 474. As to Count I, Plaintiffs allege that Defendants have violated the separation of powers because "Congress has created" the Department via statute, and Defendants thus cannot contravene that action. Compl. ¶ 316. Count

II's alleged constitutional violation is of the Appropriations Clause, but Plaintiffs' real allegation is that Defendants have violated statutes where Congress "has expressly directed that funds be expended for the operations of the agency that it has created." Compl. ¶ 322. This is precisely the sleight of hand rejected by the Supreme Court in *Dalton*. "[S]tatutory claims do not become constitutional ones by operation of the separation-of-powers principles," invoked by Plaintiffs, that "prevent . . . the Executive Branch from disregarding federal statutes." *Vought*, slip op. at 46. And if Plaintiffs' argument were accepted, every garden-variety action by a federal agency alleged to be in violation of a statutory provision could be used to "transform a statutory claim into a constitutional one to avoid limits on judicial review," contrary to *Dalton*. *Glob. Health Council*, 2025 WL 2326021, at *8.

Even if Plaintiffs could bring those freestanding claims to compel Defendants to expend appropriated money (and they cannot), the remedies they seek are precluded by history and tradition. There is no presumption as a constitutional matter that the Executive Branch must expend all funds appropriated by Congress. Contrary to Count II here, the Appropriations Clause was written as a negative constraint, namely that "no money can be paid out of the Treasury" without an act of Congress. U.S. Const. Art. I, § 9, cl. 7. That is not an affirmative command that whatever Congress appropriates must be spent. *See Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (describing the Appropriations Clause "as a restriction upon the disbursing authority of the Executive department"). The concept of appropriations grew out of a concern by the English Parliament in the 17th century about overspending by the King. As the King came to depend on revenue "financed through various forms of taxation" that "required parliamentary authorization," rather than on other sources of income, Parliament enacted measures placing limits on the King's spending. *CFPB v. Community Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 427–28 (2024); *see*

*also id.* at 439 (explaining that "Parliament secured fiscal supremacy and wielded that power to superintend the King").[10] That practice also carried over to the American colonies. Before the ratification of the Constitution, "[m]any early state constitutions vested the legislative body with power over appropriations" to constrain executive spending. *CFPB*, 601 U.S. at 430.[11]

Thus, at least in the absence of more specific legislation, there is no basis for presuming that the mere appropriation of funds compels the President to expend them. Dating back to at least the early 1800s, there are numerous instances where the Executive Branch has declined to spend the full amount of funds appropriated by Congress. In 1803, President Jefferson explained that $50,000 that had been "appropriated by Congress for providing gun-boats[] remain[ed] unexpended" because changed circumstances "rendered an immediate execution of that law unnecessary." Thomas Jefferson, *Third Annual Message to Congress* (Oct. 17, 1803). In 1876, President Grant refused to expend more than half of the total $5 million in funds appropriated for harbor and river improvements because some of the works would not adequately advance the national interest. *See* 4 Cong. Rec. 5628 (1876). Other notable examples include Presidents Hoover and Roosevelt withholding large sums of appropriated funds during the Great Depression and World War II, and Presidents Truman, Eisenhower, and Kennedy declining to spend

---

[10] For example, the English Bill of Rights and implementing legislation prohibited the King from spending money not granted by Parliament. *See* Bill of Rights Act 1689, 1 W. & M. 2, c. 2 (Eng.) (declaring that "levying money for or to the use of the crown, by pretence of prerogative, without grant of parliament, for longer time, or in other manner than the same is or shall be granted, is illegal").

[11] For example, the Pennsylvania Constitution allowed the Executive to "draw upon the treasury for such sums as shall be appropriated by the house." Pa. Const. of 1776, § 20. Similarly, the South Carolina Constitution directed that "no money be drawn out of the public treasury but by the legislative authority of the State." S.C. Const. of 1778, art. XVI. Under the Articles of Confederation, the Confederation Congress likewise served in the role of specifying through appropriations "the necessary sums of Money to be raised for the service of the united states." Articles of Confederation of 1781, art. IX, para. 5.

congressionally appropriated funds for various defense projects. *See* Nile Stanton, *History and Practice of Executive Impoundment of Appropriated Funds*, 53 Neb. L. Rev. 1, 10–13 (1974).

This history suggests a prevailing understanding that appropriations statutes confer implicit authority for the Executive Branch to forgo spending across a range of circumstances. Late nineteenth-century Attorney General opinions indicated that, even when an appropriation contained language providing that the funds "shall be expended" on a program, the appropriation should not be considered mandatory "to the extent that [executive officials] are bound to expend the full amount if the work can be done for less." Appropriation—Contracts, 21 Op. Att'y Gen. 414, 414–15 (1896). A House report in 1950 similarly recognized that "[a]ppropriation of a given amount for a particular activity constitutes only a ceiling upon the amount which should be expended for that activity." H.R. Rep. No. 81-1797, at 9 (1950). This approach of preserving the Executive Branch's flexibility and optionality avoids encroaching on the Executive Branch's constitutional responsibilities and prerogatives in executing the laws.

This backdrop underscores why disputes about funding are committed to a dialogue between the political branches, as set forth in the ICA. In so doing, the scheme preserves the political branches' accountability for enacting and implementing the appropriations laws. And it accounts for the possibility that the Executive Branch may decide to withhold funds in a wide variety of contexts for a wide variety of reasons—some of which might implicate the Executive's own constitutional prerogatives, some of which might give Congress no concern at all, and some of which might draw a response from Congress affirmatively acquiescing in or rejecting the Executive's proposal. *Cf. City of New Haven v. United States,* 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may

result from "the normal and orderly operation of the government" (quotation marks omitted)). As discussed, Plaintiffs' suit flouts this scheme by inserting them into "a complex scheme of interbranch dialogue" that contains no "backdoor" for third parties like Plaintiffs to get involved. *Glob. Health Council*, 2025 WL 2326021, at *10; *see also supra* at 41–42.

As a final note, Plaintiffs' *ultra vires* claims are not conceptually distinct from their APA contrary-to-law claim. Counts I and III allege that Defendants' actions violate mandatory duties and exceed powers "conferred by the Constitution and federal statutes," specifically statutes in which Congress "created the Department of Health and Human Services." Compl. ¶ 314, 316. Plaintiffs claim that Defendants "incapacitate[d] that Department" by "functionally clos[ing]" components that work on required programs. *Id.* ¶¶ 316, 328. Count IV tracks that same theory, alleging that Defendants have contravened "statutory authority that created the departments in the first place," *id.* ¶ 339, including by refusing "to spend money Congress has appropriated for HHS and its various functions," *id.* ¶ 337. Indeed, Count III alleges that Defendants' conduct "is contrary to law." *Id.* ¶ 328. Thus, in addition to their other infirmities, Counts I and III also fail for the same reasons that Count IV fails, including that Plaintiffs have failed to show Defendants are actually violating (or will imminently violate) a specific statutory requirement. *See Glob. Health Council*, 2025 WL 2326021, at *11–12 (*ultra vires* claim "that the defendants have exceeded their statutory authority" failed where plaintiffs could point to no statutory violation).

## CONCLUSION

Plaintiffs' complaint should be dismissed.

Dated: August 15, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

CHRISTOPHER R. HALL
Assistant Branch Director
Civil Division, Federal Programs Branch

ELIZABETH HEDGES
Counsel to the Assistant Attorney General
Civil Division

/s/ *Christian Dibblee*
CHRISTIAN DIBBLEE
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 353-5980
Email: Christian.R.Dibblee@usdoj.gov

*Counsel for Defendants*