# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK; STATE OF WASHINGTON; STATE OF RHODE ISLAND; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAIʻI; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; THE PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; and STATE OF WISCONSIN, | Case No. 1:25-cv-00196-MRD-PAS |
| Plaintiffs, | |
| v. | **AMENDED COMPLAINT** |
| ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| Defendants. | |

## INTRODUCTION

1.      The core mission of the Department of Health and Human Services (HHS, or the Department) is to enhance the health and well-being of all Americans by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services. HHS, its many agencies, divisions, offices, and programs are the manifestation of Congress's interest in protecting and improving the well-being of our citizens. Congress has passed dozens of laws for HHS to enforce and authorized HHS to

1

spend $2.5 trillion in Fiscal Year 2024 alone because, in Congress's judgment, the work of the Department is that critical.

2.      Over the course of a few days in late March and early April, HHS Secretary Robert F. Kennedy, Jr. (Secretary Kennedy) announced a directive to "Make America Healthy Again" (the March 27 Directive) and issued termination notices (also called reduction in force notices, or RIFs) to 10,000 employees. Those employees were immediately put on administrative leave. These RIFs, coupled with a "reorganization" that shuttered over a dozen agencies and regional offices and reassigned statutorily mandated programs to other or new centers, implemented the March 27 Directive.

3.      On April 1, 2025, Defendants issued the 10,000 RIF notices and immediately expelled employees from their work email, laptops, and offices; work across the vast and complicated Department came to a sudden halt. Critical offices throughout HHS, many explicitly created by Congress, were left unable to perform statutory functions. There was no one to answer the phone, factories went into shutdown mode, experiments were abandoned, trainings were cancelled, site visits were postponed, application portals were closed, laboratories stopped testing for infectious diseases such as hepatitis, and partnerships were immediately suspended. The Food and Drug Administration missed a vaccine application deadline and cancelled a critical test for the bird flu virus, suspending that testing program for the year. Office closures and layoffs left Head Start and Low-Income Home Energy Assistance Program grantees abandoned with no one to answer their questions. The World Trade Center Health Program had no doctors to certify new illnesses for coverage, a necessary part of caring for the responders and survivors of the 9/11 attacks under the Zadroga Act, and programs aimed at monitoring maternal and newborn health were abruptly shuttered.

4.      The RIFs did not fall evenly across the Department and certain sub-agencies and programs at the Centers for Disease Control and Prevention (CDC), the Food and Drug Administration (FDA), the Substance Abuse and Mental Health Services Administration (SAMHSA), and the Administration for Children and Families (ACF) went dark.

5.      HHS did not issue RIFs or engage in restructuring legally or carefully. Secretary Kennedy has since said that he knew from the beginning that possibly twenty percent of the RIFs were going to be "mistakes." He did not perform a careful line-by-line review of who should be fired because "it takes too long" and he would lose "political momentum"—making plain that the process used to determine layoffs was arbitrary and capricious.

6.      The RIFs and reorganizations happened quickly, but the consequences are severe, complicated, and potentially irreversible. Plaintiff States have already suffered consequences from these RIFs and reorganizations. Those employees who remain at HHS were prevented from collecting and reviewing new applications; designing, distributing, and implementing new policies and guidance; collecting and distributing scientific data; issuing obligated funds to the Plaintiff States and others; investigating for program integrity; and responding to any manner of public inquiry. Dismantling HHS by seeking to terminate the people necessary for it to meet its own mandates and paralyzing it by means of a confusing reorganization is an unlawful effort to undercut the will of Congress who ordered the agencies and programs to run.

7.      Recognizing that Defendants' actions were likely contrary to law and that Plaintiff States faced irreparable harm, the Court partially enjoined implementation of the March 27 Directive on July 1, 2025, ECF No. 73, then issued a revised order on August 12, 2025, ECF No. 89.

3

8.     The harm to States has not fully abated as a result of the Preliminary Injunction because in many divisions of HHS key staff subject to the RIFs remain on administrative leave and unable to perform the statutorily mandated tasks they were hired to perform. Defendants cannot fulfill their responsibilities with respect to Plaintiff States without their employees. Further, Defendants have continued their efforts to dismantle programs and teams where possible, including by terminating staff in divisions not subject to the Court's injunction (as revised).

9.     Plaintiff States seek declaratory and injunctive relief to prevent the unconstitutional and illegal dismantling of the Department.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act (APA). 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 705, 706.

11.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff State of Rhode Island is a resident of this district, and a substantial part of the events or omissions giving rise to this Amended Complaint occurred and continues to occur within the District of Rhode Island.

## PARTIES

### I.    Plaintiffs

12.     Plaintiff State of New York is a sovereign state of the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian,

and representative of all residents, and political subdivisions of New York. Attorney General Letitia James is the chief law enforcement officer for New York.

13.    Plaintiff State of Washington is a sovereign state in the United States. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.

14.    Plaintiff State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

15.    Plaintiff State of Arizona is a sovereign state in the United States of America. Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona.

16.    Plaintiff State of California is a sovereign state in the United States of America. California is represented by Rob Bonta, the Attorney General of California and the chief law officer of California.

17.    Plaintiff State of Colorado is a sovereign state in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

18.    Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

19.     Plaintiff State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

20.     Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

21.     Plaintiff State of Hawaiʻi is a sovereign state of the United States of America. Hawaiʻi is represented by Attorney General Anne E. Lopez, Hawaiʻi's chief legal officer and chief law enforcement officer, who is authorized by Hawaiʻi Rev. Statutes § 28-1 to pursue this action.

22.     Plaintiff State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, section 15. See 15 Ill. Comp. Stat. 205/4.

23.     Plaintiff State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. § 191.

24. Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

25. The People of the State of Michigan are represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

26. Plaintiff State of Minnesota is a sovereign state of the United States. Minnesota is represented by and through its chief legal officer, Minnesota Attorney General Keith Ellison, who has common law and statutory authority to sue on Minnesota's behalf.

27. Plaintiff State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew Platkin, who is the State's chief law enforcement officer.

28. Plaintiff State of New Mexico is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.

29. Plaintiff the State of Oregon, represented by and through Attorney General Dan Rayfield, is a sovereign state of the United States. The Oregon Attorney General is Oregon's chief law enforcement officer and authorized to pursue this action by Oregon Revised Statutes Chapter 180.

30.     Plaintiff the State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity R. Clark, who is Vermont's chief legal officer and is authorized to pursue this action on behalf of the State. Vt. Stat. Ann. tit. 3, § 159.

31.     The State of Wisconsin is a sovereign state of the United States. Wisconsin is represented by Attorney General Josh Kaul, who is the State's Chief Law Officer.

## II.     Defendants

32.     Defendant Robert F. Kennedy, Jr., is the Secretary of the Department of Health and Human Services, and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 42 U.S.C. §§ 3501a, 3502.

33.     Defendant the United States Department of Health and Human Services is a cabinet agency within the executive branch of the United States government. 42 U.S.C. §§ 3501, 3501a.

## FACTUAL ALLEGATIONS

34.     Congress created HHS to enhance and protect the health and well-being of all Americans. Since its inception, Congress has charged HHS and its Secretary with more and more responsibilities and granted it more and more authorities to fulfill those responsibilities. Congress also entrusted HHS and its Secretary with the financial resources necessary to fulfill those obligations and, over seventy-two years, HHS has grown to manage a complex portfolio of work.

35.     The Secretary of HHS advises the President on health, welfare, and income security plans, policies, and programs of the federal government; directs Department staff in carrying out the programs and activities of the Department; and promotes general public understanding of the Department's goals, programs, and objectives.

## III.     The Department's Origins and Structure

36.     The modern HHS was created through a succession of acts of Congress. Pursuant to the Reorganization Act of 1939, 53 Stat. 561 (1939), and the Reorganization Plan No. 1 of 1939, 4 Fed. Reg. 2727 (1939), Congress issued a joint resolution creating the Federal Security Agency, 53 Stat. 813 (1939). The new agency would bring together related federal activities in health,

education, and social insurance including the Public Health Service (PHS), headed by the Surgeon General.

37.     In 1953, Congress created the cabinet-level Department of Health, Education, and Welfare (HEW). 42 U.S.C. § 3501 (1953). The new Department encompassed all functions of the former Federal Security Administration, including the PHS and the CDC, the FDA, the Social Security Administration, and the Office of Vocational Rehabilitation.

38.     Thirteen years later, Congress passed the Reorganization Plan No. 3 in 1966 which transferred all functions and authorities of PHS from the Surgeon General to the Secretary. As a result, the Secretary oversees programs housed within the PHS, as well as the National Institutes of Health, the Bureau of Medical Services, the Bureau of State Services, and the Office of the Surgeon General.

39.     In 1979, Congress enacted the Department of Education Organization Act to remove the Department of Education from HEW, creating two separate cabinet-level departments: the Department of Education and HHS. 20 U.S.C. §§ 3411, 3508 (1979).

40.     In 1994, Congress removed the Social Security Administration from HHS, establishing the Social Security Administration as an independent agency. 108 Stat. 1465 (1994).

41.     In Fiscal Year 2024, HHS committed to spending roughly $2.5 trillion—twenty-six percent of all federal spending. A majority of the HHS budget is comprised of mandatory spending for Medicare and Medicaid.

42.     At the end of 2024, HHS employed 82,000 people across its many agencies and offices, which, themselves, were spread across the Department's headquarters in Washington D.C. and ten regional offices. In Fiscal Year 2024, approximately seventy percent of all federal health

spending was mandatory and eleven percent was discretionary. Salaries and payroll are entirely discretionary spending.

43.     Congress has specifically designed certain aspects of HHS's structure. For many HHS divisions and programs, Congress has directed the Secretary to carry out activities through the head of a particular HHS sub-agency, indicating Congress directed HHS to maintain that program within the sub-agency. For example, by statute, Congress ordered the authorities of SAMHSA must be used by "the Secretary, acting through the Assistant Secretary of SAMHSA." 42 U.S.C. § 290aa(d).  By the statutory text, that work must be done within SAMHSA, not another sub-agency of HHS. Additionally, "the Secretary, acting through the Director of the Centers for Disease Control and Prevention" shall provide technical assistance, data management, and applied research grants and cooperative agreements to State agencies or designated entities to collect data related to early-hearing detection intervention. 42 U.S.C. § 280g-1(b)(1)(A). By the statutory text, that work must be done within the CDC, not another sub-agency of HHS.

### IV.    Secretary Kennedy's Views on the Department

44.     Long before he was nominated by President Trump to lead HHS, Secretary Kennedy had a history of advocating for the evisceration of the Department's statutorily mandated work promoting public health.

45.     As early as 2013, he described the CDC's vaccine policies and decision-making as "like Nazi death camps."[1]

46.     Three years later, Secretary Kennedy founded Children's Health Defense (CHD), a non-profit organization dedicated to promoting false and misleading claims about the safety and

---

[1] Daniel Dale & Danya Gainor, *Fact check: RFK JR. Denied saying things he did say*, CNN (Feb. 1, 2025, 1:55 PM), https://www.cnn.com/2025/02/01/politics/rfk-jr-fact-check-confirmation-heading/index.html.

efficacy of vaccines. In 2020, CHD financed a video, "Plandemic," which baselessly alleged the COVID-19 pandemic was planned as part of a global conspiracy involving HHS.[2]

47.     Secretary Kennedy then wrote a book, The Real Anthony Fauci,[3] accusing former National Institutes of Health (NIH) official Anthony Fauci of sabotaging HIV/AIDS research and treatments and conspiring with tech mogul Bill Gates and drugmakers to sell COVID-19 vaccines.

48.     The week before the 2024 election, Secretary Kennedy tweeted: "FDA's war on public health is about to end. This includes its aggressive suppression of psychedelics, peptides, stem cells, raw milk, hyperbaric therapies, chelating compounds, ivermectin, hydroxychloroquine, vitamins, clean foods, sunshine, exercise, nutraceuticals and anything else that advances human health and can't be patented by Pharma. If you work for the FDA and are part of this corrupt system, I have two messages for you: 1. Preserve your records, and 2. Pack your bags."

49.     After Trump won the 2024 election, Secretary Kennedy continued to share his intention to destroy HHS, this time naming the NIH, a division of HHS: "We need to act fast, and we want to have those people in place on Jan. 20 so that on Jan. 21, 600 people are going to walk into offices at NIH, and 600 people are going to leave."[4]

50.     President Trump and other officials in the current federal administration support Secretary Kennedy's views about the Department and have expressed disdain for the work of the Department. In 2024, then-candidate Trump said of Secretary Kennedy, "I'm going to let him go

---

[2] Shannon Bond, *Inside RFK Jr.'s nonprofit's legal battles over vaccines and public health,* NPR (Dec. 4, 2024, 5:00 AM), https://www.npr.org/2024/12/03/nx-s1-5198506/rfk-jr-anti-vaccine-chd-lawsuits; Martin Enserink & Jon Cohen, *Fact-checking Judy Mikovits, the controversial virologist attacking Anthony Fauci in a viral conspiracy video*, Science (May 8, 2020), https://www.science.org/content/article/fact-checking-judy-mikovits-controversial-virologist-attacking-anthony-fauci-viral.
[3] Robert F. Kennedy Jr., The Real Anthony Fauci: Bill Gates, Big Pharma and the Global War on Democracy and Public Health (2021).
[4] Rob Stein, *Trump may overhaul the NIH, with input from RFK, Republican lawmakers*, NPR (Nov. 12, 2024), https://www.npr.org/2024/11/12/nx-s1-5183014/trump-election-2024-nih-rfk.

wild on health. I'm going to let him go wild on the food. I'm going to let him go wild on medicines."[5]

51.     Director of the Office of Management and Budget, Russell Vought shared Secretary Kennedy's disregard for the work of HHS and, in September 2024, at a panel discussion he said: "Look at CDC . . . . Most of them don't even do public health. They are researchers that publish material. Who knows if it's even relevant or not?"[6]

## V.    The Illegal Dismantling of HHS

52.     On January 20, 2025, the day President Trump was inaugurated, Defendants began systematically dismantling HHS. The earliest steps were to impose severe restrictions on all public-facing agency activity, fire the independent inspector general, rescind job offers, and institute a hiring freeze. The next steps were to remove the existing key leaders within the agencies unsympathetic to Secretary Kennedy's favored views, and to fire tens of thousands of the rank and file. Finally, Defendants would reorganize dozens of sub-agencies making them and their work, effectively, disappear. This coordinated dismantling has stopped crucial work that Plaintiff States relied upon.

### A.  The Early Steps

53.     On the new administration's first full day in office, January 21, 2025, the Acting Secretary of HHS, Dorothy Fink, ordered a sweeping communications freeze prohibiting public issuance of any document or communication until it has been reviewed and approved by a Presidential appointee.

---

[5] Katherine Fung, *Everything RFK Jr. Has Said About What He'll Do If Named Trump Health Czar*, Newsweek (Nov. 5, 2024, 8:02 AM), https://www.newsweek.com/rfk-public-health-vaccines-flouride-drinking-water-1979990.
[6] Liz Essley Whyte & Natalie Andrews, RFK Jr. Plans 10,000 Job Cuts in Major Restructuring of Health Department, Wall St. J. (Mar. 28, 2025, 1:15 PM), https://www.wsj.com/politics/policy/rfk-jr-job-cuts-health-human-services-bdec28b0?msockid=3b1de0a03d0767c53feef45c3c446651.

54.     On day two, January 22, all HHS travel was suspended immediately and indefinitely. The only exceptions were for return travel and for Indian Health Services (IHS) employees.

55.     On January 25, President Trump fired HHS Inspector General Christi Grimm along with sixteen others from her office.

56.     On February 11, the White House published Executive Order 14,210 "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," which ordered: "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs)" so as to "eliminat[e] waste, bloat, and insularity."

57.     Robert F. Kennedy Jr. was confirmed as HHS Secretary on February 13, 2025. He was sworn in on the same day in the Oval Office.

58.     Two days later, on February 15, 5,200 probationary workers across multiple HHS agencies received termination notices. In a letter attached to the termination email, signed by Jeffrey Anoka, acting head of Human Resources for HHS, recipients of the termination notice were told they were "not fit for continued employment because your ability, knowledge and skills do not fit the Agency's current needs, and your performance has not been adequate to justify further employment at the Agency." Additionally, many contractors were terminated at the same time.

59.     Of the 5,200 notices, 1,250 of those were sent to employees of CDC—roughly ten percent of the workforce. Those employees came from a range of experience levels—from senior officials to the entire first-year class of the CDC's Epidemic Intelligence Services officers, known as "disease detectives."

60.    On Friday March 8, all HHS employees received an offer to leave their job for as much as a $25,000 buyout that was offered as part of the executive branch's "Fork in the Road" cuts to the federal civil service. The offers gave workers until March 14 to accept.

61.    On March 25, the Senate confirmed Dr. Marty Makary to be the next Commissioner of FDA and Jay Battacharya to be Director of NIH. While Secretary Kennedy had been sworn in the same day he was confirmed by the Senate, Commissioner Makary and Director Battacharya would wait a week until April 1 at 10:00am.

### B.  HHS Announced the March 27 Directive

62.    On March 27, 2025, the HHS Press Office released "HHS Announces Transformation to Make America Healthy Again," which outlined a directive to lay off employees and reorganize the agency. The March 27 Directive is attached here to as Exhibit 1. The only legal authority given was EO 14,210, which ordered the Secretary to prepare to initiate prompt, large-scale RIFs. Plaintiff States challenge both components of the March 27 Directive here: the mass layoffs and the reorganizations, as well as their implementation.

63.    The Announcement was accompanied by a "Fact Sheet: HHS' Transformation to Make America Healthy Again." The Fact Sheet is attached hereto as Exhibit 2.

64.    In these documents, HHS announced a reduction in workforce of about 10,000 full-time employees. Ex. 1 at 2. When combined with the early retirement and buyout offers, HHS will have lost a combined 20,000 employees—roughly a quarter of its workforce.

65.    HHS's twenty-eight divisions would be restructured down to fifteen, including a new Administration for a Healthy America (AHA), and centralized human resources, information technology, procurement, external affairs and policy offices. Under the Directive's proposed restructuring:

a.  The new AHA would combine the Office of the Assistant Secretary for Health (OASH), Health Resources and Services Administration (HRSA), Substance Abuse and Mental Health Services Administration (SAMHSA), Agency for Toxic Substances and Disease Registry (ATSDR), and National Institute for Occupational Safety and Health (NIOSH). Divisions of AHA would include Primary Care, Maternal and Child Health, Mental Health, Environmental Health, HIV/AIDS, and Workforce, with support of the U.S. Surgeon General and Policy team.

b.  The Administration for Strategic Preparedness and Response (ASPR), responsible for national disaster and public health emergency response, would transfer to CDC.

c.  A new Assistant Secretary for Enforcement would oversee the Departmental Appeals Board, Office of Medicare Hearings and Appeals (OMHA), and Office for Civil Rights.

d.  The Assistant Secretary for Planning and Evaluation (ASPE) would merge with the Agency for Healthcare Research and Quality (AHRQ) to create a new Office of Strategy.

e.  The Administration for Community Living (ACL) and its programs that support older adults, people with disabilities, and their families and caregivers, would be split across other HHS agencies including the Administration for Children and Families (ACF), ASPE, and the Centers for Medicare & Medicaid Services (CMS).

