# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK, et al., <br><br>        Plaintiffs, <br><br>   v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES, et al., <br><br>        Defendants. | Civil Action No. 1:25-cv-00196 |

## <u>DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT CONCERNING HEARING.......................................................................... 2

BACKGROUND .................................................................................................................. 2

I.      The U.S. Department of Health and Human Services ............................................. 2

II.     Factual Background ................................................................................................. 4

        A.      Executive Order 14210 ............................................................................... 4

        B.      February 26, 2025, Workforce Memorandum ............................................. 5

        C.      The Department's Implementation of Executive Order 14210 and the
                Workforce Memorandum.............................................................................. 7

III.    Procedural Background............................................................................................ 9

LEGAL STANDARD......................................................................................................... 10

ARGUMENT ...................................................................................................................... 10

I.      This Court Lacks Jurisdiction. .............................................................................. 10

        A.      The CSRA Precludes District-Court Jurisdiction Over Plaintiffs' Claims. ......... 10

        B.      Plaintiffs Lack Article III Standing.......................................................... 14

                1.      Plaintiffs Lack Cognizable Informational Injury. ....................... 16

                2.      Plaintiffs Lack Cognizable Injury Based On Services Allegedly Not
                        Provided. ..................................................................................... 20

                3.      For Some Alleged Lapses, Plaintiffs Have Not Stated Any
                        Particularized Injury.................................................................... 28

        C.      Some of Plaintiffs' Allegations Belong In The Court Of Federal Claims. ........... 30

        D.      Plaintiffs' Claims Are Not Reviewable Under the APA Because They Do
                Not Seek Judicial Review of a Discrete, Final Agency Action. ......................... 33

II.     The Complaint Does Not State a Claim for Violation of the APA................................... 37

        A.      Plaintiffs Seek to Compel Agency Action But Cannot Meet the
                Mandamus-Like Standard. ........................................................................ 37

B.    Plaintiffs Fail to State an Arbitrary and Capricious Claim. .................................. 40

C.    Plaintiffs Fail to State A Claim That The RIFs And Restructuring Are Contrary To Law And Exceed The Department's Statutory Authority. ............... 42

III.    Plaintiffs' Constitutional and *Ultra Vires* Claims Fail on the Merits. ............................. 44

IV.    Applying The Above Principles, All Allegations In The Complaint Fail. ...................... 48

CONCLUSION ....................................................................................................................... 56

# TABLE OF AUTHORITIES

## CASES

*A.M. Capen's Co. v. Am. Trading & Prod. Corp.*,
   202 F.3d 469 (1st Cir. 2000) .................................................................. 16

*Alabama-Coushatta Tribe of Tex. v. United States*,
   757 F.3d 484 (5th Cir. 2014) ................................................................. 33

*Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Env't Prot.*,
   163 F.3d 74 (1st Cir. 1998) .................................................................... 39

*Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*,
   367 F.3d 932 (D.C. Cir. 2004) ............................................................... 13

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
   929 F.3d 748 (D.C. Cir. 2019) .................................................... 11, 12, 13

*Amrhein v. eClinical Works, LLC*,
   954 F.3d 328 (1st Cir. 2020) .................................................................. 16

*Anglers Conservation Network v. Pritzker*,
   809 F.3d 664 (D.C. Cir. 2016) ............................................................... 38

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ............................................................ 26, 27

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................... 10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................................... 10, 28

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................................... 35

*Bingham v. Massachusetts*,
   616 F.3d 1 (1st Cir. 2010) ..................................................................... 49

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984) ............................................................................... 13

*Cal. Cmtys. Against Toxins v. EPA*,
   934 F.3d 627 (D.C. Cir. 2019) .......................................................... 35, 37

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
   333 U.S. 103 (1948) ............................................................................... 36

*Cincinnati Soap Co. v. United States*,
    301 U.S. 308 (1937)........................................................................................ 46

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983).......................................................................................... 25

*City of New Haven v. United States*,
    809 F.2d 900 (D.C. Cir. 1987)....................................................................... 47

*Cobell v. Kempthorne*,
    455 F.3d 301 (D.C. Cir. 2006)....................................................................... 34

*Cobell v. Norton*,
    240 F.3d 1081 (D.C. Cir. 2001)............................................................... 39, 40

*Conservation L. Found., Inc. v. Acad. Express, LLC*,
    129 F.4th 78 (1st Cir. 2025)........................................................................... 15

*Crowley Gov't Servs., Inc. v. GSA*,
    38 F.4th 1099 (D.C. Cir. 2022)..................................................................... 30

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006)....................................................................................... 27

*Dalton v. Specter*,
    511 U.S. 462 (1994)....................................................................................... 45

*Dantzler, Inc. v. Empresas Berríos Inventory and Operations, Inc.*,
    958 F.3d 38 (1st Cir. 2020)..................................................................... 10, 15

*Department of Education v. California*,
    604 U.S. 650 (2025)....................................................................................... 31

*Dreher v. Experian Info. Sols., Inc.*,
    856 F.3d 337 (4th Cir. 2017) ........................................................................ 16

*Elgin v. Dep't of the Treasury*,
    567 U.S. 1 (2012)............................................................................... 11, 12, 13

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021)....................................................................................... 41

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)............................................................... 14, 15, 16, 19, 28, 30

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)................................................................................. 35, 36

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) ................................................................. 34, 35

*Gill v. Whitford*,
    585 U.S. 48 (2018) ............................................................................... 23, 28

*Glob. Health Council v. Trump*,
    — F.4th —, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) ...................... 44, 46, 47

*Golden v. Zwickler*,
    394 U.S. 103 (1969) ............................................................................... 24

*Gonzalez v. United States*,
    284 F.3d 281 (1st Cir. 2002) ................................................................. 10, 21

*Graham v. Ashcroft*,
    358 F.3d 931 (D.C. Cir. 2004) ............................................................... 11

*Harper v. Werfel*,
    118 F.4th 100 (1st Cir. 2024) ................................................................. 36

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ............................................................................... 43

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
    593 F.3d 923 (9th Cir. 2010) ................................................................. 37

*In re Bluewater Network*,
    234 F.3d 1305 (D.C. Cir. 2000) ............................................................. 38, 39

*In re Core Commc'ns, Inc.*,
    531 F.3d 849 (D.C. Cir. 2008) ............................................................... 38

*Karahalios v. Nat'l Fed'n of Fed. Emps.*,
    489 U.S. 527 (1989) ............................................................................... 13

*Kerin v. Titeflex Corp.*,
    770 F.3d 978 (1st Cir. 2014) ................................................................. 23

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ............................................................................... 41, 43

*Littlefield v. Dep't of the Interior*,
    85 F.4th 635 (1st Cir. 2023) ................................................................. 41

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................... 15, 20, 32

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) .................................................................... 33, 34, 42

*Mahoney v. Donovan,*
   721 F.3d 633 (D.C. Cir. 2013) ................................................................ 12

*Markland v. OPM,*
   140 F.3d 1031 (Fed. Cir. 1998) ......................................................... 20, 42

*Maryland v. USDA,*
   151 F.4th 197 (4th Cir. 2025) ....................................... 13, 23, 25, 26, 27, 43, 48

*Maryland v. USDA,*
   2025 WL 1073657 (4th Cir. April 9, 2025) ................................................... 12

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ....................................................................... 41

*McKenna v. Dep't of Interior,*
   996 F.2d 1235 (Fed. Cir. 1993) ............................................................ 42

*McMahon v. New York,*
   606 U.S. —, 145 S. Ct. 2643 (2025) ......................................................... 14

*Murthy v. Missouri,*
   603 U.S. 43 (2024) ......................................................................... 15

*Nat'l Ass'n of Gov't Emps., Inc. v. Yellen,*
   120 F.4th 904 (1st Cir. 2024) .............................................................. 15

*Nat'l Treasury Emps. Union v. Vought,*
   149 F.4th 762 (D.C. Cir. 2025) .......................................... 34, 35, 40, 45, 46

*New York v. Kennedy,*
   — F.4th —, 2025 WL 2658233 (1st Cir. Sep. 17, 2025) ................................... 14, 26

*Newbury v. U.S. Dep't of Hous. and Urb. Dev.,*
   2024 WL 4785147 (D.R.I. Nov. 14, 2024) .................................................. 23, 50

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004) ........................................................... 33, 34, 38, 39, 42

*Nyunt v. Chairman, Broad Bd. of,*
   *Govs.*, 589 F.3d 445 (D.C. Cir. 2009) ...................................................... 12

*O'Shea v. Littleton,*
   414 U.S. 488 (1974) ...................................................................... 15, 25

*Puerto Rico v. United States*,
   490 F.3d 50 (1st Cir. 2007) ................................................................................. 33

*Raines v. Byrd*,
   521 U.S. 811 (1997) ........................................................................................... 15

*Rhode Island v. Trump*,
   781 F. Supp. 3d 25 (D.R.I. 2025) ....................................................................... 30

*Rhode Island v. Trump*,
   — F.4th —, 2025 WL 2621593 (1st Cir. Sep. 11, 2025) ..................................... 14

*Roth v. United States*,
   952 F.2d 611 (1st Cir. 1991) ............................................................................... 11

*Sampson v. Murray*,
   415 U.S. 61 (1974) ............................................................................................. 43

*Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*,
   674 F.3d 97 (1st Cir. 2012) ........................................................................... 38, 41

*Sheldon v. Vilsack*,
   538 F. App'x 644 (6th Cir. 2013) ................................................................. 37, 44

*Sig Sauer, Inc. v. Brandon*,
   826 F.3d 598 (1st Cir. 2016) ............................................................................... 35

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976) ............................................................................................. 55

*Spectrum Leasing Corp. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985) ........................................................................... 32

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ........................................................................................... 16

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ............................................................................................. 10

*Steir v. Girl Scouts of the USA*,
   383 F.3d 7 (1st Cir. 2004) ................................................................................... 24

*Telecomms. Research & Action Ctr. v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) ............................................................................. 38

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ..................................................................................... 12, 13

*Towns of Wellesley, Concord & Norwood v. FERC*,
  829 F.2d 275 (1st Cir. 1987) ............................................................... 39

*Train v. City of New York*,
  420 U.S. 35 (1975) ............................................................................... 44

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ................................................................... 16, 17, 28

*Trudeau v. FTC*,
  456 F.3d 178 (D.C. Cir. 2006) ............................................................ 37

*Trump v. Am. Fed'n of Govt' Emps.*,
  606 U.S. —, 145 S. Ct. 2635 (2025) ................................................... 14

*Trump v. Mazars USA, LLP*,
  591 U.S. 848 (2020) ............................................................................ 47

*Tyler v. Hennepin Cnty.*,
  598 U.S. 631 (2023) ............................................................................ 15

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
  770 F. Supp. 3d 155 (D.D.C. 2025) .................................................... 32

*United States v. Fausto*,
  484 U.S. 439 (1988) ................................................................. 11, 12, 13

*United States v. Texas*,
  599 U.S. 670 (2023) ............................................... 14, 25, 26, 27, 49

*Vera Inst. of Just. v. U.S. Dep't of Just.*,
  2025 WL 1865160 (D.D.C. July 7, 2025) ....................................... 31, 32

*Vill. W. Assocs. v. R.I. Hous. and Mortg. Fin. Corp.*,
  618 F. Supp. 2d 134 (D.R.I. 2009) ...................................................... 32

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978) ....................................................................... 41, 55

*Wilson v. Genzyme Corp.*,
  93 F.4th 33 (1st Cir. 2024) .................................................................. 15

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ............................................................................ 45

**STATUTES**

2 U.S.C. § 683(a) .................................................................................... 43

2 U.S.C. § 684(a) ................................................................................................. 43

2 U.S.C. § 687 .................................................................................................... 43

5 U.S.C. § 704 .................................................................................... 33, 35, 36

5 U.S.C. § 706(1) ................................................................................... 37, 38

5 U.S.C. § 706(2) .......................................................................... 37, 38, 42

15 U.S.C. § 1341 ..................................................................................... 19, 51

15 U.S.C. § 1341(a)(1) ......................................................................... 22, 23

21 U.S.C. § 387f ................................................................................................ 21

21 U.S.C. § 387j ................................................................................................ 21

28 U.S.C. § 1491(a) .............................................................................. 30, 31

29 U.S.C. § 670(a) .......................................................................................... 40

42 U.S.C. § 242c(b) ............................................................................... 18, 48

42 U.S.C. § 242c(c)(1) ................................................................................. 17

42 U.S.C. § 247b-12 ..................................................................................... 19

42 U.S.C. § 247b-13(c)(1) ......................................................................... 40

42 U.S.C. § 263a-5 ................................................................................. 17, 50

42 U.S.C. § 300mm(h) ................................................................................. 28

42 U.S.C. § 3501 ................................................................................................. 2

42 U.S.C. § 9902(2) ........................................................................................ 17

Further Consolidated Appropriations Act of 2024,
    Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460 .............................. 44

## LEGISLATIVE MATERIALS

4 Cong. Rec. 5628 (1876) .......................................................................... 46

## ADMINISTRATIVE & EXECUTIVE MATERIALS

Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ............................ 4, 5, 6, 7

**RULES**

Federal Rule of Civil Procedure 12(b)(1) ..................................................................... 10

Federal Rule of Civil Procuedure 12(b)(6) .......................................................... 10, 28

**REGULATIONS**

2 C.F.R. § 200.439 ......................................................................................................... 54

Annual Update of the HHS Poverty Guidelines,
90 Fed. Reg. 5917 (Jan. 17, 2025). ..................................................................... 8, 17

Notice Regarding Requirement for Annual Submission of the Quantity of Nicotine Contained in Smokeless Tobacco Products Manufactured, Imported, or Packaged in the United States, 64 Fed. Reg. 14,086 (Mar. 23, 1999). ....................................................................... 18

**OTHER AUTHORITIES**

CDC, *About the FFFIPP*,
https://www.cdc.gov/niosh/firefighters/fffipp/about.html ..................................... 8, 24

