# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK; STATE OF WASHINGTON; STATE OF RHODE ISLAND; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; THE PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; and STATE OF WISCONSIN, | Case No. 1:25-cv-00196-MRD-PAS |
| Plaintiffs, | |
| v. | |
| ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATEMENT CONCERNING HEARING ........................................................................ 3

BACKGROUND ................................................................................................................ 3

    I.    The Department and Its Subagencies ................................................................ 3

    II.   The Challenged Agency Action ....................................................................... 7

    III.  Effects of the March 27 Directive Upon Plaintiff States ............................... 9

    IV.  Procedural Background ................................................................................... 17

STANDARD OF REVIEW ............................................................................................. 18

ARGUMENT ................................................................................................................... 20

    I.    Defendants' Motion to Dismiss for Lack of Jurisdiction Should Be Denied ........... 20

         A.   Plaintiff States have standing to challenge the March 27 Directive .................. 20

             1.   Service-related injuries ..................................................... 21

             2.   Informational injuries ....................................................... 23

             3.   Funding-related injuries .................................................... 27

             4.   Plaintiffs' injuries are redressable through court order ............... 28

         B.   The Civil Service Reform Act does not divest this Court of jurisdiction .......... 30

         C.   The Tucker Act does not divest this Court of jurisdiction ................................. 34

    II.   Plaintiff States Adequately Pled APA Claims ............................................... 38

         A.   Plaintiffs sufficiently alleged a discrete, final agency action .............................. 38

         B.   The March 27 Directive should be set aside under 5 U.S.C. § 706(2) and is not committed to agency discretion by law ............................................................... 40

         C.   Plaintiff States adequately pled a claim that the March 27 Directive is contrary to law ...................................................................................................................... 42

         D.   Plaintiff States adequately pled a claim that the March 27 Directive is arbitrary and capricious ............................................................................................................ 43

    III.  Plaintiff States Adequately Pled Violations of the U.S. Constitution ......................... 45

    IV.  Plaintiffs Adequately Pled an *Ultra Vires* Claim .......................................... 49

    V.   Defendants' Remaining Arguments Are Unavailing ...................................... 51

CONCLUSION ................................................................................................................ 53

i

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Acheson Hotels v. Laufer*,
    601 U.S. 1, 144 S. Ct. 18, 217 L. Ed. 2d 155 (2023) ................................................................ 23

*Aids Vaccine Advocacy Coalition v. Dep't of State*,
    Nos. 25-00400 (AHA), 25-00402 (AHA), 2025 WL 752378 (D.D.C. Mar. 10, 2025) ........... 47

*Air Courier Conf. of Am. v. Am. Postal Workers Union*,
    498 U.S. 517 (1991) .................................................................................................................. 20

*Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*,
    No. 25-cv-1923 (JMC), 2025 WL 2615054 (D.D.C. Sept. 10, 2025) ..................................... 37

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
    782 F. Supp. 3d 793 (N.D. Cal. 2025) ..................................................................................... 48

*Am. Fed'n of Gov't Emps. v. Trump*,
    139 F.4th 1020 (9th Cir. 2025) ................................................................................................. 33

*Am. Fed'n of State and Cnty. Mun. Emps., AFL-CIO v. U.S. Off. of Mgmt. and Budget*,
    2025 WL 3018250 (N.D. Cal. Oct. 28, 2025) ..................................................................... 47, 49

*Andersen v. Vagaro, Inc.*,
    57 F.4th 11 (1st Cir. 2023) ....................................................................................................... 19

*Armstrong v. Exceptional Child Center, Inc.*,
    575 U.S. 320, 135 S. Ct. 1378, 191 L. Ed. 2d 471 (2015) ................................................. 47, 49

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ....................................................... 43

*Atieh v. Riordan*,
    727 F.3d 73 (1st Cir. 2013) ....................................................................................... 20, 42, 43, 44

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
    598 U.S. 175, 143 S. Ct. 890, 215 L. Ed. 2d 151 (2023) .................................................... 31, 32

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ....................................................... 43

*Bennett v. Spear*,
    520 U.S. 154, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997) ....................................................... 28

*Biden v. Missouri*,
    595 U.S. 87, 142 S. Ct. 647, 211 L. Ed. 2d 433 (2022) .......................................................... 41

*Biden v. Sierra Club*,
    142 S. Ct. 46, 210 L. Ed. 2d 985 (2021) .................................................................................. 48

*Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. Dep't of Health & Hum. Servs.*,
    557 F. Supp. 3d 224 (D. Mass. 2021) ...................................................................................... 44

*Bowen v. Massachusetts*,
    487 U.S. 879, 108 S. Ct. 2722, 101 L. Ed. 2d 749 (1988)...................................... 28, 36

*Child Trends, Inc. v. Dep't of Ed.*,
    No. 25-1154-BAH, 2025 WL 2379688 (D. Md. Aug. 15, 2025) ............................ 48

*Ciba-Geigy Corp. v. EPA*,
    801 F.2d 430 (D.C. Cir. 1986) ................................................................................. 38

*City and Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) .................................................................................. 45

*City of Arlington v. FCC*,
    569 U.S. 290, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (2013)....................................... 43

*City of Fresno v. Turner*,
    No. 25-cv-07070-RS, 2025 WL 2721390 (N.D. Cal. Sept. 23, 2025)..................... 37

*City of Providence v. Barr*,
    954 F.3d 23 (1st Cir. 2020)...................................................................................... 41

*Clinton v. City of New York*,
    524 U.S. 417, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998)................................. 45, 48

*Colorado v. Dept. of Health and Human Servs.*,
    788 F. Supp. 3d 277 (D.R.I. 2025)........................................................................... 46

*Concord Hosp., Inc. v. NH Dep't of Health and Human Servs.*,
    770 F. Supp. 3d 400 (D.N.H. 2025).......................................................................... 20

*Cook County, Illinois v. Wolf*,
    461 F. Supp. 3d 779 (N.D. Ill. 2020) ....................................................................... 44

*Dalton v. Specter*,
    511 U.S. 462, 114 S. Ct. 1719, 128 L. Ed. 2d 497 (1994)....................................... 48

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
    958 F.3d 38 (1st Cir. 2020)...................................................................................... 28

*Dep't of Educ. v. California*,
    604 U.S. 650, 145 S. Ct. 966, 221 L. Ed. 2d 515 (2025)......................................... 34

*Donaldson v. United States*,
    400 U.S. 517, 91 S. Ct. 534, 27 L. Ed. 2d 580 (1971)............................................ 47

*FCC v. Prometheus Radio Project*,
    592 U.S. 414, 141 S. Ct. 1150, 209 L. Ed. 2d 287 (2021)....................................... 42

*FEC v. Akins*,
    524 U.S. 11, 118 S. Ct. 1777, 141 L. Ed. 2d 10 (1998).......................................... 23

*Fed. Express Corp. v. Dep't of Commerce*,
    39 F.4th 756 (D.C. Cir. 2022)................................................................................... 49

*Foley v. Wells Fargo Bank, N.A.*,
    772 F.3d 63 (1st Cir. 2014)................................................................................ 19, 42

iii

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) ....................................... 28, 29, 30, 53

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002) ........................................................ 34

*Gregory v. Ashcroft*,
  501 U.S. 452, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991) ...................................................... 48

*Illinois v. FEMA*,
  No. 25-206 WES, --- F.Supp.3d ----, 2025 WL 2716277 (D.R.I. Sept. 24, 2025) .................. 38

*In re Aiken Cnty.*,
  725 F.3d 255 (D.D.C. 2013) ............................................................................................... 45, 46

*Larson v. Valente*,
  456 U.S. 288, 102 S. Ct. 1673, 72 L. Ed. 2d 33 (1982) .......................................................... 30

*Laufer v. Acheson Hotels, LLC*,
  50 F.4th 259 (1st Cir. 2022) ....................................................................................... 23, 26, 52

*Lincoln v. Vigil*,
  508 U.S. 182, 113 S. Ct. 2024, 124 L. Ed. 2d 101 (1993) ................................................... 2, 41

*Littlefield v. Dep't of the Interior*,
  85 F.4th 635 (1st Cir. 2023) .................................................................................................. 42

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) ................................................. 20, 21

*Maryland v. USDA*,
  151 F.4th 197 (4th Cir. 2025) ............................................................................................... 34

*Massachusetts v. EPA*,
  549 U.S. 497, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007) .................................................. 29, 42

*McKenna v. Dep't of Interior*,
  996 F.2d 1235 (Fed. Cir. 1993) ............................................................................................ 41

*McMahon v. New York*,
  145 S. Ct. 2643 (2025) ........................................................................................................ 33

*Merlonghi v. United States*,
  620 F.3d 50 (1st Cir. 2010) .................................................................................................. 19

*Myers v. United States*,
  272 U.S. 52, 47 S. Ct. 21, 71 L. Ed. 160 (1926) ............................................................... 45, 49

*NAACP v. Sec'y of Hous. and Urb. Dev.*,
  817 F.2d 149 (1st Cir. 1987) ................................................................................................ 40

*Nat'l Fed. of Indep. Bus. v. OSHA*,
  595 U.S. 109, 142 S. Ct. 661, 211 L. Ed. 2d 448 (2022) ........................................................ 49

*Nat'l Treasury Emp. Union v. Vought*,
  149 F.4th 762 (D.C. Cir. 2025) ....................................................................................... 39, 40

*New York v. Kennedy*,
   155 F.4th 67 (1st Cir. 2025)............................................. 1, 2, 18, 21, 23, 28, 30, 33, 34, 36, 38

*New York v. Kennedy*,
   No. 25-1780 (Doc. 00118359763), dismissed on Oct. 30, 2025 (Doc. 00118360206) ...... 18, 38

*New York v. McMahon*,
   784 F. Supp. 3d 311 (D. Mass 2025) ....................................................................... 29

*Patchak v. Zinke*,
   583 U.S. 244, 138 S. Ct. 897 (2018)......................................................................... 48

*Planned Parenthood of Greater N.Y. v. Dep't of Health and Hum. Servs.*,
   No. 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025) ......................................... 37

*President and Fellows of Harvard Coll. v. Dep't of Health and Hum. Servs.*,
   No. 25-cv-11048-ADB, No. 25-cv-10910-ADB, --- F. Supp. 3d ----, 2025 WL 2528380
   (D. Mass. Sept. 3, 2025) ......................................................................................... 37

*R.I. Coal. Against Domestic Violence v. Kennedy, Jr.*,
   No. 25-CV-342-MRD-PAS, 2025 WL 2899764 (D.R.I. Oct. 10, 2025)................... 37

*Rhode Island Dep't of Env't Mgmt. v. United States*,
   304 F.3d 31 (1st Cir. 2002)..................................................................................... 19

*Rhode Island v. Trump*,
   No. 1:25-cv-128-JJM-LDA, 2025 WL 1303868 (D.R.I. May 6, 2025) ................... 47

*Rodriguez-Vives v. Puerto Rico Firefighters Corps of Puerto Rico*,
   743 F.3d 278 (1st Cir. 2014).................................................................................... 52

*Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*,
   674 F.3d 97 (1st Cir. 2012)...................................................................................... 42

*Seila L. LLC v. CFPB*,
   591 U.S. 197, 140 S. Ct. 2183, 207 L. Ed. 2d 494 (2020)...................................... 45

*Sierra Club v. Trump*,
   963 F.3d 874 (9th Cir. 2020) .................................................................................. 48

*Somerville Pub. Schs. v. McMahon*,
   139 F.4th 63 (1st Cir. 2025)........................................................................ 31, 33, 52

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200, 114 S. Ct. 771, 127 L. Ed. 2d 29 (1994)..................................... 32, 33

*Trump v. Am. Fed'n of Gov't Emps.*,
   145 S. Ct. 2635 (2025)............................................................................................ 33

*Trump v. Mazars USA, LLP*,
   591 U.S. 848, 140 S. Ct. 2019, 207 L. Ed. 2d 951 (2020)...................................... 47

*Utah v. Evans*,
   536 U.S. 452, 122 S. Ct. 2191, 153 L. Ed. 2d 453 (2002)...................................... 29

*Webb v. Injured Workers Pharm., LLC*,
   72 F.4th 365 (1st Cir. 2023).................................................................................... 21

*Webster v. Doe,*
    486 U.S. 592, 108 S. Ct. 2047, 100 L. Ed. 2d 632 (1988) ...................... 41

*Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.,*
    586 U.S. 9, 139 S. Ct. 361, 202 L. Ed. 2d 269 (2018) ......................... 38

*Widakuswara v. Lake,*
    779 F. Supp. 3d 10 (D.D.C. 2025) ................................................. 33

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579, 72 S. Ct. 863, 96 L. Ed. 1153 (1952) ....................... 45, 49

## Constitutional Provisions

U.S. Const. art. I, § 1 ..................................................................... 45

U.S. Const. art. I, § 9, cl. 7 ........................................................ 45, 46

## Statutes

2 U.S.C. § 683(b) ......................................................................... 46

2 U.S.C. § 684(b) ......................................................................... 46

5 U.S.C. § 706(1) ......................................................................... 40

5 U.S.C. § 7103(a)(1)-(2) .............................................................. 30

5 U.S.C. § 7105(a)(2) .................................................................... 31

5 U.S.C. § 7117 ........................................................................... 31

5 U.S.C. § 7118 ........................................................................... 31

5 U.S.C. § 7511(a)(1) .................................................................... 31

5 U.S.C. § 7512 ........................................................................... 31

5 U.S.C. § 7513(d) ....................................................................... 31

15 U.S.C. § 1341 ........................................................................... 4

15 U.S.C. § 1341(a)(1) ................................................................... 22

15 U.S.C. § 1341(a)(4) ................................................................... 22

21 U.S.C. § 387a(e) .................................................................... 5, 6

21 U.S.C. § 387s(c)(2)(A) ................................................................ 6

28 U.S.C. § 1491(a)(1) .................................................................. 34

42 U.S.C. § 242c(c)(2) .................................................................. 25

42 U.S.C. § 242c(c)(2)(A)(ii) .......................................................... 25

42 U.S.C. § 247b-12 ....................................................................... 4

42 U.S.C. § 247b-13 ................................................................................................. 50

42 U.S.C. § 247b-4a ................................................................................................ 50

42 U.S.C. § 247b-4f ................................................................................................. 50

42 U.S.C. § 274f-3 ................................................................................................... 50

42 U.S.C. § 280g-1(b) ............................................................................................... 5

42 U.S.C. § 290aa .............................................................................................. 6, 50

42 U.S.C. § 290aa(b) ................................................................................................ 6

42 U.S.C. § 290aa(c) ................................................................................................ 6

42 U.S.C. § 290aa(d) ........................................................................................... 6, 51

42 U.S.C. § 290aa(d)(4) ............................................................................................ 6

42 U.S.C. § 290aa-4 .................................................................................................. 6

42 U.S.C. § 290aa-4(b) ........................................................................................... 51

42 U.S.C. § 290aa-4(d)(1)(A) ................................................................................... 6

42 U.S.C. § 290bb-25 ............................................................................................... 6

42 U.S.C. § 299 ....................................................................................................... 50

42 U.S.C. § 300cc-31(a) ............................................................................................ 4

42 U.S.C. § 300ee-4 .................................................................................................. 4

42 U.S.C. § 300f-111 ................................................................................................ 4

42 U.S.C. § 300mm .................................................................................................. 4

42 U.S.C. § 9601 ....................................................................................................... 5

42 U.S.C. § 9604(i)(1) ............................................................................................... 5

Pub. L. 101-558 ........................................................................................................ 5

Pub. L. 102-321 ........................................................................................................ 6

Pub. L. 102-493 ........................................................................................................ 4

Pub. L. 106-310 ........................................................................................................ 5

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................................ 19

LR Cv 7(c) ................................................................................................................ 3

## Other Authorities

David Bradley, et al., Cong. Rsch. Serv. R47936, Labor, Health and Human Services, and
Education: FY2024 Appropriations (2024), https://www.congress.gov/crs-product/R47936
.................................................................................................................................. 46

*Find a Clinic*, World Trade Center Health Program, https://www.cdc.gov/wtc/clinics.html (last
updated March 7, 2025) ............................................................................................... 4

*History of the WTC Health Program*, Administrative Manual Chapter 1—Overview of the WTC
Health Program, https://www.cdc.gov/wtc/ppm.html (last updated August 19, 2025)............. 4

Senate HELP Comm. Republicans, *Senate HELP Hearing: FY 2026 Dep't of Health and Human
Servs. Budget*, YouTube (May 14, 2025),
https://www.youtube.com/live/do7L8jUvZoo?si=gz6Q4doXzNR3yHb6&t=4373
............................................................................................................................ 8, 11, 28

*Specific Performance*,
Black's Law Dictionary (12th ed. 2024)................................................................. 36

## INTRODUCTION

Defendants recycle a smorgasbord of failed arguments in an attempt to shield Secretary Kennedy's illegal and unconstitutional March 27 Directive[1] from judicial review. Most of these arguments have already been rejected by this Court and the First Circuit in ruling on Plaintiff States' successful motion for preliminary injunction and Defendants' unsuccessful emergency appeal to stay that injunction. All lack similar merit on a motion to dismiss.

