**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>*Plaintiffs*,<br><br>ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-00196-MRD-PAS |

**BRIEF OF CLAYTON ANDERSON, WANDA IRVING, CHARLES JOHNSON, INDIGENOUS WOMEN RISING, NATIONAL BIRTH EQUITY COALITION, BIRTHMARK DOULA COLLECTIVE, AND 4KIRA4MOMS AS *AMICI CURIAE* IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## CORPORATE DISCLOSURE STATEMENT

Amici Indigenous Women Rising, National Birth Equity Coalition, and 4Kira4Moms are nonprofit corporations or organizations. Birthmark Doula Collective is a Louisiana Limited Liability Corporation. None of the amici has a parent corporation, and no publicly owned corporation owns 10% or more of any amici curiae's stock.

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT ..... ii

TABLE OF AUTHORITIES ..... iv

STATEMENT OF INTEREST OF AMICI CURIAE ..... 1

ARGUMENT ..... 3

A. Protecting Public Health Is a Core Public Interest. ..... 3

B. Maternal Deaths Are a Public Health Crisis. ..... 4

1. Kansas ~ Krystal Anderson ~ Joy Personified. ..... 4

2. Georgia ~ Dr. Shalon Irving ~ Brilliant Epidemiologist and Champion for Health Equity ..... 7

3. California ~ Kira Johnson ~ Adventure Seeker Who Radiated Sunshine ..... 10

C. The Communiqué Threatens the Nation's Maternal Mortality Prevention Infrastructure. ..... 13

1. Maternal Mortality Review Committees ..... 14

2. Pregnancy Risk Assessment Monitoring System ..... 16

3. Perinatal Quality Collaboratives ..... 17

D. Community Organizations Confirm That a Permanent Injunction Would Serve the Public Interest. ..... 18

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Banzhaf v. F.C.C.*,
405 F.2d 1082 (D.C. Cir. 1968) .... 3

*Dutra v. Trustees of Boston Univ.*,
96 F.4th 15 (1st Cir. 2024) .... 4

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
425 F.3d 158 (2d Cir. 2005) .... 3

*Harris Cnty. Texas v. Kennedy*,
No. 25-cv-1275, 2024 WL 1707665 (D.D.C. June 17, 2025) .... 3

*Jaffee v. Redmond*,
518 U.S. 1 (1996) .... 4

*Loving v. Virginia*,
388 U.S. 1 (1967) .... 5

*Pharmaceutical Soc'y of N.Y. v. N.Y. State Dep't of Soc. Servs.*,
50 F.3d 1168 (2d Cir. 1995) .... 3

**STATUTES**

42 U.S.C. § 247 .... 14, 16

Pub. L. No. 115-344, 132 Stat. 5047 (2018) .... 2, 14

**OTHER AUTHORITIES**

*About the Division of Reproductive Health*, Nat'l Ctr. for Chronic Disease Prevention & Health Promotion (May 15, 2024), http://www.cdc.gov/nccdhp/divisions-offices/about-the-division-of-reproductive-health.html .... 13

*About PRAMS*, CDC (May 15, 2024), https://www.cdc.gov/prams/about/index.html .... 16

*About Reproductive Health*, CDC (Jan. 7, 2025), https://www.cdc.gov/reproductive-health/about/index.html .... 16

Apoorva Mandavilli & Roni Caryn Rabin, *Trump's Budget Cuts Funding for Chronic Disease Prevention*, N.Y. Times (May 2, 2025), https://www.nytimes.com/2025/05/02/health/trump-budget-cdc-chronic-conditions.html .... 14

Jessica Glenza, *Trump Administration Eviscerates Maternal and Child Health Programs*, The Guardian (Apr. 5, 2025), https://www.theguardian.com/us-news/2025/apr/05/maternal-child-health-cuts .... 14

*Enhancing Reviews and Surveillance to Eliminate Maternal Mortality*, CDC (Aug. 7, 2024), https://www.cdc.gov/maternal-mortality/php/erase-mm/index.html .... 15

Dr. Veronica Gillispie-Bell, *Opinion: RFK Jr.'s Policies Will Make America's Maternal Mortality Rates Worse*, Yahoo! News (Jun. 6, 2025), https://www.yahoo.com/news/opinion-rfk-jr-policies-america-180235246.html. .... 17

Latoya Hill et al., *Racial Disparities in Maternal and Infant Health: Current Status and Efforts to Address Them*, Kaiser Family Foundation (Oct. 25, 2024), https://www.kff.org/racial-equity-and-health-policy/racial-disparities-in-maternal-and-infant-health-current-status-and-efforts-to-address-them/ .................... 4

Lauren Webber et al., *RFK Jr. Announces Big Cuts to Department of Health and Human Services*, The Washington Post (Mar. 27, 2025), https://www.washingtonpost.com/health/2025/03/27/hhs-cuts-layoffs-rfk-cdc-fda/................ 14

Lorena O'Neil, *How Trump's CDC Purge Will Affect Reproductive Health: 'Women will Die,"* Rolling Stone (Apr. 5, 2025), https://www.rollingstone.com/politics/politics-features/cdc-hhs-layoffs-impact-women-1235310574/. .................... 17

Maria Luisa Martines et al., *An Approach to Antibiotic Treatment in Patients with Sepsis*, 12 J. Thoracic Disease, no. 3, 1007, 1021 (Mar. 23, 2020), https://jtd.amegroups.org/article/view/35952/html .................... 7

*Maternal Mortality Review Committee Guides and Tools*, CDC (May 21, 2024), https://www.cdc.gov/maternal-mortality/php/mmrc/guides-tools.html .................... 15

