**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,<br><br>Defendants. | Case No. 1:25-Civ-00196 |

**PLAINTIFFS' FIRST MOTION FOR DISCOVERY**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

ARGUMENT ............................................................................................................ 6

I. The Court Should Order Defendants to Complete the AR. ............................................... 8

A. The AR is Incomplete. ................................................................................... 9

B. Defendants Cannot Hide Behind the Deliberative Process Privilege. .......................... 17

II. The Court Should Order Supplementation of the AR to Aid in the Court's Review. ....... 22

III. The Court Should Order Extra-Record Discovery to Determine the True Reasoning Behind Defendants' Actions. .................................................................................... 24

IV. Plaintiffs are Further Entitled to Discovery on their Constitutional and *Ultra Vires* Claims. ................................................................................................................ 25

CONCLUSION ........................................................................................................ 26

## INTRODUCTION

Plaintiff States allege that Secretary of Health and Human Services Robert F. Kennedy, Jr. and the U.S. Department of Health and Human Services (HHS or the Department) (collectively, Defendants) violated the Administrative Procedure Act (APA) by issuing the March 27 Communiqué on March 27, 2025. The March 27 Communiqué announced the Department's decision to issue Reduction-in-Force (RIF) notices to 10,000 employees and eliminate dozens of component agencies as part of a massive reorganization of the Department. The APA makes clear that Plaintiffs are entitled to the entire record before the agency at the time it made this decision. However, the Administrative Record (AR) produced by Defendants is plainly deficient. Consisting of only twenty documents, the AR contains no documents whatsoever explaining how, why, or by whom the decision to issue and implement the March 27 Communiqué was made; why particular RIF notices were sent and component agencies eliminated; or how the March 27 Communiqué would achieve its claimed benefits. Defendants have since refused to provide basic information that could explain how such a threadbare AR could be complete; information such as the identity of the decisionmakers and the method and scope of their search for documents.

Accordingly, Plaintiffs respectfully request that the Court require Defendants to respond to discovery requests which are permissible under the APA in these circumstances. Plaintiffs ask the Court to: (1) order HHS to complete the AR and produce a log of relevant documents withheld for privilege; (2) order HHS to supplement the AR with agency records related to factors that it was required to consider under the APA before issuing and implementing the March 27 Communiqué; and (3) order extra-record discovery to clarify the mismatch between the reason for the March 27

Communiqué and the reason given. Plaintiffs have attached to this motion proposed Requests for Production (Exhibit A)[1] and Interrogatories (Exhibit B).

**BACKGROUND**

Defendants have offered four reasons they decided to notice for termination 10,000 of their own employees and effectively shutter dozens of sub-agencies. According to Defendants' public statements and the March 27 Communiqué itself, the RIFs and reorganization were designed to save the taxpayers $1.8 billion per year, "combat waste, fraud, and abuse in federal health programs," "implement the Make America Healthy Again goal of ending the chronic disease epidemic," and "mak[e] the agency more responsive and efficient." Am. Compl., ECF No. 94 ¶¶ 67–74.[2] Additionally, Secretary Kennedy assured the public that he could "eliminate an entire alphabet soup of departments while preserving their core functions by merging them into a new organization called the Administration for a Healthy America or AHA." *Id.* ¶ 69.

But Secretary Kennedy knew, ex ante, that the RIFs and reorganization were proceeding without the level of deliberation and care required by the APA. Not only did Secretary Kennedy know the planned RIFs and reorganization included "mistakes," *id.* ¶ 83, he knowingly declined a "line-by-line-by-line review" of each employee's job responsibilities before noticing individuals for termination. *Id.* ¶ 81.

Defendants had help in assembling the details—the who, what, where, and when—of the RIFs and reorganization. Secretary Kennedy made no secret that he developed the plan with the U.S. Department of Government Efficiency (DOGE), which approved all hiring decisions at the

---

[1] Citations herein to "Exhibit ___" are to the Declaration of Andres Ivan Navedo filed on September 11, 2026.

[2] Unless otherwise indicated, all docket citations herein are to the docket in this matter.

time. *Id.* ¶ 56; Exec. Order No. 14210 § 3(b), 90 Fed. Reg. 9669 (Feb. 11, 2025). Secretary Kennedy openly discussed Defendants' cooperation with DOGE to the press: "at DOGE, we talked about this from the beginning, [] we're going to do 80% cuts, but 20% of those are going to have to be reinstated, because we'll make mistakes." *Id.* ¶ 80. Defendants also collaborated with both the Office of Management and Budget (OMB) and the Office of Personnel Management (OPM) which approved the plans for the RIFs and reorganization. *See* Exec. Order No. 14210 § 3(e) (directing agency heads to submit reports of "any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities and to "discuss whether the agency or any of its subcomponents should be eliminated or consolidated"); *see also id.* at NYvK-AR-000102 (Thomas Nagy, Chief Human Capital Officer, requesting OPM approval of competitive areas to be subject to RIFs).

The March 27 Communiqué was implemented on April 1, 2025. ECF No. 94 ¶ 75. Plaintiff States filed this lawsuit on May 5, 2025, ECF No. 1, bringing causes of action under (1) the Appropriations and Spending Clauses of the U.S. Constitution; (2) the APA prohibitions on agency actions that are contrary to law and arbitrary and capricious; and (3) the Court's common law power to curtail *ultra vires* actions. *Id.* ¶¶ 319–58. This Court entered a preliminary injunction on July 1, 2025, ECF No. 73; *see also* ECF No. 89, and denied Defendants' Motion to Dismiss on April 7, 2026, ECF No. 113.