66.  HHS would close five of its ten regional offices.

67.  The March 27 Directive claimed the terminations and reorganizations were policy driven and would "implement the Make America Healthy Again goal of ending the chronic disease epidemic." HHS promised "the restructuring will improve Americans' experience with HHS by

making the agency more responsive and efficient, while ensuring that Medicare, Medicaid, and other essential health services remain intact."

68.     The Fact Sheet expressly contemplated future layoffs: "No additional cuts are currently planned, but the Department will continue to look for further ways to streamline its operations and agencies."

69.     That same day, Secretary Kennedy took to Twitter and said: "We are streamlining HHS to make our agency more efficient and more effective. We will eliminate an entire alphabet soup of departments, while preserving their core functions by merging them into a new organization called the Administration for a Healthy America or AHA. This overhaul will improve the health of the entire nation — to Make America Healthy Again."[7]

70.     The Twitter post included a video of Secretary Kennedy saying: "The agency has been inefficient as a whole . . . . The rate of chronic disease and cancer increased dramatically as our department has grown."[8]

71.     HHS' work stopped immediately. On Friday, March 28, dozens of federal health employees within the Office of Infectious Disease and HIV/AIDS Policy (OIDP) were told they would be put on leave. Several of OIDP's advisory committees, including the National Vaccine Advisory Committee and others that advise on HIV/AIDS response, had their meetings cancelled.

72.     Congressional leaders and their staff learned about the reorganization and RIFs for the first time as it was announced on March 27.

73.     On March 28, Dr. Peter Marks, Director of the Center for Biologics Evaluation and Research (CBER) at FDA, resigned. He had worked at FDA for thirteen years, served on the White

---

[7] Secretary Kennedy (@SecKennedy), X (Mar. 27, 2025, 9:00 AM), https://x.com/SecKennedy/status/1905243470366670926.
[8] *Id.*

House Coronavirus Task Force, and is credited with leading Operation Warp Speed which delivered a COVID-19 vaccine in a matter of months. In his resignation letter, he wrote:

> As you are aware, I was willing to work to address the Secretary's concerns regarding vaccine safety and transparency by hearing from the public and implementing a variety of different public meetings and engagements with the National Academy of Sciences, Engineering, and Medicine. However, it has become clear that truth and transparency are not desired by the Secretary, but rather he wishes subservient confirmation of his misinformation and lies.[9]

74.     Some FDA employees were told to go home with their laptops and prepare for the possibility that they would not be back. If they received a RIF notice via email, they would also lose access to the building.

### C.  On April 1, HHS Sent RIF Notices to 10,000 HHS Employees to Implement the March 27 Directive

75.     In the early morning of April 1, 2025, HHS employees in all offices, administrations, agencies and sub-agencies began to receive RIF notices. Some employees had not seen their early morning email before leaving for the office, and were surprised when they arrived at work to find their access cards had been deactivated.

76.     The emailed notices instructed employees that they had been placed on administrative leave. The notices, which came from Tom Nagy within the HHS Human Resources office, told employees they would be formally terminated on June 2.

77.     Many notices contained errors. For example, some listed incorrect information about workers' recent performance ratings. At FDA, the listed point of contact for the Equal Employment Opportunity office had departed a month earlier.

---

[9] Letter from Peter Marks, Director of the Center for Biologics Evaluation and Research, to Sara Brenner, citing Commissioner of Food and Drugs (Mar. 28, 2025) (https://static01.nyt.com/newsgraphics/documenttools/c946b864e1dc08f9/05e7e4f0-full.pdf).

78.     Noticed employees were immediately cut off; they were locked out of their HHS-issued email, their HHS-issued laptop, their office, and their building.

79.     There was no opportunity to offboard or transition important work to other offices or employees and no opportunity to preserve and share documents that were in employees' inboxes.

80.     Within two days, Secretary Kennedy told reporters that twenty percent of the employees received RIF notices in error: "Personnel that should not have been cut, were cut. We're reinstating them. And that was always the plan. Part of the—at DOGE, we talked about this from the beginning, is we're going to do 80% cuts, but 20% of those are going to have to be reinstated, because we'll make mistakes."[10]

81.     In an April 9, 2025, interview, Secretary Kennedy again admitted that he knew "as many as 20%" of the cuts would be mistakes. He also agreed that HHS chose not to perform a "line-by-line-by-line" review of each employee's job responsibilities before issuing RIF notices and made that choice because doing so would "take[] too long and you lose political momentum."[11]

82.     In the aftermath of the RIF notices, HHS and its operating divisions often claimed publicly that the agency's work was unaffected and that HHS was still able to carry out its statutory functions. But the reality is that offices and divisions across HHS missed deadlines, canceled cooperative programs with states, closed public health labs, and functionally stopped maintaining many databases and cleaning many data sets.

83.     On May 14, Secretary Kennedy testified before the Senate to answer questions regarding the legality and reasoning behind the massive restructuring of HHS.

---

[10] Alexander Tin, *RFK Jr., says 20% of health agency layoffs could be mistake*s, CBS News (Apr. 3, 2025, 7:12 PM), https://www.cbsnews.com/news/rfk-jr-hhs-job-cuts-doge-mistakes/.
[11] Watch: RFK Jr.'s first network TV interview as HHS secretary, YouTube (Apr. 9, 2025) (Originally aired on CBS News) https://youtu.be/o2U0csKvqMY?si=sl_PrcAr9lxogj6C.

a. Secretary Kennedy testified that HHS "had to act quickly so that we could do something for the American people that is lasting. And we understood that there would be some mistakes made and that we would go back and reverse them when they were made. But it was more important to do decisive action quickly that could eliminate the metastasizing of this agency, which was growing, and growing, growing as our health declined."

b. Secretary Kennedy also testified that HHS made "a couple of mistakes." He stated that the cuts at the World Trade Center Health Program "should not have been made."

c. In response to questioning from Senator Murkowski about whether the March 27 Directive had resulted in delays in disbursements of domestic violence prevention funding because the people who administer grants had been laid off, Secretary Kennedy agreed that RIFs "could be" why funding had not been released.[12]

84. Since March 27, Congress has not passed legislation reorganizing HHS. To the contrary, on July 31, 2025, the Senate Health, Education, Labor, and Pensions Committee approved a fiscal 2026 budget that did not ratify the March 27 Directive's reorganization of HHS or other Directive changes.

## VI. The March 27 Directive Has Disabled HHS and Its Agencies From Performing Their Statutorily Required Functions

85. The March 27 Directive and its implementation's effects on HHS sub-agencies are profound and extensive. They are also complicated due to HHS's vast organizational structure and hundreds of related statutes, regulations, and programs. As of March 26, HHS was composed of

---

[12] Senate HELP Committee, *Senate HELP Hearing: FY 2026 Department of Health and Human Services* Budget, YouTube (May 14, 2025), https://www.youtube.com/live/do7L8jUvZoo?si=XnRQJtWv24DKFpyN.

28 operating divisions, generally referred to by acronyms which can appear similar at first glance, making its various functions difficult to comprehend to those unfamiliar with it. The effects of the March 27 Directive and its implementation on HHS's programs are detailed in the paragraphs below.

### A.  Centers for Disease Control and Prevention (CDC)

#### *Statutory Mandates*

86.    CDC's mission is to protect America from health, safety and security threats, both foreign and in the United States. Whether diseases start at home or abroad, are chronic or acute, curable or preventable, human error or deliberate attack, CDC fights disease and supports communities and citizens to do the same.

87.    The CDC was created under the authority of the Public Health Service Act of 1944. 42 U.S.C. Chapter 6A (PHSA). It was charged to protect deployed members of the military, to prevent exotic infections from being established in the United States, and to combat endemic infections within the United States.

88.    Congress then reorganized CDC in 1953 to the new Department of Health, Education and Welfare under Reorganization Plan No. 1.

89.    The CDC is subject to and required to follow numerous congressional mandates. The mandates assigned to the CDC Director in 42 U.S.C. § 242c ("Appointment and authority of the Director of the Centers for Disease Control and Prevention"), include: investigating, detecting, identifying, preventing and controlling diseases or conditions "to preserve and improve public health domestically and globally and address injuries and occupational and environmental hazards," *id.* § 242c(b)(1); managing the overall direction of the CDC and the management and operation of its programs and activities across centers, institutes, and offices, including through priority setting reviews and the development of strategic plans, *id.* § 242c(b)(2)-(6); and

communicating, including through convening annual meetings, with public and private entities regarding relevant public health programs and activities, and, as applicable, the Strategic Plan, *id.* § 242c(b)(7).

90.     CDC must also develop, implement, and update a Strategic Plan that prevents, reduces, and eliminates the spread of communicable and noncommunicable diseases or conditions, and addresses injuries, and occupational and environmental hazards; supports the efforts of State, local, and Tribal health departments to prevent and reduce the prevalence of the diseases or conditions; contains, mitigates, and ends disease outbreaks; and enhances global and domestic public health capacities, capabilities, and preparedness, including public health data, surveillance, workforce, and laboratory capacity and safety, and other priorities established by the Director. 42 U.S.C. § 242c(c)(2)(A).

91.     Congress directed the Secretary to act through CDC to address specific public health matters. For example, by law the Secretary shall, through the CDC "expand, intensify, and coordinate the activities of the [CDC] with respect to preterm labor and delivery, preventable maternal mortality and severe maternal morbidity, and infant mortality." 42 U.S.C. § 241(e); *see also* 42 U.S.C. § 247b-13. CDC's director is also required to improve and coordinate data on food-related allergic responses, 42 U.S.C. § 242r; conduct activities to prevent lead poisoning and treat lead toxicity, 42 U.S.C. § 247b-3; address infant health and hearing, 42 U.S.C. §§ 247b-4 & 247b-4a; establish fellowship and training programs to work on State public health matters, 42 U.S.C. § 247b-8; collect data on juvenile diabetes, 42 U.S.C. § 247b-9; study and publish data on asthma, 42 U.S.C. § 247b-10; research the effects of folic acid on preventing birth defects, 42 U.S.C. § 247b-11; study water fluoridation, 42 U.S.C. § 247b-14; enter into cooperative agreements with States to study HPV prevalence, 42 U.S.C. § 247b-17. The list of required activities is broad, and

these are examples, but by no means a full overview of what Congress has required the CDC to do.

92.    The CDC also oversees the National Institute of Occupational Safety and Health, *see infra* Section VI.B, and eleven Centers, each of which manages additional divisions, programs, and offices.

93.    The eleven Centers are: the National Center for Chronic Disease Prevention and Health Promotion (NCCDPHP) (Section VI.C); the National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention (NCHHSTP) (Section VI.D); the National Center for Environmental Health (NCEH) (Section V.E); the National Center on Birth Defects and Developmental Disabilities (NCBDDD) (Section VI.F); the National Center for Injury Prevention and Control (NCIPC) (Section VI.G); the Center for Forecasting and Outbreak Analytics (CFA); the National Center for Emerging and Zoonotic Infectious Diseases (NCEZID); the National Center for Health Statistics (NCHS); the National Center for Immunization and Respiratory Diseases (NCIRD); the National Center for State, Tribal, Local, and Territorial Public Health Infrastructure and Workforce (NCSTLTPHIW); and the Global Health Center (GHC).

94.    The CDC is subject to obligations under Freedom of Information Act (FOIA). 5 U.S.C. § 552.

95.    CDC's budget for core public health programs in Fiscal Year 2024[13] was approximately $9.2 billion, reflecting Congress's view of the importance of its work to Americans' health. Many of CDC's obligations have been conducted in coordination with states and their political subdivisions, including disease prevention and control, public health research and data

---

[13] In March 2025, Congress adopted a continuing resolution (CR) that adopted (for the most part) the same appropriations from FY 2024 for FY 2025. *See* Pub. L. No. 119-4, §§ 1101-1102 (2025). Thus, in this Amended Complaint, the allegations refer to FY 2024 appropriations, and where relevant and necessary, indicate whether those appropriations were amended via the CR.

collection, preventive health services programs such as vaccination and cancer screening programs, and preparation for and response to public health emergencies. In FY 2023, for example, CDC reported that it had provided nearly $15 billion in "grants and cooperative agreements . . . to health departments, universities, and other public and private agencies in the United States."[14]

96.     Near the end of 2024, CDC employed approximately 12,000 people.

### Implementation of the March 27 Directive against CDC, and its impact on Plaintiff States

97.     On April 1, Defendants notified 2,400 CDC employees that they were being fired. HHS sent these RIF notices after it had fired thousands of CDC's probationary employees in February.

98.     Defendants sent RIF notices to all CDC workers that handled FOIA requests.

99.     Not only has the CDC been under a communications freeze and data purge, which the CDC has said were a response to the President's Day One Executive Orders, the communications team has been terminated including the leader of CDC communications, the studio team, and digital and social media communicators.

100.    On March 25, the Director of the Public Health Infrastructure Center, the Director of NCBDDD, the Director of the Office of Science, the Director of the Office of Policy, Performance and Evaluation, and the Director of the Office of Health Equity announced their retirements from the Department. In addition, the Director of the Office of Communications, the Chief Operating Officer, and the Principal Deputy Director all departed CDC in February and March.

---

[14] Centers for Disease Control and Prevention, Fiscal Year 2023 Grants Summarily Profile Report for U.S. States and District of Columbia, available at https://perma.cc/CHU3-EKAG.

101.    Additionally, starting April 1, the March 27 Directive's layoffs shuttered or severely diminished capacity at laboratories that test for infectious diseases. As a result, many states have sent their samples to Plaintiff New York State's Wadsworth Center, a state-run laboratory with elite capabilities. Wadsworth Center has many capabilities for testing for rare diseases and complex STIs that, before April 1, could not be done anywhere else in the country except for the CDC.

102.    For instance, only two labs in the U.S. can perform advanced testing for Chagas Disease: a CDC lab that was closed, and the lab at Wadsworth. The same is true for Leptospirosis, a disease that can be fatal and/or cause kidney or liver failure without early detection and treatment. Even for more common diseases, like measles, rubella, gonorrhea, or hepatitis, Wadsworth had to fill in for gaps created by closures of various CDC laboratories, including the Viral Hepatitis laboratory (discussed below).

103.    In a webpage listing the numerous infectious diseases for which it has "discontinued" or "temporarily paused" diagnostic testing as of May 3, 2025, CDC expressly directed State Public Health Laboratories (SPHLs) and federal agencies to submit their specimens to Wadsworth Center for enteroviruses, such as enterovirus D68 and poliovirus, parechovirus, and picornavirus.[15] Additionally, hemorrhagic fever testing was "temporarily paused," and SPHLs and federal agencies are directed to submit their specimens to "Laboratory Response Network laboratories."[16] The Wadsworth Center is the only laboratory within this network that can perform testing for these pathogens within twenty-four to forty-eight hours.

104.    Also as of May 3, 2025, CDC was no longer testing for Neisseria meningitis and Haemophilus influenzae, and was directing that "[d]iagnostic testing should be referred to Vaccine

---

[15] Centers for Disease Control and Prevention, Infections Diseases Laboratories, Test Directory, available at https://perma.cc/WK3X-RLD2.
[16] *Id*.

Preventable Diseases Reference Centers."[17] The Wadsworth Center is, again, one of these reference centers (and the most comprehensive). CDC no longer tested for key food-borne pathogens: Salmonella, Shigella, E. Coli, Listeria, and Campylobacter. CDC will no longer test for fungal pathogens.[18] Some of these infections are of major concern in nursing and assisted living homes due to drug-resistance that makes them untreatable. CDC no longer tested for Mycobacterium tuberculosis or conduct drug susceptibility testing.[19] For all of these pathogens, the Wadsworth Center is considered one of the top—and sometimes the only—reference center, with CDC no longer conducting the relevant testing.

105.    Since April 1, CDC has discontinued or scaled back essential diagnostic testing for several pathogens of major public health concern. These changes reduce the nation's centralized diagnostic capacity and shift responsibilities onto state public health laboratories. As a direct result of these continuing declines in CDC diagnostic testing capacity, the Wadsworth Center and other state laboratories are filling gaps left by CDC cutbacks, attempting to ensure that essential diagnostic services remain available.

106.    As of the last week of August 2025, CDC is referring the following tests to the Wadsworth Center: Varicella Zoster Virus, Enterovirus, and Parechovirus Detection and Identification (including Enterovirus-D68 (EV-D68)); Picornavirus testing (these viruses are responsible for a wide spectrum of diseases, including the common cold, poliomyelitis, meningitis, hepatitis, and paralysis); Measles and Rubella Detection (PCR) and Genotyping; and Arbovirus Isolation and Identification.

---

[17] *Id.*
[18] *Id.*
[19] *Id.*

107.    Additionally, as of the last week of August 2025, the CDC has discontinued or dramatically scaled back other tests, including real time PCR testing for Marburg Virus; identification and susceptibility for *Neisseria gonorrhoeae* (even amid a national resurgence of gonorrhea and rising concern about highly drug-resistant strains); Legionella; Listeria (a major foodborne pathogen); *Bordetella pertussis* (agent of whooping cough; testing capacity has reduced even as cases are increasing); *Mycobacterium tuberculosis* Complex; Measles and Rubella Serology (testing capacity has been discontinued, even with ongoing outbreaks in the United States and around the world); Borrelia (including B. burgdorferi, Lyme Disease); and *Bacillus anthracis* and other bioterrorism agents.

108.    The list of tests that CDC no longer performs (or cannot perform in a timely manner) continues to expand.

109.    Since CDC labs were closed, Wadsworth Center has seen new demand for its capabilities and its opinions. Wadsworth Center is responding to the urgent demand as it can; however, it was not built to replace the CDC and it simply could never fill that hole. Wadsworth Center's pricing models, liability insurance, headcount, and human resources infrastructure were all built to serve the needs of Plaintiff State of New York. Only the CDC, with its federal financing, statutorily mandated fundings, and national footprint can keep Americans safe from the national threats of epidemics.

110.    The diminished lab testing abilities of CDC have meant that it can no longer play an important role of coordinating a multi-jurisdictional response to outbreaks of infectious diseases. Diseases do not stop at state lines, and the March 27 Directive and its implementation's impact on CDC has meant that Plaintiff States are hindered in their ability to prepare for and address multi-jurisdictional outbreaks of infectious diseases.

26

111.    In August 2025, all staff at the Partnership and Vaccine Equity Branch at the Immunization Services Division were finally terminated. They had received RIF notifications on April 1 and were not covered by the preliminary injunction as revised. The Partnership and Vaccine Equity Branch supported efforts by State health departments to improve immunization rates in hesitant populations, such as those affected by measles outbreaks over the last decade.