CDC, *Coal Workers' Health Surveillance Program*,
https://www.cdc.gov/niosh/cwhsp/about/index.html ........................................... 8, 24

CDC, *National Firefighter Registry (NFR) for Cancer*,
https://www.cdc.gov/niosh/firefighters/registry/index.html ................................. 8, 24

CDC, *Request a NIOSH Health Hazard Evaluation*,
https://www.cdc.gov/niosh/hhe/request/index.html ............................................. 8, 24

CDC, *Respirator Approval Program*,
https://www.cdc.gov/niosh/rap/index.html ......................................................... 8, 24

FDA, *Public Health Education Campaigns*,
https://www.fda.gov/tobacco-products/public-health-education/public-health-education-campaigns ................................................................................................................... 41

FDA, *Tobacco Compliance Check Outcomes*,
https://timp-ccid.fda.gov/ .................................................................................... 7, 21

FDA, *Tobacco Products Marketing Orders*,
https://www.fda.gov/tobacco-products/market-and-distribute-tobacco-product/tobacco-products-marketing-orders .................................................................................. 7, 21

*HHS, CBP Seize $86.5 Million Worth of Illegal E-Cigarettes in Largest-Ever Operation* (Sep. 10, 2025),
https://www.hhs.gov/press-room/hhs-fda-cbp-seize-record-4-7-million-illegal-e-cigarettes-chicago-operation.html ....................................................................................... 21

HHS, *Fiscal Year 2026 Budget in Brief, available at* https://www.hhs.gov/sites/default/files/fy-2026-budget-in-brief.pdf........................................................................................... 53

Nile Stanton, *History and Practice of Executive Impoundment of Appropriated Funds*, 53 Neb. L. Rev. 1 (1974) ........................................................................................ 46

OPM, *Memorandum re: Guidance on Agency RIF and Reorganization Plans Requested by* Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative, https://perma.cc/Q9NH-RV8Y ....................................................................................... 5

SAMHSA, *Statistical Products Publication Schedule*, https://www.samhsa.gov/data/about-us/upcoming-releases .............................................. 22, 54

Thomas Jefferson, *Third Annual Message to Congress* (Oct. 17, 1803)..................................... 46

**INTRODUCTION**

The Executive Branch has broad discretion to manage its personnel and order its priorities. Yet here, several states argue otherwise and seek to enjoin and set aside restructuring and reduction-in-force (RIF) plans in progress at the Department of Health and Human Services (HHS or the Department). In so doing, Plaintiffs are asking this Court to manage the Department's personnel and order the Department's priorities. In an amended complaint ranging 105 pages and 375-plus paragraphs, Plaintiffs theorize that the restructuring and RIFs will inevitably violate the Department's statutory duties. To support these allegations, Plaintiffs adopt a kitchen-sink approach, cataloguing alleged lapses in services by the Department in recent months and speculating that those lapses will happen again once the agency finalizes its plans. But all those allegations fail.

For one thing, Plaintiffs have brought the wrong claims under the wrong statute. Their claims revolve around federal employment actions, and such claims can be litigated only through the statutory scheme specifically provided by Congress for this purpose. For another, Plaintiffs lack standing given that the Department intends to carry out its statutory duties and the performance of its workforce is a federal concern that Plaintiffs cannot challenge under well-established standing principles. Plaintiffs attempt to surmount this problem by alleging a whole swath of injuries. But the alleged lapses in the Department's functions either do not exist or represent generalized grievances that cannot confer standing. Plaintiffs also rely on speculative statements about alleged future harms from the Department's restructuring. And although Plaintiffs allege previous lapses by the Department, past injuries cannot ground Plaintiffs' request for sweeping prospective relief. In short, Plaintiffs cannot dictate how the Department orders its prerogatives and conducts its day-to-day operations.

Plaintiffs' claims fail for other reasons, some similar to the deficiencies related to standing.

Even if the Administrative Procedure Act were a proper vehicle for review—and it is not—Plaintiffs challenge steps in an ongoing transition within the Department. This is not the kind of discrete agency action subject to APA review. Nor are the challenged actions final—the Department's restructuring is an ongoing process. Further, a significant aspect of Plaintiffs' allegations is that the RIFs and restructuring will cause (or have caused) the Department to cease performing functions mandated by statute. For those allegations of agency action unlawfully withheld, Plaintiffs must surmount a heightened standard, which they do not.

Setting aside these threshold and jurisdictional defects, Plaintiffs' claims fail on the merits. The Department has stated that the restructured agency will continue carrying out its statutory functions. That it may not do so in the ways Plaintiffs prefer or in ways it has in the past does not mean it is violating applicable law. Nor was the decision to better align the Department with its core statutory duties, and consolidate duplicative and overlapping functions, arbitrary and capricious. As for Plaintiffs' *ultra vires* and constitutional claims, Supreme Court precedent prohibits Plaintiffs from bringing them as freestanding claims. And precedent, history, and tradition foreclose Plaintiffs' implied theory that the Executive must spend all funds allocated by Congress.

The Court should dismiss the Amended Complaint.

## STATEMENT CONCERNING HEARING

Under LR Cv 7(c), Defendants defer to the Court regarding the need for a hearing.

## BACKGROUND

### I.     The U.S. Department of Health and Human Services

The U.S. Department of Health and Human Services is the federal agency charged with enhancing the health and well-being of Americans, including by fostering advances in the sciences underlying medicine, public health, and social services. *See* 42 U.S.C. §§ 3501 *et seq.* The

Department consists of 28 distinct staff and operating divisions.

One of these operating divisions is the Centers for Disease Control and Prevention (CDC), which itself consists of several components. Relevant here, the National Center for HIV, Viral Hepatitis, STD, and TB Prevention (NCHHSTP) is a CDC component that seeks to reduce incidence of infection, morbidity, and mortality in connection with certain infectious diseases. The National Center for Chronic Disease Prevention and Health Promotion (NCCDPHP) is a CDC center that includes the Division of Reproductive Health (DRH), which focuses on issues related to reproductive, maternal, and infant health, and the Office on Smoking and Health (OSH), which works to protect the public's health from the harmful effects of tobacco use by seeking to reduce tobacco-related health disparities, death, and disease. The National Center on Birth Defects and Developmental Disabilities (NCBDDD) works to advance the health and well-being of individuals with birth defects and developmental disabilities and their families. The National Institute for Occupational Safety and Health (NIOSH) conducts research, provides services, and makes recommendations for the prevention of work-related injury and illness. The National Center for Environmental Health (NCEH) plans, directs, and coordinates programs to protect Americans from environmental hazards. Finally, the National Center for Injury Prevention and Control (NCIPC) conducts research, tracks trends, raises awareness, and implements prevention programs to prevent injury, overdose, suicide, and violence.

Other HHS operating divisions include the Food and Drug Administration (FDA), the Administration for Children and Families (ACF), and the Substance Abuse and Mental Health Services Administration (SAMHSA). FDA contains the Center for Tobacco Products (CTP), which sets performance standards, reviews premarket applications for new and modified-risk tobacco products, requires new warning labels, and establishes and enforces advertising and

promotion restrictions. ACF contains the Office of Head Start (OHS), the agency that administers the Head Start federal discretionary grant program that promotes school readiness for low-income children up to age five. And SAMHSA is the operating division that leads efforts to promote mental health, prevent substance misuse, and provide treatments to foster recovery and support from mental and substance use disorders.

Finally, HHS staff divisions include the Office of the Assistant Secretary for Planning and Evaluation (ASPE) and the Office of the Assistant Secretary for Health (OASH). Within ASPE is the Division of Data and Technical Analysis, which updates the Federal Poverty Guidelines on an annual basis. Within OASH is the Office of Infectious Disease and HIV/AIDS Policy (OIDP), which provides leadership among federal agencies and stakeholders to reduce the burden of infectious diseases.

## II.    Factual Background

### A.    Executive Order 14210

On February 11, 2025, President Trump issued Executive Order 14210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative" (Workforce Executive Order). Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025). One subpart, titled "Reductions in Force," directs "Agency Heads [to] promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id.* § 3(c). Further, it directs that "[a]ll offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in

appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website." *Id*.

The Workforce Executive Order further provides that agency heads submit to OMB and OPM within 30 days of its issuance (*i.e.*, by March 13, 2025) a report identifying "any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities." *Id.* § 3(e). That report "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated." *Id.* The Executive Order also allows agency heads to "exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities." *Id*. § 4(b). And it provides that it "shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id*. § 5(b).

### B.     February 26, 2025, Workforce Memorandum

On February 26, 2025, OPM and OMB jointly issued a memorandum (Workforce Memorandum) providing guidance for complying with the Workforce Executive Order. *See* OPM, *Memorandum re: Guidance on Agency RIF and Reorganization Plans Requested by* Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative, https://perma.cc/Q9NH-RV8Y. Under this guidance, "agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily required functions." *Id.* at 2.

The Workforce Memorandum also identifies certain "principles" agencies should consider in undertaking reorganization and reduction actions. Specifically, agencies should:

> seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient

service delivery; and maximally reduce the use of outside consultants and contractors.

*Id.* at 2. In addition, the Workforce Memorandum directs agencies to "review their statutory authority and ensure that their plans and actions are consistent with such authority." *Id.*

The Workforce Memorandum states that agencies should submit Agency RIF and Reorganization Plans (ARRPs) in two phases: Phase 1 ARRPs, to be submitted by March 13, 2025, "shall focus on initial agency cuts and reductions." *Id.* at 3. Phase 1 ARRPs were to provide, among other things, a list of agency subcomponents or offices that provide direct services to citizens, any statutes that establish those agencies or subcomponents, any agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations, "[a] list by job position of all positions categorized as essential for purposes of exclusion from largescale RIFs," and the agency's timetable for implementation of each part of the Phase 1 ARRP. *Id.*

Phase 2 ARRPs were to be submitted by April 14, 2025, and were to "outline a positive vision for more productive, efficient agency operations going forward." *Id.* at 4. Agencies were to provide, among other things, confirmation that the agency has reviewed all its personnel data and plans to ensure that employees are grouped based on like duties and functions to the maximum extent possible; all reductions (of full-time-employee (FTE) positions and otherwise); an explanation of how the ARRP will improve services for Americans and advance the President's priorities; and, for agencies providing direct services to citizens, the agency's certification that implementation of the ARRPs will have a positive effect on the delivery of such services" (a certification that "should include a written explanation from the Agency Head"). *Id.* at 5–6. The Workforce Memorandum also delineates timing: it states that Phase 2 Plans should be planned for implementation by September 30, 2025. *Id.* at 4.

C.     **The Department's Implementation of Executive Order 14210 and the Workforce Memorandum**

As a step along the ARRP process, Secretary Robert F. Kennedy, Jr., publicly announced on March 27, 2025, the planned reorganization of certain components of the Department. *See* ECF No. 44-1. The Secretary's announcement does not contemplate the elimination of any statutorily mandated HHS programs or divisions. Instead, the focus is reduction of wasteful spending, increased efficiency, and increased responsiveness to the needs of the American people.

Specifically, the announcement identified plans to consolidate 28 divisions; centralize shared services including information technology, external affairs, human resources, and procurement; create a new Administration for a Healthy America to coordinate chronic care and disease prevention programs and harmonize health resources to low-income Americans more efficiently; appoint a new Assistant Secretary for Enforcement to combat waste, fraud, and abuse in federal health programs; and consolidate ten regional offices into five. *Id.* at 1–2. The goal of the consolidation and streamlining of agency functions is to reduce redundancy and allow the Department to perform its core functions more efficiently. As the announcement explained, the Department intends to accomplish its goals "without impacting critical services." *Id.* at 1.

As the Department and its operating divisions have continued to plan this restructuring, they are also working to ensure that statutorily mandated programs continue to function. For example, critical CTP functions like tobacco compliance checks and review of pre-market tobacco applications are continuing. *See* FDA, *Tobacco Compliance Check Outcomes*, https://timp-ccid.fda.gov/ (last visited Oct. 14, 2025) (demonstrating that compliance checks have continued to occur through September 2025); *see* FDA, *Tobacco Products Marketing Orders*, https://www.fda.gov/tobacco-products/market-and-distribute-tobacco-product/tobacco-products-marketing-orders (last visited Oct. 14, 2025) (demonstrating continued review of applications and

- 7 -

issuance of decisions through mid-August 2025).  NIOSH also continues to operate the Coal Workers' Health Surveillance Program, the Health Hazard Evaluation, the Fire Fighter Fatality Investigation and Prevention Program, the National Firefighter Registry for Cancer, and the National Personal Protective Technology Laboratory.[1]  Similarly, employees from the Division of Data and Technical Analysis within ASPE were subject to the RIFs, but the annual requirement for the Department to revise the Federal Poverty Guidelines—a function that had been managed by this ASPE division—was already completed for this year, *see* Annual Update of the HHS Poverty Guidelines, 90 Fed. Reg. 5917 (Jan. 17, 2025), allowing ample time for this function to be consolidated with other functions before the next annual revision is due in January 2026.

As it has worked to ensure continued performance of statutorily mandated functions, HHS and its operating divisions have in some cases determined that employees who initially received RIF notices should be returned to work.  For example, on May 13, 2025, the Department notified more than 300 NIOSH employees that they would not be affected by the upcoming RIFs and should return to work.  Decl. of John J. Howard ¶ 3, ECF No. 52-1.  More recently, the Department determined that RIF notices for another 467 CDC employees should be rescinded.  *See* Decl. of Sara Patterson ¶ 3, ECF No. 70-1; Decl. of Sara Patterson ¶ 4, ECF No. 82-1.  Those employees would be returned to a host of CDC components, including NCEH and NCHHSTP, ECF No. 70-1

---

[1]    *See* CDC, *Coal Workers' Health Surveillance Program*, https://www.cdc.gov/niosh/cwhsp/about/index.html (last visited Oct. 14, 2025); CDC, *Request a NIOSH Health Hazard Evaluation*, https://www.cdc.gov/niosh/hhe/request/index.html (last visited Oct. 14, 2025); CDC, *About the FFFIPP*, https://www.cdc.gov/niosh/firefighters/fffipp/about.html (last visited Oct. 14, 2025); CDC, *National Firefighter Registry (NFR) for Cancer*, https://www.cdc.gov/niosh/firefighters/registry/index.html (last visited Oct. 14, 2025); CDC, *Respirator Approval Program*, https://www.cdc.gov/niosh/rap/index.html (last visited Oct. 14, 2025).  Some of these websites currently display disclaimers informing the public that certain functions are inoperable due to the current lapse in appropriations.