The Court has the Article III power to hear Plaintiff States' Amended Complaint because Plaintiff States allege concrete and particularized injuries that are actual or imminent, traceable to Defendants, and redressable by the Court. *See* ECF No. 73 at 13; *New York v. Kennedy*, 155 F.4th 67, 73–74 (1st Cir. 2025) (holding that Defendants failed to show they were likely to succeed in showing Plaintiff States lacked standing). More than this, Plaintiff States' injuries are supported by a mountain of evidence already on the docket that this Court found met the standard of irreparable harm. ECF No. 73 at 50–53; *see also generally* ECF No. 44. Defendants say nothing to change this conclusion, let alone in a posture with a less onerous burden for Plaintiff States.

Defendants' channeling arguments are also stale and wrong. The CSRA does not apply because Plaintiff States are not HHS employees (nor do they represent them), and this is not an employment dispute. ECF No. 73 at 28 (holding CSRA does not apply to Plaintiffs States' claims); *New York*, 155 F.4th at 74 (same). The Tucker Act has no application here too. Though Plaintiff States allege that the March 27 Directive has harmed some Plaintiff States because it has led to the failure of the Department of Health and Human Services to renew grants or fulfill services under cooperative agreements, that does not convert this action into one sounding in contract. ECF No. 73 at 28–30 (holding Tucker Act does not apply to Plaintiff States' claims); *New York*, 155 F.4th

---

[1] Cognizant that the Court used the word "communiqué" (ECF No. 73 at 7), Plaintiff States will continue to call it a "directive" for the purposes of consistency with the Amended Complaint (*see, e.g.*, ECF No. 94 at 2).

at 75 n.4 (same). The Amended Complaint does not seek an order compelling payment of money, and Defendants do not seriously contend that the Court of Federal Claims would have jurisdiction over this case.

Overcoming Defendants' twice-rejected justiciability objections leads to their similarly empty merits arguments. As a threshold matter, "the March 27 [Directive] constitutes final agency action." ECF No. 73 at 37; *see also New York*, 155 F.4th at 75–76 (same). As such, this Court may declare it unlawful and set it aside under section 706(2) of the APA; Defendants misconstrue Plaintiff States' requested relief to artificially increase their burden in arguing that the Amended Complaint seeks to "compel agency action unlawfully withheld" under section 706(1).

The March 27 Directive is not committed to agency discretion by law because it runs roughshod over a plethora of statutes that command HHS to do specific things in specific ways. This is not one of the very few areas where there is "no law to apply" leaving courts with no way to measure an agency's exercise of discretion. *See* ECF No. 73 at 48–49 (distinguishing *Lincoln v. Vigil*, 508 U.S. 182, 113 S. Ct. 2024, 124 L. Ed. 2d 101 (1993)). Defendants argue that the Amended Complaint does not plausibly allege the March 27 Directive was arbitrary and capricious, but the *Iqbal-Twombly* plausibility standard does not apply to APA actions which are evaluated solely on the administrative record. Even judging the Amended Complaint against the standard of Rule 12(b)(6), the arbitrary and capriciousness of the Directive is more than plausible. This Court already held it was likely arbitrary and capricious (ECF No. 73 at 41), and the First Circuit affirmed that Defendants were unable to show they were likely to succeed on the merits of their appeal of that claim (*New York*, 155 F.4th at 76). To now assert that it isn't *plausible* that the March 27 Directive was arbitrary and capricious is not serious.

2

Finally, Plaintiff States sufficiently alleged violations of the Constitution and *ultra vires* agency action. Defendants' arguments to the contrary boil down to a rejection of the separation of powers and meaningful judicial review of executive action. But centuries of precedent say the opposite, as this Court appropriately recognized. *See* ECF No. 73 at 4–5, 58.

The Court should deny Defendants' Motion to Dismiss.

## STATEMENT CONCERNING HEARING

Plaintiff States defer to the Court regarding the need for a hearing. LR Cv 7(c).

## BACKGROUND

### I.    The Department and Its Subagencies

Congress created the Department of Health and Human Services (the Department, or HHS) to oversee a growing and complex organization of subagencies and programs[2] that serve the health and well-being of the American people. ECF No. 94 at ¶¶ 36–43. As Congress assigned more responsibilities to the Department over the past 86 years, it entrusted the Secretary, often in statute, to execute those responsibilities. *Id.* at ¶ 43. The importance and complexity of this work grew and so did Congress's financial commitment; in Fiscal Year 2024, HHS committed to spending roughly $2.5 trillion. *Id.* at ¶ 41.

HHS oversees dozens of subagencies created by Congress, including the Centers for Disease Control and Prevention (CDC), the Food & Drug Administration (FDA), the Administration for Children and Families (ACF), the Substance Abuse and Mental Health Services Administration (SAMHSA), and several administrative offices. ECF No. 94 at ¶¶ 86–96, 257–65, 273–78, 313–16.

---

[2] Plaintiffs use "subagency" to refer to all the entities that fall within HHS's organizational structure, including but not limited to departments, centers, institutes, offices, divisions, and branches. "Programs," i.e. groups working on a single work product, are referred to separately.

With respect to CDC, CDC subagencies' responsibilities are mandated by statute and supported by specific appropriations:

- The National Institute for Occupational Safety and Health (NIOSH) was created under the Occupational Safety and Health Act of 1970, and must conduct research and publish information related to occupational safety, and contract with state personnel to provide compliance assistance for employers. ECF No. 94 at ¶ 117. Congress later "permanently established" an Office of Mine Safety and Health within NIOSH to research and test new technologies and equipment designed to enhance mine safety and health. *Id.* at ¶ 120. To fulfill these mandates, NIOSH funds extramural research programs, including several in Plaintiff States, intramural programs to cover specific research functions, and several miner- and firefighter-related safety surveillance programs. *Id.* at ¶¶ 121–29, 131–34. NIOSH also houses the World Trade Center Health Program (WTCHP), which was created by Congress to care for the health needs of responders and survivors of the 9/11 terrorist attacks. 42 U.S.C. § 300mm; ECF No. 94 at ¶¶ 135–37. Plaintiff States partner with WTCHP as providers who participate in the program,[3] and as grant recipients.[4] Congress appropriated over $362 million for NIOSH work in Fiscal Year 2024. ECF No. 94 at ¶ 120.

- The National Center for Chronic Disease Prevention and Health Promotion (NCCDPHP) oversees several subagencies including the Division of Reproductive Health (DRH) and the Office on Smoking and Health (OSH). ECF No. 94 at ¶ 165. DRH is responsible for several programs including the Pregnancy Risk Assessment Monitoring System (PRAMS) which collects data across the country related to maternal and infant health outcomes, 42 U.S.C. § 247b-12, as well as surveillance and publication of data related to contraception safety, abortion, and in vitro fertilization (IVF) pregnancies. ECF No. 94 at ¶ 170; Pub. L. 102-493. DRH also provided emergency response guidance to states on the needs of pregnant and postpartum people and babies in emergencies. ECF No. 94 at ¶ 171. Separately within NCCDPHP, OSH promotes tobacco control interventions by collecting, studying, and sharing information on smoking and its effects on health. *Id.* at ¶¶ 172–79; 15 U.S.C. § 1341. Congress appropriated over $1.1 billion to the NCCDPHP programs in Fiscal Year 2024. ECF No. 94 at ¶ 180.

- The National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention (NCHHSTP) works to reduce incidence of infection, morbidity and mortality, and health disparities in the U.S. ECF No. 94 at ¶ 202. It oversees the operations of Disease Intervention Training Centers to strengthen the capacity of local and state health departments to conduct intervention services for communicable diseases including HIV/AIDS. *Id.* at ¶ 204. By law, CDC must establish training programs to develop skills in fighting the AIDS epidemic. *Id.*; *see* 42 U.S.C. §§ 300cc-31(a), 300f-111, 300ee-4.

---

[3] *Find a Clinic*, World Trade Center Health Program, https://www.cdc.gov/wtc/clinics.html (last updated March 7, 2025).
[4] *2.0 History of the WTC Health Program*, Administrative Manual Chapter 1—Overview of the WTC Health Program, https://www.cdc.gov/wtc/ppm.html (last updated August 19, 2025).

NCHHSTP also partnered with states to run the HIV Medical Monitoring Project, which generated data to guide HIV policy and funding decisions. ECF No. 94 at ¶ 205.

- The National Center for Environmental Health (NCEH) protects people's health from environmental hazards by, in part, overseeing the Agency for Toxic Substances and Disease Registry (ATSDR). ECF No. 94 at ¶ 218; 42 U.S.C. § 9601 *et. seq.* By law ATSDR must not only cooperate directly with state and local health officials to implement the health authorities of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) but also to maintain a national registry of serious disease and illnesses and a national registry of persons exposed to toxic substances. ECF No. 94 at ¶ 218; 42 U.S.C. § 9604(i)(1). Congress specifically appropriated NCEH over $191 million in Fiscal Year 2024. ECF No. 94 at ¶ 220.

- The National Center on Birth Defects and Developmental Disabilities (NCBDDD) was established within CDC by the Children's Health Act of 2000, Pub. L. 106-310, and oversees, among other things, the Sickle Cell Data Collection Program, which runs surveillance programs in partnership with several Plaintiff States, and the Community Counts program which gathers and shares information about common health issues related to an array of bleeding disorders cared for in U.S. hemophilia treatment centers. ECF No. 94 at ¶¶ 227–29. NCBDDD also oversees the Early Hearing Detection and Intervention (EHDI) program, which expanded public health capacity for children who are deaf or hard-of-hearing. *Id.* at ¶¶ 231–32; 42 U.S.C. § 280g-1(b). Congress appropriated over $206 million for the work of NCBDDD in Fiscal Year 2024. ECF No. 94 at ¶ 233.

- The National Center for Injury Prevention and Control (NCIPC) was created by the Injury Control Act of 1990, Pub. L. 101-558, and performs congressionally mandated work to prevent injuries by overseeing the Overdose Data to Action cooperative agreements with state departments and the Division of Violence Prevention, which researches and issues guidance on how best to respond to and prevent violence including intimate partner violence, sexual violence, and firearm injury and death. ECF No. 94 at ¶¶ 248–51. Congress appropriated over $761 million for the work of NCIPC in Fiscal Year 2024. *Id.* at ¶ 252.

HHS also oversees FDA, which administers the Center for Tobacco Products (CTP) as required under the Family Smoking Prevention and Tobacco Control Act. ECF No. 94 at ¶ 260; 21 U.S.C. § 387a(e). The CTP performs many workstreams required by statute such as conducting compliance checks on vendors, reviewing premarket applications for new tobacco products, enforcing advertising and promotion restrictions, and educating the public about the risks of tobacco use, including the dangers of e-cigarettes and other tobacco products. *Id.* Operating CTP

costs taxpayers nothing as Congress ordered it to fund its operations by user fees. ECF No. 94 at ¶ 261; 21 U.S.C. §§ 387a(e), 387s(c)(2)(A).

HHS also oversees the Administration for Children and Families (ACF), which administers the Head Start program, Temporary Assistance for Needy Families (TANF), and Child Care and Development Fund block grants. ECF No. 94 at ¶ 276. Head Start maintains a presence in Washington D.C., but most of its employees work out of one of ten regional offices around the country, including in regional offices in Plaintiff States Illinois, Colorado, New York, California, and Washington. *Id.* at ¶¶ 277–78. As of May 2024, Congress had appropriated more than $70 billion dollars to ACF. *Id.* at ¶ 278.

HHS also oversees the Substance Abuse and Mental Health Services Administration (SAMHSA), which Congress created in 1992 by reorganizing all agencies that addressed substance misuse and behavioral health. ECF No. 94 at ¶ 293; Pub. L. 102-321; 42 U.S.C. § 290aa *et. seq.* By law, SAMHSA must collect data each year on the national incidence and prevalence of mental illness and substance abuse and make grants to public and nonprofit private entities for the purpose of carrying out programs. *Id.*; 42 U.S.C. §§ 290aa-4, 290bb-25. Congress explicitly organized SAMHSA subagencies, 42 U.S.C. § 290aa(b), created a head of SAMHSA known as the "Assistant Secretary," *id.* at § 290aa(c), and ordered the Secretary to implement SAMHSA duties "acting through the Assistant Secretary." ECF No. 94 at ¶ 294; 42 U.S.C. § 290aa(d). Congress directed SAMHSA to operate the National Suicide Prevention Lifeline, ECF No. 94 at ¶ 299, and to publish many reports related to substance abuse and mental health including the National Survey on Drug Use and Health (NSDUH), 42 U.S.C. § 290aa(d)(4), and the Drug Abuse Warning Network (DAWN), 42 U.S.C. § 290aa-4(d)(1)(A). ECF No. 94 at ¶¶ 295–96. SAMHSA's strategic plan, which is required under 42 U.S.C. § 290aa(1), commits SAMHSA to many initiatives

including public awareness efforts such as the "Talk. They Hear You." campaign to prevent underage drinking. *Id.* at ¶ 298.