*Maternal Mortality Review Committee Logic Model*, CDC, https://www.cdc.gov/maternal-mortality/media/pdfs/2025/04/MMRC-Logic-Model-508.pdf (last visited Dec. 1, 2025). ...... 15

Munira Z. Gunja et al., *Insights into the U.S. Maternal Mortality Crisis: An International Comparison*, The Commonwealth Fund (Jun. 4, 2024), https://www.commonwealthfund.org/publications/issue-briefs/2024/jun/insights-us-maternal-mortality-crisis-international-comparison .................... 4

*National Network of Perinatal Quality Collaboratives*, Nat'l Inst. for Children's Health Quality, https://nichq.org/projects/national-network-of-perinatal-quality-collaboratives/ (last accessed Dec. 1, 2025). .................... 17

*Perinatal Quality Collaboratives*, CDC (May 15, 2024), https://www.cdc.gov/maternal-infant-health/pqc/index.html .................... 17

Susanna Trost et al., *Pregnancy-Related Deaths: Data From Maternal Mortality Review Committees in 38 U.S. States, 2020*, CDC (May 28, 2024), https://dspace.njstatelib.org/server/api/core/bitstreams/e42cae83-600e-4d64-8b83-8cce5dfa041f/content .................... 15, 16

Vincent X Liu et al., *The Timing of Early Antibiotics and Hospital Mortality in Sepsis*, 196 Am, J. of Respiratory and Critical Care Med. no. 7, 856, 853 (2017) .................... 7

*Amici curiae* family members who lost loved ones to childbirth complications and organizations that address maternal mortality submit this brief in opposition to Defendants' October 14, 2025, motion to dismiss. Granting Defendants' motion would harm the public interest by undermining federal and state efforts to prevent maternal mortality.

**STATEMENT OF INTEREST OF AMICI CURIAE**

Amici **Clayton Anderson**, **Wanda Irving**, and **Charles Johnson** have each endured the loss of a loved one to preventable pregnancy complications. They represent three of the thousands of families across the nation who now live with the consequences of our country's maternal mortality crisis—a crisis Congress and the Department of Health and Human Services have long sought to address through the very programs now under threat from the March 27, 2025, Communiqué (the "Communiqué") at issue in this case. Their experiences illustrate the public interest in ensuring federal systems designed to prevent maternal deaths remain in place.

Additional amici include community-based organizations working to combat maternal mortality in the United States. They serve on Maternal Mortality Review Committees ("MMRCs"), support families whose loved ones' deaths are being reviewed by MMRCs, and participate in Perinatal Quality Collaboratives ("PQCs"). Each depends on the technical assistance and data infrastructure Congress established through the Preventing Maternal Deaths Act. The Communiqué threatens to dismantle those supports, jeopardizing their work and the lives they strive to protect.

**Indigenous Women Rising** creates space for Indigenous people to tell their stories as acts of resistance, self-love, and survival. Indigenous Women Rising works to advance equity in healthcare access, combining art, research, policy, and community organizing to bring visibility to Native communities. Indigenous Women Rising partners with Indian Health Services to improve

reproductive and postpartum care and serves on the MMRC in New Mexico, where Indigenous women suffer maternal mortality rates 3.5 times the state average.

The **National Birth Equity Coalition** ("NBEC") addresses maternal and infant mortality in Black and Brown communities, where systemic racism and inequities in care contribute to disproportionately high risks of pregnancy-related death. NBEC engages in policy advocacy, research, training, and technical assistance to shift the culture of maternal healthcare toward respect for all people and away from practices that lead to disparate outcomes for communities of color. NBEC relies on federal data sources such as the Pregnancy Risk Assessment Monitoring System ("PRAMS") and contributes expertise to PQCs and MMRCs, which would be hamstrung without federal coordination and support.

**Birthmark Doula Collective** ("Birthmark") is a doula-owned cooperative based in New Orleans, Louisiana, dedicated to supporting, educating, and advocating for pregnant and parenting people and their families. Birthmark focuses on increasing access to respectful, community-centered care for populations facing barriers in accessing the healthcare system. Its mission is to ensure all birthing people have dignified, transformative, and empowering birth and parenting experiences. Birthmark works in partnership with state and local MMRCs and PQCs and depends on the federal technical assistance and data infrastructure now under threat from the Communiqué.

**4Kira4Moms** improves maternal outcomes through advocacy, public education, and peer support for grieving families. It was instrumental in passing the Preventing Maternal Deaths Act of 2018[1]—the very statute that created the federal maternal health infrastructure dismantled by the Communiqué. It also operates a national Maternal Mortality/Morbidity Response Team, which provides wraparound support within 24 hours of a maternal death or near-miss event. Additionally,

---

[1] Preventing Maternal Deaths Act, Pub. L. No. 115-344, 132 Stat. 5047 (2018).

4Kira4Moms provides food, formula, baby supplies, grief counseling, legal assistance, and social service navigation during the critical first year after an incident of maternal death or a near-miss event. In the past five years, 4Kira4Moms has supported roughly 120 families, many of whose losses will be reviewed by MMRCs to shape recommendations to prevent future deaths while this litigation is pending.

## ARGUMENT

The stories of the amici family members and the work of the amici organizations shed light on some of the programs described in Plaintiff States' opposition brief and highlight why the remedy sought in this case—a permanent injunction—serves the public interest. The collective voices of the amici underscore what Plaintiff States have advanced in their opposition filings: halting plans to dismantle the federal maternal health infrastructure is not only within this Court's power, but is essential to protecting families, communities, and the public interest.