The case then moved into discovery, and Defendants agreed to produce the AR—that is, all materials relied upon, either directly or indirectly, by agency decisionmakers—on June 8, 2026. ECF No. 114. But with seven weeks to prepare, Defendants produced an AR comprising just **<u>20 documents</u>** and **<u>no privilege log</u>**. "The June 8 AR," attached as Exhibit J; *see also* ECF No. 117-1 (Index). The AR includes: (1) Executive Order 14210 and an accompanying fact sheet; (2)

guidance from OMB and the OPM about implementing Executive Order 14210; (3) the March 27 press release and fact sheet announcing the RIFs and reorganization; (4) an overview of the functions and work performed by the Food and Drug Administration (FDA) and the Administration for Children and Families (ACF) (two of the 28 HHS divisions at issue in this litigation); (5) a series of emails between HHS and OPM seeking approval of designated competitive areas; (6) lists of employees who were laid off; and (7) sample materials sent to laid off employees. *Id.*

Plaintiffs sent Defendants a deficiency letter on June 22, "Plaintiffs' June 22 Letter," attached as Exhibit C, identifying categories of documents that were completely missing from the AR. Plaintiffs attached public documents to their June 22 Letter, each of which show that relevant documents were missing from the AR. Those missing categories of documents were:

- The AR included "no information that the agency relied upon in reaching the decision to issue the specific RIFs at issue, when to issue them, which employees would be RIFed, or which divisions of the Department would be impacted by RIFs," Ex. C, 2;
- The AR included no documents that "relate to the reorganization announced in the March 27 Communiqué, including any materials relied upon to decide which component agencies would be eliminated, reorganized, or created as new component agencies," *id.*;
- The AR did not reveal, and Defendants had not disclosed, the identity of the agency decisionmakers of the March 27 Communiqué, *id.* at 3;
- The AR failed to identify "whether any briefings occurred with agency decisionmakers at which materials and information was provided," *id.*;
- The AR did not mention, and included no information related to, DOGE despite its key role in crafting the RIFs and reorganization, *id.* at 3–5;
- The AR included no documents related to Defendants' claimed benefits of the March 27 Communiqué, including "financial or cost-saving analyses, redundancy analyses of reliance interests, or any other relevant material," *id.* at 5;
- The AR lacks materials "upon which decisionmakers might have relied to analyze which functions of any of the impacted component agencies of the Department were statutorily mandated" or how those functions would continue after implementation of the March 27 Communiqué, *id.* at 5;

- The AR contained no materials considered by decisionmakers regarding how Departmental services would not be affected by the sweeping March 27 Communiqué (e.g., Medicare and Medicaid services, food and drug reviews and inspections, clinical trials, and NIOSH functions), *id.*;
- The AR contained no materials to show Defendants expected the March 27 Communiqué to promote Secretary Kennedy's policy priorities including "ending America's epidemic of chronic illness by focusing on safe, wholesome food, clean water, and the elimination of environmental toxins," *id.* at 6.

The Defendants agreed to review Plaintiff States' concerns, ECF No. 118, 1, but after two weeks produced just one email and attachment missing from the first AR, "Document 12.1," attached as Exhibit K (Exhibits K & J, collectively, "the AR"); *see also* ECF No. 119-1 (Index of Revised AR). Defendants also took the position that the deliberative process privilege justified withholding all collected documents save for the 20 included in the AR. "Defendants' July 2 Letter," attached as Exhibit D. Defendants asserted that documents subject to the deliberative process privilege are properly "exclude[d]" from the AR, and that they had no obligation to create or serve a privilege log. *Id.* at 3.

Plaintiffs requested clarification of Defendants' positions on July 20, 2026, and repeated their request that Defendants describe the method and scope of the search for relevant documents in light of the unaddressed deficiencies. "Plaintiffs' July 20 Letter," attached as Exhibit E.

Defendants again declined to provide any responsive information regarding the method and scope of their search for records and responded with only a blanket invocation of the deliberative process privilege: "[A]ll documents withheld by Defendants as attorney-client or work-product protected are also protected under the deliberative process privilege. Accordingly, Defendants would need to produce a privilege log as to those documents only upon a 'showing of bad faith or improper behavior,' which Plaintiffs have not made." "Defendants' July 31 Letter" at 2, attached as Exhibit F. Defendants also stated that the AR "contains all non-privileged documents

that the decisionmakers at the Department of Health and Human Services directly or indirectly considered before undertaking the actions challenged in this lawsuit." *Id.* at 1.

The parties have reached an impasse on two issues. *First*, whether the AR is complete (which it is not). These 20 documents, as evidenced both by their small number and deficient content, could not possibly represent all the non-privileged documents before Defendants when they designed and implemented the March 27 Communiqué. In fact, public documents raised to opposing counsel in June, and attached to this motion, show the AR is incomplete. *Second*, whether Defendants must file a privilege log (which they must). Defendants' blanket assertion that all relevant documents save for the 20 included in the AR are protected by the deliberative process privilege, and stubborn refusal to provide any information as to the scope and method of collection used to assemble the AR, justifies the Court ordering Defendants to log their withholdings.

As currently assembled, the threadbare AR prevents this Court from effectively reviewing the challenged agency action under the requirements of the APA, and, therefore, it is facially deficient.

## ARGUMENT

The Court should order completion of the record, supplementation of the record, and extra-record discovery to aid its review of this case. Under the APA, a court must review the Secretary's decision based on "the full administrative record that was before the Secretary at the time he made his decision." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *see also* 5 U.S.C. § 706 (in evaluating agency action, "the court shall review the whole record"). To that end, an AR "must consist of all documents and materials directly or indirectly considered by the agency decision-makers and include[] evidence contrary to the agency's position." *Roe v. Mayorkas*, No. 22-cv-10808, 2024 WL 5198705, at *7 (D. Mass. Oct. 2, 2024) (citation modified). A complete

AR includes "not only materials directly considered by the agency decisionmaker, but also all materials that might have influenced the agency's decision, including any work and recommendations of subordinates on which the agency decisionmaker based his or her decision." *Batalla Vidal v. Duke*, No. 16-cv-4756, 2017 WL 4737280, at *5 (E.D.N.Y. Oct. 19, 2017) (citation modified).

A party may seek to add to the AR as initially produced in several ways. First, where a party demonstrates that the agency failed to include materials that influenced the decision-making process, a court may order the agency to complete the record. *Mayorkas*, 2024 WL 5198705, at *7; *see also Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1, 14 (D.D.C. 2015), *on reconsideration*, 164 F. Supp. 3d 56 (D.D.C. 2016). To complete the record, the court need not issue a finding of bad faith. *Mayorkas*, 2024 WL 5198705, at *2.

Second, courts may order supplementation of the record with additional documents that should have been part of the decision-making process but were left out of the AR. The court "may consider supplemental evidence to facilitate [its] comprehension of the record of the agency's decision," including "when [the court is] faced with a failure to explain administrative action as to frustrate effective judicial review." *City of Taunton v. EPA*, 895 F.3d 120, 127 (1st Cir. 2018); *see also Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) ("[The] district court is free to exercise its discretion to permit further discovery 'to ascertain the contours of the precise policy'" under review).