112.    These attacks on the CDC leave it, and the Secretary charged with executing the law, unable to meet the statutory mandates of 42 U.S.C. § 242c(b):

113.    *First*, the Secretary is required to "preserve and improve public health domestically and globally and address injuries and occupational and environmental hazards," *id.* § 242c(b)(1), but Defendants slashed employees and funds necessary to address injuries and occupational and environmental hazards, firing the most experienced and senior members of its team—members so senior and specialized it will be impossible to replace them in a timely manner that avoids holding up publication, application, and other deadlines or impacting the quality of CDC's work. The closure and cuts to infectious diseases laboratories within CDC (including at the National Center for Emerging and Zoonotic Infectious Diseases and at the National Center for Immunization and Respiratory Diseases, which have lost hundreds of scientists and, in the last week of August 2025, their directors) are perhaps the most egregious example of how the March 27 Directive and its implementation have destroyed CDC's ability to meet its statutory mandates to investigate, detect, and identify diseases. *Id.* § 242c.

114.    *Second*, the Secretary must implement and update the required Strategic Plan of CDC and its offices. *Id.* § 242c(b)(4), (c). The CDC published its 2022–2027 CDC Strategic Plan, which identified priorities and objectives "supporting the efforts of State, local, and Tribal health departments" to prevent and reduce the prevalence of diseases or conditions. Yet, the full plan does

not appear on the CDC website (instead, a brief summary, labeled "Measures of Success," is public) and in any event, much of the March 27 Directive is incompatible with the Strategic Plan. Without employees sufficient to deliver on this Strategic Plan, Plaintiff States and their citizens are less protected against disease and conditions and lose out on the benefits of that plan.

115.     *Third*, the Secretary must "communicate" through meetings and otherwise, with Plaintiff States and other public and private entities, regarding health programs and activities. 42 U.S.C. § 242c(b)(7). Yet the CDC communications team lost both its leaders and its rank and file. CDC's ability to alert Plaintiff States to news related to emergency health threats such as the active bird flu and measles epidemics therefore has been limited. As long as the CDC communications team lacks staff and leadership, Plaintiff States and their citizens are at risk of not receiving the most current, reliable information that CDC is responsible to provide.

116.     *Fourth*, Plaintiff States and their citizens have a right to demand and receive public documents from CDC under FOIA. 5 U.S.C. § 552; 45 C.F.R. Part 5 (outlining FOIA responsibilities to HHS). With no FOIA staff and no working FOIA office, CDC is unable to timely and properly accept, review, and respond to FOIA requests as it must. The public and Plaintiff States are harmed by the loss of access to CDC's records.

### B.  National Institute for Occupational Safety and Health (CDC, NIOSH)

#### *Statutory Mandates*

117.     The National Institute for Occupational Safety and Health (NIOSH or the Institute) sits within CDC and was created by Congress to address and prevent work-related injury and illness, and is the only federal agency statutorily authorized to conduct workplace health and safety research. 29 U.S.C. § 651 *et seq.* This law, the Occupational Safety and Health Act of 1970, also created the Occupational Safety and Health Administration (OSHA), which sits in the Department of Labor. *Id.* While OSHA sets and enforces safety standards, NIOSH is required to: conduct or

fund "research, experiments, and demonstrations relating to occupational safety and health"; "produce . . . criteria identifying toxic substances" including setting "exposure levels that are safe for various periods of employment"; and "publish . . . at least annually a list of all known toxic substances by generic family or other useful grouping, and the concentrations at which such toxicity is known to occur"; disseminate information about occupational safety to employers and employees; conduct education programs about occupational safety; and contract with State personnel to provide compliance assistance for employers. 29 U.S.C. §§ 669(a)(1)-(3), 669(a)(6), 669(d), 670, 671(c)(2).

118.    The Occupational Safety and Health Act of 1970 also required NIOSH "shall be headed by a Director" appointed by the Secretary for a six-year term unless removed. 29 U.S.C. § 671(b).

119.    NIOSH is slated to be absorbed into the newly created AHA.

120.    Additionally, Congress has required that there be "permanently established" within NIOSH an Office of Mine Safety and Health, which is "responsible for research, development, and testing of new technologies and equipment designed to enhance mine safety and health." 29 U.S.C. § 671(h). The work of NIOSH can be divided into Extramural Programs, Intramural Programs, and Safety Surveillance Programs. In Fiscal Year 2024, Congress appropriated $362,800,000 for NIOSH's work.

### *Extramural Programs*

121.    Extramural research programs operate at non-federal facilities and interface with private and public partners. For instance, before the March 27 Directive, NIOSH funded eighteen Education and Research Centers (ERCs), which NIOSH described as playing a key role in fulfilling its statutory directive to conduct either directly or with grants, "education programs to

29

provide an adequate supply of qualified personnel to carry out the purposes" of the Occupational Safety and Health Act. 29 U.S.C. § 670(a). ERCs are academic institutions that provide graduate, post-graduate degree and academic certificate training in core and allied disciplines of occupational safety and health, including industrial hygiene, occupational health nursing, occupational medicine, and occupational safety. NIOSH also funded twelve Centers for Agricultural Safety and Health, designed to address emerging occupational safety and health problems in the agriculture, fishing, and forestry sector—sectors where workers experience fatal injury rates at over five times the rate of all other workers.

122.    NIOSH also funded ten academic Centers of Excellence for Total Worker Health across the United States, which conducted multidisciplinary research to advance worker safety, health and well-being by building the scientific evidence base necessary to develop new solutions to complex occupational safety and health problems and offering practical solutions to keep workers safe and health, and helping employers build and retain a productive workforce.

123.    Additionally, NIOSH funded twenty-three states to conduct state-based occupational safety and health surveillance—the State Occupational Safety and Health Surveillance Program. These programs often represent necessary, critical, and fundamental research and prevention activities tailored to the specific industries, occupational injury and health hazards of their state.

124.    At the University of Washington in Seattle, for instance, NIOSH grants fund both the Northwest Center for Occupational Health and Safety, an ERC, and the Pacific Northwest Agriculture Safety and Health Center, an Agriculture Safety Center. Without NIOSH funding, these Centers will be forced to shutter.

125.    Additionally, as part of its Extramural Research and Training, NIOSH engages in cooperative agreements with 23 States, including with agencies within Plaintiff States like Washington Division of Labor & Industries, for state-based surveillance of occupational injuries and illnesses. These programs conduct vital research and surveillance such research to prevent workplace fatalities, occupational respiratory disease, and adult occupational lead exposure.

### Intramural Programs

126.    Intramural programs cover specific research functions run by NIOSH employees and are often mandated or authorized to exist within NIOSH by the Occupational Safety Act or another statute. One example is the National Occupational Research Agenda (NORA), a partnership program to stimulate innovative research and improved workplace practices. These partnerships include broad participation from universities, large and small businesses, professional societies, government agencies, and worker organizations to identify and research sector-specific research priorities.

127.    NIOSH operates laboratories and facilities across the country. Each has unique abilities, specialties, and equipment to study risks for professionals in dangerous work environments including but not limited to miners, health care workers, farmers, and firefighters. Two of its key facilities are located in Pittsburgh, PA, and Spokane, WA.

128.    The Pittsburgh facility, which is home to the National Personal Protective Technology Laboratory (NPPTL), is the only laboratory authorized to review and approve respirators, including those used in health care and mining. 42 C.F.R. § 84.10(c) ("[T]he examination, inspection, and testing of all respirators will be conducted or caused to be conducted by the National Personal Protective Technology Laboratory."). Under the same rule, private partners have a legal right to communicate with the Pittsburgh lab to discuss applications for their

products. *Id.* § 84.10(d) ("Applicants, manufacturers, or their representatives may visit or communicate with the NPPTL in order to discuss the requirements for approval of any respirator or the proposed designs thereof."). The Pittsburgh facility is also home to the Pittsburgh Mining Research Division, which has test facilities for pinpointing hazardous machine noise, mine roof supports, evaluating dust hazards and controls, and evaluating human performance in completing mining tasks.

129.    The Spokane NIOSH facility, Spokane Research Laboratory, is NIOSH's largest facility west of the Mississippi River, and, before the March 27 Directive, it was home to Spokane Mining Research Division (which studied issues arising from work in mining metal and nonmetal resources) and the Western States Division (which studied occupational safety and health issues more common to the Western United States, among them oil and gas extraction; transportation, warehousing and utilities; maritime safety; motor vehicle safety; and wildland firefighting safety and health.). The Spokane Mining Research program developed safety maneuvers for miners and ran trainings on those safety maneuvers. It was the only facility of its kind doing this type of work.

### *The World Trade Center Health Program and Other Safety Surveillance Programs*

130.    NIOSH also oversaw three required surveillance programs related to miner- and firefighter-safety, and the World Trade Center Health Program.

131.    *First*, under the Coal Mine Health and Safety Act of 1969, later amended by the federal Mine Safety and Health Act of 1977, coal miners have the right to have respiratory diseases detected and, if a disease is detected, a right to transfer to positions that are less damaging to their lungs. 30 U.S.C. § 843. The Act requires that "[t]he operator of a coal mine shall cooperate with the Secretary of Health and Human Services in making available to each miner working in a coal mine the opportunity to have a chest roentgenogram . . . ." *Id.* § 843(a). These roentgenograms, or

X-rays, are given on a specified schedule and "shall be read and classified" through procedures set by HHS, which must in turn provide miners with results and inform them of their rights under the chapter. *Id.* § 843(a). Those rights include, for miners showing signs of pneumoconiosis (lung disease caused by breathing in certain kinds of dust particles), the option of transferring from their positions to other positions in any area of the mine, for such period or periods as may be necessary to prevent further development of such disease. *Id.* § 843(b)(1). Until recently, NIOSH fulfilled, in part, these statutory directives through its Coal Workers' Health Surveillance Program (CWHSP), which provided health information to miners through health screenings and surveillance, including collection of test results, evaluation, classification, and recommendation of transfers to low-dust jobs.

132.    *Second*, NIOSH administered the Health Hazard Evaluation (HHE) program, which was created by Section 20(a)(6) of the Occupational Safety and Health Act of 1970, and Sections 301 and 501 of the Federal Mine Safety and Health Act of 1977. 29 U.S.C. § 669(a)(6); 30 U.S.C. § 951(a)(11). As part of its implementing regulations, NIOSH must conduct investigations upon request of possible safety and health hazards and conduct inspections resulting from employee or committee reports of unsafe of unhealthful working conditions. 29 C.F.R. § 1960.35(a). NIOSH is also required to provide a hazard evaluation program for all federal agencies. *Id.* § 1960.35(b).

133.    *Third*, in 1998, Congress recognized the need to address the national problem of work-related firefighter deaths and serious injuries, and accordingly appropriated funds NIOSH to implement a firefighter safety initiative. As part of this initiative, NIOSH created the Fire Fighter Fatality Investigation and Prevention Program (FFFIPP), which conducted independent investigations of select career and volunteer firefighter medical and traumatic injury line-of-duty deaths. Since 1998, FFFIPP has investigated more than 700 firefighter line-of-duty deaths, and

about forty percent of all firefighter deaths. The reports produced by FFFIPP contain summaries of the fire events, factors that contributed to the firefighter's death, and recommendations to prevent similar deaths. As part of the FFFIPP program, NIOSH also evaluated self-contained breathing apparatus (SCBAs) worn during incidents investigated by the FFFIPP to determine if the SCBA unit met the applicable regulations while worn during the incident, and whether it may have contributed to a firefighter fatal event. In doing so, NIOSH collects SCBA units from local fire departments and tests them at their laboratories.

134.    *Fourth,* in 2018, Congress similarly recognized the need to develop and maintain a voluntary registry of firefighters in order to collect history and occupational information that can be used to determine the incidence of cancer among firefighters. It passed the Firefighter Cancer Registry Act of 2018, which was signed by then-President Trump on July 9, 2018, 2 U.S.C. § 280e-5, directing the CDC to develop and maintain a voluntary registry to collect data from firefighters to better understand the link between firefighting and cancer. The resulting National Firefighter Registry for Cancer, housed within NIOSH, was the largest effort ever undertaken to understand and reduce risk of cancer among U.S. firefighters.

135.    *Finally*, NIOSH oversees the World Trade Center Health Program (WTCHP). WTCHP was created by Congress in response to the health needs of responders and survivors of the 9/11 terrorist attacks. 42 U.S.C. 300mm (the Zadroga Act). WTCHP provides no-cost medical treatment, research, and monitoring to over 137,000 responders and survivors of the attacks on the World Trade Center, the Pentagon, and the Shanksville (PA) crash site for certified WTC-related health conditions. These survivors live, and can receive care under WTCHP, in every state.

136.    Under the Zadroga Act, in order for responders or survivors to receive treatment, a medical doctor must certify that members coming forward with a new condition meet the

requirements of the law. WTCHP does not employ staff physicians or individuals with medical degrees, and, instead, relies on NIOSH doctors to certify eligible members with new conditions. WTCHP does not have a staff epidemiologist and has always relied on NIOSH epidemiologists to review pending petitions for whether to add new conditions to the list of covered conditions. WTCHP also uses NIOSH staff to determine research grant awards, nearly $20 million a year, which are required of the program to fund research on 9/11 conditions and care.

137.    WTCHP also relies heavily on NIOSH's Office of Acquisition Services to oversee WTCHP contracts with its national network of providers. The office ensures that these contracts and providers meet the needs of enrollees and provides oversight and quality assurance for the network.

### *Implementation of the March 27 Directive against NIOSH, and its impact on Plaintiff States*

138.    Approximately 873 NIOSH employees (a sizable majority of the Institute's staff), including its director, Dr. John Howard, received RIF notices on April 1. Dr. Howard was in the middle of his fourth six-year term as Director of NIOSH and had served under both Republican and Democratic administrations.

139.    Following the initiation of this lawsuit on May 5, 2025, some of these NIOSH employees in select departments, including Dr. Howard, were told their RIF notices were being rescinded. However, as of the date of this filing, at least 46% (and likely more) of NIOSH's staff remain on administrative leave; the RIF notices for these staff have *not* been rescinded and remain pending, subject to the preliminary injunction.

140.    As part of its March 27 Directive, HHS announced that NIOSH (what was left of it) would be absorbed into AHA.

141.    Following March 27, NIOSH immediately stopped services and closed locations. The Spokane Research Laboratory, whose labs performed statutorily mandated research into safe practices for miners and maritime workers, went into immediate shutdown transition on April 1. There, managers and engineers received RIF notices on April 1, and remaining workers received a notice of intent for a RIF. Those RIF notices have not been rescinded. Defendants provided no guidance to the Spokane Research Laboratory on how to wind down its operations and equipment in such a short time frame. Some of its equipment is kept on third-party property and other equipment is too large, heavy, and stationary to be moved or demolished.

142.    On May 2, 2025, nearly all of the remaining NIOSH employees received RIF notices, who were all told their duties "have been identified as either unnecessary or virtually identical to duties being performed elsewhere in the agency." These employees were placed on administrative leave and told they would be officially separated on July 2, 2025. NIOSH employees confirmed to CBS News via an annotated organizational chart that NIOSH had effectively been completely dismantled, leaving only scattered few employees in two smaller sub-departments:



143. Following the initiation of this litigation, employees in a few of these sub-departments learned that their RIF notices were being rescinded. This mainly included some select staff in in the NIOSH Office of the Director; the Respiratory Health Division in Morgantown, West Virgina; the Division of Compensations and Analysis Support, part of the National Personal Protective Laboratory, and part of the Division of Field Studies and Surveillance. But these restorations did not include critical sub-departments like the Spokane Mining Research Division, which remains woefully understaffed, or the Western States Division in Spokane, which now maintains only two active employees; both are unable to fulfill their intended functions. Even in some of the previously sub-departments that were restored, the elimination of other sub-departments they worked in conjunction with, as well as support offices within NIOSH, severely hindered NIOSH's ability to fulfill its statutory mission in all respects. Ultimately, however, Defendants have given no indications these limited restorations were intended to be permanent, or

any guarantee to Plaintiff States they could not (or will not) not simply be repeated on the Secretary's whim.

144.    The National Personal Protective Technology Laboratory in Pittsburgh, PA, which is required to vet and approve personal protective equipment, including N95 respirators, lost all or nearly all its employees to the March 27 Directive. No other federal facility may issue these approvals. As of May 5, 2025, its website read: "Due to the reduction in force across NIOSH, no new respirator approval applications can be accepted."[20]



145.    When this lawsuit was initially filed (May 5, 2025), the Coal Workers' Health Surveillance Program—a Congressionally-mandated program—also had stopped work and announced it had stopped providing medical screenings or accepting new requests for review of

---

[20] Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (NIOSH), Personal Protective Equipment, available at https://perma.cc/ZYM2-TYTE; Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (NIOSH), Respirator Approval Program, available at https://perma.cc/G6K4-WEQF.

medical information to determine coal miners' rights for transfer to low-dust jobs, as a direct result of the March 27 Directive. [21]



146.    The same was true for the Health Hazard Evaluations—another Congressionally-mandated program—announced that it would not accept any new health hazard evaluation requests due to the implementation of the March 27 Directive. [22]



---

[21] Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (NIOSH), Coal Workers' Health Surveillance Program, available at https://perma.cc/SU5C-W2NF. This website has since been updated to remove the "Notice" that was present on May 5, 2025.

[22] Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (NIOSH), Health Hazard Evaluations, available at https://perma.cc/9HAP-MNVV. This website has since been updated to remove the "Notice" that was present on May 5, 2025.

147.    The same was true for FFFIPP—another Congressionally-mandated program—which announced it had stopped and would not accept new requests, due to the implementation of the March 27 Directive.[23]



148.    Finally, the same was true for the congressionally mandated National Firefighter Registry, which by May 5, 2025, had announced that firefighters could no longer enroll due to the NIOSH RIF:[24]

---

[23] Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (NIOSH), About the FFFIP, available at https://perma.cc/Q9SR-6XPU. This website has since been updated to remove the "Notice" that was present on May 5, 2025.

[24] Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (NIOSH), National Firefighter Registry (NFR) for Cancer, available at https://perma.cc/K9UP-BVDD. This website has since been updated to remove the "Notice" that was present on May 5, 2025.



149.    The cessation of work at NIOSH facilities has deprived Plaintiff States of resources guaranteed to them under statute. As just one example, federal regulations require NIOSH certify respiratory equipment, 42 C.F.R. § 84.10(c), and an estimated five million American workers are required to use respirators for their jobs. Plaintiff States—as employers and operators of health care facilities and other settings where respiratory equipment is necessary—face harm from the sudden cessation of certification of respiratory equipment, which will make it more difficult to source and purchase necessary respiratory equipment for State workers and State facilities. If the NIOSH facility in Pittsburgh is ultimately shut down or unable to function due to lack of staff, private partners lack any effective ability to communicate with the Pittsburgh lab to discuss requirements for approval or the proposed designs of their respiratory equipment. *Id.* § 84.10(d). And, without the facility in Pittsburgh, no respiratory equipment may be approved for manufacture or use, and no partners can communicate with product reviewers.