¶ 4, and would restore support for NCEH's agreements for lead poisoning, asthma, and environmental public health tracking, as well as NCHHSTP's research and lab testing activities. *Id.* ¶¶ 8–10.

### III.   Procedural Background

On May 5, 2025, Plaintiffs filed this lawsuit challenging the RIFs and restructuring referenced in the March 27 press release and alleging five claims under the U.S. Constitution and the APA.[2]  *See* ECF No. 1.  On May 9, Plaintiffs moved for a preliminary injunction, asking the Court to enjoin the planned restructuring and RIFs announced in the March 27 press release as to four components: CDC, CTP, OHS and Head Start regional offices, and ASPE.  *See* ECF No. 43. On July 1, 2025, the Court preliminarily enjoined Defendants from "taking any actions to implement or enforce" the restructuring as to the HHS components at issue.  ECF No. 73 at 56. On August 12, the Court clarified that the preliminary injunction applies only to CTP, OHS and OHS regional staff, NCHHSTP, DRH, NIOSH, OSH, NCEH, NCBDDD, and ASPE's Division of Data and Technical Analysis.  ECF No. 89.  Defendants have appealed the preliminary injunction. *See New York v. Kennedy*, No. 25-1780 (1st Cir.).

Defendants moved to dismiss the initial complaint on August 15, 2025.  *See* ECF No. 93. Three weeks later, Plaintiffs filed an Amended Complaint asserting the same five claims as before, but only against the Department and Secretary Kennedy.  *See* ECF No. 94 (Am. Compl.).  The Court subsequently granted the parties' joint motion for a briefing schedule regarding a motion to dismiss the Amended Complaint.  *See* Text Order (Sep. 17, 2025).

---

[2] The Amended Complaint challenges—and this motion addresses—the RIFS that occurred in connection with the Secretary's March 27 announcement, not any subsequent RIFs.

## LEGAL STANDARD

Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Under Rule 12(b)(1), Plaintiffs bear the burden to establish subject matter jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95, 104 (1998). Standing is "a prerequisite to" a court's subject matter jurisdiction. *Dantzler, Inc. v. Empresas Berríos Inventory and Operations, Inc.*, 958 F.3d 38, 46 (1st Cir. 2020) (quotation marks omitted). When adjudicating a 12(b)(1) motion, courts may consider material from outside the pleadings. *See Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002). As for Rule 12(b)(6), a court should grant a motion to dismiss under that rule if the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

## ARGUMENT[3]

### I.    This Court Lacks Jurisdiction.

### A.    The CSRA Precludes District-Court Jurisdiction Over Plaintiffs' Claims.

The Amended Complaint should be dismissed because the Court lacks jurisdiction to adjudicate Plaintiffs' challenges to federal agency employment decisions. Personnel decisions represent the core of the Amended Complaint, which posits that RIFs have resulted in, or will result in, diminished services to Plaintiffs. *See, e.g.*, Am. Compl. ¶ 101 (alleging that "layoffs shuttered or severely diminished capacity at laboratories"), ¶ 239 (alleging that Plaintiffs cannot

---

[3] As this Court knows, there is currently a lapse in appropriations for many of the Department's activities and staff, including those who possess knowledge about the programs and actions at issue in this lawsuit. *See* ECF No. 96. The Department nonetheless has endeavored to collect the information necessary for a robust and accurate motion, but reserves the right to file a supplemental or corrected motion once the lapse ends and all Department personnel return to work.

duplicate epidemiological data because "there has been no staff to respond" to requests for data). Indeed, the primary relief Plaintiffs have received in this litigation is a preliminary injunction prohibiting execution of RIF notices.  And, although this Court denied the request, Plaintiffs have even asked this Court to require HHS to reinstate specified employees.  *See* ECF No. 83 at 11–14 ("The proper remedy that will fully redress Plaintiffs injuries, therefore, is to reinstate the employees…").

The Civil Service Reform Act (CSRA) and the Federal Service Labor-Management Relations Statute (FSL-MRS) together provide a comprehensive "scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes brought by unions representing those employees.  *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) (*AFGE*) (regarding FSL-MRS); *see also Roth v. United States*, 952 F.2d 611, 615 (1st Cir. 1991) ("Congress intended [the CSRA] to provide an exclusive procedure for challenging federal personnel decisions[.]" (citation omitted)); *Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (similar).  In the CSRA, Congress made the Merit Systems Protection Board (MSPB) and Federal Labor Relations Authority (FLRA) the exclusive fora for federal employees, labor unions, and other interested parties to challenge final, non-discrimination-related, adverse employment actions.[4]  *See United States v. Fausto*, 484 U.S. 439, 455 (1988).  CSRA channeling is required even for constitutional claims.  *See Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10–15 (2012) (citation omitted); *see also, e.g.*, *AFGE*, 929 F.3d at 752.

The D.C. Circuit's decision in *AFGE* provides a roadmap here.  In that case, the court

---

[4] As argued *infra* at pages 33–37, the RIFs and restructuring at issue in this case do not constitute final agency action as required for APA review. However, if the Court disagrees on that point, the argument in this section provides an independent alternative basis for dismissing the case as to the RIFs at minimum.

applied the "two-step framework" of *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), to conclude that the union plaintiffs could not challenge in district court three executive orders related to federal employment. *AFGE*, 929 F.3d at 754. Under that framework, district courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of appeals is "(i) fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *See id.* at 755 (citations omitted).

The framework is satisfied here. As to the first step, the Supreme Court has held repeatedly that the CSRA provides the exclusive means of redressing employment disputes involving federal employees. *See Elgin*, 567 U.S. at 10–15; *Fausto*, 484 U.S. at 455. In other words, Congress intended to make the FSL-MRS and CSRA the exclusive review scheme.

As to the second step, beyond restricting judicial review of covered constitutional claims, the CSRA prevents district courts from deciding the merits of APA claims challenging an agency's "systemwide . . . policy interpreting a statute," its "implementation of such a policy in a particular case," *Nyunt v. Chairman, Broad Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quotation marks omitted), or its decision to engage in "a *type* of personnel action the [CSRA] does not cover," *i.e.*, "even when the [CSRA] provides no relief for the complained-of employment action," *Mahoney v. Donovan*, 721 F.3d 633, 635–36 (D.C. Cir. 2013) (citation and quotation marks omitted).

That Plaintiffs have framed their alleged injuries partly in constitutional terms does not allow them to sidestep the CSRA's mandatory channeling regime. *Cf. Maryland v. USDA*, 2025 WL 1073657, at *1 (4th Cir. April 9, 2025). Were it otherwise, downstream users of government services could always go directly to court to challenge RIFs despite Congress's determination that the employees themselves must first pursue relief administratively. Courts have repeatedly

rejected these sorts of end runs.  In *Elgin*, the Supreme Court held that even where an employee raises constitutional claims, the CSRA imposes an "implied preclusion of district court jurisdiction." 567 U.S. at 12.    Similarly, in *AFGE*, where federal unions asserted broad constitutional and statutory challenges to a set of three Executive Orders, the D.C. Circuit held that the FLRA provided the exclusive avenue for review.  *See* 929 F.3d at 752, 754–61 (citing *Thunder Basin*, 510 U.S. at 212–16).  In short, because "district courts do not have concurrent jurisdiction over matters within the exclusive purview of the FLRA," this Court should reject Plaintiffs' effort to disrupt Congress's review scheme and to seek premature, improper review before this Court. *Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*, 367 F.3d 932, 935 (D.C. Cir. 2004) (citing *Karahalios v. Nat'l Fed'n of Fed. Emps.*, 489 U.S. 527, 533 (1989)).

This limitation is not only doctrinally mandated; it also makes common sense because Plaintiffs are not members of the class benefited by Congress's comprehensive statutory structure. It would be odd if strangers to the federal-employment relationship—such as Plaintiffs here— could raise claims in this Court that the affected federal employees cannot themselves raise.  *Cf. Maryland v. USDA*, 151 F.4th 197, 214 (4th Cir. 2025) ("The proper parties to vindicate the rights of employees under federal employment law are the employees themselves, not state governments on their behalf.").  The "exclusion" of Plaintiffs "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [Plaintiffs] from seeking review" under other provisions.  *Fausto*, 484 U.S. at 455.  When a comprehensive scheme of the sort at issue here permits review at the behest of some types of plaintiffs but not others, it implicitly precludes review by plaintiffs who are not authorized to bring claims.  *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347–48 (1984); *see Fausto*, 484 U.S. at 448 (applying *Block* to conclude that certain employees who lacked CSRA appeal rights "should not be able to demand

- 13 -

judicial review for the type of personnel action covered by that chapter"). Congress intentionally foreclosed judicial review for parties other than those specifically authorized to seek relief; therefore, Plaintiffs, who are not employees of the Department, cannot challenge the Department's employment actions.[5]

In sum, the CSRA's channeling provisions preclude this Court's review of Plaintiffs' claims. Everything about those claims, and the remedies Plaintiffs seek, derives from the relationship between the federal government and its employees, to which Plaintiffs and their members are strangers. Plaintiffs cannot step into the shoes of those employees and assert claims against the Department that the employees cannot themselves assert in federal district court but instead must pursue before the FLRA or the MSPB.

### B. Plaintiffs Lack Article III Standing.

Standing is a "bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). It requires that a plaintiff "possess a personal stake" in the outcome, which "helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Standing doctrine thus "serves to protect the 'autonomy' of those who are most directly affected so that they can decide whether and how to

---

[5] The Department acknowledges this Court's previous holding that Plaintiffs' claims are not subject to CSRA channeling. *See* ECF No. 73 at 23–28. But subsequent Supreme Court guidance counsels for revisiting that determination because the Supreme Court subsequently stayed the injunctions on which this Court relied and which involved similar agency actions to those at issue here. *See Trump v. Am. Fed'n of Gov't' Emps.*, 606 U.S. —, 145 S. Ct. 2635 (2025); *McMahon v. New York*, 606 U.S. —, 145 S. Ct. 2643 (2025). The Department also acknowledges the First Circuit's subsequent opinions stating that these stay decisions do not support a CSRA argument like that advanced here. *See New York v. Kennedy*, — F.4th —, 2025 WL 2658233, at *4 (1st Cir. Sep. 17, 2025); *Rhode Island v. Trump*, — F.4th —, 2025 WL 2621593, at *8 (1st Cir. Sep. 11, 2025). However, the Department respectfully maintains its position that the Supreme Court's stay decisions in the *AFGE* and *McMahon* cases support revisiting this Court's reasoning in its preliminary-injunction order, including its holding that the claims here are not subject to CSRA channeling.

challenge the defendant's action." *Id.* at 379–80 (citation omitted). Standing is not "dispensed in gross," *Wilson v. Genzyme Corp.*, 93 F.4th 33, 40 (1st Cir. 2024) (quotation marks omitted), meaning that "for every defendant, there must be at least one plaintiff with standing," *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). A plaintiff must plead facts "on the face of [its] complaint" that support standing. *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 637 (2023). And, at the pleading stage, standing is determined based on the allegations in the complaint. *See Dantzler*, 958 F.3d at 47. "Conclusory assertions or unfounded speculation will not suffice." *Id.* Moreover, when a plaintiff files an amended complaint, the Court looks to that amended pleading to determine whether the plaintiff has standing, not the original complaint. *See Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 85–86 (1st Cir. 2025).

Under any theory of standing, "the irreducible constitutional minimum" requires that (1) the plaintiff has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). "Injury in fact" requires "an invasion of a legally protected interest." *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (citation omitted). If the plaintiff relies on a "risk of future harm" to a legally protected interest, that future harm must be "certainly impending," or there must be a "substantial risk" that it "will occur." *Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*, 120 F.4th 904, 910 (1st Cir. 2024) (citation omitted). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief[.]" *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974). And "when (as here) a plaintiff challenges the government's unlawful regulation (or lack of regulation) of *someone else*, standing is not precluded, but it is ordinarily

substantially more difficult to establish." *All. for Hippocratic Med.*, 602 U.S. at 382 (emphasis in original) (citation and quotation marks omitted).

This Court's previous finding of standing at the preliminary-injunction stage was a statement "of [a] probable outcome[]" and does not conclusively determine standing for the rest of the case. *A.M. Capen's Co. v. Am. Trading & Prod. Corp.*, 202 F.3d 469, 473 (1st Cir. 2000) (quotation marks omitted). Moreover, Plaintiffs must assert standing as to "each claim," and multiple components mentioned in the Amended Complaint were not implicated by the preliminary-injunction motion. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Regardless of its determination at that stage of the case, the Court must address standing afresh as to these claims and based on the allegations in the Amended Complaint.

Plaintiffs appear to assert injuries resulting from not receiving information previously provided by the Department and not receiving services previously provided by the Department. These theories fail. Moreover, as to various programs and their alleged lapses, Plaintiffs fail to allege a personal stake in the litigation, defeating standing for claims regarding those programs.

### 1. Plaintiffs Lack Cognizable Informational Injury.

First, Plaintiffs have not suffered a cognizable informational injury. To establish informational injury under Article III, Plaintiffs must show that (1) they "lack access to information to which [they are] legally entitled" and (2) "the denial of that information creates a 'real' harm with an adverse effect." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)); *see also Amrhein v. eClinical Works, LLC*, 954 F.3d 328, 332–33 (1st Cir. 2020). Even if a statute requires the provision of information, "a bare procedural violation" is not enough to give Plaintiffs standing. *Spokeo*, 578 U.S. at 341. They must still show "a concrete injury" caused by lack of access to the information. *Id.* Here,

that means Plaintiffs must show that alleged informational deficiencies resulting from the Department's restructuring caused real-life "consequences." *TransUnion*, 594 U.S. at 442 (holding that "an asserted informational injury that causes no adverse effects cannot satisfy Article III" (quotation marks omitted)).