HHS also oversees many administrative offices that administer statutorily mandated programs including the Office of Human Services Policy, which is responsible for publication of the federal poverty guidelines, ECF No. 94 at ¶¶ 313–14, and the Office of Infectious Disease and HIV/AIDS Policy, *id.* at ¶¶ 315–16.

## II.    The Challenged Agency Action

Secretary Kennedy designed and ordered a dismantling of the Department that was announced on March 27, 2025. Under the March 27 Directive, HHS quickly terminated 10,000 full-time employees and shuttered dozens of subagencies. ECF No. 94 at ¶ 62; *see* ECF Nos. 94-1, 94-2. The Directive specified how many employees would be terminated within many subagencies, which subagencies would be eliminated with certain remnants consolidated under a new Administration for a Healthy America (AHA), and which regional offices would be closed. ECF No. 94 at ¶ 65.

On April 1, 2025, Defendants implemented the March 27 Directive—haphazardly. That morning, HHS employees in all offices, administrations, agencies and subagencies began receiving reduction in force (RIF) notices. ECF No. 94 at ¶ 75. Some employees had not seen their early morning email before leaving for the office, and were surprised when they arrived at work to find their access cards had been deactivated. *Id.* The error-ridden email notices, several of which listed incorrect information about workers' performance ratings and contained outdated points of contact, instructed employees that they had been placed on administrative leave, and they would be formally terminated on June 2, 2025. *Id.* at ¶¶ 76–77. The terminated employees were

immediately cut off, locked out of HHS systems and facilities, with no opportunity to offboard or transition their work. *Id.* at ¶¶ 78–79.

All told, in addition to earlier RIFs of probationary employees, and thousands of employees leaving for early retirement or accepting buyouts, HHS dropped from 82,000 full-time employees down to 62,000—an abrupt loss of over twenty-four percent of HHS's total workforce. ECF No. 94 at ¶ 64; ECF No. 94-2 at 2–3.

Secretary Kennedy made no effort to hide the fact that the March 27 Directive was implemented with a butcher's cleaver, not a scalpel. Two days after the termination notices were sent out, Secretary Kennedy told reporters:

> Personnel that should not have been cut, were cut. We're reinstating them. And that was always the plan. Part of the—at DOGE, we talked about this from the beginning, is we're going to do 80% cuts, but 20% of those are going to have to be reinstated, because we'll make mistakes.

ECF No. 94 at ¶ 80. One week later he again admitted that he knew "as many as 20%" of the cuts would be mistakes, and that HHS chose not to perform a "line-by-line-by-line" review of each employee's job responsibilities before issuing RIF notices and made that choice because doing such a review would "take[] too long and you lose political momentum." *Id.* at ¶ 81.

Secretary Kennedy appeared before the Senate Committee on Health, Education, Labor and Pensions on May 14 to answer questions about the March 27 Directive. There, he testified that HHS "had to act quickly," despite acknowledging multiple times that there were "mistakes." ECF No. 94 at ¶ 83. Secretary Kennedy also admitted that delays in federal funding for state programs, including CDC domestic violence prevention funding, could be expected because HHS had fired the people who administered the grants. *Id.* at ¶ 83.[5]

---

[5] Senate HELP Comm. Republicans, *Senate HELP Hearing: FY 2026 Dep't of Health and Human Servs. Budget*, YouTube (May 14, 2025), https://www.youtube.com/live/do7L8jUvZoo?si=gz6Q4doXzNR3yHb6&t=4373 (beginning at 1:12:53).

### III.    Effects of the March 27 Directive Upon Plaintiff States

While all of HHS was impacted by the March 27 Directive, certain subagencies were disproportionately hit by termination notices. Many that were responsible for statutorily mandated work were completely wiped out. Subagencies that relied on regional offices to interact with state and local partners were left flat-footed.

**CDC—Laboratories**: CDC lost 2,400 of its roughly 12,000 employees. ECF No. 94 at ¶¶ 96–97. Defendants RIF'd every member of several CDC laboratories. *Id.* at ¶¶ 101–02. CDC's website posted that testing of numerous infectious diseases were "discontinued" or "temporarily paused," and State Public Health Laboratories were directed to send many of their specimens to New York's Wadsworth Center because it was now the only laboratory in the country with certain testing capabilities. *Id.* at ¶¶ 103–05. As of the filing of the Amended Complaint, CDC was still referring some tests to Wadsworth and either discontinued or drastically scaled back other tests. *Id.* at ¶¶ 105–09. As a result of the closures, Plaintiff States lost their ability to prepare for and address multi-jurisdictional outbreaks of infectious diseases, and CDC remains unable to meet statutory mandates of 42 U.S.C. § 242c(b). *Id.* at ¶¶ 112–16.

**NIOSH—Occupational Safety**: On April 1, approximately 873 NIOSH employees (a sizable majority of NIOSH's staff) were noticed for termination, ECF No. 94 at ¶ 138, and many statutorily mandated programs stopped services because of the RIF according to their own websites. *Id.* at ¶¶ 144–48. Several facilities were immediately closed and ceased services— NIOSH had been functionally dismantled. *Id.* ¶¶ at 141–42.

While some NIOSH workers have since seen their RIF notices rescinded, others have not and remain on administrative leave and noticed for termination. ECF No. 94 at ¶¶ 138–39. This includes critical sub-departments like the Spokane Mining Research Division, which remains

9

woefully understaffed, and the Western States Division in Spokane, which now has only two active employees; both are unable to fulfill their intended functions. *Id.* at ¶ 143. At least forty-six percent (and likely more) of NIOSH's staff remain on administrative leave; the RIF notices for these staff have *not* been rescinded and remain pending, subject to the preliminary injunction. *Id.* at ¶ 139. Defendants have given no indication that these limited restorations were intended to be permanent, nor any guarantee to Plaintiff States they could not (or will not) simply be repeated on the Secretary's whim, should he be allowed to proceed with the March 27 Directive. *Id.* at ¶ 143.

The cessation of work at NIOSH is ongoing and has deprived Plaintiff States of statutorily mandated services including funding for education research centers (ERCs) at State agencies and universities, ECF No. 94 at ¶ 158, design collaboration on worker safety projects, such as reducing airborne silica dust, *id.* at ¶ 151, and participation in NIOSH-led partnerships including the National Occupational Research Agenda, *id.* at ¶ 152. Plaintiff States also lost statutorily mandated information including the NIOSH Recommended Exposure Limits and NIOSH Manual of Analytical Methods, both of which are relied upon by Plaintiff States to support their own laws and regulations on worker safety. *Id.* at ¶¶ 153–54. Furthermore, the March 27 Directive's effects on NIOSH endangered miners by making it impossible for NIOSH to implement the congressionally mandated NIOSH mining research program, *id.* at ¶ 156, and use other unique NIOSH capabilities, *id.* at ¶¶ 155–59, further disrupting Plaintiff States' own efforts (internally and in collaboration with NIOSH) to preserve the health of miners within their geographical boundaries.

The WTCHP, which sits within NIOSH, also lost workers to the March 27 Directive on April 1. Secretary Kennedy has since testified that WTCHP cuts "should not have been made," and when asked if the WTCHP staffing would return to pre-Directive levels, Secretary Kennedy

responded: "The program itself will continue."[6] In any event, WTCHP has delayed services to patients, unaddressed petitions to qualify new conditions for coverage, failed to hold meetings with its Responder and Survivor Steering Committees to renew contracts with its partners or approve research grants, and has effectively frozen new research grant proposal review due to insufficient grant processors—all of which are required under the Zadroga Act. ECF No. 94 at ¶ 162.

**NCCDPHP—Reproductive Health and Antismoking**: RIF notices hit the NCCDPHP disproportionately hard, especially its subagencies the Division of Reproductive Health (DRH), the Division of Population Health (DPH), and the OSH. DRH, alone, lost most of its 100 employees. ECF No. 94 at ¶ 181. Defendants sent RIF notices to virtually all staff at three of the four branches in the Division: the Applied Sciences Branch (which included the fifteen-person team responsible for PRAMS), the Women's Health and Fertility Branch (forty employees), and the Field Support Branch, as well as DRH's Office of the Director. *Id.* Following April 1, CDC communicated to Plaintiff States that it would be unable to provide the resources promised under the PRAMS agreements because of the lost staff. *Id.* at ¶ 182. The CDC has since responded with empty promises about providing support, but have ignored the data they already lost, their inability to collect reliable data moving forward, and have not addressed their inability to provide adequate services with their employee ranks decimated and their resources dismantled. *Id.* at ¶¶ 183–84.

Plaintiff States have lost their PRAMS partnership support and the critical reproductive health data that came with it. ECF No. 94 at ¶ 185. As of September 4, 2025, CDC had not released a Notice of Funding Opportunity for 2026 data collection. *Id.* Critical data Plaintiff States rely on for addressing maternal and infant health remains missing, with Plaintiff States left to figure out

---

[6] Senate HELP Comm. Republicans, *Senate HELP Hearing: FY 2026 Dep't of Health and Human Servs. Budget*, YouTube (May 14, 2025), https://www.youtube.com/live/do7L8jUvZoo?si=gzhzr6VYC5ifoAAj&t=8746 (start at 2:25:46).

on their own how to recreate irreplaceable national data sets on a piecemeal, patchwork basis. *Id.* at ¶¶ 186–87. Moreover, Plaintiff States' grants remain in bureaucratic limbo because staff who would process the grants are not working. *Id.* at ¶ 188.

Defendants also sent RIF notices to almost everyone in the DRH Field Support Branch, including staff working directly on public health in the Plaintiff States, and the entire team responsible for guidance on the needs of pregnant and postpartum people and infants in emergencies, such as COVID-19, Zika, and Ebola—all of which pose specific and particularly deadly risks for pregnant women. ECF No. 94 at ¶ 190. Programs like the Maternal and Child Health Epidemiology Program (MCHEP), which provided direct assistance to states through the assignment of CDC maternal and child health epidemiologists as field assignees, were eliminated. *Id.* at ¶ 191.

OSH, as well, was destroyed. ECF No. 94 at ¶ 192. All or nearly all of the roughly 120 full-time employees who had not already filed for retirement or early retirement received RIF notices (in addition to the many contract workers who had lost their jobs in February). *Id.* Accordingly, OSH is unable to fulfill its statutory mandates to collect and publish relevant data, manage annual submissions of cigarette ingredient reports from manufacturers and importers, and monitor tobacco use trends and health impacts to inform FDA regulations and enforcement policies. *Id.* at ¶¶ 193–95. This gap deprived Plaintiff States of information they used to bolster their own antismoking efforts, the funding needed to maintain effective antismoking programs, and education resources relied on to maintain the success of State programs. *Id.* at ¶¶ 196–201.

**NCHHSTP—Sexually Transmitted Diseases**: Several branches within HHS's subagency responsible for sexually transmitted diseases, NCHHSTP, lost their entire staff pursuant to the March 27 Directive: behavioral and clinical surveillance HIV research, HIV prevention capacity

12

development, prevention communications, quantitative sciences, and all work that is global in nature ceased. ECF No. 94 at ¶ 207. One laboratory that studied infectious diseases, including HIV/AIDS and drug-resistant gonorrhea, was shuttered. *Id.* at ¶ 208. Another, the Division of Viral Hepatitis's (DVH) Laboratory Branch at CDC headquarters, the foremost viral hepatitis laboratory in the world, was similarly decimated, forcing Plaintiff States to immediately seek new partners to tend to the difficult testing needs previously provided by HHS. *Id.* at ¶ 209.[7] The March 27 Directive has also meant that CDC has no one to run or manage agreements related to their Disease Intervention Training Centers, upon which Plaintiff States relied to support services and interventions that prevent the spread of HIV/AIDS. *Id.* at ¶¶ 211–13. Monitoring and Surveillance projects were completely destroyed, their grants left to wither, and the data collection needs shifted to Plaintiff States. *Id.* at ¶¶ 214–15.

**NCEH—Environmental Health, including Lead Poisoning**: The March 27 Directive eliminated the entire NCEH Division of Environmental Health Science and Practice (DEHSP) team, the primary division responsible for asthma control and lead poisoning prevention. ECF No. 94 at ¶¶ 217, 221. At the time of the March 27 Directive, DEHSP was in the middle of responding to a lead crisis in Milwaukee, Wisconsin. Because of the RIFs, DEHSP had to stop creating a plan for mass testing of schoolchildren for lead, stop holding weekly discussions with city health officials on the investigation, stop providing coaching and document reviews, and stop helping stakeholders with technical questions. *Id.* at ¶ 223. Plaintiff States continue to be deprived of support services and data used to track lead exposures, even following this Court's Preliminary Injunction. *Id.* at ¶¶ 224–26.

---

[7] For both laboratories, Defendants allowed laid off staff to return to work following the entry of this Court's Preliminary Injunction. ECF No. 94 at ¶¶ 208–09. Of course, should this case be dismissed and the preliminary injunction vacated, Defendants have given no indication they would not simply re-fire these terminated employees to comply with the March 27 Directive.

**NCBDDD—Birth Defects and Developmental Disability**: More than forty percent of the 225 scientists and public health workers at the NCBDDD received RIF notices and were put on administrative leave, eliminating the staff responsible for carrying out many of its statutorily mandated functions. ECF No. 94 at ¶ 234. The entire Director's Office was eliminated, leaving programs—like the Division of Blood Disorders and Public Health Genomics, which performed research on conditions such as hemophilia, sickle cell disease, and many other conditions impacting blood—rudderless, grant funding on track to dry up, data requests to go unanswered, labs to be closed and their samples destroyed, and state surveillance programs to end. *Id.* at ¶¶ 235–42. Without the Division of Blood Disorders and Public Health Genomics, there is no way to collect the data submitted by treatment centers, and no data has been added to the dataset since April 1. Individual grantees have no capacity to create a national dataset or perform analysis without federal support. *Id.* at ¶ 243.

The March 27 Directive also eviscerated the Division for Human Development and Disability and destroyed its branch for Disability and Health Promotion which managed the EHDI, completely destroying the data collection and analysis services that Plaintiff States could not replace. ECF No. 94 at ¶¶ 244–45. Moreover, NCBDDD's Disability and Health Data Science teams worked on the National Syndromic Surveillance Program Disability Data, which monitors emergency department visits to detect public health outbreaks and other health issues affecting people with disabilities. *Id.* at ¶ 246. All the people responsible for that program were terminated. *Id.*

**NCIPC—Injury Prevention**: Entire teams at the NCIPC that focused on motor vehicle crashes, child maltreatment, rape prevention and education, drowning, traumatic brain injury, falls in the elderly, and other issues were cut. More than 200 positions at NCIPC were eliminated under

the March 27 Directive. ECF No. 94 at ¶ 253. Data collection efforts on the National Electronic Injury Surveillance System, which collects data on injuries from approximately 100 hospitals across the U.S., were halted, including data on injuries from motor vehicle crashes, falls, alcohol consumption, adverse drug effects, and work-related injuries. *Id.* at ¶ 255. CDC's Division of Violence Prevention was gutted, their research on gun violence scuttled. *Id.* at ¶ 256. Plaintiff States had relied on NCIPC and its datasets on injury and violence to improve their on-the-ground efforts to support their own programs on preventing violence, overdoses, motor vehicle accidents, drownings, and other lethal accidents. *Id.* at ¶ 254.