### A. Protecting Public Health Is a Core Public Interest.

Courts nationwide have recognized a strong public interest in promoting public health, safety, and welfare. *See, e.g.*, *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (classifying "public health" as a "significant public interest[]"); *Pharmaceutical Soc'y of N.Y. v. N.Y. State Dep't of Soc. Servs.*, 50 F.3d 1168, 1174–75 (2d Cir. 1995) (explaining that ensuring pharmacies providing Medicaid services receive full compensation, which will prevent them from dropping out of the program and "reduc[ing] the number of providers of health care to poor individuals," is in the public interest); *Harris County, Texas v. Kennedy*, No. 25-cv-1275 (CRC), 2024 WL 1707665, at *17 (D.D.C. June 17, 2025) (holding that public health is in the public interest, and "the public has an interest in funding activities aimed at minimizing the spread of [infectious] diseases."). Indeed, "[w]hatever else it may mean . . . the public interest indisputably includes the public health." *Banzhaf v. F.C.C.*, 405 F.2d 1082, 1096 (D.C. Cir. 1968);

*see also Dutra v. Trustees of Boston Univ.*, 96 F.4th 15, 21 (1st Cir. 2024) (observing that "protection of public health and safety interests and securing compliance with government health orders" are in the public interest); *see generally Jaffee v. Redmond*, 518 U.S. 1, 11 (1996) (declaring that the mental and physical health of "our citizenry" are "public good[s] of transcendent importance").

**B. Maternal Deaths Are a Public Health Crisis.**

The United States has the highest maternal mortality rate among high-income nations, which has risen over the past few decades.[2] The risk is even higher for Black and Indigenous women and women in rural communities, where access to quality healthcare is limited.[3] After losing a loved one to pregnancy-related maternal death, families are left to rebuild their lives. Their stories of loss say more than statistics can about the maternal mortality crisis in the nation.

**1. <u>Kansas ~ Krystal Anderson ~ Joy Personified.</u>**

The world lost Krystal Anderson on March 20, 2024, to sepsis that developed after the stillbirth of her daughter, Charlotte. Amicus Clayton Anderson glows when speaking of his late wife: "Krystal was most known for being a [Kansas City] Chiefs cheerleader, but she was just a cheerleader in life for anybody. . . . She was going to become your friend and then have your back and support you no matter what," Clayton explained. "In your highest of highs and your lowest of lows, she just wanted to always be there, and she wanted good things to happen for her people."

---

[2] Munira Z. Gunja et al., *Insights into the U.S. Maternal Mortality Crisis: An International Comparison*, The Commonwealth Fund (Jun, 4, 2024), https://www.commonwealthfund.org/publications/issue-briefs/2024/jun/insights-us-maternal-mortality-crisis-international-comparison.

[3] Latoya Hill et al., *Racial Disparities in Maternal and Infant Health: Current Status and Efforts to Address Them*, Kaiser Family Foundation (Oct. 25, 2024), https://www.kff.org/racial-equity-and-health-policy/racial-disparities-in-maternal-and-infant-health-current-status-and-efforts-to-address-them/.

Krystal was a doer—up early, always moving, striving for excellence. After college, she joined a hospital software company, where she worked for 18 years. Her evenings were devoted to cheerleading, mentoring cheerleaders, and teaching yoga. Clayton later joined her at the same company. They got engaged just before the pandemic and bought a home near an elementary school. "That was our next chapter—our plan for the future," Clayton said. Krystal envisioned walking their children to school, attending the Halloween parade, and "lovingly" spying on them at recess from their kitchen window. At day's end, they found joy in spending simple time together—on the couch with their rescue dogs, Sprocket and Louis Armstrong. "It's also the time at the end of the night when you really realize she's not there anymore," Clayton said. Each year, Clayton and Krystal marked birthdays and anniversaries—always honoring the anniversary of *Loving v. Virginia*, 388 U.S. 1 (1967), the Supreme Court decision that made interracial marriages like theirs possible. To Clayton, Krystal was joy personified, and for eight years, he cherished every moment with her.

Because of her work on maternal health applications for her software company, Krystal entered pregnancy aware of the risks, particularly for Black women: "She knew the statistics and that Black and Brown women do not get the same level of care as white women or Asian women," Clayton said. "The time she spent working with . . . maternal health applications was the most rewarding part of her work." Krystal and her team developed patented software that digitized the calculation of blood loss during postpartum hemorrhage, replacing the crude practice of weighing blood-soaked rags. Their program also assessed risks arising from that loss. "She was really proud of that—as she should have been. It was a big deal. And it's tragic the way everything played out," Clayton said.

The couple's first pregnancy ended in loss. Krystal was at a Chiefs game, assisting cheerleaders, when she suddenly felt ill. In the ER, staff first suspected COVID-19, but she sensed something else was wrong. During the sonogram, Clayton realized the heartbeat on the screen was Krystal's, not their baby's. Forty-five minutes later, they learned their son, James, had died and that a C-section was required. Krystal developed sepsis, which was treated over three days, and the hospital let them spend time with James. "Even though our son was dead, we could still hold him and talk to him," Clayton said.

They committed to doing everything possible to make the next pregnancy succeed—therapy, planning, checkups. On November 26, 2023, Krystal approached Clayton as he exercised, beaming. "She pulled out the pregnancy test from behind her back, and I almost fell off the bike." Joy quickly turned to guarded hope. Early on, a subchorionic hemorrhage resolved. They focused on milestones: passing week 12, then week 16, when a cerclage—a stitch on the cervix—was placed on Krystal as a preventative measure to guard against premature birth. Then, the doctor's office cancelled Krystal's 18-week appointment, saying it was unnecessary. Krystal and Clayton questioned the office's decision, but "we also didn't want to be difficult patients, either," Clayton said. "You know, you play the what if game?"