Third, where an agency does not disclose the basis of its decision, or if the moving party offers a "strong showing of bad faith or improper behavior," a court may permit extra-record discovery, including allowing discovery of a broader range of documents and use of other discovery devices such as interrogatories or depositions. *Housatonic River Initiative v. EPA*, 75

F.4th 248, 278–79 (1st Cir. 2023) (citation omitted). Such bad faith exists when the agency provides pretextual reasons for the challenged action. *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019) (extra-record discovery is appropriate where there is "a significant mismatch between the decision the Secretary made and the rationale he provided").

In this case, completion of the record, supplementation of the record, and extra-record discovery are all appropriate. Plaintiffs have attached to this motion proposed discovery requests, Exs. A, B, and they reserve the right to seek additional discovery.

**I. The Court Should Order Defendants to Complete the AR.**

The government is required to complete the AR in cases where, as here, it has omitted materials that were part of the decisionmaking process. *Mayorkas*, 2024 WL 5198705, at *7. Completion of the record is warranted if a party provides "reasonable, non-speculative grounds to believe that materials considered in the decisionmaking process are not included in the record." *Id.*; *see Univ. of Colo. Health*, 151 F. Supp. 3d at 13.

This Court must rest its evaluation of the sweeping March 27 Communiqué on a record that includes all documents and materials "directly or indirectly considered by the agency decision-makers." *Mayorkas,* 2024 WL 5198705, at *7 (citing *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F2d 1458–59 (1st Cir. 1992)). Other courts presiding over challenges to the same agency action have already ordered extensive discovery. *See Jackson v. Dep't of Health and Hum. Servs.*, No. 1:25-cv-01750, ECF No. 37, Am. Scheduling Order (D.D.C. August 18, 2026) (ordering document productions of over fourteen custodians by January 11, 2027, and anticipating depositions of all); *see also New York v. McMahon*, No. 25-10601-MJJ (D. Mass. April 1, 2026) ECF No. 210 (granting discovery including requests for production of documents, interrogatories, requests for admission, and Rule 30(b)(6) deposition).

Defendants' blanket invocation of the deliberative process privilege withholds an unknown number of documents from the AR, and the Court should not allow Defendants to hide behind this qualified privilege. Instead, the Court should order Defendants produce a privilege log. *See infra* Section I.B.

**A. The AR is Incomplete.**

The AR lacks multiple categories of documents that Defendants relied upon in reaching their decision to implement the RIFs and reorganization in the March 27 Communiqué. There is strong evidence, both within the AR itself and from public sources, that Defendants relied on non-privileged documents when making their decision. Those documents are missing from the AR. This Court should order Defendants to complete the record with those documents by responding to Requests for Production Nos. 1–11, *see* Ex. A, as well as Interrogatories Nos. 1–5, *see* Ex. B.

<u>The AR Does Not Disclose the Factors Defendants Considered Before Noticing 10,000 HHS Employees for Termination.</u>

The AR omits information that the agency relied upon in reaching its decision to issue RIFs including how individuals were selected to be RIFed, when the RIFs should be issued, and which divisions of the Department should face more RIFs than others. Without those documents, the AR provides no grounds from which this Court may evaluate the reasoning of the agency's decision.

Public disclosures in the media and in other litigation make plain that the Defendants' decision to RIF was based on significant documents. In an email produced as part of the consolidated agency file submitted to the Merit Systems Protection Board in a matter involving the April 1 RIFs,[3] "MSPB Record," attached as Exhibit G, Jennifer Wade (FDA's then-Acting

[3] *HHS RIF FDA CDER v. Department of Health and Human Services*, MSPB Docket No. CF-0351-26-0076-I-1 (April 9, 2026).

Director, Division of Reorganizations and Delegations of Authority) forwarded a "summary of decisions" regarding the reorganization at FDA to Rachel Riley (DOGE liaison to HHS) reflecting decisions made during their discussion on March 17. Ex. G, 56 of 354; *see also id.* ("FDA will first conduct a large-scale RIF and then realign functions and personnel to the new structure (implement on October 1, 2025).") (emphasis added). In another excerpt from the MSPB Record, HHS and DOGE personnel considered post-RIFs staffing estimates in deciding who to RIF and how to reorganize. Ex. G, 66 of 354 ("Once we have the final post-RIF staffing positions identified, we will identify all of the positions for realignment based on function."). These emails and others like them in the MSPB Record are absent from the AR and must be included.

The AR Does Not Disclose the Factors Defendants Considered Before Drastically Reorganizing HHS.

The AR omits documents related to the decision to reorganize the Department, including any materials Defendants may have relied upon to decide which component agencies would be eliminated, which would be merged, which would be left alone, and what justified creating new subagencies comprised of several old ones, including AHA.

Public documents show that Defendants considered the scope and timing of the reorganization. According to the MSPB Record, at least with regards to the FDA, Defendants considered and rejected proceeding according to the usual process and timing for implementing the reorganization. Ex. G, 65 of 354 ("The typical reorganization development and clearance process is 6-18 months. . . . Typically, we develop a proposal, clear it through FDA, HHS, and OMB and then formally notify Congress. After notification, we announce the new structure to staff."); *id.* ("At the same time, we [FDA] also need to rewire our processes given the significant impact to our operations."). And separately, according to the MSPB Record, HHS considered an

undated presentation, with no confidentiality designation, titled "Reorganization Priorities Slides," that detailed precisely the sort of agency action analysis of the large-scale RIFs that Defendants failed to include in the AR here. Ex. G, 258 of 354.

The MSPB Record includes several more relevant documents missing from the AR:

- **"fda.xlsx"**: A March 17, 2025 spreadsheet sent from Rachel Riley (HHS-DOGE) to Dr. Sarah Brenner (HHS-FDA), apparently containing a list of employees with a request for Brenner to identify which employees at FDA to retain or "delete." Ex. G, 157 of 354.

- **"FDA Shared Services - Recommendation 2025 03 19.docx"**: A document created March 19, 2025, outlining FDA's proposal for a "shared services model" indicating which sub-agency functions could be "centralized" to "facilitate 2025 reorganization realignment." Ex. G, 60–62 of 354.

- **"FDA proposed 2025.03.31. 3.pdf"**: A document created March 31, 2025 showing a "simple high-level future state chart" for FDA following the March 27 "reorganization," with an explanation that the proposed org chart "reflects [FDA's] understanding of what IOS agreed to for the future state structure." Ex. G, 65–67 of 354.