150.    The essential elimination of NIOSH, its leadership, stature and authority to guide the nation, states, and communities in a coordinated effort to advance worker safety and health and

assist employers in providing a workplace free of hazards, will harm workers in almost every industry sector across the nation.

151.    The loss of highly skilled NIOSH workers also directly impacts the States and local communities where these workers were located. For instance, in Washington, NIOSH employees have frequently collaborated with Washington State Labor and Industries to analyze and describe workers' compensation claims among Washington mining operators. Recently, NIOSH Spokane employees collaborated with two industry partners to design, build and deploy a hybrid dust control system that proved to reduce airborne silica dust by ninety-three percent at a mine site near Spokane. Without these collaborations, States will need to curtail their own activities or divert funding from other necessary programs to fill the gap.

152.    States have lost their ability to participate in NIOSH-led partnerships. The partnerships formed from NORA lead to actionable publications that combine the perspectives of the many stakeholders in occupational safety and health. For example, the NORA Services Sector Council recently produced a draft publication titled "Protecting Temporary Workers: Best Practices for Host Employers," which was coauthored by NIOSH, NORA, the American Society of Safety Professionals, the American Staffing Association, and Washington L&I's Safety and Health Assessment and Research for Prevention program. This document provided a set of best practices for host employers to follow to better protect the safety and health of temporary workers. Without NIOSH, states lack the weight, authority, and breadth to replicate these comprehensive partnerships, priorities, and agendas for industries and major safety and health issues. Without NORA and other coordination by NIOSH, research and prevention opportunities for states will be missed, and workers and employers will lose the benefit of coordinated efforts to eliminate hazards in their workplace.

42

153.    The threatened elimination of NIOSH, especially the divisions that have not had any RIF notices rescinded, diminishes the information available to establish safe workplaces in Plaintiff States. For instance, NIOSH publishes Recommended Exposure Limits (NIOSH RELs). NIOSH RELs provide exposure limits to hazardous substances in the workplace to protect workers from any harm. NIOSH RELs are developed through a comprehensive data review. NIOSH RELs are published in the NIOSH Pocket Guide to Chemical Hazards. In the absence of OSHA regulations for specific chemicals, NIOSH RELS can be helpful to employers to provide guidance on safe exposure levels. The personnel and resource demands to develop a comprehensive set of RELs are not available in state labor or health agencies.  Similarly, NIOSH publishes the NIOSH Manual of Analytical Methods (NMAM). NMAM is a collection of sampling and analytical methods for workplace exposure monitoring. It includes methods for workplace air, surfaces, and blood and urine, and provides standardized, authoritative methods for the collection and analysis of these samples across the United States. If NIOSH lacks the ability to update NMAM, it will become obsolete. The number of methods developed and in need of updating far exceeds the capacity of one state or even multiple states and as such the loss of NIOSH, the loss of NMAM, will create confusion, with the application of inconsistent methods across states.

154.    Plaintiff States regularly rely on NIOSH's data and research findings to inform and support their own laws and regulations on worker safety. For instance, Washington's workplace safety rules frequently reference and rely on NIOSH research and publications in setting their own standards, and explicitly require NIOSH-certified equipment to be used in certain situations. *See, e.g.*, WAC 296-305-04001 (requiring firefighters' self-contained breathing apparatus to be NIOSH certified); WAC 296-842-11005 (relying on NIOSH certification for respirator selection for workplaces; noting "[i]f a respirator is not certified by NIOSH, you have no guarantee that it meets

minimum design and performance standards for workplace use"); WAC 296-842-19005 (relying on NIOSH Pocket Guide to Chemical Hazards to determine whether immediately dangerous to life or health conditions exist); *see also* RCW 49.17.460 (relying on NIOSH alerts in setting policy for exposure to hazardous drugs, noting "[i]t is the intent of the legislature to require health care facilities to follow rules requiring compliance with all aspects of [NIOSH]'s alert regardless of the setting in order to protect health care personnel from hazardous exposure to such drugs.").

155.    NIOSH's dismantling also directly, and significantly, endangers miners. For instance, by firing almost all the employees in the Respiratory Health Division, Defendants made it impossible for NIOSH to implement the CWHSP, as the agency no longer has the necessary personnel or expertise to fulfill its statutory obligations to coal miners. The announcement that no new submissions will be accepted for CWHSP, a congressionally mandated program, is telling. Without NIOSH fulfilling these critical functions, the need for monitoring, prevention, and treatment of affected miners—all of which previously required the immense amount of resources and specialization of NIOSH—will be borne fully by states. Critical efforts to monitor and stem the incidence of black lung among our nation's miners will either be borne completely and imperfectly by a patchwork of state health institutions, or lost entirely.

156.    The elimination of some of NIOSH's congressionally mandated and funded role in researching and monitoring mining safety is also endangering miner health efforts in other agencies that depend on NIOSH. For instance, NIOSH's Mining Research Divisions in Spokane and Pittsburgh (which have not had their RIF notices rescinded) represent the only locations where critical research into mining structural safety, and miner personal safety, are capable of being conducted. They house unique and specialized equipment that require trained personnel to operate, such as (1) a large heat stress chamber designed for voluntary human subject research; (2) a

network of seismic sensor arrays designed to provide seismic monitoring for mines, widely distributed throughout the region and some of which is located on private property; (3) large equipment testing support structures in mines to prevent mine collapse; and (4) large scale direct shear test frames designed to test soil and rock samples, simulating ground stresses to test a sample's strength characteristics. Only the current NIOSH personnel (now on administrative leave) know how to operate this machinery, much of which is immobile and could not be sold or transferred in its current form without being destroyed. And in additional to its laboratory and field research, NIOSH's Spokane Mining Research Division also manages the Miner Health Program, a long-term, systematic effort to understand and improve the health and well-being of all miners. It supports this effort not only through integration of research, active collaboration with the mining community, and data transfer, but through a number of miner-focused programs such as the mobile surveillance programs, where NIOSH workers travel to different mining or mining-adjacent sites and test for common diseases like black lung.

157.    The loss of the NIOSH mining safety research and programs would come at a critically inopportune time, as the Trump Administration is implementing the President's Executive Orders calling for increased domestic coal mining, oil and gas extraction, and rare earth mineral mining. Mining is a dangerous job—dozens of Washington miners, for instance, have died in coal mining disasters. Aside from the real risk of explosions and cave-ins, mining also has a high prevalence of occupational respiratory and other types of disease, as workers are frequently exposed to coal mine dust, other chemical and respiratory hazards, and excessive noise. As a result of the planned reductions in force, NIOSH will not be able to conduct this important research or develop guidance to prevent and reduce these serious illnesses and injuries for miners—an area where NIOSH has produced hundreds of research articles, presentations, and industry guidance.

158.    The threatened elimination of NIOSH ERCs directly impacts the numerous centers at state agencies, such as the University of Washington, that will be forced to close without NIOSH funding. The impacts of the loss of these centers goes well beyond the inevitable layoffs of faculty and staff, or the elimination of incoming student classes and the resulting lost revenue for academic institutions. The closure of ERCs diminishes (if not eliminates) the states' supply of occupational medical doctors, industrial hygienists, and other occupational safety and health professionals. Without these specialists, workplace hazards will go undetected, preventable injuries will increase, and evidence-based care for injured workers will decline.

159.    The threatened eliminations of the remaining NIOSH intramural and extramural programs, such as the HHE program, Total Worker Health Centers, and state-based occupational health surveillance programs, will place added strain on Plaintiff-States' already-strained health and labor agencies, who do not have the resources, data, legal mandates, or reach of NIOSH to effectively replace the massive loss of institutional knowledge and application. In Washington, for instance, NIOSH's HHE Program has provided at least ten technical assistance evaluations to businesses and industry in the State of Washington over the last twenty years, covering issues like (1) Tuberculosis transmission from elephants to zoo employees; (2) chlorine gas release at a metal recycling facility; (3) exposure to potential hazards during harvesting and processing cannabis at an outdoor organic farm; and (4) concerns over occupational exposure to new drycleaning solvents among drycleaning workers. In each instance NIOSH conducted a thorough investigation and provided public recommendations and findings that provided industry guidance on strengthened safety protocols. If the March 27 Directive's gutting of NIOSH is put into effect, no other federal agency would have the capability to provide the same service.

160.    For its part, WTCHP had already lost probationary workers in February before it lost sixteen more employees on April 1. These terminations came after HHS repeatedly said no members of WTCHP would be terminated.

161.    Secretary Kennedy was confronted about the WTCHP terminations by the Senate Committee on Health, Education, Labor and Pensions and testified that "we made a couple of mistakes, that was one," and that the WTCHP cuts "should not have been made."[25] Secretary Kennedy testified that he "restored the staff to that program" on May 14, 2025,[26] however, staffing at WTCHP still has not returned to its pre-Directive level and a hiring freeze remains in place.

162.    The implementation of the March 27 Directive has led to several failures by WTCHP:

a. *First*, WTCHP relies upon medical doctors at NIOSH to certify new cancers and terminations. The April 1 RIF notices, however, put all of NIOSH's medical doctors on administrative leave, severely impacting WTCHP. Since April 1, patients have experienced delays in receiving care and coverage for their medical needs.

b. *Second*, under the Zadroga Act, the head of WTCHP (WTC Program Administrator) must regularly determine if a new diagnosis should be added to the list of "WTC-related health conditions" and, thereby, qualifies for coverage. 42 U.S.C. § 300mm-22(a)(1) ("WTC-related health condition defined"); *see also id.* § 300mm-22(a)(6) ("Addition of Health Conditions to List for WTC Responders"). Several petitions pending review to add conditions to the list have sat unaddressed by the WTCHP since before March 27, 2025.

---

[25] Senate HELP Committee, *Senate HELP Hearing: YF 2027 Department of Health and Human Services Budget*, YouTube (May 14, 2025), https://www.youtube.com/live/do7L8jUvZoo?si=hBEZl8QpRnc3Ua6W&t=8573.
[26] *Id.*

    c.  *Third*, without its staff, WTCHP has no way to, as it must under the Zadroga Act, hold meetings of the Responder and Survivor Steering Committees, renew contracts with its partners or approve research grants. 42 U.S.C. § 300mm-1.

    d.  While previously approved grants are slowly receiving notifications of awards, newly submitted research grant proposals have been effectively frozen as there are insufficient grant processors. 42 U.S.C. § 300mm-51.

163.    Further, WTCHP, with the rest of NIOSH, is to be moved out of CDC and into the new AHA agency under the March 27 Directive, but there has been no explanation as to how WTCHP will secure staff to replace the staff it shared with CDC before the reorganization.

164.    Even the few hollowed-out NIOSH programs spared by the March 27 Directive's near-total cuts, or partially restored in the midst of this litigation, have been rendered functionally ineffective, placing increased financial burden on the Plaintiff States. For instance, restoring some employees in the NPPTL or HHE programs is functionally useless to Plaintiff States if critical support staff (like lab supply procurement specialists and chemists) are not also restored.

### C. National Center for Chronic Disease Prevention and Health Promotion (CDC, NCCDPHP)

#### *Statutory Mandates*

165.    The National Center for Chronic Disease Prevention and Health Promotion (NCCDPHP) sits within CDC and supports healthy behaviors and preventive medical care to help people prevent and manage chronic diseases. Its work focuses on many of the leading causes of preventable deaths in the United States, including tobacco use, poor nutrition, lack of physical activity, and overuse of alcohol. More than seventy-five percent of its annual budget is used to support State, local, territorial, and Tribal partners. The NCCDPHP includes the Division of Reproductive Health and the Office on Smoking and Health.

166.     The Division of Reproductive Health (DRH) is made up of an Office of the Director and four branches: Applied Sciences Branch, Women's Health and Fertility Branch, Field Support Branch, and a Maternal and Infant Health Branch.

167.     The DRH Applied Sciences Branch is responsible for studying many aspects of the health and well-being of pregnant people and babies, as set out by statute. 42 U.S.C. § 247b-12 ("Safe motherhood"); *id.* § 247b-13 ("Prenatal and postnatal health"). The Pregnancy Risk Assessment Monitoring System (PRAMS) is one such program, which collected national data regarding maternal and infant health outcomes. PRAMS was a site-specific, population-based surveillance system designed to identify groups of women and infants at high risk for health problems, to monitor changes in health status, and to measure progress towards goals in improving the health of mothers and infants.

168.     Public and private health organizations partnered with DRH to collect PRAMS data and receive grant funding. That partnership extended beyond the grant itself. PRAMS partners are entitled to receive from the CDC, through their substantial programmatic involvement, post-award monitoring, technical assistance, performance reviews, and general assistance to carry out the award. Additionally, grants provide for a project officer or other staff to support the PRAMS project with "day-to-day" management. The data collected in the survey must be kept confidential pursuant to a Standard Data Management Plan.

169.     Congress requires the Secretary, acting through the Director of the CDC, to carry out the PRAMS data collection activities. 42 U.S.C. § 247b-13(a). State officials and health care providers rely on the massive survey data collected through PRAMS, which was running for nearly forty years, to improve health outcomes. At least one state has used the PRAMS data to guide legislative efforts aimed at improving maternal health.

170.   The Women's Health and Fertility Branch is responsible for overseeing surveillance, study, and publication of data related to contraception safety and contraception guidelines, abortion data collection, and in vitro fertilization (IVF) pregnancies. A dedicated team collected data from assisted reproductive technology clinics on their pregnancy success rates and maintained a nation-wide database of clinics that offered IVF. This Branch also maintained an online tool that individuals interested in becoming pregnant could use to estimate their success of IVF and researched how to make treatments cheaper through state-mandated insurance. Much of this work is ordered by Congress. *See* Fertility Clinic Success Rate and Certification Act of 1992, Pub. L. 102-493.

171.   DRH also ran a Field Support Branch which provides guidance to states on the needs of pregnant and postpartum people and infants in emergencies. That Branch includes the Maternal and Child Health Epidemiology Team and the Emergency Preparedness and Response Team. The Field Support Branch is responsible for supporting Plaintiff States with maternal and child health epidemiology program (MCHEP) by assigning epidemiologists directly to states where they analyze public health data. The Field Support Branch also provided leadership and staff trainings to Plaintiff States that address the special needs of reproductive-aged women, pregnant women, and postpartum women and infants during emergency responses of emerging and re-emerging infections as well as environmental concerns. The Field Support Branch's work is mandated by Congress. Pandemic and All-Hazards Preparedness Act, Pub. L. 109-417; 42 U.S.C. § 247-12.

172.   In addition to the DRH, NCCDPHP oversees the Office on Smoking and Health (OSH). OSH is the lead federal agency for comprehensive tobacco prevention and control and played a critical role in preventing youth tobacco use, which includes smoking, vaping, and other

nicotine products, and helping adults to quit smoking. Cigarette smoking is the leading cause of preventable disease, disability, and death in the United States. OSH is responsible for working to prevent and reduce cigarette smoking by collecting, studying, and sharing information on cigarette smoking and its effects on health, as mandated by Congress. 15 U.S.C. § 1341 ("Smoking, research, education and information").

173.    Among other projects required under 15 U.S.C. § 1341(a), OSH is responsible for managing a tobacco use data portal which provided access to the latest tobacco prevention and control data, graphs, and maps, as well as the State Tobacco Activities Tracking and Evaluation (STATE) System, which presents data on traditional Medicaid coverage of tobacco cessation treatments in fifty U.S. States and the District of Columbia. Plaintiff States rely on this data to assess tobacco cessation policies.

174.    OSH also is responsible for managing annual submissions of cigarette and smokeless tobacco ingredient reports from manufacturers, packagers, and importers as mandated under the Federal Cigarette Labeling and Advertising Act (15 U.S.C. § 1335a) and the Comprehensive Smokeless Tobacco Health Education Act (15 U.S.C. § 4403(a)(1)(A)), and monitors tobacco use trends and health impacts in part to inform FDA regulations and enforcement of the Tobacco Control Act of 2009 (Pub. L. 111-31). In 2019, OSH linked contaminated vaping devices to fatal lung damage.

175.    Further, OSH plays an important role in surveillance and surveys, including the state-based Behavioral Risk Factor Surveillance System, National Health and Nutrition Examination Survey, and National Youth Tobacco Survey (NYTS). OSH's national surveillance system has provided reliable, consistent, and cost-effective data collection that many Plaintiff States use to evaluate their work and monitor progress in tobacco use prevention. NYTS collected

data on tobacco use by high school and middle school students, including which products they use, how often they use them, and how youth access them. OSH additionally published state-level data on tobacco prevention use in the STATE System.

176.    OSH must educate the public about the harms of tobacco use, 15 U.S.C. § 1341(a)(2), and did so via media campaigns such as Tips from Former Smokers (Tips Campaign). The Tips Campaign ads, which were placed on television, radio, and billboards, encourages smokers to quit by featuring real people with serious health conditions caused by smoking and secondhand smoke exposure. The 2012–2018 Tips Campaign has a significant positive impact on Americans' health. CDC estimates that over 16.4 million smokers attempted to quit and approximately one million successfully quit because of the Tips Campaign. Smokers who saw Tips Campaign videos reported greater intentions to quit smoking, and former smokers with higher exposure to the ads were associated with lower odds of relapse. The Tips Campaign was credited with helping prevent approximately 129,000 early deaths during 2012–2018. Moreover, the Tips Campaign saved precious government resources: CDC estimates the Tips Campaign saved $7.3 billion in smoking-related healthcare costs. Every $3,800 spent prevented the early death of an American.

177.    OSH scientists publish high-quality reports on tobacco use trends that states utilized to prioritize interventions, monitor progress, and reduce disparities. OSH's Best Practices for Comprehensive Tobacco Control Program Guide advises states on how to develop, implement, and fund an evidence-based tobacco control program. OSH likewise placed its publications and resources to the "Publication Catalog and Ordering System" where state agencies and other users could access campaign materials and Surgeon General's reports. In addition, OSH provided resources for middle and high school educators to help young people avoid or quit vaping.

178.    OSH is responsible for maintaining the national network of tobacco cessation
quitlines to encourage people to quit tobacco use by supporting quitline services in fifty states, two
U.S. territories, and Washington, D.C. OSH funds state quitlines to deliver resources such as
counseling and medications—it funds more than seventy-five percent of quitline costs in five states
and two U.S. territories and at least twenty-five percent for eighteen states. The Tips Campaign
has resulted in a sustained and dramatic increase of calls to quitlines, including over two million
additional calls during 2012–2023.

179.    OSH also provides millions in funding to the National and State Tobacco Control
Program. OSH is the only federal agency that funds tobacco control efforts in fifty states, the
District of Columbia, eight U.S. territories, and twenty-eight tribes and tribal organizations. The
National and State Tobacco Control Program has served as a backbone to protect the public from
the harms of tobacco use. Participating states use OSH funds to prevent kids from using tobacco,
reduce secondhand smoke exposure, help people quit smoking, and address disparities in tobacco
use. Moreover, these investments serve the public fisc. Under the Tobacco Control Program, CDC
has distributed $69.7 million per year to 51 recipients, including Plaintiff States, to implement the
state tobacco control program and about $16 million to ensure quitline capacity. For every one
dollar spent on strong tobacco control programs, states achieve a fifty-dollar return on investment,
mostly due to the state averting paying increased health care costs to treat smoking-related illness.