Many of Plaintiffs' allegations fail the first element of informational standing. As an initial matter, they allege no current or imminent deprivation of information to which they are legally entitled. For example, Plaintiffs claim that the CDC must "update the required Strategic Plan" and post that Plan to its website. Am. Compl. ¶ 114. Yet the law requires the Secretary to update the Plan every four years, not any time the agency's priorities change. *See* 42 U.S.C. § 242c(c)(1). Similarly, Plaintiffs allege that "IVF data collection" has ceased, leading to a "gap" in the data. Am. Compl. ¶ 189. But the law requires the Secretary to publish that data "annually." 42 U.S.C. § 263a-5; *see also* CDC, *National ART Surveillance System*, https://www.cdc.gov/art/php/nass/index.html (last visited Oct. 14, 2025) ("After CDC conducts extensive data checks, the ART success rates by clinic and clinic-level datasets are published at the end of year 3."). Plaintiffs thus have all the IVF information to which they are entitled, and the Department has not violated its annual publication requirement.

Similar issues plague Plaintiffs' allegations about the poverty guidelines, which Plaintiffs worry will be "inaccurate or out-of-date" due to the restructuring. Am. Compl. ¶ 319. The Secretary is required to revise "the poverty line" annually. 42 U.S.C. § 9902(2). That deadline has already been met for this year, *see* Annual Update of the HHS Poverty Guidelines, 90 Fed. Reg. 5917 (Jan. 17, 2025), and the authorizing statute does not require that the revision be done by any particular office, *see* 42 U.S.C. § 9902(2). Plaintiffs thus have all the information regarding poverty guidelines that the law requires the Secretary to publish. Similarly, although Plaintiffs

allege that OSH has paused ingredient-report submissions, *see* Am. Compl. ¶ 194, there is no statutory deadline for those submissions, and applicable regulations require only that the submissions be made by March 31 of each year. *See* Notice Regarding Requirement for Annual Submission of the Quantity of Nicotine Contained in Smokeless Tobacco Products Manufactured, Imported, or Packaged in the United States, 64 Fed. Reg. 14,086 (Mar. 23, 1999) (setting this timetable). The law therefore provides ample time for the Department to accept submissions. For these allegations, Plaintiffs have failed to allege any deprivation of legally required information.

Elsewhere, Plaintiffs complain about deprivations of information not required to be provided by law. For example, Plaintiffs allege that the CDC will stop communicating information to them as required by law, *see* 42 U.S.C. § 242c(b)(7), simply because the CDC communications team allegedly lost its leaders and employees, *see* Am. Compl. ¶ 115. The CDC must "communicate" with public and private entities, including through annual meetings, but the statute does not require any other specific mode of communication or that it be conducted by particular staff inside the CDC. 42 U.S.C. § 242c(b)(7).

Plaintiffs also claim that the CDC has "effectively frozen" certain grant proposals to WTCHP, Am. Compl. ¶ 162(d), and "offered no funding timeline" regarding a funding opportunity, *id.* ¶ 200. Here again, Plaintiffs fail to identify any law that requires the agency to process proposals on a particular timeline or even offer a funding timeline for new OSH opportunities. *See also id.* ¶ 312 (complaining about short timeframe to submit SAMHSA grant applications without identifying any timeframe required by the law). So too for Head Start and ACF. Plaintiffs allege that the Department has failed to issue "critical guidance" regarding Head Start, "causing harmful delays and confusion," and has also delayed approval of grant modifications related to enrollment percentages. *Id.* ¶¶ 285–86. That includes guidance about how to implement a recent

determination by the Department under the Professional Responsibility and Work Opportunity Act. *See id.* ¶ 289.  Plaintiffs identify no requirement that the Department must provide guidance or approve grant proposals on a particular timeline.  *See also id.* ¶ 310 (alleging that SAMHSA communications "have been delayed, creating planning uncertainty" but not alleging any statutorily required timeline for those communications).

Consider too Plaintiffs' assertion that the Community Counts program "was close to publishing a national report on inhibitor development." *Id.* ¶ 238.  Plaintiffs identify no statute requiring publication of that report, nor do they cite any law to substantiate their assertion that Community Counts "is supposed to respond" to certain data requests. *Id.* ¶ 239.  Plaintiffs also provide no basis to suggest that the CDC is required by statute to collaborate with the Consumer Product Safety Commission on the National Electronic Injury Surveillance System. *See id.* ¶ 255.

In some instances, Plaintiffs identify information that the Department is statutorily required to collect or provide but allegedly is failing to provide.  The collection of certain pregnancy- and maternal-risk-related data (referred to as PRAMS data) under 42 U.S.C. § 247b-12 arguably falls in this category, as does the collection of data under 15 U.S.C. § 1341.  But Plaintiffs do not show that this information is being intentionally withheld or indefinitely suspended.  In fact, as to PRAMS, Plaintiffs admit that the Department has said that it will provide the required program management support for PRAMS and admit that data collection has resumed.  *See id.* ¶ 183.  Plaintiffs doubt how the Department will do so without certain specific employees, but that is not enough to allege an actual deprivation of information nor to assert that such deprivation is "likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at 381.  Nor do Plaintiffs allege that this information has been unavailable long enough to violate any statutory requirement.  Given the Workforce Executive Order's direction to implement ARRPs consistent with applicable law and

the Department's stated intention to proceed "without impacting critical services," the reasonable interpretation is a temporary lapse in providing the information rather than a refusal to undergo statutorily mandated collections and publications.  ECF No. 44-1 at 1.

And even if Plaintiffs plausibly allege that required information is delayed or not provided, these standing assertions still have two flaws.  First, Plaintiffs have not shown harm based on lack of access to the information.  Lack of access without more is not enough.  For PRAMS, Plaintiffs' apparent injury is an inability "to identify and respond to trends in maternal and infant health outcomes, or to shape evidence-based programs" without access to PRAMS data.  Am. Compl. ¶ 186.  But States can still "monitor the health and well-being of pregnant people and their infants" without access to completely updated PRAMS data.  *Id.*  States can also still "evaluate their work and monitor progress in tobacco use prevention" despite a temporary pause in reports from OSH. *Id.* ¶ 175.  And second, even if Plaintiffs could show harm from a lack of information access, they do not show that their preferred access would resume if restructuring efforts were reversed or particular employees reinstated.  After all, the Department still has discretion to manage its personnel.  *See Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998) (agencies entitled to "wide discretion" in RIFs).  The absence of redressability defeats standing.  *See Lujan*, 504 U.S. at 560–61.

## 2.  Plaintiffs Lack Cognizable Injury Based On Services Allegedly Not Provided.

Next, Plaintiffs have not suffered cognizable injury based on non-provision of services for multiple reasons.

### a.  *Plaintiffs' Allegations Of Current And Future Lapses In Service Are Speculative.*

Most fundamentally, the Amended Complaint speculates that, because certain employees who have historically performed certain functions are no longer employed, those functions will no

longer be performed.  But the Department is not required to use specific personnel to perform its functions.  Much of Plaintiffs' speculation is unsupported by factual allegations that these functions are not being performed.

Take Plaintiffs' allegations regarding CTP.  Contrary to their suggestion that CTP "cannot continue to operate" because "[i]ts enforcement abilities were stopped in its tracks," Am. Compl. ¶ 269, CTP has continued to conduct compliance checks as required by 21 U.S.C. § 387f, *see* FDA, *Tobacco Compliance Check Outcomes*, https://timp-ccid.fda.gov/ (last visited Oct. 14, 2025) (compliance checks have continued to occur through September 2025).  And far from being unable "to properly process pre-market applications," Am. Compl. ¶ 271, CTP review of pre-market tobacco applications continues as required by 21 U.S.C. § 387j, *see* FDA, *Tobacco Products Marketing Orders*, https://www.fda.gov/tobacco-products/market-and-distribute-tobacco-product/tobacco-products-marketing-orders (last visited Oct. 14, 2025) (continued review of applications and issuance of decisions from January through mid-August 2025).  Plaintiffs also suggest that CTP cannot stem "ongoing proliferation of disposable flavored vapes from China." Am. Compl. ¶ 270.  But the Department has continued to interdict and seize unauthorized e-cigarette products, including those imported from China. *See HHS, CBP Seize $86.5 Million Worth of Illegal E-Cigarettes in Largest-Ever Operation* (Sep. 10, 2025), https://www.hhs.gov/press-room/hhs-fda-cbp-seize-record-4-7-million-illegal-e-cigarettes-chicago-operation.html; *see also Gonzalez*, 284 F.3d at 288 (court may consider material outside the pleadings on a 12(b)(1) motion).

Plaintiffs similarly speculate about potential lapses in certain SAMHSA services, but they do not support that speculation with specific factual allegations.  For example, Plaintiffs say that no one is available at the Department to "analyze and prepare data" submitted as part of the

Treatment Episode Data Set (TEDS).  Am. Compl. ¶¶ 306–07.  Yet SAMHSA released the annual report for TEDS in August and has announced publicly its plans to release more TEDS data before the end of the year.  *See* SAMHSA, *Statistical Products Publication Schedule*, https://www.samhsa.gov/data/about-us/upcoming-releases (last visited Oct. 14, 2025).  Plaintiffs thus speculate about a nonexistent lapse.[6]  Consider too Plaintiffs' allegations about TANF grants.  *See* Am. Compl. ¶ 291.  Plaintiffs do not allege that the Department has failed to disburse TANF grants or otherwise violated a statutory requirement.  That there are fewer staff to perform those tasks does not mean that the Department is violating any mandates.  And Plaintiffs fail to allege that certain programs are statutorily required at all, such as the HIV Medical Monitoring Project and the National HIV Behavioral Surveillance Project.  *See id.* ¶¶ 214–15.

Consider too Plaintiffs' allegations about Head Start.  Plaintiffs allege that, due to the closure of Head Start regional offices, grantees have lost technical support, whether because they "will have to travel further on average to reach their regional office," *id.* ¶ 280, or because grantees must "send all inquiries to a generic email box," *id.* ¶ 285.  Allegedly "delayed responses" and the change to a program email address are not tantamount to statutory violations.  *Id.* ¶ 281.

As to other allegations, Plaintiffs read a statutory mandate too broadly and say that the Department is not providing required services.  Plaintiffs say that 15 U.S.C. § 1341 "compel[s] OSH to manage" the Tips from Former Smokers ad campaign.  *Id.* ¶ 199.  But the statute does not mention that campaign by name.  The Department may still "conduct and support research on the effect of cigarette smoking"—its prime statutory mandate—without the Tips Campaign.  15 U.S.C. § 1341(a)(1).  Nor does that statute require OSH to be in charge of such efforts.  Congress directed

---

[6] Plaintiffs mention other data sets in this section of the Amended Complaint, *see* Am. Compl. ¶ 297, but assert harm only from an alleged lapse as to TEDS, *see id.* ¶ 307.

"the Secretary" to "inform the public of any dangers to human health presented by cigarette smoking." *Id.* § 1341(a). OSH need not be the HHS component in charge of those functions. Especially given the Department's intent to streamline "without impacting critical services," there is no basis for assuming that disruption of statutorily mandated programs will occur in the reorganized Department. ECF No. 44-1 at 1.

At minimum, a handful of particularized allegations of some delay or disruption in a government service cannot justify sweeping relief freezing in place an entire restructuring effort. If Plaintiffs adequately alleged entitlement to information or services that they did not receive within a required timeframe, they would at most have standing to seek provision of such information or services—not an order requiring the Department to provide it in a particular fashion or with particular staff. *See Maryland*, 151 F.4th at 214 (holding that "an appropriate remedy" for informational injury is injunction requiring government to produce required information, not broad order enjoining further RIFs). Courts may not grant relief for a supposed injury that goes far beyond redressing the injury itself. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018).

Plaintiffs also assert an array of potential future harms premised on sheer speculation. Such allegations are insufficient to create standing. *See Kerin v. Titeflex Corp.*, 770 F.3d 978, 982–83 (1st Cir. 2014); *Newbury v. U.S. Dep't of Hous. and Urb. Dev.*, 2024 WL 4785147, at *5 (D.R.I. Nov. 14, 2024), *appeal filed*, No. 24-2137 (1st Cir. Dec. 19, 2024) ("[V]ague allegations of future harm are insufficiently concrete and imminent to qualify as an injury in fact"). This is most apparent in the allegations about Head Start. Plaintiffs assert a litany of potential harms "if Head Start programs in their States are forced to pause operations or close," Am. Compl. ¶ 282, resulting in "fewer Head Start programs," *id.* ¶ 283. But nowhere do Plaintiffs allege any imminent closure of Head Start facilities. They are simply speculating that such an occurrence will happen, and

- 23 -

speculation is not enough to state an injury. "It is not enough for a plaintiff to assert that she 'could be' subjected in the future to the effects of an unlawful policy or illegal conduct by a defendant." *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 16 (1st Cir. 2004) (quoting *Golden v. Zwickler*, 394 U.S. 103, 109 (1969)). Especially given the Department's focus on avoiding disruption of critical services, the risk that any of these harms will actually materialize is not imminent.

As to certain allegations, Plaintiffs also seem to base their speculation on alleged past lapses. For example, Plaintiffs highlight that, "[a]s of May 5, 2025," the websites for the Coal Workers' Health Surveillance Program, the Health Hazard Evaluations program, the Fire Fighter Fatality Investigation and Prevention Program, the National Firefighter Registry for Cancer, and the National Personal Protective Technology Laboratory indicated that those programs were inoperable. Am. Compl. ¶¶ 144–148. But as Plaintiffs implicitly concede, the websites for these NIOSH programs no longer contain disclaimers indicating disrupted operations due to RIFs.[7] Similarly, Plaintiffs allege that past lab closures by NCHHSTP forced Plaintiffs to "find new partners" to handle testing needs and that Plaintiffs could not rely on the CDC's expertise "in responding to cross-jurisdictional outbreaks." *Id.* ¶ 210. Yet Plaintiffs admit that the RIF notices sent to lab staff have since been rescinded, *see id.* ¶¶ 208, 209, and do not allege that the labs are not currently operating.