**FDA/CTP—Tobacco**: On April 1, Defendants fired nearly twenty percent of the FDA's full-time employees, specifically gutting the CTP, leaving it unable to operate. ECF No. 94 at ¶¶ 266–69. Because of this, following the April 1 RIF Notices, the CTP was unable to, for instance, timely review tobacco products before they reach market, as is required under 21 U.S.C. § 387j(c)(2)(A), or to enforce existing tobacco sales laws. *Id.* at ¶¶ 268–69. The CTP being unable to meet its mandates under the Tobacco Control Act to review premarket applications (due to lack of staff) directly impacts Plaintiff States' own enforcement regimes, as many Plaintiff States' laws depend on FDA product review and approval to determine which products may be legally sold in their state based on an exemption for FDA-approved e-cigarette products. *Id.* at ¶¶ 271–72.

**ACF—Regional Offices and Head Start**: Following implementation of the March 27 Directive, ACF has gone from a head count of 2,400 at the beginning of 2025 to 1,500—a loss of about thirty-eight percent. ECF No. 94 at ¶ 279. All regional staff in ACF's Boston (Region 1), New York City (Region 2), Chicago (Region 5), San Francisco (Region 9), and Seattle (Region 10) offices—staff that provide critical support to ACF's Head Start, Child Care, Family Assistance programs, and the Children's Bureau—received RIF notices. *Id.* at ¶ 280. Without staff available

15

to process grants and administer Head Start funding, the numerous programs in Plaintiff States that rely on this support risk closure. *Id.* at ¶¶ 281–82. Risk of closure is seriously damaging Head Start programs (many of which are run at state agencies), leaving them without technical assistance and guidance and disrupting their funding, forcing Plaintiff States to either watch these programs perish or expend a large amount of their own resources to pick up the pieces. *Id.* at ¶¶ 283–91.

**SAMHSA**: The March 27 Directive decimated SAMHSA, cleaving its workforce in half, and closing ten of SAMHSA's regional offices, along with its external engagement team, the Office of Minority Health (notwithstanding Congress's express requirement that SAMHSA establish and staff this office) and the Office of Behavioral Health Equity, among others. ECF No. 94 at ¶¶ 303–04. The entire Office of Treatment Services, the team responsible for the National Survey on Drug Use and Health, the Behavioral Health Services Information System, and the Drug Abuse Warning Network, was laid off, its data collection effectively halted. *Id.* at ¶¶ 305–07. States must submit data to one of the data sets it curates, the Treatment Episode Data Set, in order to be eligible for state block grants. *Id.* at ¶ 307. Defendants have noticed for termination the exact staff who enable Plaintiff States to complete and receive block grant funding. *Id.*

A quarter of the team assigned to work on 988 Lifeline digital communications received RIF notices, imperiling the crisis lifeline programs Plaintiff States operated in partnership with SAMHSA. ECF No. 94 at ¶¶ 308–09. On July 1, SAMHSA staff disclosed that approximately fifty percent of calls are dropped at the national interactive voice response system before being connected to a contracted contact center. *Id.* at ¶¶ 309–10. Moreover, Plaintiff States have not been given access to demographic data required under 42 U.S.C. § 290bb-36c(e), limiting their ability to track equity and access for high-risk populations. *Id.* at ¶ 311.

**Administrative Offices**: More than two-thirds of the Office of the Assistant Secretary for Planning and Evaluation (ASPE) received RIF notices under the March 27 Directive, including every member of the team that, until April 1, annually updated the federal poverty guidelines and reported to Congress on indicators of welfare dependence. ECF No. 94 at ¶ 317. Plaintiff States rely on those federal guidelines being both up-to-date and accurate in the administration of federal and State benefits, and these layoffs threaten that reliance, as the calculation of the guidelines is specialized and is not something that can be quickly passed on to a new group of employees. *Id.* at ¶ 318. Because the federal poverty guidelines are used for so many programs—from Head Start, to Medicaid, to SNAP, to the National School Lunch and Breakfast Programs, to Legal Services Corporation-funded programs—the impact of inaccurate and out-of-date guidelines will be immense, risking the denial of benefits to eligible individuals and families or issuing benefits to ineligible individuals and families. *Id.* at ¶ 319.

Additionally, because the March 27 Directive eliminated the entire staff at the Office of Infectious Disease and HIV/AIDS Policy (OIDP), the required annual report on welfare indicators and risk factors, which is typically published in late spring/early summer, has not been published as of late August 2025. ECF No. 94 at ¶ 319. The cuts to OIDP stopped the consistent progress that had been made by Ending the HIV Epidemic in the U.S. (EHE) initiative—an initiative President Trump started in 2019—but the gains that have been made over the past six years will be lost. *Id.* at ¶¶ 320–21.

## IV.    Procedural Background

Plaintiffs filed suit on May 5, 2025, ECF No. 1, and moved for a preliminary injunction to partially enjoin the March 27 Directive on May 9. ECF No. 44. Defendants objected, unsuccessfully raising all the arguments they now repackage, often essentially verbatim, in their

Motion to Dismiss. *Compare* ECF No. 52 *with* ECF No. 98. This Court found that Plaintiffs had shown a substantial likelihood of success on the merits—a significantly higher burden than required when responding to a motion to dismiss—and partially enjoined the March 27 Directive. ECF No. 73; *revised at* ECF No. 89. Defendants moved for an emergency stay pending appeal of the revised injunction, which the First Circuit denied. *See New York*, 155 F.4th 67. Defendants voluntarily dismissed their appeal of the preliminary injunction. *New York v. Kennedy*, No. 25-1780 (Doc. 00118359763), dismissed on Oct. 30, 2025 (Doc. 00118360206). The revised preliminary injunction remains in effect.

Plaintiffs filed an Amended Complaint, ECF No. 94, on September 5, 2025. For the purpose of the Court's analysis of Defendants' Motion to Dismiss, the bones of the Amended Complaint are the same as the initial Complaint. It removed named defendants other than Secretary Kennedy and HHS, revised the factual background about HHS's origins and structure, provided updated information on the illegal dismantling of the agency as described in the initial Complaint, laid out further details relating to HHS's applicable statutory mandates, and updated the impacts of the March 27 Directive on Plaintiff States. *Compare* ECF No. 1 *with* ECF No. 94. The Amended Complaint contains the same causes of action as the original Complaint with minor semantic changes (e.g., to tailor the allegations to the remaining defendants): Separation of Powers (Count I), the Appropriations Clause (Count II), *ultra vires* (Count III), and the APA (Counts IV and V). ECF No. 94. On October 14, 2025, Defendants moved to dismiss the Amended Complaint pursuant to both Rules 12(b)(1) and 12(b)(6). ECF No. 98.

## STANDARD OF REVIEW

Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) (lack of subject matter jurisdiction) and 12(b)(6) (failure to state a claim upon which relief can be granted).

Each provision imposes different standards and burdens on the parties. While the plaintiff must prove that the court has subject matter jurisdiction, the court "must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor" on a Rule 12(b)(1) motion. *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010); *see also Andersen v. Vagaro, Inc.*, 57 F.4th 11, 13 (1st Cir. 2023). The district court may also consider evidence submitted by the parties from outside the pleadings to determine subject-matter jurisdiction. *Merlonghi*, 620 F.3d at 54. Rule 12(b)(1) governs Defendants' arguments concerning Article III standing (Argument Section I.A. *infra*), Civil Service Reform Act channeling (Argument Section I.B. *infra*), and the Tucker Act (Argument Section I.C. *infra*).

Under Rule 12(b)(6), the defendant has the burden to show that the plaintiff has not stated a viable claim—and in analyzing the defendant's argument, the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 68, 71 (1st Cir. 2014) (quotation omitted). The federal pleading standard merely requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief"—it does not require detailed factual allegations. Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) governs the remainder of Defendants' arguments. *See Rhode Island Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 40 (1st Cir. 2002) (citing *Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517,

523 n.3 (1991)) ("[T]he issue of whether the APA provides for judicial review of the nonfinal ruling is not one that, precisely speaking, implicates the subject-matter jurisdiction of the court.").[8]

## ARGUMENT

### I.    Defendants' Motion to Dismiss for Lack of Jurisdiction Should Be Denied

#### A.  Plaintiff States have standing to challenge the March 27 Directive

Plaintiffs have standing because they have established, both through the allegations in the well-pled complaint and through evidence introduced in support of their motion for preliminary injunctive relief, that they have suffered numerous "concrete and particularized" injuries that are "actual [and] imminent"; "fairly traceable" to Defendants' challenged behavior; and "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (citation modified). Defendants' arguments to the contrary ignore hundreds of allegations in the Amended Complaint and the unrebutted evidentiary record introduced with the motion for preliminary injunction. Defendants have also argued that, even if this Court were to order reinstatement, the Department could still "manage its personnel" in such a way as to deny the Plaintiff States access to information to which they are statutorily entitled, and that this "absence of redressability defeats standing." ECF No. 98 at 32. But of course, the fact that Defendants may find another way to harm Plaintiff States does not mean that the relief sought in this case will not redress the harm that has already occurred.[9]

---

[8] "Although the First Circuit holds that the Rule 12(b)(6) plausibility standard ordinarily 'does not apply to a complaint for judicial review of final agency action,' the Circuit recognizes an exception where the government alleges that the plaintiff's claim is legally flawed." *Concord Hosp., Inc. v. NH Dep't of Health and Human Servs.*, 770 F. Supp. 3d 400, 404 (D.N.H. 2025) (quoting *Atieh v. Riordan*, 727 F.3d 73, 76, 76 n.4 (1st Cir. 2013)). Here, Defendants argue that Plaintiffs' claims of final agency action are legally flawed. *See, e.g.*, ECF No. 98 at 35 ("It is a programmatic challenge foreclosed by the APA."), 36 ("*Bennett's* test is not satisfied . . . ."). Therefore, final agency action is a 12(b)(6) issue.

[9] Defendants do not dispute that Plaintiffs' injuries are fairly traceable to the March 27 Directive. Defendants' one-time mention of the purported lack of a link between alleged harms and the Defendants' conduct, appearing on the last page of the Motion to Dismiss, ECF No. 98 at 67, fails to provide a legal basis to argue against traceability. Should Defendants raise the defense in their Reply, Plaintiffs would seek to file a surreply.

### 1. Service-related injuries

When ordering preliminary relief, this Court found, and the First Circuit affirmed, that Plaintiffs suffered service-related injuries. ECF No. 73 at 21; *New York*, 155 F.4th at 73. Plaintiffs carried a higher burden at the preliminary injunction phase (a "clear showing") than what they must demonstrate at this Rule 12 stage. *Webb v. Injured Workers Pharm., LLC*¸ 72 F.4th 365, 371–72 (1st Cir. 2023).

Because Defendants' Motion to Dismiss offers no meaningful evolution from their previous failed arguments, this Court should again hold Plaintiffs have standing. For instance, Plaintiffs' Amended Complaint repeats allegations of loss of access to CDC laboratory testing capabilities. *See* ECF No. 1 at ¶¶ 109–13; ECF No. 94 at ¶¶ 101–05. The Amended Complaint further alleges that CDC continues to refer certain critical testing to the Wadsworth Center in New York as of late August 2025, and has discontinued or dramatically scaled back other testing capabilities. ECF No. 94 at ¶¶ 106–07. Defendants overlook these allegations in claiming that Plaintiffs "do not allege that the labs are not currently operating." ECF No. 98 at 36. On this ground alone, Plaintiffs have sufficiently pled an injury-in-fact.

Defendants argue that Plaintiffs have only alleged "speculative" lapses and services at certain agencies and programs. ECF No. 98 at 33–34 (CTP and SAMHSA), 34–35 (TANF, HIV, MMP, and Head Start Regional Offices), 35–36 (Head Start, NIOSH programs, NCHHSTP). But far from being "speculative," Plaintiffs' alleged injuries either have already occurred or are imminent. *Lujan*, 504 U.S. at 560–61; ECF No. 94 at ¶¶ 270–72 (CTP), 305–07, 309 (SAMHSA), 214 (HIV Medical Monitoring Project), 280–81, 286, 290 (Head Start Regional Office closures led to unanswered, or conflicting, communications and chaos), 280–91 (Head Start), 159 (NIOSH), 211 (NCHHSTP). In one notable example, Defendants boldly claim Plaintiff States cannot

possibly show injury from the "(speculative) closure of ERCs" due to NIOSH's destruction—apparently forgetting that the ERCs are programs run by Plaintiff State agencies (like the University of Washington) that receive NIOSH funding that will now not be administered due to lack of staffing. ECF Nos. 98 at 61, 94 at ¶¶ 124, 158.

Furthermore, evidence already in the record supports that injuries resulting from RIF at specific subagencies either have occurred or are imminent. ECF Nos. 44-24 at ¶¶ 7, 21; 44-28 at ¶¶ 15, 17, 25; 44-31 at ¶¶ 16–21, 25; 44-33 at ¶¶ 7, 13, 15; 44-34 at ¶¶ 8, 34; 44-37 at ¶¶ 32–35; 44-38 at ¶¶ 29, 32–33, 35; 44-39 at ¶¶ 16–17, 19, 23–24; 44-40 at ¶¶ 16–18, 21; 44-50 at ¶¶ 27–36, 52, 56, 57; 44-51 at ¶¶ 42–44; 44-52 at ¶¶ 14, 17, 23–24, 30, 35, 37, 41, 44; 44-59 at ¶¶ 48–59; 44-60 at ¶ 14; 55-3 at ¶¶ 3–4, 9; 55-6 at ¶¶ 19–24; 55-8 at ¶¶ 21–25; 55-10 at ¶¶ 16, 20, 29–35, 37, 38, 41. Such evidence may be considered in a Rule 12(b)(1) challenge.

Defendants also argue Plaintiffs read one of the many cited statutory mandates "too broadly" to require the Office of the Head Start (OHS) to maintain the Tips for Smokers campaign. ECF No. 98 at 34; *see* 15 U.S.C. §§ 1341(a)(1) (The Secretary shall "conduct and support research on the effect of cigarette smoking on human health and develop materials for informing the public of such effect."), 1341(a)(4) (The Secretary shall "collect, analyze, and disseminate . . . information, studies, and other data relating to the effect of cigarette smoking on human health, . . . ."). But while Defendants claim they may comply with § 1341(a) without the Tips for Smokers campaign, they do not argue they can satisfy § 1341(a) while complying with the March 27 Directive, which has directly caused the loss of the staff responsible for the tobacco cessation quitlines, reports to educate residents about tobacco cessation services, the STATE system, National Youth Tobacco Survey, Best Practices for Comprehensive Tobacco Control Program Guide, and the Tobacco Control Program funding. ECF No. 94 at ¶¶ 173, 175–78. Nor

do Defendants point to any work that they are now doing in the absence of these programs that would satisfy § 1341(a).