At week 20, they learned the cerclage had failed. The doctors warned of the possibility of early delivery and sent them home. Clayton wishes they had been hospitalized for monitoring. Four days later, they returned to the hospital knowing something was wrong. That night, Charlotte's heart stopped. Then the unthinkable—Krystal began to go septic, and the hospital missed the signs. "We're there in the hospital, and they missed them," Clayton said. At 2:30 a.m., she complained that she was seeing spots. Protocols were delayed. "With sepsis, every hour your

mortality risk can go up 9%," Clayton said.[4] "When they delayed the start of the sepsis protocol, they set her behind the eight ball from the get-go."

After surgery to remove Charlotte, Krystal suffered lung, liver, and kidney failure. She never regained consciousness. "I hope she could hear me talking to her those three days in the hospital, but I don't know," Clayton said. "She didn't open her eyes after that surgery." Clayton has read the 1,487 pages of her medical records—twice—and is certain her death was preventable. MMRC committees, supported by the CDC's Division of Reproductive Health (the "Division"), exist to identify such preventable deaths and share lessons with communities nationwide so these tragedies are not in vain. After Krystal's death, Clayton recalls being told by a friend, "You know, Krystal's candle didn't get to burn very long, but man did it burn bright." A foundation now carries her name, focused on that brightness—the uplifting legacy Krystal would want.

Krystal's death is expected to come before the Kansas MMRC during the pendency of this litigation. Thanks to the preliminary injunction, the Kansas MMRC should continue to receive technical support and resources from the Division as it reviews Krystal's death and those of others in the state that year—ensuring the lessons learned can be shared and applied to help prevent future losses.

2. **<u>Georgia ~ Dr. Shalon Irving ~ Brilliant Epidemiologist and Champion for Health Equity</u>**

[4] *See also* Maria Luisa Martines et al., *An Approach to Antibiotic Treatment in Patients with Sepsis*, 12 J. Thoracic Disease, no. 3, 1007, 1021 (Mar. 23, 2020), https://jtd.amegroups.org/article/view/35952/html ("In 2017, in a large retrospective and multicenter study of 35,000 patients with sepsis admitted to the ED, Liu *et al.* reported that each elapsed hour between presentation and antibiotic administration was associated with a 9% increase in the mortality risk.") (citing Vincent X Liu et al., *The Timing of Early Antibiotics and Hospital Mortality in Sepsis*, 196 Am, J. of Respiratory and Critical Care Med. no. 7, 856, 853 (2017)).

Three weeks after giving birth to her daughter, Soleil, Dr. Shalon Irving lost her life to complications of high blood pressure. Shalon's death has had a devastating ripple effect on her community: Soleil lost a mother; Amicus Wanda Irving lost a daughter and best friend; and the world lost a bright, brilliant mind devoted to justice and equity.

"Shalon's life philosophy was: 'I see inequity wherever it exists. I'm not afraid to call it by name and work hard to eliminate it,'" said Wanda. With two Ph.D.s and two master's degrees—and a goal of earning a clinical social work degree in the future—Shalon devoted her career to ensuring marginalized communities have access to healthcare. "Shalon was always looking out for the underdog," Wanda recalled. "That started with her older brother, who had multiple sclerosis. She fought for him to get health insurance and the best possible treatment. She would fly back and forth to his doctor's appointments, even when she was in graduate school and working on her doctorate. That was just the kind of person she was."

After graduate school, Shalon became a Lieutenant Commander in the U.S. Public Health Service and later joined the CDC's Division of Violence Prevention. Using her training as a sociologist and a gerontologist, she specialized in women's health, with a focus on addressing the disparities that contribute to poor health outcomes for Black women. Although her work was busy, Shalon made time to run marathons and travel worldwide. "For the last eight years of her life, Shalon and I traveled together to Europe at least once a year. She always found the best hotels and the best deals, and took me places I had never been and never even heard of," Wanda said.

Even as Shalon poured herself into her work and hobbies, her dream was to become a mother. "That was the most important thing to her," recalled Wanda. "With all her degrees, all her accolades, she said that her greatest achievement was having Soleil." Shalon had tried to become pregnant for years, but fertility treatments were unsuccessful. When she unexpectedly learned she

was pregnant with Soleil, she was ecstatic but nervous. "Shalon knew all about the challenges faced by Black women during pregnancy. She did a lot of research and found a great OB/GYN and made a really detailed birth plan," Wanda explained.

During Shalon's pregnancy, she developed Factor 5 Leiden, a condition that affects blood clotting. She scheduled a C-section because she had a history of benign fibroids. Her delivery went smoothly, and she was discharged from the hospital quickly. "Three or four days after Soleil was born, Shalon started to feel a little off," said Wanda. "It started with a lump on her C-section incision. She was told to go to a women's health clinic because the OB/GYN's office wouldn't see her after she had the baby," Wanda said. "At first, the doctor at the clinic said it was nothing to worry about, but she happened to run into her OB/GYN in the elevator. Her OB/GYN took a look and knew her scar had to be monitored." A visiting nurse checked on the scar, noticed Shalon's blood pressure was steadily rising, and referred her to a high-risk doctor for follow-up treatment.

Wanda explained: "When Shalon went to see the high-risk doctor, they quickly dismissed her. Basically, they thought she was being overly dramatic, like she couldn't accept that she had just had a baby and these are normal side-effects of giving birth." But Shalon knew something was wrong. As her blood pressure steadily rose, her limbs swelled and she developed a persistent headache. But each time she went to the doctor, they sent her home without treatment.