Nor does the AR include emails from Debra Houry, the Chief Medical Officer and Deputy Director for Program and Science at CDC at the time of the RIFs and reorganization. "The Houry Emails," attached as Exhibit H. The Houry Emails were released by the Senate HELP Committee earlier this year and appear to have been relied upon by agency decisionmakers when implementing the reorganization. Those emails show that HHS employees created several documents analyzing the effects and rationale of the March 27 RIFs, such as:

- "**NIOSH and NCEH Essential Functions Options.docx**": A document created prior to April 27, 2025 by CDC personnel purportedly outlining the essential functions of NIOSH and NCEH for purposes of, inter alia, "bring[ing] all NIOSH staff in 'critical functions' until their RIF end date."

- "**NIOSH lab closure/animal disposition memo**": A memo drafted prior to April 3, 2025 that outlined procedures for NIOSH lab closures following the RIFs, among other items.

- "**ASPR-CDC integration-high level picture**": A document created prior to April 3, 2025 purportedly outlining plans for integrating the Administration for Strategic Preparedness and Response (ASPR) into the CDC as part of the restructuring.

None of these documents, or any like them, were included in the AR. The AR lacks any analysis done by *any* affected HHS sub-agency of which departments and employees were to be retained or "deleted," or why. There is not one document evidencing any plans for "future states" of these sub-agencies, no forward-looking organizational charts, no informational documents identifying subagencies or areas with inefficiencies, nor any memoranda detailing the effects and consolidation plans for any of the numerous, reorganized HHS sub-agencies. Indeed, the AR includes what appears to be an incomplete list of some of the employees HHS terminated, Ex. J, NYvK-AR-000206–367, but not the information Defendants used to select those employees. A complete AR must include informational documents upon which Defendants relied when deciding how best to reorganize.

<u>The AR Does Not Disclose the Identity of the Decisionmakers.</u>

Defendants have twice refused to identify who were the decisionmakers within HHS responsible for the directive in the March 27 Communiqué. That refusal adds mystery to how Defendants could have captured the universe of documents relied upon to terminate 10,000 employees and reorganize the enormous Department on just 20 documents. Without identifying the actual decisionmakers, the AR is facially incomplete.

<u>The AR Omits All Mention of DOGE and Its Members Despite Their Critical Role Supporting Decisionmaking.</u>

Despite compelling evidence that DOGE was critical in the design and implementation of the March 27 Communiqué (HHS's own website admitted that "DOGE work[ed] with HHS Divisions on the largest HHS restructuring in 50 years," *Celebrating Big Wins of the Trump Administration*, Dep't of Health and Hum. Servs., available at https://perma.cc/5SLL-5M94), the AR is devoid of any details related to DOGE. This omission again renders the AR incomplete.

What is present in the AR is little more than a list of *what* employees and departments DOGE chose to eliminate—there is no record of what factors and information DOGE provided Defendants for the purpose of making those choices.

The AR shows that a "DOGE Team Lead" was assigned to HHS for the purpose of implementing large-scale RIFs. *See, e.g.*, Ex. J, NYvK-AR-000009 ("Agency heads should collaborate with their [DOGE] team leads within the agency in developing competitive areas for ARRPs"). But the AR is silent as to who that representative was, what information they provided, and the extent of their "collaboration."

Outside of the AR, evidence of DOGE's key role in the Department's decision-making is overwhelming. One day after the March 27 Communiqué, Secretary Kennedy confirmed that **Elon Musk**, then-acting head of DOGE, played an active role in the HHS mass layoffs, including creating a new "org chart" for HHS and deciding which departments to "consolidate."[4]




> Thanks to Elon and by the way, what Elon did with our agency is going to help our agency. So I'm very grateful to him. He came in for the first time with a real org chart for the agency. The agency org

---

[4] NewsNation, *RFK Jr. on HHS cuts 'We're not cutting frontline workers'* | *CUOMO*, at 3:17, YouTube (Mar. 28, 2025) https://youtu.be/RYOwE-r7p4M?si=ktP-1RzT-PiYB6cv&t=197.

> chart when I arrived was incomprehensible . . . What Elon is doing is he's using AI [artificial intelligence] to improve health, to improve efficiency, to improve delivery, and he had a bunch of geniuses come over to the department, create an org chart that worked, and consolidated.

And the role of DOGE in the March 27 Communiqué goes well beyond Elon Musk. In other lawsuits involving DOGE's involvement in HHS affairs in 2025, the Department has testified that at least the following other individuals acted as "DOGE Team Affiliates" to HHS in 2025: Brad M. Smith; Rachel Riley; Amy Gleason; Luke Farritor; Edward Coristine; Marko Elez; Kyle Schutt; Conor Fennessy; Zach Terrell; and Jeremy Lewin. Transcript of 30(b)(6) Deposition of HHS, *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.,* No. 25-cv-00339 (D.D.C. Apr. 29, 2025), ECF No. 82-3 at 11:21–12:9. "HHS Deposition Transcript," attached as Exhibit I; *see also Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, No. 25-cv-00339, 2026 WL 879518, at *3 (D.D.C. Mar. 31, 2026) (adding that at least one additional DOGE affiliate, Aram Moghadassi, joined HHS by mid-February.).

These DOGE employees provided documents and materials considered by Defendants that are missing from the AR. For instance, **Brad M. Smith**, the "DOGE lead to HHS," Ex. I, 41:18–19, served as the public face for DOGE operations at HHS in media interviews including on the day of the March 27 Communiqué.[5] In filings to MSPB, HHS identified Mr. Smith's position during RIF planning as "Senior Advisor to the Secretary," and his role as "[p]articipated in senior-level meetings and advised the Secretary on the high-level, Department-wide objectives of the

[5] *See* Fox News, *Elon Musk and DOGE team give behind the scenes look at their mission*, YouTube (March 27, 2025) https://www.youtube.com/watch?v=l7kQNwJ4H_w.