180.    In Fiscal Year 2024, Congress appropriated $1,192,647,000 to the programs of the
NCCDPHP.

### *Implementation of the March 27 Directive against NCCDPHP, and its impact on Plaintiff States*

181.    RIF notices hit NCCDPHP disproportionately hard, especially its subagencies
DRH, DPH, and OSH. DRH, alone, lost most of its 100 employees. Defendants sent RIF notices

to virtually all staff at three of the four branches in the Division: the Applied Sciences Branch (which included the fifteen-person team responsible for PRAMS), the Women's Health and Fertility Branch (forty employees), and the Field Support Branch, as well as DRH's Office of the Director.

182.    Following April 1, CDC communicated to Plaintiff States that it would be unable to provide the resources promised under the PRAMS agreements.

183.    While CDC now asserts that it will be able to provide program management support for PRAMS after implementing the March 27 Directive, Defendants have not explained *how* the statutorily mandated collection, review, and publication of the PRAMS data would continue without interruption or a dip in quality after firing everyone in the division. Nor could they have: after sending RIF notices to all full-time employees working on PRAMS, which included epidemiologists and other experts who supervised and standardized the survey, data collection stopped. Months later, contract reviewers began to restart collection, but their efforts were unsupervised and uncoordinated leading to data collection that is unusable by Plaintiff States. Furthermore, the irreparable damage had been done and a significant portion of the data for the year was lost. States stopped receiving weighted and cleaned data; instead, CDC sent them data that is unusable unless the States separately find, hire, and pay statisticians to clean and weight the data.

184.    Nor has CDC explained how it will maintain data systems and keep those systems secure while there is no one working in DRH. These data systems were required under the terms of the PRAMS agreements and include extremely sensitive personal health information protected under numerous federal and state laws and regulations.

185.    Plaintiff States have lost their PRAMS partnership support and the critical reproductive health data that came with it. The PRAMS agreement required CDC to provide Plaintiff States "substantial programmatic involvement" after the award was made, including post-award monitoring, technical assistance, and performance reviews. Instead, with no warning, Plaintiff States lost access to these experts (e.g., epidemiologists) and services (e.g., data management, IT support). As of September 4, 2025, CDC has not released a Notice of Funding Opportunity for 2026 data collection.

186.    Plaintiff Connecticut, as one example, uses PRAMS data to collaborate with community and state organizations and provide insight into the experiences of the Medicaid population during pregnancy. This supported the development of the HUSKY Maternity Bundle, an initiative aimed at improving outcomes for people on Medicaid that launched this year. PRAMS is a tool used by many state agencies, such as but not limited to the Delaware Division of Public Health, the Michigan Department of Health and Human Services, and the Hawaiʻi Pediatric Department of Health, to monitor the health and well-being of pregnant people and their infants. Without reliable access to this data, Plaintiff States will continue to be unable to identify and respond to trends in maternal and infant health outcomes, or to shape evidence-based programs and policies aimed at reducing infant and maternal morbidity and mortality.

187.    RIFs at the Women's Health and Fertility Branch also impacted collection and publication of assisted reproductive technology data which Plaintiff States have relied on to support perinatal health surveillance, inform clinical guideline discussions, and assist in public education efforts about associated risks and outcomes.

188.    In addition to the lost data and services, the PRAMS agreements with Plaintiff States and local health departments committed substantial grant funding and post-award

programmatic involvement such as trainings and technical assistance by CDC program officials and project scientists that will be lost. With all DRH staff terminated, including those who managed the grants and ran the trainings, Plaintiff States and their instrumentalities are losing out on the services and data that was promised to them. Some Plaintiff States were told that their project officer and/or technical monitor was on administrative leave, associated with the RIFs.

189.    Beyond PRAMS data, the States have lost a range of data regarding maternal and infant health outcomes including maternal mortality, needs of pregnant and postpartum people and infants in emergencies, and IVF success rates; even data on how to lower the cost of IVF via state-mandated insurance. IVF data collection stopped after the implementation of the March 27 Directive creating a gap that will substantially weaken the data. Plaintiff States rely on receiving that data to efficiently deploy their resources and respond to the health needs of their citizens.

190.    Defendants also sent RIF notices to almost everyone in the DRH Field Support Branch, including individuals working directly on public health in the Plaintiff States, and the entire team responsible for guidance on the needs of pregnant and postpartum people and infants in emergencies, such as COVID-19, Zika, and Ebola—all of which pose particular risks for pregnant women. This team, known as the Emergency Preparedness and Response Team, closely collaborated with public health organizations such as the National County and City Health Officials and the Association of Maternal and Child Health Programs, within Plaintiff States on maternal and infant health capacity-building programs for state and local jurisdictions.

191.    The Field Support Branch also manages the MCHEP, which had provided direct assistance to states since 1986 through the assignment of CDC maternal and child health epidemiologists as field assignees. These epidemiologists are funded by a mix of state and CDC funds and all received RIF notices as a result of the March 27 Directive.

192.    OSH, as well, was destroyed. All or nearly all of the roughly 120 full-time employees who had not already filed for retirement or early retirement received RIF Notices (and many contract workers had lost their jobs in February). The former Director & Senior Medical Officer of OSH from 2010–2017, described what happened to OSH as "the greatest gift to the tobacco industry in the last half century."

193.    OSH is unable to fulfill its statutory mandates to collect and publish relevant data, manage annual submissions of cigarette ingredient reports from manufacturers and importers, and monitor tobacco use trends and health impacts to inform FDA regulations and enforcement policies. Since April 1, OSH has stopped conducting adult tobacco product surveillance and youth surveillance is limited. Plaintiff States will no longer have access to these data to inform their program and policy interventions.

194.    CDC's website "Tobacco Ingredient and Nicotine Reporting," which provided relevant background and guidance for manufacturers, packagers, and importers of tobacco products to report the ingredients and the quantity of nicotine in the products, has posted a disclaimer that ingredient submissions are paused and no new Certificates of Compliance will be issued "[d]ue to the impact of the HHS Reduction in Force and reorganization," which has remained on the website for months. Each manufacturer, packager, or importer of cigarettes or smokeless tobacco products must annually submit to OSH a list of ingredients added in the products, 15 U.S.C. 1335a, and yet, on the CDC's own website, it announced that because of the March 27 Directive, it was pausing submissions:[27]

---

[27] Centers for Disease Control and Prevention, Smoking and Tobacco Use – Tobacco Ingredient and Nicotine Reporting, available at https://perma.cc/KCF2-VTKH.



195.    As of September 4, 2025, the same disclaimer remains.[28]

196.    Plaintiff States rely on these reports in a number of ways, including as a basis for their tobacco control or enforcement laws. In some Plaintiff States, one factor considered when deciding whether a brand may appear on its directory of products permitted for sale is participation in the Tobacco Ingredient and Nicotine Report.

197.    Similarly, OSH education ads are unavailable to Plaintiff States. Before the March 27 Directive, states could order free and low-cost tobacco education campaign materials to support its own communication efforts and avoid the high cost of producing new ads.

---

[28] Centers for Disease Control and Prevention, Smoking and Tobacco Use – Tobacco Ingredient and Nicotine Reporting, available at https://perma.cc/55Y5-W3WB.



198.    As of September 4, 2025, the same disclaimer remains and MCRC remains unable to process orders.[29]

199.    The implementation of the March 27 Directive has also kept CDC from fulfilling its obligations to "conduct and support research on the effect of cigarette smoking on human health and develop materials for informing the public of such effect," "establish and maintain a liaison with . . . State and local public agencies respecting activities relating to the effect of cigarette smoking on human health," and "collect, analyze and disseminate (through publications, bibliographies, and otherwise) information, studies, and other data relating to the effect of cigarette smoking on human health . . ." under the Comprehensive Smoking Education Act, 15 U.S.C. § 1341(a)(1), (3)-(4). These mandates compel OSH to manage, among other projects, the Tips from Former Smokers ad campaign, the national and state quitlines, scientific reports and studies supporting smokefree indoor air protections all of which have already been cut or are in jeopardy.

---

[29] Centers for Disease Control and Prevention, Media Campaign Resource Center, available at https://perma.cc/3KTA-3R2U.

For many years, Plaintiff States have relied on the Tips campaign, quitlines, and reports to educate its residents about tobacco cessation resources.

200.     Defendants' actions have left the Tobacco Control Program unworkable. For example, Defendants recently announced a funding opportunity under the Program which many Plaintiff States have applied for but Defendants offered no funding timeline. Plaintiff States lack current information as to the status of their applications or when they can expect to receive funds and, thus, hire people. Without open communication regarding the application or a program officer to answer questions, Plaintiff States cannot make plans or efficiently use the funds even if their application is granted.

201.     HHS cuts and layoffs to these critical resources, that have helped more than one million smokers to quit, have reduced access to these free or low-cost quitlines. Without state quitlines, fewer people will be encouraged to quit, fewer people will know where to get help, and fewer people will quit.

### D. National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention (CDC, NCHHSTP)

#### *Statutory Mandates*

202.     The National Center for HIV, Viral Hepatitis, STD and Tuberculosis Prevention (NCHHSTP) sits within CDC and works "to reduce incidence of infection, morbidity and mortality, and health disparities in the U.S. and abroad."[30] Prior to April 1, NCHHSTP fulfilled this mission by monitoring public health, researching disease prevention, funding local programs that prevent disease, and developing and promoting strategies to reduce harm and other tools for providers and affected or at-risk communities. It was created to further the objectives set forth in

---

[30] Centers for Disease Control and Prevention, National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention, NCHHSTP Strategic Priorities, available at https://perma.cc/F3TS-9P3H.

the PHSA. In Fiscal Year 2024, Congress appropriated $1,391,056,000 for the CDC's prevention research and other efforts relating to HIV/AIDS, viral Hepatitis, STIs, and Tuberculosis.

203.    Among other divisions and offices, NCHHSTP is responsible for overseeing the Division of HIV Prevention (DHP), whose mission is to promote health and quality of life by preventing HIV infection and reducing HIV-related illness and death in the United States, the Division of Sexually Transmitted Disease Prevention (DSTDP), whose mission is to maximize the impact of STI prevention through science, programs, and policy, and the Division of Viral Hepatitis (DVH), whose mission is to end the viral hepatitis epidemics through leadership in science and public health practices.

204.    These divisions are responsible for running Disease Intervention Training Centers to strengthen the capacity of local and state health departments to conduct intervention services for communicable diseases including HIV/AIDS. CDC is required, by statute, to "establish fellowship and training programs to be conducted by the [CDC] to train individuals to develop skills in epidemiology, surveillance, testing, counseling, education, information, and laboratory analysis relating to [AIDS]." 42 U.S.C. § 300cc-31(a); *see also id.* § 300ff-111 (authorizing grants to train health personnel with regards HIV/AIDS interventions); *id.* § 300ee-4 (requiring technical assistance relating to AIDS).

205.    These Divisions are responsible for running the HIV Medical Monitoring Project, which is led by state, local, and territorial health departments in partnership with CDC, and which generates data that has been used to guide HIV policy and funding decisions, and to improve care for people living with HIV.[31] States both participate in the Project as a collectors of data, and rely

---

[31] https://perma.cc/SV26-GU5X.

on the Project to monitor trends, identify unmet healthcare needs, and assess access to care and support.

206.    These Divisions also are responsible for running the National HIV Behavioral Surveillance Project, which collected data on behavioral risk factors, testing behaviors, and prevention services and strategies in populations disproportionately affected by HIV.[32] The States play a role in gathering data for this Project, and they rely on the Project's findings in developing HIV prevention and intervention strategies.

### Implementation of the March 27 Directive against NCHHSTP, and its impact on Plaintiff States

207.    Several branches under the DHP lost their entire staff pursuant to the March 27 Directive: behavioral and clinical surveillance HIV research, HIV prevention capacity development, prevention communications, quantitative sciences, and all work that is global in nature.

208.    DSTDP shut down a laboratory that analyzed and tracked complex sexually transmitted infections (STI Lab) around the country. The STI Lab lost seventy-seven scientists, with a collective 1,400 years of field experience. This was a state-of-the-art Bio Safe Level 4 lab that studied many infectious diseases, including HIV/AIDS and drug-resistant gonorrhea. On June 11, after Plaintiffs' motion for a preliminary injunction had been fully briefed and argued, Defendants rescinded the RIF notices that had been sent to the staff of the STI lab and allowed them to return to work.

209.    The CDC also shut down the Division of Viral Hepatitis's (DVH) Laboratory Branch at CDC headquarters by laying off all twenty-seven of the lab's scientists on April 1, when

---

[32] http://perma.cc/E66H-YPK5.

scientists were given just one day to shut down the lab, secure approximately one million blood samples being preserved in the facility's multi-million dollar freezers, and pause investigations into current hepatitis outbreaks in at least seven states. Congress had appropriated $53 million specifically to efforts to combat viral hepatitis. The DVH Lab, which was integral to research that was awarded a Nobel Prize in Medicine for helping to make the initial discovery of Hepatitis C in the 1980s, is the foremost viral Hepatitis laboratory in the United States and the world, and the research it conducts in real time to track active Hepatitis outbreaks using the virus's genetic code is not conducted by any other institution. Similar to the STI lab, Defendants rescinded the RIF notices that had been sent to the staff of the DVH lab after Plaintiffs' motion for a preliminary injunction had been briefed and argued.

210.    Because Defendants suddenly closed the DSTDP's STI Lab and the DVH Lab at CDC headquarters with no notice or explanation of how the work could possibly continue, Plaintiff States had to find new partners to handle their most difficult testing needs that had previously been handled by the CDC. This came with additional cost, and it also meant that Plaintiff States lost the ability to rely upon CDC's expertise in responding to cross-jurisdictional outbreaks.

211.    The March 27 Directive has also meant that CDC has no one to run or manage agreements related to their Disease Intervention Training Centers. In a notice sent to states on April 10, 2025, CDC wrote:

> Dear Funded Partner, Last week CDC experienced a large reduction in force (RIF), in accordance with President Donald Trump's Executive Order 14210 and the Department of Health and Human Services' (HHS) broader reorganization strategy to improve its efficiency and effectiveness. This cooperative agreement CDC-RFA-PS20-2003: STD/HIV Disease Intervention Training Centers (DITC) will not be extended. Unfortunately, the Division of STD Prevention (DSTDP) is no longer able to provide programmatic technical assistance or project monitoring as required by law.

212.     Plaintiff States had relied on these training centers to support services and interventions that prevent the spread of HIV/AIDS. Plaintiff New York had been notified verbally that its funding would be renewed and was awaiting a formal notice of award when it received the April 10 notice that funding would be terminated because of the March 27 Directive. As a result, Plaintiff New York lost $300,000 in grant funding, harming New York's ability to respond occurs to expanding national sexually transmitted infections. When New York sought an explanation, every staff person at CDC who might have been able to provide a clarification or explanation had been placed on administrative leave and was unreachable.

213.     DITC also provided technical assistance through the National Coalition of STD Directors and the Regional Prevention Training Centers to Plaintiff States. The virtual and in-person trainings offered by Prevention Training Centers to Plaintiff States are no longer available and existing training programs, including the "Passport to Partner Services," have fallen out of date and must be updated. These programs were crucial for new investigators, which require at least three months of training, and experienced investigators to develop necessary expertise. States and local jurisdictions must now develop and maintain their own disease intervention training curricula, which is especially challenging in environments with high staff turnover and in rural health departments. Even if states and local jurisdictions could replace the lost curriculum and trainings, it would take years to get back to the level of expertise that was held by DITC that was lost as a result of the March 27 Directive.

214.     The March 27 Directive has meant that the Medical Monitoring Project was functionally terminated, because there are no staff to run it. All meetings have been canceled, data collection has ended, and grant funding was stopped. States are now left without funding to continue this critical survey work on their own.

215.    The March 27 Directive has meant that the National HIV Behavioral Surveillance Project was severely stalled because there was no staff at CDC who could work on the project. All initial meetings were canceled without notice or understanding of how this cooperative work would proceed. States were left to continue the work on their own with no direction or input from the CDC through June. Though the CDC staff returned in July, they have been unable to answer many of the questions from State health departments about this program.

### E.  National Center for Environmental Health (CDC, NCEH)

#### *Statutory Mandates*

216.    NCEH sits within CDC and exists to protect people's health from environmental hazards that can be present in the air we breathe, the water we drink, and the world that sustains us by investigating relationships between environmental factors and health, developing guidance, and building partnerships with U.S. and international agencies. Within NCEH sits the Division of Environmental Health Science and Practice (DEHSP) which is responsible for providing critical environmental health support and funding for environmental health departments and other partners with similar missions.

217.    DEHSP is the primary Division responsible for asthma control and lead poisoning prevention. It consists of the Asthma and Air Quality Branch, the Climate and Health Activity, the Emerging Environmental Hazards and Health Effects Branch, the Environmental Public Health Tracking Branch, the Lead Poisoning Prevention and Surveillance Branch, and the Water, Food, and Environmental Health Services Branch.

218.    DEHSP is responsible for administratively overseeing, and often collaborated with, the otherwise independent Agency for Toxic Substances and Disease Registry (ATSDR). Congress ordered creation of ATSDR in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA Act), 42 U.S.C. § 9601 *et seq.*, and ordered ATSDR report directly

to the Surgeon General, though it may cooperate with several other leaders of federal agencies, "and appropriate State and local health officials" to implement the health authorities of the CERCLA Act. *Id.* § 9604(i)(1). Under the first of those obligations, ATSDR must "in cooperation with the States, establish and maintain a national registry of serious diseases and illnesses and a national registry of persons exposed to toxic substances." *Id.* § 9604(i)(1)(A).

219.    DEHSP also plays a key role in the National Environmental Public Health Tracking Program, which uses a network of people and information systems to deliver non-infectious disease, environmental, and socio-economic data from various sources. Congress appropriated funds to CDC to establish this program in 2002, and the program funds have continued to go to thirty-three states to consolidate data from local, State, and national levels to monitor and assess health risks for public health officials.

220.    In Fiscal Year 2024, Congress appropriated $191,850,000 for the work of NCEH.

### Implementation of the March 27 Directive against NCEH and its impact on Plaintiff States

221.    The entire DEHSP was eliminated. It is unclear how many staff were lost at ATSDR.

222.    The March 27 Directive calls for ATSDR to be absorbed by the new AHA.

223.    At the time of the March 27 Directive, DEHSP was in the middle of responding to a lead crisis in Milwaukee, WI. Because of the RIFs, DEHSP had to stop creating a plan for mass testing of schoolchildren for lead, stop holding weekly discussions with city health officials on the investigation, stop providing coaching and document reviews, and stop helping stakeholders with technical questions. The Director of ATSDR wrote to city officials: "I sincerely regret to inform you that due to the complete loss of our Lead Program, we will be unable to support you with this."