Plaintiffs cannot base a request for prospective relief on alleged past lapses that have since

---

[7] *See* CDC, *Coal Workers' Health Surveillance Program*, https://www.cdc.gov/niosh/cwhsp/about/index.html (last visited Oct. 14, 2025); CDC, *Request a NIOSH Health Hazard Evaluation*, https://www.cdc.gov/niosh/hhe/request/index.html (last visited Oct. 14, 2025); CDC, *About the FFFIPP*, https://www.cdc.gov/niosh/firefighters/fffipp/about.html (last visited Oct. 14, 2025); CDC, *National Firefighter Registry (NFR) for Cancer*, https://www.cdc.gov/niosh/firefighters/registry/index.html (last visited Oct. 14, 2025); CDC, *Respirator Approval Program*, https://www.cdc.gov/niosh/rap/index.html (last visited Oct. 14, 2025).

been remedied.  Plaintiffs instead must show a "real and immediate" threat of future injury, *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983), and "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief," *O'Shea*, 414 U.S. at 495–96.  "Prospective relief must instead be justified by prospective injury."  *Maryland*, 151 F.4th at 209.  This limitation on standing prevents courts from leaping "into the area of speculation and conjecture" about what injuries might be suffered.  *O'Shea*, 414 U.S. at 497.  Plaintiffs ask the Court to take that leap and assume that because some programs may have been temporarily paused, the Department will permanently discontinue these or other programs in the future.   The Court cannot make that assumption to find a cognizable injury in fact, *see Lyons*, 461 U.S. at 105, especially given the Department's ongoing reorganization, the focus of which is the maintenance of statutorily mandated functions.

>  b.  *Alleged Effects On State Budgets And Resources Are Not Cognizable Injuries-In-Fact.*

Otherwise, Plaintiffs allege that the Department is not providing services that they have historically benefited from, and they allege that they will incur (or are incurring) expenses to find alternative sources of such services. *See* Am. Compl. ¶ 159 (alleging that threatened elimination of NIOSH programs "will place added strain on Plaintiff-States' already-strained health and labor agencies"); ¶ 213 (lack of trainings from Regional Prevention Training Centers will force Plaintiffs to "develop and maintain their own disease intervention training curricula"); ¶ 282 ("if Head Start programs . . . are forced to pause operations or close," children will come to Plaintiffs and "strain" their "social support programs").

That theory is inconsistent with Supreme Court precedent.  In *United States v. Texas*, states challenged a federal immigration policy that would "impose[] costs on the States." 599 U.S. at 674.  The states claimed the government's immigration-enforcement decisions would force them

to "supply social services such as healthcare and education" to additional persons. *Id.* The Supreme Court held that the states lacked standing, explaining that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id.* at 680 n.3. "[I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id.* And the states' "indirect effects" standing theory was too "attenuated" to amount to a constitutionally sufficient injury. *Id.*; *see also, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (rejecting contention that any federal policy that "imposes peripheral costs on a State creates a cognizable Article III injury"). Recently, the Fourth Circuit has similarly held that a group of States lacked standing to challenge RIFs at executive agencies because "[i]nnumerable federal actions impact state budgets and programs." *Maryland*, 151 F.4th at 210. "If states could claim these peripheral costs for purposes of standing, there would effectively be no barrier to suit." *Id.* (quotation marks omitted). This is true at least in part because "management of the federal workforce" is a "traditionally federal" function that states cannot challenge. *Id.* at 209–10.[8]

Plaintiffs' allegations here present the same concern. They assert that the RIFs and restructuring have inflicted or may inflict downstream harms on the states' budgets and resources. They speculate, for example, that certain NIOSH programs might be eliminated or certain Head Start facilities might close, placing a "strain" on Plaintiffs' social support networks. Am. Compl. ¶¶ 159, 282. Elsewhere, Plaintiffs allege that they will need to take on "the high cost of producing new ads" regarding smoking education, *id.* ¶ 197, and that the "inspection and licensure burden"

---

[8] The First Circuit's decision denying the Department's request for a stay of the preliminary injunction in this case does not foreclose this argument. That decision confronted only whether Plaintiffs asserted a *parens patriae* theory of standing. *See New York*, 2025 WL 2658233, at *3. It did not decide whether downstream effects from actions involving the federal workforce qualify as injuries in fact under Article III.

for Head Start facilities "will increase," presumably affecting Plaintiffs' budgets, *id.* ¶ 284.  Such harms are not cognizable injuries-in-fact.  *See Texas*, 599 U.S. at 674, 680 n.3.  Were the rule otherwise, states could claim standing to second-guess nearly any federal personnel decision—hirings, firings, or relocations—on the theory that it has a downstream effect on state resources. *See Arizona*, 40 F.4th at 386 (rejecting peripheral-costs theory as "boundless" and "a bridge much too far").  The theory could reach far beyond federal personnel decisions, too, to the litany of federal policies that "frequently generate indirect effects on state revenues or state spending." *Texas*, 599 U.S. at 680 n.3.  It would, in short, "upset, indeed revolutionize, the balance inherent in dual sovereignty" requiring "reciprocal respect" between states and the federal government. *Maryland*, 151 F.4th at 215.

Ultimately, Plaintiffs have failed to identify any "case or historical practice" offering precedent for the notion that courts can micromanage federal personnel policies to produce particular downstream effects.  *Texas*, 599 U.S. at 677.  On their theory of harm, any plaintiff purportedly aggrieved by deficient government services might even seek to compel terminations of underperforming employees and then compel the government to hire better workers in their place.  Or a plaintiff might seek to require that the Executive Branch put in place a restructuring plan with different goals and directives.  The Supreme Court has declined to recognize standing for such a theory of injury because doing so would "interpose the federal courts as virtually continuing monitors of the wisdom and soundness of . . . administration, contrary to the more modest role Article III envisions."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006) (quotation marks omitted).  In short, an injury based on services not being provided in the way Plaintiffs prefer is not one "traditionally thought to be capable of resolution through the judicial process." *See Texas*, 599 U.S. at 676 (citation omitted).

3.  <u>For Some Alleged Lapses, Plaintiffs Have Not Stated Any Particularized Injury.</u>

In addition to the multiple deficiencies discussed above, Plaintiffs fail to explain their "personal stake" in certain actions about which they complain.  *TransUnion*, 594 U.S. at 423. Instead, Plaintiffs merely describe the RIFs and claim that certain agency functions might not occur as a result, but Plaintiffs do not allege any injury to them from the purported lapses.  "A federal court is not a forum for generalized grievances, and the requirement of such a personal stake ensures that courts exercise power that is judicial in nature."  *Gill*, 585 U.S. at 65 (quotation marks omitted).  "A citizen may not sue based only on an asserted right to have the Government act in accordance with law."  *All. for Hippocratic Med.*, 602 U.S. at 381 (quotation marks omitted).  That is precisely what Plaintiffs do as to certain alleged actions and, as such, they lack standing for those claims.  Alternatively, and for the same reasons, Plaintiffs' allegations as to some of their harms are insufficiently detailed to "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  The Court thus may alternatively dismiss these allegations under Rule 12(b)(6).

Plaintiffs' allegations about the WTCHP are illustrative of this defect.  *See* Am. Compl. ¶ 160–63.  Because of the RIFs, Plaintiffs say, the WTCHP does not have enough doctors, has not addressed pending petitions to add health conditions to the WTCHP's list, cannot hold meetings of two steering committees, and has "effectively frozen" grant awards.  *Id.* ¶ 162d.  These allegations fail for multiple reasons, including that RIFs related to the WTCHP have been rescinded, *see id.* ¶ 161, and that no statute requires the WTCHP to convene the steering committees at a particular time or frequency, *see* 42 U.S.C. § 300mm(h) (requiring only that WTCHP administrator "engage in ongoing outreach and consultation" with the Committees).  But conspicuously absent is any allegation that Plaintiff States themselves, rather than WTCHP members living in those Plaintiff States, rely on the WTCHP at all.  They do not allege that they have submitted any proposals or petitions that have gone unaddressed, nor do they claim to hold a

seat on either Steering Committee.  As for the alleged lack of doctors, the only harm alleged is that "patients have experienced delays," not that Plaintiff States have been affected in any way.  Am. Compl. ¶ 162a.  Plaintiffs thus present no particularized injury as to the WTCHP, and those allegations should be dismissed.

Plaintiffs fail to assert a personal stake in numerous other allegations.  For example, Plaintiffs assert that the CDC lacks a "working FOIA office," causing harm to Plaintiffs through "loss of access."  Am. Compl. ¶ 116.  Plaintiffs never allege, however, that any of them has a pending FOIA request that the Department has delayed or not addressed.  The same defect appears in Plaintiff's allegations about NIOSH's Mining Research Divisions in Spokane and Pittsburgh. Plaintiffs highlight the "critical research" taking place there and the inability of NIOSH to "develop guidance" on miner health as a result of the RIFs.  *See id.* ¶¶ 156–57.  But Plaintiffs nowhere allege the specific harm that they are suffering or will suffer without that guidance or that they have relied on it in the past.  Similarly, Plaintiffs claim that they have lost access to epidemiologists through the Maternal and Child Health Epidemiology Program (MCHEP), *see id.* ¶ 191, and subject matter expertise through the Sickle Cell Data Collection program, *see id.* ¶ 237, Community Counts, *see id.* ¶ 241, and SAMHSA's Office of Treatment Services, *see id.* ¶ 307, without identifying an instance in which one of the Plaintiffs has requested those services and been denied them because of the Department's RIFs and restructuring.  Elsewhere, Plaintiffs generically assert that they have lost required services without specifying what those services are or providing further detail.  *See id.* ¶ 188 (Division of Reproductive Health); ¶ 226 (NCEH).

Other allegations are deficient in the same way.  Plaintiffs allege that the entire Emergency Preparedness and Response Team was subject to RIFs, but they do not explain how they relied on that Team.  *See id.* ¶ 190.  They say it worked "with public health organizations . . . within Plaintiff

States," but that does not mean the States themselves relied on the Team for assistance. *Id.* Similarly, Plaintiffs allege the closure of a laboratory run by NCBDDD, *id.* ¶ 242, but they do not allege how they relied on the blood samples in that lab or on the lab's work. Nor do Plaintiffs assert that they rely on the National Syndromic Surveillance Program Disability Data, the National Electronic Injury Surveillance System, or the Drug Abuse Warning Network. *See id.* ¶¶ 246, 255, 305. So too for OIDP and alleged effects on the Ending the HIV Epidemic in the U.S. (EHE) program: Plaintiffs never assert how any program changes affect them. *See id.* ¶¶ 320–21. To allege that those cuts "stopped the consistent progress that had been made by EHE"—as Plaintiffs do, *id.* ¶ 321—is a quintessential "general legal, moral, ideological, or policy objection" that cannot confer standing, *All. for Hippocratic Med.*, 602 U.S. at 381. That is true for all these programs. Without a personal stake in those programs, Plaintiffs lack standing to challenge alleged lapses in them.

### C. Some of Plaintiffs' Allegations Belong In The Court Of Federal Claims.

Plaintiffs make multiple allegations that grants have been cancelled or that services allegedly required by cooperative agreements between the Department and Plaintiffs are not being provided. Because those allegations challenge actions based on contracts with the United States, jurisdiction over them belongs in the Court of Federal Claims.

The Tucker Act vests exclusive jurisdiction in the Court of Federal Claims for "claim[s] against the United States founded upon . . . any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). "Whether a claim is 'at its essence' contractual for the Tucker Act 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 40 (D.R.I. 2025), *appeal filed*, No. 25-1477 (1st Cir. May 20, 2025) (quoting *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022)). Plaintiffs allege two "contractual" claims for loss of

funding: that a Plaintiff State "lost $300,000 in [NCHHSTP] grant funding," and that "grant funding was stopped" for the HIV Medical Monitoring Project.  Am. Compl. ¶¶ 212, 214.  In *Department of Education v. California*, 604 U.S. 650, 650 (2025) (per curiam), the Supreme Court stayed a district court's order requiring the Government to pay "past-due grant obligations and to continue paying obligations as they accrue."  Because the claims asserted were based on "'express or implied contract[s]' with the United States," the APA's "limited waiver of immunity" did not apply, and the Tucker Act granted jurisdiction to the Court of Federal Claims.  *Id.* at 651 (quoting 28 U.S.C. § 1491(a)).  That reasoning applies squarely to any allegation here of a breach of a funding agreement.

In addition to those loss-of-funding allegations, Plaintiffs allege that the Department has failed to provide services required by cooperative or grant agreements between it and Plaintiffs. *See* Am. Compl. ¶¶ 182, 184–85, 188, 211, 237, 241, 245.  For example, as to PRAMS, Plaintiffs allege lost access to services "required" by a PRAMS agreement.  *Id.* ¶ 185.  And as to NCBDDD, Plaintiffs say they have lost access to staff expertise.  *See id.* ¶¶ 239, 245.

The Tucker Act vests jurisdiction over these claims in the Court of Federal Claims.  *First*, the source of Plaintiffs' asserted rights is contractual.  Grant agreements with the Federal Government are contracts for Tucker Act purposes, *see Dep't of Educ.*, 604 U.S. at 650, as are cooperative agreements between Plaintiffs and the Department because they are supported by consideration, *see Vera Inst. of Just. v. U.S. Dep't of Just.*, 2025 WL 1865160, at *10 (D.D.C. July 7, 2025), *appeal filed*, No. 25-5248 (D.C. Cir. July 10, 2025).  For example, Plaintiffs allege that the Department partners with other entities "to collect" PRAMS data and, in exchange, "PRAMS partners are entitled to receive" services from the Department.  Am. Compl. ¶ 168.  Agreeing to abide by "an array of requirements" constitutes consideration sufficient to make a contract for

purposes of the Tucker Act. *Vera Inst.*, 2025 WL 1865160, at *10. And to know whether the Department has fallen short in performance of its obligations, the Court will "be called upon to interpret" cooperative agreements between the Department and Plaintiffs. *Vill. W. Assocs. v. R.I. Hous. and Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 139 (D.R.I. 2009).