Defendants' last argument, that allegations of "some delay or disruption" cannot justify sweeping relief, is silent as to which programs have created "some delay or disruption" without giving rise to a concrete injury-in-fact. ECF No. 98 at 35. As Plaintiff States' Amended Complaint and the voluminous record demonstrate, Plaintiffs' injuries, manifestly, justify relief.

### 2. Informational injuries

This Court has already found that Plaintiffs have suffered information-related injuries related to the Division of Reproductive Health's failure to collect and make available PRAMS data. ECF No. 73 at 20, *aff'd*, 155 F.4th at 74–75. The Amended Complaint and evidence in the record further shows that that injury persists, is just one of many injuries arising out of the Division of Reproductive Health, and meets the requirements of an injury-in-fact.

A plaintiff who loses access to statutorily mandated information suffers an injury-in-fact that is concrete. *Laufer v. Acheson Hotels, LLC*, 50 F.4th 259, 270 (1st Cir. 2022) (vacated for mootness, 601 U.S. 1, 144 S. Ct. 18, 217 L. Ed. 2d 155 (2023)); *see also FEC v. Akins*, 524 U.S. 11, 21, 118 S. Ct. 1777, 141 L. Ed. 2d 10 (1998) (injury-in-fact arose from a failure to obtain information which "must be publicly disclosed pursuant to a statute"). And where that loss of information has a "downstream consequence" on the plaintiff, the injury is also "particularized" and justifies standing. *Laufer*, 50 F.4th at 275.

The Amended Complaint alleges that PRAMS data is mandated by statute, ECF No. 94 at ¶¶ 167–71, that the March 27 Directive ordered the firing of most of the 100 employees at the Division of Reproductive Health including "all staff" within the Division who oversaw PRAMS,

*id.* at ¶ 181, that the Division could no longer perform its PRAMS-related duties, *id.* at ¶¶ 182–83, and that multiple Plaintiff States are affected by the loss of data. *Id.* at ¶ 186.

The Amended Complaint further alleges that any current collection efforts will lead to unusable PRAMS data. ECF No. 94 at ¶ 183. Because of the absence of PRAMS staff to coordinate and assist in standardized data collection, combined with a failure to collect any data for three months and a depressed response rate traceable to the risk of early termination, future PRAMS data will be unusable to Plaintiff States. ECF Nos. 55-4 at ¶¶ 16–18; 84-8 at ¶¶ 18–19.

Nevertheless, Defendants argue that Plaintiff States have not alleged harm because, according to them, states still can monitor and respond to the health needs of pregnant people and babies despite the loss of data. ECF No. 98 at 32. But they do not dispute evidence that Plaintiff States' health authorities rely on PRAMS data and are injured without it. ECF Nos. 44-24 at ¶ 9 (Rhode Island); 55-10 at ¶¶ 9–10 (New York); 44-26 at ¶ 9 (New Jersey); 44-29 at ¶¶ 17–20 (Illinois); 44-30 at ¶¶ 7–9 (Delaware); 44-50 at ¶ 5 (Wisconsin); 44-59 at ¶¶ 28–30 (Michigan); 44-60 at ¶ 8 (Hawaiʻi). That Defendants are currently operating a sham data collection that can only produce unusable data does not negate Plaintiffs' injury—it amplifies it. ECF No. 98 at 31, 62.

Defendants also argue there can be no PRAMS data injury because the information is not "intentionally withheld or indefinitely suspended." ECF No. 98 at 31. Defendants offer no legal authority for their apparent intentionality requirement, and ignore allegations that any current data collection efforts are "unsupervised and uncoordinated leading to data collection that is unusable by Plaintiff States." ECF No. 94 at ¶ 183.

All these arguments say nothing of other injuries emanating from the dismantling of the Division of Reproductive Health. The Amended Complaint also alleges service-related injuries

supported by evidence, ECF Nos. 44-24 at ¶¶ 9, 15 (CDC can no longer provide technology assistance); 55-10 at ¶¶ 9–10 (loss of emergency services readiness), in addition to the informational injuries. ECF No. 94 at ¶¶ 187 (data regarding assisted reproductive technology data), 189 (data regarding maternal mortality, needs of pregnant and postpartum people and infants in emergencies, and IVF success rates). These injuries also resulted from the Directive's effects at the Division of Reproductive Health and sufficiently state informational injury arising out of the Division of Reproductive Health and standing.

Beyond the Division of Reproductive Health, Plaintiffs allege a loss of many forms of statutorily mandated data and a corresponding downstream consequence to Plaintiff States attributed to many more subagencies and programs. ECF No. 94 at ¶¶ 317–21 (ASPE and the Federal Poverty Guidelines), 193–96 (OSH and Ingredient Reporting Submissions), 160–64 (NIOSH and WTCHP data and guidance), 305–12 (SAMHSA reports), 280–82, 285–89 (ACF and Head Start guidance), 235–40 (NCBDDD and Community Counts), 254–55 (NCIPC and Consumer Product Safety Commission on the National Electronic Injury Surveillance System), 192–99 (NCCDPHP and OSH Reports).

Defendants argue that Plaintiff States are not injured because there is no legal entitlement to some of the information that has been lost, giving a handful of examples. ECF No. 98 at 29. But each of Defendants' examples misses the mark. While Defendants argue the Strategic Plan need not be updated at this time, *id.*, Plaintiffs allege the plan, which must support the efforts of State health departments, 42 U.S.C. § 242c(c)(2)(A)(ii), is missing from the website, in violation of 42 U.S.C. § 242c(c)(1), and that the plan could not be executed with the current, diminished staffing levels, another statutory violation, 42 U.S.C. § 242c(c)(2). ECF No. 94 at ¶ 114. Since the Plaintiff

States rely on the Strategic Plan to protect themselves against disease, *id.*, Plaintiff States have standing to challenge these deficiencies. *Laufer*, 50 F.4th at 274–75.

Defendants twice misstate allegations of informational injury as allegations of currently withheld information as opposed to a future imminent harm, but fail to recognize that when data is not collected on time it cannot possibly be analyzed and distributed in the future. Defendants argue Plaintiffs "have all the IVF information to which they are entitled." ECF No. 98 at 29. But this argument misses the point; even if 2025 PRAMS data is published, it will be unusable because of the lengthy gap in collection. This is also a thinly sliced attack that ignores Plaintiffs alleged loss of data regarding "maternal and infant health outcomes including maternal mortality, needs of pregnant and postpartum people and infants in emergencies, and IVF success rates." ECF No. 94 at ¶ 189. Defendants do not dispute that data regarding maternal mortality, and the needs of pregnant and postpartum people and infants in emergencies, has not been collected and is lost forever.

Defendants make a similar error when arguing that the federal poverty guidelines have been published this year and need not be updated until next year. ECF No. 98 at 29. Plaintiffs allege that loss of the federal poverty guidelines is actual and imminent as Defendants RIF'd "every member" of the uniquely able team responsible for updating the federal poverty guidelines. ECF No. 94 at ¶¶ 317–18. Without a single experienced worker available to ensure the reliability of an incredibly important formula to Plaintiff States, *see id.* at ¶ 318, informational injury is not merely conjectural or hypothetical.[10]

---

[10] While at the preliminary injunction stage there was an argument about whether the injury was sufficiently imminent, as the guidelines are published at the beginning of the calendar year; now, as we reach the end of 2025, there is no question that the risk of injury is imminent.

Defendants' scattered remaining arguments likewise provide no basis to dismiss the Amended Complaint. They claim some of the lost information is not legally required by any particular time. ECF No. 98 at 30–31 (referencing Head Start guidance, NCBDDD and Community Counts monitoring system, NCIPC and the Consumer Product Safety Commission on the National Electronic Injury Surveillance System). They ignore, again, allegations that the withheld information is legally required and is not being provided. ECF No. 94 at ¶¶ 228 (Community Counts), 247–49 (NCIPC), 276–90 (Head Start). Defendants likewise inaccurately claim "Plaintiffs never allege their personal stake in the work of the mining research divisions in Spokane or Pittsburgh," ignoring several paragraphs providing examples of information and services Washington and other Plaintiff States rely on from these programs. *See, e.g.*, *id.* at ¶¶ 151 (describing NIOSH collaborations with Washington to "analyze and describe workers' compensation claims among Washington mining operators," and "to design, build and deploy a hybrid dust control system that proved to reduce airborne silica dust by ninety-three percent at a mine site near Spokane"), 156 (describing loss of "a network of seismic sensor arrays designed to provide seismic monitoring for mines, widely distributed throughout the [Washington] region"), 157 (describing impact on Washington miners of loss of mining research).

Ultimately, aside from (again) arguing against the concept of "informational" injuries, Defendants do not challenge the bulk of the informational injuries alleged in the Amended Complaint, any one of which, along with those already discussed, are suitable grounds to find informational injury sufficient to establish Plaintiffs' standing to bring these claims.

### 3. Funding-related injuries

Lastly, the March 27 Directive hobbled Defendants' ability to manage their funding obligations and financially harmed Plaintiffs. For the same reasons the Court gave in its earlier

order, ECF No. 73 at 29–30, and the First Circuit gave in their review of that order, 155 F.4th at 75 n.4, Plaintiffs have a claim that is not precluded by the Tucker Act under *Bowen v. Massachusetts*, 487 U.S. 879, 108 S. Ct. 2722, 101 L. Ed. 2d 749 (1988).

To be clear, Plaintiffs do not seek to remedy their financial harms through enforcing contracts. Rather, Plaintiffs allege that HHS lacks the staff necessary to properly process grant applications and disburse funds since the March 27 Directive was implemented. ECF No. 94 at ¶¶ 162, 200, 212. Plaintiffs are not the only ones who think this is plausible: Secretary Kennedy agreed with Senator Murkowski that HHS may have sat on approved funding because the people processing the funding had been RIF'd. *Id.* at ¶ 83.[11]

### 4. Plaintiffs' injuries are redressable through court order

Plaintiffs have asserted injuries that would be directly remedied by a favorable resolution of their claims, satisfying the redressability requirement. *See Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020); ECF No. 94 at ¶¶ 8–9. To establish redressability, Plaintiffs need only show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000). Plaintiffs' burden is "relatively modest" at the pleading stage. *Bennett v. Spear*, 520 U.S. 154, 171, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997).

A court order setting aside the March 27 Directive would: (1) reopen the flow of information between federal officials and state agencies, addressing the informational injuries; (2) permit reinstatement of program certification, grant funding, and coordination mechanisms

---

[11] Senate HELP Comm. Republicans, *Senate HELP Hearing: FY 2026 Dep't of Health and Human Services Budget*, YouTube (May 14, 2025), https://www.youtube.com/live/do7L8jUvZoo?si=WxcVLYhRwDLirvn2&t=4438 (1:13:58 through 1:14:48).

suppressed by the March 27 Directive's decision to terminate 10,000 federal employees; and (3) reestablish compliance with the statutory scheme as Congress intended.

Likewise, a declaratory judgment that the March 27 Directive was unlawful would remove the barrier preventing HHS from functioning as Congress intended. Declaratory relief is appropriate to void unlawful reorganization measures and thereby redress institutional and procedural harms. *See, e.g.*, *New York v. McMahon*, 784 F. Supp. 3d 311, 329–31, 360 (D. Mass 2025) (holding that injunctive relief halting the mass RIF redressed the plaintiffs' institutional injuries by restoring the agency's ability to perform its statutory functions); *id.* at 323 (noting that the RIF "has made it effectively impossible for [the agency] to carry out its statutorily mandated functions").

Defendants' contention that "freezing the restructuring or halting the RIFs would not necessarily lead to restoration of canceled funding," misstates the redressability inquiry. ECF No. 98 at 44. Redressability does not require certainty that any individual grant will be reissued. *Massachusetts v. EPA*, 549 U.S. 497, 525–26, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007); *see also Utah v. Evans*, 536 U.S. 452, 464, 122 S. Ct. 2191, 153 L. Ed. 2d 453 (2002) (requiring a "substantial likelihood" that relief will alleviate the injury). It requires only that judicial relief will likely lessen the injury. *Id.* By reinstating the necessary procedural mechanisms, the Court would remove the unlawful barrier that caused the disruption and ensure Plaintiffs receive the benefits Congress guaranteed.

The same can be said for Defendants' assertion that "the absence of redressability defeats standing." ECF No. 98 at 32. Article III requires only that a favorable judicial decision is likely to redress, in whole or in part, the injury alleged—not that it guarantees a specific substantive outcome. *Laidlaw*, 528 U.S. at 181; *Massachusetts*, 549 U.S. at 525 ("[A] plaintiff satisfies the

redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury") (quoting *Larson v. Valente*, 456 U.S. 288, 244 n.15, 102 S. Ct. 1673, 72 L. Ed. 2d 33 (1982)). Here, Plaintiffs allege that Defendants' March 27 Directive has prevented HHS from performing its duties, and an order declaring unlawful and setting aside the March 27 Directive would remove the source of that harm, therefore satisfying redressability. The law only requires a showing that relief will likely alleviate the injury, not complete certainty as to the ultimate result. *Laidlaw*, 528 U.S. at 185. Plaintiffs have plausibly alleged an injury that a favorable judicial decision would likely remedy, and Article III does not require more.

### B.  The Civil Service Reform Act does not divest this Court of jurisdiction

This Court has already determined that Plaintiffs' claims are not subject to channeling pursuant to the Civil Service Reform Act (CSRA). ECF No. 73 at 23–28; *New York*, 155 F.4th at 74–75. The CSRA governs employee relations in the federal government, channeling certain claims brought by employees and their unions to the Merit Systems Protection Board (MSPB) and the Federal Labor Relations Authority (FLRA). By its terms, it does not apply to states bringing non-CSRA claims, as this Court previously ruled. *Id.* Nevertheless, Defendants argue that "[p]ersonnel decisions represent the core of the Amended Complaint," and that the CSRA and Federal Service Labor Management Relations Statute "provide a comprehensive scheme of administrative and judicial review for resolving both disputes between employees and their federal employers and disputes brought by unions representing those employees," depriving this Court of jurisdiction. ECF No. 98 at 22–23. Their argument ignores the text of the CSRA, the nature of the allegations in the Amended Complaint, and precedent to the contrary.

By its terms, the CSRA applies to claims brought by individual federal workers and the labor organizations representing them. *See, e.g.*, 5 U.S.C. § 7103(a)(1)-(2). MSPB review is

available for claims by federal employees arising from specific adverse employment actions taken against them by their employer. 5 U.S.C. § 7511(a)(1) (defining employee); 5 U.S.C. § 7512 (defining actions covered); 5 U.S.C. § 7513(d) (providing for procedures to appeal such actions to the MSPB). FLRA review is available for "issues relating to the duty to bargain in good faith" and unfair labor practices. 5 U.S.C. §§ 7105(a)(2), 7117, 7118.