"On her last appointment, the nurse took Shalon's blood pressure and said, 'This can't be right, there must be something wrong with the machine,'" recalled Wanda. Shalon insisted on seeing a doctor, but no one came. "The nurse left Shalon alone for 20 or 25 minutes, then returned with a prescription for blood pressure medication. Shalon asked to see the doctor, and the nurse told her he was too busy. I wanted to scream. I wanted to yell. But I tried to remain calm, because I didn't want to get us kicked out of the office," said Wanda.

That night, Shalon and Wanda returned home to pack for an upcoming trip. "It was a prepaid trip we were looking forward to, and we had gotten Soleil's passport ready. Shalon insisted we had to take this trip, even though I was worried about her health," said Wanda. "Shalon said she wasn't feeling well, so she asked me for one of the blood pressure pills. I gave it to her, then twenty minutes later, I heard her collapse. She never regained consciousness."

Wanda sees systemic healthcare failures at each stage of Shalon's pregnancy. Wanda knows studying maternal mortality cases like Shalon's is crucial to preventing them. According to the Georgia MMRC, 87% of pregnancy-related deaths in the state from 2015–2017—which covers the time of Shalon's death—were preventable. Empowering MMRCs to understand the causes of pregnancy-related deaths and develop interventions is a key step in addressing maternal mortality.

After Shalon's death, Wanda started Dr. Shalon's Maternal Action Project, a nonprofit devoted to promoting maternal health equity. "If Shalon were here today, she would want us to recognize that maternal mortality has no respect for person, income, social status, or anything else," said Wanda. "Shalon was so educated, and she was a great advocate for herself. Any woman could be Shalon, and we need to do everything we can to make sure that their stories end differently than Shalon's."

**3. <u>California ~ Kira Johnson ~ Adventure Seeker Who Radiated Sunshine</u>**

Kira Johnson lost her life on April 12, 2016, after a routine C-section left her bleeding internally for hours. Despite pleas from Kira and her husband, Amicus Charles Johnson, doctors failed to intervene to save her until it was too late.

Charles beams with pride when he recalls the special—almost unbelievably unique—person his wife was: "Kira's energy was contagious. She believed there were no limitations in life, no limit to how big the sky could be." She always managed to squeeze more out of 24 hours than anyone else he had ever met. Kira was fearless—an adrenaline junkie who had her pilot's license;

an avid skydiver; a polyglot; someone who was always chasing the next adventure. Early on, when Charles would tell his friends about her, they assumed she was a figment of his imagination. But Kira was very real—and she pushed Charles to become a better person in every aspect of his life.

More than any adventure, Kira was most excited to be a mother. "She was so excited that she started planning our son's first birthday party before he was even born," recalled Charles. They welcomed their son, Charles Jr., into the world while living together in Atlanta. Throughout her first pregnancy, Kira was healthy and supported by a wonderful local obstetrician team. She and Charles planned for a natural childbirth. When the moment came, things shifted—Charles Jr.'s heart rate began to drop while Kira was in labor, and she had to undergo an emergency C-section. Thankfully, Charles Jr. was born healthy. "We joked that he wanted to make a dramatic entrance into the world," said Charles. Kira's recovery was steady and uncomplicated.

Kira and Charles planned to continue what they jokingly called the "Johnson Family's sketchy adventures" throughout parenthood. "We talked about raising men that would change the world—and we knew if we wanted to raise men that would change the world, we would have to show them as much of the world as possible," said Charles. Kira took that responsibility seriously. "She started practicing Mandarin lessons with Charles, Jr., when he was just a toddler. And it was only after she died that I discovered she was filming those lessons. It is such a gift that we still have those videos today to watch."

Parenthood never slowed them down. Kira continued to fly planes, and the couple traveled with their 6-month-old baby. They dreamed of living abroad with their children—maybe somewhere in Europe. Kira dreamed of being a "boy mom," and the couple thought it would be special to have boys back-to-back. When they found out they were expecting another boy, they were thrilled. By then, life had brought them to Los Angeles, and they set out to find the best care

team for Kira and their second son. They researched carefully and met with several providers, choosing an older physician whose bedside manner was comforting. Throughout her second pregnancy, all signs pointed to Kira and their son being perfectly healthy. Her doctor recommended a scheduled C-section because of Kira's history. Trusting his judgment, they agreed.

Toward the end of the pregnancy, their doctor introduced the idea that another physician might be involved in the delivery. "Coming from a large practice in Atlanta, this was not something we were concerned about," Charles said. But at their final visit before their due date, their doctor insisted that they meet his colleague, which they found odd.

On April 12, 2016, they arrived for their scheduled delivery. Charles remembers the scene vividly—both doctors were present, but the new doctor to whom they had just been introduced barely acknowledged them. The intake nurses whispered about how it was "a lot" for their new doctor to be performing a C-section after a 12-hour shift. Charles overheard one nurse swear. She had never seen a baby delivered so fast during a C-section. Their son Langston was born healthy. Family gathered to congratulate them in the hospital room. "Everything we prayed for was finally here," Charles said.

While Kira rested, Charles noticed blood in her catheter. He immediately notified nurses and doctors who came in and examined Kira. They ordered tests, including an emergency CT scan that never happened. Kira's condition worsened. She was writhing in pain, shivering uncontrollably, and growing pale. Their family had gone home, and they were alone. Charles pleaded with the nurses for help. "One nurse told me, 'Sir, your wife just isn't a priority right now,'" Charles recalled. As Kira's condition continued to deteriorate, nurses left the room and never returned.