RIF . . . . Oversaw RIF plans drafted by Rachel Riley in direct coordination with operating and staff divisions." Ex. G, 37 of 354.[6]

Similarly, **Rachel Riley,** another "Senior Advisor to the Secretary," "[d]rafted RIF plans across the Department in direct coordination with operating and staff divisions." Ex. G, 36–37 of 354. Several emails in the MSPB Record confirm Ms. Riley played an active role in the RIFs leading up to March 27:

- **March 17, 2025**: An email from Rachel Riley to Dr. Sarah Brenner (FDA) titled "FDA Spreadsheet for Input." This email references and attaches a "spreadsheet discussed at the meeting today" detailing nearly every office within the FDA (along with the number of employees working within them), and Ms. Riley asking Dr. Brenner for "input" on which employees to "delete." Ex. G, 157 of 354.
- **March 18, 2025:** An email from Jennifer Wade (FDA) to Rachel Riley forwarding a "Draft Summary of Decisions" for FDA's "large-scale RIF" plans, including competitive area approach and reorganization actions post-RIFs. Ex. G, 56 of 354. In this email, Ms. Wade stated the FDA was "conducting additional analysis based on this approach." *Id.*
- **March 22, 2025:** An email between Rachel Riley and Jennifer Wade (FDA) detailing FDA's approach to External Affairs Post-RIF, including recommendations of which offices to retain and which ones to cut. Ex. G, 53 of 354.

The AR contains none of these documents, nor does it contain any mention of Mr. Musk, Mr. Smith, Ms. Riley, or any other DOGE affiliate.[7] The AR does not contain the DOGE "org charts" referenced by Secretary Kennedy or any documentation of the meetings DOGE reportedly

---

[6] Other courts, including those within the First Circuit, have recognized Mr. Smith's role in directing other "DOGE"-related directives, such as the mass terminations of grants at the NIH. *See, e.g., Am. Pub. Health Ass'n v. Nat'l Insts. of Health,* 791 F. Supp. 3d 119, 144–75 (D. Mass. 2025) (describing Mr. Smith and Ms. Riley's role as DOGE officials at the National Institute of Health within HHS).

[7] Nor does the Record contain any email, document, or mention of the numerous other DOGE employees HHS has already admitted played roles in implementing the March 27 RIFs including Zach Terrell (Senior DOGE Advisor), whom, according to HHS, was "[r]unning queries in OHR database, producing spreadsheets, generating PDFs, [and] sending emails as directed by senior agency leadership" in connection with the FDA RIF. Ex. G, 39 of 354.

had with HHS agency heads. The AR does not contain any explanation or document about what "AI" programs DOGE might have used to create the analyses relied upon by decisionmakers. See RFK Interview, *supra* at 14. It does not contain the "RIF plans" drafted by Ms. Riley, or any communications between Ms. Riley and sub-agency heads concerning the RIFs at issue in this case. Many of those communications are public; HHS even produced them in other tribunals before beginning collection for an AR in this case.

Ultimately, over a year after publicly touting DOGE's active role in the restructuring at issue in this case, Defendants produced an AR devoid of any indication that DOGE had anything to do with the RIFs and reorganization at HHS. This leaves the AR incomplete.

<u>OPM and OMB Documents</u>

OPM and OMB also played a well-publicized role in assisting Defendants' decision to implement the March 27 Communiqué. Nine of the 20 documents in the AR either originated from or were sent to OPM, and seven of those predate the April 1 RIFs. ECF No. 119-1 (Doc Nos. 3, 8–16). Those documents indicate review and approval of the RIFs memorialized in the March 27 Communiqué, and if OPM commented on or advised Defendants on the RIFs proposed, then those communications would have contained information that was before the agency decisionmakers and therefore should have been produced as part of the AR. *See Authors Guild v. Nat'l Endowment for the Humans.,* No. 25-cv-3657 (CM), 2025 WL 3678097, at *6 (S.D.N.Y. Dec. 18, 2025) (noting that all documents considered by agency decisionmakers are subject to inclusion in the AR regardless of their "custodial location" or whether they were generated by other agencies, offices, or officials within the federal government); *see also California v. U.S. Dep't of Homeland Sec.*, 612 F. Supp. 3d 875, 890–91 (N.D. Cal. 2020) (holding inter-agency communications, including communications from White House staff to the agency, may be subject to inclusion in the AR).

Further, OMB approval of the RIFs was required by Executive Order. *See* Exec. Order No. 14210 §§ 3(c), (e). If OMB advised on earlier versions of the RIFs, or if they answered Defendants' questions about the RIFs, that information similarly would belong in the AR.

Ultimately, the AR is not only facially incomplete, Plaintiffs have shown Defendants that the AR omits relevant documents that are publicly avialable. And while Defendants contend that the Court would need to find "clear evidence" that the AR is incomplete to overcome the presumption of regularity, Ex. D, 1, Plaintiffs have made such a showing. *Mayorkas*, 2024 WL 5197805, at *8 (rejecting the presumption of regularity where Plaintiffs "have already identified documents that were omitted from the initial administrative record and appear directly relevant to the issues and time period before this Court."). Thus, the presumption of regularity does not prohibit this Court from ordering Defendants to complete the AR.

**B. Defendants Cannot Hide Behind the Deliberative Process Privilege.**

Defendants insist that all documents withheld from this facially deficient AR are protected by the deliberative process privilege. Ex. F, 2 ( " . . . [T]o the best of Defendant's knowledge, all documents withheld by Defendants as attorney-client privileged or work-product protected are also protected under the deliberative process privilege."). But Defendants' refusal to describe the scope and method of collection, their blanket assertion of privilege over an untold number of documents from an untold number of document custodians, and insistence that the privilege applies to documents that postdate the Communiqué or are purely informational and, in many instances, are already public, justifies the Court declining to permit withholding on this basis. Rather, the Court should order Defendants to respond to Plaintiffs' discovery requests, *see* Exs. A,

B, and produce a privilege log sufficient to evaluate the claim of privilege for each withheld document.[8]

The deliberative process privilege protects "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Mayorkas*, 2024 WL 5198705, at *3 (citing *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021)). "To qualify for the deliberative process privilege, a document must be (1) 'predecisional,' that is, prior to the adoption of the agency policy, and (2) 'deliberative,' that is, related to the policy-making process." *In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35, 39 (D. Mass. 2008) (citing *Texaco P.R., Inc.*, 60 F.3d at 884).