224.    Other state and local health departments across the country were negatively affected. For example, the CDC, and in particular ATSDR and DEHSP, played an important role in pooling and disseminating knowledge and best practices, providing technical expertise and assistance, and helping adapt lessons from across the country to specific problems, like the discovery of lead paint in Milwaukee school buildings. ATSDR and DEHSP cannot, because of the layoffs and reorganization, continue to perform their duties to respond to lead exposures.

225.    Plaintiff States also rely on data published by NCEH, including the Environmental Public Health Tracking Program which experienced months-long disruptions in maintaining, collecting, and publishing data due to the at DEHSP. Plaintiff States were left without federal information that Congress paid for to inform their own responses to environmental health emergencies, including lead exposures.

226.    On June 10, following argument on the motion for a preliminary injunction in this case, some of the RIF notices that had been sent to NCEH staff were rescinded and some staff were able to return to work. However, even after some RIFs were rescinded at NCEH, Plaintiff States have not been able to obtain support from the childhood lead poisoning team and have been harmed by the lack of guidance being issued on lead and product recalls.

## F. National Center on Birth Defects and Developmental Disabilities (CDC, NCBDDD)

### Statutory Mandates

227.    Congress established the NCBDDD within CDC under the Children's Health Act of 2000. Prior to April 1, 2025, the NCBDDD and its programs served to prevent birth defects like spina bifida and congenital heart defects, prevent over 30,000 people with hemophilia from suffering bleeding crises while protecting the blood supply for all Americans, and address the special needs of people with disabilities. NCBDDD was  created by Congress within CDC for the

Secretary to: (1) "collect, analyze, and make available data on birth defects, developmental disabilities, and disabilities and health"; (2) "operate regional centers for the conduct of applied epidemiological research on the prevention of such defects and disabilities"; (3) conduct public education on same; (4) "conduct research on and to promote the prevention of such defects and disabilities, and secondary health conditions among individuals with disabilities"; and (5) establish a program to prevent and reduce suffering from spina bifida. 42 U.S.C. § 247b-4(a)(2).

228.    The NCBDDD manages the Division of Blood Disorders and Public Health Genomics, which works to promote health, prevent disease, and reduce health inequities for people at increased genetic risk across the lifespan, so they can have the opportunity to be as healthy as possible. This Division is responsible for running two surveillance programs required by statute. First, the Sickle Cell Data Collection Program, 42 U.S.C. § 300b-5, which partnered with several Plaintiff States to collect population-based data on people living with sickle cell disease. The Sickle Cell Data Collection program helps inform policy decisions and resource allocation with several Plaintiff States to improve and extend the lives of people with sickle cell disease. Second, the Community Counts, 42 U.S.C. § 300c-22, which gathered and shared information about common health issues, medical complications, and causes of death that affect people with an array of bleeding disorders cared for in U.S. hemophilia treatment centers. There are over 130 such centers in the country today, including about 63 treatment centers in Plaintiff States.

229.    As part of Community Counts, the Division of Blood Disorders and Public Health Genomics' laboratory branch developed testing and validation procedures for inhibitor development, which is one of the most harmful treatment complications that can impact individuals with bleeding disorders. Further, it generated empirical data that informed the

development of laboratory testing guidelines for a complication associated with hemophilia treatment.

230.    The Division of Blood Disorders and Public Health Genomics also maintains a laboratory with blood samples dating back to 1996 to which additional samples are added to this day. The laboratory collected more than 100,000 blood samples and performed testing for HIV, Hepatitis B, Hepatitis C, and inhibitor development, including a posterity sample stored to test for emerging issues in the community.

231.    NCBDDD also oversaw the Division of Human Development and Disability. This Division promotes health equity by studying public health information, reducing disparities, promoting healthy living, and supporting inclusive health programs. One such program is the Early Hearing Detection and Intervention (EHDI) Programs, which are responsible for expanding public health capacity with regards to children who are deaf or hard-of-hearing. *See* 42 U.S.C. § 280g-1(b). Under the law, the Secretary must work through CDC to develop state-wide screenings, diagnosis, and intervention programs for deaf and hard-of-hearing newborns, infants, and young children. *Id.*

232.    The EHDI has been a major health success which boosted screenings of infants from 11% twenty years ago to over 95% today. Receiving early intervention services can help children meet speech, language, social, and emotional development milestones. For example, with appropriate services, children can develop the comprehension and use of language, known as language acquisition.

233.    In Fiscal Year 2024, Congress appropriated $206,060,000 for the work of NCBDDD.

***Implementation of the March 27 Directive against NCBDDD, and its Impact on Plaintiff States***

234.    More than forty percent of the 225 scientists and public health workers at the NCBDDD received RIF notices and were put on administrative leave, eliminating the staff responsible for carrying out many of NCBDDD's statutorily mandated functions, notwithstanding Congress' appropriations for the Center's crucial work.

235.    All employees of NCBDDD's Office of the Director received RIF notices, leaving the lower divisions bereft of oversight and administrative support that was critical to their ability to perform their functions.

236.    The cuts completely eliminated the Division of Blood Disorders and Public Health Genomics, which performed research on conditions such as hemophilia, sickle cell disease, and many other conditions impacting blood. The American Society of Hematology and ninety related organizations called for Secretary Kennedy to reverse the cuts at the Division of Blood Disorders, cuts, which the Society stated are "effectively dismantling this critical division."

237.    The Division of Blood Disorders and Public Health Genomics is responsible for managing the Sickle Cell Data Collection program, which gathers health information about people with sickle cell disease to assess the long-term trends in diagnosis, treatment, and healthcare access for people with sickle cell disease in the U.S. However, since April 1, there has been no staff to manage this program. The Sickle Cell Data Collection program's cooperative agreements grantees continue to be funded through 2025 and will be funded for 2026. However, there is no subject matter expert from the Division of Blood Disorders and Public Health Genomics to provide technical assistance to the grantees or oversee activities to ensure alignment with budgetary or programmatic requirements.

238.    The Division of Blood Disorders and Public Health Genomics staff also worked on the Community Counts monitoring system. The staff was close to publishing a national report on inhibitor development before the RIFs were announced. The report remains unpublished.

239.    The Community Counts program is also supposed to respond to epidemiological data requests, but since April 1, there has been no staff to respond to those requests. States cannot duplicate that data because they do not have the epidemiologists or data experts to process and refine the data, nor do they have access to the 20 years of national, historical data that CDC has in its possession.

240.    Community Counts data continues to be collected at the grantee level, however, the data is raw, unstandardized, and will be useless to Plaintiff States who have relied on access to that data to efficiently respond to the needs of those living with blood disorders.

241.    The cooperative agreements grantees continue to be funded through 2025 and will be funded for 2026. However, there is no subject matter expert from the Division of Blood Disorders and Public Health Genomics to provide technical assistance to the grantees or oversee activities to ensure alignment with budgetary or programmatic requirements.

242.    The Division of Blood Disorders and Public Health Genomics' laboratory has been shut down and all stored blood samples have been destroyed.

243.    Without the Division of Blood Disorders and Public Health Genomics, there is no way to collect the data submitted by the treatment centers and no data has been added to the dataset since April 1. Individual grantees have no capacity to create a national dataset or perform analysis without federal support.

244.    The March 27 Directive also eviscerated the Division for Human Development and Disability and destroyed its branch for Disability and Health Promotion which managed the EHDI

team. All but one member of the EHDI team received a RIF notice. In an email sent to all recipients of EHDI funding, including Plaintiff States, the Division of Human Development and Disability wrote that, "the typical functions of project officers, health/data scientists and evaluation scientists are not occurring," even though the primary requirement of EHDI grant recipients (including some of Plaintiff States) "is data submission." The email also explained that there was only one person "currently supporting all IT-related requests for" NCBDDD, and indicated that, "[a]s a result of the RIF," the review of future grant applications was "on hold."

245.    Similar to other sub-agencies, EHDI offers irreplaceable data collection and analysis services which Plaintiff States cannot replace because they lack both the expertise (medical, scientific, and technological) and the national reach to collect data from the same number of environments and patients to replace what the CDC offered. Congress ordered the Secretary and CDC to provide technical assistance, data management, and applied research to State agencies, 42 U.S.C. § 280g-1(b), and now Defendants have fired everyone who knew how to do the work and offered no explanation for how the work should continue.

246.    NCBDDD's Disability and Health Data Science teams worked on the National Syndromic Surveillance Program Disability Data, which monitors emergency department visits to detect public health outbreaks and other health issues affecting people with disabilities. All the people responsible for that program were terminated.

## G.  National Center for Injury Prevention and Control (CDC, NCIPC)
### Statutory Mandates

247.    The mission of the National Center for Injury Prevention and Control (NCIPC or the Injury Center), which sits within CDC, is to prevent injury, overdose, suicide, and violence across the lifespan through science and action. NCIPC is responsible for working proactively with

partners, including Plaintiff States, to track trends, conduct research, raise awareness, and implement prevention programs.

248.    The work of NCIPC was established in 1993 and was created by the Injury Control Act of 1990, which amended the PHSA to revise and extend the program for the prevention and control of injuries. Injury Control Act of 1990, Pub. L. 101-558, 104 Stat. 2772 (1990). NCIPC is governed by 42 U.S.C. § 280b.

249.    Within NCIPC sits the Office of the Director and three divisions, including the Division of Injury Prevention. The Division of Injury Prevention's mission is to prevent injuries by connecting data, science, and action to ensure healthy communities. This work is required by statute. 42 U.S.C. § 280b (requiring CDC to "conduct, and give assistance to public and nonprofit private entities, scientific institutions, and individuals engaged in the conduct of, research relating to the causes, mechanisms, prevention, diagnosis, treatment of injuries, and rehabilitation from injuries"); *id.* § 280b-0 ("the Director of the Centers for Disease Control and Prevention, shall— (1) assist States and political subdivisions of States in activities for the prevention and control of injuries").

250.    NCIPC also oversees the Division of Overdose Prevention which, among many other things, was responsible for overseeing the Overdose Data to Action (OD2A) cooperative agreements with state departments to track overdoses and emerging threats and to support state health departments in preventing overdoses.

251.    NCIPC also oversees the Division of Violence Prevention which, among many other things, researched and issued guidance on how best to respond to and prevent violence (e.g., intimate partner violence, sexual violence, firearm injury and death).

252.    In Fiscal Year 2024, Congress appropriated $761,379,000 for the work of NCIPC.

***Implementation of the March 27 Directive against NCIPC and its impact on Plaintiff States***

253.    Entire teams at NCIPC that focused on motor vehicle crashes, child maltreatment, rape prevention and education, drowning, traumatic brain injury, falls in the elderly, and other issues were cut. More than 200 positions at NCIPC were eliminated as a result of the March 27 Directive. Much of their work was required by statute; the result is that funding appropriated by Congress will not be spent.

254.    Plaintiff States had relied on NCIPC and its datasets on injury and violence to improve their on-the-ground efforts. The data was used to efficiently deploy measures meant to prevent overdose, motor vehicle accidents, drownings, and other lethal accidents.

255.    CDC partnered with the Consumer Product Safety Commission on the National Electronic Injury Surveillance System, which collects data on injuries from approximately 100 hospitals across the U.S. As a result of the March 27 Directive, data collection efforts through that System will be significantly limited, including that data on injuries from motor vehicle crashes, falls, alcohol, adverse drug effects, work-related injuries will no longer be collected.

256.    In mid-August 2025, Defendants terminated 600 CDC employees who had been noticed for termination on April 1 and who were not subject to the preliminary injunction as narrowed. This included roughly one hundred full-time employees of the CDC's Division of Violence Prevention within NCIPC who had been working to reduce instances of violence, including gun violence, through data collection and research relied on by some Plaintiff States, such as the National Violent Death Reporting System.

### H.  Food and Drug Administration (FDA)

*Statutory Mandates*

257.     FDA is responsible for protecting the public health by assuring the safety, efficacy, and security of human and veterinary drugs, biological products, medical devices, our nation's food supply, cosmetics, and products that emit radiation. The FDA also provides accurate, science-based health information to the public.

258.     FDA was first created by the Pure Food and Drug Act of 1906, which itself was passed as a response to Upton Sinclair's The Jungle. Pub. L. 59-384. That act was then replaced by the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq* (FDCA). FDA also derives statutory authority from a number of other laws, including the PHSA.

259.     By law the FDA shall, among other things, "promote the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products in a timely manner." 21 U.S.C. § 393(b)(1). Further, the Commissioner of the FDA shall be responsible for, among other things, "coordinating and overseeing the operation of all administrative entities within the Administration," *id.* § 393(d)(2)(B), "research relating to foods, drugs, cosmetics, devices, and tobacco products in carrying out this chapter," *id.* § 393 (d)(2)(C), and "conducting educational and public information programs relating to the responsibilities of the Food and Drug Administration," *id.* § 393(d)(2)(D).

260.     In 2009, the Family Smoking Prevention and Tobacco Control Act (Pub. L. 111-31 (Tobacco Control Act)) amended the Federal Food, Drug, and Cosmetics Act (21 U.S.C. § 301 *et seq.*, (FDCA)) to authorize FDA to oversee the manufacture, marketing, distribution, and sale of tobacco products and to protect the public from the harmful effects of tobacco product use. The Tobacco Control Act directed FDA to establish a Center for Tobacco Products (CTP) to implement the law. 21 U.S.C. § 387a(e). Among other duties, CTP conducts compliance checks on vendors

and retailers to ensure that tobacco products are not sold to those under the age of twenty-one, 21 U.S.C. § 387f, reviews premarket applications for new tobacco products before they can be marketed in the United States, 21 U.S.C. § 387j ("Application for review of certain tobacco products"), enforces advertising and promotion restrictions, 21 U.S.C. § 387f-1, and educates the public about the risks of tobacco use including the dangers of e-cigarettes and other tobacco products, 21 U.S.C. § 393(d)(2)(D). CTP also develops and administers "The Real Cost" campaign, a tobacco prevention advertising campaign that provides current information on the harms of tobacco products. 15 U.S.C. § 1341(a). "The Real Cost" campaign prevented an estimated 444,252 American youth from starting e-cigarettes between 2023 and 2024.

261.    CTP operates at no cost to taxpayers and, by law, is entirely funded by user fees. 21 U.S.C. §§ 387a(e), 387s(c)(2)(A).

262.    CTP is established by the Secretary and reports to the Secretary, through the Commissioner of Food and Drugs, as the other agency centers within FDA. 21 U.S.C. §§ 393(d)(1), 387a(e).

263.    CTP is led by a director, and oversees five offices: the Office of Management, Office of Regulations, Office of Science, Office of Health Communication and Education, and the Office of Compliance and Enforcement.

264.    In Fiscal Year 2024, FDA's budget was approximately $6.6 billion, of which only $3.5 billion was appropriated by Congress. The remainder of the FDA's budget was paid for by user fees, many of which were generated by the Prescription Drug User Fee Act. More than eighty percent of FDA's budget was spent on its work ensuring the safety and reliability of human drugs, foods, tobacco, devices/radiological health, biologics, and animal drugs and feed. As of October

2024, FDA was responsible for regulating the food, medical, and tobacco products industries which cumulatively account for $3.9 trillion in economic activity.

265.    FDA is headquartered in Silver Spring, Maryland, and has hundreds of field offices and fifteen laboratories located across all fifty states, the United States Virgin Islands, and Puerto Rico. FDA had more than 18,000 employees in 2024.

### Implementation of the March 27 Directive against FDA and its impact on Plaintiff States

266.    On April 1, Defendants fired 3,500 employees (nearly twenty percent of the agency's full-time employees) from FDA including many high-ranking, experienced agency leaders from Center for Biologics Evaluation and Research, the Center for Drug Evaluation and Research, the Human Foods Program, the Center for Veterinary Medicine and CTP. Those terminated agency leaders included: the Director of the Office of Regulatory Operations, CBER; the Associate Director of Policy, CBER; the Associate Director of Product Management, CBER; the Deputy Director of CBER; the Director of the Office of New Drugs, CDER; the Director of the Office of Strategic Programs, CDER; the Director of CTP; the Director of the Office of Science, CTP; the Chief Veterinary Officer, CVM; and the Chief Medical Officer.

267.    These leaders joined many other FDA leaders who departed after Election Day 2024 but before April 1, 2025, including: the Director of CBER; the Deputy Director of CBER; the Director of the Office of Clinical Evaluation, CBER; the Chief of the Laboratory of Molecular and Developmental Immunology, CBER; the Director of CDER; the Deputy Director of CDER; the Deputy Director for Clinical Science, CDER; the Chief Counsel of the FDA; the Chief Medical Officer of the FDA; the Deputy Commissioner of the Human Foods Program; the Director of the Office of Product Evaluation and Quality, Center for Devices and Radiological Health; the Deputy Director of the Center for Science, Center for Devices & Radiological Health; the Director of the

Digital Health Center of Excellence, Center for Devices & Radiological Health; the Deputy Directors of the Oncology Center of Excellence; the Deputy Director of the Oncology Center of Excellence; and the Principal Deputy Commissioner.

268.    The April 1 RIF notices devastated CTP. CTP's Director was placed on administrative leave. The Office of Regulations, an office of about 30, was cut down to one person. The Office of Management was cut entirely. The leadership of the Office of Science, which collaborates with the Office of Smoking and Health in administering the NYTS and reviews premarket tobacco product applications, was eviscerated leaving the CTP unable to timely review every new tobacco product before it reaches the market. 21 U.S.C. § 387j(c)(2)(A).

269.    CTP cannot continue to operate, as it must under the Tobacco Control Act, after the cuts. Its enforcement abilities were stopped in its tracks. The cuts prompted a sprint by some remaining enforcement officials to seek extensions for the active complaints against retailers slated to go before the HHS board charged with reviewing them. The FDA was forced to ask people back to continue operations.

270.    Inside the FDA, the cuts raised fears about CTP's ability to continue enforcing the tobacco sales laws. Without enforcement the ongoing proliferation of disposable flavored vapes from China, that has already alarmed U.S. lawmakers, in the U.S. may skyrocket, particularly impacting children who find the sweet flavors and flashy designs appealing.

271.    Further, CTP has been unable to meet its mandates under the Tobacco Control Act to review premarket applications for new tobacco products before they can be marketed in the U.S., enforce regulations, and educate the public about the risks of tobacco use, including the dangers of e-cigarettes and other tobacco products. Before April 1, CTP had reviewed premarket tobacco applications for about 27 million e-cigarette products and approved only the thirty-four e-

cigarette products that met the applicable public health standard required by law, including that the potential for the approved products to benefit adults who smoke outweighed the risk to youth. CTP now lacks the staff to properly process pre-market applications. Many Plaintiff States' laws depend on FDA product review and approval to determine which products may be legally sold in their state based on an exemption for FDA-approved e-cigarette products.