Plaintiffs' requested relief as to these challenged actions also fundamentally sounds in contract. An order "to specifically perform" a contract is a contractual remedy. *Id.*; *see Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (Specific performance is "the classic contractual remedy."). That is precisely what Plaintiffs seek. They ask this Court to reinstate the experts and other technical staff supposedly needed to fulfill the Department's side of the agreements. *See* Am. Compl. ¶ 237 (complaining that there is "no staff" left in the Sickle Cell Data Collection program, despite funded cooperative agreements). Indeed, Plaintiffs have already moved this Court for reinstatement of various staff personnel. *See* ECF No. 83 at 11–14. "Such an order that the government must perform on its contract" by reinstating specific personnel "is one that must be resolved by the Claims Court." *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025) (quotation marks omitted).

Moreover, even if this Court had jurisdiction over these allegations, freezing the restructuring or halting the RIFs would not necessarily lead to restoration of canceled funding. Plaintiffs thus fail to show that their requested relief would redress any injury based on an allegedly terminated grant. Therefore, Plaintiffs lack standing as to these claims. *See Lujan*, 504 U.S. at 560–61.

### D.    Plaintiffs' Claims Are Not Reviewable Under the APA Because They Do Not Seek Judicial Review of a Discrete, Final Agency Action.[9]

Beyond the above issues, Plaintiffs' APA claims fail because they identify no discrete, final agency action that this Court can review.  Again, Defendants acknowledge this Court's previous conclusion to the contrary. *See* ECF No. 73 at 32–37.  But this Court remains free to revisit its earlier determination, which was rendered in a preliminary posture and regarding a different complaint.

Plaintiffs must plead "an identifiable action or event" and "direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (*Nat'l Wildlife Fed'n*).  That final agency action must be "circumscribed [and] discrete." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (*SUWA*).  The APA does not provide for "general judicial review of [an agency's] day-to-day operations." *Nat'l Wildlife Fed'n*, 497 U.S. at 899.  On the contrary, it contains "a prohibition on programmatic challenges," meaning those "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (cleaned up); *see also SUWA*, 542 U.S. at 64.  "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized

---

[9] "The issue of whether there was final agency action implicates the jurisdiction of the federal courts, and such final action is normally a prerequisite to judicial review." *Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007).  Whether the issue is analyzed as a jurisdictional issue— as Defendants believe is appropriate—or as a Rule 12(b)(6) defect in Plaintiffs' attempt to state a claim, the Court should dismiss for lack of final agency action because such action is a baseline requirement for APA reviewability.  *See Puerto Rico*, 490 F.3d at 70 (noting that "the question of whether there has been final agency action is one that implicates statutory, rather than constitutional, jurisdiction"); *see generally* 5 U.S.C. § 704 (providing that "final agency action[s] for which there is no other adequate remedy in a court are subject to judicial review").

complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). The avoidance of such "generalized" review reflects separation-of-powers concerns and courts' recognition that, unlike "circumscribed, discrete agency actions," a plan can represent "the sum of many individual actions, including some yet to be taken." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006) (citation omitted). "[P]lans themselves are generally unreviewable"; instead, "it is only [the] specific actions implementing the plans that are subject to judicial scrutiny." *Id.* at 20–21.

**1.** Plaintiffs' claims do not challenge a "discrete" action; instead, they present exactly the type of wholesale challenge the APA forbids. They seek comprehensive judicial review of an ongoing restructuring that will affect roughly half of the Department's 28 divisions. Far from presenting the Court with a "narrow question to resolve," *Kempthorne*, 455 F.3d at 307, Plaintiffs prematurely challenge a multifaceted streamlining of operations and consolidation of various units and functions that remains in process. Addressing this type of claim would require the Court to supervise the Department's activities and determine how it should accomplish each statutorily mandated function going forward—an even more extreme kind of supervisory claim than the one rejected by the Supreme Court in *National Wildlife Federation*. *See* 497 U.S. at 892–93. Such a claim would thwart the purpose of the APA's discrete agency action requirement, which is to "protect agencies from undue judicial interference with their lawful discretion and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *SUWA*, 542 U.S. at 66–67. It is not the "task of the judiciary, rather than the Executive Branch, to determine what resources an agency needs to perform its broad statutory functions." *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 790 (D.C. Cir. 2025) (*Vought*).

In its preliminary-injunction order, this Court opined that Defendants have not explained

"why a communication that foists mass terminations and is implemented to effectively discontinue sub-agencies would not constitute a discrete action." ECF No. 73 at 34. The answer is that the March 27 press release was a general statement of overarching principles to be implemented as a series of "many individual actions." *Fund for Animals*, 460 F.3d at 20; *see also Vought*, 149 F.4th at 790 (APA claim challenging "a constellation" of individual actions did not challenge a discrete action). The number of actions needed to implement the planned restructuring likely numbers in the thousands. Plaintiffs' challenge is far too broad. They challenge a restructuring that affects much of the Department and how the Department conducts a significant number of its statutory responsibilities. Such an attack is the opposite of "discrete." It is a programmatic challenge foreclosed by the APA.

**2.** Even assuming Plaintiffs have identified discrete agency actions—which they have not—they have not shown that these programmatic actions are final. "Final agency action" has two components. First, the action must "mark the consummation of the agency's decisionmaking process[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted). It may not be a "preliminary, procedural, or intermediate agency action." 5 U.S.C. § 704. Second, the action must "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (citation and quotation marks omitted). As to this second criterion, the "core question" is whether the agency action "will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992); *see also Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (action being challenged must be "the definitive statement of the agency's position" and must have "direct and immediate" effect on complaining parties). This requirement means that documents with "no independent legal authority" are not reviewable. *Cal. Cmtys. Against Toxins v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019).

- 35 -

Plaintiffs allege that the planned restructuring outlined in the March 27 press release meets the *Bennett* test. *See* Am. Compl. ¶ 359. But *Bennett*'s test is not satisfied based on the press release's own terms, which clarify that the agency's "decisionmaking process" is ongoing and evolving. For example, it describes "specific contents of the restructuring plan that have been announced *so far*." ECF No. 44-1 at 2 (emphasis added). And the accompanying Fact Sheet notes that while "[n]o additional cuts are currently planned" beyond those described in the sheet, the Department "will continue to look for further ways to streamline its operations and agencies." ECF No. 44-2 at 2. These statements underline the developing nature of the agency's process.

The Department's steps to begin to address what it sees as a necessary restructuring are "preliminary" in nature and "not directly reviewable" under the APA. *See* 5 U.S.C. § 704. They "may be . . . step[s], which if erroneous will mature into a prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make those steps themselves the "consummation of the administrative process." *Id*. at 113. In addition, premature judicial intervention by this Court will deny the Department "an opportunity to correct its own mistakes and to apply its expertise." *Harper v. Werfel*, 118 F.4th 100, 117 (1st Cir. 2024) (quotation marks omitted). Indeed, since the press release, the Department reversed some of the RIFs, as noted above, and responded to facts on the ground in a way that courts are not able to quickly accomplish and that judicial management impedes.

The restructuring plan is not final agency action for two additional reasons. First, the March 27 press release and the planned restructuring do not "directly affect" Plaintiffs, which are not the subject of the restructuring. *See Franklin*, 505 U.S. at 797. Although Plaintiffs allege that they must confront its alleged effects, those are downstream effects. Second, the press release that Plaintiffs paint as the source of a "Directive," Am. Compl. ¶ 360, has "no direct and appreciable

legal consequences," *Cal. Cmtys.*, 934 F.3d at 638; *cf. Trudeau v. FTC*, 456 F.3d 178, 189 (D.C. Cir. 2006) ("[W]e have never found a press release of the kind at issue here to constitute 'final agency action' under the APA"). Instead, it describes aspects of what the Department "will" do going forward (to the extent not enjoined). ECF No. 44-1. No one "action" is encompassed by the press release because the restructuring is still being planned. *Cf. Cal. Cmtys.*, 934 F.3d at 637–38 (memorandum announcing agency's final interpretation of law not final for APA purposes, even though it "unequivocally declare[d]" the agency's "definitive" position and "forecast[]" "in no uncertain terms" how the agency would proceed).

## II.    The Complaint Does Not State a Claim for Violation of the APA.

### A.    Plaintiffs Seek to Compel Agency Action But Cannot Meet the Mandamus-Like Standard.

Plaintiffs allege that the restructuring and RIFs violate the law because they will cause (or have caused) the Department to cease performing functions mandated by statute. *See, e.g.*, Am. Compl. ¶ 149 (alleging that RIFs have deprived Plaintiffs "of resources guaranteed to them under statute"), ¶ 253 (alleging that RIFs at NCIPC are illegal because they allegedly affect work "required by statute"); ¶ 311 (alleging Plaintiffs "have not been given access to demographic data required" by statute). Those allegations are governed by the APA's provision permitting courts to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1).[10] Plaintiffs cannot succeed under § 706(1)'s mandamus-like standard.

---

[10] Although the Court applied 5 U.S.C. § 706(2) to Plaintiffs' claims at the preliminary-injunction stage, *see* ECF No. 73 at 50 n.13, the § 706(1) standard applies to any allegations that the Department no longer takes (or will no longer take) actions or provides services that are legally required. In such a scenario—where an agency allegedly does not do what a statute requires, "§ 706(1) is the relevant provision." *Sheldon v. Vilsack*, 538 F. App'x 644, 649 n.3 (6th Cir. 2013); *accord Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 933 (9th Cir. 2010) (claim based on Forest Service not following a statutory command cognizable under § 706(1)).

"The only agency action that can be compelled under the APA is action legally *required*." *SUWA*, 542 U.S. at 63 (emphasis in original). In 5 U.S.C. § 706(1), "the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through" writs like mandamus, a remedy "normally limited to enforcement of a specific, unequivocal command, the ordering of a precise, definite act . . . about which [an official] had no discretion whatever." *Id.* (alterations in original) (citations and quotation marks omitted). Thus, "Section 706(1) permits judicial review of agency inaction, but only within strict limits," mirroring "the common law writ of mandamus." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016). Those strict limits mean that a plaintiff challenging "federal agency *inaction*" must show that the agency "failed to take a *discrete* agency action that it is *required to take.*" *Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97, 99 (1st Cir. 2012) (quoting *SUWA*, 542 U.S. at 64); *see In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (§ 706(1) relief "starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act." (quoting *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000))).

Several significant hurdles limit the availability of § 706(1) relief. Reflecting the traditional limitations on mandatory injunctions issued to co-equal branches, "[i]n the case of agency inaction" the Court "not only must satisfy [itself] that there indeed exists such a duty, but that the agency has 'unreasonably delayed' the contemplated action." *Bluewater Network*, 234 F.3d at 1315 (quoting 5 U.S.C. § 706(1)). Even once there has been an "unreasonable delay" in fulfilling the required statutory duty, this Court evaluates "whether the agency's delay is so egregious as to warrant mandamus." *Core Commc'ns, Inc.*, 531 F.3d at 855 (quoting *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984) (*TRAC*)). The *TRAC* standard

for determining whether an agency's delay is sufficiently egregious "is very deferential to administrative agencies." *Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Env't Prot.*, 163 F.3d 74, 82 n.9 (1st Cir. 1998) (*AAMA*); *see also Towns of Wellesley, Concord & Norwood v. FERC*, 829 F.2d 275, 277 (1st Cir. 1987) (applying the *TRAC* standard). And even where performance of a required duty is delayed enough to satisfy that deferential standard, courts must still be careful not to "enmesh[]" the judiciary "in the minutiae of agency administration." *Cobell v. Norton*, 240 F.3d 1081, 1108–09 (D.C. Cir. 2001) (citation omitted). If a court does find a violation after applying the proper deference, *see AAMA*, 163 F.3d at 82 n.9, "[i]t is proper . . . to allow the government the opportunity to cure" that violation, *Cobell*, 240 F.3d at 1108–09 (citation omitted).

And even if Plaintiffs have identified any discrete and statutorily required action that the Department is withholding, any relief would have to accord with the remedial principles applicable under § 706(1). Yet Plaintiffs do not identify any "specific, unequivocal command" to which the Department is subject such that the Court could "order[] . . . a precise, definite act." *SUWA*, 542 U.S. at 63 (citations omitted). They describe no "transparent violations of a clear duty to act," let alone one that has been withheld so long as to be "unreasonably delayed." *Bluewater Network*, 234 F.3d at 1315. Indeed, several instances where Plaintiffs purport to identify required departmental activities do not involve a ministerial duty, and the Department enjoys discretion in how to act. For example, the HIV Medical Monitoring Project and the National HIV Behavioral Surveillance Project, which do help carry out statutory functions, are not specifically mandated by statute. *See* Am. Compl. ¶¶ 204–06 (alleging loss of access to resources from these programs). And even statutorily prescribed activities such as the funding of training and education programs like ERCs, which has historically been conducted by NIOSH, are not required to be conducted in a particular manner. *See id.* ¶ 121. Instead, the Secretary has discretion to "conduct, directly or

- 39 -

by grants or contracts," such programs.  29 U.S.C. § 670(a); *see also* 42 U.S.C. § 247b-13(c)(1) (allowing the same for PRAMS).

Finally, issuing a permanent injunction would not "allow the government the opportunity to cure" any statutory violation the Court may find.  *Cobell*, 240 F.3d at 1108–09 (citations omitted); *cf. Vought*, 149 F.4th at 786 (recognizing that immediate judicial review is inappropriate when an agency has shown willingness to change course).  In sum, this case is a poor candidate for the mandamus-style relief afforded by § 706(1).  And because § 706(1) is in large part the most logical avenue for Plaintiffs' theory of harm, the Court should dismiss all allegations that effectively seek to require the Department to take actions such as providing information and services.  In any event, as discussed further below, Plaintiffs' claims fail whether analyzed under § 706(1) or § 706(2).