Defendants concede, as they must, that Plaintiff States are excluded from the CSRA's reach. ECF No. 98 at 25. Instead, they argue that "Congress intentionally foreclosed judicial review" for parties like the States, but point to nothing in the text of the CSRA or its legislative history to support that bold assertion. ECF No. 98 at 25–26. In the absence of any indication that Congress intended the CSRA to preclude non-CSRA claims brought by non-employees, this Court cannot close its doors to the Plaintiff States. As the First Circuit explained in *Somerville Public Schools v. McMahon*, the CSRA does not divest federal courts of "the power to hear non-CSRA claims brought by parties who will be imminently injured by the agency's effective inability to provide them with the services to which they are entitled." 139 F.4th 63, 71 (1st Cir. 2025).

But even if the CSRA somehow extended its preclusive effect to the Plaintiff States (it does not) this dispute is outside the CSRA's scope because it is not an employment dispute. *See Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 189, 143 S. Ct. 890, 215 L. Ed. 2d 151 (2023) (distinguishing between challenges to "specific substantive decisions" and challenges raising questions that go "to the structure or very existence of an agency"). Plaintiff States do not challenge whether the government's RIF followed the procedures for RIFs established in the CSRA and applicable regulations. Nor do they stand in the shoes of federal workers, contrary to Defendants' blatant mischaracterization of Plaintiffs' claims. As this Court correctly recognized in its preliminary injunction ruling, it "is not the case here" that Plaintiffs are stepping into the shoes of

federal employees; Defendants' argument to the contrary "represents an incorrect reading of the asserted claims." ECF No. 73 at 24–25. Nor do Plaintiff States appeal any specific decisions about individual employees. What they challenge, instead, is a directive that eliminated congressionally mandated subagencies and programs, reorganized the Department in violation of federal law, and stopped the Department from conducting work that is fully funded by Congress and required by statute. That the government chose to carry out its illegal action by RIF and reorganization does not make this action by the Plaintiff States an employment dispute between federal employees and their employer.

In its preliminary injunction ruling, this Court carefully analyzed the factors identified by the Supreme Court in *Thunder Basin Coal Co. v. Reich* and determined that Plaintiffs' claims fall outside the CSRA's preclusive sphere. ECF No. 74 at 23–29. To determine whether petitioner's claims are "of the type Congress intended to be reviewed within this statutory structure," this Court must determine (1) whether "precluding district court jurisdiction" would "'foreclose all meaningful judicial review' of the claim"; whether the claim is "wholly collateral to [the] statute's review provisions" and (3) whether the claim is "outside the agency's expertise." *Axon*, 598 U.S. at 186 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13, 114 S. Ct. 771, 127 L. Ed. 2d 29, (1994)). "When the answer to all three questions is yes, we presume that Congress does not intend to limit jurisdiction." *Axon*, 598 U.S. at 186 (citation modified).

Defendants concede that the answer to the first question is "Yes." ECF No. 98 at 25. As to the second question, the claims here—sounding in the APA and provisions of the U.S. Constitution—are fully collateral, "because they are challenging [the Department's] power to proceed at all, rather than actions taken in the agency proceedings." *Axon*, 598 U.S. at 192. As this Court determined, "[t]he States' claims do not pertain specifically to [federal] workers'

employment relationships or unfair labor practices" and "are, therefore, 'wholly collateral to [the CSRA's] review provisions.'" ECF No. 73 at 25 (quoting *Thunder Basin Coal Co.*, 510 U.S. at 212). Tellingly, Defendants have not attempted to argue that the MSPB or FLRA has any expertise in the claims raised in this case, and there could be no basis for asserting such expertise here, where the claims do not raise questions about the procedural and substantive protections to which federal employees are entitled. As this Court explained, the States' claims are ill-suited for agency adjudication because the focus of this case "is not on why or how employees were fired, or within MSPB or FLRA's areas of expertise." ECF No. 73 at 26. Other courts have rejected similar channeling arguments. *See, e.g.*, *McMahon*, 139 F.4th at 71–73; *Am. Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1030–33 (9th Cir. 2025); *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 30–32 (D.D.C. 2025).

Defendants acknowledge that this Court has already determined that Plaintiffs' claims are not subject to CSRA channeling, but seek new consideration in light of purported "guidance" from the Supreme Court's shadow docket. ECF No. 98 at 19 n.5 (citing *Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025); *McMahon v. New York*, 145 S. Ct. 2643 (2025)). But the First Circuit has held *in this case*, when denying Defendants' emergency motion to stay the preliminary injunction, that the Supreme Court's interim ruling in *AFGE* "points to the opposite conclusion," and is "doubly unhelpful to the government." *New York*, 155 F.4th at 75 (noting that the Supreme Court explicitly did not rule on the type of actions at issue in this case and that the Court's determination in *AFGE* that the government was likely to succeed on the merits "indicates that the Supreme Court concluded that the district court likely had jurisdiction to make that decision"). The Supreme Court's interim order in *McMahon* is no more instructive, as the Supreme Court did not identify which of the numerous grounds argued by the government justified their ruling to grant

the stay. *Id.*; *see also* ECF No. 81 at 2. And, as the First Circuit observed in this case, no "other Supreme Court interim order or decision accepted the government's CSRA argument in a like case." *New York*, 155 F.4th at 74. Finally, *Maryland v. USDA* is easily distinguished as that case sought to protect the "rights of employees," which this case does not. 151 F.4th 197, 214 (4th Cir. 2025).

The CSRA cannot be interpreted to divest this Court of jurisdiction over Plaintiffs' claims. This Court so held in its preliminary injunction ruling, and so it should hold again.

### C.  The Tucker Act does not divest this Court of jurisdiction

This Court has also already ruled that the Tucker Act does not compel Plaintiffs' claims to be in the Court of Federal Claims. ECF No. 73 at 28–30. The Tucker Act requires that claims against the United States, upon "any express or implied contract with the United States" be brought in the Court of Federal Claims. 28 U.S.C. § 1491(a)(1). The Amended Complaint does not bring any claim sounding in contract law and the Plaintiff States are not asking the Court for "orders 'to enforce a contractual obligation to pay money.'" *Dep't of Educ. v. California*, 604 U.S. 650, 651, 145 S. Ct. 966, 221 L. Ed. 2d 515 (2025) (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002)). Defendants argue that the Tucker Act divests this Court of jurisdiction as to some of Plaintiffs' claims, plucking at a few allegations about grants and other cooperative agreements, and arguing that "the source of Plaintiffs' asserted rights is contractual." ECF No. 98 at 43. Defendants are wrong.

The Tucker Act plainly does not prevent Plaintiffs' suit in this Court. Plaintiffs' complaint constitutes a charge that, by wholesale dismantling large portions of the Department of Health and Human Services, Defendants fail to perform their statutory and constitutional duties in a myriad of ways, and that Secretary Kennedy issued the March 27 Directive with full knowledge of these consequences. *See generally* ECF No. 94. Defendants cite eleven paragraphs of the 377-paragraph

34

complaint, asserting that allegations of Defendants' failure to fund grants on time or fulfill the terms of certain cooperative agreements convert these statutory and constitutional claims into ones sounding in contract. ECF No. 98 at 43–44 (citing ECF No. 94 at ¶¶ 168, 182, 184–85, 188, 211–12, 214, 237, 241, 245). Defendants' arguments only apply to Plaintiffs' claims about PRAMS (requiring monitoring of maternal and infant health outcomes), DITC (requiring intervention services for communicable diseases including AIDS), NCBDDD (requiring research and public education concerning birth defects such as spina bifida and congenital heart defects), and EHDI (requiring state-wide screenings, diagnosis, and intervention programs for deaf and hard-of-hearing newborns). *See id.* But even a cursory examination of the complaint shows the Tucker Act is no bar to these claims.

Each of the allegations that Defendants assert rests on grant terms is, instead, an allegation that Defendants failed to perform their *statutory* duties apart from any particular grant agreement. ECF No. 94 at ¶¶ 168–69, 182, 184–85 (alleging Defendants failed to perform duties mandated under 42 U.S.C. § 247b-13(a)), 204, 211–12, 214 (alleging that Defendants have failed to perform duties mandated under 42 U.S.C. §§ 300cc-31(a), 300ff-111, 300ee-4, but that the March 27 Directive prevented them from providing the "programmatic technical assistance or project management as required by law" (quoting April 10, 2025 CDC notice)), 227–28, 237–43 (alleging Defendants have duties under 42 U.S.C. §§ 247b-4(a)(2), 300b-5, 300c-22 that the March 27 Directive prevented them from fulfilling), 231–32, 244–45 (alleging that Defendants have duties under 42 U.S.C. § 280g-1(b) that the March 27 Directive prevented them from fulfilling). As set out in the Amended Complaint, these failures violated Defendants' statutory and constitutional duties. *See id.* at ¶¶ 328–77 (alleging causes of action). They also demonstrate the extent to which Defendants have dismantled core parts of HHS with complete disregard for their obligations under

35

law and with no plan in place to ensure that statutory obligations are met. Defendants misread Plaintiffs' allegations to characterize them as contractual. *See* ECF No. 98 at 43–44. Accordingly, the Tucker Act does not apply.

The First Circuit has already affirmed this Court's conclusion that the Tucker Act does not apply, and held Defendants' Tucker Act "argument finds no support in the caselaw that the government cites" and was "contrary to Supreme Court precedent." *New York*, 155 F.4th at 75 n.4 (citing *Bowen*, 487 U.S. at 910). As the First Circuit recognized, Plaintiff States' claims center on the "dismantling of subagencies and a RIF at the Department," and that allegations and evidence relating to failure to process grants "support[s] [the States'] claims that the sub-agencies were no longer functioning after the implementation of the March 27 [Directive]." *Id.* These losses of services, information, and funding to Plaintiff States were the all-too-foreseeable result of the March 27 Directive, and they are both a measure of how the Directive has dismantled federal agencies and also a measure of how the Plaintiff States have suffered concrete harms from the Directive, as this Court previously held. *See* ECF No. 73 at 30 ("Simply put, the Tucker Act plays no role here.").

Defendants argue that "what Plaintiffs seek" is specific performance. ECF No. 98 at 44. Not so. Plaintiff States seek declaratory relief, vacatur, an order enjoining "Defendants from implementing the March 27 Directive," and fees and costs. ECF No. 94 at 105 (Prayer for Relief iv). Defendants argue that if such an order is issued this would "reinstate the experts and other technical staff supposedly needed to fulfill the Department's side of the agreements." ECF No. 98 at 44. Perhaps, but Plaintiff States are not seeking any relief that would specifically direct the Department to meet its obligations under particular contracts and cooperative agreements, and that is fatal to this argument. *See Specific Performance*, Black's Law Dictionary (12th ed. 2024)

(defining specific performance as "a court-ordered remedy that requires precise fulfillment of a legal or contractual obligation when monetary damages are inappropriate or inadequate").

Instead, Plaintiff States ask the court to stay, vacate, and enjoin implementation of the March 27 Directive, and issue declaratory judgment that the Directive violates both the U.S. Constitution and the APA—independent of Defendants' contractual commitments. As Courts around the country have held, the Tucker Act does not apply to a case like this one. *See, e.g.*, *R.I. Coal. Against Domestic Violence v. Kennedy, Jr.*, No. 25-CV-342-MRD-PAS, 2025 WL 2899764, at *5 (D.R.I. Oct. 10, 2025) (Tucker Act did not apply because plaintiffs' challenge required analysis of the relevant statutes and regulations, and not an analysis of the respective grant agreements themselves); *President and Fellows of Harvard Coll. v. Dep't of Health and Hum. Servs.*, No. 25-cv-11048-ADB, No. 25-cv-10910-ADB, --- F. Supp. 3d ----, 2025 WL 2528380, at *12 (D. Mass. Sept. 3, 2025) (holding Tucker Act did not bar an APA challenge to internal agency guidance otherwise reviewable under the APA); *Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*, No. 25-cv-1923 (JMC), 2025 WL 2615054, at *2, 12–13 (D.D.C. Sept. 10, 2025) (holding Tucker Act did not bar jurisdiction over prospective APA claims and constitutional claims); *City of Fresno v. Turner*, No. 25-cv-07070-RS, 2025 WL 2721390, at *6 (N.D. Cal. Sept. 23, 2025) (holding Tucker Act did not apply where "Plaintiffs challenge the Defendant agencies' *policies* and *guidance* to condition funding on the Grant Conditions on *statutory*, namely APA, and *constitutional* grounds, and they seek injunctive relief barring Defendants' imposition of the conditions and setting aside related internal agency directives"); *Planned Parenthood of Greater N.Y. v. Dep't of Health and Hum. Servs.*, No. 25-2453, 2025 WL 2840318, at *13 (D.D.C. Oct. 7, 2025) (holding Tucker Act did not bar APA challenge to Policy Notice concerning use of grant funds); *Illinois v. FEMA*, No. 25-206 WES, --- F.Supp.3d ----, 2025 WL 2716277, at *9 (D.R.I.

Sept. 24, 2025) (Tucker Act did not bar APA claims where "Plaintiff States challenge the validity of DHS's promulgated conditions under the APA and the Constitution, not a termination decision sounding in contract or seeking monetary relief"). There are no viable grounds to set aside this Court's and the First Circuit's prior rulings on the Tucker Act.

## II.    Plaintiff States Adequately Pled APA Claims

### A.  Plaintiffs sufficiently alleged a discrete, final agency action

Plaintiffs challenge a reviewable final agency action. The APA "creates a basic presumption of judicial review [for] one suffering legal wrong because of agency action." *Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*, 586 U.S. 9, 22, 139 S. Ct. 361, 202 L. Ed. 2d 269 (2018) (citation modified); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986) ("Once the agency publicly articulates an unequivocal position . . . and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review.").

This Court has already determined that the HHS announcement "represented final agency action such that the Court can review the alleged violations of the Administrative Procedure Act," ECF No. 73 at 4 (fulsome analysis at 32–37), and the First Circuit subsequently affirmed that the government had not made a strong showing of likely success on their argument, "given that [the March 27 Directive] was followed, just days later, by the Department's dismantling of subagencies and a RIF impacting 10,000 employees."[12] *New York*, 155 F.4th at 76. Defendants offer no post-dated evidence or change in the law to justify a different outcome on their Motion to Dismiss. Instead, Defendants simply cite to the same set of cases contained within their prior briefing on

---

[12] Defendants neither acknowledged nor addressed the First Circuit's order declining to stay the preliminary injunction or its analysis relating to final agency action. Defendants voluntarily dismissed their appeal of the preliminary injunction on October 29, 2025. Joint Stipulation to Dismiss Appeal, *New York v. Kennedy*, No. 25-1780 (Doc. 00118359763).

the subject save one, and assert that "this Court remains free to revisit its earlier determination, which was rendered in a preliminary posture and regarding a different complaint." ECF No. 90 at 33. Defendants do not point to any portion of the Amended Complaint that would materially change the Court's analysis.