After more than ten hours, medical staff finally took Kira to emergency surgery. "The last thing Kira said to me was, "'I'm scared,'" Charles said. "The doctor told me not to worry. He said that it wasn't a big deal and assured me that Kira would be back in 15 minutes. That was the last time I saw her alive." Emergency surgery revealed their new doctor had lacerated Kira's bladder during her C-section. She had been bleeding internally for hours, leaving 3 liters of blood in her abdomen. Kira died in surgery. Charles later learned the doctor spent less than three minutes delivering Langston—far below what the standard should be for a repeat C-section.

After Kira's death, Charles started 4Kira4Moms, a nonprofit dedicated to combating maternal mortality through education, advocacy, and legislation. He often thinks of what Kira would do or say in any given parenting moment and sees her story and stories like hers as powerful tools to effect change: "Although there is nothing we can do to bring Kira back, the highest honor we can pay her is to do everything we can to send other mothers home with their babies," Charles said. "These things should be core tenets that we believe in—regardless of what color you are, who you love, and how you vote. It should be a fundamental part of our fabric to prioritize mothers giving birth to healthy babies—and then living to raise those children. That is the least we can do as a society."

### C. The Communiqué Threatens the Nation's Maternal Mortality Prevention Infrastructure.

The Division of Reproductive Health has been developing and implementing programs related to women's health and pregnancy care for almost 60 years.[5] The Division provides essential funding and technical support to help states combat maternal mortality, improve the quality of healthcare for infants and mothers, and systematize the collection and analysis of data on maternal

[5] *About the Division of Reproductive Health*, Nat'l Ctr. for Chronic Disease Prevention & Health Promotion (May 15, 2024), https://www.cdc.gov/nccdphp/divisions-offices/about-the-division-of-reproductive-health.html.

and infant health.[6] The Communiqué from Department of Health and Human Services Secretary Robert F. Kennedy Jr.—part of the "Department of Government Efficiency" initiative—dramatically reorganized the department.[7] It merged 28 divisions into 15, laid off or reassigned thousands of employees, and proposed eliminating the National Center for Chronic Disease Prevention and Health Promotion, including the Division.[8] The Communiqué seeks to defund and dismantle the Division's work, gravely undermining national and state efforts to study, address, and prevent maternal mortality and morbidity.[9]

**1. <u>Maternal Mortality Review Committees</u>**

In 2018, Congress enacted the Preventing Maternal Deaths Act in response to the rising maternal mortality crisis in the United States.[10] This legislation and its reauthorization through fiscal year 2028 authorizes the CDC to support state and tribal MMRCs in identifying, analyzing, and preventing pregnancy-related deaths.[11] MMRCs are multidisciplinary committees comprising a diverse range of stakeholders.[12] Each year, MMRCs review deaths that occurred during or within

---

[6] *Id.*

[7] *See* Lauren Webber et al., *RFK Jr. Announces Big Cuts to Department of Health and Human Services*, The Washington Post (Mar. 27, 2025), https://www.washingtonpost.com/health/2025/03/27/hhs-cuts-layoffs-rfk-cdc-fda/.

[8] *Id.*; Apoorva Mandavilli & Roni Caryn Rabin, *Trump's Budget Cuts Funding for Chronic Disease Prevention*, N.Y. Times (May 2, 2025), https://www.nytimes.com/2025/05/02/health/trump-budget-cdc-chronic-conditions.html.

[9] *See* Jessica Glenza, *Trump Administration Eviscerates Maternal and Child Health Programs*, The Guardian (Apr. 5, 2025), https://www.theguardian.com/us-news/2025/apr/05/maternal-child-health-cuts.

[10] Pub. L. No. 115-344, 132 Stat. 5047 (2018); *see also Preventing Maternal Deaths Reauthorization Act of 2023*, Pub. L. No. 118-20, 138 Stat. 100 (2024) (amending 42 U.S.C. § 247b-12) (reauthorizing FY 2024–2028).

[11] *See* 42 U.S.C. § 247b-12.

[12] 42 U.S.C. § 247b-12(d)(1)(A).

1 year of pregnancy to determine the cause of death and develop recommendations for prevention of similar deaths in the future.[13]

Before MMRCs can meet, they gather all applicable data, prepare de-identified case narratives, and ensure adherence to standardized assessment protocols. These processes are both time- and resource-intensive.[14] The Division provides critical financial and logistical support to help MMRCs achieve their mission through the *Enhancing Reviews and Surveillance to Eliminate Maternal Mortality* ("ERASE MM") initiative,[15] which delivers essential funding and technical assistance to MMRCs and develops and implements standardized tools, such as the Maternal Mortality Review Information Application ("MMRIA") and the MMRIA Dashboard, which allow for systematic data collection and visualization.[16] These tools enable MMRCs to assess the circumstances surrounding maternal deaths, determine preventability, and recommend actionable strategies for prevention.[17] Additionally, the Division's funding helps MMRCs hire necessary staff members to locate and analyze data and manage and support meetings and recommendations.