Even as to documents that meet the privilege criteria, courts have discretion to decline application of the privilege. "Because the deliberative process privilege is 'qualified' and 'not absolute,' the First Circuit has described it as a 'discretionary privilege,' which means that even if a record satisfies the elements of the privilege, 'nondisclosure is not automatic.'" *Sierra Club v. U.S. Army Corps of Eng'rs*, No. 2:20-CV-00396-LEW, 2023 WL 4350730, at *3 (D. Me. July 5, 2023) (quoting *Texaco P.R., Inc.*, 60 F.3d at 885); *see also In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. at 40 ("Even if a document is both predecisional and deliberative, nondisclosure is not automatic."). "In exercising its discretion . . . , a court 'should consider, among other things, the interests of the litigants, society's interest in the accuracy and integrity of factfinding, and the public's interest in honest, effective government.'" *In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. at 40 (quoting *Texaco P.R., Inc.*, 60 F.3d at 885); *see*

---

[8] Plaintiff States reserve the right to challenge designations of privilege at a later date.

*also New York v. McMahon*, 826 F.Supp.3d 184, 198 (D. Mass. 2026) ("The deliberative privilege is a qualified one, it is not absolute."). All such interests, in this case, favor declining the privilege.

Here, Defendants' blanket application of the privilege is implausible and effectively unreviewable. Defendants have refused to disclose whose documents were searched, how documents were collected and reviewed, when the decision to announce and implement the challenged agency action was made or by whom, and the basis for asserting the privilege in each instance. *See* Ex. C, 3 ("Plaintiffs are therefore concerned that whatever scope and method you used to gather the Administrative Record was inadequate"); Ex. E, 2–3 ("Plaintiff States understand Defendants to take the position that any apparent omissions from the Administrative Record are due to claims of deliberative process privilege, and therefore Defendants refuse to review the methodology used to gather the record."). Defendants, thereby, assert the privilege over an unknown number of documents of custodians, but they must not be allowed to shirk their burden of establishing the applicability of the privilege. *See Exxon Mobil Corp. v. Mnuchin*, No. 3:17-cv-1930, 2018 WL 10396585, at *4 (N.D. Tex. June 26, 2018) ("[E]xcusing Defendants from the requirement of providing a privilege log would essentially vitiate their burden of establishing the applicability of the privilege."). Multiple courts have held, as this one should, that the proper remedy to a blanket invocation of privilege is ordering a privilege log. *Id.* (finding "blanket invocations of the deliberative process privilege are impermissible," and ordering production of a privilege log); *Sierra Club v. U.S. Army Corps of Eng'rs*, 2023 WL 4350730, at *7 (ordering production of a privilege log); *McMahon*, 826 F.Supp.3d at 198 n.3 (same).

Public documents offer clear evidence the Defendants are overextending the privilege to withhold documents that are neither "predecisional" nor "deliberative."

First, the decision to RIF and reorganize was made sometime before March 27, 2025 yet Defendants assert that documents, which Plaintiffs presented back to them and dated days *after* the Communiqué, are "predecisional." *See* Ex. C (containing, as "Exhibit 2," a March 31, 2025 email from Jennifer Wade to Sara Brenner: "HHS is required by statute to notify Congress regarding FDA's reorganization proposals prior to implementation."). The Houry Emails, as well, overwhelmingly postdate the Communiqué and cannot be considered predecisional. *See e.g.*, Ex. H at A8-1 (April 28, 2025 email: "For all of the functions that have been eliminated through the RIFs, do we know of other parts of the agency or other parts of government that can do this work longer term?"). Defendants cannot plausibly explain why these late-created documents are protected by deliberative process privilege. *Texaco P.R., Inc.*, 60 F.3d at 884 (documents that are "predecisional" are "antecedent to the adoption of agency policy.").

Second, Defendants invoke the privilege to withhold purely informational documents that could not be described as "deliberative." *Cobell v. Norton*, 213 F.R.D. 1, 6 (D.D.C. 2003) (factual summaries prepared for informational purposes should be disclosed, and "must be disclosed," if severable from information protected under privilege). The MSPB Record shows that such materials exist and were omitted from the AR. *See, e.g.,* Ex. G, 264–316 of 354 (email to Thomas Nagy from Michelle Arcara, dated April 21, 2025, attaching "FDA Master Retention Register"); *id.* at 157 (March 17, 2025, email from Rachel Riley to Sara Brenner attaching summaries of every FDA "office and FTE count in your division"). Defendants are impermissibly withholding relevant evidence by their blanket assertion of deliberative process privilege.

Third, and beyond the two deliberative process criteria, Defendants maintain that *public* documents remain subject to deliberative process privilege and should be excluded from the AR. Ex. D, 2 (citing *Heffernan v. Azar*, 317 F. Supp. 3d 94, 120 (D.D.C. 2018). But Defendants' own

cited case undermines their position; *Heffernan* held that deliberative process privilege is waived when produced documents are disclosed to "unnecessary third parties." 317 F. Supp. 3d at 120. It is self-evident that the MSPB Record has been disclosed to Plaintiff States (an "unnecessary third party" to the MSPB proceeding) and that the MSPB Record is full of relevant information which belongs in the AR. *Cf. id.* (plaintiff offered only conjecture that reports withheld for deliberative process privilege addressed relevant topics). If ever there were grounds to decline the qualified deliberative process privilege, then it would be when relevant documents are public and already before the court.

With all their arguments addressed, this Court should order Defendants to search custodians identified by public documents and require Defendants to produce a privilege log. Individuals identified in the following three public sources are likely to have relevant documents: The MSPB Record, wherein HHS identified eleven "Individuals Who Made Decisions or Provided Input on the RIF," *see* Ex. G, 35–41 of 354; the HHS Deposition Transcript in which HHS testified that eleven individuals were "DOGE Team Affiliates" to HHS, *see* Ex. I, 11:21–12:9; and the Houry Emails which included nine CDC employees who considered and identified multiple factors as they sought to maintain CDC's functionality after April 1, 2025. These individuals have been identified in Requests for Production 5–7, *see* Ex. A, and a tailored set of "Defined Search Terms" designed to lead to the collection of relevant documents are also provided. *See id.* at 2.

Defendants should also be ordered to produce a privilege log. There is a "growing consensus among district courts . . . [t]hat agencies must submit a log if they withhold privileged materials from an AR." *Save the Colo. v. Spellman*, No. 18-cv-03258-CMA, 2023 WL 2402923, at *4 (D. Colo. Mar. 7, 2023) (collecting cases). Even the case law cited by Defendants supports that trend. Ex. D, 3 (citing *Mayorkas*, 2024 WL 5198705, at *11 (declining to order production of

a privilege log for failure to show "bad faith or improper behavior"); *but see Mayorkas*, 2024 WL 5198705, at *9 (citing precedent from the Second and Fourth Circuits ordering production of a log without such a finding). Further, the court in *Mayorkas* based its decision not to require a privilege log on Defendants' action "cur[ing]" the omission once raised, which is not the case here. *Id.* at *11.