272.    States have also relied on FDA to monitor marketing of tobacco and nicotine products which not only drive down use by minors, but informs state enforcement actions. When some Plaintiff States see a product in the field that is subject to an FDA marketing or distribution violation, they report violations of FDA regulations directly to the FDA. Without people at FDA to oversee marketing and distribution efforts, this partnership has failed.

## I.  Administration for Children and Families (ACF)

### *Statutory Mandates*

273.    ACF administers programs and provides advice to the Secretary on issues relevant to children, youth, and families such as child support enforcement, community services, developmental disabilities, family assistance, Native American assistance, and refugee resettlement.

274.    ACF was created in 1991, 42 U.S.C. § 12311, though its oldest program is the Children's Bureau which was established in 1912. The establishment of ACF, which involved a reorganization of preexisting HHS offices under the authority of Section 6 of the Reorganization Plan No. 1 of 1953, 42 U.S.C. § 3501, placed greater emphasis and focus on the needs of America's children and families.

275.    Congress established ACF within HHS. 42 U.S.C. § 12311; 42 U.S.C. § 616. The Secretary is thereby charged with statutory duties including, *inter alia*: the collection and

dissemination of information relating to the problems of young people and families; administering the grants authorized in title 42, chapter 127, subchapter I; assisting in the establishment and implementation of various types of programs; providing technical assistance and consultation to the States; gathering statistics that other federal agencies are not collecting; developing policies and priorities for the programs and activities under title 42, chapter 127; convening conferences with State and local agencies on programs for children, youth, and families. *Id.* § 12312(a); and, providing training and technical assistance for Head Start Programs, 42 U.S.C. § 9843.

276.    ACF manages many statutorily mandated programs including Head Start, which were created by statute including the Head Start Act, 42 U.S.C. § 9801, and amended by the Improving Head Start for School Readiness Act of 2007, Pub. L. 110-134; Temporary Assistance for Needy Families, which was created by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193; Child Care and Development Fund block grants, which operate under the Child Care & Development Block Grant Act of 2014, Pub. L. 113-186; Low-Income Home Energy Assistance Program (LIHEAP), which was established by Title XXVI of the Omnibus Budget Reconciliation Act of 1981, Pub. L. 97-35.

277.    Prior to April 1, 2025, ACF was comprised of twenty-three offices, including the Immediate Office of the Assistant Secretary and the Office of Regional Operations, which facilitated the work of the ten regional offices around the country. Those offices included the Office of Early Childhood Development (which oversaw the Offices of Child Care and Head Start) and the Office of Community Services (which oversaw LIHEAP, among other programs).

278.    As of January 21, 2025, ACF employed 2,400 federal employees, and an additional 500 contractors, with some staff working at the central office in Washington, D.C., and the majority working out of the regional offices in Atlanta, Boston, Chicago, Dallas, Denver, Kansas City, MO,

New York City, Philadelphia, San Francisco and Seattle. As of May 2024, ACF administered more than 60 programs with a budget appropriated by Congress of more than $70 billion.[33]

### *Implementation of the March 27 Directive at ACF and its impact on Plaintiff States*

279.    Approximately 500 staff members at ACF received a RIF notice on April 1, 2025. These were in addition to the roughly 200 probationary employees who were already on administrative leave, and another 200 who had left under the Fork in the Road option. At bottom, ACF has gone from a head count of 2,400 at the beginning of 2025 to 1,500—a loss of about thirty-eight percent.

280.    All regional staff in ACF's Boston (Region 1), New York City (Region 2), Chicago (Region 5), San Francisco (Region 9), and Seattle (Region 10) offices received RIF notices. These regional offices offered critical support to ACF's Head Start, Child Care, Family Assistance programs, and the Children's Bureau. The program specialists at these offices were intimately familiar with the complex structures and operations of the countless providers, grantees, and state and local agencies that ACF served. In fact, the majority of Office of the Head Start (OHS) employees within ACF work out of the regional offices. Further, the closure of many regional offices means that grantees will have to travel farther on average to reach their regional office. The National Head Start Association has said the cuts happened without a "clear plan for how the administration intends on supporting Head Start." The programs that receive Head Start and Child Care funds are deeply reliant on federal money: during the brief hold on federal grants in February, many Head Start grantees were unable to make payroll the day of the freeze and several Head Start centers temporarily closed.

---

[33] https://perma.cc/PJ5T-GAYU.

281.    After the terminations and closures of regional offices, communications to OHS from Head Start grantees and Plaintiff States went largely unanswered. Some of those unanswered communications involved important questions related to funding applications and deadlines and the sudden regional realignments. The delayed responses which grantees did receive were often incomplete, confusing, or conflicting. As a result, Head Start grantees flooded Plaintiff States' agencies with their urgent questions that took time and resources to address.

282.    Plaintiff States rely upon functional, fully operational Head Start programs and will be harmed in numerous ways if Head Start programs in their States are forced to pause operations or close. Hundreds of thousands of children (and their families) depend on Head Start programs for childcare, early education, and health supports; loss of which would inevitably impact and strain the Plaintiff States' social support programs. Some Plaintiff States administer, and receive direct funding in support of, Head Start programs. For example, Washington State has several public colleges and institutions of higher learning that operate Head Start programs pursuant to grant funding from the Office of Head Start.

283.    Head Start programs give preference to foster children, who have few other options for free childcare. Many foster parents would have to reconsider whether they could continue to foster children in the child welfare system if they had to forego the high quality, free childcare provided by Head Start. With fewer Head Start programs, Plaintiff States would face increased difficulties in recruiting foster parents and caring for their most vulnerable youth.

284.    Additionally, Plaintiff States inspect and license childcare centers operating in their jurisdictions. Head Start programs are subject to heightened inspection and licensing standards, and as a result, they have historically required far fewer resources to inspect and license by the Plaintiff States. If Head Start programs close, the inspection and licensure burden on Plaintiff

States will increase as the balance shifts towards newer centers that are not subject to other inspection regimes.

285.    ACF staff who received RIF notices were responsible for not only processing and administering billions in Head Start funding to programs in the Plaintiff States, but for providing training and technical assistance, monitoring, and other program support. This would include site visits for safety and program integrity. Now, without dedicated program specialists to email or call, Head Start providers have been instructed to send all inquiries to a generic email box.

286.    OHS stopped issuing critical guidance to states and grantees causing harmful delays and confusion. Head Start programs are required to maintain 97% enrollment or risk being put on an onerous year-long "full enrollment plan" which could result in losing their grant funding. Since the 2020 Pandemic, many programs have had difficulty maintaining 97% enrollment, primarily due to staffing shortages. As a result, some programs have requested grant modifications to serve fewer children with the same amount of grant funding. This allows them to improve wages, hire and retain qualified staff, and meet the enrollment requirement. Yet, since the March 27 Directive, many programs have reported these applications being delayed, leaving providers (who must complete enrollment at the start of the school year) without clear direction on enrollment requirements. At least one program received conflicting notices of award in response to such a request and did not have a point of contact at the regional office to ask for clarification when the regional office was closed, paralyzing the enrollment process.

287.    Separately, grantees are required to obtain permission for certain transactions over $10,000 even when those transactions do not require additional grant funding. Only one such expense request can be submitted at a time, so no new requests can be submitted while another one is pending, creating an even longer delay in processing additional requests. As one example,

a grantee in a Plaintiff State submitted a request in February to replace two aging facilities maintenance trucks. Typically, those requests would be processed in 30–60 days. The request still has not been processed, harming the program. This program has other similar needs—including replacing aging telecommunication lines that have become unreliable and thus pose a safety risk—that it cannot submit because the truck request remains pending. This program is located in a rural area, making it essential to have reliable modes of maintenance transportation and telecommunications. The program relies on landlines for incoming calls from parents; a landline failure thus severs parents from their children and raises a safety issue. Many other programs have faced similar delays that impact services and jeopardize substantial funding.

288.    OHS has also begun reviewing grant applications, websites, and publications with artificial intelligence (AI) to assess compliance with Executive Orders related to Diversity, Equity, and Inclusion. See Executive Order 14151 (January 20, 2025). Without guidance and communications from OHS or ACF regarding how to interpret and comply with the requirements of the Executive Order, grantees and states are left to guess. A failure to comply with federal actions brings severe consequences, and at least one Head Start grantee has been notified that their grant, which had already been approved, was re-reviewed and erroneously found not in compliance due to an error by the AI review software.

289.    Plaintiff States have been burdened in responding to new or revised HHS guidance without coordinated guidance from OHS. For example, when HHS issued a notice under the Personal Responsibility and Work Opportunity Reconciliation Act, 90 Fed. Reg. 31,232 (July 14, 2025), OHS offered no guidance on how to implement the new requirements. Plaintiff States, both as grantees and as authorities within their state, were impeded from providing timely and accurate

updates to critical guidance documents, grant agreements, manuals, tools, and rules to help grantees.

290.    The Head Start program funds the employment of a State Director of Head Start Collaboration within each State. 42 U.S.C. § 9837b(a). These State Directors work closely with OHS employees in the regional offices and Head Start grantees within their States to coordinate and facilitate the administration of Head Start services. Since the regional staffs of Regions 1, 2, 5, 9, and 10 received RIF notices, the State Directors within those regions—who are employed by the agencies within Plaintiff States administering children and family services—have been inundated with requests for help from Head Start grantees whose funding was delayed, or otherwise could not reach their usual contacts within the regional offices for routine assistance.

291.    Beyond Head Start, ACF administers TANF grants to Plaintiff States to help families when parents or other relatives cannot provide for the family's basic needs. As part of the March 27 Directive, the entire State Policy team in ACF's central office and the entire policy division received RIF notices. The TANF grants are now run through ACF's Office of Family Assistance. After the April 1 RIF notices were sent out, the Office of Family Assistance had only three program managers and seven program specialist staff to respond to the needs of the entire country.

## J.  Substance Abuse and Mental Health Services Administration (SAMHSA)
### *Statutory Mandates*

292.    SAMHSA's mission is to lead public health and service delivery efforts that promote mental health, prevent substance misuse, and provide treatments and supports to foster recovery while ensuring access and better outcomes for all.

293.    SAMHSA was created in 1992 when Congress amended the PHSA to reorganize the agencies addressing substance misuse and behavioral health. The amendment abolished the Alcohol, Drug Abuse, and Mental Health Administration and consolidated substance-abuse related functions within the new HHS sub-agency. Pub L. 102-321, 106 Stat. 323 (1992), 42 U.S.C. § 290aa. Congress ordered the Secretary, acting through the Assistant Secretary of SAMHSA, "to supervise the functions of the Centers of [SAMHSA]," 42 U.S.C. § 290aa, to "collect[] data each year on the national incidence and prevalence of the various forms of mental illness and substance abuse," 42 U.S.C. § 290aa-4, to, among other things, "make grants to public and nonprofit private entities for the purpose of carrying out programs," 42 U.S.C. § 290bb-25.

294.    Congress created multiple Centers within SAMHSA, 42 U.S.C. § 290aa(b), and created the role of "the Assistant Secretary" to head SAMHSA. 42 U.S.C. § 290aa(c). By statute SAMHSA's actions must be carried out by the Secretary "acting through the Assistant Secretary." 42 U.S.C. § 290aa(d).

295.    One of the centers overseen by SAMHSA is the Center for Behavioral Health Statistics and Quality (CBHSQ), 42 U.S.C. § 290aa-4, which is required to collect mental health and substance abuse data nationally. One of the several data collection systems an surveys maintained by CBHSQ is the National Survey on Drug Use and Health (NSDUH), an annual survey conducted via face-to-face interviews in people's homes and online that collects, and after review provides, nationally representative data on the use of tobacco, alcohol, and drugs; substance use disorders; mental health issues; and receipt of substance use and mental health treatment among the civilian, noninstitutionalized population aged twelve or older in the U.S. According to

SAMHSA, the NSDUH is "paramount in meeting a critical objective of SAMHSA's mission . . . and selected areas as required by [42 U.S.C. 290aa(d)(4)]."[34]

296.    CBHSQ also must oversee the Drug Abuse Warning Network (DAWN), a national data collection program required by Congress, 42 U.S.C. § 290aa-4(d)(1)(A), to collect the number of individuals admitted to the emergency rooms of hospitals as a result of the abuse of alcohol or other drugs, analyze and disseminate results. The program operates as an early warning system for changes in substance abuse patterns and monitors, among many other drugs, abuse of opioids.

297.    The Center for Behavioral Health Statistics and Quality also oversees the Behavioral Health Services Information System (BHSIS), which collects information on the U.S. behavioral health treatment system and connects people with substance use and mental health treatment. BHSIS is comprised of seven data sets: Inventory of Substance Use and Mental Health Treatment Facilities, Findtreatment.gov, National Substance Use and Mental Health Service Survey, National Survey of Substance Abuse Treatment Services and National Mental Health Services Survey, Treatment Episode Data Set (TEDS), Mental Health Client-level Data, and the Uniform Reporting System.

298.    As required by 42 U.S.C. 290aa(l), the Assistant Secretary of SAMHSA must develop and carry out a strategic plan. The Strategic Plan, 2023–2026, is available on SAMHSA's website, and contains renewed commitments to SAMHSA's objectives of Preventing Substance Use and Overdose; Enhancing Access to Suicide Prevention and Mental Health Services; Promoting Resilience and Emotional Health for Children, Youth, and Families; Integrating Behavioral and Physical Health Care; and Strengthening the Behavioral Health Workforce. In furtherance of those priorities, the Strategic Plan committed to many initiatives, including

---

[34] https://perma.cc/2JFC-7URB.

treatment and recovery programs (*e.g.*, State/Tribal Opioid Response programs and Building Communities of Recovery grants), public awareness efforts ("Talk. They Hear You." an underage drinking campaign), technical assistance and training to communities and organizations (*e.g.*, The Strategic Prevention Technical Assistance Center, and Prevention Technology Transfer Center Network), and infrastructure grants and partnerships between SAMHSA and state agencies to develop culturally appropriate service delivery systems.

299.    SAMHSA also is responsible for overseeing several smaller offices, including the 988 Lifeline & Behavioral Health Crisis Coordinating Office. Congress ordered the Assistant Secretary of SAMHSA to operate a National Suicide Prevention Lifeline program. 42 U.S.C. § 290bb-36c(a) ("The Secretary, acting through the Assistant Secretary, shall maintain the National Suicide Prevention Lifeline program."). The law requires the Secretary to maintain the program's many activities, *id.* § 290bb-36c(b), consult with State departments of health in developing requirements of crisis centers across the country, *id.* § 290bb-36c(c)(3), share secure and de-identified epidemiological data with the CDC, *id.* § 290bb-36c(d), and demographic data with state and local agencies, *id.* § 290bb-36c(e).

300.    SAMHSA receives funding under several federal statutes including the Bipartisan Safer Communities Act (BSCA), Pub. L. 117-159 (2022) (assigning $800 million for mental health services block grants, the National Child Traumatic Stress Network, Project AWARE, Mental Health Awareness Training, and the National Suicide Prevention Lifeline through Fiscal Year 2025), the Comprehensive Addiction and Recovery Act (CARA), Pub. L. 114-198 (2016), and the Sober Truth on Preventing (STOP) Underage Drinking Act, Pub. L. 109-422 (2006).

301.    SAMHSA also worked out of each of HHS's ten regional offices. The SAMSHA regional offices provide leadership, consultation, and partner with state, tribal, territorial, and local community stakeholders.

302.    SAMHSA's FY2024 budget was more than $7.4 billion. As of September 2024, SAMSHA employed 916 federal workers.

### Implementation of the March 27 Directive against SAMHSA and its impact on Plaintiff States

303.    SAMHSA lost half of its employees, including the Director of SAMHSA's Center for Mental Health Services, to the April 1 RIF notices. SAMHSA also lost its central offices for the Center for Mental Health Services, the Center for Substance Abuse Prevention, and many of their contract management staff. All ten of SAMHSA's regional offices were closed, along with its external engagement team, the Office of Minority Health (notwithstanding Congress's express requirement that SAMSHA establish and staff this office) and the Office of Behavioral Health Equity, among others. SAMHSA had already lost ten percent of its staff in February.

304.    SAMHSA is slated to be absorbed into the newly created AHA.

305.    On April 1, Defendants issued RIF notices to the entire Office of Treatment Services; the team responsible for the NSDUH, BHSIS, and DAWN. According to SAMHSA's website, DAWN has already discontinued new data collection.[35]

306.    Contract workers and partners may continue to collect data related to BHSIS and NSDUH based on current contracts. But without experts within the Office of Treatment Services to manage collection and analyze and prepare data, the data is not useful or reliable to Plaintiff States.

---

[35] Substance Abuse and Mental Health Services Administration, Drug Abuse Warning Network (DAWN), available at https://perma.cc/ER64-JJLP.

307.    There is no one at the Office of Treatment Services to oversee BHSIS and its seven data sets. There is no one to answer technical questions, provide expert guidance, analyze data, or standardize data collection. One of those seven data sets, TEDS, plays a special role in state block grants and a state's failure to properly and timely complete TEDS data submission is grounds to lose block grant funding. Thus, Defendants have noticed for termination the exact staff who had the experience, special knowledge, and training necessary to enable Plaintiff States to complete and receive block grant funding.

308.    Beyond the Office of Treatment Services, a quarter of the team assigned to work on 988 Lifeline digital communications, received RIF notices. According to one 988 Lifeline digital communications worker, the layoffs will impact awareness about the 988 Lifeline. Plaintiff States typically operate these crisis lifelines in partnership with SAMHSA and, while local operations remain stable, several national-level issues are impacting 988 Lifeline caller experience, transparency, and state oversight.

309.    Plaintiff States typically operate these crisis lifelines in partnership with SAMHSA which relies on a national interactive voice response system to connect callers with a state's contracted contact center. On July 1, SAMHSA staff disclosed that approximately 50% of calls are dropped at the national interactive voice response system before being connected to a contracted contact center.

310.    SAMHSA communications to Plaintiff States regarding allowable expenses, Notices of Award, and FCC requirements for 988 text geo-routing have been delayed, creating planning uncertainty. Similarly, Plaintiff States' requests for guidance regarding federal actions such as the impact of executive orders have gone unaddressed.

311.    Plaintiff States have not been given access to demographic data required under 42 U.S.C. § 290bb-36c(e), limiting their ability to track equity and access for high-risk populations.

312.    SAMHSA is offering extremely short deadlines for funding applications. Some Plaintiff States were given just two business days to submit an Agency Interest Form which did not allow reasonable time for internal legal review and, previously, would have been due weeks after announcement.

### K.  Administrative Offices

#### *Statutory Mandates*

313.    ASPE, established in 1966, serves as the principal advisor to the Secretary and is responsible for policy development in health, disability, human services, data, and science. ASPE performs research and evaluation studies, develops policy analyses, and estimates the costs and benefits of policy alternatives under consideration by the HHS or Congress. It is comprised of five offices, including the Office of Human Services Policy (HSP) which performs research and analyses on issues relating to health policy for the Secretary, and its health policy research includes reports to Congress, research and issues briefs, and its authored or sponsored published work in journals. HSP serves as a liaison with other agencies on broad economic matters and is the Department's lead on poverty measurement.