### B.    Plaintiffs Fail to State an Arbitrary and Capricious Claim.

Even to the extent Plaintiffs' APA claims challenge the manner in which the Department is going about fulfilling its mandates—as opposed to the Department's alleged failure to take required actions at all—and thus may be analyzed under § 706(2), those claims fail.  *See, e.g.*, Am. Compl. ¶ 285 (challenging decision to use a generic email box for questions from Head Start providers).  Plaintiffs present various arguments in support of their APA arbitrary and capricious claim.  Specifically, they assert that the Defendants "provided no reasoned basis or explanation" for their restructuring plans, "failed to consider the consequences of their actions," and failed to consider "important reliance interests." Am. Compl. ¶¶ 370, 371, 374.  These are, in essence, different ways of alleging the same thing: that the Department's actions are arbitrary and capricious because they failed to adequately analyze the Department's problems before addressing them.

But Plaintiffs' dissatisfaction with the degree of analysis does not support their APA claim.  "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not

substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also Littlefield v. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023). "As the Supreme Court has 'repeated time and again, an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities.'" *Scarborough Citizens*, 674 F.3d at 101 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007)). Thus, the Court must review only to ensure "that the agency has acted within a zone of reasonableness[.]" *Prometheus*, 592 U.S. at 423; *cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way").

The Department's actions satisfy this deferential review. Although Plaintiffs assert that the Department's various actions do not bear a connection to its goals as described in the press release, they overlook the cost-saving value of actions like consolidating components that have overlapping responsibilities. For example, Plaintiffs highlight OSH's role in educational campaigns regarding the effects of smoking. *See* Am. Compl. ¶ 197. But FDA also maintains smoking education campaigns.[11] Plaintiffs also overstate the alleged harms that may follow finalization of the restructuring process—harms that, as discussed earlier, are largely speculative. *See supra* at 23–24.

Plaintiffs may disagree with the Department's analysis, but they are not entitled to judicial relief "dictating to the agency the methods[] [and] procedures" it uses to complete its statutory obligations. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519,

---

[11] FDA, *Public Health Education Campaigns*, https://www.fda.gov/tobacco-products/public-health-education/public-health-education-campaigns (last visited Oct. 14, 2025).

545 (1978) (citation omitted).  "The decision to undertake a reorganization necessitating a [RIF] is within the discretion of the agency," *McKenna v. Dep't of Interior*, 996 F.2d 1235 (Fed. Cir. 1993) (table).  And any other programmatic decisions regarding the Department's handling of its statutorily required duties or responsibilities are likewise committed to agency discretion.  *See Nat'l Wildlife Fed'n*, 497 U.S. at 891; *SUWA*, 542 U.S. at 62.  To override these principles and enjoin agency leadership from exercising control over their own staffing and organizational issues would violate the separation of powers.

### C.    Plaintiffs Fail to State A Claim That The RIFs And Restructuring Are Contrary To Law And Exceed The Department's Statutory Authority.

Plaintiffs fail to state a claim that the RIFs and restructuring are "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2).  Plaintiffs' allegation is that the Department's plans will "dismantle statutorily mandated agency functions." Am. Compl. ¶ 358; *see, e.g.*, *id.* ¶ 7 ("Dismantling HHS by seeking to terminate the people necessary for it to meet its own mandates . . . is an unlawful effort to undercut the will of Congress[.]"), ¶ 112 (CDC will be "unable to meet" certain statutory mandates) the agency's statutory mandates"); ¶ 193 ("OSH is unable to fulfill its statutory mandates . . . ."), ¶ 271 (stating, without support, that CTP "has been unable to meet its mandates under the Tobacco Control Act").  That is incorrect.  To reiterate, HHS's restructuring is in progress, and the Department has made clear that it intends to continue carrying out its statutory duties.  Certain components of that restructuring are currently subject to this Court's injunction, but if and when that injunction is lifted, the Department will be able to continue developing and implementing its restructuring plans.

In any event, and so long as agencies perform their statutory mandates, the law recognizes wide latitude in performing RIFs.  *See Markland*, 140 F.3d at 1033 (stating that "[w]e accord an agency wide discretion in conducting a reduction-in-force" (cleaned up)).  Staffing decisions fit

neatly among those "categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Lincoln*, 508 U.S. at 191–92 (citation and quotation marks omitted). "The federal workforce performs federal functions." *Maryland*, 151 F.4th at 209. "How it performs them is a matter of federal concern." *Id.* After all, the point of the Department's actions is to improve efficiency, which allows the Department to "meet its statutory responsibilities in what [the new administration] sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. As the Supreme Court has held, "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and "the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs," *Sampson v. Murray*, 415 U.S. 61, 83 (1974). Moreover, Plaintiffs point to no statute limiting the agency's inherent discretion to reduce headcount.

Plaintiffs also argue that the planned restructuring violates the law because the Executive Branch cannot "decline to expend appropriated funds." *Id.* ¶ 341; *see id.* ¶ 253 (alleging that result of RIFs "is that funding appropriated by Congress will not be spent"). As an initial matter, the Department has never said it will not spend appropriated funds on statutorily mandated programs, and Plaintiffs do not allege facts suggesting otherwise. And saving taxpayer money by consolidating functions and reducing personnel redundancy is not inherently inconsistent with spending appropriated funds. Even if the agency did plan not to spend all money appropriated for required functions, Plaintiffs' APA challenge to that decision would be foreclosed by the Impoundment Control Act. That statute provides the exclusive means to challenge presidential impoundment of appropriated funds and contemplates litigation by the Comptroller General, not parties outside the interbranch relationship between the President and Congress. *See* 2 U.S.C. §§ 683(a), 684(a), 687. "[I]t does not make sense that the Congress would craft a complex scheme

of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits . . . at any time and without notice to the Congress of the alleged violation." *Glob. Health Council v. Trump*, —— F.4th ——, 2025 WL 2480618, at *10 (D.C. Cir. Aug. 28, 2025).

Moreover, even if Plaintiffs could bring such a claim under the APA, they have not identified a statutory command in any of the most recent appropriation statute. *See* Am. Compl. ¶¶ 1, 120, 180, 202, 220, 233, 252, 264, 316 (citing amount of appropriations for FY 2024). That statute simply provides that Congress is appropriating large undifferentiated sums for various activities such as to "carry out" specified provisions of the various public health acts. For example, the Further Consolidated Appropriations Act of 2024 states that it is appropriating $362,800,000 to NIOSH "[f]or carrying out" statutory obligations. Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460, 654. The same verbiage appears in the appropriation of funds regarding birth defects, environmental health, and STI prevention, all programs that are the subject of Plaintiffs' complaint here. *See id.* at 653–54. These statements do not affirmatively and unequivocally command expenditure of specific funds on a specific timetable for specific recipients. Instead, they "permit[] but do[] not require the Executive Branch to spend funds." Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, 1 Op. O.L.C. Supp. 303, 309 (1969); *see also Train v. City of New York*, 420 U.S. 35, 43–44 (1975) (similar) And Plaintiffs identify no other provision that includes such a command to spend appropriated money. Even if they did, Plaintiffs are simply speculating that the Department will not spend all appropriated money for statutorily mandated programs.

## III. Plaintiffs' Constitutional and *Ultra Vires* Claims Fail on the Merits.

Plaintiffs' other theories in their complaint similarly fail. In Count I, Plaintiffs bring a constitutional claim asserting that the Department has usurped legislative authority. *See* Am. Compl. ¶¶ 328–37. Count II similarly asserts that the Department has infringed on congressional

power, except this time by violating the Appropriations Clause. *See id.* ¶¶ 338–43. And Count III is an *ultra vires* claim alleging that the Department has exceeded the scope of its statutory authority. *See id.* ¶¶ 344–49. Each of these claims fails.

As an initial matter, Plaintiffs cannot bring freestanding constitutional claims that are actually statutory in nature. As the Supreme Court explained in *Dalton v. Specter*, 511 U.S. 462 (1994), not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. Rather, the Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases); *see also Vought*, 149 F.4th at 792 (noting the same distinction in *Dalton*). The Constitution is implicated, for example, if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" that can be asserted through a direct cause of action. *Id.* at 473–74.

Here, Plaintiffs' asserted constitutional claims are really "statutory" because they claim that the Department exceeded its statutory authority. *Id.* at 474. Count I alleges that the Department has violated the separation of powers because "Congress has created" the Department via statute, and the Department thus cannot contravene that action. Am. Compl. ¶ 335. Count II alleges a violation of the Appropriations Clause, but the real allegation is that the Department has violated statutes where Congress "has expressly directed that funds be expended for the operations of the agency that it has created." *Id.* ¶ 341. This is the sleight of hand rejected by the Supreme Court in *Dalton*. "[S]tatutory claims do not become constitutional ones by operation of the separation-

- 45 -

of-powers principles," invoked by Plaintiffs that "prevent . . . the Executive Branch from disregarding federal statutes." *Vought*, 149 F.4th at 792. And if Plaintiffs' argument were accepted, every garden-variety action by a federal agency alleged to be in violation of a statutory provision could be used to "transform a statutory claim into a constitutional one to avoid limits on judicial review," contrary to *Dalton*. *Glob. Health Council*, 2025 WL 2480618, at *8.

Even if Plaintiffs could bring those freestanding claims to compel the Department to expend appropriated money (and they cannot), the remedies they seek are precluded by history and tradition. There is no presumption as a constitutional matter that the Executive Branch must expend all funds appropriated by Congress. The Appropriations Clause was written as a negative constraint, namely that "no money can be paid out of the Treasury" without an act of Congress. U.S. Const. Art. I, § 9, cl. 7. That is "a restriction upon the disbursing authority of the Executive department," not an affirmative command that whatever Congress appropriates must be spent. *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937). Thus, since the early days of the Republic, the Executive Branch has declined to spend the full amount of appropriated funds on numerous occasions. *See* Thomas Jefferson, *Third Annual Message to Congress* (Oct. 17, 1803) (President Jefferson on gunboats); 4 Cong. Rec. 5628 (1876) (President Grant on harbor and river improvements); Nile Stanton, *History and Practice of Executive Impoundment of Appropriated Funds*, 53 Neb. L. Rev. 1, 10–13 (1974) (Presidents Truman, Eisenhower, and Kennedy on various defense projects).

This history suggests a prevailing understanding that appropriations statutes confer implicit authority for the Executive Branch to forgo spending across a range of circumstances. As noted above, disputes about funding are committed to a dialogue between the political branches, as set forth in the ICA, to be "hashed out in the hurly-burly, the give-and-take political process between

the legislature and the executive." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (cleaned up); *see supra* at 43–44.  That scheme preserves the political branches' accountability for enacting and implementing the appropriations laws by accounting for the possibility that the Executive Branch may decide to withhold funds in a wide variety of contexts for a wide variety of reasons and that Congress can respond to those withholdings.  *Cf. City of New Haven v. United States,* 809 F.2d 900, 907 (D.C. Cir. 1987) (explaining how Congress has previously acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from "the normal and orderly operation of the government" (quotation marks omitted)).  Plaintiffs' suit flouts this scheme by inserting them into "a complex scheme of interbranch dialogue" that contains no "backdoor" for third parties like Plaintiffs to get involved.  *See supra* at 43–44.

Plaintiffs' *ultra vires* claim also fails because it merely reframes their meritless APA contrary-to-law claim. Count III alleges that the Department's actions "functionally closed departments that worked on statutorily mandated programs across agencies."  Am. Compl. ¶ 347.  Count IV tracks that same theory, alleging that the Department has contravened "statutory authority that created the departments and administrations in the first place," *id.* ¶ 358, including by refusing "to spend money Congress has appropriated for HHS and its various functions," *id.* ¶ 356, thereby "dismantl[ing] statutorily mandated agency functions," *id.* ¶ 358. Indeed, Count III alleges that the Department's conduct "is contrary to law."  *Id.* ¶ 348.  Thus, Count III fails for the same reasons as Count IV, including that Plaintiffs have failed to show the Department is actually violating (or will imminently violate) a specific statutory requirement. *See Glob. Health Council*, 2025 WL 2480618, at *12 (*ultra vires* claim "that the defendants have exceeded their statutory authority" failed where plaintiffs could point to no statutory violation).

**IV.    Applying The Above Principles, All Allegations In The Complaint Fail.**

Each of Plaintiffs' claims should be dismissed based on the arguments made above.  In this section, the Department applies those arguments directly to each of Plaintiffs' claims to explain in greater detail why each fails.

***General CDC Allegations.***  Plaintiffs make much of the alleged changed "capacity at laboratories that test for infectious diseases," Am. Compl. ¶ 101, but nowhere do they allege that any of those services are statutorily required.  The CDC can still conduct "investigation, detection, identification, prevention, [and] control of diseases or conditions" without these specific labs, which are not required by the statute.  42 U.S.C. § 242c(b).  As for the CDC's alleged failure to post an updated Strategic Plan on its website, *see* Am. Compl. ¶ 114, Plaintiffs have not claimed an injury from that alleged failure, so they lack standing to challenge it.  There is also no statutory authority requiring the CDC to communicate with States in a particular way or with a particular staff.  *See supra* at 18; *contra* Am. Compl. ¶ 115.  As for the CDC's FOIA Office, Plaintiffs have not alleged any actual harm to them.  *See supra* at 29; Am. Compl. ¶ 116.