*National Treasury Employees Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025), the only "new" case Defendants cite to argue finality, does not support the argument that the March 27 Directive is not challengeable under the APA. ECF No. 98 at 34–35. In *Vought*, the plaintiffs asserted that an email asking employees to obtain approval before performing work, and an inferred decision to shut down the Consumer Financial Protection Bureau, qualified as final agency actions. 149 F.4th at 781–82. But that alleged "constellation of discrete actions" is not comparable precedent for the Directive at issue here. *Id.* at 790. Defendants cannot rebrand the March 27 Directive as a "general statement of overarching principles," ECF No. 98 at 35, when in fact the Directive included dozens of concrete, detailed instructions. ECF No. 94 at ¶¶ 62–68; ECF No. 94-2. And, as the First Circuit agreed, the March 27 Directive was immediately followed by the wholesale dismantling of subagencies and the RIF of 10,000 employees. The putative shutdown decision in *Vought*, in stark contrast to the Directive, did not, "by itself[,] effect[] the termination of any employees." *Vought*, 149 F.4th at 784. Less than three weeks after the email at issue in *Vought*, the Chief Legal Officer sent another email clarifying that "[e]mployees should be performing work that is required by law and do not need to seek prior approval to do so." *Id.* at 782. Moreover, the plaintiffs in *Vought* did not seek to challenge any discrete decisions that caused them harm, unlike the Plaintiff States' Amended Complaint in this case. *Id.* at 784; *see supra* (Background Section III) (detailing consequences of the March 27 Directive alleged in the Amended Complaint). In *Vought*, the CFPB leadership "had an opportunity to change course

39

*before* the decision resulted in the denial of any service." *Vought* at 786 (emphasis added). Here, service denials have already occurred. *Vought* does not resuscitate the argument that this Court and the First Circuit have already denied. To restate what has been thoroughly briefed to-date, the March 27 Directive is a final agency action under the APA. Where Plaintiffs have already alleged sufficient facts to support a preliminary injunction (and the subsequent appellate denial of a stay of it), they have exceeded the lower standard required on a motion to dismiss. Accepting the factual allegations in the Amended Complaint as true, and construing reasonable inferences in the Plaintiff States' favor, the factual allegations in the Amended Complaint set forth (more than) a plausible claim upon which relief may be granted as relates to final agency action.

### B. The March 27 Directive should be set aside under 5 U.S.C. § 706(2) and is not committed to agency discretion by law

Defendants raise two other objections to Plaintiff States' APA claims that can be handled simply. First, contrary to Defendant's mischaracterization, Plaintiffs' claims are brought under 5 U.S.C. § 706(2), which allows the reviewing court to "hold unlawful and set aside agency action." *See* ECF No. 94 at ¶¶ 352, 365, 377. By attempting to recast Plaintiffs' claims as seeking to "*compel* agency action unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1) (emphasis added), Defendants invite the Court to apply a more stringent "mandamus-like" standard of review. ECF No. 98 at 49–52. But Plaintiffs do not seek to compel an agency action withheld or delayed. Rather, Plaintiffs seek vacatur of the March 27 Directive and an injunction preventing Defendants from implementing it. *Id.* at 104–05; *See NAACP v. Sec'y of Hous. and Urb. Dev.*, 817 F.2d 149, 160 (1st Cir. 1987) (The "purpose of § 706(2)(A) is to provide for judicial review of agency action and inaction that falls outside its statutory powers."). This Court previously addressed this issue, ECF No. 73 at 50 n.13, and Defendants offer no new reason to justify a different outcome now.

Second, Defendants appear at times to argue the March 27 Directive is "committed to agency discretion" and unreviewable under 5 U.S.C. § 701(a)(2). *See* ECF No. 98 at 53–54 (The decision to undertake a RIF "[a]nd any other programmatic decisions regarding the Department's handling of its statutorily required duties or responsibilities are likewise committed to agency discretion."); *id.* at 54–55 (quoting *Lincoln*, 508 U.S. at 191–92). But the Supreme Court warns that this exception only applies to "rare circumstances where the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Lincoln*, 508 U.S. at 191 (quoting *Webster v. Doe*, 486 U.S. 592, 108 S. Ct. 2047, 100 L. Ed. 2d 632 (1988)). Courts are loath to apply the powerful exception to a new area of agency action. *See Biden v. Missouri*, 595 U.S. 87, 142, 142 S. Ct. 647, 211 L. Ed. 2d 433 (2022) (declining to apply the exception to the Centers for Medicare and Medicaid Services' imposition of new conditions on Medicare and Medicaid grant funds); *City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) (declining to apply the exception to the Department of Justice's decision to place new conditions on Byrne JAG grant funds). Defendants have not cited any case where the 701(a)(2) exception was applied to a RIF and reorganization that effectively collapses an agency. *Cf. McKenna v. Dep't of Interior*, 996 F.2d 1235 (Fed. Cir. 1993) (upholding RIF eliminating Chief Administrative Law Judge position where "agency had an independent, *bona fide* basis for the reorganization" based on Blue Ribbon Committee report).

Here, dozens of statutes outline how the Defendants are to go about their statutory responsibilities. *See generally* ECF No. 94. Defendants' cited authorities for the proposition that "an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities," ECF No. 98 at 41, are all cases where the agency action in question was undisputedly within the bounds of its statutory mandates. *See Scarborough*

41

*Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97 (1st Cir. 2012) (citizen groups challenged agency use of wildlife conservation funds); *Massachusetts*, 549 U.S. 497 (agency denied petition for rulemaking to regulate greenhouse gas emissions under Clean Air Act); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 141 S. Ct. 1150, 209 L. Ed. 2d 287 (2021) (agency modified media ownership rules under Telecommunications Act of 1996); *Littlefield v. Dep't of the Interior*, 85 F.4th 635 (1st Cir. 2023), *cert. denied sub nom. Littlefield v. Dep't of the Interior*, 144 S. Ct. 1117 (2024) (challenge to agency decision to establish Indian reservation.). Defendants' argument that the RIFs are within Defendants' delegated discretion therefore fails.

### C. Plaintiff States adequately pled a claim that the March 27 Directive is contrary to law

As this Court already recognized, the large-scale destruction of statutorily mandated functions and subagencies alleged by Plaintiff States is a viable claim that the March 27 Directive is contrary to law. ECF No. 73 at 41–50.

Defendants offer no serious reason to depart from this conclusion. Defendants assert without citation that "the Department has made clear that it intends to continue carrying out its statutory duties" and that the allegations in the complaint saying that the March 27 Directive prevents it from doing so are "incorrect." ECF No. 98 at 54. This kind of *ipse dixit* does not suffice to dismiss a well-pleaded complaint, where the court takes "all of the pleaded factual allegations in the complaint as true." *Foley*, 772 F.3d at 71. That goes doubly so here, where the Court has already held that because the Directive is "dismantling critical, statutorily mandated functions of the Agency . . . it is contrary to law." ECF No. 73 at 47.

Moreover, even if a "plausibility" standard applied to Plaintiffs' contrary to law claim— which it does not, *see Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013)—Plaintiffs have met their burden. Dozens of statutes mandate the means and mode in which hundreds of programs are to

run, *see, e.g.*, ECF. No. 94 at ¶¶ 167, 172–73, 231 (identifying statutory requirements for PRAMS, OSH, and EHDI). Plaintiffs allege that by firing all of the people capable of performing that work, and by reorganizing several subagencies contrary to the mandates of the statutes, Defendants acted contrary to law. *See, e.g.*, *id.* at ¶¶ 218–24 (alleging elimination of ATSDR), 293–312 (elimination of SAMHSA); *City of Arlington v. FCC*, 569 U.S. 290, 297, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (2013) ("[H]ow [agencies] are to act is authoritatively prescribed by Congress."). This Court has already found that these allegations and the evidence submitted to support them has "substantiated" the allegations that these terminations and reorganizations are contrary to law. *See* ECF No. 73 at 46–47. Defendants' plausibility arguments as to Plaintiffs' contrary to law claims are misplaced and fail on their own terms regardless.

### D. Plaintiff States adequately pled a claim that the March 27 Directive is arbitrary and capricious

"The plausibility standard is a screening mechanism . . . [that] asks whether the complaint contain[s] sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Atieh*, 727 F.3d at 76 (citation modified); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Defendants argue that Plaintiffs "fail to state" APA claims in part on the basis that the facts alleged in the Complaint to support those claims "are largely speculative." *See* ECF No. 98 at 40–44.[13] But "[t]he relevant inquiry is—and must remain—not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's decision." *Atieh*, 727 F.3d at 76. Defendants' factual plausibility arguments fail because First Circuit precedent precludes review of the plausibility of APA claims.

---

[13] To the extent that Defendants' arguments about speculation go to the harmful effects of HHS's actions, those arguments fail for reasons explained in Argument Section I.A.

In *Atieh*, the district court dismissed an alleged claim of arbitrary and capricious agency action as implausibly plead under Rule 12(b)(6) on the defendants' motion and the plaintiffs' erroneous concession that the plausibility standard applied to its factual allegations. 727 F.3d at 76. The First Circuit held that "the parties led the court down a primrose path" and vacated the district court's decision. *Id.* ("APA review . . . involves neither discovery nor trial. Thus, APA review presents no need for screening. It follows that the plausibility standard has no place in APA review.").

Here, Defendants have already agreed that to the extent this case is governed by the APA, "the only factual record should be the administrative record," ECF No. 85 at 4. The Court should, therefore, reject Defendants' misplaced plausibility argument and set a prompt date for production of the Administrative Record in this case consistent with its ruling.

Even under the plausibility standard, however, Plaintiffs' allegations more than meet the requirements of Rule 12(b)(6). The allegations that Defendants highlight (ECF No. 98 at 40) concerning Defendants' failures to engage in reasoned decision-making or consider the consequences of HHS restructuring are corroborated by Secretary Kennedy's own public admissions describing his animus towards HHS and its employees, rendering those allegations more than plausible. *See Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. Dep't of Health & Hum. Servs.*, 557 F. Supp. 3d 224, 246 (D. Mass. 2021). "Most people know by now that the quiet part should not be said out loud," but where it is, the plausibility standard is easily satisfied. *Id.* at 245 (quoting *Cook County, Illinois v. Wolf*, 461 F. Supp. 3d 779, 794 (N.D. Ill. 2020), *motion to certify appeal denied*, No. 19 C 6334, 2020 WL 3975466 (N.D. Ill. July 14, 2020)). After all, this Court already held that Plaintiff States are likely to succeed in showing that the March 27 Directive was arbitrary and capricious. ECF No. 73 at 40–41 ("Unable to perceive

any rational basis for the Agency's actions, the Court concludes that HHS's actions in implementing the March 27 [Directive] were both arbitrary and capricious."). The allegations in the Amended Complaint are more than plausible: they're substantiated.

### III.    Plaintiff States Adequately Pled Violations of the U.S. Constitution

The Separation of Powers doctrine is a central tenet of our Constitution and is "evident from the Constitution's vesting of certain powers in certain bodies." *Seila L. LLC v. CFPB*, 591 U.S. 197, 227, 140 S. Ct. 2183, 207 L. Ed. 2d 494 (2020). Article I of the Constitution allows only Congress to make law. U.S. Const. art. I, § 1. Thus, only Congress may create and define federal agencies. *See Myers v. United States*, 272 U.S. 52, 129, 47 S. Ct. 21, 71 L. Ed. 160 (1926) ("To Congress under its legislative power is given the establishment of offices" and "the determination of their functions and jurisdiction."). The Constitution also "exclusively grants the power of the purse to Congress, not the President." *City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing U.S. Const. art. I, § 9, cl. 7).

Under the structure of the Constitution, "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587, 72 S. Ct. 863, 96 L. Ed. 1153 (1952). Consequently, the Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998); ECF No. 73 at 58 ("The Executive Branch does not have the authority to order, organize, or implement wholesale changes to the structure and function of the agencies created by Congress."). And "settled, bedrock principles of constitutional law" require the Executive to expend the funds that Congress duly authorizes and appropriates. *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.D.C. 2013) (Kavanaugh, J.).

This foundational separation of powers principle is reflected in the Appropriations Clause, which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. And it has been codified in the Impoundment Control Act, which provides that all funds appropriated by Congress "shall be made available for obligation" unless Congress itself has rescinded the appropriation, 2 U.S.C. § 683(b), and that "[n]o officer or employee of the United States may defer any budget authority" except in exceedingly narrow circumstances, *id.* § 684(b); *see also Aiken Cnty.*, 725 F.3d at 261 n.1 ("[E]ven the President does not have unilateral authority to refuse to spend the funds."). Congress has, as detailed *supra* (Background Section I), enacted a series of statutes that require the Department to undertake important, lifesaving work, from preventing HIV/AIDS to providing technical assistance to Head Start Programs. In fact, in Fiscal Year 2024 alone, Congress appropriated $103.7 billion to HHS (not including mandatory entitlement spending).[14]

Though Defendants claim the March 27 Directive "will save taxpayers $1.8 billion per year," ECF No. 94-1 at 2, it is Congress who must make the decision whether to cut programs for taxpayer savings. *Colorado v. Dept. of Health and Human Servs.*, 788 F. Supp. 3d 277, 308–09 (D.R.I. 2025) (holding decision to stop COVID–era programs violated separation of powers). And Congress *has* spoken here, by imposing many mandatory duties on HHS and appropriating funds for the Department to carry out those duties. It is not for the Executive to refuse to spend appropriated funds or to refuse to undertake mandatory work for which Congress has appropriated funds. *Aiken Cnty.*, 725 F.3d at 261 n.1. Defendants' actions usurp Congress's power of the purse by disregarding congressional appropriations and disregarding mandatory statutory duties. *Aids Vaccine Advocacy Coalition v. Dep't of State*, Nos. 25-00400 (AHA), 25-00402 (AHA), 2025 WL

---

[14] David Bradley, et al., Cong. Rsch. Serv. R47936, Labor, Health and Human Services, and Education: FY2024 Appropriations (2024), https://www.congress.gov/crs-product/R47936.

752378, at *17 (D.D.C. Mar. 10, 2025); *Rhode Island v. Trump*, No. 1:25-cv-128-JJM-LDA, 2025 WL 1303868, at *12 (D.R.I. May 6, 2025).

Against this, Defendants assert a free-standing executive power "to forgo spending across a range of circumstances." *See* ECF No. 98 at 58–59. They rely on *Trump v. Mazars USA, LLP*, 591 U.S. 848, 140 S. Ct. 2019, 207 L. Ed. 2d 951 (2020), where President Trump sued targets of congressional subpoenas, financial institutions with which he had dealings, to prevent them from releasing responsive records. ECF No. 98 at 59. Even though Trump himself was not the target of the subpoenas, the Court held that the separation of powers interests were too strong to deny the President a forum. *Mazars*, 591 U.S. at 866. And even though the history of congressional demands for presidential records showed that such tensions were typically resolved in the "hurly-burly" of politics, the courts nonetheless play a role in adjudicating claims that one branch has overstepped, even as to third parties, as President Trump was with respect to the subpoenas at issue. *Compare id.* at 859, 869 *with Donaldson v. United States*, 400 U.S. 517, 531, 91 S. Ct. 534, 27 L. Ed. 2d 580 (1971) (holding taxpayer had no right to intervene in action to enforce administrative subpoena issued to the taxpayer's bank for the taxpayer's records).