In addition to supporting individual MMRCs, the Division aggregates de-identified case data submitted through MMRIA to identify national trends and persistent disparities in maternal outcomes.[18] This work has revealed that the overwhelming majority of pregnancy-related deaths—

---

[13] Susanna Trost et al., *Pregnancy-Related Deaths: Data From Maternal Mortality Review Committees in 38 U.S. States, 2020*, CDC (May 28, 2024), https://www.cdc.gov/maternal-mortality/php/data-research/index.html.
[14] *See, e.g.*, *Maternal Mortality Review Committee Logic Model*, CDC https://www.cdc.gov/maternal-mortality/media/pdfs/2025/04/MMRC-Logic-Model-508.pdf (last visited Dec, 1, 2025) (describing the extensive inputs and activities that lead to short, immediate, and long-term outcomes to eliminate preventable maternal death and reduce maternal morbidity).
[15] *Enhancing Reviews and Surveillance to Eliminate Maternal Mortality*, CDC (Aug. 7, 2024), https://www.cdc.gov/maternal-mortality/php/erase-mm/index.html.
[16] *Id.*; *see also Maternal Mortality Review Committee Guides and Tools*, CDC (May 21, 2024), https://www.cdc.gov/maternal-mortality/php/mmrc/guides-tools.html.
[17] *Id.*
[18] *Id.*

approximately 80 percent—are preventable.[19] The Division emphasizes an equity-centered approach, encouraging MMRCs to examine social determinants of health, engage community stakeholders, and address racial and ethnic disparities in maternal mortality.[20]

The Division's efforts extend beyond surveillance, encompassing research, policy translation, and global maternal health initiatives.[21] In this way, the work carried out under MMRIA exemplifies the Division's broader mission: to use data-driven public health strategies to protect the lives and well-being of pregnant and postpartum individuals.[22]

**2. <u>Pregnancy Risk Assessment Monitoring System</u>**

The Division also leads the Pregnancy Risk Assessment Monitoring System ("PRAMS"), a state-based surveillance project that collects population-level data on maternal experiences before, during, and shortly after pregnancy.[23] Implemented in collaboration with state and territorial health departments, PRAMS captures self-reported information on a wide range of topics, including prenatal care access, maternal stress, substance use, chronic conditions, birth control use, and experiences of discrimination.[24] Importantly, PRAMS data are stratified by race, ethnicity, and geography, enabling public health officials and researchers to uncover disparities and design equity-focused solutions.

Through its stewardship of PRAMS, the Division equips policymakers, clinicians, and advocates with the evidence necessary to craft informed, responsive, and life-saving maternal and

---

[19] *See* Susanna Trost et al., *Pregnancy-Related Deaths: Data From Maternal Mortality Review Committees in 38 U.S. States, 2020*, CDC (May 28, 2024), https://www.cdc.gov/maternal-mortality/php/data-research/index.html.
[20] *Id.*
[21] *About Reproductive Health*, CDC (Jan. 7, 2025), https://www.cdc.gov/reproductive-health/about/index.html.
[22] *Id.*
[23] *See About PRAMS*, CDC (May 15, 2024), https://www.cdc.gov/prams/about/index.html.
[24] *Id.*; *see also* 42 U.S.C. § 247b-13(a).

infant health policies.[25] The Division is also responsible for standardizing and weighing the raw data submitted through PRAMS to ensure high-quality analysis. Eliminating critical staff positions within the Division would result in the cessation of all future data collection activities under PRAMS and has the potential to erase all historic PRAMS data, which researchers and policymakers continue to rely on today.

**3. <u>Perinatal Quality Collaboratives</u>**

Finally, the Division provides critical support to Perinatal Quality Collaboratives ("PQCs"), multidisciplinary teams that develop systems for improving the quality of maternal and infant healthcare.[26] The CDC funds 36 state-based PQCs and provides technical support to PQCs through the National Network of Perinatal Quality Collaboratives.[27] CDC support allows PQCs to collaborate across states and build capacity to address the primary causes of maternal death, including hemorrhage and mental health conditions.[28] Along with MMRCs, PQCs are responsible for measurable improvements in reproductive healthcare across the country.[29] MMRCs and PQCs work together—first to identify the causes of maternal deaths, and then to identify and implement solutions to address the causes, including developing new diagnostic criteria for leading causes of

---

[25] *See Id.*; *see also* Lorena O'Neil, *How Trump's CDC Purge Will Affect Reproductive Health: 'Women will Die,"* Rolling Stone (Apr. 5, 2025), https://www.rollingstone.com/politics/politics-features/cdc-hhs-layoffs-impact-women-1235310574/ ("'We cannot understand factors associated with poor pregnancy outcomes without surveillance like PRAMs,' Taylor says.").
[26] *Perinatal Quality Collaboratives*, CDC (May 15, 2024), https://www.cdc.gov/maternal-infant-health/pqc/index.html.
[27] *Id.*
[28] *See, e.g.*, *id.*; *National Network of Perinatal Quality Collaboratives*, Nat'l Inst. for Children's Health Quality, https://nichq.org/projects/national-network-of-perinatal-quality-collaboratives/ (last accessed Dec. 1, 2025).
[29] *See* Dr. Veronica Gillispie-Bell, *Opinion: RFK Jr.'s Policies Will Make America's Maternal Mortality Rates Worse*, Yahoo! News (Jun. 6, 2025) https://www.yahoo.com/news/opinion-rfk-jr-policies-america-180235246.html.

death and introducing and integrating hospital-based interventions.[30] Without continued CDC support for PQCs, cross-state opportunities for collaboration and knowledge-sharing will be lost.