Records produced by HHS in the MSPB Record, the Houry Emails, deposition testimony submitted by HHS in separate litigations, and the thinness of the AR itself, all show the AR is incomplete. Based on the same factors, and Defendants' refusal to correct the deficiencies when raised outside of court, this Court should order Defendants complete the record by responding to Requests for Production Nos. 1–11, s*ee* Ex. A, and Interrogatories Nos. 1–5, *see* Ex. B, and where withholding documents for privilege, filing a privilege log that would allow the Court to balance the relevant interests and evaluate the invocation of privilege where necessary.

## II. The Court Should Order Supplementation of the AR to Aid in the Court's Review.

The AR also lacks documents supporting the Department's stated reasons for implementing the March 27 Communiqué; nothing in the AR explains why the RIFs and reorganization would achieve the goals Defendants have claimed. This Court should order Defendants to supplement the AR and provide documents regarding the various explanations given for their action by responding to Requests for Production Nos. 12–18, *see* Ex. A, and Interrogatories Nos. 6–9, *see* Ex. B.

The First Circuit permits supplementation of the AR to facilitate a court's "comprehension of the record or the agency's decision," where there is a "failure to explain administrative action as to frustrate effective judicial review." *City of Taunton*, 895 F.3d at 127 (*quoting Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)), or where "there is a strong showing of bad faith or improper behavior." *Housatonic River Initiative*, 75 F.4th at 278–79 (citation modified). "[W]hen the agency

action cannot be adequately explained in the record it compiled, the court's consideration of evidence outside the agency's administrative record is not only warranted, but necessary to a meaningful judicial review of the agency's action." *Tummino v. Hamburg*, 936 F. Supp. 2d 162, 196 (E.D.N.Y. 2013); *see also McMahon*, No. 25-10601-MJJ, 2026 WL 622484, at *5 (D. Mass. Feb. 11, 2026) (supplementation permitted "where the agency has failed to explain the reasoning behind their decision"); *see also Authors Guild v. Nat'l Endowment for the Humans.*, No. 25-cv-3657, 2025 WL 3678097, at *6 (S.D.N.Y. Dec. 18, 2025) (An AR that fails to disclose "the contemporaneous reasoning and materials on which the agency relied in reaching [the challenged decision] is insufficient to permit meaningful judicial review.") (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943)).

Here, the AR lacks documents to evaluate Defendants' given reasons for the challenged action which would frustrate any judicial review on this record. Defendants announced that the March 27 Communiqué would "save taxpayers $1.8 billion per year"; would "streamline the functions of the Department"; would make HHS "more responsive and more efficieint"; would "improve America's experience with HHS by making the agency more responsive and efficient, while ensuring that Medicare, Medicaid, and other essential services remain intact"; and would support the "new HHS priority of ending America's epidemic of chronic illness by focusing on safe, wholesome food, clean water, and the elimination of environmental toxins." ECF No. 1-1 at 1–2. The AR that has been produced is silent on these forecasts and must be supplemented.

Further, the current AR is so lacking that is it not assistive in evaluating essential elements of Plaintiffs' claims. Plaintiffs showed a substantial likelihood at the PI stage, and plausibly alleged at the Motion-to-Dismiss stage, that the March 27 Communiqué was arbitrary and capricious. ECF No. 113 at 14–15; ECF No. 73 at 37–41. Yet the AR offers no grounds upon which the Court may

base meaningful judicial review of Plaintiffs' claims. *Authors Guild*, 2025 WL 3678097, at *6. The AR is silent as to whether Defendants relied on factors which Congress intended HHS *not* to consider when implementing the March 27 Communiqué which shuttered subagencies and reassigned statutorily mandated duties; whether Defendants failed to consider an important aspect of the problem they were trying to solve with the Communiqué; or whether Defendants offered an explanation for the March 27 Communiqué that either runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *See State Farm*, 463 U.S. at 43. The same is true for the contrary to law claim; no court could look at this AR and determine whether Defendants could still comply with the many at-issue statutes or their own regulations after implementing the March 27 Communiqué regardless of the claim that the March 27 Communiqué would "preserve [HHS subagencies'] core functions." ECF No. 94 ¶ 69. The AR must be supplemeneted to allow effective judicial review.

## III. The Court Should Order Extra-Record Discovery to Determine the True Reasoning Behind Defendants' Actions.

Beyond completion and supplementation of the record, additional documents and different forms of extra-record discovery are appropriate where there is "a significant mismatch between the decision the Secretary made and the rationale he provided," *Biden v. Texas*, 597 U.S. 785, 811–12 (2022) (*citing Dep't of Com.*, 588 U.S. at 783). Given the conflict between Defendants' given justifications for the Communiqué, and the Communiqué's characteristics and effects, Plaintiffs request that the Court order the Defendants to submit to extra-record discovery and explain the mismatch.

Courts may infer improper behavior or bad faith, and thus allow extra-record discovery, where there is evidence that an agency's explanation for its decision is pretextual. *Dep't of Com.*,

588 U.S. at 783 ("[T]his evidence established that the Secretary had made up his mind to reinstate a citizenship question 'well before' [the ostensible reason for doing so occurred], and did so for reasons unknown but unrelated to the [stated reasoning].") (citation modified).

Here, Defendants' claims that the March 27 Communiqué will lead to many benefits while preserving "core functions"is orthoganol to Defendants' action to gut certain subagencies which were the only subagencies performaing statutorily mandated work. For examples, the CDC's Division of Reproductive Health supervised many unique projects including the Pregnancy Risk Assessment Monitoring System, *see* ECF No. 94 ¶¶ 166–69, and the Office on Smoking and Health was the lead federal agency for comprehensive tobacco prevention and control. *Id.* ¶ 172. The March 27 Communiqué eliminated those subagencies completely. *Id.* ¶ 181; *see also id.* ¶ 104 (CDC laboratories), ¶¶ 138–43 (National Institute for Occupational Health and Safety); ¶¶ 207–09 (Division for Viral Hepatitis); ¶¶ 266–68 (Center for Tobacco Products); ¶ 305 (the Office of Treatment Services); ¶ 317 (Office of the Assistant Secretary for Planning and Evaluation).