314.    HSP's Division of Data and Technology is responsible for the annual updates to federal poverty guidelines, which are used by federal, State, local, and Tribal agencies to assess eligibility for certain means tested programs. A 1981 appropriations act requires the Secretary to create and update annually the federal poverty guidelines. Omnibus Budget Reconciliation Act of 1981, Pub. L. 97-35, 95 Stat. 357, 42 U.S.C. § 9902(2). The Division of Data and Technology also prepared a required, annual report to Congress on indicators and predictors of "welfare

dependence." Welfare Indicators Act of 1994, Pub. L. 103-432, 42 U.S.C. § 1314a(d)(1). That Act requires the report to include three programs: Temporary Assistance for Needy Families (TANF) (which replaced the Aid to Families with Dependent Children program), the Supplemental Security Income program (SSI), and the Supplemental Nutrition Assistance Program (SNAP) (formerly the Food Stamp Program). ASPE has submitted twenty-three of these highly technical reports to Congress.

315.    The Office of the Assistant Secretary of Health (OASH) was first created in 1967 following the Reorganization Plan No. 3 of 1966. The plan allowed the Secretary of Health, Education, and Welfare to restructure the PHS and was later renamed as OASH following the Department of Education Organization Act in 1972. OASH serves as the central hub for leadership and coordination within HHS and its operating divisions and is dedicated to developing policy recommendations on public health issues. Directed by the Assistant Secretary for Health, OASH oversees many smaller offices including Office of Infectious Disease and HIV/AIDS Policy (OIDP).

316.    OIDP manages the National Vaccine Program (NVP), which Congress established by statute, 42 U.S.C. § 300aa-1, and which has the following mandatory duties: vaccine research; vaccine development; safety and efficacy testing of vaccines; licensing of vaccine manufacturers and vaccines; production and procurement of vaccines; distribution and use of vaccines; necessity and effectiveness of vaccines; and monitoring adverse events related to vaccines and immunization activities. 42 U.S.C. § 300aa-2. One of the initiatives under NVP is Ending the HIV Epidemic in the U.S. (EHE), which monitored the spread of new HIV infections in the U.S. and aimed to end the HIV epidemic by 2030. EHE, which was launched under the first Trump administration, provides resources, expertise, and technology to fifty-seven geographic focus areas, many of which

are within Plaintiff States. Congress approved $573 million in funding to CDC, HRSA, IHS, and NIH for Fiscal Year 2024 to support continued scale-up and implementation of EHE.

### *Implementation of the March 27 Directive against the Administrative Offices and its impact on Plaintiff States*

317.    More than two-thirds of the ASPE received RIF notices under the March 27 Directive. All told, ASPE went from 140 staff members to forty. The RIF notices reached every member of the team that, until April 1, annually updated the federal poverty guidelines and reported to Congress on indicators of welfare dependence, including its long-time leader. Those workers had years of expertise in doing the complex work of gathering and analyzing data to arrive at the federal poverty guidelines.

318.    Plaintiff States will be harmed by the layoffs to ASPE's unit that calculates federal poverty guidelines, as they rely on those guidelines being both up-to-date and accurate in the administration of federal and State benefits. The calculation of the guidelines is specialized and is not something that can be quickly passed on to a new group of employees. Each year, the calculation is performed by a small group of staff.

319.    Because the federal poverty guidelines are used for so many programs—from Head Start, to Medicaid, to SNAP, to the National School Lunch and Breakfast Programs, to Legal Services Corporation-funded programs—the impact of inaccurate and out-of-date guidelines would have immense effects on Plaintiffs States in the administration of State programs. For instance, Plaintiff States use the benefits to calculate individual and family eligibility for means-tested benefits programs, such as TANF and Medicaid. With inaccurate or out-of-date federal poverty guidelines, Plaintiff States risk denying benefits to eligible individuals and families or issuing benefits to ineligible individuals and families. Of course, programs such as Medicaid implicate State dollars as well as federal funding. Additionally, the required annual report on

welfare indicators and risk factors, which is typically published in late spring/early summer, has not been published as of late August 2025.

320.    The entire staff of OIDP was noticed for termination. At the end of 2024, OIDP employed roughly sixty people who oversaw the NVP which, in turn, included the EHE program. Also, 150 employees in the Office of HIV Prevention at the CDC and its key leaders have been reassigned to other programs, leaving one of OIDP's key partners in the EHE initiative powerless.

321.    The March 27 Directive has had a similarly disastrous effect on OIDP and its effort to end the HIV/AIDS epidemic. In fact, the cuts to OIDP stopped the consistent progress that had been made by EHE—an initiative President Trump started in 2019—but the gains that have been made over the past six years will be lost.

## L.  Regional Offices

### *Statutory Mandates*

322.    As of January 2025, there were ten regional offices of HHS in Atlanta, Boston, Chicago, Dallas, Denver, Kansas City, Mo., New York, Philadelphia, San Francisco and Seattle. These regional offices are hosted by the Office of Intergovernmental and External Affairs (IEA) within the Department. The functions of the IEA include: advising HHS officials on State, local, and Tribal issues; facilitating communication between HHS and State, local, and Tribal governments; and coordinating the regional offices.

323.    Each regional office has a Regional Director. The Regional Directors are subject to presidential appointment and represent the Department in maintaining close contact with State, local, and Tribal governmental officials and offices, as well as non-government organizations.

324.    Moreover, several subagencies within HHS designate members of their staffs to work out of the regional offices. Each of ACF, ACL, ATSDR, CMS, FDA, HRSA, IHS, and

SAMHSA maintains Regional Operating Division Offices. Certain subagencies rely more heavily on the regional offices than others; for example, the majority of Head Start employees work out of the regional offices rather than in ACF headquarters. Office of Head Start employees in the regional offices support the administration of grants, oversight, and technical assistance to Head Start grant recipients.

### Implementation of the March 27 Directive against Regional Offices and its impact on Plaintiff States

325.    Pursuant to the March 27 Directive, the Department closed half of the regional offices in early April, and put all regional office staff therein on administrative leave except CMS staff. The regional offices eliminated were Boston (Region 1), New York (Region 2), Chicago (Region 5), San Francisco (Region 9), and Seattle (Region 10).

326.    The impacts of the Regional Office closures were immediate, preventing the Department from carrying out a range of statutorily mandated functions.

327.    Plaintiff States rely on regional office employees for critical program support. Abrupt closure of half of the regional offices caused disruption in the disbursement of services provided to Plaintiff States and the general public by regional office staff, including monitoring, site visits, and technical assistance in a variety of programs funded by Congress and administered by HHS.

## CAUSES OF ACTION

### Count I
### Violation of the Separation of Powers Doctrine – Usurping Legislative Authority
### (Against Both Defendants)

328.    The States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

329.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress." U.S. Const. Art. I, Sec. 1.

330.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC*, 591 U.S. at 223 (quoting The Federalist No. 70, at 475 (A. Hamilton) and No. 51, at 350).

331.    Thus "'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42-43, 6 L.Ed. 253 (1825)).

332.    The separation of powers doctrine thus represents a central tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020).

333.    Consistent with these principles, the Executive's powers are limited to those specifically conferred by the Constitution and federal statutes, and do not include any undefined residual or inherent power.

334.    Rather, the Executive is required to "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3; *Utility Air Reg. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . 'faithfully execute[s]' them.").

335.    Here, where Congress has created the Department of Health and Human Services and many of its operating divisions, the Executive and its agencies cannot incapacitate them absent Congressional action that directs them to do so. The March 27 Directive and any implementation,

as described in this Amended Complaint, challenged herein thus violates constitutional and statutory mandates, contravenes Congressional intent, and is unlawful.

336.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579. Thus, Plaintiff States are further entitled to a preliminary and permanent injunction preventing Defendants from implementing the March 27 Directive.

337.    Pursuant to 28 U.S.C. § 2201, the States are also entitled to a declaration that HHS's implementation of the March 27 Directive violates the constitutional separation of powers doctrine and impermissibly arrogates to the executive power that is reserved to Congress.

### Count II
### Violation of the Appropriations Clause
### (Against Both Defendants)

338.  Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

339.    The Appropriations Clause of the Constitution provides in part that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. Art. I, § 9, cl. 7. The clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

340.    The Appropriations Clause likewise requires that the executive spend appropriated funds for their designated purpose. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals."); *In re Aiken*

*Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) ("[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds.") (Kavanaugh, J.).

341.    Here, Congress has expressly directed that funds be expended for the operations of the agency that it has created. Defendants' unilateral executive action to decline to expend appropriated funds therefore infringes on Congress's appropriations power and is unconstitutional. Among the funds that Defendants have declined to expend are those that Congress appropriated: to CDC to research occupational safety for miners and maritime workers and to screen for health problems in high risk occupations; to CDC to collect data about the health and well-being of pregnant people and infants; to CDC and FDA for supporting State-led tobacco control efforts; to CDC to research viral Hepatitis, HIV/AIDS, and STIs; to FDA to conduct mandated enforcement, research, and compliance efforts relating to tobacco; and to SAMHSA to support communications around 988 Lifeline.

342.    This court is authorized to enjoin any action by the Executive and its agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952). Thus, Plaintiff States are further entitled to a preliminary and permanent injunction preventing Defendants from implementing the March 27 Directive.

343.    Pursuant to 28 U.S.C. § 2201, the States are also entitled to a declaration that the March 27 Directive and any implementation, as described in this Amended Complaint, violated the Appropriations Clause.

## Count III
### *Ultra Vires* – Conduct Outside the Scope of
### Statutory Authority Conferred on the Executive
### (Against Both Defendants)

344.    The States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

345.    Neither the President nor an agency can take any action that exceeds the scope of their constitutional and/or statutory authority.

346.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

347.    Defendants' conduct in dismantling HHS and many of its constituent agencies is contrary to law and outside of Defendants' authority. Defendants laid off so many employees, that they functionally closed departments that who worked on statutorily mandated programs across agencies, whether in labs detecting viral Hepatitis, or in departments supporting tobacco control efforts, or in studying lead poisoning.

348.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the March 27 Directive and any implementation thereof is contrary to law and outside of Defendants' authority.

349.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing Defendants from implementing the March 27 Directive.

## Count IV
## Violation of the Administrative Procedure Act – Contrary to Law
## (Against Both Defendants)

350.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

351.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

352.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C).

353.    Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). In *Loper Bright*, the Supreme Court clarified that historical principles of "respect" did not equate to deference, and that "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 392 (emphasis in original). Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

354.    An agency may not take any action that exceeds the scope of its constitutional or statutory authority.

355.    No constitutional or statutory authority authorizes HHS to refrain from fulfilling its statutory duties, or to violate federal law.

100

356.    No constitutional or statutory authority permits HHS to refuse to spend money Congress has appropriated for HHS and its various functions.

357.    An agency likewise may not violate its own regulations. When a federal agency promulgates "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954). "It is an abecedarian principle of administrative law that agencies must comply with their own regulations." *Manguriu v. Lynch*, 794 F.3d 119, 122 (1st Cir. 2015) (citation omitted). An agency's action may be set aside pursuant to the APA if the action violates the agency's own procedures, particularly if that error prejudices the interest of a person before the agency. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004); *see also Town of Weymouth, Mass. v. Mass. Dep't of Env't Prot.*, 961 F.3d 34, 47 (1st Cir. 2020), *on reh'g*, 973 F.3d 143 (1st Cir. 2020) ("[A]n agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" (quoting *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014)).

358.    Defendants lack authority to reorganize departments and administrations in direct contravention of statutory authority that created the departments and administrations in the first place. Defendants lack authority to use layoffs to override the limitations on their own power to dismantle statutorily mandated agency functions. These agency actions are unauthorized, unprecedented, and not entitled to deference by this Court.

359.    The March 27 Directive was a final agency action, because it marked "the consummation" of agency decision making and determined "rights or obligations . . . from which legal consequences" flowed. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

360.    In implementing the March 27 Directive, the Defendants have acted contrary to the statutes and regulations governing the administration of Department functions and appropriating money for it to administer.

361.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Defendants lack legal authority to implement the March 27 Directive, contrary to congressional directive and intent, and have, in so doing, acted contrary to law, outside of statutory authority, and in violation of the APA.

362.    Plaintiff States are also entitled to vacatur of the March 27 Directive and any implementation thereof, and a preliminary and permanent injunction preventing the Defendants from implementing the March 27 Directive.

## Count V
### Violation of the Administrative Procedure Act – Arbitrary & Capricious (Against Both Defendants)

363.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

364.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

365.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

366.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between

the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

367. That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decision making process." *Id.*

368. An action is also arbitrary and capricious if the agency failed to consider . . . important aspects of the problem before it. *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

369. In addition, when an agency "rescinds a prior policy," the agency must, at minimum, "consider the 'alternatives' that are within the ambit of the existing policy," "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents*, 591 U.S. 1, 30, 33 (2020).

370. The March 27 Directive and any implementation, as described in this Amended Complaint, is arbitrary and capricious because the Defendants provided no reasoned basis or explanation for its decision to dismantle itself and its sub-agencies which were performing essential public health and human services work.

371. The March 27 Directive and any implementation, as described in this Amended Complaint, is arbitrary and capricious because the Defendants failed to consider the consequences of their actions.

372. The March 27 Directive and any implementation, as described in this Amended Complaint, is arbitrary and capricious because the Department's stated reasons for the layoffs and

reorganization—to promote "efficiency" and "accountability"—are pretext for Secretary Kennedy's stated goal of attacking science and public health.

373.    The March 27 Directive and any implementation, as described in this Amended Complaint, is arbitrary and capricious because the Defendants' actions impede their own ability to perform HHS's functions, both those that are required by statute and those that are not.

374.    The March 27 Directive and any implementation, as described in this Amended Complaint, is arbitrary and capricious because it fails to take into account important reliance interests.

375.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Defendants' actions implementing the March 27 Directive violate the APA because they are arbitrary and capricious.

376.    Plaintiff States are also entitled to vacatur of the Defendants' implementation of the March 27 Directive pursuant to 5 U.S.C. § 706, and a preliminary and permanent injunction preventing Agency Defendants from implementing the March 27 Directive.

377.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States pray that this Court:

i.      Issue a judicial declaration that the March 27 Directive (as defined above to include the RIF and reorganization) and any implementation, as described in this Amended

Complaint, is unlawful because it violates the United States Constitution and the Administrative Procedure Act;

ii.    Pursuant to 5 U.S.C. § 705, stay the March 27 Directive and any implementation thereof;

iii.    Pursuant to 5 U.S.C. § 706, vacate the March 27 Directive and any implementation thereof;

iv.    Preliminarily and permanently enjoin Defendants from implementing the March 27 Directive;

v.    Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

vi.    Grant other such relief as this Court may deem proper.

Dated: September 5, 2025                    Respectfully submitted,

**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ Spencer W. Coates*
Spencer W. Coates
Kelsey E. Endres
*Assistant Attorneys General*
Cynthia Alexander
William McGinty
*Deputy Solicitors General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
spencer.coates@atg.wa.gov
kelsey.endres@atg.wa.gov
cynthia.alexander@atg.wa.gov
william.mcginty@atg.wa.gov

*Counsel for the State of Washington*

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Molly Thomas-Jensen*
Molly Thomas-Jensen
Jessica Ranucci
*Special Counsel*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Andres Ivan Navedo
Molly Brachfeld
*Assistant Attorneys General*
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
molly.thomas-jensen@ag.ny.gov
jessica.ranucci@ag.ny.gov
ivan.navedo@ag.ny.gov
molly.brachfeld@ag.ny.gov

*Counsel for the State of New York*

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

*By: /s/ Dorothea Calvano Young*
Dorothea Calvano Young
(RI Bar No. 6661)
*Special Assistant Attorney General*

Kathryn M. Sabatini (RI Bar No. 8486)
*Chief, Civil Division*
Sarah W. Rice (RI Bar No. 10465)
*Deputy Chief, Public Protection Bureau*
Chandana Pandurangi (RI Bar No. 10922)
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
ksabatini@riag.ri.gov
srice@riag.ri.gov
dyoung@riag.ri.gov
cpandurangi@riag.ri.gov

*Counsel for the State of Rhode Island*

**ROB BONTA**
Attorney General for the State of California

By: /s/ Crystal Adams
Crystal Adams
*Deputy Attorney General*
Michael L. Newman
Neli Palma
*Senior Assistant Attorneys General*
Kathleen Boergers
Virginia Corrigan
Srividya Panchalam
*Supervising Deputy Attorneys General*
Jesse Basbaum
Jeanelly Orozco Alcala
*Deputy Attorneys General*
1515 Clay Street

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: /s/ *Alexa G. Salas*
Alexa G. Salas
*Assistant Attorney General*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Alexa.Salas@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**PHILIP J. WEISER**
Attorney General of Colorado

By: /s/ *David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Counsel for the State of Colorado*

Oakland, CA 94612-1499
(510) 879-3428
Crystal.Adams@doj.ca.gov
Michael.Newman@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Virginia.Corrigan@doj.ca.gov
Srividya.Panchalam@doj.ca.gov
Jesse.Basbaum@doj.ca.gov
Jeanelly.OrozcoAlcala@doj.ca.gov

*Counsel for the State of California*

**WILLIAM TONG**
Attorney General of the State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Andrew C. Mendrala___*
Andrew C. Mendrala
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.mendrala@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**KWAME RAOUL**
Attorney General of the State of Illinois

Jane Elinor Notz
*Solicitor General*

By: */s/ Alex Hemmer*
Alex Hemmer
Deputy Solicitor General
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
312-814-3000
alex.hemmer@ilag.gov

*Counsel for the State of Illinois*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Michael Drezner*
Michael Drezner
*Senior Assistant Attorney General*
Federal Accountability Unit
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6959
mdrezner@oag.state.md.us

*Counsel for the State of Maryland*

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Margaret Machaiek*
Margaret Machaiek
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
August, ME 04333-0006
Tel.: 207-626-8800
Fax: 207-287-3145
margaret.machaiek@maine.gov

*Counsel for the State of Maine*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
HaidarD1@michigan.gov

*Counsel for the People of the State of Michigan*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

By: */s/ Justine M. Longa*

Justine M. Longa
Jessica L. Palmer
*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-4527
Justine.Longa@law.njoag.gov

Jessica.Palmer@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Astrid Carrete*_____
Astrid Carrete
Impact Litigation Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
acarrete@nmdoj.gov

*Counsel for the State of New Mexico*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

*Counsel for the State of Vermont*

**DAN RAYFIELD**
Attorney General of the State of Oregon

By: /s/ *Elleanor H. Chin*
Elleanor H. Chin
*Senior Assistant Attorney General*
100 Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
elleanor.chin@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Charlotte Gibson*
Charlotte Gibson
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218  (phone)
(608) 294-2907 (Fax)
Charlie.Gibson@wisdoj.gov

*Counsel for the State of Wisconsin*