***NIOSH.***  Plaintiffs' NIOSH allegations rest largely on speculation and can be dismissed for lack of standing.  Plaintiffs suggest that this Court grant injunctive relief based on harms that will allegedly result "if the NIOSH facility in Pittsburgh is ultimately shut down," Am. Compl. ¶ 149, and based on "threatened elimination" of certain programs and publications, *id.* ¶ 158.  Plaintiffs do not assert facts indicating that those shutdowns or eliminations are likely to happen.  Instead, Plaintiffs attempt to manufacture standing through allegations about previous temporary pauses in certain NIOSH programs, like the Coal Workers Health Surveillance Program or the Respirator Approval Program.  *See id.* ¶¶ 144–49, 155.  As discussed, those services are operational, *see supra* at 8, 24, and standing for prospective relief cannot be based on any previous infraction.  "Prospective relief must instead be justified by prospective injury." *Maryland*, 151

F.4th at 209.  As for other NIOSH services and facilities, Plaintiffs never allege their personal stake in the work of the mining research divisions in Spokane or Pittsburgh.  *See* Am. Compl. ¶¶ 156–57.  To the extent any of their allegations about NIOSH might be construed to allege a personal stake, it is the kind of downstream effect from a federal action that the Supreme Court has said cannot confer standing on a state.  *See Texas*, 599 U.S. at 674, 680 n.3.  This includes allegations that the (speculative) closure of ERCs will diminish Plaintiffs' supply of doctors and "place strain" on Plaintiffs' state agencies.  Am. Compl. ¶¶ 158–59.  Plaintiffs also fail to identify a statutory violation with respect to the NORA partnership, *see id.* ¶ 152, and allegations that certain agencies are "functionally ineffective" or "functionally useless" are too vague to support a claim of injury, *id.* ¶ 164.  *See Bingham v. Massachusetts*, 616 F.3d 1, 7 (1st Cir. 2010) (holding that "a vague allegation of harms" is not "the kind of concrete, particularized injury required to show standing").

The NIOSH allegations include allegations about the WTCHP, which should also be dismissed for lack of standing.  Plaintiffs have alleged no tangible stake in the delays that patients have allegedly suffered due to the lack of WTCHP doctors.  *See* Am. Compl. ¶ 162a.  Plaintiffs also do not allege that they are affected in any way by the alleged backlog of petitions to add conditions to the WTCHP's list, *see id.* ¶ 162b, or by the alleged inability of the WTCHP to liaise with various steering committees, *see id.* ¶ 162c.  Indeed, the statute authorizing those committees does not require a certain frequency of meetings with these committees.  *See supra* at 28.  As for the allegation that the WTCHP has "effectively frozen" approval of grant proposals, Am. Compl. ¶ 162d, Plaintiffs do not allege any effect on their own grant proposals, nor do they allege that any supposed delay in approvals has violated a statutory mandate.

*NCCDPHP.*  Even if Plaintiffs' original complaint had stated a claim as to the PRAMS program, the Amended Complaint does not.  Plaintiffs' original allegations regarding the PRAMS program were premised on the CDC's April 1 statement that "it would be unable to provide the resources promised under the PRAMS agreements."  *Id.* ¶ 182.  Plaintiffs now acknowledge, however, that the CDC has said "that it *will* be able to provide program management support" and that "contract reviewers began to restart collection."  *Id.* ¶ 183 (emphasis added).  That suffices to nullify any allegations about the loss of access to data systems or experts allegedly provided by the PRAMS cooperative agreements.  *See id.* ¶¶ 183–88.  Plaintiffs' only remaining complaint is that the same staff are no longer there to manage the program*, see id.* ¶¶ 183–84, but Plaintiffs cannot micromanage the staff the Department chooses to utilize to fulfill its obligations.  And even if Plaintiffs could police those activities by claiming breach of PRAMS agreements, such a challenge belongs in the Court of Federal Claims.  *See supra* at 31–32.

Regarding IVF data in paragraph 189, Plaintiffs have not alleged that the Department has failed to meet the statutory requirement to publish the data "annually."  42 U.S.C. § 263a-5.  As for the Emergency Preparedness and Response Team, Plaintiffs never allege that Plaintiffs themselves—as opposed to organizations "within Plaintiff states"—worked with that Team.  Am. Compl. ¶ 190.  Similarly, Plaintiffs never allege what epidemiological support, if any, they require but have not received from a MCHEP epidemiologist.  *See id.* ¶ 191.

Plaintiffs' allegations regarding OSH suffer from many of the same flaws.  Plaintiffs say they "will no longer have access" to OSH's data, *id.* 193, but this "vague allegation[] of future harm" cannot state an injury-in-fact for standing purposes, *Newbury*, 2024 WL 4785147, at *5.  Nor do Plaintiffs allege a statutory violation regarding ingredient reporting, which as noted above is an annual process, with all manufacturer submissions due by March 31.  *See supra* at 18.

Regarding the Media Campaign Resource Center, the Tips campaign, and national and state quitlines, 15 U.S.C. § 1341 does not specifically require these activities and instead leaves discretion for the Department to determine how best to meet its broad mandates.  Moreover, nothing in the statute requires that OSH be the component to conduct these activities.   As for the other allegations, States cannot base standing on the downstream costs they might bear from the Department's actions, including "the high cost of producing new ads."  Am. Compl. ¶ 197; *see supra* at 25–27.  And absent a statutory command (which they don't identify), Plaintiffs cannot dictate the timeframe in which the Department must respond to their applications under the Tobacco Control Program.  *See* Am. Compl. ¶ 200.

*NCHHSTP.*    A primary defect in Plaintiffs' allegations regarding NCHHSTP is that Plaintiffs identify few statutory requirements.  For example, neither the HIV Medical Monitoring Project nor the National HIV Behavioral Surveillance Project are mandated by statute.  *See* Am. Compl. ¶¶ 214–15.  Here too, Plaintiffs attempt to manufacture standing based on temporary pauses of services at two laboratories, even though the Amended Complaint admits that RIF notices for the employees at both were rescinded.  *See id.* ¶¶ 208–09.  And in any event, past lapses cannot create standing for prospective relief.  *See supra* at 24–25.  As for the allegations that Plaintiffs have lost support from Disease Intervention Training Centers (or that the Department has wrongfully terminated the agreement for those centers) and that New York lost $300,000 in grant funding, those allegations belong in the Court of Federal Claims.  *See* Am. Compl. ¶¶ 211–12; *see supra* at 30–32.  Finally, Plaintiffs' alleged need to "develop and maintain their own disease intervention training curricula," Am. Compl. ¶ 213, is the kind of downstream budgetary effect that cannot confer standing on a state, *see supra* at 26–27.

*NCEH.*   As to their NCEH allegations, Plaintiffs again base their standing on past occurrences.  They allege that the Department was unable to create a plan for "mass testing of schoolchildren for lead," Am. Compl. ¶ 223, and they allege a "months-long disruption" of data in the Environmental Public Health Tracking Program, *id.* ¶ 225.  But Plaintiffs admit that RIF notices to NCEH staff have been rescinded, *see id.* ¶ 226.  And although Plaintiffs assert that, even following these rescissions, they have not received support or guidance from the childhood lead poisoning team, they do not specify the type of support or guidance they have not received or whether that specific support or guidance is required by statute.  *Id.* ¶ 226.

*NCBDDD.*   For this CDC center, Plaintiffs again largely fail to identify applicable statutory mandates, specifically as to the alleged Community Counts report on inhibitor development, *see id.* ¶ 238, Community Counts's response to requests for epidemiological data, *see id.* ¶ 239, the laboratory containing stored blood samples, *see id.* ¶ 242, the Department's addition to the treatment-center dataset on a particular timetable, *see id.* ¶ 243, and the National Syndromic Surveillance Program Disability Data program, *see id.* ¶ 246.  For some of these and other programs, Plaintiffs also fail to allege their personal stake.  They do not allege that they have sought expertise from the Sickle Cell Data Collection program, *see id.* ¶ 237, or submitted a request to Community Counts that has gone unaddressed, *see id.* ¶ 239, nor do they allege how they rely on the National Syndromic Surveillance Program Disability Data, *see id.* ¶ 246.  Moreover, to the extent Plaintiffs complain about the lack of technical expertise from the Sickle Cell Data Collection program, those allegations involve a cooperative agreement and belong in the Court of Federal Claims.  *See id.* ¶ 237; *see supra* at 31–32.  So too with the Early Hearing Detection and Intervention Programs (EHDI)—Plaintiffs allege that the Department is no longer providing full

services to "recipients of EHDI funding." Am. Compl. ¶ 244. Such a claim belongs in the Court of Federal Claims.

**NCIPC.** Plaintiffs do not allege that the National Electronic Injury Surveillance System is statutorily required or how they rely on that system in particular. *See id.* ¶ 255. Similarly, Plaintiffs never allege a specific injury flowing from the Division of Violence Prevention. *See id.* ¶ 256. In fact, the chief injury alleged as to NCIPC is that "funding appropriated by Congress will not be spent." *Id.* ¶ 253. Of course, the Department has never said it will not spend appropriated funds on required programs, and Plaintiffs' allegation to the contrary is sheer speculation.

**FDA.** For FDA, Plaintiffs allege only that CTP "cannot continue to operate" because it can no longer take enforcement actions or conduct certain statutorily required functions. *Id.* ¶ 269. But as discussed, CTP's compliance checks, reviews of premarket applications, and enforcement actions against unauthorized tobacco products, including those imported from China, are continuing. *See supra* at 21. Plaintiffs thus complain about a nonexistent injury.

**ACF.** Plaintiffs' allegations as to Head Start rest almost entirely on speculative statements that Head Start facilities will close. *See supra* at 23–24. Not only are those statements too speculative to confer standing; they are also implausible given the Department's publicly stated (and unrebutted) intention to continue funding Head Start. *See, e.g.*, HHS, *Fiscal Year 2026 Budget in Brief* 28–29, *available at* https://www.hhs.gov/sites/default/files/fy-2026-budget-in-brief.pdf. Moreover, many of the conjectural harms raised by Plaintiffs are the type of downstream harms that cannot confer standing, such as increased calls to state agencies, *see* Am. Compl. ¶ 281, strains on Plaintiffs' "social support programs," *id.* ¶ 282, difficulties in recruiting foster parents, *see id.* ¶ 283, and increased licensure and inspection burdens on Plaintiffs, *see id.* ¶ 284. Plaintiffs further allege that they have lost technical assistance due to the closure of certain regional offices,

must send requests for assistance to a different OHS email address than before, and have experienced increased questions from other grantees.  *See id.* ¶¶ 280, 285, 290.  Nowhere, however, do Plaintiffs allege specific assistance that they have requested and not received.  That the process for doing so is different than before does not mean the Department has failed statutory mandates.

Similarly, Plaintiffs fail to allege that TANF grants are not being distributed as required, despite allegations that staff have been reduced.  *See id.* ¶ 291.  Plaintiffs also identify no statute requiring the Department to act within a specific timeframe on grant modifications, *see id.* ¶ 286, or propound guidance regarding Executive Orders, *see id.* ¶¶ 288–89, or on equipment reimbursements requests, *see id.* ¶ 287.  Moreover, Plaintiffs have not cited any rule requiring "[o]nly one such expense request can be submitted at a time[.]"  *Id.*  The financial-assistance regulations governing equipment expenditures do not include such a rule, *see* 2 C.F.R. § 200.439, so Plaintiffs have not alleged a statutory violation by the Department (or even that there is any command related to equipment reimbursements).

*SAMHSA.*  The primary allegation regarding SAMHSA is that the office overseeing the Behavioral Health Services Information System (BHSIS) was subject to the RIF, supposedly leaving no staff available to "analyze and prepare data" in various data sets.  *Id.* ¶¶ 305–06. Plaintiffs do not explain how they rely on these data sets in any concrete way except for TEDS, which they allege "plays a special role in state block grants."  *Id.* ¶ 307.  And, again, Plaintiffs' speculation of harm that might come from reduced staff is not supported by factual allegations that services have actually been disrupted.  Indeed, despite the RIFs, SAMHSA has maintained that dataset, publishing the annual report for TEDS in August with plans to release more data before year's end.  *See* SAMHSA, *Statistical Products Publication Schedule,*

https://www.samhsa.gov/data/about-us/upcoming-releases (last visited Oct. 14, 2025). As for the 988 lifelines, Plaintiffs say that "approximately 50% of calls are dropped at the national interactive voice response," Am. Compl. ¶ 309, but they do not allege facts to suggest that those drops are linked to the RIFs at SAMHSA. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42–43 (1976) ("purely speculative" allegation of traceability is insufficient to confer standing). Plaintiffs also have not alleged that the Department's alleged failure to provide certain guidance, *see* Am. Compl. ¶ 310, or its alleged imposition of short application windows, *see id.* ¶ 312, violates a statutory command. In fact, this Court cannot impose procedural requirements on the Department absent a statutory mandate. *See Vt. Yankee*, 435 U.S. at 547–48. Finally, as to the suicide demographic data, Plaintiffs have not alleged a delay that violates any statutorily mandated deadline. *See* Am. Compl. ¶ 311.

***Administrative Offices.*** As noted above, the Department has not violated any requirement regarding the National Poverty Guidelines because the Assistant Secretary of Planning and Evaluation has already published them for this year. *See supra* at 17. As for OIDP and EHE, Plaintiffs fail to allege a specific injury to them related to these programs and instead allege only generalized grievances that do not create standing.

***Regional Offices.*** Plaintiffs make no specific allegations of injury from staff reductions at HHS regional offices. They claim that closure of regional offices "prevent[ed] the Department from carrying out a range of statutorily mandated functions," but the Department is not required by statute to maintain a specific number of regional offices. Am. Compl. ¶ 326. Furthermore, except for their allegations regarding the Head Start program, which have already been addressed, *see supra* at 53–54, Plaintiffs fail to allege specific functions that are statutorily mandated but not being performed.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Amended Complaint should be dismissed.

Dated: October 14, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

CHRISTOPHER R. HALL
Assistant Branch Director
Civil Division, Federal Programs Branch

ELIZABETH HEDGES
Counsel to the Assistant Attorney General
Civil Division

/s/ *Christian Dibblee*
CHRISTIAN DIBBLEE
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 353-5980
Email: Christian.R.Dibblee@usdoj.gov

*Counsel for Defendants*