*Mazars* thus stands for the exact opposite of what Defendants cite it for, and it is consistent with a long line of precedent holding that Article III courts have the power and are available to enjoin unconstitutional government action where it causes injury. *E.g.*, *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327, 135 S. Ct. 1378, 191 L. Ed. 2d 471 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."); *Am. Fed'n of State and Cnty. Mun. Emps., AFL-CIO v. U.S. Off. of Mgmt. and Budget*, 2025 WL 3018250, at *21 (N.D. Cal. Oct. 28, 2025) (holding reductions in force during the government

shutdown were in excess of the President's constitutional power). The U.S. Constitution established a federal government of limited powers to guard against tyranny and protect individual rights. *See*, *e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 458, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991) ("[T]he separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch . . . . "); *Patchak v. Zinke*, 583 U.S. 244, 249–50, 138 S. Ct. 897 (2018) (holding that the constitutional system prevents "an accumulation [of power] that would pose an inherent 'threat to liberty'" (quoting *Clinton*, 524 U.S. at 450)). Defendants do not have the constitutional authority to implement the March 27 Directive, and Plaintiffs' constitutional claims should not be dismissed.

Defendants argue that if these claims proceed than nothing would stop a plaintiff from transforming "garden-variety" agency action into constitutional claims, ECF No. 98 at 58, but "*Dalton* [*v. Specter*, 511 U.S. 462, 114 S. Ct. 1719, 128 L. Ed. 2d 497 (1994),] suggests that some actions in excess of statutory authority may be constitutional violations, while others may not." *Sierra Club v. Trump*, 963 F.3d 874, 889 (9th Cir. 2020), *vacated and remanded as moot sub nom. Biden v. Sierra Club*, 142 S. Ct. 46, 210 L. Ed. 2d 985 (2021); *see also Child Trends, Inc. v. Dep't of Ed.*, No. 25-1154-BAH, 2025 WL 2379688, at *16 (D. Md. Aug. 15, 2025) (Where executive action not contemplated by Congress independently violates a statute that delegates no authority to the President to interfere, "the separation of powers is clearly implicated."). As one court reviewing mass RIFs recently explained, "[t]he facts of *Dalton* could not be more different from the scenario here," since *Dalton* "challenged Presidential action taken pursuant to statutory authority that Congress delegated to the President," whereas Plaintiffs' claims are about Defendants "acting without *any* authority, constitutional or statutory." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 782 F. Supp. 3d 793, 821 (N.D. Cal. 2025); *see also Am. Fed'n of State Cnty.*

48

*and Mun. Emps, AFL-CIO v. U.S. Off. of Mgmt. and Budget*, 2025 WL 3018250 at \*21; *Youngstown*, 343 U.S. 579.

Defendants also claim, at length, that the remedies Plaintiffs seek under the Appropriations Clause are expenditure of all funds appropriated by Congress. ECF No. 98 at 58. Yet those claims ring hollow as Plaintiffs seek only an injunction against the implementation of the March 27 Directive and a declaration that the Directive was unconstitutional. ECF No. 94 at ¶¶ 336–37, 342–43. Defendants retain any and all lawful discretion to administer the various programs Congress has directed HHS to perform, but they cannot dismantle the agency wholesale thereby preventing it from fulfilling its statutory duties.

## IV.    Plaintiffs Adequately Pled an *Ultra Vires* Claim

"Judicial review for ultra vires agency action rests on the longstanding principle that if an agency action is unauthorized by the statute under which [the agency] assumes to act, the agency has violate[d] the law and the courts generally have jurisdiction to grant relief." *Fed. Express Corp. v. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022) (citation modified). For centuries, federal courts have maintained the authority to enjoin violations of federal law by federal officials. *Armstrong*, 575 U.S. at 326–27.[15]

Administrative agencies "are creatures of statute." *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 117, 142 S. Ct. 661, 211 L. Ed. 2d 448 (2022). "Congress under its legislative power is given the establishment of offices [and] the determination of their functions and jurisdiction." *Myers*, 272 U.S. at 129. No constitutional or statutory authority allows the President or the head of an agency to take actions that incapacitate core statutory functions of an agency that Congress

---

[15] Defendants have tied their arguments against Plaintiffs' *ultra vires* claim to their arguments against the APA, contrary to law, claim. ECF No. 98 at 59. Thus, even taking Defendants at their word, the *ultra vires* claim survives the motion for the same reasons Count IV does.

created. As detailed *supra*, the Executive cannot repeal statutes and must spend funds that Congress appropriated.

Further, Congress limited the Secretary's ability to reorganize HHS agencies in founding statutes that dictated who it authorized to run the program or agency. Where the March 27 Directive reorganization violates that instruction, the Defendants have violated the law. Thus, where the March 27 Directive orders the reorganization of PRAMS, EHDI, and other work of the CDC, it violates the founding statutes:

- PRAMS work must be established and carried out "by the Secretary of [HHS], acting through the Director of the [CDC]," 42 U.S.C. §§ 247b-4f, 247b-13;

- Early Hearing Screenings must be done by the Secretary "acting through the Director of the [CDC]," 42 U.S.C. § 247b-4a;

- Congress created SAMHSA, for one, to operate under the authority of "[t]he Secretary, acting through the Assistant Secretary" of SAMHSA, 42 U.S.C. § 290aa. Many programs within SAMHSA have similar prescriptive reporting structures in statute.

Where the March 27 Directive orders the Agency for Healthcare Research and Quality (AHRQ) into the newly created "Office of Strategy," ECF No. 94-2 at 3, it violates the following laws:

- "There is established within the Public Health Service an agency to be known as the [AHRQ], which shall be headed by a director appointed by the Secretary. The Secretary shall carry out this subchapter acting through the Director," 42 U.S.C. § 299;

- "The Secretary, acting through the Director of the Agency for Healthcare Research and Quality, shall develop scientific evidence in support of efforts to increase organ donation and improve the recovery, preservation, and transportation of organs," 42 U.S.C. § 274f-3;

- "The Secretary, acting through the Director of the Agency for Healthcare Research and Quality, as appropriate, shall provide support for research and dissemination of findings . . . ." 42 U.S.C. § 274f-3.

Where the March 27 Directive orders SAMHSA to merge with four other subagencies to form the new AHA, ECF No. 94-2 at 3, the March 27 Directive violates the founding statutes:

- "The Secretary, acting through the Assistant Secretary [of SAMHSA], shall supervise the functions of the Centers of the Administration . . . [,]" 42 U.S.C. § 290aa(d);

- "The Assistant Secretary [of SAMHSA] shall maintain within the Administration a Center for Behavioral Health Statistics and Quality" which is required to, *inter alia*, "coordinate the Administration's integrated data strategy, including by collecting data each year on [] the national incidence and prevalence of the various forms of mental illness and substance abuse; and [] the incidence and prevalence of such various forms in major metropolitan areas selected by the Director [of the Center for Behavioral Health Statistics and Quality]." 42 U.S.C. § 290aa-4(b).

These statutes represent Congress's deliberate instruction to limit the Secretary from shuffling organizations around as he did in the March 27 Directive.

Furthermore, the March 27 Directive incapacitates many HHS offices from performing their statutorily mandated functions. Employees at DRH's Office managing PRAMS, OSH, NIOSH, DHP, DEHSP, NCBDDD's Office of the Director, CTP, ACF's regional offices, and SAMHA's regional offices were all, or nearly all, noticed for termination. ECF No. 94 at ¶¶ 141, 181, 192, 207, 221, 235, 268, 280, 303. Rather than proportionally tightening the belt across the Department, the March 27 Directive dismissed all the employees responsible for management of certain disfavored programs and projects (many of whom have unique skills, experience, and credentials). Because the March 27 Directive exceeds the Executive's lawful authority, the Amended Complaint properly asserts that Defendants have acted *ultra vires*.

## V.    Defendants' Remaining Arguments Are Unavailing

Finally, Defendants' scattershot arguments in Section IV (ECF No. 98 at 48–55), which attempt to tether generalized arguments about jurisdiction, standing, plausibility and sufficiency to various out-of-context allegations or purportedly missing allegations from the Amended Complaint, fail for the reasons explained above. For example, Defendants argue that Plaintiff

51

States failed to allege that certain specific elements of various HHS programs are not "statutorily required." *See, e.g.*, ECF No. 98 at 48 ("capacity laboratories that test for infectious diseases"), 49 (statute "does not require a certain frequency of meetings" with WTCHP committees), 51 ("[N]either the HIV Medical Monitoring Project nor the National HIV Behavioral Surveillance Project are mandated by statute."). But as explained *supra* (Background Section III, Argument Section II.C.), the wholesale dismantling of HHS subagencies and programs through reductions in force prevented HHS and its subagencies from fulfilling their statutory mandates, and the loss of discrete programs impairs those subagencies' ability to perform their statutorily-required functions. *See McMahon*, 139 F.4th at 69; *Rodriguez-Vives v. Puerto Rico Firefighters Corps of Puerto Rico*, 743 F.3d 278, 283 (1st Cir. 2014) ("A complaint need not allege every fact necessary to win at trial" and should be read "as a whole."). Likewise, Defendants argue that the Amended Complaint fails to allege that the Plaintiff States have a "personal" or "tangible stake" in various narrowly-defined components of the terminated programs, or, that if they do, any harms from termination are too far "downstream" to confer standing. *See, e.g.*, ECF No. 98 at 49 ("Plaintiffs never allege their personal stake" in NIOSH services), 52 (NCBDDD), 53 (strains on state programs are "conjectural harms."). But that argument willfully ignores Plaintiffs' copious, well-pleaded allegations detailing those harms, *see supra* (Background Section III, Argument Section I.A.); *see also Laufer*, 50 F.4th at 270 (traceable "downstream" injuries confer standing). Defendants' arguments that certain of Plaintiff States' claims belong in the Court of Federal Claims (ECF No. 98 at 50–52) fail for reasons explained *supra* (Argument Section I.C.). Finally, Defendants' arguments that many of Plaintiff States' alleged injuries are "speculative" or "nonexistent" in light of Defendants' "continuing" performance of their statutory duties (*see* ECF No. 98 at 65–67) ignore the evidence introduced at the preliminary injunction stage. And that

certain RIFs have been, for now, voluntarily rescinded (*see id.* at 51–52), does not show that these wrongful terminations "could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 189.

## CONCLUSION

The Court should deny Defendants' Motion to Dismiss.

Dated: November 14, 2025.                    Respectfully submitted,

**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ Spencer W. Coates*
Spencer W. Coates
Kelsey E. Endres
*Assistant Attorneys General*
Cynthia Alexander
William McGinty
*Deputy Solicitors General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
spencer.coates@atg.wa.gov
kelsey.endres@atg.wa.gov
cynthia.alexander@atg.wa.gov
william.mcginty@atg.wa.gov

*Counsel for the State of Washington*

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Molly Thomas-Jensen*
Molly Thomas-Jensen
Jessica Ranucci
*Special Counsel*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Andres Ivan Navedo
Molly Brachfeld
*Assistant Attorneys General*
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
molly.thomas-jensen@ag.ny.gov
jessica.ranucci@ag.ny.gov
ivan.navedo@ag.ny.gov
molly.brachfeld@ag.ny.gov

*Counsel for the State of New York*

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Dorothea Calvano Young*
Dorothea Calvano Young
(RI Bar No. 6661)
*Special Assistant Attorney General*
Kathryn M. Sabatini (RI Bar No. 8486)
*Chief, Civil Division*
Sarah W. Rice (RI Bar No. 10465)
*Deputy Chief, Public Protection Bureau*

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Alexa G. Salas*
Alexa G. Salas
*Assistant Attorney General*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Alexa.Salas@azag.gov
ACL@azag.gov

Chandana Pandurangi (RI Bar No. 10922)
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
ksabatini@riag.ri.gov
srice@riag.ri.gov
dyoung@riag.ri.gov
cpandurangi@riag.ri.gov

*Counsel for the State of Rhode Island*

**ROB BONTA**
Attorney General for the State of California

By: */s/ Crystal Adams*
Crystal Adams
*Deputy Attorney General*
Michael L. Newman
Neli Palma
*Senior Assistant Attorneys General*
Kathleen Boergers
Virginia Corrigan
Srividya Panchalam
*Supervising Deputy Attorneys General*
Jesse Basbaum
Jeanelly Orozco Alcala
*Deputy Attorneys General*
1515 Clay Street
Oakland, CA 94612-1499
(510) 879-3428
Crystal.Adams@doj.ca.gov
Michael.Newman@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Virginia.Corrigan@doj.ca.gov
Srividya.Panchalam@doj.ca.gov
Jesse.Basbaum@doj.ca.gov
Jeanelly.OrozcoAlcala@doj.ca.gov

*Counsel for the State of California*

**WILLIAM TONG**
Attorney General of the State of
Connecticut

*Counsel for the State of Arizona*

**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Counsel for the State of Colorado*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

54

By: */s/ Michael K. Skold*
Michael K. Skold
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

*Counsel for the State of Connecticut*


**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Andrew C. Mendrala*
Andrew C. Mendrala
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.mendrala@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
Attorney General of the State of Illinois

Jane Elinor Notz
*Solicitor General*

By: */s/ Alex Hemmer*
Alex Hemmer
Deputy Solicitor General
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
312-814-3000
alex.hemmer@ilag.gov

*Counsel for the State of Illinois*

By: */s/ Vanessa L. Kassab*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*


**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Margaret Machaiek*
Margaret Machaiek
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
August, ME 04333-0006
Tel.: 207-626-8800
Fax: 207-287-3145
margaret.machaiek@maine.gov

*Counsel for the State of Maine*

55

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Michael Drezner*
Michael Drezner
*Senior Assistant Attorney General*
Federal Accountability Unit
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6959
mdrezner@oag.state.md.us

*Counsel for the State of Maryland*

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Astrid Carrete*
Astrid Carrete
Impact Litigation Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
acarrete@nmdoj.gov

*Counsel for the State of New Mexico*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
HaidarD1@michigan.gov

*Counsel for the People of the State of Michigan*

**MATTHEW J. PLATKIN**
 Attorney General of New Jersey

By: */s/ Justine M. Longa*
Justine M. Longa
Jessica L. Palmer
*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-4527
Justine.Longa@law.njoag.gov
Jessica.Palmer@law.njoag.gov

*Counsel for the State of New Jersey*

**DAN RAYFIELD**
Attorney General of the State of Oregon

By: */s/ Elleanor H. Chin*
Elleanor H. Chin
*Senior Assistant Attorney General*
100 Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
elleanor.chin@doj.oregon.gov

*Counsel for the State of Oregon*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

*Counsel for the State of Vermont*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Charlotte Gibson*
Charlotte Gibson
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 (phone)
(608) 294-2907 (Fax)
Charlie.Gibson@wisdoj.gov

*Counsel for the State of Wisconsin*