### D. Community Organizations Confirm That a Permanent Injunction Would Serve the Public Interest.

The Division's funding and technical support are essential drivers in the fight against maternal mortality. Rachael Lorenzo, the founder of Amicus Indigenous Women Rising, illustrates how MMRIA creates a data feedback cycle to inform recommendations for improvement: "A representative of Indigenous Women Rising sits on the New Mexico MMRC. Through this work, we learned that Native women are 3.5 times more likely to die of pregnancy-related causes than their peers," she said. "The MMRC and data collection efforts at the federal level have allowed us to identify this disparity and make specific recommendations to address it. That includes advocating for Medicaid coverage for doulas and midwives and establishing hospital policies that allow Native women to integrate spiritual and traditional care during their pregnancy." Likewise, Dr. Joia Crear-Perry, the Founder and President of Amicus NBEC, explained, "Comparing state-by-state data has allowed us to recognize stark racial disparities and the impact of maternity care deserts on maternal health outcomes. With federal coordination, we have been able to . . . see the disparities, while also identifying how we can make a difference. For example, our review of the data has led us to work on increasing access to mental health services and improving screening for anxiety and depression during and after pregnancy."

---

[30] *Id.* ("This is an example of how [MMRCs and PQCs] work together: In Louisiana, our maternal mortality review identified obstetric hemorrhage as our leading cause of pregnancy-related deaths in 2018. As a result, the Louisiana Perinatal Quality Collaborative (LaPQC) through the reducing maternal morbidity initiative and the safe births initiative worked to implement the AIM obstetric hemorrhage patient safety bundle. As a result, Louisiana mothers experiencing hemorrhage saw a 39% decrease in severe maternal morbidity (SMM), with a 58% decrease among Black women.").

PQCs also play a key role in building responsive, equitable, and accessible infant and maternal healthcare systems by leveraging community expertise to create recommendations for future guidelines. Steph Visco of Amicus Birthmark explained that PQCs are an important way for community organizations like Birthmark to learn how to better support their clients. "During the last several years, we have learned so much about our client population and how to better serve them through our work on the Louisiana PQC. For example, we have learned that our client base faces an increased risk of premature labor. This has influenced our practices as community health workers and helped us develop new initiatives—like training our doulas and our clients on how to recognize the signs and symptoms of hypertension and preeclampsia. It has also helped us engage with other health care providers and enhanced our referral system across the maternal health landscape in Louisiana."

The Division's support for MMRCs and PQCs is a relatively recent initiative in the fight to reduce maternal mortality, but it fills a crucial gap. Dr. Crear-Perry described the critical role of the Division's financial support for MMRCs: "Before 2019, the United States didn't have an accurate way of counting and evaluating maternal deaths. MMRCs didn't have the people they needed to do this work—ranging from interviewers to epidemiologists. But all of this became possible with [the Division] funding."

Allowing the Communiqué to take effect would jeopardize the progress Dr. Crear-Perry has seen and halt all future state and national efforts to analyze data and share recommendations to prevent maternal mortality. As Dr. Crear-Perry explained, "We have realigned our resources within the [Division] to help address the underlying causes of maternal deaths. To take away that office now that we finally have traction on eliminating this crisis would be a terrible thing."

4Kira4Moms supported the passage of the Preventing Maternal Deaths Act of 2018. Today, it advocates nationally for legislation to decrease the maternal mortality rate, educates families on how to protect each other, and provides rapid response to families who have been impacted by maternal mortality. Many of the families 4Kira4Moms supports have loved ones whose deaths will be analyzed by MMRCs during the course of this litigation. Gabrielle Albert, the Executive Director at 4Kira4Moms, underscores the human cost of maternal mortality: "You can't fix a life once it's gone. . . . Kira will never be back . . . . And families are being ravaged for no reason, on what should be the most important days of their lives."

The Division's programs are not abstract bureaucratic exercises, but the scaffolding that enables communities to demand accountability, expose systemic racism, and press for reforms that save lives. The Communiqué would demolish that scaffolding, silencing communities and stripping away the federal partnership that makes the vital work of prevention and improvement possible. The stories of amici curiae and the work of their organizations make plain what is at stake in this case: the sudden, devastating loss of mothers, daughters, and partners whose deaths are overwhelmingly preventable. Congress created and funded the very infrastructure now under threat precisely to prevent such tragedies. The Communiqué, if allowed to take effect, would dismantle the foundation on which families and communities rely to demand accountability, expose systemic inequities, and save lives.

## CONCLUSION

For the foregoing reasons, amici curiae respectfully urge this Court to deny Defendants' motion to dismiss.

Respectfully submitted,

Dated: December 2, 2025

/s/ Lynette Labinger
Lynette Labinger (RI Bar #1645)
*Cooperating Counsel*
ACLU FOUNDATION OF RHODE ISLAND
128 Dorrance St., Box 710
Providence, RI 02903
Phone: (401) 465-9565
ll@labingerlaw.com

Jamila Johnson*
*Co-director, Litigation*
Allison Zimmer*
*Senior Counsel*
LAWYERING PROJECT INC.
900 Camp St., No. 1197
New Orleans, LA 70130
Phone: (347) 706-4981 (JJ)
Phone: (347) 515-6074 (AZ)
Fax: (646) 480-8622
jjohnson@lawyeringproject.org
azimmer@lawyeringproject.org

Juanluis Rodriguez*
*Litigation Counsel*
LAWYERING PROJECT INC.
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1080
Fax: (646) 480-8622
prodriguez@lawyeringproject.org

Ronelle Tshiela*
*Litigation Fellow*
LAWYERING PROJECT INC.
1525 S. Willow St., Unit 17, No. 1156
Manchester, NH 03103
Phone: (347) 429-9834
Fax: (646) 480-8622
rtshiela@lawyeringproject.org

*Motion for admission *pro hac vice* forthcoming

Counsel for *Amici Curiae*

## Certificate of Service

I hereby certify that on June 1, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Rhode Island by using the CM/ECF system. I certify that all participants in the case are registered as ECF Filers and that they will be served by the CM/ECF system.

/s/ Lynette Labinger
Lynette Labinger