These targeted subagencies' mandatory work has not been made more efficient with fewer hands, or reassigned elsewhere in the Department, or assigned out to contractors at a lower cost—at least, the AR does not show that—and this Court need not merely take Defendants at their word. *See Dep't of Com.*, 588 U.S. at 785 ("[W]e cannot ignore the disconnect between the decision made and the explanation given"). This Court should order extra-record discovery to uncover facts upon which to base its determination whether Defendants' given reason for the March 27 Communiqué was pretextual and order Defendants respond to Requests for Production Nos. 19–24. Ex. A.

## IV. Plaintiffs are Further Entitled to Discovery on their Constitutional and *Ultra Vires* Claims.

As additional grounds to support Plaintiffs' need for discovery, Plaintiffs should also be permitted to seek discovery on their consitutional and *ultra vires* claims. Plaintiffs' constitutional claims plausibly allege that the March 27 Communiqué violated explicit statutory mandates, prevent the Department from spending funds appropriated by Congress, and incapacitate the Department's agencies which were created at the direction of Congress. *See* ECF No. 113 at 13; *see also* ECF No. 94 ¶ 335. Courts have permitted discovery outside the administrative record for "independent constitutional claims for which the record of the agency's decision making would not comprehensively address." *United Farm Workers v. Noem*, No. 1:25-cv-00246-JLT-CDB, 2025 WL 1490131, at *7 (E.D. Cal. May 23, 2025). The AR produced by Defendants is not an adequate evidentiary record for resolving these claims. Therefore, as additional and alternative grounds, the Court should order all of the requested discovery to facilitate judicial review of Plaintiffs' constitutional and *ultra vires* claims.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Discovery and require Defendants to respond to the Requests for Production and Interrogatories attached to this motion, as well as produce a privilege log.

Dated: September 11, 2026

Respectfully Submitted,

**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ Spencer W. Coates*
Spencer W. Coates
Kelsey E. Endres
*Assistant Attorneys General*
Cynthia Alexander
William McGinty

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Molly Thomas-Jensen*
Molly Thomas-Jensen
Jessica Ranucci
*Special Counsel*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*

*Deputy Solicitors General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
spencer.coates@atg.wa.gov
kelsey.endres@atg.wa.gov
cynthia.alexander@atg.wa.gov
william.mcginty@atg.wa.gov

*Counsel for the State of Washington*

Andres Ivan Navedo
Molly Brachfeld
*Assistant Attorneys General*
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
molly.thomas-jensen@ag.ny.gov
jessica.ranucci@ag.ny.gov
ivan.navedo@ag.ny.gov
molly.brachfeld@ag.ny.gov

*Counsel for the State of New York*

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

*By: /s/ Dorothea Calvano Young*
Dorothea Calvano Young
(RI Bar No. 6661)
*Special Assistant Attorney General*
Kathryn M. Sabatini (RI Bar No. 8486)
*Chief, Civil Division*
Sarah W. Rice (RI Bar No. 10465)
*Deputy Chief, Public Protection Bureau*
Chandana Pandurangi (RI Bar No. 10922)
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
ksabatini@riag.ri.gov
srice@riag.ri.gov
dyoung@riag.ri.gov
cpandurangi@riag.ri.gov

*Counsel for the State of Rhode Island*

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: /s/ *Alexa G. Salas*
Alexa G. Salas
*Assistant Attorney General*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Alexa.Salas@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**ROB BONTA**
Attorney General for the State of California

By: /s/ Crystal Adams
Crystal Adams
*Deputy Attorney General*

**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*

Michael L. Newman
Neli Palma
*Senior Assistant Attorneys General*
Kathleen Boergers
Virginia Corrigan
Srividya Panchalam
*Supervising Deputy Attorneys General*
Jesse Basbaum
Jeanelly Orozco Alcala
*Deputy Attorneys General*
1515 Clay Street
Oakland, CA 94612-1499
(510) 879-3428
Crystal.Adams@doj.ca.gov
Michael.Newman@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Virginia.Corrigan@doj.ca.gov
Srividya.Panchalam@doj.ca.gov
Jesse.Basbaum@doj.ca.gov
Jeanelly.OrozcoAlcala@doj.ca.gov

*Counsel for the State of California*

1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General of the State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: /s/ *Vanessa L. Kassab*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Andrew C. Mendrala*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day

Andrew C. Mendrala
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.mendrala@dc.gov

*Counsel for the District of Columbia*

Special Assistant to the Attorney General
Kaliko'onālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawai'i*

**KWAME RAOUL**
Attorney General of the State of Illinois

Jane Elinor Notz
*Solicitor General*

By: */s/ Alex Hemmer*
Alex Hemmer
Deputy Solicitor General
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
312-814-3000
alex.hemmer@ilag.gov

*Counsel for the State of Illinois*

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Margaret Machaiek*
Margaret Machaiek
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
August, ME 04333-0006
Tel.: 207-626-8800
Fax: 207-287-3145
margaret.machaiek@maine.gov

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Michael Drezner*
Michael Drezner
*Senior Assistant Attorney General*
Federal Accountability Unit
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6959
mdrezner@oag.state.md.us

*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
HaidarD1@michigan.gov

*Counsel for the People of the State of Michigan*

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: /s/ Lindsey E. Middlecamp
Lindsey E. Middlecamp
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: /s/ Justine M. Longa
Justine M. Longa
Jessica L. Palmer
*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-4527
Justine.Longa@law.njoag.gov
Jessica.Palmer@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

By: /s/ Anjana Samant
Anjana Samant
Impact Litigation Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
acarrete@nmdoj.gov

*Counsel for the State of New Mexico*

**DAN RAYFIELD**
Attorney General of the State of Oregon

By: /s/ Elleanor H. Chin
Elleanor H. Chin
*Senior Assistant Attorney General*
100 Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
elleanor.chin@doj.oregon.gov

*Counsel for the State of Oregon*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: /s/ Ryan P. Kane
Ryan P. Kane
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

*Counsel for the State of Vermont*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: /s/ Charlotte Gibson
Charlotte Gibson
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 (phone)
(608) 294-2907 (Fax)
Charlie.Gibson@wisdoj.gov

*Counsel for the State of Wisconsin*